**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

BLUEGREEN VACATIONS UNLIMITED, INC., a Florida corporation; and BLUEGREEN VACATIONS CORPORATION, a Florida corporation,

       Plaintiffs,

v.

TIMESHARE LAWYERS P.A. d/b/a FEDERAL FINANCIAL LAW GROUP, a Florida corporation; CARLSBAD LAW GROUP, LLP, a California limited liability partnership; GALLAGHER-CLIFTON, LLC, a Florida limited liability company; MG&N GROUP LLC d/b/a NATIONAL CREDIT REHAB, a Florida limited liability company; YUGE INTERNET MARKETING, LLC, a Florida limited liability company; BIGLY INTERNET MARKETING, LLC, a Florida limited liability company; PANDORA MARKETING, LLC d/b/a TIMESHARE COMPLIANCE, a Wyoming limited liability company; VCF ENTERPRISES, LLC, a Nevada limited liability company; RICH FOLK, an individual and resident of the State of California; WILLIAM WILSON a/k/a Bo Wilson, an individual and resident of the State of California; JL 'SEAN' SLATTERY, an individual and resident of the State of California; PAUL STEWART, an individual and resident of the State of Florida; ANGELA CONSALVO, an individual and resident of the State of Florida; PADDY DEIGHAN, an individual and resident of the State of Nevada; and PATRICK THOMPSON, an individual and resident of the State of Florida, and DAVID J. CRADER, an individual and resident of the State of Florida,

       Defendants.

Case No.:

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiffs, BLUEGREEN VACATIONS UNLIMITED, INC. ("BVU"), and BLUEGREEN VACATIONS CORPORATION ("BVC") (together, "Plaintiffs" or "Bluegreen"), hereby sue Defendants, TIMESHARE LAWYERS P.A. d/b/a FEDERAL FINANCIAL LAW GROUP, a Florida corporation ("Timeshare Lawyers"); CARLSBAD LAW GROUP, LLP, a California limited liability partnership ("Carlsbad Law"); GALLAGHER-CLIFTON, LLC, a Florida limited liability company ("Gallagher-Clifton"); MG&N GROUP LLC d/b/a NATIONAL CREDIT REHAB, a Florida limited liability company ("NCR"); YUGE INTERNET MARKETING, LLC, a Florida limited liability company ("Yuge"); BIGLY INTERNET MARKETING, LLC, a Florida limited liability company ("Bigly"); PANDORA MARKETING, LLC d/b/a TIMESHARE COMPLIANCE, a Wyoming limited liability company ("TSC"); VCF ENTERPRISES, LLC, a Nevada limited liability company ("VCF"); RICH FOLK, an individual and resident of California ("Folk"); WILLIAM WILSON a/k/a Bo Wilson, an individual and resident of California ("Wilson"); JL 'SEAN' SLATTERY, an individual and resident of California ("Slattery"); PATRICK THOMPSON, an individual and resident of Florida ("Thompson"); PADDY DEIGHAN, an individual and resident of Nevada ("Deighan"); PAUL STEWART, an individual and resident of Florida ("Stewart"); ANGELA CONSALVO, an individual and resident of Florida ("Consalvo"); and DAVID J. CRADER, an individual and resident of Florida ("Crader"), and state:

## I.    INTRODUCTION

1.    TSC, VCF, Folk and Wilson (the "Marketing Defendants") utilize a variety of advertising designed to target and solicit Bluegreen owners under the false premise that the Marketing Defendants have a legitimate process to release or "exit" Bluegreen owners from their timeshare interest.

2.      In reality, the Marketing Defendants have no such legitimate process.  Instead, the Marketing Defendants induce timeshare owners, including Bluegreen owners, to breach their timeshare contracts through nonpayment, resulting in the loss of their timeshare ownership due to default.

3.      From the initial sales pitch, the Marketing Defendants sell their illusory service to Bluegreen owners under the false pretense that their "process" permits the Bluegreen owner to legally and permanently stop payments as soon as they sign up for the Marketing Defendants' services.

4.      As an element of their advertising and during sales calls, the Marketing Defendants lead the Bluegreen owner to the conclusion that they can safely stop payments to Bluegreen, and use those same funds to instead pay the Marketing Defendants.

5.      The Marketing Defendants mischaracterize their "service" in advertisements to further provide the false impression that the Marketing Defendants' services constitute legal representation.

6.      However, the Marketing Defendants do not perform any actual services themselves.

7.      The Marketing Defendants operation actually consists of employees and independent contractors who perform marketing and sales.

8.      By example, on TSC's website, the Marketing Defendants' describe their company as an "advocacy group" helping "clients."



Stressing About Your TIMESHARE?
We are a full-service advocacy group helping clients like you legally and successfully exit timeshare contracts.

http://www.timesharecompliance.com. A current version of TSC's Website is attached hereto as Exhibit "2".

9.      However, TSC is not a law firm, and none of the Marketing Defendants can lawfully serve as the legal representative of any Bluegreen owner.

10.      In order to give a sense of legitimacy, the Marketing Defendants mischaracterize the salespeople who are tasked with closing deals with potential timeshare owner leads, describing each of them as a "Case Analyst."

11.      In truth, these Case Analysts are nothing more than sales closers hired to extract money from unsuspecting consumers, including Bluegreen owners.

12.      The Marketing Defendants use a variety of legal jargon throughout their advertisements in order to falsely characterize their service as constituting legal representation, including terms such as: "case", "advocate", "case representative", and "legal experts."

13.      The Marketing Defendants' legal references are misleading and deceptive as their organization is nothing more than a sales apparatus, but their use of these terms is designed to increase the perceived value of the illusory services they offer.

14.      In fact, the Marketing Defendants characterization of its entire "team" misleads timeshare owners into believing that the Marketing Defendants themselves actually provide some valuable service, when in fact they do not.

15.      By example, the below description of the Marketing Defendants' "dream team", in reality, describes nothing more than commissioned sales people and administrative staff that collect the exorbitant fees.



https://timesharecompliance.com/how-we-work/ (September 24, 2020).

16.    The amounts charged by the Marketing Defendants are arbitrary, based on the amount the salesperson believes they can convince the timeshare owner to pay, and not based on any actual work to be performed.

17.    In furtherance of their sales efforts, the Marketing Defendants have conspired with others and developed relationships with outside marketing partners, law firms and credit repair companies, who have agreed to contribute to key aspects of the scheme. A chart detailing the interrelationship of the various Defendants is attached hereto as Exhibit "1".

18.    One such marketing partner is Crader, who owns Yuge and Bigly, based in Tampa, Florida.

19.    Crader is responsible for publishing the content found on the website https://www.timeshareexitcompanies.com ("Ratings Website").

20.    The Ratings Website purports to neutrally "review" various timeshare exit companies, but is actually an affiliate marketing scheme intended to advertise the services of TSC.

21.    The Marketing Defendants have contracted with Crader, Yuge, and Bigly to advertise the Marketing Defendants' services on the Ratings Website.

22.     Crader, Yuge, and Bigly are compensated for directing timeshare owners to the Marketing Defendants.

23.     The Marketing Defendants have worked with Crader to pitch the Marketing Defendants' services to timeshare owners who visit the Ratings Website.

24.     In fact, Crader, Yuge, and Bigly have actively solicited timeshare owners on behalf of the Marketing Defendants, including via a live chat feature and telephone number advertised on the Ratings Website.

25.     By example, timeshare owners who visit the Ratings Website are prompted to engage in a live chat:



26.     The telephone number and live chat feature on the Ratings Website allows Crader to live transfer timeshare owner leads to the Marketing Defendants.

27.     The Marketing Defendants solicit Bluegreen owners, and justify the exorbitant fees they charge, by falsely claiming that their service will provide them with the services of an attorney.

28.     In reality, the Marketing Defendants do not intend for the Bluegreen owner to ever meet with an attorney. The Marketing Defendants collect their upfront fee before an attorney is even aware of the identity of the timeshare owner.

29.     Timeshare Lawyers, based in Kissimmee, Florida, Gallagher-Clifton, based in Destin, Florida, and Carlsbad Law, located in California, and their respective principals, Thompson, Deighan, Stewart, and Slattery (collectively, the "Lawyer Defendants"), have all agreed to accept a small flat fee in exchange for accepting the Marketing Defendants customers.

30.     Despite Thompson, Deighan, and Slattery being licensed to practice law in select states, they purport to represent Bluegreen owners located across the country.

31.     By working with the Marketing Defendants, the Lawyer Defendants have attempted to circumvent prohibitions on direct solicitation and fee sharing which govern the practice of law.

32.     In return for a flat fee of several hundred dollars, the Lawyer Defendants are expected to do nothing more than lend their name and signature to a form letter sent to Bluegreen.

33.     This form letter is designed to cut off any communication between Bluegreen and the Bluegreen timeshare owners, and constitutes the entirety of any "service" the Lawyer Defendants perform.

34.     The Marketing Defendants use of Stewart and Gallagher-Clifton only further evidences the fact that the Lawyer Defendants do not perform any meaningful legal services, as Stewart is not a licensed lawyer and Gallagher-Clifton (despite sending legal form letters to Bluegreen) is not even an actual law firm.

35.     In other words, the Marketing Defendants have utilized a fake law firm in Florida, operated by a non-lawyer, who submitted correspondence to Bluegreen falsely claiming to be the legal representative of Bluegreen owners.

36.     By attempting to cut off communication, the Marketing Defendants and Lawyer Defendants intent is to facilitate and encourage the owner's non-payment, as the owner may no longer receive notifications of their delinquency.

37.     The submission of the form letter also serves as a false validation of the illusory service, providing the impression that monies paid to the Marketing Defendants and the Lawyer Defendants has resulted in some legal action having taken place on their behalf.

38.     Subsequent to referral of the Bluegreen Owners to the Lawyer Defendants, it is not the Lawyer Defendants' practice to provide any subsequent litigation services to such Bluegreen owners. Nor would engagement for such litigation services be reasonably expected based on the amount of the fee paid to the Lawyer Defendants.

39.     As it is the intent of the scheme to cause the timeshare owner to lose their interest due to default, the Marketing Defendants have attempted to mitigate the harm they cause (and thereby perpetuate the scheme) by advertising that their service will also protect the timeshare owner's credit.

40.     By claiming that the timeshare owner's credit will be protected, the Marketing Defendants are able to further persuade the timeshare owners to immediately stop payments.

41.     Accordingly, the advertisement and use of credit repair services is critical to the overall scheme as it facilitates the Defendants' tortious interference with the Bluegreen owners' timeshare contracts.

42.     By advertising, selling, and/or performing these credit repair services, TSC constitutes a "credit repair organization" as defined under the Credit Repair Organization Act - 15 U.S.C. § 1679a.

43.     Defendant Wilson, a co-founder of TSC, selected NCR and its principal, Consalvo, based in Boynton Beach, Florida, to provide credit repair services for the Marketing Defendants customers, including Bluegreen owners.

44.     Wilson specifically trained Consalvo to engage in a dubious practice of "tradeline blocking", which attempted to manipulate Bluegreen owners' credit reports through false claims that these owners were the subject of identity theft.

45.     In so doing, Wilson directed Consalvo to file false police reports claiming identity theft, in order to use those reports to convince the credit bureaus to block future negative reporting that would result from the Marketing Defendants' instruction to Bluegreen owners to stop payments to Bluegreen.

46.     Below is an example of an email sent by a police department rejecting one such false police report:

---------- Forwarded message ----------
From: <CaSanDiegoPd@coplogic.com>
Date: Oct 25, 2016 1:42 PM
Subject: Your Online Police Report T16014258 Has Been Rejected
To: <gabyram17@gmail.com>
Cc:

We're sorry the following problem was found during review
of your submitted report T16014258:

---Your report was rejected.  This is most likely a civil situation.  Contact the Carlsbad Police
Department at 760.931.2197 for further assistance.

Thank you,

San Diego Police Department

47.     By submitting these false police reports to the credit bureaus, Wilson, Consalvo,
and their respective companies, NCR, TSC, and VCF, violated federal law. *See* 15 U.S.C. §
1679b.

48.     Further, by collecting upfront fees for this credit repair service, NCR and TSC
violated federal law. *See* 15 U.S.C. § 1679b.

49.     Consalvo and her company, NCR, were able to submit these false police reports
without the knowledge of timeshare owners as Consalvo utilized information (such as copies of
drivers licenses, social security cards, and utility bills) that was provided to the Marketing
Defendants (at the Marketing Defendants' instruction).

50.     Wilson and Folk specifically hired staff at TSC to act as a "coordinator", tasked
with obtaining the documentation necessary to engage in this dubious credit repair practice. This
position is described on TSC's website:



**Coordinator**

Walks you through the credit
restoration and monitoring
process, should you opt-in.

https://timesharecompliance.com/how-we-work/ (September 24, 2020).

51. According to a witness who previously worked with the Marketing Defendants, Consalvo forged the signature of timeshare owners on police reports using the signature found on the drivers licenses collected by the Marketing Defendants.

52. Additionally, Folk and Wilson included a specific "Block and Repair Addendum" for NCR in TSC's written agreements with timeshare owners, including Bluegreen owners, which set forth the credit repair services that would be provided.

53. Through the use of the Lawyer Defendants and the credit repair scheme described above, the Marketing Defendants falsely assure Bluegreen owners that their process will result in a legal and permanent release of any obligations associated with their timeshare interest.

54. The Marketing Defendants do not disclose to the Bluegreen owners the consequences of ceasing payments, or that their "cancellation" or "exit" will actually result in an unlawful breach of their timeshare contract due to non-payment, leading to a termination of their timeshare interests.

55. Nevertheless, after the timeshare contracts have been terminated for non-payment, the Marketing Defendants then misrepresent to these former Bluegreen owners that they were successful in "cancelling" or "exiting" their timeshare contract.

56.     Cancellation or rescission of a contract is very different in nature than a breach and termination.  But the Marketing Defendants advertise the former only to mislead Bluegreen owners into the latter.

57.     Each Bluegreen owner pays the Marketing Defendants thousands of dollars to essentially breach a timeshare contract that the Bluegreen owner could have breached on his or her own, for free.  Defendants' "cancellation" services are therefore illusory, and the Bluegreen owners often do not even realize that they have been scammed until after the damage is done. Further, the Marketing Defendants engage in the conduct described above and herein not only in their own name, but on behalf of another similar entity—Intermarketing Media, LLC d/b/a Resort Advisory Group—pursuant to a written agreement therewith.

## II.     Bluegreen's Valid Timeshare Contracts

58.     Individuals who purchase timeshare interests through Bluegreen (the "Bluegreen owners") enter into valid and binding purchase agreements, also referred to as Owner Beneficiary Agreements. If a Bluegreen Owner obtains financing for their purchase, the Bluegreen owner may also execute a promissory note (the purchase agreement and note, if applicable, are referred to herein as the "Timeshare Contracts").  Those Timeshare Contracts control the benefits and obligations of vacation ownership and the relationship between Bluegreen and the Bluegreen Owners.

59.     Defendants, who are non-parties to the Timeshare Contracts, solicit Bluegreen owners by advertising and offering the ability to legally release or "cancel" the Bluegreen Owners' from the Timeshare Contracts.

60.     However, under Florida law, the "cancellation" of a Timeshare Contract is a specific, non-waivable rescission right held by Bluegreen owners that can only be exercised

within a certain time period following the execution of a Timeshare Contract.  See Fla. Stat. § 721.10.  It is not a service that can be advertised, sold, or provided in commerce.

61.     It is inherently false and deceptive to advertise to Bluegreen owners, who are not within the applicable rescission period, that Defendants can relieve the Bluegreen owner of "all further liability regarding your timeshare contract."

62.     Below is a representative sample of such claim on TSC's website:



https://timesharecompliance.com/how-we-work/ (September 24, 2020).

## III.    PARTIES, JURISDICTION, AND VENUE

### A.    *The Plaintiffs*

63.     Plaintiff, BVC, is a Florida corporation organized with its principal place of business located at 4960 Conference Way North, Suite 100, Boca Raton, FL 33431.

64.     Plaintiff, BVU, is a Florida corporation with its principal place of business located at 4960 Conference Way North, Suite 100, Boca Raton, FL 33431.  BVU is a wholly owned subsidiary of BVC.

### B.    *The Defendants*

65.     Timeshare Lawyers is a Florida limited liability company, with its principal address located at 201 Hilda Street, Suite 23, Kissimmee, Florida 34741, and its registered agent, Patrick J. Thompson, located at 15192 Harrington Cove Drive, Orlando, Florida 32819.

66.     Gallagher-Clifton is a Florida limited liability company, with its principal address located at 4641 Gulfstarr Drive, Suite 102, Destin, Florida 32541, and its registered agent, William P. Stewart, Jr., located at 122 Seascape Drive, Unit 1607, Miramar Beach, Florida 32550.

67.     Carlsbad Law is the successor entity to a merger between two other entities controlled by Defendant Slattery: Slattery, Sobel & Decamp, LLP and Del Mar Law Group, LLP.

68.     Carlsbad Law is a limited liability partnership organized and existing under the laws of the State of California with a principal address at 5050 Avenida Encinas, Suite 300, Carlsbad, California 92008.

69.     Slattery is an individual, citizen of the State of California, a member of the California Bar, and may be found at 5050 Avenida Encinas, Suite 300, Carlsbad, California 92008. Slattery controls the actions of Carlsbad Law and is its managing partner.

70.     NCR is a Florida limited liability company, with its principal address at 9588 Cobblestone Creek Drive, Boynton Beach, Florida, and its registered agent, Michael Consalvo, located at 9502 Sun Pointe Drive, Boynton Beach, Florida 33437.

71.     Yuge is a Florida limited liability company, with its principal address at 214 S Cedar Ave., Apt. #3, Tampa, Florida 33606.

72.     Bigly is a Florida limited liability company, with its principal address at 214 S Cedar Ave., Apt. #3, Tampa, Florida 33606.

73.     Crader is an individual and resident of Florida, believed to reside at  214 S Cedar Ave., Apt. #3, Tampa, Florida 33606.

74.     TSC is a limited liability company organized and existing under the laws of the State of Wyoming.  TSC's principal address is located at 26970 Aliso Viejo Parkway, Suite 150, Aliso Viejo, California 92656.

75.     VCF is a limited liability company organized and existing under the laws of the State of Nevada. VCF's registered agent, United States Corporation Agents, Inc., is located at 500 N. Rainbow Boulevard, Suite 300 A, Las Vegas, Nevada 89107.

76.     Folk is an individual and resident of the State of California and may be found at 26970 Aliso Viejo Parkway, Suite 150, Aliso Viejo, California 92656.

77.     Wilson is an individual and resident of the State of California and may be found at 26970 Aliso Viejo Parkway, Suite 150, Aliso Viejo, California 92656.

78.     Thompson is an individual and resident of the State of Florida and may be located at 15192 Harrington Cove Drive, Orlando, Florida 32819.

79.     Deighan is an individual and resident of the State of Nevada and may be located at 2000 N Fashion Show Drive, Suite 2222, Las Vegas, Nevada 89109.

80.     Stewart is an individual and resident of the State of Florida and may be located at 122 Seascape Drive, Unit 1607, Miramar Beach, Florida 32550.

81.     Consalvo is an individual and resident of the State of Florida and may be located at 9588 Cobblestone Creek Drive, Boynton Beach, Florida 33472.

*C.*     ***Subject Matter Jurisdiction***

82.     This Court has subject matter jurisdiction over the claims sounding in the Lanham Act alleged herein pursuant to 28 U.S.C. §§ 1331 and 1338.  This Court has subject matter jurisdiction over the claims sounding in state law alleged herein pursuant to 28 U.S.C. § 1367 as the state law claims are so related to the Lanham Act claims that they form part of the same case or controversy.

D.      ***Personal Jurisdiction***

83.     This Court has personal jurisdiction over the Defendants for the following reasons:

    a.  As to Timeshare Lawyers, Gallagher-Clifton, Yuge, Bigly, and NCR, because they are all limited liability companies organized and existing under the laws of the State of Florida and actually operating in the State of Florida;

    b.  As to Thompson, Stewart, Crader, and Consalvo, because they are residents of the State of Florida;

    c.  As to TSC, VCF, Folk and Wilson, because they have conspired with the other Florida-based Defendants to execute its scheme and, as part of this conspiracy, have utilized a Florida-based marketing partner (Crader, Yuge, Bigly), and have actually forwarded unsuspecting Bluegreen owners to Timeshare Lawyers, Gallagher-Clifton, and NCR, all located in Florida, and therefore have systemic contacts with the State of Florida;

    d.  Further, as to TSC, VCF, Folk and Wilson, this Court also has personal jurisdiction pursuant to Florida Statute §48.193 as these Defendants have engaged in the following acts:

        i.  Folk and Wilson intentionally engaged in a business venture in Florida whereby they personally orchestrated a strategy to target Florida residents, including Bluegreen owners located in Florida, and thereafter directed employees and independent contractors associated with TSC to directly solicit Bluegreen owners located in Florida through in-person sales presentations in Florida;

      ii.   TSC, VCF, Folk and Wilson established an office in Fort Lauderdale, Florida, and utilized this office to market their services, the supposed expertise of Folk and Wilson, individually, and the services of VCF and TSC to outside lead generators and Bluegreen owners;

     iii.   Employees or independent contractors of TSC operated and resided in the State of Florida, and directly solicited Bluegreen owners located in Florida;

     iv.   TSC, VCF, Folk and Wilson committed a tortious act within Florida by tortiously interfering with Bluegreen contracts relating to real property located in Florida and with Bluegreen customers located in Florida, and by falsely advertising to Bluegreen owners located in Florida; and because

      v.   TSC, VCF, Folk and Wilson's actions caused economic losses to Bluegreen, which is located in Florida.

e.   As to Carlsbad Law and Slattery, because they purport to represent Bluegreen owners located in Florida, have contracted with Bluegreen owners located in Florida, committed a tortious act in Florida, have conspired with the Marketing Defendants to falsely solicit Bluegreen owners and other consumers located in Florida, have transmitted spurious form letters to Bluegreen located in Florida, have caused losses to Bluegreen located in Florida, and have otherwise engaged in substantial and not isolated activity within Florida;

f.   As to both the Marketing Defendants and the Lawyer Defendants, because they have caused false demand letters to be directed to Bluegreen in the State of Florida and interfered with Bluegreen's business in the State of Florida, all of

which involves the repeated use of the wires and mails to transmit correspondence and other items into the State of Florida;

g.   As to Wilson, TSC, VCF, Folk, NCR, and Consalvo, because they conspired to operate the "tradeline blocking" scheme through NCR, located in Florida, and utilized such scheme to accomplish the tortious interference with the Timeshare Contracts, and which further harmed Bluegreen by preventing Bluegreen from engaging in proper credit reporting practices; and

h.   Further, as to all Defendants, because their actions are directed at consumers across the country, including consumers in the state of Florida.  They operate or contribute to websites that are freely accessible from Florida and target consumers in the State of Florida, which involves, *inter* alia, the repeated transmission of files over the Internet in, to, and out of the State of Florida, because they have each committed tortious acts in Florida, and because at least some of the Timeshare Contracts and Bluegreen owners at issue in this civil action were entered into in Florida or with residents of Florida.

E.   ***Venue***

84.   Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §1391 because, as described herein, a substantial part of the events giving rise to Plaintiffs' claims occurred in Florida, the Defendants ultimately harm the consuming public and Bluegreen in Florida, Bluegreen's principal place of business and home venue is the Southern District of Florida, and Defendants' conduct giving rise to the claims set forth herein occurred in this District.

F.      **_Conditions Precedent_**

85.     All conditions precedent to the bringing and maintenance of this action have been performed, were waived, would be futile if attempted, or have otherwise been satisfied or occurred.

## IV.     SPECIFIC FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

A.      **False Advertising on the "Ratings Website"**

86.     The Defendants advertise to Bluegreen owners through a variety of formats, including TV, radio, internet ads, websites, and direct solicitation via cold-calling.

87.     With respect to internet marketing, TSC has partnered with Yuge, Bigly, and Crader, all located in Tampa, Florida, to solicit Bluegreen owners via a website which falsely claims to neutrally rate various timeshare exit companies: www.timeshareexitcompanies.com (the "Ratings Website").

88.     The Ratings Website is designed to appear as if it is an independent "consumer advocacy" website providing information and resources to the consuming public:



(https://www.timeshareexitcompanies.com/about-us/, last accessed September 24, 2020)

## Timeshare Compliance Review

📅 July 27, 2020

| Facebook | Twitter | Email |
|---|---|---|

Español

Timeshare Compliance is a trustworthy timeshare exit company that may be able to cancel your timeshare even if you still owe a mortgage. The company has been in business since 2012 and is based out of Irvine, California.

When reviewing the company's website, the main thing that immediately stands out to us is the Escrow payment option. Using an Escrow service to cancel your timeshare is the smartest thing you can do because the timeshare exit company does not get paid in full until after the timeshare has been cancelled. Learn more about 100% money-back vs no up-front escrow here.

**Timeshare Compliance gets a +1 from us for offering an escrow option.**



TimeshareExitCompanies.com guarantees your satisfaction if you choose to work with Timeshare Compliance. If you're not satisfied after 365 days and use escrow, let us know and we'll give you $1,000. Yes, it's really that simple. Learn More

(https://www.timeshareexitcompanies.com/timeshare-compliance-review/          last          accessed September 24, 2020).

89.     TSC engages with Crader to develop and create the TSC-related content contained on the Ratings Website.

90.     The statements contained on the Ratings Website regarding TSC are false and deceptive.

91.     By example, the supposed "escrow option" advertised on the Ratings Website and offered by TSC is misleading, as TSC's "escrow option" requires an upfront nonrefundable fee.

92.     Further, in order to utilize TSC's supposed "escrow option", the consumer is required to actually pay a higher overall fee than consumers who decline the "escrow option".

93.     These premiums are substantial in order to discourage consumers from actually utilizing the "escrow option."  Thus, the Ratings Websites promotion of the "escrow option" is

misleading as the Marketing Defendants have made the option so expensive as to deter anyone from using those options.  This is not disclosed to consumers until late in the sales process, a tactic that is commonly referred to as a "bait-and-switch".

94.     Very few of TSC's customers actually elect the "escrow option."

95.     Crader, Yuge, and Bigly are aware that the "escrow option" is a false choice, and therefore claim to offer their own money-back guarantee, only to make that guarantee contingent on the timeshare owner having elected the escrow option.

96.     The Ratings Website purports to offer a $1,000 satisfaction guarantee if the timeshare owner chooses TSC, is not satisfied after 365 days, *and* chooses to use the "escrow option".

97.     The satisfaction guarantee is itself illusory, as the fine print describing the eligibility indicates that the consumer is only eligible for the $1,000 guarantee if, after 365 days, TSC fails to return the escrowed money.



TimeshareExitCompanies.com guarantees your satisfaction if you choose to work with Timeshare Compliance. If you're not satisfied after 365 days and use escrow, let us know and we'll give you $1,000. Yes, it's really that simple. Learn More

(https://www.timeshareexitcompanies.com/timeshare-compliance-review/    last    accessed
September 24, 2020).

98.    Additionally, the Ratings Website states that its goal is "to help timeshare owners
find a reputable timeshare exit company to work with":

**OUR GOAL**

Our goal is to help timeshare owners find a reputable timeshare exit company to work with.
We like to recommend timeshare exit companies that offer a no up front fee escrow
payment option, so you are protected from scams. Contact us to receive a free timeshare
exit consultation.

99.    This advertisement is false and/or misleading because the goal of the website is
not to "help timeshare owners find a reputable timeshare exit company to work with", the goal of
the website is to drive consumers, including Bluegreen owners, to TSC.

100.    The Ratings Website lists 'Timeshare Compliance' – which is TSC – as a
'recommended company'.

101.    Thus, the Marketing Defendants have established a lead generation relationship
with Crader, who operates the Ratings Website on behalf of the Marketing Defendants.  The
Ratings Website is false and/or misleading because it is designed to give the appearance of being
somewhat independent when they are, in fact, controlled by the Marketing Defendants and
designed to recommend TSC.

102.    The Ratings Website, as well as TSC's other webpages and advertisements, have
advertised TSC as having "been in business since 2012".  This is false and/or misleading
because, while the limited liability company may have been formed in 2012, it was not "in
business" until at least 2016.

103.    Pandora Marketing, LLC is what is commonly known as a "shelf" company, a company that is formed and then "put on the shelf" to allow it to "age".  The purpose of this practice is to make companies appear older – and thus more capable and trustworthy – than they actually are:

> Wyoming Corporate Services will help clients create a company, and more: set up a bank account for it; add a lawyer as a corporate director to invoke attorney-client privilege; even appoint stand-in directors and officers as high as CEO. Among its offerings is a variety of shell known as a "shelf" company, which comes with years of regulatory filings behind it, lending a greater feeling of solidity.
>
> "A corporation is a legal person created by state statute that can be used as a fall guy, a servant, a good friend or a decoy," the company's website boasts. "A person you control... yet cannot be held accountable for its actions. Imagine the possibilities!"

*Special Report – A little house of secrets on the Great Plains: SHELL GAMES: A Reuters Investigation*, Reuters News Service, available at https://www.reuters.com/article/oukwd-uk-usa-shell-companies-idAFTRE75R22L20110628 (last accessed September 24, 2020).

104.    TSC was formed by Wyoming Corporate Services out of its infamous 2710 Thomas Avenue address.

105.    TSC did not actually come into the control of any of the defendants until June of 2016 when Wilson was installed as the managing member.

106.    Thus, the Marketing Defendants, along with Crader, Yuge, and Bigly, through the Ratings Website, falsely and/or misleadingly advertise the "age" of TSC, making it appear to have been operating in business for nearly twice as long as it has actually operated.

**B.      False and Misleading Statements on the "Compliance" Webpage.**

107.    The Ratings Website has, in the past, specifically referenced the "compliance" page of TSC's Website, stating that it "is unique and not something we've seen on any other

timeshare company's website…[t]hey've even gone so far as to cite their sources with links to websites with more information about the laws they reference. **The company gets another +1 from us for this detailed analysis of the law.**" https://www.timeshareexitcompanies.com/timeshare-compliance-review/ (emphasis in original).

108.    The "compliance" webpage, which has been removed since lawsuits were filed against TSC, but was located at https://timesharecompliance.com/timeshare-cancellation-attorneys/, is nothing but a series of false and/or misleading advertisements.

109.    The "compliance" webpage is broken into fifty separate links, one for each state. Clicking on a link creates a 'pop-out box' allegedly containing information on that state's timeshare laws and a statement about how Pandora Marketing will help the consumer.  None of the statements are accurate.

110.    For example, clicking on the first state (Alabama) reveals the following text:



111.    There is no law in Alabama that allows the cancellation of a timeshare under any and all circumstances, which is what Pandora Marketing advertises on its Timeshare Compliance website.   For example, a video on the Timeshare Compliance website states that Pandora Marketing can help if a consumer simply "feels they overpaid and just want out".  Nothing in the Alabama statute allows a timeshare owner to cancel their timeshare contract for "just want[ing] out".

112.    Advertisements regarding other states are even more egregious.  The Alaska link on the "compliance" page displays the following text:



113.    Alaska Statute 34.08.550 states, in its entirety:

If the declaration provides that ownership or occupancy of a unit is or may be in time shares, the public offering statement must disclose, in addition to the information required by AS 34.08.530 ,

(1) the number and identity of units in which time shares may be created;

(2) the total number of time shares that may be created;

(3) the minimum duration of any time shares that may be created;

(4) the extent to which the creation of time shares will or may affect the enforceability of the lien of the association for assessments under AS 34.08.470 ;

(5) any restraint on the power of the purchaser of the time-share unit to transfer the interest in the time-share unit;

(6) whether the time-share unit is included in an exchange program, the present cost and a good faith estimate of the future cost to the purchaser from the exchange program; and

(7) whether the purchaser is required to become a member of the exchange program.

Nothing in this statute permits the cancellation of a timeshare interest.

114.    Another example is clicking on the link for Hawaii, which displays:

> If want to cancel a timeshare contract in Hawaii, contact Timeshare Compliance. Our team is well versed in all laws that govern timeshare contracts in Hawaii. Those laws are codified in the Hawaii Revised Statutes. The relevant statures are in Title 28, which pertains to property. At Timeshare Compliance, we pay particular attention to those laws:

115.    The only reference to "timeshare" in Hawaii Statutes Title 28 is Section 503B, which creates the "Time Share Commissioners of Deeds".

116.    The "Compliance" webpage is nothing but one giant false and/or misleading advertisement containing 50 separate false and/or misleading advertisements, all designed to create the impression that Pandora Marketing (and the Lawyer Defendants, whom are referenced by implication as part of the "team") have some special skill, strategy, and/or legal basis to cancel timeshare contracts, including Bluegreen Contracts, for any reason when they, in fact, do not.

**C.    The content of TSC's website is false and/or misleading.**

117.    The   Marketing   Defendants   own   and   control   TSC's   website: http://www.timesharecompliance.com ("TSC's Website").

118.    TSC's website, prior to an overhaul which occurred after multiple lawsuits were filed against them, made the following statement:

> _ **Will Timeshare Compliance completely remove my liability from the contract?**
>
> Yes. Our team at Timeshare Compliance has a proven track record of persuading developers to exit timeshare contracts. We will remove all liability from your timeshare contract. You will no longer be responsible for maintenance fees, assessment fees, or payments on debts. Your heirs will no longer be responsible for any liability. You will no longer have any liability for your timeshare contract.

119.    The current version of the TSC Website still contains the claim that their process will "[relieve] you of all further liability regarding your timeshare contract."



http://www.timesharecompliance.com (last accessed September 24, 2020).

120.    Each of these advertisements are false and/or misleading because they claim that TSC's process will result in the Bluegreen owner having no further liability to Bluegreen regarding the timeshare contract.

121.    The TSC Website has also previously stated:

> **– What will be necessary for us to use your service?**
>
> Provide the information we need to accelerate our proven, proprietary strategy of resolving timeshare contracts. You may call us at 1-800-705-6856 and one of our specialists will call you to begin gathering the information our analysts and other professionals will need. They rely upon that information to begin the process of resolving your timeshare contract. Or you may enter your email information and we will send you a free book that explains our process. You can fill in the information requested and return the documentation we need to start.

122.    This advertisement is false and/or misleading because TSC does not have any "proprietary strategy of resolving timeshare contracts".

123.    The TSC Website has also stated:

> − How can I remove liability for my heirs on my timeshare?
>
> Timeshare Compliance will remove all liability from your timeshare contract. Upon the successful resolution of your contract, we will provide you with written documentation from the developer showing that the contract has been resolved and there is no further liability.

124.    Once again, this advertisement is false and/or misleading because there is no absolute way to "remove all liability from your timeshare contract".

**D.    The Marketing Defendants' telephone and in-person sales pitches are false and/or misleading.**

125.    The Marketing Defendants utilize employees and independent contractors to solicit potential Bluegreen owners located across the country.

126.    Folk and Wilson personally supervise and control these sales people.

127.    In some instances, Folk and Wilson have personally directed TSC employees or independent contractors to solicit timeshare owners located in Florida.

128.    In some instances, Folk and Wilson have directed TSC employees or independent contractors to fly to Florida to meet with timeshare owner leads who might be of high value.

129.    In fact, Folk and Wilson specifically targeted Florida and its market of timeshare owners by opening a regional office for TSC in Fort Lauderdale, Florida.

130.    This Fort Lauderdale, Florida office was used with the intent of conducting sales pitches to potential customers, including Bluegreen owners.

131.    When TSC decides not to conduct in-person presentations, they will pitch their services over the phone.

132.    Folk and Wilson personally supervise and approve the content of call scripts utilized during telephonic solicitations.

133.    Folk and Wilson have also reviewed and listened to recordings of sales calls in order to improve the performance of TSC sales people.

134.    Accordingly, the advertising statements made to Bluegreen owners during these sales calls were made with the consent, approval, and direct involvement of Folk and Wilson.

135.    During these sales calls, "case analysts" and other TSC employees are encouraged and permitted to make demonstrably false statements regarding TSC's service. These false statements generally include:

      a.    Claims that TSC's service permits the Bluegreen owner to safely stop payments to Bluegreen;

      b.    That the Bluegreen owner is guaranteed to receive a legal release from their timeshare obligation; and

      c.    That TSC has a 100% success rate with Bluegreen owners.

136.    The advertisements set forth in Paragraphs 85 through 134 above are hereinafter collectively referred to as the "False and/or Misleading Advertisements".

**E.    Use of the Lawyer Defendants**

137.    The Marketing Defendants have designed the "Case Analyst" sales pitch in such a manner that they intend for the Bluegreen owner to believe that the service they are paying for allows them to safely and legally stop payments to Bluegreen immediately upon signing up.

138.    At the direction of Folk and Wilson, the "Case Analysts" use the prospect of immediately stopping payments as a technique to convince the Bluegreen owner to purchase their illusory service.

139.    The Marketing Defendants' advertisement conveys to potential customers the notion that the team that will perform the advertised services is trained in the law.

140.   The Marketing Defendants' presentation of their services as a legal method to stop payments to Bluegreen managed by legal professionals is a dispositive factor in their advertising.

141.   Absent the Marketing Defendants' presentation of their services as a legal method to stop payments to Bluegreen managed by legal professionals there would be no reason for the Bluegreen owners to retain the Marketing Defendants' services.

142.   The Lawyer Defendants are aware of the intent of the scheme, the central part they play, and have agreed to participate in it with the Marketing Defendants.

143.   Slattery, Thompson, Deighan, and Stewart have all individually agreed to participate in this scheme with the Marketing Defendants and negotiated a fee-sharing arrangement with them.

144.   Further, as Slattery, Thompson, Deighan, and Stewart have agreed to accept a flat fee per timeshare owner file, and as this amount is not enough to provide any meaningful services of their own, they have tacitly admitted that their role in the scheme is nothing more than to facilitate the breach of contract, which constitutes the Marketing Defendants' true intent.

145.   The Lawyer Defendants role in the scheme is to create the appearance that the exorbitant fees charged by the Marketing Defendants is due to the value of the legal services to be provided, even though the Lawyer Defendants have agreed to receive only a small fraction of the total fees the Marketing Defendants collect and do not intend to engage in any litigation practice.

146.   The Lawyer Defendants agreement to accept referrals from the Marketing Defendants encourages such Marketing Defendants to further falsely advertising their services as a legal method to stop payments to Bluegreen managed by legal professionals even while both

the Marketing Defendants and Lawyer Defendants both know that Lawyer Defendants will not be engaging in such services.

147.    Participation in the scheme alleged herein benefits the Lawyer Defendants by allowing them to circumvent ethical rules in regard to attorney advertising or communication with client or potential clients and provides them a way to generate additional clients without the need to expend money on ethically permissible means of advertising.

**F.    Credit Repair Scheme**

148.    As the Defendants are aware that the scheme relies on the Bluegreen owners to stop payments and lose their interest due to default, they have taken the premeditated step of engaging with various credit repair companies to mitigate the eventual harm to the Bluegreen owner's credit.

149.    Folk and Wilson, since the inception of TSC, have partnered with credit repair companies, such as NCR, in order to attempt to mask the effects caused by inducing these timeshare owners to stop payments.

150.    The Marketing Defendants also advertise credit repair as part of the service and utilize the promise of credit protection as a means to convince Bluegreen owners that they can safely stop payments to Bluegreen immediately upon signing up.

151.    TSC conspired with NCR and Consalvo by establishing a Google drive account accessible in Florida.

152.    As TSC signed up new clients, NCR and Consalvo would receive new electronic files in the Google drive account, accessible to them in Boynton Beach, Florida.

153.    At the direction of Wilson, NCR implemented a "tradeline blocking" scheme designed to preemptively "block" negative reporting that might result from stopping payments to Bluegreen.

154.    As part of Wilson's "tradeline blocking" scheme, Wilson attempted to exploit the Fair Credit Reporting Act, which permits victims of identity theft to preserve their good credit which might be harmed by unauthorized activity on a tradeline, such as a credit card account.

155.    In this effort, Wilson directed that NCR and its principal, Consalvo, claim to the various credit bureaus that Bluegreen owners were the victims of identity theft, such that once these Bluegreen owners followed the advice of TSC to stop payments, the credit bureaus would be required, under the Fair Credit Reporting Act, to preclude such negative reporting from affecting the owner's credit report or credit score.

## COUNT I
### False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)
(against the Marketing Defendants)

156.    Bluegreen adopts and realleges paragraphs 1 through 62, and 86 through 155 above as if fully set forth herein.

157.    This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

158.    TSC, VCF, Folk, and Wilson willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers. The False and/or Misleading Advertisements incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

159.    The False and/or Misleading Advertisements were commercial speech made by a defendant acting in competition to Bluegreen by trying to interfere with Bluegreen's business relationships for Defendants' own financial gain, for the purpose of influencing consumers to

retain Defendants' services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

160.    VCF is nothing but an alter-ego shell of the individual Defendants, Folk and Wilson, and is under their common control.  VCF participates in, and reaps the benefit of, the false and/or misleading advertisements described herein.  VCF is therefore liable for the actions of Folk, Wilson, and TSC.

161.    Folk and Wilson are each personally and individually liable for the actions of TSC as they are the creators and managers of TSC and each personally and individually direct and participate in the activities of TSC.  Indeed, they are each, individually, and together, the driving force behind TSC, and are personally responsible for TSC's improper business scheme.

162.    Folk and Wilson are repeatedly referenced in the False and/or Misleading Advertisements on the TSC Website, which claims that "[our] leadership team has more than 50 years of combined experience of working in the timeshare industry."

163.    Folk and Wilson are that leadership team, having previously worked in the timeshare industry.

164.    Additionally, TSC directs the content about TSC which has appeared on the Ratings Website.

165.    TSC has entered into agreements with Crader, Yuge, and/or Bigly that compensates them for referring leads generated by the Ratings Website to TSC.

166.    TSC, VCF, Folk, and Wilson may sometimes hereinafter be referred to as the "Direct False Advertising Defendants".

167.    The Direct False Advertising Defendants' false or misleading statements either deceived or had the capacity to deceive a substantial segment of the consuming public.

168.    The Direct False Advertising Defendants' deception is material, in that it is likely to influence the consumers' decisions whether to retain the Direct False Advertising Defendants' services or to cease making payments to Bluegreen.

169.    The Direct False Advertising Defendants' false and/or misleading advertising causes Bluegreen owners to believe that they may legally and safely breach their contract and stop payments to Bluegreen by using the Direct False Advertising Defendants' competing "exit" service, even though that service is false and illusory. *See Lexmark*, 572 U.S. at 133 ("[A] plaintiff can be directly injured by a misrepresentation even where a third party [such as a consumer], and not the plaintiff, relied on it." (citation and internal quotation marks omitted)).

170.    Moreover, the Direct False Advertising Defendants' false and/or misleading advertising materially misrepresents their services, what they can do for consumers, and the relationships amongst the Direct False Advertising Defendants', all of which is designed to trick Bluegreen owners into retaining the services of the Direct False Advertising Defendants, thereby diverting payments from Bluegreen to the Direct False Advertising Defendants.

171.    The Direct False Advertising Defendants' advertised services affect interstate commerce.

172.    The Direct False Advertising Defendants are operating as competitors to Bluegreen. Once a Bluegreen owner enters into an agreement with TSC, the sole purpose of that agreement is to cause that Bluegreen owner to withdraw his or her business from Bluegreen, effectively converting that individual from a Bluegreen owner to a customer of the Direct False Advertising Defendants.

173.    Bluegreen has been and continues to be injured as a result of the Direct False Advertising Defendants' false and misleading statements.

174.     Bluegreen has standing to bring this claim. A plaintiff has standing to sue when a defendants' misleading statements "seek[] to promote his own interests by telling a known falsehood to *or about* the plaintiff or his product," thus "proximately caus[ing] the plaintiff's harm." *Lexmark*, 572 U.S. at 138 (noting that "although diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising, it is not the only type of injury cognizable under § 1125(a)"). "[T]he causal chain linking" a plaintiff's "injuries to consumer confusion [need] not [be] direct," but may include an "intervening link of injury," consistent with "[t]raditional proximate-causation principles." *See id.* at 138–39 (finding that the plaintiff had adequately alleged proximate cause establishing standing even where the defendant's misleading statements were not directly diverting business from plaintiff to defendant).

175.     The Direct False Advertising Defendants' misleading advertising causes consumers to utilize the Direct False Advertising Defendants' false exit services, which directly results in the Bluegreen owners ceasing to pay on their contracts at the Direct False Advertising Defendants' instruction.

176.     Without the Direct False Advertising Defendants' false and/or misleading advertisements, the Bluegreen owners would have continued to make payments on their timeshares and continued to understand that their Timeshare Contracts are legitimate and enforceable.

177.     Additionally, the Direct False Advertising Defendants' false and/or misleading advertising causes consumers to believe that Bluegreen's business model is unlawful and that they were "scammed" into their timeshares, necessitating the Direct False Advertising Defendants' "help," when in reality, their contracts are legitimate and the Direct False Advertising Defendants are the ones perpetuating a scam.

178. Pursuant to 15 U.S.C. § 1117, Bluegreen is entitled to recover: (1) its actual damages sustained as a result of the false advertising; (2) Defendants' profits resulting from their false advertising to Bluegreen Owners; and (3) the costs of this action.

179. Pursuant to 15 U.S.C. § 1116, Bluegreen seeks an injunction upon such terms as the Court may deem reasonable, to prevent further violations by the Direct False Advertising Defendants of 15 U.S.C. § 1125(a).

**COUNT II**
**Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)**
(against Crader, Bigly, and Yuge)

180. Bluegreen adopts and realleges paragraphs 1 through 62, and 86 through 155 above as if fully set forth herein.

181. This is an action for a contributory violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

182. The Direct False Advertising Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers. The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

183. Bluegreen has been and continues to be injured as a result of the Direct False Advertising Defendants' false and/or misleading statements.

184. Crader, Yuge, and Bigly have contributed and continue to contribute to the Direct False Advertising Defendants' false and/or misleading advertising by knowingly inducing or causing the conduct, or by materially participating in it.

185.    Crader, Yuge, and Bigly have materially participated in the Direct False Advertising Defendants' false and/or misleading advertising in several ways, including but not limited to:

    a.  Copying portions of the content of the Compliance website on the Ratings Website;

    b.  Copying video advertisements for TSC on the Ratings Website;

    c.  Allowing TSC to edit the content of the Ratings Website;

    d.  Falsely stating how long TSC has been in business;

    e.  Publishing false and/or misleading descriptions about the Ratings Website neutrality in providing "reviews";

    f.  Establishing a telephone number and live chat feature in order to direct leads to the Direct False Advertising Defendants;

    g.  Providing false and/or misleading information regarding TSC's escrow option; and

    h.  Encouraging timeshare owners to sign up with TSC through the Ratings Website by offering a satisfaction guarantee.

186.    Additionally, Crader, Yuge, and Bigly explicitly or implicitly encourage the false advertising because they knowingly cooperate with the Direct False Advertising Defendants in publishing the Ratings Website, which contains false statements about TSC's service that the Direct False Advertising Defendants has the ability to review and approve.

187.    The Direct False Advertising Defendants compensate Crader, Yuge and Bigly to publish the false statements on the Ratings Website.

188.    Crader, Yuge, and Bigly also contribute to the Direct False Advertising Defendants' false and/or misleading statements as the Ratings Website is designed to gather leads for the Direct False Advertising Defendants, who receive "live transfers" of leads generated from the Ratings Website.

189.    Additionally, the Direct False Advertising Defendants themselves utilize the content of the Ratings Website during telephone sales calls in order to close deals by presenting the Ratings Website as a neutral party providing unbiased information about timeshare exit companies when in fact the Direct False Advertising Defendants pay Crader, Yuge, and Bigly to promote TSC.

190.    Crader, Yuge, and Bigly have full knowledge of the Direct False Advertising Defendants' false and/or misleading advertisements, as they have been directed to include such statements on the Ratings Website, and in fact, have copied portions of the Direct False Advertising Defendants' Compliance website onto the Ratings Website.

191.    Crader, Yuge, and Bigly all financially gain from the false advertisements in the form of commissions and fees paid by the Direct False Advertising Defendants.

192.    In other words, revenue derived by Crader, Yuge, and Bigly from the Ratings Website is a result of sales made by the Direct False Advertising Defendants.

193.    Pursuant to 15 U.S.C. § 1117, Bluegreen is entitled to recover: (1) its actual damages sustained as a result of the false and/or misleading advertising by the False Advertising Defendants; (2) Crader, Yuge, and Bigly's profits resulting from the Direct False Advertising Defendants' false advertising to Bluegreen owners; and (3) the costs of the action.

194.     Pursuant to 15 U.S.C. § 1116, Bluegreen seeks an injunction upon such terms as the Court may deem reasonable, to prevent further contributory violations by Crader, Yuge, and Bigly of 15 U.S.C. § 1125(a).

### COUNT III
### Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)
(against the Lawyer Defendants)

195.     Bluegreen adopts and realleges paragraphs 1 through 62, and 86 through 155 above as if fully set forth herein.

196.     This is an action for a contributory violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

197.     The Direct False Advertising Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers. The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

198.     Bluegreen has been and continues to be injured as a result of the Direct False Advertising Defendants' false and/or misleading statements.

199.     The Lawyer Defendants have contributed and continue to contribute to the False Advertising Defendants' false and/or misleading advertising by knowingly inducing or causing the conduct, or by materially participating in it.

200.     The Lawyer Defendants explicitly or implicitly encourage the false advertising because they knowingly accept legal representation of the consumers deceived by the false and/or misleading advertising. Without the Lawyer Defendants' willingness to accept those consumers as clients, the Direct False Advertising Defendants could not advertise what they do.

201.     The Lawyer Defendants provide a dispositive factor to the Direct False Advertising Defendants' false and/or misleading advertisements.

202.    The Direct False Advertising Defendants' false and/or misleading advertisements are public, serious, and widespread; therefore, the Lawyer Defendants have full knowledge of such advertising and condone it.

203.    More than that, the Lawyer Defendants each individually financially gain from the false advertisements in the form of client referrals and fee-splitting with the Direct False Advertising Defendants.

204.    In other words, each of the Lawyer Defendants' businesses derive much, if not all, of their revenue from the consumers solicited through the Direct False Advertising Defendants' false and/or misleading advertising.

205.    Pursuant to 15 U.S.C. § 1117, Bluegreen is entitled to recover: (1) its actual damages sustained as a result of the false and/or misleading advertising by the False Advertising Defendants; (2) the Lawyer Defendants' profits resulting from the False Advertising Defendants' false advertising to Bluegreen owners; and (3) the costs of the action.

206.    Pursuant to 15 U.S.C. § 1116, Bluegreen seeks an injunction upon such terms as the Court may deem reasonable, to prevent further contributory violations by the Lawyer Defendants of 15 U.S.C. § 1125(a).

### COUNT IV
### Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)
(against NCR and Consalvo)

207.    Bluegreen adopts and realleges paragraphs 1 through 62, and 86 through 155 above as if fully set forth herein.

208.    This is an action for a contributory violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

209.    The Direct False Advertising Defendants willfully, deliberately, and egregiously made false and/or misleading statements of fact in their commercial advertisements and intended

to mislead consumers. The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

210.   Bluegreen has been and continues to be injured as a result of the Direct False Advertising Defendants' false and misleading statements.

211.   The Direct False Advertising Defendants have advertised the credit repair and "tradeline blocking" services of NCR and Consalvo.

212.   The Direct False Advertising Defendants have advertised that NCR and Consalvo's credit repair services prevent any negative credit reporting from affecting the Bluegreen owner's credit report.

213.   The Direct False Advertising Defendants expressly state that these credit repair services are included as part of the package sold to Bluegreen owners.

> Should you opt-in for credit restoration and monitoring, your coordinator will contact you to walk you through the process.

https://timesharecompliance.com/how-we-work/ (last accessed September 24, 2020).

214.   The Direct False Advertising Defendants also claim in advertising that their credit repair services, fulfilled by NCR and Consalvo, allow the Bluegreen owners to stop payments without any negative consequence.

215.   NCR and Consalvo contributed to the Direct False Advertising Defendants' false advertising by knowingly inducing or causing the conduct, or by materially participating in it.

216.   NCR and Consalvo explicitly or implicitly encourage the false advertising because it is the credit repair company through which the Direct False Advertising Defendants claim they can safeguard a Bluegreen owners credit, and because they receive payments for each timeshare owner ensnared by these advertisements.

217.    NCR and Consalvo have financially gained from the false advertisements in the form of payments from the Direct False Advertising Defendants.

218.    In other words, NCR and Consalvo have derived much, if not all, of its revenue from the Direct False Advertising Defendants' false and misleading advertising.

219.    Additionally, it appears that payments made to NCR and Consalvo as a result of this scheme were improper or illegal, as NCR and Consalvo received upfront payments in violation of the Credit Repair Organizations Act, 15 U.S.C. § 1679b(b).

220.    Pursuant to 15 U.S.C. § 1117, Bluegreen is entitled to recover: (1) its actual damages sustained as a result of the false and/or misleading advertising by the False Advertising Defendants; (2) NCR and Consalvo's profits resulting from the False Advertising Defendants' false and/or misleading advertising to Bluegreen Owners; and (3) the costs of the action.

221.    Pursuant to 15 U.S.C. § 1116, Bluegreen seeks an injunction upon such terms as the Court may deem reasonable, to prevent further contributory violations by NCR and Consalvo of 15 U.S.C. § 1125(a).

## COUNT V
## Tortious Interference with Contractual Relations
(against all Defendants)

222.    Bluegreen adopts and realleges paragraphs 1 through 62, and 86 through 155 above as if fully set forth herein.

223.    This is a cause of action for tortious interference with contractual relations.

224.    Bluegreen has contractual relationships with the Bluegreen owners.

225.    Defendants have actual, constructive, and/or specific knowledge of the contractual relationships between Bluegreen and the Bluegreen owners. The very fact that Plaintiffs have a business relationship with the Bluegreen owners is the basis upon which

Defendants sought to establish a relationship with the Bluegreen owners. Indeed, if it were not for the existence of the contractual relationships between Bluegreen and the Bluegreen owners, Defendants would have no reason to exist.

226.    Defendants have successfully solicited Bluegreen owners[1] and caused or induced them to breach and/or terminate their contractual relationships with Bluegreen.

227.    In particular, Defendants have intentionally procured the breach of Bluegreen's contractual relationships by soliciting Bluegreen owners and persuading them to hire Defendants to help "exit" (in reality, breach) their Timeshare Contracts.

228.    Defendants also procure breaches by directly instructing Bluegreen owners to stop paying their timeshare loans.

229.    If Bluegreen owners knew the truth about Defendants' illusory and fraudulent services or about how Defendants' actions would adversely impact them, they would not pay exorbitant fees to Defendants nor unlawfully terminate their timeshare interests (through breach resulting in foreclosure).

230.    Defendants have utilized improper, fraudulent, and/or illegal means to interfere with Plaintiffs' contractual relations.

231.    Defendants' actions were done with improper motive and not in good faith, but rather were done with the knowledge and predominant purpose to injure Plaintiffs or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting from Defendants' actions and without reasonable grounds for Defendants to believe that their actions were justified and proper.

---

[1] Due to the confidential and sensitive nature of the identities of Bluegreen Owners who have been victims of Defendants' conduct, as well as the sheer volume of Bluegreen owners impacted, Bluegreen has not included their identifying information herein. However, Bluegreen can and will provide the Court with copies of the contracts with which Defendants have interfered at the appropriate time.

232.     As a direct and proximate result of Defendants' intentional misconduct, Bluegreen owners have terminated, or have baselessly sought to terminate via Defendants, their contractual relationships with Bluegreen, before the expiration of the terms of those contracts. These terminations, and attempted terminations, also interfere with Bluegreen's ability to enter into subsequent transactions with those same Bluegreen owners.

233.     Defendants did not and do not have any justification or privilege in procuring the breach of such contractual relationships, as Defendants are strangers to the contractual relationships between Bluegreen and its Bluegreen owners, and their interference with Plaintiffs' business is willful and malicious.

234.     The Marketing Defendants, NCR, Consalvo, Gallagher-Clifton, and Stewart are not law firms and have no attorney-client relationships with Bluegreen owners; therefore, they are not privileged to interfere under the attorney-client privilege.

235.     The Defendants are not agents of the Bluegreen Owners because the Bluegreen Owners do not control their actions. Rather, the Defendants control and guide the "exit" strategy as a so-called "service" that they provide to the Bluegreen owners.

236.     Further, the Defendants are motivated by personal gain and not by the interests of the Bluegreen owners.

237.     Therefore, the Defendants are not privileged to interfere as an agent of the Bluegreen owners.

238.     Similarly, the Lawyer Defendants have failed to establish an attorney-client relationship with the Bluegreen owners who paid and retained the Marketing Defendants' so-called services. Moreover, the Lawyer Defendants participation in the tortious interference provides them a benefit over the portion of the fee that is split with them.

239.   Accordingly, the Lawyer Defendants are not privileged to interfere with Bluegreen's Timeshare Contracts.

240.   Even if the Lawyer Defendants have established an attorney-client relationship with the Bluegreen owners, the Lawyer Defendants nevertheless profit greatly by accepting significant fees from Bluegreen owners (through the Marketing Defendants') and then performing little or no actual legal work on their behalf to "exit" their timeshare contracts. Instead, Defendants convince Bluegreen owners to stop making payments on their Timeshare Contracts, which is not in the Bluegreen owners' best interests and which greatly damages the Bluegreen owners' finances and credit, in order to achieve the desired "exit."

241.   The Lawyer Defendants are therefore not privileged to interfere with Bluegreen's contractual relationships because Defendants act in their own interests and without an honest belief that the strategy of defaulting on the Timeshare Contracts is justified by the fees received from the Bluegreen owner or even the best course of action to terminate the Timeshare Contract, considering the Bluegreen owner could lawfully terminate her contract for free, or at a much lower cost, by appealing directly to Bluegreen.

242.   Furthermore, the Lawyer Defendants undermine any attorney-client relationship by rarely or never filing lawsuits on behalf of those Bluegreen owners related to their timeshares and by rarely or never representing Bluegreen owners in foreclosure proceedings on their timeshare interests. In other words, the lawyers only "represent" timeshare owners for the purpose of breaching contracts under the guise of legality.

243.   As to NCR and Consalvo, they have directly facilitated the breach of these Timeshare Contracts by offering a false means to preemptively "block" the negative reporting that will result from the breach.

244.     Without NCR and Consalvo, the Marketing Defendants would be unable to induce Bluegreen owners to stop payments to Bluegreen and breach the Timeshare Contracts.

245.     As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

246.     Plaintiffs are entitled to damages against all Defendants jointly and severally.

247.     Defendants' ongoing conduct has caused, and if not permanently enjoined, will continue to cause, irreparable harm to Bluegreen due to the disruption of customer and other contractual relations; therefore, Bluegreen does not have an adequate remedy at law to fully remedy the harm caused by Defendants to Bluegreen. Bluegreen seeks an injunction upon such terms as the Court may deem reasonable, to prevent further harm to Bluegreen due to the disruption of customer and other contractual relations.

248.     Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

## COUNT VI
### Violation of Florida's Deceptive and Unfair Trade Practices Act
(against all Defendants)

249.     Bluegreen adopts and realleges paragraphs 1 through 62, and 86 through 155 above as if fully set forth herein.

250.     This is a cause of action for damages and permanent injunctive relief under Florida Statutes § 501.211.

251.     This cause of action is separate and apart from the causes of action premised upon Defendants' Lanham Act violations. *Cf. Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1332–33 (11th Cir. 2008) ("Since Natural Answers is unable to bring an unfair competition claim under the Lanham Act under the theory of either *false advertising or trademark infringement*, it follows that the common law claims *based on unfair competition and*

*trademark infringement* must fail as well." (emphasis added)). It is based not only on Defendants' false and misleading advertisements, but also on Defendants' business practices as a whole, which are deceptive and unfair.

252.    Bluegreen is a legitimate business enterprise under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

253.    Bluegreen's owners and prospective owners are consumers for purposes of FDUTPA.

254.    Defendants are engaged in trade or commerce as those terms are defined by FDUTPA.

255.    Defendants are engaged in certain deceptive and unfair practices as set forth above, including but not limited to: (1) luring Bluegreen Owners into procuring Defendants' illusory services with false advertising; (2) using misrepresentations to convince Bluegreen Owners to pay substantial fees to "exit" their Timeshare Contracts with Bluegreen; and (3) falsely claiming that they can protect the Bluegreen owner's credit once the Bluegreen owner agrees to breach their Timeshare Contract.

256.    Further, Defendants are engaged in other deceptive and unfair practices, including but not limited to: (1) offering guarantees to Bluegreen owners about their "exits," even though Defendants know that any such exits rely on Bluegreen's assent and are thus never guaranteed; (2) claiming a 100% success rate, when Defendants know that to be untrue; (3) failing to disclose to and/or concealing from the Bluegreen owners that Defendants' "exit" "services" often includes a default and foreclosure, and subsequent negative credit impacts, and congratulating the Owners upon foreclosure by lying to the owners that the "exit" "services" were successful; (3) unscrupulously telling the Bluegreen owners that they are represented by counsel, even

though the Owners do not speak to those counsel and those counsel are doing little or nothing to assist the Owners; and (4) signing Bluegreen owners up for a fraudulent credit repair scheme which violates the Credit Repair Organizations Act, 15 U.S.C. §1679b.

257.   As to Wilson, Folk, VCF, TSC, NCR, and Consalvo, their participation in the credit repair scheme constitutes a *per se* violation of FDUTPA, as they have violated 15 U.S.C. §1679b of the Credit Repair Organizations Act by:

    a.   Making, or advising timeshare owners to make, untrue or misleading statements regarding their credit standing to the credit agencies, including but not limited to, the submission of false police reports claiming identity theft;

    b.   Making, or advising timeshare owners to make, statements intended to alter the timeshare owner's identification with respect to the tradeline reflecting payment obligations to Bluegreen, including but not limited to, claims that the tradeline related to Bluegreen was the result of identity theft;

    c.   Charging or receiving money or other valuable consideration for the performance of credit repair services for timeshare owners, before such service is fully performed.

258.   As to Wilson, Folk, VCF, TSC, NCR, and Consalvo, their participation in the credit repair scheme also constitutes a *per se* violation of FDUTPA, as they have violated 15 U.S.C. §1679c of the Credit Repair Organizations Act by failing to provide Bluegreen owners, before they enter into a written agreement with them, a written disclosure statement as required by 15 U.S.C. §1679c.

259.   Paragraphs 255 through 258 are hereinafter collectively referred to as the "Deceptive and Unfair Acts".

260.    As a result of Defendants' actions, Bluegreen has suffered financial loss as the Deceptive and Unfair Acts caused Bluegreen not to receive regular payments owed by Bluegreen Owners to Bluegreen.

261.    Section 501.211(1) "permits a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to occur in the future." *Bluegreen Vacation Resorts, Inc. v. Timeshare Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. 5th DCA 2012).

262.    Under § 501.211(1), "anyone aggrieved" includes a broader class of complainants than merely consumers; the scope of the injunctive remedy is also greater than the actual damage remedy under § 510.211(2). *Id.*; *see also Kinger v. Weekly World News, Inc.*, 747 F. Supp. 1477, 1480 (S.D. Fla. 1990).

263.    In addition to its identifiable financial losses, the Deceptive and Unfair Acts in violation of FDUTPA aggrieved Bluegreen and Bluegreen is entitled to injunctive relief. *See* Fla. Stat. § 501.204(1).

264.    Bluegreen's losses will increase unless Defendants are permanently enjoined from continuing their deceptive and unfair business practices.

265.    Bluegreen is entitled to recover its attorney's fees and costs from Defendants under Florida Statutes §§ 501.2105 and 501.211.

### COUNT VII
### Civil Conspiracy to Commit Tortious Interference
(against all Defendants)

266.    Bluegreen adopts and realleges paragraphs 1 through 62, and 86 through 155 above as if fully set forth herein.

267.    This is a cause of action for civil conspiracy to interfere with existing contractual relations.

268.    Defendants are parties to a civil conspiracy. Defendants had a common design, each having the intent and knowledge of the others' intent to accomplish by concerted action unlawful purposes and/or lawful purposes by unlawful means.

269.    Defendants conspired to do an unlawful act to cause Plaintiffs harm. Defendants acted in concert with a common design, scheme, or plan to bring about a desired result and/or accomplish a preconceived plan for financial gain to the detriment of Plaintiffs through unlawful and/or illegal means of interfering with Plaintiffs' business relations with Bluegreen owners and/or causing Bluegreen owners to breach their Timeshare Contracts with Plaintiffs.

270.    Defendants committed or engaged in overt acts in furtherance of their unlawful conspiracy to interfere with Plaintiffs' business relations or to induce Plaintiffs' customers to breach their contractual agreements.

271.    Defendants conspired to interfere with Plaintiffs' contractual relationships with the Bluegreen owners and/or were directed by other Defendants to interfere with Plaintiffs' contractual relationships with the Bluegreen owners.

272.    Defendants each performed and/or were directed by other Defendants to perform one or more overt actions in furtherance of their conspiracy as set forth above and below:

     a.  the Direct False Advertising Defendants conspired with Crader, Yuge, Bigly, the Lawyer Defendants, NCR, and Consalvo to effect the conspiracy.

     b.  For instance, the Direct False Advertising Defendants engaged in false and/or misleading advertisements designed to lure the Bluegreen owners into obtaining their services.

c.  The Direct False Advertising Defendants utilized, in part, the Ratings Website controlled by Crader, Yuge, and Bigly to solicit Bluegreen Owners and engage in false and/or misleading advertising.

d.  Crader, Yuge, and Bigly were then instructed to transfer leads to the Direct False Advertising Defendants, who would instruct the Bluegreen Owners not to pay on their Timeshare Contracts.

e.  In order to induce Bluegreen owners to stop payments on the Timehare Contracts, the Direct False Advertising Defendants relied on NCR and Consalvo to operate an illegal "tradeline blocking" scheme and other credit repair methods that would assuage any concerns that stopping payments would have negative consequences for the Bluegreen owners.

f.  The Direct False Advertising Defendants relied on the Lawyer Defendants to use their status as attorneys to make the Direct False Advertising Defendants' business appear to be legitimate, further inducing the Bluegreen owners to stop paying on their Timeshare Contracts. The Bluegreen owners then paid the Direct False Advertising Defendants directly, and further agreed in their written agreements with the Direct False Advertising Defendants to pay the Lawyer Defendants a flat fee.

g.  As for their part in the scheme, the Lawyer Defendants sent formulaic demand letters to Bluegreen, in concert with the Direct False Advertising Defendants, stating non-legal bases upon which the Bluegreen Owners could purportedly "cancel" or "terminate" their Timeshare Contracts, in furtherance of the conspiracy.

h. The Direct False Advertising Defendants could not have accomplished their part in the scheme without Crader, Yuge, Bigly, the Lawyer Defendants, NCR, and Consalvo, and vice versa.

i. All Defendants, benefited from the conspiracy.

273. As a direct and proximate result of Defendants' civil conspiracy, Bluegreen owners have unlawfully terminated, or have sought to terminate, their Timeshare Contracts with Plaintiffs before the expiration of the terms of those contracts.

274. Defendants did not have any justification or privilege in procuring the breach of such Timeshare Contracts.

275. Each of the Defendants have a personal stake in the conspiracy activities.

276. Folk and Wilson each have a personal stake in the conspiracy activities of TSC and VCF; they each individually financially benefit from the conspiracy, separate and apart from the motives of TSC and VCF. Specifically, because TSC and VCF are closely held companies, Folk and Wilson have personal motives and stakes in conspiring with TSC, VCF and the other Defendants to financially benefit from the concerted tortious interference. *See State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*, No. 6:06-cv-1757-Orl-GJK, 2008 WL 11333443, at *13 (M.D. Fla. Dec. 24, 2008) (in which the plaintiffs argued that the defendant company was closely held and thus that the individual defendant owners of the company personally benefited from the conspiracy, and the court held that the argument created a genuine issue of material fact as to whether the personal stake exception applied, allowing the claim to survive summary judgment).

277. The Lawyer Defendants are not outside counsel to the Marketing Defendants. Thus, the Lawyer Defendants are not lawyer-agents of TSC. The Lawyer Defendants are

independent entities acting in conspiracy with the Marketing Defendants; they too have an independent financial benefit derived from participating in the conspiracy.

278.    As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

279.    Defendants, acting in concert, have engaged in an unlawful scheme to take advantage of timeshare owners and to cause Bluegreen and its business substantial economic losses.

280.    Defendants acted willfully and with malice in taking these actions.

281.    Defendants are jointly and severally liable to Plaintiffs for Damages.

282.    Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request the Court enter final judgment in their favor and against Defendants, jointly and severally, for:

a.    Damages;

b.    Corrective advertising;

c.    Disgorgement of Defendants' profits;

d.    Together with interest thereon;

e.    An award of court costs;

f.    A determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees under the Lanham Act;

g.    An award of attorney's fees under FDUTPA;

h.    Entry of permanent injunctive relief against Defendants, as well as their agents, representatives, employees, and affiliates, prohibiting Defendants from publishing or contributing to any false and misleading statements in advertising, including

but not limited to on their websites or in any other electronic or print media or materials, advertising any ability to cancel or end Bluegreen Owners' timeshare interests;

i. Entry of permanent injunctive relief against Defendants, as well as their agents, representatives, employees, and affiliates, prohibiting Defendants from offering and engaging in credit repair services in violation of state and federal law; and

j. For such other and further relief as the Court deems appropriate.


Respectfully Submitted,

*/s/ Eric C. Christu, Esq.*
**ERIC C. CHRISTU, ESQ.**
Florida Bar No. 434647
ecchristu@shutts.com
**SHUTTS & BOWEN, LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, FL 33131
Telephone: (305) 358-6300
Facsimile: (305) 381-9982

And

**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile:  (407) 849-7255

*Attorneys for Plaintiffs*

ORLDOCS 18191413 2