UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| BLUEGREEN VACATIONS UNLIMITED, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> TIMESHARE LAWYERS P.A., *et al.*, <br><br> Defendants. | Case No.: 1:20-cv-24681-RNS |

## JOINT PRETRIAL STATEMENT

The Parties, Bluegreen Vacations Unlimited, Inc. ("BVU") and Bluegreen Vacations Corporation ("BVC") (together, "Plaintiffs" or "Bluegreen") and Defendants Carlsbad Law Group and JL Sean Slattery (together, the "Lawyer Defendants") and Defendants Pandora Marketing, Rich Folk ("Folk") and William Wilson ("Wilson") (collectively, "Pandora") (the Lawyer Defendants with Pandora, the "Defendants") (the Plaintiffs with the Defendants, the "Parties"), pursuant to Local Rule 16.1(e) and this Court's Order [ECF No. 289], hereby submit this Joint Pretrial Statement.

1.  **A Concise Statement of the Case by Each Party**

    A.  **Plaintiffs' Statement of the Case**

    Plaintiffs are related hospitality companies who develop, market, and sell timeshare interests to individual consumers (the "Owner(s)").

    Pandora engages in an illegitimate nationwide sales campaign designed to convince Owners to pay thousands of dollars in upfront fees with the promise that Pandora will provide

legal services that will "legally and permanently" terminate the Owner's timeshare contract. Pandora falsely sells their "service" by claiming that the Owner can safely and immediately stop payments to Bluegreen because of Pandora's promised services, that the Owner's credit will be protected, that Pandora has always gotten their customers out of obligations owed to timeshare developers, that their attorneys will negotiate with Bluegreen, and that stopping payment will help Pandora terminate the Owner's timeshare contract.

Once Pandora collects their fee (which bears no connection to the amount of services such parties will provide to the Owners), they refer Owners to one of a small number of attorney partners, including co-Defendant JL Sean Slattery. After referral, the Owners would execute a retainer agreement with one of Slattery's law firms including co-Defendant Carlsbad Law Group, LLP ("Carlsbad"). Slattery himself would typically sign such retainer agreements on behalf of the law firms. Slattery first began accepting clients from Pandora in 2017 through the non-party entity Del Mar Law Group, LLP ("Del Mar"). By 2019, Slattery was accepting clients from Pandora through Carlsbad, a successor entity of Del Mar and an entity of which Slattery is a founding owner. At first, Slattery's fee was paid to him or his firm directly by Pandora Marketing, LLC ("Pandora"). Later, referred Owners were directed to make payment of the flat fee directly to Carlsbad.

The Owners that Pandora refers to Slattery sign a retainer agreement and pay a fee of no more than $750 to Carlsbad, despite having also paid Pandora thousands for the same service. Pandora, in the sales pitch, advise the Owners in advance of the separate $750 fee, but mislead as to the purpose of the fee so as to not alert the Owner that they have now paid thousands of dollars for $750 in legal services.

The Carlsbad retainer agreements typically obligate the law firm to draft two letters to Bluegreen requesting that Bluegreen release the Owners from their contractual obligations. The retainer agreements typically also require Carlsbad to negotiate a resolution with Bluegreen. The actual services that Lawyer Defendants provide are generally limited to sending two letters to the developer and then waiting for a response. There is no subsequent negotiation or attempt to negotiate. While Pandora's advertising suggests that the Owners will be "legally" exited from their timeshares, both Pandora and the Lawyer Defendants are aware that the minimal actions the Lawyer Defendants take on behalf of Owners will have no such legal effect. Instead, Pandora and the Lawyer Defendants rely on the Owner defaulting on his or her payment obligation. When performing services for other timeshare owners with obligations to other developers, such default may precipitate a foreclosure by the Developers which the defendants claim as successful delivery of their promised services. Indeed, both Pandora Marketing and Carlsbad admit that they know of no owner who continued payment to their developer that was relieved of timeshare obligations. Bluegreen; however, does not foreclose on delinquent timeshare interests and; therefore, the strategy of pushing owners into default will not—even under the Defendants' twisted logic—result in exit from Bluegreen timeshare obligations.

Slattery, who is aware of Pandora's false claims, has specifically instructed Pandora to only refer to him clients who have credit protection services in place. Therefore, Slattery has participated (and continues to participate) in the false advertising, with knowledge that Pandora is selling the service by advising Owners that they can stop payments on their timeshare.

Bluegreen intends to present the testimony of legal ethics expert Mark Tuft, who is expected to testify that Slattery enables the egregious conduct of Pandora, putting his own personal gain ahead of, and in conflict with, the interests of his own clients. Slattery's conduct does not

comply with attorney ethics standards. The advertising engaged in by Pandora violates standards for the advertisement of legal services, yet, Slattery continues to accept such referrals. As many of the demand letters directed by Slattery to be sent to Bluegreen are on behalf of Owners with no connection to California, Slattery's conduct also constitutes the unlicensed practice of law.

Additionally, by accepting referrals from Pandora, Slattery violates California's Business and Professions Code § 6155, which prohibits an attorney from accepting a referral from an entity who is not registered with the State Bar of California. Section 6155 also prohibits "the combined charges to the potential client by the referral service and the attorney" from exceeding "the total cost that the client would normally pay if no referral service were involved." Here, the thousands collected by Pandora far exceed the $750 in legal services actually provided.

While Slattery has feigned ignorance as to the false advertising, such willful blindness is insufficient for him to escape liability. An attorney should not repeatedly accept referrals from a third-person without knowing whether such solicitation complies with restrictions on lawyer advertising. As Pandora's advertising is misleading and deceptive, Slattery was prohibited from accepting referrals from Pandora. Not only did Slattery accept large quantities of referrals over a multi-year period, Slattery has continued to accept additional referrals even after this lawsuit was filed.

Based on this conduct, Bluegreen's claims against the Defendants, to be decided at trial, include:

**Count I:** False Advertising in violation of the Lanham Act against Pandora

**Count III:** Contributory False Advertising in violation of the Lanham Act against the Lawyer Defendants

**Count V:** Tortious Interference with Contractual Relations against all Defendants

4

**Count VI:** Violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") against all Defendants

**Count VII:** Civil Conspiracy to Commit Tortious Interference against all Defendants

Bluegreen seeks damages and equitable relief for the harm caused by the Defendants' conduct. Pandora harms Bluegreen both in the sales presentation, upon execution of a "services agreement," and thereafter. The Lawyer Defendants harm Bluegreen through their participation in the scheme with Pandora. When the Defendants instruct or induce an owner to stop making their payments to Bluegreen, Bluegreen suffers harm. Bluegreen also suffers harm to its customer relationship, goodwill, and ability to interact with its Owners. Bluegreen seeks to redress these injuries through damages and statutory equitable remedies.

This conduct is also ongoing, meaning Bluegreen has no adequate remedy at law, and an injunction is required to halt the Defendants' unlawful conduct.

### B.  Pandora's Statement of the Case

**Introduction:**   Defendants' counsel are veterans of the timeshare legal wars, mostly concentrated in the federal courts of Florida.  Developers like Bluegreen often use the same outside law firms (Shutts & Bowen or Greenspoon Marder), brining cookie cutter complaints, the purpose of which is to put exit companies, and lawyers who seek to help the developers' defrauded customers, out of business.  For about the past 10 years the developers' playbook has been the same.  File a complaint alleging violations of the Lanham Act, tortious interference, conspiracy and FUDPTA violations based on allegations that exit companies tell timeshare owners to stop paying on their contracts. Alleged damages to the developer plaintiffs are all unpaid loan balances due on the owners contracts.  The complaints do not identify the defaulted loans being sued upon – that comes much later in the case.  And the complaints are carefully drafted to allege current

ownership of the yet-to-be-identified loans, beginning the case with the incorrect presumption that the developers' have owned all to-be-identified loans from inception to the time the complaint was filed.  Because of Judge Goodman's discovery ruling in this case, the developers' complaints are now exposed as misrepresentations to the court and defense counsel.

Per Judge Goodman's discovery orders, Bluegreen was forced to produce historical loan-by-loan ownership information for each of the 218 loans in its damages pool.  Judge Goodman's ruling was informed by defense counsels' explanation of Bluegreen's SEC filings wherein the company states that it sells most of its timeshare loans to third party investors, ***non-recourse***, in order to raise hundreds of millions of dollars.  Per Bluegreen's SEC filing, two or three times each year, its timeshare contract loans are bundled and sold non-recourse to various third-party investors.  Judge Goodman's ruling was also based on defense counsels' explanation that in the Wyndham Litigation (the same litigation that Bluegreen wants to hijack this trial with by including 16 depositions and hundreds of documents not produced in this case) defense counsel discovered Wyndham securitization process only after discovery was closed, and so there was a very limited opportunity to gather the specific loan-by-loan ownership histories.  Wyndham was able to continue to hide behind the misrepresentations in its complaint.  But not so here.  As Judge Goodman said during the hearing wherein he ordered Bluegreen to produce all ownership information about their 218 damages loans:

> Now, I understand your position.  I have some empathy for you, because if it turns out that your client has, in fact, assigned some or most or many of these loans, and was involved in the securitization of these loans at relevant times, and your client did not, in fact, own these loans at the time that the alleged injury occurred, then it seems to me, like Mr. Gabrielson indicated, there may well be a ***significant issue of standing to even pursue the case***.  So, I'm sure that your client is having not only substantial discussions with your law firm about this discovery response, but it wouldn't surprise me if they're having discussions about the ***entire case*** and some thorny discovery issues, and ***some even thornier standing issues***.

DE 185 at 25-26.

Bluegreen finally produced a Second Revised Assignments Chart on Sept. 19, 2022.  That chart is an admission that Bluegreen did not own 200 of the 218 loan *at the time the claims in this case arose* – at the time when owners stopped paying.  Bluegreen's Second Revised Assignments Chart also admits that Bluegreen's claim of current ownership of the 200 loans is premised on assignments, many of which are non-written/oral assignments.   First, the short, written assignments produced as evidence of ownership of some of the 200 loans simply do not convey the causes of action in this case.  Second, there is no contemporaneous documentation that supports the existence of alleged non-written/oral assignments, let alone any such evidence that the cause of action where convey.  Bluegreen's Second Revised Assignments Chart begins a new era in these timeshare litigation wars, as from now on developers will not be able to misrepresent the truth in their complaints.  And based on Bluegreen's admissions in its Second Revised Assignments Chart, developers will no longer be able to avoid the predicate, and dispositive, legal issues raised their securitization process.   Defendants' counsel understands that this is the first timeshare case wherein a court has ordered loan-by-loan discovery of all damages loans.  Here are the legal issues that follow:

1. If Bluegreen did not own 200 of the loans at the time that the cause of action arose, they have no standing to sue on any claims related to those 200 loans.

2. To the extent that Bluegreen argues that it now owns the 200 loans by way of assignment, such assignment must be disclosed in the complaint, which was not the case here.  And so all claims related to the 200 loans must be dismissed.

3. To the extent that Bluegreen argues that it now owns the 200 loans by assignment, Bluegreen must prove up valid assignments, *that covey the causes of action in this case*.  This Bluegreen has not done.

4.  Because Bluegreen says it knowingly purchased defaulted loans by assignment, which loans it previously sold non-recourse, Bluegreen cannot establish legal causation against defendants on any claim related to the 200 loans.  Bluegreen's decision to knowingly buy bad debt when there was no legal obligation to do so, shields defendants from any liability regarding any of the 200 loans.

5.  Bluegreen admits that by not permitting owners to exit their timeshares they are losing money.  Bluegreen routinely takes back defaulted timeshares after 90 to 128 days, resells them at full value, keeping all the original owner's money (no refund), and issues the owner a 1099-A Form after submitting it to the IRS.  Bluegreen's 1099s state that Bluegreen does not lose money on the deal.  In fact, Bluegreen 1099s often recite a value in excess of the owners' outstanding loan balance.  Of the 218 damages loans in this case, Bluegreen has already terminated over 60 percent of the loans, and taken the timeshare interest back.  So for these loans, there is simply no financial harm to Bluegreen.  Regarding the remainder, Bluegreen has the present ability cure its alleged harm, by simply taking the timeshare interests back and reselling them.  Seeking to recover a third time on these loans by sue defendants for payment is an illegal windfall.

**Plaintiffs' lack of loan ownership and standing to bring all claims:**  As noted above, Plaintiffs have no standing for the 200 loans that they admit they do not own.  *See* Pandora's Motion for Summary Judgment ("MSJ") [DE 276] at 1-8; Reply in support of MSJ [DE 326] at 1-5.  Plaintiffs now argue that they repurchased the defaulted loans, in many cases using non-written assignments.  *Id*.  Again, such assertions are fatal.  *Id*.  First, suing on the "repurchased" rights of others must be disclosed in the complaint, which was not done in this case.  *Id*.  Second, intentionally buying distressed debt that was sold non-recourse breaks the chain of causation for

8

all of plaintiffs' related claims. *Id*. No law or contract required Bluegreen to repurchase distressed loans that were sold away non-recourse. *Id*. As a matter of law this act breaks the causal chain and Defendants cannot be charged with damages as alleged by Plaintiffs. *Id*. Third, the actual alleged mechanism of repurchase – including many non-written or oral assignments is laughable. *Id*. Clearly Plaintiffs just made this up in order to save their case. *Id*. What Fortune 200 publicly traded firm relies on non-written assignments to "reclaim" millions of dollars of loans. *Id*. Importantly, Bluegreen has produced no evidence (contemporaneous our otherwise) that supports their assertion of non-written re-assignments of defaulted loans. *Id*. In addition, there is no evidence that the *causes of action* in this case were "repurchased." *Id*. We note that even the few written re-assignments do not state that the causes of action were repurchased. *Id*. In short, the law prevents Bluegreen from making it to trial on all but 18 loans in this case.

As set forth in Pandora's MSJ [DE 276] and Reply in support thereof [DE 326], Plaintiffs' lack standing to sue for 200 of the 218 loans in their then-damages pool, because Plaintiffs did not suffer injury in fact as a result of default on loans which they did now own. *Id.* To establish standing to recover for harm sustained as a result of a default under a loan, Plaintiff must (1) establish that it owned the loan at the at the time the causes of action accrued, or (2) establish that it was assigned the right to bring the action from the party to which the right originally accrued, *i.e.*, the party that owned the loan at the time the causes of action accrued.[1] *Id.* Plaintiffs have

---

[1] *See Ginsberg v. Lennar Florida Holding, Inc.*, 645 So.2d 490, 496 (Fla. 3d DCA 1994) (plaintiff precluded from asserting tort claims related to defaulted mortgages it had purchased because the events giving rise to such claims took place before the purchase of the loans); *In re Gonzales*, 2013 WL 6797171, at *4 (Bankr. N.D. Cal. Dec. 23, 2013) ("Shortly after funding the loan, Landmark sold the loan to Countrywide. Thus, any default on the Loan has not damaged Landmark."); *Macomb Interceptor Drain Drainage Dist. v. Kilpatrick*, 896 F. Supp. 2d 650, 660 (E.D. Mich. 2012) ("[A]n assignment provision incorporating the language 'rights under all contracts' does not *per se* assign claims or causes of action, but instead assigns only rights and obligations arising under a contract…[T]he ability of an assignee to enforce contractually-created rights does not necessarily permit the assignee to also bring tort or statutory claims that are merely related somehow to the contractual relationship but that arose outside of the rights created by the contract.").

done neither.  *Id.*  Plaintiffs admitted that they did not own 200 of the 218 loans at time of alleged

tortious conduct.  *Id.*  Plaintiffs have also failed to proffer sufficient evidence that the causes of

action were assigned – self-serving, post-facto deposition testimony of "non-written" (and non-

oral) assignments, unsupported by any corroborating evidence, does not establish that a valid

assignment exists to cover "the particular claim involved in the action."[2]  *Id.*

Even if Plaintiffs' evidence could pass muster, the allegations still fail for lack of standing,

because where standing is based on assignment of the right to sue, the assignment must be alleged

in the complaint[3] – allegations which are completely absent in Plaintiffs' complaint.  *Id.*  Plaintiffs'

failure to plead assignment is not only a dishonest decoy – distracting the Court and Defendants

from the truth underlying this lawsuit – but it is fatal to their ability to establish constitutional

standing in this case.[4]  *Id.*  It is too late to "plead" assignments in response to a summary judgment

---

[2] *VCA Cenvet, Inc. v. Voll. Veternary Ctrs., Inc.*, 2012 WL 3779101, at *6 (N.D. Ga. Aug. 31, 2012). See also *Ginsberg*, 645 So. 2d at 496; *see also Llano Fin. Grp. v. Nyitray, Jamphaus*, 2016 Fla. Cir. LEXIS 27402, at *1-2 (Fla. 15th Cir. Ct., Oct. 21, 2016) ("assignment of all rights, title, and interest in all loan documents without a specific assignment of the right to prosecute tort actions from the original lender confers no right to pursue a tort claim upon the assignee").

[3] *See Talisman Capital Alt. Invs. Fund, Ltd. v. Mouttet*, (In re Mouttet), 493 B.R. 640 (Bankr. S.D. Fla. 2013) (holding that plaintiff lacked standing because the complaint did not include any allegations that the claims were assigned to plaintiff, and subsequent affidavits filed in response to a motion to dismiss could not cure pleading infirmities); *Llano Fin. Grp. v. Ammons*, 2017 WL 7596921, at *2 (N.D. Fla. June 15, 2017) ("When an assignment of interest is involved, the plaintiff must allege a valid assignment of that cause of action"); *Cortlandt St. Recovery Corp. v. Hellas Telecomms*, 790 F.3d 411, 420 (2d Cir. 2015) (holding that "a purported assignee of a claim must plead a propriety interest in the claim" to establish Article III standing).

[4] *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 976, (11th Cir. 2005) ("The plaintiff has the burden to clearly and specifically set forth facts sufficient to satisfy [] Art. III standing requirements. If the plaintiff fails to meet its burden, this court lacks the power to create jurisdiction by embellishing a deficient allegation of injury."); *In re Mouttet*, 493 B.R at 654 at *24 ("Talisman lacks standing…The Complaint does not include any allegations that the RICO claims were assigned by the Original Lenders to Talisman."); *Cortland*, 790 F.3d at 420 (holding that "a purported assignee of a claim must plead a propriety interest in the claim" to bring a claim in his or her own name in order to satisfy the requirements of constitutional standing.); *Electrostim Med Servs. v. Health Care Serv. Corp*., 614 Fed. Appx. 731, 742 (5th Cir. 2015) (holding that while plaintiff could have standing to assert an ERISA claim if it had received an assignment, the complaint failed to allege an assignment).*Oaktree Capital Mgmt., L; .P. v. KPMG*, 963 F. Supp. 2d 1064, 1077-81 (D. Nev. 2013) (assignment of the right to sue must be pled in accordance with Rule 8, alleging facts that if proved would confer standing upon the plaintiff); *Llano Fin. Grp.*, 2017 WL 759692, at *2 ("When an assignment of interests is involved, the plaintiff must allege a valid assignment of that cause of action."); *MAO-MSO RECOVERY II, LLC v. Boehringer Ingelheim Pharm*., Inc., 281 F. Supp. 3d 1278, 1282-83 (S.D. Fla. 2017) (assignment and facts supporting alleged assignment of right to sue must be pled).

motion, as the Eleventh Circuit has ruled time and again, a plaintiff may not "eliminate a critical deficiency in the allegations of their amended complaint by including additional facts" at the summary judgment stage.[5]

**Plaintiffs cannot establish causation required under their tortious interference and FDUTPA claims:** Plaintiffs are the proximate and legal cause of their own injury.  First, Plaintiffs' business decisions to repurchase the defaulted loans breaks the chain of causation.  *See* Pandora's Motion for Summary Judgment ("MSJ") [DE 276] at 9-12; Reply in support of MSJ [DE 326] at 5-7.[6]  All of Plaintiffs' alleged harm was caused by BVC's voluntary business decision to reacquire loans because the loans were non-performing.  *Id.*  Plaintiffs admit that they repurchase the loans after default in the ordinary course of business (regardless of the reason for default) and admit that they are not obligated to repurchase the loans.  *Id.*

Second, Plaintiffs' business decisions to refuse to provide assistance to the owners who hired defendants or requested to exit their timeshares broke the chain of causation.  *Id.*[7]  Pandora's alleged false statements were not, on their own, injurious to Plaintiffs.  *Id.*  In fact, Plaintiffs did

---

[5] *See Dukes v. Deaton*, 852 F.3d 1035, 1046 (11th Cir. 2017) ((when a plaintiff offers newly-asserted arguments and facts as late as the summary judgment stage, it is, in actuality, "an improper attempt to amend [the] complaint."); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004) (plaintiff may not raise new unpled claims "through argument in a brief opposing summary judgment"); *Flintlock Constr. Servs. v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1227 (11th Cir. 2013); *Lightfoot v. Henry Cty. Sch. Dist.*, 771 F.3d 764, 779 (11th Cir. 2014) (district court properly declined to consider a "new factual basis" raised for the first time in the plaintiff's response in opposition to summary judgment); *Mitchell v. Pilgrim's Pride Corp.*, 817 F. App'x 701, 708 (11th Cir. 2020) (proper to reject "additional evidence" and "new factual basis" for claims presented in plaintiff's opposition to summary judgment not raised in the pleadings); *Dawsey v. Carnival Corp.*, 2018 WL 5251850, at *13 (S.D. Fla. Oct. 22, 2018) (granting Defendant's summary judgment motion because Plaintiff could not, in a memorandum opposing summary judgement, pursue an agency theory, where the complaint contained no allegation of actual or apparent agency); *Joseph M. Still Burn Ctrs., Inc. v. Liberty Mut. Ins. Co.*, 2010 WL 55471, at *13 (S.D. Ga. Jan. 6, 2010) (failure to plead third party beneficiary was fatal per *Gilmour*, explaining that the complete lack of notice precluded consideration of factual allegations on summary judgment.)

[6] *See also Nat'l Investor Servs. Corp. v. Integrated Fund Servs.*, 145 Fed. App'x. 696, 697 (2d Cir. 2005); *see also Granite Commun., Inc. v. One Communs. Corp.*, 2008 WL 4793729, at *5 (D. Conn. Oct. 31, 2008); *DZE Corp. v. Vickers*, 299 So. 3d 538 (Fla. 1st DCA 2020), reh'g denied (July 27, 2020), 2021 WL 1426782 (Fla. Apr. 15, 2021).

[7] *See Sussman v. Soleil Mgmt.*, 2020 WL 870222 (D. Nev. Feb. 21, 2020).

not the majority of the loans at issue at the time of the alleged injury (when the owners stopped paying). *Id.* But regardless of who owned the loans at the time of injury, Plaintiffs' entire claim for damages in this case stems from Plaintiffs' voluntary business decisions. *Id.* Moreover, Plaintiffs have a "no tolerance" policy under which they refuse to assist owners who hire an exit company or exit lawyer, effectively holding the owners in limbo and hurting their credit. *Id.* These voluntary business decisions to refuse assistance to the owners and voluntarily purchase loans already in default also break the chain of causation between Pandora's alleged conduct and the harm Plaintiffs allegedly sustained in this case, precluding Pandora's liability in this case as a matter of law. *Id.*

Finally, Pandora was not even the exit company for 12 loans and thus could not possibly have been the cause of any claimed losses as to them. *Id.*

Pandora is not the proximate cause of Plaintiffs' alleged harm – the owners would have ceased payments regardless of Pandora's actions. Plaintiffs are required to establish proximate causation on a contract-by-contract basis.[8] *See* DE 276 at 9-12; DE 326 at 5-7. The undisputed evidence shows that the owners would have stopped making payments even without ever having met Pandora, due to, among numerous reasons, their growing financial distress, their dissatisfaction with timeshare plan offered by Plaintiffs, Plaintiffs' misrepresentations and oppressive sales practices, and/or Plaintiffs' substandard (or nonexistent) customer service.

---

[8] *See Westgate Resorts, Ltd. v. Sussman*, 2019 WL 3836534, at *2 (M.D. Fla. Aug. 15, 2019) ("This is 175 separate claims of tortious interference with contractual relations at the same time. That means 175 contracts, 175 owners, 175 timeshares, and 175 sets of circumstances surrounding each owner's nonpayment."); *Westgate Resorts, Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1362 (M.D. Fla. 2019) ("Payments stopped at the beginning of Mr. Sussman's or an exit company's representation and throughout the process, could perhaps logically be attributed to an initial direction to stop payments. Not necessarily, though, for owners' continued non-payments at the back end of the process, depending on method and proof.").

Indeed, all 18 owners deposed testified that they decided to stop paying Bluegreen and/or decided they wanted to get rid of their timeshare before even learning of Pandora.  *Id*.

Plaintiffs' internal policy was to default owners who were 128 days delinquent (which was applicable to all 218 owners) – a policy Plaintiffs conceal from its owners.  However, Plaintiffs refused to speak with owners working with exit companies, a fact which breaks the chain of causation and demonstrates that Defendants' alleged conduct did not harm anyone.  Because non-payment by the owners was imminent for reasons wholly unrelated to Pandora's alleged conduct, Pandora cannot be said to have proximately caused any of Plaintiffs' losses.

**Plaintiffs seek an impermissible double recovery on their tortious interference and FDUTPA claims:**  As set forth in Pandora's MSJ, it is well-established in Florida and the Eleventh Circuit that an aggrieved party should not be permitted to receive damages in the form of a windfall.[9]  *See* DE 276 at 12-13.  As a result, and crucial to this case, a creditor who forecloses on collateral securing his loan must reduce the loan balance by the value of the collateral and can only sue for the deficiency – not the entire, unreduced loan balance.  *Id.*

Plaintiffs secured their loans with the timeshare purchasers in this case with the timeshare interests as collateral.  *Id.*  Plaintiffs proceeded to terminate 138 of the 218 contracts at issue and repossessed all of the timeshare interests and points conveyed to these owners.  *Id.*  The IRS Form 1099As filed by Plaintiffs in connection with these timeshare interests reported that the fair market value of these property interests as of the date of their re-acquisition is $1,369,528.40.  *Id.*  But instead of reducing or eliminating the alleged loan balances by the value of the collateral and the

---

[9] *See Exim Brickell, LLC v. Bariven*, S.A., 2011 WL 13131263, at *58 (S.D. Fla. Aug. 16, 2011); *see also MapleWood Partners, L.P. v. Indian Harbor Ins. Co.*, 2014 WL 5791562, at *2 (S.D. Fla. Nov. 6, 2014) ("Despite Plaintiffs' arguments to the contrary, the possibility of a windfall double recovery here is a potentially dispositive threshold issue that the Court must consider in determining whether either side is entitled to summary judgment.") (citing additional Florida cases refusing to overcompensate a plaintiff); *In re Johnson*, 477 B.R. 879, 882 (Bankr. M.D. Fla. 2012) ("no more than a full recovery of the indebtedness may be had").

proceeds of the timeshare interests recovered (as Plaintiffs must) they seek to retain all the value they receive from the foreclosures and resales and recover the full loan balance from the Defendants in this case. *Id.* Plaintiffs are essentially looking to place themselves in a better position after the owners' default than they would have been if the owners fully performed under the contracts. *Id.*

**Plaintiffs failed to comply with the UCC:** Under the Uniform Commercial Code ("UCC"), once Plaintiffs repossess the collateral – as they have in connection with every loan at issue in this suit – they have only one of two choices: (a) they accept the collateral in full satisfaction of the underlying debt or (b) they dispose of the collateral in a commercially reasonable manner ("CRM").[10] *See* DE 276 at 14-15. Lenders, such as Plaintiffs, are obligated under the UCC to keep secured collateral identifiable (even if commingled) and then to sell repossessed collateral in a CRM. *Id.* Lenders who repossess collateral and do not satisfy the debt in full or resell the property in a CRM are in direct violation of the UCC and, in such cases, the law presumes that the debt has been fully satisfied. *Id.* Plaintiffs resell the collateral they reacquire, but fail to keep track of commingled assets. *Id.* After terminating and repossessing the collateral, Plaintiffs had an obligation to account for the interests recovered and resold in order to determine the debt any defaulting owner owed, if any, as a deficiency. *Id.* Plaintiffs ignored their obligation by failing to maintain the identification of this recovered collateral, account to the debtors, or notify them of a sale of the collateral. *Id.* Consequently, the debt of each of the 138 terminated contracts was presumptively satisfied, and the actual damages Plaintiffs seek should be reduced accordingly. *Id.*

---

[10] *See* § 679.620(7) (prohibiting UCC lenders in consumer transaction from taking the collateral back in partial satisfaction of the loan); § Fla. Stat. 679.609(1); *Spellman v. Indep. Bankers' Bank of Fla.*, 161 So. 3d 505, 509 n.5 (Fla. 5th DCA 2014) ("A commercially reasonable disposition may include a judicial sale after the collateral has been repossessed, so long as the sale is not unduly delayed and the repossession has been undertaken for the legitimate purpose of preserving the property for sale.").

**Tortious interference and FDUTPA: Pandora did not engage in any actionable conduct:**  To prevail on a cause of action for tortious interference, Plaintiffs must prove an unjustified interference with their contracts.  *See* Response at 17-18.  A plaintiff cannot establish a claim for tortious interference where the defendant did nothing more than provide a third party with truthful information or honest advice.  *Id*.  Pandora truthfully informed its customers that when they cease making payments, it is easier and faster to get them out of their contracts (as Bluegreen's own policy states) and Plaintiffs would not likely initiate litigation against them for the deficiency.  *Id.*

Plaintiffs allege three unavailing "bases" in support of their FDUTPA claim: 1) their false advertising claim under the Lanham Act; 2) a legally unsupported "bait and switch"; and 3) a purported violation of Cal. Bus. & Prof. Code § 6155(a).  *See* DE 306 at 18.  First, as discussed below, none of the alleged false statements are actionable under the Lanham Act.  *Id*.  Second, Plaintiffs' description of Pandora's services as a "bait & switch" is a self-serving mischaracterization of the process.  *Id*.  Lastly, Plaintiffs' attempt to predicate their FDUTPA claim on Bus. & Prof. Code § 6155(a) fails because it was raised for the first time by way of Plaintiffs' motion for summary judgment; a state statute (like FDUTPA) cannot apply to commerce that takes place wholly outside of the state's borders; and Pandora never received referral fees from the Lawyer Defendants.  *Id*.

**Plaintiffs cannot prove that Pandora violated the Lanham Act:**  Plaintiffs cannot establish a genuine issue of material fact on their Lanham Act claim, much less meet their burden of proof at trial as to the elements and other strictures required to prevail under the Lanham Act. In particular:

15

First, Plaintiffs' lack statutory standing under the Lanham Act.  The Lanham Act is not intended "to allow all factually injured plaintiffs to recover," but only those plaintiffs "whose interests fall within the zone of interests protected by the law invoked" and "whose injuries are proximately caused by violations of the statute."  The Lanham Act only applies when "the harm alleged has a sufficiently close connection to" the false advertisements.  *See* DE 276 at 16-19; DE 326 at 9-17.  Plaintiffs fail this test on numerous grounds.  *Id.*  First, Plaintiffs failed to claim reputational damage.  Second, an owner's purchase of exit services does not harm Plaintiffs as the owner can buy Pandora's exit services and continue paying their timeshare mortgage.  *Id.*  Third, causation is sorely lacking due to Plaintiffs' multiple voluntary business decisions that broke the chain of causation and because non-payment was imminent regardless of Pandora's alleged conduct.  *Id.*  Fourth, court ruling in similar cases have found that false advertisements that do not instruct (or cause) owners to stop paying are "too remote" to be the "type of interest the Lanham Act was intended to protect."[11]  *Id.*  Fifth, in the case of non-direct competitors, *Lexmark* requires that any such lost sales between non-competitors amount to a near 1-to-1 loss of funds (from Plaintiffs to Pandora), which Plaintiffs cannot satisfy.  *Id.*

Second, the oral statements are true and not misleading.  All five statements at issue are true, not misleading, and otherwise are not actionable under the Lanham Act, to wit: 1) once an owner retains Pandora and an attorney contacts Bluegreen, the owner is out of their contract and able to cease payment; 2) the owners' credit will be protected when they stop making those payments to developers; 3) Pandora has "always" gotten its clients out, is "100% successful," and has never lost a case; 4) the attorneys will negotiate or otherwise engage in conversations with

---

[11] *See Westgate Resorts, Ltd. v. Reed Hein & Assocs.*, LLC, 2020 WL 674108, at *2 (M.D. Fla. Feb. 11, 2020); *Wyndham Vacation Ownership v. Reed Hein & Assocs.*, LLC, 2019 WL 2232241, at *3 (M.D. Fla. May 23, 2019); *Orange Lake Country Club, Inc. v. Reed Hein & Assocs.*, LLC, 2019 WL 7423517, at *14 (M.D. Fla. Oct. 4, 2019).

Bluegreen on the owners' behalf; and 5) the attorneys will have more success in getting an owner out of their timeshare contract when the owner stops making payments to the developer.

Third, the oral statements were not widely disseminated.  In order to qualify as advertising or promotion, oral statements must be widely disseminated and part of an organized campaign to penetrate the relevant market.  *Id.*  Thus, the statements must be directed at a class or category of consumers, not simply particular individuals.  *Id.*  There is no evidence that any of the oral statements giving rise to Plaintiffs' Lanham Act claim was anything more than individual statements by sales personnel to individual customers.  *Id.*

Fifth, Plaintiffs' claimed disgorgement damages constitute impermissible double recovery. Plaintiffs' claim for disgorgement of profits in addition to actual damages is impermissible double recovery.  *Id.*  Plaintiffs seek actual damages in this case resulting from Pandora's alleged misconduct of "diverting payments from Bluegreen to the Direct False Advertising Defendants." But these alleged "diverted payments" are the "revenues received from Bluegreen Owners" – which Plaintiffs also seek as "disgorgement damages".  *Id.*  Accordingly, an award of disgorgement of profits would be duplicative of any actual damages award and is impermissible as a matter of law.  *Id.*  Additionally, in providing for the remedy of disgorgement, 15 U.S.C. § 1117(a) dictates that any sum awarded "shall constitute compensation and not a penalty."  *Id.* Thus, calculation of disgorgement cannot produce a windfall, and there may not be a "gross disconnect between harm and recovery."  *Id.*  Because Plaintiffs in fact suffered zero proximately caused monetary damages, the astronomical amount requested is grossly disconnected from the harm, and is clearly punitive and not compensatory, in contravention of the Lanham Act, and should be denied.  *Id.*

**Plaintiffs are not entitled to injunctive relief:** Plaintiffs cannot prove that 1) they suffered an irreparable injury; 2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; 3) that, considering the balance of hardships between the Plaintiffs and Defendants, a remedy in equity is warranted; and 4) that the public interest would be served by an injunction. *Id.*

### C.  Lawyer Defendants' Statement of the Case

<u>Pandora Marketing, LLC ("Pandora")</u>. In early 2016, Defendant Pandora began offering assistance to customers seeking to terminate their relationships with timeshare developers. Pandora's officers were Defendant Rich Folk (a former Wyndham Executive Vice President of Sales and Marketing) and Defendant William "Bo" Wilson (a former Wyndham Vice President, Site Sales and Marketing). Both were very familiar with the deceptive and high pressure sales tactics used by many timeshare developers. (Based on the 17 depositions of Bluegreen Owners taken by Plaintiffs in this action, Bluegreen employs such tactics. As for any concern over "loss of goodwill", it arises as a result of Bluegreen's own actions.)

Each of the timeshare owners who retained Pandora contended that their agreement to purchase had been obtained through misrepresentations and deception. In their Service Agreements with Pandora, each owner contracted with Pandora to provide assistance in terminating their timeshare relationship through any of several mechanisms, including voluntary surrender of their timeshare interest, non-judicial foreclosure, and judicial foreclosure.  Each owner acknowledged that Pandora was not a law firm and could not render legal advice, but that they would be referred to a law firm and required to pay that law firm a separate fee for its legal services.

After being retained, Pandora did refer its clients to various law firms for representation. During 2016-2017, Pandora and those attorneys were very successful in obtaining releases.

<u>Referrals to Lawyer Defendants</u>. In June 2017, after approximately 18 months of operation, Pandora added to its referral list Del Mar Law Group, LLP, a law firm in which Defendant Sean Slattery was a partner, and began to refer potential clients to Del Mar. In March 2019, after Del Mar ceased operations, Pandora began referring some of its customers to Defendant Carlsbad Law Group, LLP ("Carlsbad").

Carlsbad Law Group, whose partners are Sean Slattery and David Hall, commenced business in early 2019. Its work includes representing clients in various litigation matters. On March 1, 2019, Carlsbad began accepting timeshare owner referrals from Pandora and, assumed the representation of the former timeshare clients of Del Mar Law Group. Neither Del Mar, nor Carlsbad, nor Sean Slattery have ever paid any compensation to receive those referrals.

Lawyer Defendants play no role in Pandora's internal operations, including its marketing. They do not provide input into Pandora's promotional materials, do not review sales scripts, and do not observe sales presentations.  Carlsbad is simply one of several law firms to whom Pandora refers potential clients.

Among those referrals have been Bluegreen Owners. Each has represented that they were victims of Plaintiffs' fraud and unethical sales practices and wished to terminate their relationship with Bluegreen. Each had made the decision to terminate that relationship before ever contacting Del Mar (pre-March 1, 2019) or Carlsbad (following March 1, 2019).

Prior to retention, each Bluegreen Owner was informed in writing that the law firm could offer no guarantee as to the outcome, including no assurances that a termination could be achieved. To the degree that any owner had believed that the process of obtaining an exit was simple or

certain, that misunderstanding was corrected. If an owner believed that Pandora had represented differently, each owner had every opportunity to raise that issue with Pandora.

No client was misled as to the nature of the fee or as to the work to be performed. For the fee received (initially $600.00 and later $750.00), the law firm agreed to initially perform certain tasks:

- send a "Cease and Desist" letter in an effort to preclude bill collectors from harassing that client and to potentially open settlement discussions;
- send a demand letter describing the fraudulent misrepresentation and unethical practices which had occurred; and
- use its best efforts to negotiate a resolution with the developer to the extent possible.

Since 2017, Del Mar, and later Carlsbad, have successfully negotiated resolutions of the disputes with many developers. The majority of developers respond to the correspondence received from attorneys. With some, a settlement is quickly achieved. With others, the process is more protracted, but after a period of time, the matter is resolved, with the client relinquishing any claim to the timeshare interest and being released from any liability.

But as for Bluegreen, after a period of time, Plaintiffs ceased to respond to communications. When that occurred, Lawyer Defendants believed that the best approach for their clients was to wait. Typically, the timeshare interest securing the debt was worth substantially more than what was owed. Plaintiffs' practice was not to seek deficiencies against an owner. Lawyer Defendants believed that after a period of time, Plaintiffs would want to recover the timeshare interest so that it could be re-sold to another buyer at a profit. Plaintiffs would then be willing to take back the timeshare interest and issue an IRS 1099-A form releasing the client from

any further liability.[12] The strategy of being patient appeared to be a better approach than exposing clients to the risks and expenses involved in litigation.

The results achieved by Bluegreen owners support the wisdom of that approach. Of the 218 loans in Plaintiffs' damage model, 140 (64%) have already been terminated and the owners released from any further liability, saving collectively several million dollars. As for the owners of the remaining 78 loans, none have had to pay any additional monies to Plaintiffs and collectively have saved hundreds of thousands of dollars.

The Impact of an Owner Ceasing to Make Payments. An important factor in determining how quickly a resolution can be achieved is often whether the owner is continuing to make payments to the developer. As long as the developer has a stream of income from the owner, it has far less incentive to resolve the matter. This reality is recognized by individuals familiar with the timeshare industry.

In this litigation, Bluegreen claims that a representation that "lawyers are often able to achieve a quicker resolution if a client is not making payments" is false. In fact, the truth of that statement is widely recognized and has been noted in national publications such as AARP's magazine. Indeed, Bluegreen's own internal policies demonstrate the truth of this statement, providing that it shall recover any timeshare interest where the owner is more than 90 days delinquent and release that owner from any further liability.

But, in this litigation, Defendants have learned that in 2018 Bluegreen adopted a "no tolerance" policy. If they ever catch an owner working with an exit company or with an associated

---

[12] In this litigation, discovery has confirmed that: (1) it is Plaintiffs' practice to reacquire a timeshare interest for resale after a loan has been delinquent for more than 90 days and to release the owner from any further financial responsibility; (2) Plaintiffs do not seek deficiencies against owners who stopped paying; and (3) in every case, Plaintiffs represent to the IRS that the fair market value of the timeshare interest reacquired was worth at least as much as the debt owed.

law firm, they claim they will never release that owner from the owner's obligations and will report that owner as a bad credit risk on a monthly basis for the rest of that owner's life. Testimony in this litigation has confirmed that is Bluegreen's policy. Bluegreen has also admitted that by administering this policy, it is intentionally damaging both the owner and itself, since it could simply recover the timeshare interest and re-sell it.  As a result of this policy, 78 of the 218 loans have not been terminated.

Clearly, as to the owners of the 140 loans which have been terminated, their decision to stop making payments has benefitted them.  As to the owners of the other 78 loans, Bluegreen's strategy decision to not apply its standard 90-day cancellation policy to those owners and to punish them for retaining an exit company by working to damage their credit is unfortunate.  But even, as to those owners, the savings achieved each month outweigh any negative consequences.  During the 17 owner depositions, most deponents were asked, "If you had been aware that you could get out by stopping payments, but that it would hurt your credit, would you still do it?"  Everyone answered, "yes."  Even the 78 owners have benefitted by ceasing to make payments.

The advice given by Lawyer Defendants has been good advise and the approach adopted has benefitted their clients.

## 2. Basis of the Court's Subject-Matter Jurisdiction

This Court has subject matter jurisdiction over Bluegreen's Lanham Act claim as it arises under the laws of the United States. 28 U.S.C. § 1331.  Further, the Court has subject matter jurisdiction over Bluegreen's state law claims pursuant to the Court's diversity jurisdiction, 28 U.S.C. § 1332, as there is complete diversity between Bluegreen and the Defendants and the amount in controversy exceeds Seventy-Five Thousand and 00/100 Dollars ($75,000.00). Finally, this Court continues to retain supplemental jurisdiction over the claims asserted under 28 U.S.C.

§ 1367. Defendants' pending motions for summary judgment challenge Plaintiffs' standing to bring this action.

3. **The Pleadings Raising the Issues**

The issues in this case are raised in the following pleadings:

- Plaintiffs' Complaint for Damages and Injunctive Relief [ECF No. 1];

- Pandora's Answer, Affirmative Defenses, and Demand for Trial by Jury [ECF No. 102];

- The Lawyer Defendants' Amended Answer and Affirmative Defenses [ECF No. 187].

4. **Outstanding Motions or Other Matters**

The following motions remain outstanding for the Court's determination:

- ECF No. 270: *Plaintiffs' Motion for Partial Summary Judgment Against Defendants and Incorporated Memorandum of Law*

- ECF No. 274: *Defendants', Carlsbad Law Group, LLP and J.L. "Sean" Slattery, Motion for Final Summary Judgment Against All Plaintiffs and Memorandum of Law*

- ECF No. 276: *Pandora Marketing, LLC, Rich Folk and William Wilson's Motion for Summary Judgment*

- ECF No. 351: *Lawyer Defendants' Motion to Allow Live Remote Testimony at Trial of Bluegreen Owners Upon the Court Determining that Good Cause Exists and Memorandum in Support Thereof*

- ECF No. 352: *Pandora Marketing, LLC, Rich Folk and William Wilson's Omnibus Motion in Limine*

- ECF No. 353: *Defendants Pandora Marketing, LLC, William Wilson and Rich Folk's Daubert Motion to Exclude the Expert Report and Testimony of Plaintiffs' Expert Mark L. Tuft*

- ECF No. 354: *Lawyer Defendants' Unopposed Motion to Bifurcate the Determination of the Amount of Punitive Damages at Trial and Memorandum in Support Thereof*

- ECF No. 355: *Lawyer Defendants' Daubert Motion to Exclude Opinion Testimony of Mark Tuft*

- ECF No. 356: *Plaintiffs' Motion in Limine*

- ECF No. 357: *Plaintiffs' Daubert Motion to Exclude Expert Opinions and Testimony of Daniel M. White, Esq.*

- ECF No. 358: *Lawyer Defendants' Motion in Limine and Memorandum in Support Thereof*

- ECF No. 387: *Defendants' Joint Motion in Limine to Exclude Plaintiffs' Deposition Designations and All Other Evidence from a Different Case and Motion to Require Parties to Combine All Designated Video Deposition Testimony into One Single Video Per Witness at Trial*

- ECF No. 388: *Pandora Marketing, LLC, Rich Folk, and William Wilson's Motion in Limine to Exclude Plaintiffs' Deposition Designations of Jimmy Baskett*

- ECF No. 394: *Plaintiffs' Expedited Motion to Strike Defendants' Motions in Limine [ECF No. 387, 388] and Incorporated Memorandum of Law*

- ECF No. 399: *Joint Expedited Motion for Extension of Time as to Joint Objections*

**5.  <u>A Concise Statement of Uncontested Facts</u>**

24

1.      Bluegreen's principal place of business is located in the State of Florida.

2.      Bluegreen's principal place of business is located within the judicial district of the United States District Court for the Southern District of Florida.

3.      Pandora Marketing does business as Timeshare Compliance.

4.      Pandora Marketing is owned by Defendants Rich Folk and William "Bo" Wilson.

5.      Bluegreen filed this lawsuit on November 13, 2020.

6.      The Parties anticipate continuing to work together to reach additional stipulations to expedite matters for trial if possible, including presentation of voluminous records.

**6.   A Concise Statement of Issues of Facts**

    **A.  Plaintiffs' Statement**

The following outlines Plaintiffs' statement of remaining issues of fact as of the date of this joint filing. Such remaining issues may be resolved prior to trial pursuant to the Court's expected order on pending motions for summary judgment.[13]

## COUNT I

As to Count I – False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1), there are four (4) remaining factual issues to be resolved. These include:

(1)     whether the Pandora's advertising statements at issue were false or misleading, including whether the statements were either literally false or literally true but false by implication;

(2)     whether Pandora's advertising statements at issue deceived, or had the capacity to

---

[13] Bluegreen's motion for summary judgment (ECF No. 270) has sought the alternative relief under Rule 56(g) of the Federal Rules of Civil Procedure requesting that the Court enter an order stating that certain "material fact[s] . . .[are] not genuinely in dispute and treating the fact[s] as established in the case." To the extent that such relief is granted, one or more of the issues identified below may be resolved for purposes of trial.

deceive, consumers including Bluegreen Owners;

(3)     whether Pandoras advertising statements at issue had a material effect on purchasing consumers' decisions and withholding of payments from Bluegreen; and

(4)     whether

(a) Bluegreen was injured as a result of Pandora's false advertising statements at issue to Bluegreen Owners, and if so, in what amount;

(b) Bluegreen is entitled to disgorgement from Pandora of any and all profits earned by Pandora on account of their false advertising, and if so, in what amount, and/or

(c) Bluegreen is entitled to corrective advertising relief from Pandora.

As to determination of whether the Pandora's advertising affects interstate commerce, admissions to certain requests for admission satisfy such element of Bluegreen's claim. *See* PM's Resp. to RFA No. 1 (Admission that Pandora Marketing engages in nationwide advertising for its services.).

Additionally, with regard to future conduct, factual issues remain regarding whether the Defendants' businesses practices, if not enjoined, will cause future irreparable harm to Bluegreen and Bluegreen Owners.

Bluegreen also asserts that BVC's status as a servicer of all timeshare loans at issue renders it a real party in interest to prosecute claims related to the loans at issue, separate and independent of any other bases for Bluegreen to assert standing.

## **COUNT III**

As to Count III - Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1), there are two (2) remaining factual issues to be resolved. These include:

(1)     whether Pandora engaged in an underlying false advertising; *see infra*, and

(2)     whether the Lawyer Defendants materially furthered or were "aware" of the false advertising.

In relation to any actual, imputed, or constructive knowledge requirement, the trier of fact may also consider whether the Lawyer Defendants were willfully blind to the other Defendants' false advertising, such that the law will impute actual knowledge to Lawyer Defendants of the false advertising.  Slattery has admitted that he was aware that Pandora Marketing engaged in advertising. *See* Slattery's Resp. to RFA Nos. 16-17.

Additionally, with regard to future conduct, factual issues remain regarding whether the referral scheme between Lawyer Defendants and Pandora Marketing, if not enjoined, will continue to contribute to Pandora Marketing's false advertising statements to Bluegreen Owners.

Finally, there is a factual issue of whether Bluegreen is entitled to disgorgement from the Lawyer Defendants of any and all profits earned on account of their contribution to Pandora's false advertising, and/or whether Bluegreen is entitled to corrective advertising relief from the Lawyer Defendants.

Bluegreen also asserts that BVC's status as a servicer of all timeshare loans at issue renders it a real party in interest to prosecute claims related to the loans at issue, separate and independent of any other bases for Bluegreen to assert standing.

## COUNT V

As to Count V: tortious interference with contractual relations, there are four (4) remaining factual issues:

(1)     The existence of contracts between Bluegreen and Bluegreen Owners, including those identified by Bluegreen on its Rule 26(a) Disclosures.  This includes timeshare purchase agreements (i.e., Owner Beneficiary Agreements), and debt

financing agreements (i.e., promissory notes or other financing instruments).

(2)    Whether the Defendants knew of the existence of contracts between Bluegreen and the Bluegreen Owners;

(3)    Whether the Defendants' intentionally procured breach of Bluegreen's contracts with Bluegreen Owners, through advertising statements or otherwise;

(4)    Damages and other non-quantifiable harm to customer relationships resulting from disruption of customer relationships resulting from the Bluegreen Owners' breach of their contracts; and

(5)    Whether Defendants' conduct was intentional misconduct or gross negligence warranting the imposition of punitive damages against Pandora and/or the Lawyer Defendants under Chapter 768, Florida Statutes.

As to certain of the elements of Bluegreen's claims, admissions to certain requests for admission satisfy such elements as to certain defendants. Specifically, Pandora Marketing admitted facts sufficient to show that there exist contracts between Bluegreen and the relevant owners and that it had knowledge of such contracts. *See* PM's Resp. to RFA Nos. 48 (Admission that when Pandora enters into agreements with owners it does so under the belief that each customer is a party to a writing that purports to create a contract between such customers and a timeshare developer), 49 (Admission that Pandora Marketing only enters into agreements with customers who claim to have signed a timeshare contract).

Moreover, both Pandora Marketing and Slattery admitted facts sufficient to satisfy the element that they are not privileged to interfere with Bluegreen's contracts. *See* PM Resp. to RFA Nos. 129 and 144 (Admissions that contracts between Bluegreen and Bluegreen timeshare owners do not require payment to Pandora Marketing); 142 (Admission that Pandora Marketing has no

economic or beneficial interest of its own in any contract between Bluegreen and any Bluegreen timeshare owner); 143 (Admission that Pandora Marketing is not a third-party beneficiary of any contract between Bluegreen and any Bluegreen timeshare owner); 225 (Admission that the contracts between Pandora Marketing and its customers disclaim the existence of any agency relationship); Slattery's Resp. to RFA Nos. 37 (Slattery does not have an economic or beneficial interest of his own in any contract between Bluegreen and any Bluegreen timeshare owner); 38 (The law firms associated with Slattery do not have an economic or beneficial interest of their own in any contract between Bluegreen and any Bluegreen timeshare owner); 39-40 (Admissions that neither Slattery nor his affiliated law firms are not third-party beneficiaries of any contract between Bluegreen and any Bluegreen Owner).

Bluegreen also asserts that BVC's status as a servicer of all timeshare loans at issue renders it a real party in interest to prosecute claims related to the loans at issue, separate and independent of any other bases for Bluegreen to assert standing.

## <u>COUNT VI</u>

As to Count VI: Violation of Florida's Deceptive and Unfair Trade Practices Act, there are two (2) factual issues:

(1)     Whether the Lawyer Defendants engaged in a deceptive or unfair act or practice; and

(2)     Whether Wyndham was aggrieved by the deceptive or unfair act or practice.

The Court should decide whether the conduct at-issue is likely to mislead consumers or offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

This conduct includes, without limitation, Pandora's false advertising discussed in regard to the Lanham Act Claim above, along with Pandora's business practices, which may be best

characterized as the colloquial "bait & switch." Specifically, Pandora preys on Bluegreen Owners via a guarantee of a lawful exit from their timeshare contracts backed by an oversell of legal services using buzz words and references to filing cases, trial, and legal teams. They then "sweeten the deal" by telling the timeshare owner that the Defendants' services permit the owner to stop payments to Bluegreen with no harm to their credit so long as they use specific credit repair vendors.  Thereafter, neither Pandora nor Lawyer Defendants do anything to effect the timeshare owners' legal obligations. The methods employed by the Pandora are drastically different than the advertised service and are likely to mislead reasonable Bluegreen owners to believe they are no longer obligated on their timeshare contracts to the owners' detriment.

As for the Lawyer Defendants, the Court should find that they participate and enable Pandora's bad acts. Lawyer Defendants' allow Pandora to perform traditional legal functions (i.e., screening clients, client origination, client communication, rendering of advice), they share fees, subject owners to excess fees, engage in and support the unlicensed practice of law, and enable Pandora advertisement of legal services which includes improper claims regarding the scope of the advertised service and its efficacy.

Furthermore, the relationship separately constitutes a per se violation of FDUTPA under California Business and Professions Code § 6155 and other authorities as raised in the report of Mark Tuft, which is the subject of the parties' summary judgment and Daubert motions.

Bluegreen also asserts that BVC's status as a servicer of all timeshare loans at issue renders it a real party in interest to prosecute claims related to the loans at issue, separate and independent of any other bases for Bluegreen to assert standing.

**COUNT VII**

As to Count VI: Civil Conspiracy to Commit Tortious Interference, the remaining factual issues include:

(1)    Whether an agreement existed between the Lawyer Defendants and Pandora, or Pandora perpetrated a scheme to interfere with Bluegreen's timeshare contracts;

(2)    Whether the Lawyer Defendants and Pandora did an unlawful or a lawful act by unlawful means, or whether Lawyer Defendants knowingly participated in the tortious scheme perpetrated by Pandora;

(3)    Whether the Lawyer Defendants and/or Pandora took overt acts in furtherance of the conspiracy, and

(4)    Whether Bluegreen was harmed by the acts done under the conspiracy.

Bluegreen also asserts that BVC's status as a servicer of all timeshare loans at issue renders it a real party in interest to prosecute claims related to the loans at issue, separate and independent of any other bases for Bluegreen to assert standing.

Finally, with regard to Bluegreen's conspiracy claim, there is a factual issue as to whether Defendants' conduct was intention misconduct or gross negligence warranting the imposition of punitive damages against Pandora and/or the Lawyer Defendants under Chapter 768, Florida Statutes.

**B.  Pandora's Statement**

**Standing:**  Does Bluegreen have standing to bring the claims it has asserted with respect to 200 of the 218 owners at issue?  *See* Pandora's Motion for Summary Judgment [DE 276] and Reply in support thereof [DE 326].

**Lanham Act:**

a.  Where Pandora's alleged advertisements false or misleading?

b.  Did the alleged advertisements deceive, or have the capacity to deceive, consumers?

c.  Did the alleged deception have a material effect on purchasing decisions?

d.  Did the allegedly misrepresented product or service affect interstate commerce?

e.  Was Bluegreen in fact injured as a result of the alleged false advertising?

f.  Did Bluegreen prove: 1) "an injury to a commercial interest in reputation or sales;" and, 2) an "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff"?

g.  Where the alleged statements commercial speech?

h.  Where the alleged statements made for the purpose of influencing consumers to buy Pandora's goods or services?

i.  Where the alleged statements disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry."

j.  Where the alleged statements widely disseminated and part of an organized campaign to penetrate the relevant market.

k.  Where the alleged statements commercial claims that are literally false as a factual matter?

l.  Were the statements literally true or ambiguous and implicitly convey a false impression, are misleading in context, or are likely to deceive consumers

m.  Did Bluegreen present evidence of deception in the form of consumer surveys, market research, expert testimony, or other evidence?

n.  Did Bluegreen establish that Defendants' alleged deception is likely to influence the purchasing decision?

o. Did the evidence on the issue of whether the representations mattered to consumers rise above speculation that due to some function or efficiency of the product, consumers are deceived?

p. Did Bluegreen establish proximate causation of injury, that is, economic or reputational injury flowing directly from the deception wrought by Defendants' advertising?

q. Did the alleged false advertising statements cause the claimed injury?

r. If the advertisement was literally false, did Bluegreen establish materiality?

**Tortious Interference Claim:**

a. Did a valid contract exist between Bluegreen and each of the 218 owners at issue at the time of injury when the claim arose?

b. Did Pandora Defendants have knowledge of the contract?

c. Did Pandora Defendants intentionally procure the contract's breach?

d. Did Pandora Defendants act without any justification or privilege?

e. Did any damages result from the breach?

f. Did Defendants provide truthful information?

g. Did Defendants provide honest advice within the scope of a request for the advice?

h. Did Plaintiffs prove tortious interference for each and every contract at issue in the case?

i. Was there damage proximately caused by the tortious interference in that the interference directly and in natural and continuous sequence produced, or contributed substantially to producing such injury?

j. Did the proximate cause of an injury constitute a cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and

without which the result would not have occurred?

k.  Was the evidence of causation of tortious interference established by a contract-by-contract proof of the circumstances that surrounds the breach of each contract?

l.  Was causation established with (1) evidence that advertisements were viewed, (2) evidence of temporal relationship of economic injury *and* (3) expert opinion that the advertisements were likely to cause viewers to stop making payments?

m.  Where any of the owners at issue predisposed to breach?

**FDUTPA:**

a.  Did Pandora engage in deceptive acts or unfair trade practices?

b.  Did these actions cause damage to Plaintiffs?

c.  Did Plaintiffs incur actual damage?

d.  Can Plaintiffs prove an injury or detriment to consumers?

**Conspiracy:**

a.  Was there 1) an agreement between two or more parties 2) to do an unlawful act or to do a lawful act by unlawful means, 3) the doing of some overt act in furtherance of the conspiracy, and 4) damage to plaintiff as a result of the acts done under the conspiracy?

**Pandora's Affirmative Defenses:**

a.  First Affirmative Defense: Was Pandora retained to provide timeshare exit services as the agent of certain timeshare owner/customers?

b.  Second Affirmative Defense: Did Pandora act in the best interests of each timeshare owner/customer as the agent thereof?

c.  Fourth Affirmative Defense: Did any of Pandora's advertisements identified in the Amended Complaint include instructions and/or any basis permitting an inference that

a timeshare owner should stop making payments owed pursuant to a contract purportedly entered into with the Plaintiffs?  [Sorry, but I do not understand this one]

d.  Fifth Affirmative Defenses: Did Plaintiffs have standing to pursue their claims as to the 200 of the 218 owners?

e.  Sixth Affirmative Defense: Any action taken by Mr. Folk in his capacity as a Member of Pandora Marketing inured to that limited liability company. Therefore, any allegations pled against Mr. Folk other than in his capacity as a Member of Pandora Marketing are barred, as a matter of law.

f.  Seventh Affirmative Defense: Any action taken by Mr. Wilson in his capacity as a Member of Pandora Marketing inured to that limited liability company. Therefore, any allegations pled against Mr. Wilson other than in his capacity as a Member of Pandora Marketing are barred, as a matter of law.

g.  Eighth Affirmative Defense: Mr. Folk neither dominated nor controlled Pandora Marketing to the extent necessary to subsume the independent existence of that limited liability company. Further, on no occasion did Mr. Folk use Pandora Marketing for any improper means.

h.  Ninth Affirmative Defense: As the Ninth Affirmative Defense, Pandora affirmatively states Mr. Wilson neither dominated nor controlled Pandora Marketing to the extent necessary to subsume the independent existence of that limited liability company. Further, on no occasion did Mr. Wilson use Pandora Marketing for any improper means. Therefore, no basis exists to support an allegation, if any, of Mr. Wilson as an alter ego of Pandora Marketing, as matter of law.

i.  Tenth and Eleventh Affirmative Defense: Are punitive damages recoverable?

### C.  Lawyer Defendants' Statement

1. Of the 218 loans in Plaintiffs' damage model, which were owned by Plaintiff, Bluegreen Vacations Corporation (hereinafter "BVC"), at the time the asserted causes of action arose?

2. Of the 218 loans in Plaintiffs' damage model, which were owned by Plaintiff, Bluegreen Vacations Unlimited, Inc. (hereinafter "BVU"), at the time the asserted causes of action arose?

3. As to loans not owned by Plaintiff BVC when the cause of action related to that loan arose, was that cause of action later assigned to BVC and, if so, was the fact of that assignment and the fact that BVC was seeking those damages incurred by a third party asserted in the pleadings?

4. As to loans not owned by Plaintiff BVU when the cause of action related to that loan arose, was that cause of action assigned to BVU and, if so, was the fact of that assignment and the fact that BVU was seeking those damages incurred by a third party asserted in the pleadings?

5. As to each of the owners of the 218 loans at issue, did that owner decide to cancel and/or not perform the timeshare contract prior to contacting any of the Defendants?

6. As to each loan in Plaintiffs' damage model, was any act of any of the Pandora Defendants a legal cause of that owner's decision to breach his or her contract?

7. As to each loan in Plaintiffs' damage model, was any act of any of the Lawyer Defendants a legal cause of that owner's decision to breach his or her contract?

8. What was the legal cause of each owner's decision to cease to perform under  that owner's timeshare contract?

9.  As to the Pandora Defendants, where they rendered advice to an owner, was that advice requested by the owner and, if so, was the advice given honest or good advice?

10. Was advice given to clients by Lawyer Defendants appropriate advice which, in the opinion of the Lawyer Defendants, was in the client's best interest?

11. As to those owners who followed the advice given by any Defendant and who have been released from their obligations under their timeshare contract, have the financial benefits received by that owner exceeded any negative financial consequences incurred?

12. As to those owners who followed advice given by any Defendant, but who have not been released from their obligations under their timeshare contract, have the financial benefits received by that owner exceeded any negative financial consequences incurred?

13. In making an affirmative decision not to recover the timeshare interests associated with approximately 78 of the loans in question, have Plaintiffs intentionally inflicted damages upon themselves?  Have Plaintiffs failed to mitigate their damages?

14. As to Plaintiff BVC's claim for actual damages in the amount of the "aggregation of unpaid loan balances outstanding on mortgage loans owed to Bluegreen", what is the amount of those unpaid loan balances?

15. As to Plaintiff BVU's claim for actual damages in the amount of the "aggregation of unpaid loan balances outstanding on mortgage loans owed to Bluegreen", what is the amount of those unpaid loan balances?

16. As to BVC's claim for disgorgement damages, what is the amount of those damages?

17. As to BVU's claim for disgorgement damages, what is the amount of those damages?

18. Did the Pandora Defendants engaged in any false advertising and, if so, was such advertising the legal cause of any owner's decision to stop making payments to Plaintiffs.

19. Did Lawyer Defendants contribute to any false advertising which was a legal cause of any owner's decision to stop making payments to Plaintiffs.

20. Did Lawyer Defendants engage in any deceptive or unfair acts or practices which were a legal cause of a decision of an owner to stop making payments to Plaintiffs.

21. Was either Plaintiff an "aggrieved party" sufficient to warrant relief under FDUPTA.

22. Was any client of Lawyer Defendants harmed by the allegedly deceptive or unfair trade practices in violation of the provisions of Florida law?

23. Were any Florida residents harmed by the allegedly deceptive or unfair trade practices of Lawyer Defendants?

24. Did any act by Lawyer Defendants constituted improper interference with a contract between an owner and Plaintiffs.

25. Did Lawyer Defendants conspire with the Pandora Defendants to do an unlawful act or to do a lawful act by unlawful means which resulted in damage to the Plaintiffs.

26. Were any of the Plaintiffs damaged by an owner's decision to cease making payments on a loan, other than damage which that Plaintiff intentionally chose to inflict upon itself?

27. Were the acts of the Lawyer Defendants protected by a privilege to work to advance a client's interests or by the provisions of Section 772, Restatement (2nd) of Torts?

28. Was the conduct of Lawyer Defendants privileged under the Noerr-Pennington Doctrine?

29. Given the Plaintiffs' decision to conceal the fact that they did not own the vast majority of the loans upon which they based their damage claims at the time the causes of action arose, which information was only released after it was so ordered by Magistrate Judge Goodman, are Plaintiffs entitled to equitable relief?  If so, what relief?

30. Is any Plaintiff entitled to disgorgement and, if so, in what amount?

31. Is either Plaintiff entitled to injunctive relief against any Lawyer Defendant under the provisions of the Lanham Act or FDUPTA and, if so, the terms of that injunctive relief?

32. Is any party entitled to attorney's fees under the Lanham Act or under FDUPTA?

**7.  A Concise Statement of Uncontested Legal Principles**

1.  Lanham Act False Advertising Claim:

    1.  "To succeed on a false advertising claim, the plaintiff must prove that: (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been— or is likely to be—injured as a result of the false advertising*." Futuristic Fences, Inc. v. Illusion Fence Corp.*, 558 F. Supp. 2d 1270, 1278 (S.D. Fla. 2008).

    2.  To establish statutory standing under the Lanham Act, a plaintiff must prove: 1) "an injury to a commercial interest in reputation or sales;" and, 2) an "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 133 (2014). ).

    3.  To determine whether statements are commercial advertising under the Lanham Act, courts consider whether such statements were: (1) "commercial speech"; (2) "for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a 'classic advertising

campaign,' but may consist instead of more informal types of 'promotion,'" the representations (3) "must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012) (quotation omitted).

4. For false advertising claims, deception is presumed for literally false statements. *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1319 (11th Cir. 2010).

5. "Even if an advertisement is literally false, the plaintiff must still establish materiality." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1319 (11th Cir. 2010). "A plaintiff may establish this materiality requirement by proving that 'the defendants misrepresented an inherent quality or characteristic of the product.'" *Diamond Resorts Int'l, Inc. v. Aaronson*, 371 F. Supp. 3d 1088, 1108 (M.D. Fla. 2019) (quotation omitted). "A plaintiff attempting to establish … that an advertisement is literally true but misleading, must present evidence of deception in the form of consumer surveys, market research, expert testimony, or other evidence." *Hickson Corp.* 357 F.3d at 1261 (internal citations omitted.)

2. Contributory False Advertising Claim:

1. To prevail on a contributory false-advertising claim under the Lanham Act a plaintiff must establish: (1) that the "third party in fact directly engaged in false advertising that injured the plaintiff" and (2) "that the defendant contributed to that conduct either by knowingly inducing or causing the conduct, or by materially participating in it." *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1277 (11th Cir. 2015).

3. Tortious Interference Claim:

    1. Under Florida law, "the elements of tortious inference with contractual relations are: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) absence of any justification or privilege; and (5) damages resulting from the breach." *Westgate Resorts, Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1349 (M.D. Fla. 2019).

4. Civil Conspiracy Claim:

    1. "A civil conspiracy claim requires: (1) an agreement between two or more parties (2) to do an unlawful act or to do a lawful act by unlawful means, (3) the doing of some overt act in furtherance of the conspiracy, and (4) damage to plaintiff as a result of the acts done under the conspiracy." *Charles v. Florida Foreclosure Placement Center, LLC*, 988 So. 2d 1157, 1159-60 (Fla. 3d DCA 2008); *see also GolTV, Inc. v. Fox Sports Latin Am. Ltd*., 277 F. Supp. 3d 1301, 1312–13 (S.D. Fla. 2017).

5. FDUTPA Claim:

    1. To state a FDUTPA claim, a plaintiff must show "(1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages." *Dolphin LLC v. WCI Cmtys., Inc*., 715 F.3d 1243, 1250 (11th Cir. 2013).

    2. Section 501.211(1), Fla. Stat., "permits a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to occur in the future… Accordingly, regardless of whether an aggrieved party can recover 'actual damages' under section 501.211(2), it may

obtain inj`unctive relief under section 501.211(1)." *Wyndham Vacation Resorts, Inc. v. Timeshare Direct, Inc*., 123 So. 3d 1149, 1152 (Fla. 5th DCA 2012). However, a claimant must nonetheless "prove that there was an injury or detriment to consumers in order to satisfy all of the elements of a FDUTPA claim." *Hyundai Motor Am. Corp. v. N. Am. Auto. Servs.,* 2021 U.S. Dist. LEXIS 99713, at \*30-31 (S.D. Fla. May 25, 2021).

6. Other legal principles:

    1. As Fla. Stat. § 721.10 is applied to the facts of this case, the "cancellation" of a timeshare contract is a specific, non-waivable rescission right held by Bluegreen timeshare owners that can only be exercised within a certain time period following the execution of a timeshare contract.

## 8.  A Concise Statement of Issues of Law

### a.  Plaintiffs' Position

1. Whether any of the Defendants' purported affirmative defenses are viable defenses to the claims asserted;

2. Whether' the Defendants' violation of violation of various laws, statutes, or regulations, including the State Bar of California Rules of Professional Conduct, or other applicable ethical standards, gives rise to a claim for relief under FDUTPA;

3. The proper award of actual damages;

4. The proper award of injunctive relief;

5. The proper award of disgorgement;

6. The proper award of attorney's fees and costs;

7. The proper award of corrective advertising; and

8. The relevance of any evidence related to Bluegreen's sales practices.

**b. Pandora's Position**

**Standing:** Does Bluegreen have standing to bring the claims it has asserted with respect to 200 of the 218 owners at issue? *See* Pandora's Motion for Summary Judgment [DE 276] and Reply in support thereof [DE 326].

**Lanham Act:**

a. Are there genuine issues of material fact on Plaintiffs' Lanham Act claim against Pandora sufficient to survive summary judgment? *See* Pandora's Motion for Summary Judgment [DE 276] and Reply in support thereof [DE 326].

b. Where Pandora's alleged advertisements false or misleading?

c. Did the alleged advertisements deceive, or have the capacity to deceive, consumers?

d. Did the alleged deception have a material effect on purchasing decisions?

e. Did the allegedly misrepresented product or service affect interstate commerce?

f. Was Bluegreen in fact injured as a result of the alleged false advertising?

g. Did Bluegreen prove: 1) "an injury to a commercial interest in reputation or sales;" and, 2) an "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff"?

h. Where the alleged statements commercial speech?

i. Where the alleged statements made for the purpose of influencing consumers to buy Pandora's goods or services?

j. Where the alleged statements disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry."

k.  Where the alleged statements widely disseminated and part of an organized campaign to penetrate the relevant market.

l.  Where the alleged statements commercial claims that are literally false as a factual matter?

m.  Were the statements literally true or ambiguous and implicitly convey a false impression, are misleading in context, or are likely to deceive consumers

n.  Did Bluegreen present evidence of deception in the form of consumer surveys, market research, expert testimony, or other evidence?

o.  Did Bluegreen establish that Defendants' alleged deception is likely to influence the purchasing decision?

p.  Did the evidence on the issue of whether the representations mattered to consumers rise above speculation that due to some function or efficiency of the product, consumers are deceived?

q.  Did Bluegreen establish proximate causation of injury, that is, economic or reputational injury flowing directly from the deception wrought by Defendants' advertising?

r.  Did the alleged false advertising statements cause the claimed injury?

s.  If the advertisement was literally false, did Bluegreen establish materiality?

**Tortious Interference Claim:**

a.  Are there genuine issues of material fact on Plaintiffs' tortious interference claim against Pandora sufficient to survive summary judgment?  *See* Pandora's Motion for Summary Judgment [DE 276] and Reply in support thereof [DE 326].

b.  Did a valid contract exist between Bluegreen and each of the 218 owners at issue at the time of injury when the claim arose?

c.   Did Pandora Defendants have knowledge of the contract?

d.   Did Pandora Defendants intentionally procure the contract's breach?

e.   Did Pandora Defendants act without any justification or privilege?

f.   Did any damages result from the breach?

g.   Did Defendants provide truthful information?

h.   Did Defendants provide honest advice within the scope of a request for the advice?

i.   Did Plaintiffs prove tortious interference for each and every contract at issue in the case?

j.   Was there damage proximately caused by the tortious interference in that the interference directly and in natural and continuous sequence produced, or contributed substantially to producing such injury?

k.   Did the proximate cause of an injury constitute a cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred?

l.   Was the evidence of causation of tortious interference established by a contract-by-contract proof of the circumstances that surrounds the breach of each contract?

m.   Was causation established with (1) evidence that advertisements were viewed, (2) evidence of temporal relationship of economic injury *and* (3) expert opinion that the advertisements were likely to cause viewers to stop making payments?

n.   Where any of the owners at issue predisposed to breach?

**FDUTPA:**

a.   Are there genuine issues of material fact on Plaintiffs' FDUTPA claim against Pandora sufficient to survive summary judgment?   *See* Pandora's Motion for Summary

Judgment [DE 276] and Reply in support thereof [DE 326].

b. Did Pandora engage in deceptive acts or unfair trade practices?

c. Did these actions cause damage to Plaintiffs?

d. Did Plaintiffs incur actual damage?

e. Can Plaintiffs prove an injury or detriment to consumers?

**Conspiracy:**

a. Are there genuine issues of material fact on Plaintiffs' conspiracy claim sufficient to survive summary judgment?  *See* Pandora's Motion for Summary Judgment [DE 276] and Reply in support thereof [DE 326].

b. Was there 1) an agreement between two or more parties 2) to do an unlawful act or to do a lawful act by unlawful means, 3) the doing of some overt act in furtherance of the conspiracy, and 4) damage to plaintiff as a result of the acts done under the conspiracy?

**Other:**

Per Fla. Stat. § 721.10, a purchaser has a right to cancel a timeshare contract within a specific time period following the execution of a timeshare contract.  The statute refers to this as a "right of cancellation."

**Pandora's Affirmative Defenses:**

a. First Affirmative Defense: Was Pandora retained to provide timeshare exit services as the agent of certain timeshare owner/customers?

b. Second Affirmative Defense: Did Pandora act in the best interests of each timeshare owner/customer as the agent thereof?

c. Fourth Affirmative Defense: Did any of Pandora's advertisements identified in the Amended Complaint include instructions and/or any basis permitting an inference that

a timeshare owner should stop making payments owed pursuant to a contract purportedly entered into with the Plaintiffs?  [Sorry, but I do not understand this one]

d.  Fifth Affirmative Defenses: Did Plaintiffs have standing to pursue their claims as to the 200 of the 218 owners?

e.  Sixth Affirmative Defense: Any action taken by Mr. Folk in his capacity as a Member of Pandora Marketing inured to that limited liability company. Therefore, any allegations pled against Mr. Folk other than in his capacity as a Member of Pandora Marketing are barred, as a matter of law.

f.  Seventh Affirmative Defense: Any action taken by Mr. Wilson in his capacity as a Member of Pandora Marketing inured to that limited liability company. Therefore, any allegations pled against Mr. Wilson other than in his capacity as a Member of Pandora Marketing are barred, as a matter of law.

g.  Eighth Affirmative Defense: Mr. Folk neither dominated nor controlled Pandora Marketing to the extent necessary to subsume the independent existence of that limited liability company. Further, on no occasion did Mr. Folk use Pandora Marketing for any improper means.

h.  Ninth Affirmative Defense: As the Ninth Affirmative Defense, Pandora affirmatively states Mr. Wilson neither dominated nor controlled Pandora Marketing to the extent necessary to subsume the independent existence of that limited liability company. Further, on no occasion did Mr. Wilson use Pandora Marketing for any improper means. Therefore, no basis exists to support an allegation, if any, of Mr. Wilson as an alter ego of Pandora Marketing, as matter of law.

i.  Tenth and Eleventh Affirmative Defense: Are punitive damages recoverable?

### c.  Lawyer Defendants' Position

1.  <u>Damages related to loans not owned by Plaintiffs</u>.  Plaintiffs did not own certain of the loans at issue at the time of harm arising from the tortious conduct or the statutory violations alleged in the Complaint.  Do they have standing to pursue claims for damages incurred by the third party owner of those loans?

2.  <u>Are Plaintiff's Claims Limited to Those Asserted in the Pleadings</u>.  In their Complaint, Plaintiff did not assert any claims for damages incurred by third parties, Plaintiffs now claim that causes of action belonging to third parties were assigned to Plaintiffs.  May Plaintiff recover damages based on those claims in this litigation, even where Plaintiffs failed to allege any such assignments in the Complaint? (i.e. If a third party was harmed as a result of the tort and statutory violations alleged in the Complaint, are those claims part of this lawsuit?)

3.  <u>Causes of Action Which First Arose Subsequent to the Filing of the Complaint</u>. Where a cause of action involving a different owner and a different loan did not arise until after the Complaint was filed and where Plaintiff did not seek leave to amend to include those claims, are those causes of action part of this lawsuit?

4.  <u>Privilege.</u>  Are the acts of Lawyer Defendants protected by the privilege doctrine? Is a lawyer who advises or assists a client to break a contract liable to a non-client for interference with the contract where the lawyer acts to advance the client's objectives without using wrongful means?

5.  <u>Truthful Information.</u> Does a Defendant improperly interfere with a contractual relationship where a third party seeks advice, where that defendant gives truthful information to the third party, and there that information causes that third party to breach the contract?

6.      <u>Tortious Interference</u>.   Have Plaintiffs established the elements necessary to support their claim?

7.      <u>Contributory False Advertising</u>.  Have Plaintiffs established the elements necessary to support their claim?

8.      <u>Violation of FDUTPA</u>.   Have Plaintiffs established the elements necessary to support their claim for damages under FDUTPA?

9.      <u>Conspiracy</u>.   Have Plaintiffs established the elements necessary to support their claim of conspiracy?

10.     <u>Section 6155, Calif. Bus. and Prof. Code</u>.   Where Lawyer Defendants accept a referral of a client and do not pay any compensation to the referring entity, does the acceptance of the referral violate California Business and Professional Code §6155?

11.     <u>Impact of Fed. R. Civ. P. 37(c)(1).</u>   If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), is that party allowed to use that information or witness to supply evidence at the trial of that action?

12.     <u>Failure to Mitigate.</u> Are Plaintiffs' claims barred, in full or in part, by Plaintiffs' failure to mitigate any damages they may have incurred?

13.     <u>Set-Off.</u> Are Lawyer Defendants entitled to a set off for any damages recoverable/recovered by the Plaintiffs as a result of amounts paid or owed by any other party who may be found at fault for any damages awarded to Plaintiffs?

14.     <u>Noerr-Pennington Doctrine.</u> Are Plaintiffs' claims barred under the Noerr-Pennington Doctrine?

15.    <u>Exterritorial Application of Florida Law.</u> Does Florida law applies to conduct which occurred outside the State of Florida where no Florida resident suffered damages resulting from that conduct?

16.    <u>The Application of California Law.</u> What is the impact of California law on the actions alleged in the Amended Complaint?

17.    <u>Expansion of Case.</u> Can Bluegreen argue the Lawyer Defendants violated a law which was not expressly alleged in the operative pleading where Plaintiff did not obtain leave to amend?

18.    <u>Entitlement to Equitable Remedies.</u>   Given the actions of Plaintiffs in this litigation, (for example, basing their damage claim for actual damages and disgorgement on 218 loans, concealing the fact that they did not own the vast majority of those loans at the time of the alleged wrongful interference, and disclosing the truth only after the intervention of Magistrate Judge Goodman), should the Court invoke its equitable powers to assist Plaintiffs and, if so, to what degree?

**9.  <u>Trial Exhibits</u>**

    **a.  Plaintiffs' Trial Exhibits**

        Attached at **Exhibit 1** hereto.

    **b.  Pandora's Trial Exhibits**

        Attached at **Exhibit 2** hereto.

    **c.  Lawyer Defendants' Trial Exhibits**

        Attached at **Exhibit 3** hereto.

10. **Trial Witnesses**

    a. **Plaintiffs' Witness List**

        Attached at **Exhibit 4** hereto.

    b. **Pandora's Trial Witness List**

        Attached at **Exhibit 5** hereto.

    c. **Lawyer Defendants' Trial Witness List**

        Attached at **Exhibit 6** hereto.

11. **Estimated Trial Time**

    a. **Plaintiffs' Position**

Plaintiffs estimate that trial of this matter based on the present posture will require four (4) weeks to complete based on the number of witnesses of defendants' witness list. Determination of the pending summary judgment motions and motions in limine may reduce the time needed for trial. Additionally, amendment of the Defendants' witness lists would reduce the time needed for trial.

    b. **Pandora's Position**

Pandora estimates that trial of this matter based on the present posture will require 3-4 weeks to complete based upon, among other things, the number of witnesses on Plaintiffs' witness list, the number of exhibits Plaintiffs are attempting to introduce at trial (over 3,000 exhibits), the numerous inadmissible Wyndham depositions and 1,200 call recordings, and the 200 loans Plaintiffs do not own and for which Plaintiffs lack standing. Determination of the pending summary judgment motions and motions in limine may significantly reduce the time needed for trial.

12. **Attorney's Fees**

    a. **Plaintiffs' Position**

Plaintiffs estimate that amount of properly allowable attorney's fees in Plaintiffs' favor to be $2.4 Million life-to-date.

    b. **Pandora's Position**

Pandora estimates that the amount of properly allowable attorney's fees in Pandora's favor to be approximately $2.5 Million.

13. **Proposed Voir Dire Questions**

    a. **Plaintiffs:**

1.    Do you presently or have you ever had a mortgage on any property?

2.    Have you been subject to a foreclosure or threat of foreclosure in the last five (5) years?

3.    Do you have opinions regarding timeshares or timeshare ownership, and if so, are they positive or negative?

4.    Have you or anyone in your immediate family ever owned a timeshare?

5.    On a scale of 1 to 10, how important is your credit score to you (with 1 being least important, and 10 being most important)?

    b. **Defendants:**

1.    Have you or anyone you know ever used a timeshare exit company or timeshare exit attorney to assist you in getting out of your timeshare?  If so, please tell us briefly about your experience, including the identity of the timeshare exit company/attorney; whether you were satisfied/dissatisfied with the service and why; and any positive or negative feelings you had regarding your experience.

2.      Have you or anyone you know ever hired a law firm or other company to help negotiate debt relief?  If so, please describe you experience, including the identity of the debt relief company; whether you were satisfied/dissatisfied with the service and why; and any positive or negative feelings you have regarding debt relief services/advisors.

3.      Have you ever hired a law firm or other company to assist in a mortgage foreclosure?  If so, please describe your experience, including the identity of the company; whether you were satisfied/dissatisfied with the service and why; and any positive or negative feelings you had regarding this service.

4.      Do you believe people are entitled to debt relief?  If so, please explain.

5.      Have you ever entered into a contract and later discovered that what the other party to the contract promised to you was false, inaccurate, or exaggerated?

Dated:  March 17, 2023                                    Respectfully submitted,

*/s/ John Y. Benford*
**JOHN Y. BENFORD, ESQ.**
Florida Bar No. 51950
john.benford@wilsonelser.com
**WILSON ELSER MOSKOWITZ**
**EDELMAN & DICKER LLP**
111 North Orange Avenue, Suite 1200
Orlando, FL 32801
Phone: (407) 203.7594
Email: john.benford@wilsonelser.com

and

**PATRICK A. BRADFORD, ESQ.**
(admitted *pro hac vice*)
pbradford@bradfordedwards.com
**BRADFORD EDWARDS & VARLACK**
**LLP**

*/s/ Christian M. Leger*
**ERIC C. CHRISTU, ESQ.**
Florida Bar No. 434647
echristu@shutts.com
**SHUTTS & BOWEN, LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, FL 33131
Telephone: (305) 358-6300
Facsimile:  (305) 381-9982

and

**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com

12 East 49th Street, 11th Floor
New York, NY 10017
Telephone: (917) 671-9406

*Attorney for Defendants Pandora
Marketing, LLC, William Wilson, and Rich
Folk*

*/s/ W. Scott Gabrielson*
**BRIAN L. WAGNER, ESQ.**
Florida Bar No.142727
bwagner@mateerharbert.com
**W. SCOTT GABRIELSON, ESQ.**
Florida Bar No. 130819
sgabrielson@mateerharbert.com
**MATEER & HARBERT, P.A.**
225 East Robinson Street, Suite 600
Post Office Box 2854
Orlando, Florida 32802-2854
Telephone: (407) 425-9044
Facsimile: (407) 423-2016
Primary: bwagner@mateerharbert.com

*Attorney for Defendant: Carlsbad Law Group,
LLP and J.L. "Sean" Slattery*

**CHRISTIAN M. LEGER, ESQ.**
Florida Bar No. 0100562
cleger@shutts.com
**BENJAMIN F. ELLIOTT, ESQ.**
Florida Bar No. 1010706
belliott@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile:  (407) 849-7255

*Attorneys for Plaintiffs*

ORLDOCS 20236182 7