United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Bluegreen Vacations Unlimited, Inc. and Bluegreen Vacations Corporation, Plaintiffs,<br><br>v.<br><br>Timeshare Lawyers P.A., and others, Defendants. | )<br>)<br>)<br>)<br>)   Civil Action No. 20-24681-Civ-Scola<br>)<br>)<br>)<br>) |

## Omnibus Order on Motions for Summary Judgment

This matter is before the Court on the parties' cross-motions for summary judgment, which have been fully briefed and are ripe for review. The following claims are at issue with respect to the pending and fully briefed cross motions for summary judgment and the indicated Defendants:

| Count | Defendant |
|---|---|
| One: False Advertising in Violation of the Lanham Act | Pandora Marketing, LLC, Rick Folk, and William Wilson (collectively, the "Marketing Defendants") |
| Three: Contributory False Advertising in Violation of the Lanham Act | Carlsbad Law Group, LLP and J.L. Slattery (collectively, the "Lawyer Defendants") |
| Five: Tortious Interference with Contractual Relations | All Defendants |
| Six: Violation of Florida's Deceptive and Unfair Trade Practices Act | All Defendants |
| Seven: Civil Conspiracy to Commit Tortious Interference | All Defendants |

The Plaintiffs Bluegreen Vacations Unlimited, Inc. and Bluegreen Vacations Corporation (collectively, "Bluegreen") move for partial summary judgment on the claims for false advertising, contributory false advertising, tortious interference, and violation of Florida's Deceptive and Unfair Trade Practice Act ("FDUTPA"), as well as on the Defendants' affirmative defenses. (Pls.' Mot. for Summ. J., ECF No. 270.) The Marketing Defendants cross-move for summary judgment on all claims, arguing, generally, that Bluegreen lacks standing and has failed to prove causation and damages and, specifically, that Bluegreen cannot satisfy the elements of its claims for false advertising or for tortious interference. (M.Ds.' Mot. for Summ. J., ECF No. 276.) The Lawyer Defendants

also cross-move for summary judgment on all claims, raising similar arguments as to Bluegreen's standing and causation, and specifically attacking the evidence in support of Bluegreen's claims for contributory false advertising, tortious interference, violation of FDUTPA, and civil conspiracy. (L.Ds.' Mot. for Summ. J., ECF No. 274.) For the following reasons, the Court **denies** the Marketing Defendants and the Lawyer Defendants' motions in their entireties (**ECF Nos. 274, 276**) and **grants in part and denies in part** Bluegreen's motion (**ECF No. 270**).

### 1. Background[1]

Bluegreen, a company in the business of selling timeshare interests, brings this action against the Defendants for damages resulting from their participation in a scheme to induce Bluegreen timeshare owners to breach their timeshare contracts. This case thus arises from the parties' competing interests in the infamous timeshare industry.

Per the Defendants, Bluegreen relies on a high-pressure and unethical sales process that ultimately leads many timeshare owners to experience dissatisfaction with their purchases and with Bluegreen's customer service. (M.Ds.' Stmt. of Facts ¶¶ 22, 30, ECF No. 275.) In response, they sell timeshare owners "exit services," or the ability to terminate their obligations under their timeshare contracts. (Pls.' Stmt. of Facts ¶¶ 1, 12, 44, ECF No. 269.) However, Bluegreen counters that the Defendants' purported exit services are nothing but a sham, which ultimately hurts both the timeshare owners and Bluegreen. The course of relevant events generally unfolds as follows:

The Marketing Defendants advertise their services through a nationwide, muti-stage campaign involving various dissemination methods, including, for example, the Marketing Defendants' website, in-person presentations, and social media. (*Id.* ¶¶ 7–8, 10.) This comprehensive advertising generates inbound calls from potential customers that are routed to the Marketing Defendants and received by their "specialists," who then schedule potential customers to speak with an "analyst." (*Id.* ¶¶ 14–17.) Analysts help potential customers decide whether the Marketing Defendants' services are right for them by delivering oral sales presentations. (*Id.* ¶¶ 18–21.)

Bluegreen contends that analysts make various false statements during the sales presentations to get potential customers to sign up for the exit services, including statements to the effect that,

i. the Marketing Defendants' process permits timeshare owners to stop payment on their financial obligations to Bluegreen (*Id.* ¶¶ 30–33);

---

[1] Except where indicated, the facts are undisputed.

ii.   the Marketing Defendants have a 100% success rate (*Id.* ¶¶ 34–35);

iii.  the timeshare owners' credit will be protected during the timeshare exit process (*Id.* ¶¶ 36–38);

iv.   the attorneys to which the Marketing Defendants make legal referrals will negotiate on the owners' behalf (*Id.* ¶¶ 39–40); and,

v.    the attorneys to which the Marketing Defendants make referrals can obtain faster and easier results when owners stop their payments (*Id.* ¶¶ 41–42).

The Defendants do not contest that some of these statements were made to some potential customers, but they dispute whether they were made to every customer as a regular course during the sales presentations. (M.Ds.' Resp. Stmt. ¶¶ 30, 34, 36–37, 39, 41, ECF No. 305; L.Ds.' Resp. Stmt. ¶¶ 30, 34, 36, 39, 41, ECF No. 311.)

The last statement, to the effect that it would be advantageous for an owner to stop making payments to Bluegreen, turns out to play a critical role in the Defendants' process. This is because of Bluegreen's internal policy of terminating and reacquiring the interests of owners who are delinquent on their payments. Specifically, Bluegreen's internal collections policy allows it, at its discretion, to terminate and reacquire the timeshare interests of owners who are delinquent on their obligations. (M.Ds.' Stmt. of Facts ¶¶ 17–18.) Pursuant to the policy, Bluegreen notifies delinquent owners at set intervals that if their delinquency is not cured within a specified period, their timeshare interest will be terminated. (*Id.*) Typically, after around 130 days of delinquency, Bluegreen terminates and reacquires an owners' interest to resell it to a new purchaser. (*Id.*) Because Bluegreen usually follows the policy, instead of suing owners who default on their loan, owners can in effect get out of their timeshare contracts by breaching them. (*See* Pls.' Reply to M.Ds.' Resp. Stmt. ¶ 134, ECF No. 330.)

After timeshare owners retain the Marketing Defendants, the latter refers them to an attorney, which may include the Lawyer Defendants, to purportedly perform the work needed to obtain the owners' releases from their timeshare agreements. (Pls.' Stmt. of Facts ¶ 51.) However, Bluegreen contends that, far from doing any work to legally release owners from their timeshare contracts, the Lawyer Defendants rely entirely on the owners' defaults on their timeshare obligations to effectuate a formal termination of their contracts with Bluegreen. (*Id.* ¶¶ 83–84.) While the Defendants dispute this, all agree that Lawyer Defendants' representation of the timeshare owners is limited to drafting two letters to, and making themselves available to negotiate with, Bluegreen. (L.Ds.' Resp. Stmt. ¶¶ 79–80.) Bluegreen's position, however, is that it has never engaged in negotiations with the Lawyer Defendants regarding the owners and does not otherwise establish a relationship with the Defendants. (Pls.' Stmt. of

Facts ¶ 82.) More importantly, neither of the Defendants is aware of any Bluegreen owner that has been released from her financial contractual obligations while continuing to make her payments to Bluegreen. (*Id.* ¶¶ 55, 84, 87.)

At least 187 owners of Bluegreen timeshare interests retained the Marketing Defendants' services. (*Id.* ¶ 88.) Based on Bluegreen's calculations, which the Defendants do not accept, forty-eight percent of those owners stopped making payments on their timeshare obligations within one month of hiring the Marketing Defendants and eighty-two percent stopped within three months. (*Id.* ¶ 90.) Bluegreen took the deposition of fifteen of those owners and claims they testified that the analysts' sales presentations were the reason they defaulted on their timeshare obligations. (*Id.* ¶ 91, 105.) The Defendants dispute Bluegreen's interpretation, arguing that those owners were predisposed to breaching their agreements with Bluegreen due to the latter's poor treatment. (M.Ds.' Resp. Stmt. ¶¶ 105, 118–33; L.Ds.' Resp. Stmt. ¶¶ 118.) To that end, the Lawyer Defendants submit declarations from fifteen additional owners, claiming that they all decided to terminate their payments to Bluegreen before contacting Pandora as a result of Bluegreen's poor conduct. (L.Ds.' Resp. Stmt. ¶¶ 118–22.)

### 2. Legal Standard

"Summary judgment is such a lethal weapon, depriving a litigant of a trial on the issue, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment." *Tippens v. Celotex Corp.*, 805 F.2d 949, 952–53 (11th Cir. 1986); *see also Brunswick Corp. v. Vineberg,* 370 F.2d 605, 612 (5th Cir. 1967) ("[C]ourts must be mindful of [the] aims and targets [of summary judgment] and beware of overkill in its use."). Thus, summary judgment is only proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. An issue of fact is "material" if it "might affect the outcome of the suit under the governing law." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (internal citation omitted). "A material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal citation and quotations omitted).

The moving party bears the burden of proof to demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in

the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004). "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990); *see also Tippens v. Celotex Corp.*, 805 F.2d at 952 ("The District Court . . . can only grant summary judgment if *everything* in the record demonstrates that no genuine issue of material fact exists.") (internal citation, quotations, and ellipses omitted). The Court will not weigh the evidence or make findings of fact. *Id.* at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the nonmoving party. *Id.*

Finally, where the moving party has asserted affirmative defenses, it bears the burden of proof to show that no genuine issue of material fact exists with respect to the affirmative defenses. *Singleton v. Dep't of Corr.*, 277 F. App'x 921, 923 (11th Cir. 2008); *see also Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 591 (11th Cir. 1994) ("Thus, by moving for summary judgment . . ., defendants thrust before the court for scrutiny not only the merits of plaintiff's evidence, but the strength of their own defense and must establish that there is an absence of any issue for jury resolution.").

### 3. Analysis

### A. Article III Standing

The Defendants both move for summary judgment by raising variations of the argument that Bluegreen lacks Article III standing to bring the instant action. To establish Article III standing, a Plaintiff must satisfy three requirements:

> First, it must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1336 (11th Cir. 2019) (cleaned up). Each requirement "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the

litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). On summary judgment, "the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting Fed. Rule Civ. Proc. 56(e)). "And at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'" *Id.* (quoting *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 115 n.31 (1979)).

The Defendants' Article III standing arguments focus on the loans associated with the contracts between Bluegreen and the timeshare owners: they argue that Bluegreen lacks Article III standing because it did not own the majority of those loans at the time the owners defaulted on them, thus breaching their contracts. (M.Ds.' Mot. for Summ. J. 1–8, ECF No. 276; L.Ds.' Mot. for Summ. J. 2–3, ECF No. 274.) The Defendants' argument seems to be directed at whether Bluegreen has suffered an injury in fact, the first element of Article III standing.[2] To properly understand the argument, additional background is needed on Bluegreen's business model, which roughly goes as follows:

- Plaintiff Bluegreen Vacations Unlimited ("BVU"), a wholly owned subsidiary of Plaintiff Bluegreen Vacations Corporation ("BVC"), is the original owner of the timeshare interests purchased by timeshare owners. (Pls.' Resp. to MDs.' Stmt. ¶ 33, ECF No. 308.) So, when owners agree to purchase a timeshare, they enter contracts that identify BVU as the developer or seller of the timeshare interest. (*Id.* ¶ 34.)

- When owners finance their purchase of a Bluegreen timeshare interest, most of the time, the associated loans are originated by BVC. (*Id.* ¶ 6.) This transaction is reflected in a separate promissory note. (*See id.* ¶ 88.)

- After a new contract has been executed, and BVC has originated the loan on that contract, BVC will often, but not always, securitize that loan. (*Id.*)

- Securitized loans are pooled together and assigned to one of several separate bankruptcy-remote special-purpose entities ("SPEs"), of which BVC is the sole member. (*Id.*)

---

[2] To the extent the Defendants' argument is that Bluegreen cannot succeed on particular claims because ownership of a loan at the time of default is critical to meeting the elements of said claims, the Court understands this as an attack on the merits of those claims and addresses it in due course. *See, e.g., Meier v. Chesapeake Operating, L.L.C.*, 778 F. App'x 561, 568 (10th Cir. 2019) ("Injury-in-fact for standing purposes simply requires that the plaintiff have a 'sufficient personal stake' in the outcome of the litigation; 'it in no way depends on the merits of the claim.'" (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 613, 624 (1989))).

- When a timeshare owner defaults on its financial obligations, BVC has several options, including repurchasing or substituting the defaulted loan. (Id. ¶ 42; M.Ds.' Stmt. of Facts ¶ 16, ECF No. 275.)

Because BVU never owned any of the loans at issue, and BVC only owned them at certain times, the Defendants argue that neither has constitutional standing to maintain any of the claims in this action. The Court is not convinced.

To begin, the Defendants do not argue that BVC did not own *all* the relevant loans at the moment of default. It is undisputed that BVC does not securitize all of the loan receivables associated with the loans it originates. (Pls.' Resp. to MDs.' Stmt. ¶ 38), and the parties have stipulated that at least seven loans were never assigned by BVC at all. (*Id.* ¶ 45.) Further, per the Defendants' own breakdown of the ownership of the loans at issue—218 by their count—*at least* twelve of those loans were owned by BVC at the time of default and at the time the complaint was filed. (M.Ds.' Stmt. of Facts ¶ 15.) So, even assuming, for the sake of argument, that the Defendants are correct, and that BVC has no standing as to the loans it did not own at default, BVC would still be able to bring its claims as to at least those loans it indisputably did own at the moment of default.

Presumably, the Defendants seek summary judgment as to all the other, purportedly not owned, loans in the hopes of knocking out the majority of Bluegreen's damages. But, even assuming the Defendants are correct as to ownership, on this record, the Court is unable to conclude that Bluegreen has not been injured as a result of the defaults on those other loans. This is because Bluegreen has put forth evidence that anytime a loan defaults there are various sorts of expenses incurred by both BVU and BVC that are independent of where that loan's ownership resides at any specific point in time.

For example, it is undisputed that when an owner defaults on a loan, BVC sends the corresponding inventory (*i.e.*, the points and vacation ownership interest) back to BVU, the inventory's original owner. (*Id.* ¶¶ 33–35.) Bluegreen has presented evidence that, upon return of the inventory, BVU incurs significant costs, including maintenance fees that accrue during the period of BVU's ownership and costs related to the sale and marketing of the reacquired timeshare interests. (*Id.* ¶¶ 36–37.)

Additionally, with respect to BVC, Bluegreen has put forth evidence that, regardless of which entity originates a loan, BVC is the owner of the loan receivables. (*Id.* ¶ 39.) Thus, Bluegreen retains an interest in the equity, or residual, of the loans even after they are transferred to the SPEs, and, if a loan defaults, Bluegreen suffers a loss of residuals regardless of whether the loan is later repurchased or substituted. (*Id.* ¶¶ 40–42.) BVC also remains the servicer

of the loans even when they are securitized, is compensated for its servicing activities, and, as servicer, is authorized to perform customary services on behalf of the SPEs, such as maintaining actions to collect sums due under the securitized loan receivables. (*Id.* ¶¶ 43–44.)

The Defendants argue that Bluegreen is not the owner of the loan receivables at all points in the securitization process, and that Bluegreen offers no evidence as to the amount of any allegedly lost residuals or servicing fees. However, apart from mere denials, the Defendants offer no evidence to demonstrate that Bluegreen does not suffer an injury when a loan defaults while owned by one of the SPEs. Moreover, the Court need not determine at this stage whether Bluegreen in fact suffered damages on its residuals or servicing fees. *See, e.g., Wyndham Vacation Ownership, Inc. v. Slattery*, No. 6:19-cv-1908-WWB-EJK, 2022 U.S. Dist. LEXIS 221094, at *18 (M.D. Fla. Oct. 21, 2022) ("Whether Plaintiffs were in fact injured and suffered damages are matters for trial.").

In sum, the Court finds that Bluegreen has met its burden at this stage by providing specific facts to show that it suffers an injury in fact when owners default on their loans. Accordingly, the Court denies the Defendants' motions for summary judgment to the extent they depend on the absence of Article III standing.

### B. Proximate Cause

The Marketing Defendants next argue that they are entitled to summary judgment on all of Bluegreen's claims because Bluegreen cannot prove proximate causation as to any of them. The Marketing Defendants raise various arguments in support of this point.[3] However, the Court finds none of them compelling.

(a) *Whether Timeshare Owners Were Predisposed to Breaching.*

The Marketing Defendants argue that they are not the proximate cause of Bluegreen's harm because the owners were predisposed to breach, and would have ceased payments on their own due to reasons wholly unrelated to the Marketing Defendants' conduct, namely Bluegreen's mistreatment and the owners' resulting dissatisfaction. Bluegreen responds by arguing that the opposite is true: that without Pandora's instruction, the owners would neither have known to breach, nor felt comfortable breaching, their agreements. The

---

[3] In raising these arguments simultaneously as to all of Bluegreen's claims, the Marketing Defendants seem to indicate that any potential distinctions in the proximate cause standards as to each claim are irrelevant.

parties largely support their conflicting positions by offering different readings
of the deposition testimony of various owners who defaulted on their loans.
After reviewing the referenced deposition excerpts, the Court concludes that
these owners would not have breached their contracts had it not been for their
contact with the Marketing Defendants.

Under Florida law, "[p]redisposition to breach means 'that the breach by
the party to the contract rather th[a]n the persuasion by the defendant was the
proximate cause of the plaintiff's damage.'" *Westgate Resorts, Ltd. v. Sussman*,
387 F. Supp. 3d 1318, 1356 (M.D. Fla. 2019) (quoting *Farah v. Canada*, 740
So. 2d 560, 561 (Fla. 5th DCA 1999)). While the available deposition testimony
undoubtedly indicates that the owners were unhappy with Bluegreen, wished
to be free of their timeshare obligations, and had even decided to find a way to
terminate their contracts, it does not show that the owners would have ceased
payment on their own, without the Marketing Defendants' intervention. In fact,
the opposite is true. Even the owners on whose testimony the Marketing
Defendants rely, largely testified that they felt the need to seek external help to
fulfill their goal of terminating their contracts. (*See, e.g.*, Dep. A. Tilahun 13:3-
10, ECF No. 271-19 ("[A]nd at that point my husband and I just decided, okay,
let's just do our research and figure out how we can get out of it. There has to
be a way."); Dep. S. Ballantyne 26:5-10, 27:7-15, ECF No. 271-20 ("Q. It wasn't
until after you hired Timeshare Compliance that you decided to stop paying
Bluegreen? A. Yes. . . . We had wanted to do that for some time, but we didn't
have the confidence that we would be able to deal with it ourselves, in getting
the cancellation."); Dep. W. Norland 48:25-49:8, ECF No. 271-23 ("Yes. In my
mind and my wife's mind, we were done making payments for them, other than
the fact that we continued because we were going to look for legal counsel to
help us with our situation. And it took us until February to get to that -- get
everything to that point.").)

Admittedly, some owners testified that they would have stopped making
payments on their own if they had known about Bluegreen's policy of
repossessing the timeshare interests of owners that were delinquent for more
than ninety days. (*See* M.Ds.' Resp. Stmt. ¶¶ 118–33.) This gives the Court
pause, because it suggests that at least some of the owners were so unhappy
with Bluegreen that they were willing to breach their contracts outright,
regardless of the ensuing damage to their credit. (*See, e.g.*, Dep. J. Harding
69:16-23, ECF No. 271-18 ("Q. If you would have known that Bluegreen has a
policy of issuing 1099 A's and letting people out of their timeshare if they're
more than 90 days past due, would you and your husband simply have just
stopped making payments to your Bluegreen timeshare? . . . A. Yes."); Dep. A.
Tilahun 69:8-12, ECF No. 271-19 ("Q. So if you had known about this ninety-

day past due policy and you would have stopped making your payments, you understand that may have negatively affected your credit. Right? A Right, and I was okay with that."); Dep. J. Lathrem 59:20-22, ECF No. 271-22 ("Q. So if you had known about this policy, would you have even hired Timeshare Compliance? A. No.").) However, a person's *willingness* to breach a contract is not the same as a *predisposition* to do so. In the end, all the foregoing testimony shows is that, prior to the Marketing Defendants' intervention, the owners did not know, and had not considered, that refusing payment to Bluegreen was a potential way to be released from their timeshare obligations.

Indeed, the vast majority of the deposed owners did not indicate that they intended, or even anticipated, simply breaching their agreements. Instead, their testimony suggests that they sought a legitimate method to end their relationship with Bluegreen, and this is what the Marketing Defendants purportedly offered. As observed by the special master analyzing proximate cause in a similar case, "[t]he sole purpose for creating Pandora [] was to help timeshare owners cancel their contracts with timeshare companies" like Bluegreen. *See Diamond Resorts United States Collection Dev., LLC v. Pandora Mktg.*, LLC, No. 2:20-cv-05486-DSF-ADS, 2022 U.S. Dist. LEXIS 238942, at *28 (C.D. Cal. Sep. 19, 2022) (special master's report and recommendation on the parties' motions for summary judgment). If most owners planned to breach on their own, there would be no role for timeshare exit entities like the Marketing Defendants. *See also Westgate Resorts, Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1356 (M.D. Fla. 2019) ("If these owners really had intent to *breach*, *i.e.*, believed they were no longer beholden to their ongoing and increasing fee obligations—[the defendant] would have never entered the picture."); *Orange Lake Country Club Inc. v. Reed Hein & Assocs.*, No. 6:17-cv-1542-Orl-78DCI, 2019 U.S. Dist. LEXIS 223939, at *43 (M.D. Fla. Oct. 4, 2019) ("While it is true that each owner wanted to exit his or her contract with Plaintiffs, Defendants have not provided any evidence that the owners intended to do so by breaching the agreements.").

Further, in support of its motion for summary judgment, Bluegreen presents direct and indirect evidence that the owners' defaults were proximately caused by the Marketing Defendants' conduct. Bluegreen provides deposition testimony from fifteen owners who stated that they stopped making payments *because of* the Marketing Defendants' statements to them in the sales presentations. (*See, e.g.*, Dep. J. Schupp 27:3-10, ECF No. 271-13 ("Q. Okay. And do you recall if the directive not to pay came during this conversation that we're listening to? A. Yes. Yes. By the time we were done with the conversation in total, whenever we hung up from the phone call we knew that, okay, stop paying.").) In addition, Bluegreen provides circumstantial

evidence temporally linking the owners' defaults to their initial contacts with the Marketing Defendants. Using a pool of 209 contracts, Bluegreen compared the delinquency dates on those contracts to the dates that the owners retained the Marketing Defendants. (*See generally* C. M. Leger Dec., ECF No. 269-33.) The results showed that a significant majority of those owners ceased payments on their contracts within a short time after being exposed to the Marketing Defendants' presentations. (*Id.*) Specifically, "[f]orty-eight percent" of owners stopped payments "within one month of hiring Pandora," and "[e]ighty-two percent" stopped payments "within three months of hiring Pandora." (*Id.*) The Marketing Defendants dispute these results but fail to provide any statistical evidence to the contrary. (*See* M.Ds.' Resp. Stmt. ¶ 90.)

In short, when considered as a whole, the direct and circumstantial evidence shows that many, if not all, of the deposed owners were influenced by the Marketing Defendants' statements during sales presentations to stop payments to Bluegreen shortly thereafter.

(b) *Whether Bluegreen's Actions Break the Chain of Causation.*

The Marketing Defendants also argue that Bluegreen's own, voluntary business decisions broke the chain of causation between their conduct and Bluegreen's injuries. The Marketing Defendants reason that, because Bluegreen ordinarily repurchases defaulted loans, regardless of the reason for default, Bluegreen's alleged harm cannot be proximately tied to their conduct. Bluegreen responds by emphasizing that, far from an intervening cause, its decision to repurchase the defaulted loans was a foreseeable result of the Marketing Defendants' conduct—*i.e.*, a response to an injury that already occurred. The Court agrees with Bluegreen.

It is undisputed that Bluegreen has more than one option for handling defaulted loans. (*See* M.Ds.' Stmt. of Facts ¶ 16.) In addition to repurchasing a defaulted loan, Bluegreen may seek to substitute it with a similarly performing loan. (*Id.*) However, even if Bluegreen is under no obligation to repurchase a defaulted loan, whether it does so is directly tied to the circumstance of default. That it is Bluegreen's voluntary business decision to choose to repurchase over another course of action does not negate that the decision would have been unnecessary without the default. Pandora's cases to the contrary are all distinguishable.[4]

---

[4] To the extent the Marketing Defendants argue that there is no proximate cause because Bluegreen would have repurchased the loans even if they were not behind the defaults, this also misses the mark. But for the owners' defaults following contact with the Marketing Defendants, and the consequences resulting therefrom, Bluegreen would have no need, indeed

In addition, the Marketing Defendants argue that Bluegreen's business practice of refusing assistance to owners who expressed a desire to exit their timeshares also breaks the chain of causation. In support, Pandora relies almost exclusively on *Sussman v. Soleil Mgmt.*, wherein the district court for the district of Nevada concluded that an attorney requiring potential clients to first seek a release from their timeshare company before providing his timeshare exit services disrupted the chain of causation such that the company's injuries did not flow directly from statements on the attorney's website. No. 2:18-cv-02218-JAD-BNW, 2020 U.S. Dist. LEXIS 30432, at *13-14 (D. Nev. Feb. 21, 2020). However, the Court agrees with Bluegreen that *Soleil* is distinguishable and concludes that Bluegreen's purported failure to assist owners wishing to exit their timeshares does not break the chain of causation.

In *Soleil*, a non-binding decision from outside this circuit, the court specifically noted that the attorney's "website d[id] not instruct timeshare owners to cease payments to their timeshare company[,]" and "the undisputed evidence show[ed] that it [wa]s [the attorney's] practice to require potential clients to first seek a release from their timeshare company." No. 2:18-cv-02218-JAD-BNW, 2020 U.S. Dist. LEXIS 30432, at *13 (D. Nev. Feb. 21, 2020). The court found that the timeshare company's subsequent denial of those requests "disrupt[ed] the chain of causation." *Id.* Thus, *Soleil* is easily distinguishable because the Marketing Defendants offer no evidence that they required owners to first seek a release from Bluegreen before offering their timeshare exit services. Moreover, there is evidence that, unlike the attorney in *Soleil*, the Marketing Defendants may have essentially instructed owners to cancel their payments to Bluegreen.

Apart from the Marketing Defendants' reliance on *Soleil*, it is unclear how Bluegreen's alleged refusal to assist owners wanting to exit their timeshares breaks the chain of causation with respect to the Marketing Defendants' conduct. The Marketing Defendants offers a couple of sentences to the effect that Bluegreen's "no tolerance" policy of refusing to assist owners who hire exit companies breaks the chain of causation and precludes their liability as a matter of law. However, by its very nature, the policy is only relevant *after* an owner has engaged a timeshare exit company. Further, Bluegreen provides evidence that the policy is specifically directed at exit companies like the Marketing Defendants, so that Bluegreen is still willing to work with owners seeking a release in different ways. Thus, the Court cannot find that Bluegreen's refusal to release a defaulting owner that is working with a

_____

no opportunity, to reacquire the defaulted loans. Thus, if the Marketing Defendants induce the defaults, they proximately cause those negative consequences.

timeshare exit company is an intervening cause of the harm resulting from that default.

In short, the Court denies the Marketing Defendants' motion for summary judgment as it relates to proximate cause because there is sufficient evidence in the record to establish that the Marketing Defendants' conduct proximately caused at least some of Bluegreen's owners to breach their contracts. Having said that, while there is clearly a direct link between the Marketing Defendants' sales presentations and several of the owners' defaults, Bluegreen does not provide evidence to allow the Court to determine exactly how many of the defaults can be attributed to the Marketing Defendants' interference. Thus, the issue of how many of Bluegreen's owners breached their contracts as result of said interference and the amount of damages Bluegreen is entitled to is in dispute and will have to be resolved by the jury.[5]

### C. Count One – False Advertising in Violation of the Lanham Act

Bluegreen moves for summary judgment on its claim for false advertising in violation of the Lanham Act, arguing that all the necessarily elements have been established as to the Marketing Defendants, and the Marketing Defendants cross-move for summary judgment, arguing that Bluegreen lacks statutory standing and that there are no actionable advertisements sufficient to support a Lanham Act claim. To succeed on a claim for false advertising in violation of the Lanham Act, a plaintiff must meet five elements:

> (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been—or is likely to be—injured as a result of the false advertising."

*Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). As explained below, the Court concludes that genuine issues of fact preclude summary judgment in favor of either party on this count. Although the Marketing Defendants' standing argument fails, Bluegreen also has failed to adduce sufficient evidence to prove that the advertisements on which it moves are actionable under the Lanham Act.

---

[5] The Marketing Defendants also briefly argue that they could not have caused twelve of the breaches at issue because they were not the exit company for those owners. However, Bluegreen has provided evidence to refute this. (*See* Pls.' Resp. to MDs.' Stmt. ¶ 2.)

**(1)** ***Standing Under the Lanham Act***

In *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, the Supreme Court set forth the "analytical framework for determining a party's standing to maintain an action for false advertising under the Lanham Act." 572 U.S. 118, 125 (2014). The Supreme Court established a two-part inquiry, requiring courts to determine (i) whether a plaintiff's interests "fall within the zone of interests protected by the law invoked" and (ii) whether the injuries suffered by plaintiff were "proximately caused by violations of the statute." *Id.* at 129, 132.

The Supreme Court explained the scope of the "zone of interests" as follows:

> [T]o come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales. A consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III, but he cannot invoke the protection of the Lanham Act—a conclusion reached by every Circuit to consider the question. . . . Even a business misled by a supplier into purchasing an inferior product is, like consumers generally, not under the Act's aegis.

*Id.* at 131–32.

The Marketing Defendants argue that Bluegreen's alleged harm does not fall within the "zone of interests" contemplated by the Lanham Act because Bluegreen does not claim damage to its reputation and has not suffered any loss in sales. However, as discussed in detail above with respect to Article III standing, Bluegreen has put forth undisputed evidence that its commercial interests are injured in various ways when owners stop their payments. The Court finds that this evidence is sufficient to bring Bluegreen's injury within the zone of interests contemplated by the Act. *See also, e.g.*, *Diamond Resorts Int'l, Inc. v. Reed Hein & Assocs., LLC*, No. 2:17-cv-03007-APG-VCF, 2019 U.S. Dist. LEXIS 205358, at *16 (D. Nev. Nov. 25, 2019) ("Diamond's central allegation is that TET solicited Diamond customers with deceptive advertisements and then induced them to breach their contracts with Diamond, thereby alleging an injury to its commercial interest in sales and bringing Diamond's claim within the zone of interests protected by the Lanham Act.").

With respect to proximate cause, "a plaintiff suing under §1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *See Id.* at 133-34. This requirement bars "suits for alleged harm that is 'too remote'

from the defendant's unlawful conduct," which is "ordinarily the case if the harm is purely derivative of 'misfortunes visited upon a third person by the defendant's acts.'" *Id.* at 1390 (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)). The Marketing Defendants' arguments on this front are practically identical to those raised in support of their general argument that all of Bluegreen's claims fail for lack of proximate cause. As discussed above, there is sufficient evidence in the record to establish that the Marketing Defendants' sales presentations proximately caused at least some of Bluegreen's owners to breach their contracts.

**(2) *Actionable Advertisements***

"The Lanham Act prescribes liability for false advertising to 'commercial advertising or promotion.'" *Tobinick v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017) (quoting 15 U.S.C. § 1125(a)(1)(B)). Bluegreen moves for summary judgment on its false advertising claim based on the purportedly false statements made by Pandora's analysts to customers during the telephonic sales presentations at the last stage of Pandora's "multi-stage advertising campaign." (Pls.' Stmt. of Facts ¶¶ 7–8, 14–20; *see also* Pls.' Mot. for Summ. J. 1–2, ECF No. 270.) Thus, the Court must first determine whether those sales presentations constitute the kind of commercial advertising or promotion addressed by the Lanham Act.

> Commercial advertising or promotion includes "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services[;]" and (4) "the representations . . . must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry."

*Id.* (cleaned up) (quoting *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012)). Because it is dispositive at this stage, the Court focuses on the fourth element—*i.e.*, whether the sales presentations and the false statements allegedly contained therein were sufficiently disseminated to the relevant public to qualify as 'advertising' or 'promotion' within the timeshare industry.

It is undisputed that the Marketing Defendants have thousands of timeshare owner customers, most, if not all, of whom were subject to the analyst sales presentations. It is also undisputed that the analysts are provided with scripts for the presentations, that they are expected to hue closely to those scripts, and, as such, that portions of the analysts' sales presentations are the same for each potential timeshare owner customer. However, because Bluegreen's claim is founded on the false and misleading statements allegedly

made during the sales presentations, the critical issue is the extent to which *those* statements were disseminated to potential customers. *See, e.g.,* *Wyndham Vacation Ownership v. Sussman*, No. 6:18-cv-2171-GAP-DCI, 2021 U.S. Dist. LEXIS 208752, at *8 (M.D. Fla. Sep. 27, 2021) ("The question here is whether Wyndham has supplied any evidence that TET routinely told Wyndham's timeshare owners to stop making timeshare payments in the [oral sales presentation]s."). The Court concludes that the record is not established enough to definitively resolve the issue of dissemination in favor of either side.

Undoubtedly, there is record evidence in the form of deposition testimony from some owners showing that the Marketing Defendants instructed them, in one way or another, to stop their payments to Bluegreen. But this is insufficient to prove that those statements were made to each and every one of the thousands of customers that eventually contracted with the Marketing Defendants. Indeed, even among those owners that were deposed, it does not appear that the sales presentations they received were entirely uniform.

Perhaps recognizing this, Bluegreen provides four "exemplar scripts" from which the Court is purportedly intended to conclusively determine the content of the sales presentations. (*See* Pls.' Stmt. of Facts ¶ 21.) However, there is no evidence on the extent to which those scripts or, more narrowly, on the extent to which key portions of those scripts, were used with potential customers. For one, there is no evidence as to how often those four scripts were employed. More importantly, even they vary in critical ways. For example, while the first script includes a credit management pitch for clients that elect to stop their payments to Bluegreen, none of the other three samples include a similar pitch. Relatedly, none of the other three samples include language addressing whether an owner should stop making payments to Bluegreen, which is a critical aspect of Bluegreen's false advertising claim. Indeed, at no point does Bluegreen contend that specific scripted content was widely used during the sales presentations, only that the analysts used, potentially variable, scripts. The significance of this is that the Court is unable to determine with certainty what statements the Marketing Defendants in fact made with sufficient regularity during the sales presentations. *See, e.g., Wyndham Vacation Ownership v. Sussman*, No. 6:18-cv-2171-GAP-DCI, 2021 U.S. Dist. LEXIS 208752, at *10 (M.D. Fla. Sep. 27, 2021) ("Wyndham must show that the OSPs directly caused its owners to stop making payments and Wyndham cannot do this if it cannot prove that the OSPs contained the alleged false statements.").

Evidently, the foregoing does not foreclose the possibility that the analysts did in fact widely disseminate substantially the same information to potential customers during the sales presentations. At this juncture, however, there is insufficient evidence in the record to establish that as a matter of fact.

Accordingly, the Court concludes that genuine issues of material fact remain as to whether the sales presentations at issue were sufficiently disseminated to constitute an actionable advertisement or promotion under the Lanham Act. As such, the Court will not decide whether Bluegreen has proven the remaining elements of its false advertising claim.

### (3) *Entitlement to Disgorgement Damages*

The Marketing Defendants also move for summary judgment on whether Bluegreen is entitled to the equitable remedy of disgorgement, but the Court concludes that such a ruling would be premature. Once a violation is established, the Lanham Act provides that a plaintiff is entitled, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Disgorgement of profits "is appropriate where: (1) the defendant's conduct was willful and deliberate, (2) the defendant was unjustly enriched, or (3) it is necessary to deter future conduct." *Optimum Techs., Inc. v. Home Depot U.S.A., Inc.*, 217 F. App'x 899, 902 (11th Cir. 2007) (citing Howard *Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1521 (11th Cir. 1990)). Moreover, in deciding whether a plaintiff is entitled to both actual and disgorgement damages, courts have considered whether awarding both would amount to an impermissible double recovery. *See, e.g.*, *Choice Hotels Int'l, Inc. v. Key Hotels of Atmore II*, No. 16-452-CG-B, 2017 U.S. Dist. LEXIS 222711, at *8 (S.D. Ala. Aug. 18, 2017) ("One such circumstance when a plaintiff may not be due both an infringing defendant's profits and any damages suffered is when awarding both amounts to double recovery.") (compiling cases).

The Marketing Defendants argue that Bluegreen is not entitled to the equitable remedy of disgorgement because it would create an impermissible double recovery and a penalty. However, among other deficiencies, the Marketing Defendants do provide any facts relating to the amount of any anticipated damages, either in the form of the Defendants' profits or Bluegreen's actual damages, that would support its position. Thus, the Marketing Defendants are essentially asking the Court to make a ruling on Bluegreen's entitlement to disgorgement as a matter of law. Such a ruling would be premature given the current record, which is not nearly developed enough to determine the amount or form of damages, if any, that Bluegreen may recover. As such, the Court denies the Marketing Defendants' motion for summary judgment on this ground.

### D. Count Three – Contributory False Advertising

Bluegreen and the Lawyer Defendants cross-move for summary judgment on Bluegreen's claim for contributory false advertising. To state a claim for contributory false advertising under the Lanham Act, a plaintiff must show, first, "that a third party in fact directly engaged in false advertising that injured the plaintiff[,]" and, second, "that the defendant contributed to that conduct either by knowingly inducing or causing the conduct, or by materially participating in it." *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1277 (11th Cir. 2015). The second element requires proof "that the defendant had the necessary state of mind -- in other words that it 'intended to participate in' or 'actually knew about' the false advertising[,]" as well as "that the defendant actively and materially furthered the unlawful conduct -- either by inducing it, causing it, or in some other way working to bring it about." *Id.* (cleaned up). As explained above, Bluegreen has not proven that the Marketing Defendants directly engaged in false advertising by widely disseminating the purportedly false statements. Because this first element is missing, Bluegreen cannot succeed on its contributory false advertisement claim at summary judgment. For their part, the Lawyer Defendants raise three arguments in support of their motion for summary judgment for why they did not contribute to the false advertising. However, the Court is not convinced.

First, the Lawyer Defendants argue that they have only an ordinary business relationship with the Marketing Defendants which falls outside the scope of contributory liability because they lack control over or involvement in the Marketing Defendants' business. However, in *Duty Free Ams., Inc.*, the Eleventh Circuit specifically found it "conceivable that there could be circumstances under which the provision of a necessary product or service, without which the false advertising would not be possible, could support a theory of contributory liability." 797 F.3d at 1277. Thus, whether the Lawyer Defendants had direct control or involvement in the Marketing Defendants' business is not determinative here.

Next, the Lawyer Defendants argue that they did not have the requisite state of mind to be contributorily liable because they lacked knowledge of specific false ads. Preliminarily, the Court notes that in its motion for summary judgment, Bluegreen seems to simultaneously argue knowing inducement and intentional participation, where *Duty Free* only requires proof of either one to show that a defendant had the necessary state of mind. Here, there is no question that the Lawyer Defendants never actually participated in the sales presentations (or other advertising conduct), so the Court focuses its analysis on whether there is evidence that the Lawyer Defendants *knew* about the false

advertising. In brief, that analysis shows that there are factual issues as to what the Lawyer Defendants knew and when, precluding summary judgment on this element.

There is record evidence from which a reasonable juror could infer that the Lawyer Defendants indeed knew about the false advertisements. For example, the Lawyer Defendants admit to only wanting referrals of owners who had "a credit-related or trade-blocking-type service." (L.Ds.' Reply to Pls.' Resp. Stmt. ¶ 44, ECF No. 332.) In addition, the Lawyer Defendants admit knowing that owners who kept paying their timeshare obligations would not be released from their obligations (*Id.* ¶¶ 45, 48), and Bluegreen has provided undisputed evidence that it does not respond to or negotiate with the Lawyer Defendants (*Id.* ¶¶ 41–43.) Thus, taken as a whole, there is evidence which might lead a reasonable juror to conclude that the Lawyer Defendants were providing their services with knowledge of the Marketing Defendants' problematic statements to potential customers.

Finally, the Lawyer Defendants argue that knowledge aside, there is no evidence that any contribution on their end was active and material because they did not directly monitor or control the false advertisements. Bluegreen counters that, to the contrary, the Lawyer Defendants' services were a necessary aspect of the Marketing Defendants' scheme. The Court agrees. As noted above, there is no requirement that the contributorily guilty party have such a degree of control over the infringing conduct as the Lawyer Defendants suggest. *See Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1277 (11th Cir. 2015). Furthermore, there is sufficient evidence in the record to establish that the Marketing Defendants' entire scheme would fall short without the services of the Lawyer Defendants and others like them. Indeed, it is undisputed that the Marketing Defendants do not offer potential clients any way to exit their timeshare agreements that does not involve the Lawyer Defendants' purported services. (Pls.' Resp. to LDs.' Stmt. ¶ 35, ECF No. 312.)

Thus, neither Bluegreen nor the Lawyer Defendants are entitled to summary judgment on the contributory false advertising count.

### E. Count Five – Tortious Interference

Bluegreen moves for summary judgment on its tortious interference claim only as to the Marketing Defendants and only with respect to the fifteen timeshare owners for whom Bluegreen provides deposition testimony (the "Deposed Owners"). The Marketing Defendants and the Lawyer Defendants both cross-move for summary judgment on Bluegreen's entire tortious interference claim. "The elements of a Florida law tortious interference with contractual relations claim are: (i) the existence of a contract; (ii) the

defendant's knowledge thereof; (iii) the defendant's intentional and unjustified procurement of a breach thereof; and (iv) damages." *Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1215 (11th Cir. 2018) (citing *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1321 (11th Cir. 1998)). The Court is not convinced by the Defendants' arguments and concludes that Bluegreen is entitled to summary judgment against the Marketing Defendants with respect to the fifteen Deposed Owners on all the elements of its claim, except as to the issue of damages.

It is undisputed that the Marketing Defendants knew that the Deposed Owners had contracts with Bluegreen at the time they signed on for the Marketing Defendants' exit services. (Pls.' Stmt. of Facts ¶ 96.) Moreover, as discussed in detail above with respect to proximate cause, the evidence shows that the Marketing Defendants, through their analysts, intentionally induced the Deposed Owners to stop payments on their contracts with Bluegreen. (*See generally id.* ¶ 105.) In short, the testimony of the Deposed Owners shows that, without the Marketing Defendants' intervention, they would not have simply breached their agreements with Bluegreen as the way to get out of their timeshare obligations. *See KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 194 F. App'x 591, 603 (11th Cir. 2006) ("[D]amage is proximately caused by interference only when the interference directly and in natural and continuous sequence produces, or contributes substantially to producing such injury. The alleged violation must be [a] direct, substantial and identifiable cause of the injury that the Plaintiff claims so that, *but for the interference, the injury would not have occurred.*").

The Marketing Defendants argue that Bluegreen cannot succeed on its tortious interference claim because their statements to the owners were justified as honest and good advice that was in the owners' best interests. However, nothing could be farther from the truth. The Marketing Defendants did not provide the owners with truthful or helpful advice, as that would have required that they fully inform the owners of Bluegreen's *discretionary*, internal collections policy, and of the potential consequences of breaching their timeshare agreements. Instead, what the Marketing Defendants did was profit from the owners' ignorance of that policy by manipulating the owners with false or misleading information to charge them for nonexistent services.

For their part, the Lawyer Defendants argue that, as to the owners with which they were involved, there is no evidence that the Lawyer Defendants interfered with any loan owned by either of the Bluegreen entities. The argument depends on an assumption that Bluegreen is only injured when owners default on their loan obligations, and that defaults occurring while the loans are still assigned to the SPEs do not impact the Bluegreen entities.

Moreover, it ignores the fact that the Owner Beneficiary Agreements (the principal contracts, which owners enter with BVU) are apart from the owners' financing agreements. In short, the Lawyer Defendants' argument is practically the same as that raised by the Defendants with respect to Article III standing and, for the reasons explained above, misses the mark.

Finally, as to the issue of damages, Bluegreen argues that it has been indisputably damaged by the Deposed Owners' breaches of their respective contracts because each such contract had an outstanding unpaid principal loan balance. However, on this record, the Court cannot determine definitively whether, and, if so, to what extent, Bluegreen has been damaged as a result of the Deposed Owners' defaults. The only support Bluegreen cites for its damages is a paragraph in its Statement of Facts that does not itself directly address the issue of the Deposed Owners' remaining loan balances, but instead is a general statement as to the owners' obligations to pay on their contracts until the outstanding loan balances reaches zero. (*See* Pls.' Stmt. of Facts ¶ 88.) Critically, the Marketing Defendants have provided evidence that, upon termination of an owner's timeshare interest, Bluegreen repossesses the interest, often for an amount equal to the total outstanding balance on the terminated loan. (M.Ds.' Stmt. of Facts ¶¶ 17–20.) Moreover, Bluegreen does not provide evidence on the degree to which it otherwise has been damaged by the Deposed Owners' defaults, such as through the costs of reselling the particular timeshare interests or through lost servicing fees. In short, the evidence on Bluegreen's damages as a result of the Deposed Owners' defaults is scant and unclear.

Thus, the Court grants summary judgment in favor of Bluegreen on its tortious interference claim as to the Marketing Defendants with respect to the fifteen Deposed Owners, *except* as to the issue of damages. Bluegreen's tortious interference claim remains undecided as to the Marketing Defendants with respect to all the other contracts at issue, and as to the Lawyer Defendants.

### F. Count Seven – Civil Conspiracy to Commit Tortious Interference

The Lawyer Defendants move for summary judgment on Bluegreen's claim for civil conspiracy to commit tortious interference. Under Florida law, success on a clam of civil conspiracy requires proof of "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009) (quoting *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159-60 (Fla. 3d DCA 2008)). "Each coconspirator need not act to further a conspiracy; each

'need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators.'" *Cordell Consultant, Inc. v. Abbott*, 561 F. App'x 882, 886 (11th Cir. 2014) (quoting *Charles*, 988 So. 2d at 1160). Although the Lawyer Defendants attack all four of the required elements, the Court concludes that summary judgment in their favor is not warranted.

First, the Lawyer Defendants state that Bluegreen's claim for civil conspiracy fails because its underlying claim for tortious interference fails. However, to the contrary, the Court has found that, except as to damages, Bluegreen is entitled to summary judgment on its tortious interference claim as to the fifteen Deposed Owners, and that summary judgment on tortious interference is denied as to the remaining owners. Accordingly, there is a viable underlying tort on which the civil conspiracy claim can be founded. The Lawyer Defendants also make a one-line argument to the effect that there can be no underlying claim for tortious interference because their actions were privileged. Not only do the Lawyer Defendants fail to provide *any* support for this privilege argument, making it practically impossible for the Court to address on the merits, they also fail to raise it with respect to the tortious interference claim itself. In any case, even assuming that the Lawyer Defendants' own conduct could not form that basis of a claim for tortious interference, the Marketing Defendants' certainly can.

Next, the Lawyer Defendants argue that Bluegreen has failed to present any evidence that there was anything more than a simple referral relationship among the Defendants. However, there is evidence in the record from which a reasonable juror could infer that the Defendants indeed reached an understanding to commit the acts amounting to tortious interference. *See Phelan v. Lawhon*, 229 So. 3d 853, 859 n.7 (Fla. 3d DCA 2017) ("The existence of a conspiracy and an individual's participation in it may be inferred from circumstantial evidence."). As just one example, there is evidence that one of the Lawyer Defendants, Slattery, has had a relationship with the Marketing Defendants for years, and previously negotiated business terms with the Marketing Defendants on behalf of Del Mar Law Group, a firm of which he was the managing partner, and of which the other Lawyer Defendant, Carlsbad Law, is the successor entity.

Third, the Lawyer Defendants argue that Bluegreen has failed to present evidence that they committed an overt act to affect the object of the conspiracy because the letters they sent on behalf of Bluegreen owners do not qualify as such an act. However, there is no requirement that each coconspirator commit an overt act in furtherance of the conspiracy. See *Cordell Consultant, Inc. v. Abbott*, 561 F. App'x 882, 886 (11th Cir. 2014). Further, the Lawyer Defendants

do not dispute that they sent the demand letters, they only argue that these letters were not qualifying acts because they were not made in pursuance of any conspiracy. As noted, this is an issue for the jury.

Finally, with respect to whether Bluegreen was damaged as a result of the acts done under the conspiracy, the Lawyer Defendants raise the same argument regarding loan ownership and proximate cause that have been rejected previously.

Accordingly, the Court denies the Lawyer Defendants' motion for summary judgment as to Bluegreen's claim for conspiracy to commit tortious interference.

### G. Count Six – Violations of FDUTPA

Bluegreen and the Lawyer Defendants cross-move for summary judgment on Count Six, which alleges the Defendants' violation of Florida's Deceptive and Unfair Trade Practices Act, §§ 501.201 *et seq.*, Fla. Stat. ("FDUTPA"). FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1). A claim pursuant to the statute has three elements: "(1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages." *Dolphin Ltd. Liab. Co. v. WCI Cmtys., Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013) (citing *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006)). While, in its complaint, Bluegreen requests both damages and injunctive relief on its FDUPTA claim (*see* Compl. ¶ 250, ECF No. 1), Bluegreen specifies on summary judgment that it is only seeking injunctive relief, reserving its argument as to actual damages for trial.[6] Although the Lawyer Defendants raise various attacks on Bluegreen's FDUPTA claim, the Court finds in favor of Bluegreen, concluding that it is entitled to its request for injunctive relief.

### (1) *Deceptive Act or Unfair Practice*

"To satisfy [FDUPTA's] first element, [a] plaintiff must show that 'the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.'" *Carriuolo v. GM Co.*, 823 F.3d 977, 983-84 (11th Cir. 2016) (quoting *Office of the AG, Dep't of Legal Affairs v. Commerce Commer. Leasing, LLC*, 946 So. 2d 1253, 1258 (Fla. 1st DCA 2007)); *see also Hucke v. Kubra Data*

---

[6] As with a claim for damages, a claim for equitable relief under FDUPTA requires an entity to "show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc. v. Arrigo Enters.*, 266 So. 3d 207, 214 (Fla. 4th DCA 2019).

*Transfer Ltd., Corp.*, 160 F. Supp. 3d 1320, 1328 (S.D. Fla. 2015) ("A deceptive act or practice is one that is likely to mislead consumers and an unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." (cleaned up)). Bluegreen argues that the Defendants' business practices are deceptive, and this is supported by the unrebutted evidence in the record. The Defendants' entire business model is based on offering a service—*i.e.*, legal cancellation of timeshare contracts—they do not actually provide.[7] The Special Master in *Diamond Resorts United States Collection Dev., LLC v. Pandora Mktg., LLC*, a similar proceeding, aptly summarized the Defendants' conduct as follows:

> The unambiguous factual message that the Exit Defendants are communicating to the timeshare owners is that they are selling a service in which they and their lawyers legally cancel the owners' timeshare contracts based on improprieties by Diamond. . . . The Exit Defendants are not providing that service and they know it. The timeshare contracts are being cancelled because the owners follow Defendants' advice and stop making payments on the contracts, which triggers foreclosure by Diamond based on default. . . .
>
> This process is not "legal" as that term is generally understood within and without the legal profession and, therefore, the Exit Defendants' repeated assertion that they accomplish cancellation by legal means is false.

No. 2:20-cv-05486-DSF-ADS, 2022 U.S. Dist. LEXIS 238942, at *48-49 (C.D. Cal. Sep. 19, 2022).

The Lawyer Defendants argue that, because they were retained to provide legal assistance to Bluegreen timeshare owners, their conduct does not involve trade or commerce and falls outside of FDUPTA's purview. FDUPTA defines "trade or commerce" as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." § 501.203(8). While "attorneys are not automatically exempt from the operation of" FDUPTA, "the usual course of legal practice will not implicate the statute because express prerequisites required to invoke FDUTPA will not ordinarily be satisfied." *Kelly v. Palmer, Reifler &*

---

[7] Bluegreen also argues that FDUPTA's first element is met here by (i) the Marketing Defendants' false advertising and the Lawyer Defendants' contributory false advertising in violation of the Lanham Act and (ii) the Defendants' violations of California Business and Professions Code § 6155. Because the Court has not found violations of the Lanham Act, Bluegreen's first point is null. Moreover, because the Court has concluded that the Defendant's business practices are deceptive, it need not address Bluegreen's second point.

*Assocs., P.A.*, 681 F. Supp. 2d 1356, 1371 (S.D. Fla. 2009), *report and recommendation adopted*, 681 F. Supp. 2d 1356, 1360 (S.D. Fla. 2010). Contrary to the Lawyer Defendants' assertion, however, the conduct at issue does not pertain to their legal practice, but instead to their close involvement in, and facilitation of, the Marketing Defendants' business scheme. *See Gastaldi v. Sunvest Cmtys. USA, Ltd. Liab. Co.*, 637 F. Supp. 2d 1045, 1056 (S.D. Fla. 2009) (Altonaga, J.) ("To state a claim under the FDUTPA, one need not show the defendant was the principal actor involved in the violative acts, or that the defendant initiated those acts.").

It is undisputed that the Lawyer Defendants knew of the Marketing Defendants' multi-level scheme offering owners the opportunity to legally exit their timeshares. (Pls.' Resp. to LDs.' Stmt. ¶ 22.) It is also undisputed that the Lawyer Defendants provided their services in support of the Marketing Defendants' scheme, even though they were aware that the timeshare contracts were being cancelled because of the owners' defaults, and not because of any work they did. (*Id.* ¶ 26, 34–36.) These actions pertain to the Lawyer Defendants' business practices, not to their pursuit of legal remedies, as they contend, and thus are actionable under FDUPTA. *See, e.g., Wyndham Vacation Ownership v. Montgomery*, No. 8:19-cv-1895-CEH-CPT, 2021 U.S. Dist. LEXIS 207860, at *28 (M.D. Fla. Oct. 18, 2021) (report and recommendation compiling cases) ("Other courts in this District have likewise determined that a lawyer's timeshare exit activity can be actionable under the FDUTPA in circumstances akin to those present in this case.").

The Lawyer Defendants also argue that, even if they engaged in trade or commerce, Bluegreen's FDUPTA claim still fails because none of the actions at issue took place in Florida and no Florida consumers were injured. However, it is undisputed that the Marketing Defendants advertise their services to timeshare owners nationwide, including Florida, that at least twenty-one of the Bluegreen owners who defaulted on their contracts are Florida residents and that, of these, at least eight were clients of the Lawyer Defendants. (Pls.' Resp. to LDs.' Stmt. ¶ 17, 55.) Although there is admittedly some confusion in the case law as to the extraterritorial application of FDUPTA, there is no question that the statute applies to practices directly affecting Florida consumers. Moreover, there is no requirement that the problematic "conduct occur[] entirely within Florida." *Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*, No. 10-23869-CIV, 2012 U.S. Dist. LEXIS 61710, at *19 (S.D. Fla. May 2, 2012) (Altonaga, J.). Indeed, various courts have confirmed the application of FDUPTA in circumstances like those here, where conduct occurring outside of Florida is directed at, and impacts, Florida consumers. *See, e.g., Wyndham Vacation Ownership v. Sussman*, No. 6:18-cv-2171-GAP-DCI, 2021 U.S. Dist.

LEXIS 208752, at *18 (M.D. Fla. Sep. 27, 2021) (denying summary judgment for lawyer defendant on issue of whether conduct occurred outside of Florida where exit company "solicited clients from around the country, including several relevant owners in Florida, [] [lawyer defendant] sent his demand letters to [timeshare company] in Florida[,]" and lawyer defendant "failed establish that the conduct pertinent to the FDUTPA claim occurred entirely outside of the state of Florida"); *Buckley v. Moore*, No. 20-CIV-61023-RAR, 2021 U.S. Dist. LEXIS 138073, at *24-25 (S.D. Fla. July 23, 2021) (Ruiz, J.) (compiling cases) (allegations that out-of-state conduct was directed to plaintiff in Florida and impacted Florida consumers considered "sufficient to establish a relationship to Florida for purposes of asserting a FDUTPA claim"). Thus, at least as to the Florida timeshare owners, the conduct at issue here falls within FDUPTA's purview.

### (2) *Causation*

With respect to whether consumers were injured as a result of the Defendants' deceptive acts, Bluegreen can satisfy causation by "'prov[ing] that an objectively reasonable person would have been deceived' by the deception or unfair act." *See BluestarExpo, Inc. v. Enis*, 568 F. Supp. 3d 1332, 1348 (S.D. Fla. 2021) (Scola, J.) (quoting *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011)); *see also State, Office of Atty. Gen., Dept. of Legal Affairs v. Wyndham Intern., Inc.*, 869 So. 2d 592, 598 (Fla. 1st DCA 2004) ("When addressing a deceptive or unfair trade practice claim, the issue is not whether the plaintiff actually relied on the alleged practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances."). As discussed in detail above when addressing proximate cause, the evidence shows that various owners relied on the false offer of a legal means to exit their timeshare contracts in hiring the Defendants and defaulting on their obligations. As such, there is no question that the Defendants' practices are deceptive to objectively reasonable consumers.

### (3) *Injunctive Relief*

Fla. Stat. § 501.211(1) provides that "[w]ithout regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of [FDUPTA] may bring an action to . . . enjoin a person who has violated, is violating, or is otherwise likely to violate" the statute. In other words, § 501.211(1) "permits a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to occur in the future . . . regardless of whether [such] aggrieved party can recover

'actual damages.'" *Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. 5th DCA 2012). "[F]or someone to be aggrieved, the injury claimed to have been suffered cannot be merely speculative." *Stewart Agency, Inc. v. Arrigo Enters.*, 266 So. 3d 207, 214 (Fla. 4th DCA 2019) (quoting *Ahearn v. Mayo Clinic*, 180 So. 3d 165, 173 (Fla. 1st DCA 2015)).

Bluegreen argues that it qualifies as an aggrieved party because it has suffered commercial harm as a result of the Defendants' deceptive conduct, and the Court agrees. In short, the record shows that the Defendants sell a service that depends entirely on the timeshare owners defaulting on their contractual obligations to Bluegreen, and this causes Bluegreen harm in various ways. As just one example, Bluegreen has put forth unrebutted evidence that anytime an owner defaults on her loan obligations Bluegreen incurs various sorts of expenses related to repossessing and reselling the timeshare interest associated with that loan. Moreover, it is undisputed that the Marketing Defendants continue to accept Bluegreen owners as customers and to refer them to attorneys, including the Lawyer Defendants. (Pls.' Stmt. of Facts ¶ 106.) This is enough to qualify Bluegreen for injunctive relief under FDUTPA. *See, e.g.*, *Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. 5th DCA 2012) (conduct that could create consumer confusion and damage timeshare company's reputation was actionable on a claim for injunctive relief under FDUTPA).

### H. Remedies

### (1) *Damages*

In their respective motions for summary judgment, the Defendants seek various determinations as to Bluegreen's entitlement to damages. The Court addresses each in turn.

#### (a) *Impermissible Double Recovery*

To begin, the Marketing Defendants argue that summary judgment is warranted in their favor on all claims because Bluegreen is not entitled to any damages. The Marketing Defendants seem to reason that, because Bluegreen has recaptured or otherwise taken possession of the collateral securing some of the timeshare owners' debts (*i.e.*, the ownership interests in the timeshares), Bluegreen has suffered no damages on its claims, which, therefore, fail. However, the Marketing Defendants' argument is flawed in various ways.

Critically, the Marketing Defendants do not cite evidence that Bluegreen has repossessed the timeshares interests on all the contracts at issue. Instead, they state that Bluegreen has terminated "*138 of the 218* contracts at issue

and repossessed all of the timeshare interests and points conveyed to *these* owners." (M.Ds.' Mot. for Summ. J. 13, ECF No. 276 (emphasis added) (citing M.Ds.' Stmt. of Facts ¶¶ 18, 32).) Therefore, following the Marketing Defendants' logic, there would still be at least eighty contracts for which Bluegreen has not recovered the collateral and as to which Bluegreen's claims would be viable.

Moreover, the Marketing Defendants' argument also ignores other areas of damages and relief potentially available to Bluegreen. Bluegreen seeks all damages resulting from the Defendants' conduct, not just the sum of unpaid loan balances. (*See, e.g.*, Compl. ¶ 178, ECF No. 1.) As touched on above with respect to the Defendants' Article III standing arguments, Bluegreen has presented evidence that anytime a loan defaults, there are various sorts of expenses incurred by Bluegreen that are independent of that loan's outstanding balance, such as maintenance fees and costs related to the sale and marketing of the reacquired timeshare interests. In addition, Bluegreen seeks other forms of relief, including injunctive relief and disgorgement damages, that have nothing to do with its recovery of the outstanding sums on the loans at issue. (*See, e.g.*, *id.* ¶¶ 178–79.)

Accordingly, the Marketing Defendants are not entitled to summary judgment based on Bluegreen's failure to suffer damages. At trial, Bluegreen's damages may be offset as applicable by the value of reacquired property interests. *See, e.g.*, *In re Johnson*, 477 B.R. 879, 882 (Bankr. M.D. Fla. 2012) (following creditor's acquisition of collateral via foreclosure "no more than a full recovery of the indebtedness may be had").

(b) *Applicability of UCC Article 9*

As an extension of their argument that Bluegreen has suffered no damages, the Marketing Defendants also argue that, because Bluegreen has failed to comply with the default provisions of Article 9 of Florida's Uniform Commercial Code ("UCC"), all the loans at issue have been presumptively satisfied. However, Fla. Stat. § 679.1091(4)(k) specifies that, with some limited exceptions, it does not apply to "[t]he creation or transfer of an interest in or lien on real property," [8] and Bluegreen has presented evidence that its timeshare owners purchase such an interest in real property.

---

[8] *See generally* 1 Asset Based Financing: A Transactional Guide § 8.04 (2023) ("T[imeshare] interests may be either real property or personal property depending upon the structure of the timeshare plan. Fee or ownership plan timeshares are tenancies-in-common, and are documented under, and subject to, real property law. They are excluded from Article 9 by Section 9-109(d)(11). On the other hand, if the owner only has a contractual right to use the premises the interest is personal property, and subject to Article 9.").

Specifically, Bluegreen states that contracting owners purchase a "timeshare estate" (*see* Pls.' Resp. to MDs.' Stmt. ¶ 34), which is supported by a review of the sample Owner Beneficiary Agreements in the record. Indeed, the sample agreement cited by the Marketing Defendants themselves describes the property being purchased as a "timeshare estate" and defines the interest being transferred in accordance with Fla. Stat. § 721. Fla. Stat. § 721.05(34), in turn, specifically prescribes that "[a] timeshare estate is a parcel of real property under" Florida law. Moreover, the Marketing Defendants do not argue that any of the exceptions in Fla. Stat. § 679.1091(k) apply.

Given the foregoing, the Court cannot apply the UCC to preclude Bluegreen's recovery of damages on summary judgment.

(c) *Loans in Bluegreen's Damages Model*

The Lawyer Defendants also seek summary judgment as to damages, arguing that certain loans should be excluded from Bluegreen's model. Bluegreen provides evidence to preclude summary judgment on these grounds as well.

The Lawyer Defendants first argue that summary judgment is warranted on seven of the loans at issue because they became delinquent prior to the formation of Carlsbad, while the clients were being represented by non-party Del Mar Law Group ("Del Mar"). But Bluegreen provides evidence that Carlsbad assumed the responsibilities of Del Mar, thereby creating a material issue of fact as to whether Carlsbad is responsible for the delinquencies on those loans. (*See* Pls.' Resp. to LDs.' Stmt. ¶ 12.)

The Lawyer Defendants next argue that there are twenty loans which should be excluded from Bluegreen's damages because they became delinquent after the complaint was filed. Per the Lawyer Defendants' own cited case law, however, "[d]amages accruing since the action began [a]re allowed, but only such as were the consequence of acts done before and constituting part of the cause of action declared on." *Lawlor v. Loewe*, 235 U.S. 522, 536 (1915); *see also McAllister v. Sec'y of Health & Human Servs.*, 70 F.3d 1240, 1243 (Fed. Cir. 1995) ("[R]ecovery for past damages ordinarily includes not only those damages that the plaintiff incurred before filing the complaint, but also any damages that the plaintiff incurs up to the time of trial.") The Lawyer Defendants do not argue that the acts leading to the twenty loans becoming delinquent took place after the complaint was filed. To the contrary, Bluegreen cites evidence that the harmful conduct resulting in those delinquencies originates in the Defendants' long-running practices. (*See, e.g.*, Pls.' Resp. to LDs.' Stmt. ¶ 49.)

The Lawyer Defendants also argue that two loans, both related to owner Thomas Hollingsworth, should be excluded because they were referred by Seaside Consultants, and therefore did not involve the Marketing Defendants. Yet, Bluegreen provides an email evidencing the Marketing Defendants' involvement with Mr. Hollingworth's file. This raises an issue of fact as to whether, and, if so, when, Mr. Hollingworth was also the subject of the Defendants' wrongful conduct.

The Lawyer Defendants' last argument is that various loans should be excluded from Bluegreen's damages because those owners stated that they had already decided to terminate their relationship with Bluegreen prior to contacting the Marketing Defendants. This argument is the same causation argument that has been addressed and rejected above.

### (2) *General Entitlement to Injunctive Relief*

Both in their opposition to Bluegreen's motion for partial summary judgment and in their own motion for summary judgment, the Marketing Defendants argue that no injunction should issue in this case because Bluegreen has not satisfied the classic factors for a permanent injunction, namely:

> (1) that [the plaintiffs have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s] and defendant[s], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*See Broad. Music, Inc. v. Evie's Tavern Ellenton, Inc.*, 772 F.3d 1254, 1261 (11th Cir. 2014) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). The Marketing Defendants do not specify to which of Bluegreen's claims their argument is directed, instead stating generally that Bluegreen has not suffered an irreparable injury and that the remedies available at law are adequate to compensate it for whatever injury it has suffered. However, Bluegreen has presented evidence to rebut both points.

While the Marketing Defendants provide no factual support for the statement that Bluegreen is fully compensated for its injuries by its internal process of foreclosing on, and then reselling, defaulted loans, as touched on above, Bluegreen has put forth evidence that anytime a loan defaults it incurs various sorts of expenses independent of the outstanding balance on a particular loan. Moreover, Bluegreen has provided evidence that its injuries are continuing and not fully compensable by damages alone. In particular, it cites

undisputed evidence that the Defendants continue to engage in the wrongful conduct at issue.

Thus, the Marketing Defendants have failed to demonstrate the absence of a genuine issue of material fact entitling them to summary judgment on Bluegreen's request for injunctive relief.

## I. Affirmative Defenses

Finally, Bluegreen moves for summary judgment on the Defendants' affirmative defenses. The Court addresses each in turn.

### (1) *The Marketing Defendants' Affirmative Defenses*

(a) *First and Second Affirmative Defenses: Agency*

The Marketing Defendants' first and second affirmative defenses state that they were privileged to interfere with the timeshare owners' contracts because they were acting as their agents. Bluegreen moves for summary judgment on these defenses by pointing out that the Marketing Defendants' own agreements with the owners expressly disclaim the existence of any such relationship. The Court agrees.

It is undisputed that the contracts entered between the Marketing Defendants and its customers disclaim the existence of any agency relationship. (*See* Pls.' Stmt. of Facts ¶ 47.) While "'[e]xpress disclaimers of agency do not eliminate the existence of an agency relationship' . . . considerable efforts to avoid an agency relationship through express disclaimers is 'palpable evidence' that there was no consent or acquiescence to an agency relationship." *Taylor Grp., Inc. v. Indus. Distribs. Int'l Co.*, 506 F. Supp. 3d 1256, 1270 (S.D. Fla. 2020) (Becerra, M.J.) (quoting *Carr v. Stillwaters Development Company, L.P.*, 83 F. Supp. 2d 1269, 1279 (M.D. Ala. 1999); *Commodity Futures Trading Commission v. Gibraltar Monetary Corp., Inc.*, 575 F.3d 1180, 1189 (11th Cir. 2009)). Moreover, the Marketing Defendants fail to point to any evidence that would support the existence of an agency relationship between them and the owners. The fact that the Marketing Defendants may listen to the customers, and maybe even try to fulfill some of their specific requests, does not show that the customers exerted control over the Marketing Defendants as their principals.

Thus, summary judgment is warranted in favor of Bluegreen on the Marketing Defendants' first and second affirmative defenses.

(b) *Third and Fourth Affirmative Defenses: Causation and Standing Denials*

The Marketing Defendants' third and fourth affirmative defenses raise issues pertaining to causation and standing respectively. Specifically, the third affirmative defense denies causation as to any timeshare owner that was delinquent in its contractual obligations prior to engaging the Marketing Defendants, and the fourth affirmative defense denies Bluegreen's standing as to its Lanham Act claims on the grounds that none of the Marketing Defendants' advertisements instructed the owners to stop making payments on their contracts with Bluegreen. Bluegreen correctly points out that these are mere denials, going to the elements of Bluegreen's prima facia case, and not appropriately labeled as affirmative defenses. *See, e.g.*, *Flav-O-Rich, Inc. v. Rawson Food Serv., Inc. (In re Rawson Food Serv., Inc.)*, 846 F.2d 1343, 1348-49 (11th Cir. 1988) ("A defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense."); *Orange Lake Country Club Inc. v. Reed Hein & Assocs.*, No. 6:17-cv-1542-Orl-78DCI, 2019 U.S. Dist. LEXIS 223939, at *55-56 (M.D. Fla. Oct. 4, 2019) ("This is not an affirmative defense but rather a denial of the existence of a conspiracy. Therefore, summary judgment will be granted."). Accordingly, the Court grants summary judgment on these issues in favor of Bluegreen to the extent the Marketing Defendants purport to raise them as affirmative defenses.

(c) *Fifth Through Ninth, and Eleventh Affirmative Defenses*[9]

The Marketing Defendants' sixth through ninth affirmative defenses were stricken. (*See* Order Adopt. R. & R., ECF No. 155; Omnibus R. & R. on Mot. to Strike, ECF No. 123.)

The Marketing Defendants' fifth affirmative defense states their potential entitlement to recover attorneys' fees and costs as a prevailing party pursuant to FDUPTA, and their eleventh affirmative defense states that no recovery of punitive damages pursuant to Bluegreen's tortious interference claims may exceed the limits imposed by Chapter 768 of the Florida Statutes. Bluegreen argues that neither of these has been appropriately brought as an affirmative defense, and the Court agrees.

If the Marketing Defendants ultimately consider that they are entitled to attorneys' fees and costs pursuant to FDUPTA, they may file a motion requesting such relief. *See, e.g.*, *Schmidt v. Synergentic Communs., Inc.*, No.

---

[9] Although Bluegreen states that it moves for summary judgment on *all* the Defendants' affirmative defenses, it fails to specifically address the Marketing Defendants' tenth affirmative defense. Because that defense relates to Bluegreen's entitlement to "punitive damages," the Court need not address it at this stage.

2:14-cv-539-FtM-29CM, 2015 U.S. Dist. LEXIS 27020, at *6 (M.D. Fla. Mar. 5, 2015) (striking defendants' assertions that they were entitled to attorneys' fees and costs pursuant to particular statutes as an improper affirmative defense); *Perez-Nunez v. N. Broward Hosp. Dist.*, No. 08-61583-CIV-MOORE, 2009 U.S. Dist. LEXIS 25557, at *6 (S.D. Fla. Mar. 13, 2009) (Moore, J.) ("Defendant's claim for attorneys' fees is not an affirmative defense. Should Defendant seek to pursue a claim for attorneys' fees or other sanctions, it must present such a claim as a separate motion.").

Moreover, the Marketing Defendants' eleventh affirmative defense is a mere statement of the law, which they fail to connect to any particular facts. *See Torres v. TPUSA, Inc.*, No. 2:08-cv-618-FtM-29DNF, 2009 U.S. Dist. LEXIS 22033, at *4 (M.D. Fla. Mar. 19, 2009) (defendant's allegation that plaintiff's damages were limited by applicable law considered simply a statement of the law and not an affirmative defense); *see also Charlemagne v. Alibayof*, No. 20-62043-CIV-SMITH, 2022 U.S. Dist. LEXIS 97310, at *10 (S.D. Fla. Apr. 29, 2022) (Smith, J.) (defendant did not waive right to assert damage cap by failing to plead it as an affirmative defense).

Thus, the Court also grants summary judgment in favor of Bluegreen on the Marketing Defendants' fifth and eleventh affirmative defenses to the extent they are brought as affirmative defenses.

**(2) The Lawyers Defendants' Affirmative Defenses**

(a) *First Affirmative Defense: Agency*

The Lawyer Defendants' first affirmative defense is that the timeshare owners retained them to provide legal services and so they were privileged to act on behalf of the timeshare owners as their agents. In opposition, Bluegreen argues that this doesn't matter because (i) the Lawyer Defendants' involvement in the Marketing Defendants' scheme predated any legal representation they offered to the timeshare owners and (ii) the Lawyer Defendants' unlawful conduct precludes agency immunity. The Court agrees on both grounds.

First, assuming that the Lawyer Defendants eventually formed an agency relationship with the timeshare owners, Bluegreen is correct that the claims at issue are based on conduct independent of such a relationship. Bluegreen's claims against the Lawyer Defendants are based on their involvement in the scheme to sell timeshare exit services to the public. Bluegreen explains, for example, that merely by accepting the Marketing Defendants' referrals generally, the Lawyer Defendants legitimize and facilitate the scheme. Bluegreen's claims against the Lawyer Defendants are not premised on their representation of the owners or, to that end, on any activity intended to legally

free owners from their timeshare obligations. Thus, even if they created an agency relationship, the Lawyer Defendants' representation of the owners cannot shield them from Bluegreen's claims. *See, e.g.*, *Wyndham Vacation Ownership, Inc. v. Miller*, No. 6:19-cv-817-Orl-40EJK, 2019 U.S. Dist. LEXIS 186597, at *17-18 (M.D. Fla. Oct. 11, 2019) ("[E]ven if the privilege applied, Plaintiffs sufficiently allege that Defendants' false advertisements—that is, conduct predating the purported agency relationship—interfered with Plaintiffs' contracts. The allegations of tortious interference are plainly directed at activities outside the scope of Defendants' representation.").

Second, to the extent Bluegreen's claims are based on the Lawyer Defendants' advise to owners after they were retained, the Lawyer Defendants' wrongful conduct would preclude agency immunity. "'[T]he privilege afforded [to] an agent . . . is not available where the agent acts solely with ulterior purposes and the advice is not in the principal's best interest,' . . . or where 'improper methods' are employed." *Orange Lake Country Club v. Reed Hein & Assocs., LLC*, 367 F. Supp. 3d 1360, 1370 (M.D. Fla. 2019) (quoting *Scussel v. Balter*, 386 So. 2d 1227, 1228-29 (Fla. 3d DCA 1980); *Scussel v. Balter*, 386 So. 2d 1227, 1228-29 (Fla. 3d DCA 1980)).[10] In short, the evidence in the record shows that the Lawyer Defendants' entire relationship with the timeshare owners was a sham, as the latter thought they were paying to be legally released from their timeshare contracts, when in reality it was their defaults that did all the work.

Thus, the Court grants summary judgment in favor of Bluegreen on the Lawyer Defendants' first affirmative defense.

(b) *Second Affirmative Defense: Litigation Privilege*

The Lawyer Defendants' second affirmative defense states that their actions on behalf of the timeshare owners were in anticipation of litigation and therefore immunized by Florida's litigation privilege. "At its most basic level, Florida's litigation privilege 'provid[es] legal immunity for actions that occur in judicial proceedings.'" *Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1218 (11th Cir. 2018) (quoting *Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So.2d 380, 383 (Fla. 2007)). The privilege "arises immediately upon the doing of any act required or permitted by law in the due course of the judicial proceeding or as *necessarily preliminary* thereto." *Fridovich v. Fridovich*, 598 So. 2d 65, 66 (Fla. 1992) (emphasis added)

_____

[10] *See generally* Restat 3d of the Law Governing Lawyers, § 57 (a lawyer advising a client to break a contract "is not liable if the lawyer does not employ wrongful means and if the lawyer acts to protect the client's welfare").

(quoting *Ange v. State*, 98 Fla. 538, 123 So. 916, 917 (Fla. 1929)). Courts have applied the privilege, for example, "to pre-suit communications required by statute or by contract as a condition precedent to suit," but declined to apply it to "pre-suit letters sent prior to a complaint or even with a summons and complaint as a debt collection practice." *See Westgate Resorts, Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1353-54 (M.D. Fla. 2019) (compiling cases). Bluegreen argues that the Lawyer Defendants' actions do not fall within the ambit of Florida's litigation privilege, and the Court agrees.

The Lawyer Defendants admit that their retainer agreements with the timeshare owners limit their representation to three specific tasks: (i) drafting a cease-and-desist letter, (ii) drafting a demand letter, and (iii) attempting to negotiate a resolution. (*See* Decl. of J. L. Slattery ¶14, ECF No. 268-1.) These are the only tasks covered by the fixed fee arrangement. So, if an owner's case ultimately involved some sort of judicial proceeding, he would have to execute a separate agreement with the Lawyer Defendants for those services. Thus, the concededly limited nature of the Lawyer Defendants' representation means that it could not have been undertaken in anticipation of litigation, much less as *necessarily preliminary* thereto. Consistent with this, although the Lawyer Defendants state that they are willing to litigate on behalf of owners when necessary, they have never initiated or defended an arbitration or lawsuit related to Bluegreen owners. (*See* Pls.' Resp. to LDs.' Stmt. ¶ 38.)

The only argument raised by the Lawyer Defendants on this point is that their demand letters are protected by Florida's litigation privilege because California Civil Code § 1691 purportedly requires a communication alerting a defendant to a prospective claim of rescission as a pre-requisite to filing litigation. However, among the many issues with this argument, § 1691 does not actually *require* such a communication. § 1691 states, in relevant part, that "[w]hen notice of rescission has not otherwise been given or an offer to restore the benefits received under the contract has not otherwise been made, the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both." Cal. Civ. Code § 1691. Thus, it is not true that the Lawyer Defendants were required by the statute to send those letters prior to initiating litigation.

In short, because the evidence shows that the Lawyer Defendants' conduct was wholly independent of any judicial proceedings, the Court grants summary judgment for Bluegreen on their litigation privilege affirmative defense.[11]

---

[11] *See Westgate Resorts, Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1354 (M.D. Fla. 2019) (no litigation privilege where party admitted that communications did not contemplate litigation

(c) *Third Affirmative Defense: Noerr-Pennington Doctrine*

As their third affirmative defense, the Lawyer Defendants state that Bluegreen's claims are barred by the *Noerr-Pennington* doctrine. The *Noerr-Pennington* doctrine protects the First Amendment guarantee of the right of the people to petition the government. Although originally developed in the anti-trust context, "courts have extended the *Noerr* doctrine to protect First Amendment 'petitioning of the government from claims brought under federal and state laws including . . . common-law tortious interference with contractual relations.'" *Verbena Prods. LLC v. Pierre Fabre Dermo-Cosmetique USA, Inc.*, Civil Action No. 19-23616-Civ, 2020 U.S. Dist. LEXIS 35869, at *12 (S.D. Fla. Feb. 28, 2020) (Scola, J.) (quoting *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075 1084 (5th Cir. 1988)). The doctrine thus "includes litigation and 'those acts reasonably and normally attendant upon effective litigation,' which can include 'threats.'" *Westgate Resorts, Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1355 (M.D. Fla. 2019) (quoting *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1560 (11th Cir. 1992)). The Court, however, disagrees that the instant proceedings are barred by the doctrine.

To begin, as noted with respect to the Lawyer Defendants' litigation privilege defense, there is little to no evidence supporting the idea that the Lawyer Defendants engaged in conduct reasonably attendant to litigation. The Lawyer Defendants' retainer agreements with the owners specifically exclude litigation from the scope of their covered representation. While it is not impossible that, notwithstanding their initial agreement, the Lawyer Defendants could expand their representation of certain owners to include litigation, they provide no evidence in support of this prospect. The Lawyer Defendants' bare claim that they are willing to litigate these issues when necessary does not change the fact that they have no intention of doing so when sending their letters on behalf of the timeshare owners. Without any concrete evidence that the Lawyer Defendants' conduct is reasonably and normally attendant to effective litigation, it cannot be protected by the *Noerr-Pennington* doctrine. *See Westgate Resorts, Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1355 (M.D. Fla. 2019) (attorney could not claim that his actions were immunized by *Noerr-Pennington* where there was no evidence that they were aimed at petitioning the government to redress aggrieved owners' rights).

---

and stated so); *Orange Lake Country Club, Inc. v. Reed Hein & Assocs., LLC*, 367 F. Supp. 3d 1360, 1372 (M.D. Fla. 2019) (letters not protected in the absence of evidence that they were required by statute or by contract as a conditions precedent to suit, or related to the prosecution or defense of a suit).

Moreover, even assuming that the Lawyer Defendants' letters and other limited contacts with Bluegreen were protected by the doctrine, as noted, Bluegreen correctly points out that its claims against the Lawyer Defendants are not premised on this conduct or, to that end, on any activity purportedly intended to legally free owners from their timeshare obligations. Instead, Bluegreen's claims are based on the Lawyer Defendants' participation, and central role in, the Marketing Defendants' scheme. Thus, the significance of the Lawyer Defendants' letters to Bluegreen is as evidence of the limited scope of the services that the Lawyer Defendants provide owners. *See Orange Lake Country Club v. Reed Hein & Assocs., LLC*, 367 F. Supp. 3d 1360, 1371-72 (M.D. Fla. 2019) ("Plaintiffs' conspiracy claim is not premised solely on the letters he sent to the Plaintiffs, but also on the methods he used to "exit" Orange Lake Owners from their timeshare contracts."). When contrasted with the services that the Marketing Defendants offer to timeshare owners, the letters are critical in showing the deception effected on the timeshare customers contracting for the Defendants' services.

Accordingly, because the Court concludes that the conduct at issue is not protected by the *Noerr-Pennington* doctrine, it grants summary judgment in favor of Bluegreen on this affirmative defense.

(d) *Fifth and Eighth Affirmative Defenses: Mitigation and Waiver*[12]

The Lawyer Defendants' fifth affirmative defense states that Bluegreen's claims are barred to the degree it has failed to mitigate its damages. This defense is based on the Lawyer Defendants' assertion that Bluegreen has the ability to work with timeshare owners to recover and resell their properties. Relatedly, the Lawyer Defendants' eighth affirmative defense argues that, to the extent Bluegreen chose to reacquire the timeshare interests of certain owners by terminating their agreements, it waived its right to claim damages on any amounts still owed on those contracts. Bluegreen moves for summary judgment on these defenses simultaneously, arguing that neither defense applies because the contracts at issue are non-exclusive contracts. The Court is not convinced.

"When a non-exclusive contract is involved which would allow a plaintiff to enter into other similar contracts, an exception to the requirement of avoiding foreseeable consequences is created and there is no duty to mitigate or minimize losses." *Burger King Corp. v. Berry,* No. 18-20435-CIV, 2020 U.S.

---

[12] Bluegreen does not move for summary judgement on the Lawyer Defendants' fourth affirmative defense because it was stricken. (*See* Order Adopt. R. & R., ECF No. 155; Omnibus R. & R. on Mot. to Strike, ECF No. 123.)

Dist. LEXIS 248462, at *18 (S.D. Fla. Dec. 18, 2020) (Martinez, J.) (quoting *Burger King Corp. v. Barnes*, 1 F. Supp. 2d 1367, 1372 (S.D. Fla. 1998)). In other words, "if [the plaintiff] could have performed the [relevant] contract[s] in addition to all of the contracts which it actually did perform then [the defendant] is not entitled to claim that some or all of those contracts were substitutes for its contract[,]" and "there will be no diminution of damages." *Graphic Assocs., Inc. v. Riviana Rest. Corp.*, 461 So. 2d 1011, 1014 (Fla. 4th DCA 1984); *see also Physicians Reference Lab., Inc. v. Daniel Seckinger, M.D. & Assocs., P.A.*, 501 So. 2d 107, 109 n.2 (Fla. 3d DCA 1987) (same). Thus, whether the doctrine excuses a party from mitigating damages in a particular case depends upon the facts of that case.

Although Bluegreen is adamant that its contracts with the timeshare owners are non-exclusive, there is evidence indicating otherwise. The sample owner beneficiary agreements in the record state that the property being sold is a timeshare estate and define this property in a manner that suggests the owner is receiving a unique, undivided interest in real estate. Consistent with this, when an owner defaults, Bluegreen must first terminate that owner's interest in the property at issue before it can sell the interest to a new purchaser. (*See* Dep. P. Humphrey 41:9-22, ECF No. 268-5.) Critically, John Hunt, Bluegreen's Vic President of Mortgage Operations, testified that, because Bluegreen cannot reacquire a timeshare interest until it is terminated, Bluegreen is hurt because it is unable to make any income on that interest. (*See* Dep. J. Hunt 252:9-20, ECF No. 268-3.) This is all inconsistent with Bluegreen's claim that its contracts with owners are non-exclusive. Moreover, it leaves unclear whether Bluegreen could have performed all of the defaulted contracts *in addition to* all of the contracts which it actually did perform.

Accordingly, because material issues of facts remain as to the nature of Bluegreen's contractual relationship with the owners, and, by extension, as to the damages it suffers on their default, the Court denies its motion for summary judgment as to the Lawyer Defendants' fifth and eighth affirmative defenses.

(e) *Sixth Affirmative Defense: Set-Off*

As their sixth affirmative defense, the Lawyer Defendants argue that they are entitled to a set-off for any damages Bluegreen recovers from other parties. The Court agrees with Bluegreen that this defense fails, even if not quite for the reasons Bluegreen asserts. "A set-off is defined as '[a] debtor's right to reduce the amount of a debt by any sum the creditor owes the debtor.'" *Leader Glob. Sols. LLC v. Yankelewitz*, 283 F. Supp. 3d 1314, 1324 (S.D. Fla. 2017) (Moore, C.J.) (quoting *In re TSLC I, Inc.*, 332 B.R. 476, 478 (Bankr. M.D. Fla. 2005)),

aff'd, 762 F. App'x 629 (11th Cir. 2019). Thus, "[s]etoff is permitted only where there is mutuality of claims between the parties[,]" and "[m]utuality of claims requires that the claims exist between the same parties acting in the same capacities." *Wiand v. Meeker*, 572 F. App'x 689, 691 (11th Cir. 2014) (citing *Griffin v. Gulf Life Ins. Co.*, 146 So. 2d 901, 903 (Fla. 1st DCA 1962); *Everglade Cypress Co. v. Tunnicliffe*, 107 Fla. 675, 148 So. 192, 193 (Fla. 1933)).[13] Because the Lawyer Defendants are specifically seeking set-off for damages Bluegreen may recover from parties other than itself, the Court grants summary judgment in favor of Bluegreen on this defense. *See also Diamond Resorts U.S. Collection Dev., LLC v. Neally*, No. 6:20-cv-1516-CEM-EJK, 2021 U.S. Dist. LEXIS 258844, at *4-5 (M.D. Fla. Oct. 15, 2021) (striking set-off affirmative defense where the defendant failed to allege any mutuality of claims).

(f) *Seventh Affirmative Defense: Unclean Hands*

Finally, the Lawyer Defendants' seventh affirmative defense avers that Bluegreen's own wrongful conduct precludes it from seeking equitable relief under the doctrine of unclean hands. "To assert an unclean hands defense, a defendant must show that (1) the plaintiff's wrongdoing is directly related to the claim, and (2) the defendant was personally injured by the wrongdoing." *Bailey v. Titlemax of Ga., Inc.*, 776 F.3d 797, 801 (11th Cir. 2015) (citing *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 450-51 (11th Cir. 1993)). Bluegreen argues that the Lawyer Defendants fail to show how Bluegreen's alleged wrongdoing is connected to the matter and claims at issue in this case, and the Court agrees.

In support of their defense, the Lawyer Defendants point to Bluegreen's refusal to follow its internal policy of cancelling and reacquiring defaulted timeshare interests. They allege that Bluegreen is only ignoring its own policy to manufacture the claims at issue in this case and to harm the Lawyer Defendants by undermining their relationship with the owners. However, as Bluegreen correctly points out, the unclean hands doctrine only applies when a claimant's allegedly wrongful conduct is directly related to the matter on which relief is sought. *See, e.g.*, *Gastaldi v. Sunvest Resort Cmtys.*, LC, No. 08-62076-CIV, 2010 U.S. Dist. LEXIS 9876, at *28 (S.D. Fla. Feb. 3, 2010) (Altonaga, J.) ("It is, in essence, the reason for the lawsuit; the unclean-hands conduct must be closely connected to that."). Here, Bluegreen seeks relief for conduct by the

---

[13] *See generally* 20 Am Jur 2d Counterclaim, Recoupment, and Setoff § 6 ("The doctrine of setoff, or compensation as it is called in civil law jurisdictions, is essentially an equitable one, requiring that the demands of mutually indebted parties be set off against each other and that only the balance be recovered in a judicial proceeding by one party against the other.").

Defendants that is leading its timeshare owners to default on their contractual obligations. How Bluegreen chooses to respond to those defaults is independent of the actions by the Defendants causing the defaults. As explained by Magistrate Judge Goodman in its report recommending that this defense be stricken, "the [Lawyer] Defendants fail to explain how the alleged misconduct is related to whether such defendants or any of the other defendants engaged in false advertising in breach of the Lanham Act, tortiously interfered with Bluegreen's contracts, violated FDUTPA, or were members of a conspiracy (i.e., Bluegreen's claims against them)." *Bluegreen Vacations Unlimited, Inc. v. Timeshare Lawyers P.A.*, No. 20-CV-24681-SCOLA/GOODMAN, 2022 U.S. Dist. LEXIS 4417, at *23-24 (S.D. Fla. Jan. 10, 2022), *report and recommendation adopted*, 2022 U.S. Dist. LEXIS 4417, at *23-24 (S.D. Fla. Jan. 10, 2022) (Scola, J.). Despite having had the opportunity to amend their seventh affirmative defense, the Lawyer Defendants still fail to adequately connect Bluegreen's alleged wrongdoing to its claims.

The Court thus grants summary judgment in favor of Bluegreen on the Lawyer Defendants' seventh affirmative defense.

### 4. Conclusion

In conclusion, for the reasons set forth above, the Court **denies** the Marketing Defendants and the Lawyer Defendants' respective motions for summary judgment in their entireties (**ECF Nos. 274, 276**) and **grants in part and denies in part** Bluegreen's motion for partial summary judgment (**ECF No. 270**). The Court grants summary judgment in Bluegreen's favor with respect to only the following: Bluegreen's claim for tortious interference as to the Marketing Defendants with respect to the fifteen Deposed Owners, *except* as to the issue of damages; Bluegreen's claim for injunctive relief pursuant to FDUPTA;[14] and Bluegreen's request for summary judgment on the Defendants' affirmative defenses, *except* as to the Lawyer Defendants' fifth and eighth affirmative defenses.

By way of a summary, the following claims remain for determination through trial:

| Count | Defendant |
|---|---|
| <u>One</u>: False Advertising in Violation of the Lanham Act | Marketing Defendants |
| <u>Three</u>: Contributory False Advertising in Violation of the Lanham Act | Lawyer Defendants |

---

[14] The Court will refrain from entering the injunction until the entry of final judgment.

| <u>Five</u>: Tortious Interference with Contractual Relations | All Defendants, but, with respect to the Marketing Defendants, only the issue of damages remains as to the fifteen Deposed Owners |
|---|---|
| <u>Six</u>: Violation of Florida's Deceptive and Unfair Trade Practices Act | All Defendants, but only with respect to Bluegreen's claim for damages |
| <u>Seven</u>: Civil Conspiracy to Commit Tortious Interference | All Defendants |

**Done and ordered** in Miami, Florida, on May 2, 2023.

Robert N. Scola, Jr.
United States District Judge