# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| BLUEGREEN VACATIONS UNLIMITED, INC., et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>TIMESHARE LAWYERS, P.A. d/b/a FEDERAL<br>FINANCIAL LAW GROUP, LLP, et al.,<br><br>      Defendants. | CASE NO. 1:20-cv-24681-RNS |

**SEAN SLATTERY'S DECLARATION RE:**
**<u>MODIFICATION OF PRELIMINARY INJUNCTION ORDER</u>**
(Carlsbad adv. Bluegreen)

J. L. "Sean" Slattery declares as follows:

1.    I am over the age of 18. I submit this Declaration in support of the motion of Defendants Pandora Marketing, LLC, Rich Folk, and William Wilson for modification and/or clarification of this Court's Order Granting the Plaintiffs' Motion for Preliminary Injunction (ECF No. 487). The representations set forth below are based on my personal knowledge, unless otherwise indicated, and/or upon the corporate records of Carlsbad Law Group, LLP ("Carlsbad") and/or its predecessor, Del Mar Law Group, LLP ("Del Mar").

2.    I practice law in Carlsbad, California, and have been an active member of the California Bar since December 2000.  I began my legal career with the Washington D.C. office of Winston & Strawn.  After working two years in that office, I relocated to the Los Angeles office and worked there for approximately three years.  I then moved to the law firm of Gordon & Rees, LLP, where I practiced for a little more than two years.

3.    In 2019, I co-founded Carlsbad with attorneys David Hall and Tim Campen. In March of that year, Carlsbad began accepting referrals of timeshare clients from Defendant Pandora

Marketing, LLC d/b/a Timeshare Compliance ("TSC"). Carlsbad also accepts referrals of clients from other timeshare exit companies.  Before Carlsbad, I worked with Del Mar Law Group, which also represented clients who were represented by Pandora.

4.   Since March 2019, Carlsbad has worked with thousands of clients seeking assistance in exiting that client's timeshare contract, including approximately 800 Bluegreen Owners. Ninety-nine of those contracts were made a part of this litigation (*i.e.,* 99 of the 218 contracts in Plaintiffs' Damage Model).

5.   Each of the Bluegreen Owners represented by Carlsbad enters into an attorney/client relationship, evidenced by a written Retainer Agreement executed by the parties.  The Retainer Agreement specifically set forth the tasks that Carlsbad would perform for the client (Paragraph 3), which made it clear that the scope of Carlsbad's representation would be limited to those acts described in Paragraph 3 (Paragraph 11), and which made it clear that Carlsbad would not represent that owner in any foreclosure, judicial or arbitration action (Paragraph 11). Further, each client understood that Carlsbad was not in any way guaranteeing the outcome of the representation, including not guaranteeing that Carlsbad would be able to obtain an exit from the client's timeshare obligations (Paragraph 8). (See, for example, Retainer Agreement of David and Colleen Bolanowski dated June 24, 2019 (Exhibit 1).)  In a majority of our cases (approximately 60% to 70%), I or someone from my office speaks with the client/owner to answer questions about our efforts to relieve them of their timeshare obligations.   On occasion clients recommended to Carlsbad by Pandora decide that they would rather work with another attorney.

6.   In attempting to resolve the purported timeshare obligation, it has been the experience of Carlsbad that it is difficult to negotiate an acceptable resolution as long as the client continues to make monthly payments to the developer. However, if the owner stops making payments and

that income stream is cut off, most developers seek to resolve the matter so that the timeshare interest can be reacquired and resold.  They become more open to working to achieve an acceptable settlement.

7.   It is not unethical for a party to decide not to perform its obligations under a contract where the cost of performance is significantly greater than the cost of non-performance. Typically, businesses will choose the course which they believe is economically in their best interest. California courts consider such a breach to be a "morally neutral act":

> Whereas an intentional tort is seen as reprehensible—the deliberate or reckless harming of another—**the intentional breach of contract has come to be viewed as a morally neutral act,** as exemplified in Judge Holmes's remark that "[t]he duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it—and nothing else."  (Holmes, The Path of the Law (1897) 10 Harv. L. Rev. 457, 462)

*Freeman & Mills, Inc. v. Belcher Oil Co.*, 900 P.2d 669, 681-682 (Calif. 1995) (emphasis added).

8.   The Eleventh Circuit appears to adopt a similar approach:

> [A contract] gives each party nothing more than a legal expectancy in having the other party *either* perform *or* (generally) respond in damages…It is not illegal for a party to breach a contract; **a contract gives a party two equally viable options (perform or pay compensation), between which it is generally at liberty to choose.**

*United States v. Blankenship*, 382 F.3d 1110, 1133-34 (11th Cir. 2004) (emphasis in bold added);

*see also Allapattah Servs. v. Exxon Corp.*, 61 F. Supp. 2d 1326, 1329 (S.D. Fla. 1999) (the law has long recognized the view that a contracting party has the option to breach a contract and pay damages if it is more efficient to do so).

9.   The Restatement (Second) of Contracts supports this black letter law, and this tenet has been adopted by Florida courts. Restatement (Second) Contracts, Section Scope Ch. 16:

> According to economic theory, if available goods and resources are to be utilized in their most productive manner, each good must be consumed by the person who values it most highly, and each "factor of production" must be employed in the way that produces the most valued output. Voluntary agreements in which individuals

exchange assets for those that they value more are necessary to bring about this result. A bargain from which both parties benefit results in a gain in "economic efficiency" by moving the exchanged assets to higher valued uses.

Economic theory assumes that the parties to an agreement strive to maximize their own welfare and that, absent some impediment such as mistake, misrepresentation or duress, each party places a value on the other's performance that is greater than the anticipated cost to him of his own performance. At the time the agreement is made, then, each party has a reasonable expectation that he will benefit from its performance.

If one party later concludes that a contract that he originally thought would be profitable will be unprofitable for him, his non-performance cannot be said to result in a gain in efficiency unless the value to him of the gain can be said to be greater than the value to the other party of the loss. Since individuals make different value judgments, the gain and the loss cannot be simply compared in absolute terms. However, a leading principle of economic theory can be applied to overcome this difficulty.

According to this principle, a breach of contract will result in a gain in "economic efficiency" if the party contemplating breach evaluates his gains at a higher figure than the value that the other party puts on his losses, and this will be so if the party contemplating breach will gain enough from the breach to have a net benefit even though he compensates the other party for his resulting loss, calculated according to the subjective preferences of that party. If this requirement is met, breach with such compensation will be advantageous to one party and not disadvantageous to the other. To prevent it by compelling performance, it is argued, would result in a less efficient distribution of wealth since the party in breach would lose more than the injured party would gain.

This conclusion accords well with the assumption of contract law that the principal purpose of the rules relating to breach is to place the injured party in as good a position as he would have been in had the contract been performed. Awarding damages on this basis to protect the injured party's "expectation interest" gives the other party an incentive to break the contract if, but only if, he gains enough from the breach that he can compensate the injured party for his losses and still retain some of the benefits from the breach.

Restatement 2d of Contracts, § Scope Ch. 16; *see also Dental Fix RX, LLC v. Brandon Moore & Practiceworks, LLC*, 2020 U.S. Dist. LEXIS 264920, at *22 (S.D. Fl. 2020) ("Florida has adopted the Restatement (Second) of Contracts.")

10. California's Code of Professional Responsibility reflects the above view. Public policy in California permits an attorney to recommend to a client that the client breach a contract if the

4

attorney believes that such action will best advance the client's objectives. *Schick v. Bach*, 193 Cal.App.3d 1321, 1329 (Cal. App. 1987) (absent extraordinary circumstances, an attorney may not be held liable for urging a client to breach a contract with some third party). This policy is consistent with Restatement (Third) of Law Governing Attorneys § 57(3) which provides that a lawyer who advises a client to break a contract is not liable to a non-client if the lawyer acts to advance the client's objectives.

11. During the four years Carlsbad has represented timeshare owners, I can recall almost no instance where the client continued to make payments and an acceptable resolution was achieved. Once payments cease, it is in the developer's economic interest to reacquire the property. Negotiated settlements following an owner's decision to default are, by definition, legal and permanent exits, as the developer is agreeing to the terms of the exit.  When a developer decides to release an owner following Carlsbad's sending of a cease and desist letter and a demand letter, even if the developer elects not to respond, I view these as exits prompted by my firm's representation.  Often developers will copy Carlsbad when terminating owners, even when they did not respond to my firm's letters (See Exhibit 5).  I consider this an acknowledgement that my firm's lawyers assisted in that exit.

12. When payments to the developer cease, often a resolution can be achieved through one of the following processes:

- The developer will enter into negotiations with Carlsbad and an acceptable resolution is reached. Typically, the terms include a transfer of title back to the developer. The resolution may or may not require the payment by the client of a sum which the client finds acceptable and include an exchange of releases.  Since 2019, this type of resolution has been the majority of those handled by Carlsbad, as most developers have been willing to negotiate a release.

- The developer will simply notify the owner that if the account is not brought current within a given timeframe, the developer will unilaterally take back the property and the owner will be released of all further liability.

- In some instances, the developer will institute an In Rem Foreclosure proceeding, seeking to recover title to the real property interest, but not seeking any monetary relief from the owner. In these instances, typically the owner is happy to surrender title and be free of the debt.

- On rare occasions, a developer will file suit or initiate an arbitration proceeding seeking damages. This has occurred in less than one percent of the cases in which Carlsbad has been involved.  In those cases, Carlsbad has represented the timeshare owner in the arbitrations.

- Finally, there are instances where a few developers will choose to do nothing. The developer will not respond to communication from Carlsbad but will also take no action against the owner to either recover the timeshare interest or to recover monetary sums from the owner. When this occurs, I believe the best practice is for the owner to be patient. Each month, the owner will be saving the amount of the payments due to the developer. Each month, the developer will not be realizing any return on the timeshare interest at issue. Typically, after a period of time, the developer will initiate contact and a favorable resolution can be achieved.

13. While stopping payments will usually advance the owner's objective of ending the relationship with that developer, some timeshare owners are in a position where negative credit may affect their employment or security clearance.  In those situations, ceasing payment may not be optimal for the client.

14. Carlsbad has represented approximately 800 Bluegreen Owners. In some instances, Bluegreen has released those owners from their obligations. In many instances, Bluegreen has chosen not to respond.  Of the remaining Bluegreen Owner-clients who have not been released from their timeshare obligations, it is my belief that Bluegreen will eventually release them.  It is in Bluegreen's financial interest to enter into negotiations to take back those timeshare interests and turn them into performing assets.

15. As for those Bluegreen clients where a resolution was achieved, some involved a formal settlement agreement and others did not. For example:

a.



16. Both Del Mar and Carlsbad have achieved successful resolutions for their clients with other developers using the same approaches as described above. Examples include:

a.



b.



c.

d.

e.

f.

8

17. The above are just a few examples of the work performed by Carlsbad in an effort to obtain the results sought by its timeshare clients. The settlement agreements referenced below are additional examples of resolutions achieved by Del Mar and Carlsbad on behalf of its clients with the following developers:

Hilton Grand Vacations

███████████████████████████████████████████

Holiday Inn Club Vacations

███████████████████████████████████████████

Marriott Vacation Club International

███████████████████████████████████████████

Sheraton Vacation Club


Sheraton Flex Vacations (Vistana)


Vacation International

███████████████████████████████████████████

King's Creek Plantation

███████████████████████████████████████████

Global Exchange Vacation Club

███████████████████████████████████████████

Club Exploria, LLC

███████████████████████████████████████████

Timeshare Interval (Manhattan Club)

██████████████████████

Festiva Development Group

Starpoint Resort Group
████████████████████████████

Breckenridge Grand Vacations
████████████████████████████

Welk Resort Group, Inc.
    Confidential Exhibit 40

18. ████████████████████████████████









19. I plan to appear in person and testify in the trial of this matter now scheduled in Miami for August 21 through 25 of this year.

## DECLARATION

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 21, 2023.

_____
J. L. (SEAN) SLATTERY

4865-7135-3199, v. 10

13

# EXHIBIT 1
# Redacted Pursuant to Local Rule 1.11(d)

COMPOSITE EXHIBIT 2
Redacted Pursuant to Local Rule 1.11(d)

COMPOSITE EXHIBIT 3
Redacted Pursuant to Local Rule 1.11(d)

# EXHIBIT 4
# Redacted Pursuant to Local Rule 1.11(d)

# EXHIBIT 5
# Redacted Pursuant to Local Rule 1.11(d)

# COMPOSITE EXHIBIT 6
# Redacted Pursuant to Local Rule 1.11(d)

COMPOSITE EXHIBIT 7
Redacted Pursuant to Local Rule 1.11(d)

COMPOSITE EXHIBIT 8
Redacted Pursuant to Local Rule 1.11(d)

COMPOSITE EXHIBIT 9
Redacted Pursuant to Local Rule 1.11(d)

COMPOSITE EXHIBIT 10
Redacted Pursuant to Local Rule 1.11(d)

COMPOSITE EXHIBIT 11
Redacted Pursuant to Local Rule 1.11(d)

EXHIBIT 12
Redacted Pursuant to Local Rule 1.11(d)

# EXHIBIT 13
# Redacted Pursuant to Local Rule 1.11(d)

# EXHIBIT 14
# Redacted Pursuant to Local Rule 1.11(d)

# EXHIBIT 15
# Redacted Pursuant to Local Rule 1.11(d)

# EXHIBIT 16
# Redacted Pursuant to Local Rule 1.11(d)

EXHIBIT 17
Redacted Pursuant to Local Rule 1.11(d)

# EXHIBIT 18
# Redacted Pursuant to Local Rule 1.11(d)

# EXHIBIT 19
# Redacted Pursuant to Local Rule 1.11(d)

EXHIBIT 20
Redacted Pursuant to Local Rule 1.11(d)

# EXHIBIT 21
# Redacted Pursuant to Local Rule 1.11(d)

# EXHIBIT 22
# Redacted Pursuant to Local Rule 1.11(d)

# EXHIBIT 23
# Redacted Pursuant to Local Rule 1.11(d)

# EXHIBIT 24
# Redacted Pursuant to Local Rule 1.11(d)

EXHIBIT 25
Redacted Pursuant to Local Rule 1.11(d)

# EXHIBIT 26
# Redacted Pursuant to Local Rule 1.11(d)

# EXHIBIT 27
# Redacted Pursuant to Local Rule 1.11(d)

EXHIBIT 28
Redacted Pursuant to Local Rule 1.11(d)

EXHIBIT 29
Redacted Pursuant to Local Rule 1.11(d)

EXHIBIT 30
Redacted Pursuant to Local Rule 1.11(d)

EXHIBIT 31
Redacted Pursuant to Local Rule 1.11(d)

EXHIBIT 32
Redacted Pursuant to Local Rule 1.11(d)

EXHIBIT 33
Redacted Pursuant to Local Rule 1.11(d)

# EXHIBIT 34
# Redacted Pursuant to Local Rule 1.11(d)

EXHIBIT 35
Redacted Pursuant to Local Rule 1.11(d)

EXHIBIT 36
Redacted Pursuant to Local Rule 1.11(d)

EXHIBIT 37
Redacted Pursuant to Local Rule 1.11(d)

EXHIBIT 38
Redacted Pursuant to Local Rule 1.11(d)

EXHIBIT 39
Redacted Pursuant to Local Rule 1.11(d)

EXHIBIT 40
Redacted Pursuant to Local Rule 1.11(d)

# EXHIBIT 41
# Redacted Pursuant to Local Rule 1.11(d)

# EXHIBIT 42
# Redacted Pursuant to Local Rule 1.11(d)

EXHIBIT 43
Redacted Pursuant to Local Rule 1.11(d)

# EXHIBIT 44
# Redacted Pursuant to Local Rule 1.11(d)