**JAMS ARBITRATION CASE REFERENCE NO. 1260005678**

**Diamond Resorts U.S. Collection Development LLC,**
**Claimant(s),**

**and**

**Philipps, Jennifer Marie and Jason Lee Bartow,**
**Respondents.**

---

## FINAL AWARD

### I. Introduction and Procedural History

Claimant filed a Demand for Arbitration December 11, 2019 alleging Respondents were consumers who were in breach of a 2018 Promissory Note ("Note") in connection with Purchase and Security Agreement to purchase a timeshare membership. The agreement to arbitrate is contained in Section 16 of the Parties' Purchase and Security Agreement dated June 22, 2018. A telephonic preliminary hearing was conducted August 12, 2020, and a scheduling order was entered. At the hearing the Arbitrator found Respondents' Counterclaim did not provide Claimant with reasonable notice of the counterclaim(s) and the relief sought as required by JAMS Streamlined Rule 7. Respondents were given until August 26, 2020 to serve an amended counterclaim. The Amended Counterclaim asserts claims for (1) Fraud in the Inducement/Equitable Rescission, (2) Violation of Nevada's Deceptive Trade Practices Act, (3) Violation of the Nevada Timeshare Act, (4) Unjust Enrichment, and (5) Declaratory Relief. At the hearing Counsel for Respondents argued his client's damages on the fraud claim were $3,189, the total amount paid by his clients shown in Exhibit 55, the loan payment history. However, in their post hearing brief Respondents seek to recover $7, 825.06, "the amount of the recouped liquidated damages".

Limited written discovery was allowed. The parties had several discovery disputes which the Arbitrator resolved in written orders before the Arbitration Hearing.

The Phase I Arbitration Hearing was conducted remotely via Zoom on May 28, 2021. Joshua Ihler and Abran Vigil appeared for Claimant. David Hall and Randall Stepp appeared for Respondents. At the beginning of the hearing all pre-marked joint exhibits not objected to were admitted. Respondents did not object to any of the exhibits on the joint exhibit list. Claimant objected to a number of exhibits in a statement of written objections. The Arbitrator indicated that rulings on any disputed exhibits would be reserved until an exhibit to which an objection was made was offered at the hearing.

Respondents filed a Motion in Limine to Exclude Evidence Based on Computer Data Not Disclosed. As the motion did not describe any specific data sought to be excluded the Arbitrator

reserved ruling requiring Respondents to object if and when Claimant offered any computer data Claimant had not produced as ordered in pre-hearing initial disclosures and discovery.

The hearing was stenographically reported and a transcript prepared which both sides agreed to provide for the Arbitrator's use in preparing the Award. At the conclusion of the hearing each side presented closing remarks, but requested leave to file post-hearing briefs after receipt of the hearing transcript. Briefs were timely filed and served July 7, 2021.

## II. Background Facts

The Demand asserts a single breach of contract claim arising out of a Purchase Security Agreement ("PSA") and Promissory Note ("Note") dated June 22, 2018 which Claimant ("Diamond") refers to collectively as "Purchase Agreements". Respondents ("Philipps and Bartow") purchased a timeshare interest or "Membership" in the form 2500 points in Diamond's U.S. Collection, and combined or "wrapped" the 2500 points purchased with 2500 timeshare points previously purchased. The purchase was financed with a Promissory Note in the amount of $18,363.59, with a monthly collection fee of $6.00, and a monthly finance charge of 16.99%. The Note obligated Respondents to make 120 equal monthly installments of $319.04 beginning August 11, 2018 until July 11, 2028, the maturity date. Respondents last payment was made in May 2019. Diamond's Statement of Claims, which is attached to the Demand as Exhibit "A", alleges Respondents stopped making payments on June 11, 2019, that they were therefore in default of both the PSA and Note, and as a result Diamond "has and herby accelerates the Note so that all remaining principal is immediately due and owing." The Demand seeks contractual damages for the unpaid financed amount of $17, 734.06 due as of November 1, 2019 together with accrued interest and late fees. At the hearing and in its post hearing brief Diamond asked for an Interim Award of $17, 734.06, accrued interest of $3,824.09, servicing fees and late charges of $209.00 for a total of $21,767.17 and attorneys' fees to be determined in a Phase II hearing.

## III. Issues for Determination

1. Whether Diamond proved by a preponderance of the evidence that Philipps and Bartow breached their contract with Diamond under the June 22, 2018 PSA and Note, and if so what damages, is Diamond entitled to recover.
2. Whether Respondents have established they were fraudulently induced to enter into the PSA and Note by clear and convincing evidence, and if so, what is their remedy.
3. Whether Respondents have established by a preponderance of the evidence that Diamond violated the Nevada Unfair Trade Practices Act and/or Nevada Timeshare Act in connection with the parties' timeshare sales transaction, and if so what is their remedy.
4. Whether Respondents have established, by a preponderance of the evidence their Unjust Enrichment claim for payments they made under the PSA and Note, and/or the amount they claim Diamond kept as liquidated damages when it terminated the parties' PSA and Note.
5. Whether Respondents are entitled to Declaratory Relief.

**IV. Summary of Testimony**

**Ricky Vides**

Mr. Vides has been employed by Diamond for 16 years and has been the senior manager for collections for approximately 3 years. He runs operations in Las Vegas and Orlando, calls on past due accounts, and tries to bring them current by offering payment plans. In preparation for his testimony he looked at Diamond's NLS computer system for Respondents' account, the PSA and Note, and a payment history statement generated by NLS. The payment history is a summary as of July 9, 2020. In May of 2019 the member called in and asked that automatic payments stop. No payments have been made since then. The payoff quote which includes principal, interest, and late fees which would pay off the loan balance in full is $21, 767.17 as of July 9, 2020. The account was "active" as of July 9, 2020 or the system would not have been able to generate a payoff quote. An active account means one for which collections may still accept payments for a member wishing to bring their account current. An inactive account to his knowledge is one that a member would not able to book reservations or use, or a cancelled account. The account was not canceled as of July 9, 2020.

When an account is 5 days past due his department begins calling. Letters go out at 10 days past due, and incrementally after that, as courtesy reminders. Exhibit 59 is a reminder notice in this account stating the June 2019 payment had not been made. These letters are generated by a third party vendor, not directly by Diamond, but pursuant to Diamond's collection policy or process. A letter of mortgage acceleration is sent out when an account is 120 days past due. Exhibit 63 is a notice of mortgage acceleration dated September 9, 2019 for this account. A revocation of note letter goes out next. Exhibit 151 is a November 27, 2019 notice of default/revocation of note for this account sent out as part of Diamond's collection process. Paragraph B of the letter states: "[i]f the account remains in default for 14 days, without further notice your loan will be subject to termination and any reservations in your name will be canceled and all amounts previously paid by you will be retained as damages."

The November 27, 2019 letter states the members have two options. Option 2 is "[a]llow the loan to automatically terminate without further notice." Vides testified that to his knowledge after this letter is sent out, if no further payment is made Diamond does not send out any further correspondence to collect on the past due payments. Vides then testified that from his knowledge and understanding "it still goes through an approval process through our legal department before the account is automatically terminated." Vides was then impeached by prior sworn testimony he gave at his deposition as Diamond's Rule 30(b)(6) corporate designee in another case on July 20, 2020. In that matter he testified that if a member does not exercise Option 1, to bring the account current within 14 days, under Option 2, the account is automatically terminated. However, Vides volunteered that it was still his understanding that despite what the notice of default/revocation letter states the account still goes to the legal department which decides whether to cancel the note or not. He did not know if this was a formal written Diamond policy.

**Maher Fakih**

Mr. Fakih is employed by Diamond at the Cancun Resort in Las Vegas and has been the director of sales for about 3 years. He was familiar with Diamond's sales process in June of 2018. He described the process involved from when a member checks in and is offered a membership update, through completion of a purchase of points. The U.S. Collection is a trust held by an independent trust where the points come from, and consists of 7 resort properties to which the members have access, or "where their priority reservation would be." A "wrap is when a member is putting two loans together. So a previous existing financed amount plus a new financed amount." For this account a preexisting loan to purchase 2500 points was combined with an additional 2500-point purchase, for a total of 5,000 points.

He had no idea how the value of the points is determined. Members can negotiate the price. The more points they're purchasing the better price they get. In this case the members purchased 2500 points for approximately $8,300 which is "a lot lower than what 2500 points would normally be sold for, given that they received the $4,000 from the sampler as a credit." Philipps and Bartow previously purchased a "sampler". A sampler is an allotment of points that doesn't have maintenance fees.

He had no idea where the pricing structure for points came from. Sales just gets random updated worksheets. Updated worksheets come out if there is a new program. A vacation advisor doesn't know if the pricing is going to go up the next day, but "they can negotiate all the time."

**Jason Bartow**

Mr. Bartow signed the June 22, 2018 PSA and Note and initialed every paragraph of the purchaser's understanding and acknowledgment document. He made payments but could not recall when he stopped making payments.

He and Jennifer were offered a free dinner and a show if they attended the Diamond sales presentation. At the presentation they were told about the benefits of having a timeshare. They talked to Ken McNeill. He and Jennifer both have kids and McNeill talked about what they would pay per vacation with and without a timeshare. They talked to a bunch of representatives. The first price they were offered was around $10. They were there at least 6 hours. Around the $5 mark they were told the price couldn't go any lower, and "if we didn't take that deal today, they couldn't offer us or guarantee to hold that price". They were told if they came back another day it would be at retail price, "like the $10". They were thinking the offer was "a fairly decent price", and that it was "a great deal and we took it." He thought it was a great deal because if they left and came back another day they "would be paying exponentially more". They definitely would not have purchased if they had not been told the price would change if they came back. He now thinks they didn't get a good deal because they never got to use the points they purchased, and were constantly pressured to go to other presentations and told they would be penalized if they didn't go. They didn't use their points because "it was super hard to even try to book and use

them." He entered into the purchase with Jennifer because they both had kids and were going to be traveling, and "it made sense". They were no longer living together when Jennifer received the notice of default.

**Jennifer Philipps**

Ms. Phillips signed the June 22, 2018 PSA and Note, and initialed every paragraph of the purchaser's understanding and acknowledgment document. She made payments and believed she stopped making payments sometime before July 2019. She attended a sales presentation with Diamond Resorts in Las Vegas in June of 2018 that lasted about an hour. After the presentation they talked to a salesperson, Kenneth McNeill. She and Jason declined the first price per point offer. After that another salesperson was brought to the table. They talked to 4 or 5 salespersons. Each time the price was lowered. They were told they needed to act that day "to get this deal because we wouldn't be able to have it any other time." The price per point started at $8, $9 or $10 until it got to whatever price they paid, maybe $4 and change. They were told they'd never be able to get the same offer. They were there about 6 hours, and wanted to leave to get something to eat but "were not allowed to leave the premises". Staff provided them with food. She and Jason felt that they "wouldn't be able to afford it any other time because the price was so low." They would not have made the purchase if they had not believed the statements that they'd never get a lower price. After all the paperwork was signed they were standing outside on the patio and Ken McNeill told them they could have got a lower price if they said no a couple more times.

After this purchase Diamond sent them to Branson, Missouri for a "try out your membership" without using points trip which included another sales presentation. She took vacations at Diamond Resort properties after June of 2018.

She answered interrogatories in this case but did not identify McNeill as the person who told them that they could have gotten a lower price. She first learned that Diamond was trying to collect in this arbitration some time in 2019 or 2020.

She believed the last vacation at a Diamond property she and Jason took was in January 2019. They stopped paying because they "thought it was going to be automatically terminated without payment" based on the notice of default she received which contained their options. Exhibit 70, a February 10, 2020 letter addressed to her lawyer after the Demand was filed, refers to the status of their account as of December 31, 2019 as "active". When she saw it she thought "maybe they didn't go through the cancellation process yet". Diamond sent them on two trips to Missouri and Florida after June 22, 2018, but they did not use any points for either trip and did not use any of the points they purchased.

## V. Analysis and Decision

Under Nevada law as the party claiming breach of contract Diamond must prove, by a preponderance of the evidence: (1) the existence of a valid contract; (2) a breach by Philipps and Bartow; and (3) damage as a result of the breach. *Contreras v. American Family Ins. Co.*, 135 F Supp. 3d., 1208, 1227 (D. Nev. 2015). For the reasons explained below the Arbitrator finds Diamond has not met its burden. The factual findings that follow are necessary to the Award.

They are derived from admissions in the pleadings and the testimony and evidentiary exhibits presented at the hearing. To the extent these findings differ from any party's position, it is the result of the Arbitrator's credibility determinations, and consideration of the burden of proof, legal principles, and the weighing of the evidence, both oral and written.

Diamond has established the parties entered into valid contracts in the form of the PSA and Note, and that Philipps and Bartow breached when they stopped making payments on the Note in June of 2019. However, Diamond has not established it has any legally recoverable damages.

As an initial matter, Diamond's letters and notices to Respondents in pre-arbitration demand efforts to collect on past due amounts are extremely confusing, and contradictory in their use of terms referring to, e.g., "membership", "vacation ownership interests", a "mortgage document", "mortgage acceleration", "notice of default-revocation of note", "vacation ownership loan" and an "Owner Agreement." It is axiomatic that as the drafter of these documents any ambiguities must be construed against Claimant.

Phillips and Bartow made their last payment May 11, 2019. They were initially sent courtesy reminders of their missed payments. See, e.g. Joint Exhibit 59. On September 9, 2019 Diamond Resorts Financial Services, Inc. sent Respondents, through their counsel, what was called a "Notice of Mortgage Acceleration on Contract". Joint Exhibit 63. It referred to Loan No: 0026715902 CSV, the loan number on the Promissory Note. Joint Exhibit 2. The letter advised "your payment due on your promissory note for your vacation ownership interest is now past due. YOUR ACCOUNT IS IN DEFAULT." (emphasis in original). It demanded "payment in full for $1,116.99, indicating Diamond "must receive this payment immediately in order to prevent invocation of remedies outlined in the mortgage document regarding acceleration of the debt." It also referred to a paragraph it did not identify which purportedly "clearly states if you are in breach of contract, we may demand, under law, all amounts secured by this mortgage to be due and payable, hence legal action may ensue."

Diamond has not claimed in this arbitration that the Note is a "mortgage document". To the contrary, Diamond argues Nevada's One Action Rule does not apply to its breach of contract claim because the parties' purchase transaction involves purchase of Membership points not a deeded timeshare interest. ("There is no form of real estate mortgage or deed of trust involved to secure the Respondents' payment under the Purchase Agreement.") Claimant's Post-Hearing Brief, p. 22. The Note itself clearly provides "[t]his Promissory Note is given in partial payment for a membership in the Diamond Resorts U.S. Collection" and is "secured by a security interest established under the Purchase and Security Agreement" of the same date. The September 9, 2019 notice demanded payment of past due amounts. It did not accelerate a "mortgage" or the Note.

On November 27, 2019 Diamond sent Respondents a letter, through their counsel, entitled a "Notice of Default-Revocation of Note". Joint Exhibit 151. It referred to the account using the loan number on the Note, and indicated the "delinquent amount" for "your failure to pay the purchase installment(s) due on your loan" was $2,233.98. It then advised under paragraph "A", "pursuant to the Owner Agreement executed by you", Respondents' "right to make a reservation, or use the accommodations and facilities ... has been **SUSPENDED.**" (emphasis in original).

Paragraph "B" advised that if the account remained in default for 14 days, "without further notice your loan will be subject to **TERMINATE**" (sic), and that any reservations made in their name would be "**CANCELLED** and all amounts previously paid by you will be retained as damages." (emphasis in original).

The November 27, 2019 Notice gave Philipps and Bartow two options-- to either bring the account current within 14 days, or allow the loan to "**AUTOMATICALLY TERMINATE,** without further notice." (emphasis in original). Respondents exercised Option 2. A reasonable person receiving this notice would conclude that if they did not bring their account current by paying $2,233.98 within 14 days, the loan would be automatically terminated without further notice with Diamond keeping the amounts they had already paid as damages.

Diamond argues that because the notice uses the term "subject to" terminate, further action was required to cancel or terminate the loan. The Arbitrator disagrees. Paragraph "B" states "your loan will be subject to **TERMINATE.**" The term "subject to" has various meanings. It can mean "affected by or possibly affected by (something); (2) likely to do, have or suffer from something; or (3) dependent on something else to happen or be true. See. e.g., *Merriam Webster.com Dictionary*. Respondents were provided notice that their options were to bring the account current within 14 days or allow the loan to automatically terminate. Vides testified that after the Notice of Default-Revocation of Note correspondence is sent out Diamond does not send out any further correspondence to collect on past due payments. He also testified in July 2020 in another Diamond arbitration as Diamond's Rule 30(b)(6) corporate designee that if a member does not exercise option 1, to bring the account current within 14 days, under option 2, the account is automatically terminated. He tried to walk part of that prior testimony back by testifying at the hearing in this case that he now understands the matter is forwarded to the legal department to decide whether or not to cancel the account. If Diamond's own senior collections manager understood that once the Notice of Default-Revocation of Note correspondence went out the account was automatically terminated, no reasonable person would believe Diamond would first need to take any further action before the loan was terminated.

The November 27, 2019 notice advised that Respondents' right to use the accommodations and facilities had already been suspended, and any reservations made in their name would be cancelled if the delinquent amount was not paid in 14 days. (emphasis supplied). Significantly, the notice did not state the Note had been accelerated or demand payment of the "mortgage" accelerated amount now claimed in this arbitration.

By sending the November 27, 2019 notice, and giving Respondents the options described, Diamond elected its liquidated damages remedy. Filing an arbitration demand 14 days later which alleges Respondents "are in default under the Note and in breach of the terms of the PSA" does not erase Diamond's November 27, 2019 election of remedies. Internally referring to Respondents' account or loan status as "active" on Diamond's computer system, and sending an annual summary of vacation ownership loan to Respondents through counsel on February 10, 2020 (Joint Exhibit 70) showing the loan status as "active" also does not alter Diamond's November 27, 2019 election of its liquidated damages remedy.

Diamond acknowledges that the PSA and Note must be read together and harmonized. Its post hearing brief refers to both collectively as the "purchase agreements." Section 14.3 of the PSA outlines Diamond's contractual remedies for Respondents' default after closing. They include (i) giving written notice their Membership will be terminated and then terminate the Membership in 60 days, "and keep all amounts paid as liquidated damages and not as a penalty"; (ii) declare all amounts due under the Note and PSA immediately due and payable; (iii) enforce the Security Agreement against their Membership; and (iv) pursue any other remedy available. The series of pre-arbitration demands and notices do not refer Diamond's remedies under Section 14.3 of the PSA, and contradict the options Respondents were given during the collection process. Diamond first tried to collect delinquent payments, and did not give notice it intended to terminate the Membership and keep all amounts paid until November 27, 2019. The November 19, 2019 correspondence indicated Respondents' Membership would be terminated in 14 days if they did not bring the account current by paying the delinquent amount which was then $2,233.98. The notice of default advised Diamond would retain "all amounts previously paid by you ... as damages" without referring to the retained amount as liquidated damages under Section 14.3(i) of the PSA. Diamond never declared all amounts due under the Note and PSA immediately due and payable. Diamond did not attempt to accelerate all amounts due under the PSA and Note until it after it elected its liquidated damages remedy on November 27, 2019, and only purported to accelerate when it filed its demand for arbitration with an attached statement of claims.

Diamond argues it is entitled to recover the accelerated amount of the loan as damages citing the provision of Section 14.3 Subparagraph (iv) that provides that "the election of one right or remedy does not exclude any other rights or remedies available." However, the Nevada Supreme Court has adopted the double recovery doctrine and held "there can only be one recovery of damages for one wrong or injury" even if the plaintiff asserts multiple legal theories. *Elyousef v. O'Reilley & Ferrario*, LLC, 126 Nev. 441, 442 (2010). Diamond has asserted a single breach of contract claim. Under Nevada law liquidated damages "are generally prima facie valid". *Mason v. Fakhimi*, 109 Nev. 1153, 865 P. 2d 333 (1993). Additionally, the Nevada Supreme Court has held that "[a]s a general rule, an aggrieved party's damages for breach of contract are limited to the amount specified in a valid liquidated damages clause." *American Fire & Safety, Inc. v. City of N. Las Vegas*, 109 Nev. 357, 359 (1993). Diamond recovered the damages it was legally entitled to recover when it gave Respondents the option to allow the loan to terminate if they did not pay the delinquent amount of $2,33.98 in 14 days with Diamond electing to cancel any reservations made in their name and to retain "all amounts previously paid" by Respondents "as damages."

With respect to the counterclaims the Arbitrator finds Respondents have not met their burden of proving they were fraudulently induced to enter into the PSA and Note. Phillips and Bartow were not entirely consistent in their testimony at the hearing. Philipps testified they decided to enter into the agreements because after they kept negotiating lower and lower price per point amounts they were told around the $4 and change per point that they would never be able to get a better deal. She testified that she and Jason felt they "wouldn't be able to afford it any other time because the price was so low." However, after they signed all the paperwork Ken McNeill, their initial sales contact, told them if they had said no a couple of times they would have gotten a lower price. Bartow did not testify that McNeill made any such statement. Assuming arguendo,

the statement was made Respondents had until midnight 5 calendar days after executing the agreements to cancel the agreements. They did not do so. Phillips testified she stopped making payments because after she received the Notice of Default-Revocation of Note she thought the agreements would automatically terminate and she wanted out. However, the Notice wasn't sent out until November 27, 2019. She provided no reason for stopping payments before then.

Bartow testified that around the $5 per point mark they were told the price couldn't get any lower. However, clearly the ultimate purchase was made below the $5 per point mark. He testified they were told that if they left and came back another day they would be offered the "retail price' at around $10 per point. He also testified they both thought they were being offered "a fairly decent price" and that "it was a great deal and we took it." Although he testified he thought they would have to pay "exponentially more" if they left and came back another day, he also testified he was told by sales staff "they couldn't offer us or guarantee to hold" the price at which they ultimately purchased the points.

Fakih testified that sales staff gets random updates on pricing when new programs come out, and that the members can always negotiate a better price. He was clearly testifying about sales staff not being aware of changes in the retail price of points. Sales staff clearly negotiate down from the retail price. Bartow clearly understood they were negotiating from the retail price, and if they came back another day they would have to start negotiating again from the retail price, and there was no guarantee the price they were offered that day would be re-extended. This is negotiation 101, not evidence of fraud or misrepresentation.

Bartow testified they stopped making payments because they never got to use the points they purchased because it was hard to book reservations, and because they were pressured to go to other presentations. However, they took two other vacations on Diamond's dime after entering into the agreements without using any of the points they purchased. Their last vacation was in Florida in approximately January 2019. By the time the Notice of Default-Revocation of Note was sent Philipps and Bartow were no longer living together. The Arbitrator finds they exercised Option 2 to get out from under the agreements they no longer wanted, not because of misrepresentations by Diamond in connection with the sales transaction.

Respondents have also not established that Diamond was unjustly enriched by the payments they made. First, as Claimant correctly points out, the existence of a valid contract between the parties precludes an unjust enrichment claim. *Leasepartners Corp., Robert L. Brooks Trust.* 113 Nev. 747, 755, 942 P 2d. 182, 187 (Nev. 1997). Second, Respondents have not shown that Diamond recovered the 5,000 points they purchased, or that the points were resold at full retail value, or that Diamond has been unjustly enriched because Diamond has "also recouped all payments made by Respondents as liquidated damages."

Respondents' are also not entitled to a declaratory judgment. The PSA and Note were terminated and cancelled 14 days after November 27, 2019 when Respondents exercised Option 2 of the Notice of Default-Revocation of Note when Diamond elected to keep all sums they had paid as liquidated damages. Diamond has no other remedies to exercise against Respondents because the Nevada Supreme Court has adopted the double recovery doctrine, and Diamond may only

recover once for an injury or wrong. Diamond has already recovered the damages to which it is entitled. There are no longer any rights or obligations to adjudicate among the parties.

For these reasons,

A **FINAL AWARD** is entered in favor of Respondents, and against Claimant on Claimant's breach of contract claim. A **FINAL AWARD** is entered in favor of Claimant and against Respondents on Respondents' Counterclaims. Claimant is the prevailing party on the Counterclaims. Respondents are the prevailing parties on the breach of contract claim. Each side is responsible for its own costs and fees.

Dated: August 4, 2021

Hon. Peggy A. Leen (Ret.)
Arbitrator