D-46

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

|  |  |
|---|---|
| BLUEGREEN VACATIONS UNLIMITED, INC., *et al.*, | |
| Plaintiffs, | |
| v. | Case No.: 1:20-cv-24681-RNS |
| TIMESHARE LAWYERS P.A., *et al.*, | |
| Defendants. | |

### NOTICE OF SERVICE OF PLAINTIFF BLUEGREEN VACATIONS UNLIMITED, INC.'S SECOND AMENDED ANSWERS TO DEFENDANT SEAN SLATTERY'S SECOND SET OF INTERROGATORIES

Plaintiff, BLUEGREEN VACATIONS UNLIMITED, INC., ("Bluegreen"), by and through undersigned counsel and pursuant to Rule 26 and Rule 33 of the Federal Rules of Civil Procedure, hereby serve its Amended Answers to Defendant, J.L. "SEAN" SLATTERY'S Second Set of Interrogatories.

Dated: <u>September 19, 2022</u>

<u>/s/ Christian M. Leger</u>
**ERIC C. CHRISTU, ESQ.**
Florida Bar No. 434647
echristu@shutts.com
**SHUTTS & BOWEN, LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, FL 33131
Telephone: (305) 358-6300
Facsimile: (305) 381-9982

and

**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com



Exhibit
Job# 6242193
**Humphrey - 007**
L. Goodall, RPR 10-14-22 Humphrey

**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**MICHAEL QUINN, ESQ.**
Florida Bar No. 84587
mquinn@shutts.com
**CHRISTIAN M. LEGER, ESQ.**
Florida Bar No. 0100562
cleger@shutts.com
**BENJAMIN F. ELLIOTT, ESQ.**
Florida Bar No. 1010706
belliott@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile:  (407) 849-7255

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of September, 2022, a true and correct copy of the foregoing has been served via electronic mail to the following CM/ECF Participants and via U.S. Mail, postage prepaid, to the following non-CM/ECF Participants:

| | |
|---|---|
| Brian L. Wagner, Esq.<br>Email: bwagner@mateerharbert.com<br>Email: semerson@mateerharbert.com<br>W. Scott Gabrielson, Esq.<br>Email: sgabrielson@mateerharbert.com<br>Email: Mstoutamire@mateerharbert.com<br>Mateer & Harbert, P.A.<br>225 East Robinson Street, Suite 600<br>Orlando, FL 32801-2854<br>Telephone: (407) 425-9044<br>Facsimile: (407) 423-2016<br><br>*Attorneys for Carlsbad Law Group, LLP and JL "Sean" Slattery* | Patrick James Thompson, Esq.<br>Email: law@patrickjthompson.com<br>Patrick Thompson Law P.A.<br>7025 County Road 46A PMB 432<br>Lake Mary, FL  32746-4721<br>Telephone: (407) 750-9000<br>Facsimile: (386) 675-1445<br><br>*Patrick Thompson, Pro Se*<br><br>Patrick J. Thompson, Esq.<br>Email: law@patrickjthompson.com<br>Patrick Thompson Law P.A.<br>201 Hilda Street, Ste. 23<br>Kissimmee, FL 34741<br>Telephone: 407-750-9000<br><br>*Attorney for Timeshare Lawyers P.A.* |

John J. Bennett, Esq.
Email: jbennett@nardellalaw.com
John M. Sykes, Esq.
Email: jsykes@nardellalaw.com
Paul N. Mascia, Esq.
Email: pmascia@nardellalaw.com
Danielle N. Waters, Esq.
Email: dwaters@nardellalaw.com
Email: nmacdougall@nardellalaw.com
Email: service@nardellalaw.com
Nardella & Nardella, PLLC
135 W. Central Blvd., Suite 300
Orlando, FL  32801
Telephone: (407) 966-2680

and

Patrick A. Bradford, Esq. (Pro Hac Vice)
Email: pbradford@bradfordedwards.com
Bradford Edwards and Varlack LLP
112 East 49th Street, 11th Floor
New York, NY 10017
Telephone: (917) 671-9406
*Attorneys for Pandora Marketing, LLC d/b/a*
*Timeshare Compliance, William Wilson a/k/a*
*Bo Wilson, Rich Folk*

## NON-CM/ECF PARTICIPANTS

| | |
|---|---|
| Angela Consalvo<br>588 Cobblestone Creek Drive<br>Boynton Beach, Florida 33472 | Paul Stewart<br>508 Harbor Blvd., #401<br>Destin, FL 32541 |
| MG&N Group LLC d/b/a National Credit Rehab<br>c/o Registered Agent Michael Consalvo<br>9502 Sun Pointe Drive<br>Boynton Beach, Florida 33437 | Paddy Deighan<br>2000 Fashion Show Drive, Unit 2222<br>Las Vegas, Nevada 89109<br>Email: paddy@federalfinanciallawgroup.com<br><br>923 Haddonfield Road, Suite 300<br>Cherry Hill, NJ 08002 |
| Gallagher-Clifton, LLC<br>c/o Registered Agent William O. Stewart, Jr.<br>508 Harbor Blvd., #401<br>Destin, FL 32541 | |

*/s/ Christian M. Leger*
**CHRISTIAN M. LEGER, ESQ.**

**PLAINTIFF BLUEGREEN VACATIONS UNLIMITED, INC.'S SECOND AMENDED
ANSWERS TO DEFENDANT SEAN SLATTERY'S SECOND SET OF
INTERROGATORIES**

16.     If any Plaintiffs were parties to any contracts with the timeshare owners listed on

Exhibit "1" attached hereto, as to each such contract, please state whether that contact was assigned

to any other parties and, if so, please state:

      a.   The identity of the assignor;

      b.   The identity of the assignee;

      c.   The date of the assignment.

    If the contract was assigned multiple times, please include the same details for each time

the contract was assigned.

**ANSWER:  In response to Interrogatory No. 16, Bluegreen states that to the extent that
this Interrogatory seeks the disclosure of the referenced information in regard to the
assignment of debt associated with Owner Beneficiary Agreements that form the basis of
Bluegreen's claims in this matter (which Bluegreen has identified in its *Second Rule 26
Disclosures* dated June 21, 2022), such information is provided as to such debt that was
assigned in the table attached hereto at <u>Exhibit A</u>. Bluegreen further states that to the
extent that this Interrogatory seeks the disclosure of the referenced information in regard
to the assignment of debt associated with owners referenced in "Exhibit 1" to this
Interrogatory, but not connected to debt associated with Owner Beneficiary Agreements
that form the basis of Bluegreen's claims (as identified in the aforementioned *Second Rule
26 Disclosures*), such information was provided in the table attached at <u>Exhibit B</u> to
Bluegreen's July 25, 2022 *Amended Answers to Defendant Sean Slattery's Second Set of
Interrogatories*.**

## <u>VERIFICATION</u>

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 19, 2022.

Everett Gill
Director of Investor Reporting, Mortgage

ORLDOCS 19830905 1

| Owner Name(s) | VC # | Contract Number | Mortgage Number | Assn. # | Assignor | Assignee | Bates | Assignment Date |
|---|---|---|---|---|---|---|---|---|
| Adan & Channell Blevins | 869219 | 1075133 | 695665 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 021930 | 9/15/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 1/14/2020 |
| Albert & Nicole Renshaw | 758406 | 931278 | 616639 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 11/24/2015 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 016304 | 3/17/2016 |
| | | | | 3 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | Non-Written | 2/19/2020 |
| AlfonsoLascano Jr & Loretta Ann Wilson Lascano | 761519 | 855975 | 578246 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-written | 10/28/2014 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2015-A | BG-CARLSBAD 015948 | 1/29/2015 |
| | | | | 3 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | Non-Written | 11/17/2017 |
| Amanda & Eric Olsen | 942791 | 2659855 | 2159655 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 1/31/2020 |
| | | | | 2 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 5/20/2020 |
| Andrew & Angela Buchanan | 873583 | 1072508 | 698856 | 1 | Big Cedar Vacations,LLC | Bluegreen/Big Cedar NBA | BG-CARLSBAD 053740 | 7/10/2018 |
| Anthony & Ashley Tilahun | 835181 | 1024294 | 667808 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 021743 | 6/6/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 1/15/2020 |
| | | | | 3 | Bluegreen Corp-Vacation Club | Bluegreen Corp-Vacation Club | Non-Written | 1/17/2020 |
| Anthony Fisher & Senora Harris | 507950 | 828889 | 566190 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-written | 6/27/2014 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2015-A | BG-CARLSBAD 015887 | 1/29/2015 |
| | | | | 3 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | Non-Written | 3/16/2021 |
| Anthony L. & Melissa J. Church | 341545 | 986215 | 646293 | 1 | Bluegreen Corp-Vacation Club | BXG Receivable Note Trust 2016-A | Non-Written | 8/8/2016 |
| | | | | 2 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | Non-Written | 1/19/2021 |
| Anthony R. Murphy & Nancy L. Satterlee | 826333 | 989949 | 648248 | 1 | Big Cedar Vacations,LLC | Nat. B of AZ (NKA ZB) | BG-CARLSBAD 021596 | 12/12/2016 |
| | | | | 2 | ZB Nat. B of AZ | Bluegreen/Big Cedar | BG-CARLSBAD 021634 | 1/4/2019 |
| April Joy Worthington, Chad Alan Vincent | 715770 | 970708 | 637726 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 5/26/2016 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 016463 | 6/6/2017 |
| | | | | 3 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | Non-Written | 12/21/2020 |
| Arnold A. Gittens & Greta Stuart-Gittens | 718390 | 763446 | 534519 | 1 | Bluegreen Properties NV | BXG Timeshare Trust I | Non-Written | 7/29/2013 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | Non-Written | 9/26/2013 |
| | | | | 3 | BXG Receivables Note Trust 2013-A | Bluegreen Corp-Vacation Club | Non-Written | 2/3/2020 |
| Autumn Romain | 855912 | 1047205 | 680851 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 017348 | 6/6/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | Non-Written | 10/17/2018 |
| Beatriz Astencio & Roberto Cedeno | 668648 | 665537 | 487607 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 8/26/2011 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2012-A | BG-CARLSBAD 015552 | 9/13/2012 |
| | | | | 3 | BXG Receivables Note Trust 2012-A | Bluegreen Corp-Vacation Club | Non-Written | 10/2/2020 |
| | | | | 4 | Bluegreen Corp-Vacation Club | Bluegreen Corp-Vacation Club | Non-Written | 10/12/2020 |
| Betty J. Adams | 456408 | 1097944 | 710184 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 3/22/2018 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017643 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 1/15/2021 |
| Billy & Mary H. Hays | 813768 | 1131368 | 727368 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 8/28/2018 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017870 | 10/23/2018 |

Exhibit A

D - 0046-0007

| Owner Name(s) | VC # | Contract Number | Mortgage Number | Assn. # | Assignor | Assignee | Bates | Assignment Date |
|---|---|---|---|---|---|---|---|---|
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 9/23/2019 |
| Billy W. Garner | 707188 | 887944 | 592975 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | BG-CARLSBAD 016068 | 4/23/2015 |
| | | | | 2 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | Non-Written | 7/16/2019 |
| Bobbie E. & Alice L. McNeil | 906350 | 2583331 | 2083327 | 1 | KING 583 | KING 583/WESTERN ALLIANCE BANK | Non-Written | 10/23/2018 |
| Bobbie E. & Alice L. McNeil | 906350 | 2155848 | 2155848 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 11/25/2019 |
| | | | | 2 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 6/30/2020 |
| Bobby & Leanna Harmon | 468572 | 1029442 | 670983 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | BG-CARLSBAD 017130 | 3/27/2017 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017133; BG-CARLSBAD 017138 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 5/18/2021 |
| Bobby & Leanna Harmon | 468572 | 2613697 | 2113672 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-Written | 6/27/2019 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | Bluegreen/Liberty Bank 2010 | Non-Written | 5/17/2021 |
| | | | | 3 | Bluegreen/Liberty Bank 2010 | Bluegreen Corp-Vacation Club | Non-Written | 6/11/2021 |
| | | | | 4 | Bluegreen Corp-Vacation Club | Bluegreen Corp-Vacation Club | Non-Written | 7/15/2021 |
| Bobby & Leanna Harmon | 468572 | 2697102 | 2196872 | 1 | Bluegreen Corp-Vacation Club | Bluegreen Corp/CapitalSource Bank | BG-CARLSBAD 021189 | 1/29/2021 |
| | | | | 2 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp/CapitalSource Bank | Non-Written | 5/17/2021 |
| | | | | 3 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp-Vacation Club | Non-Written | 6/30/2022 |
| Bradley & Amy Selvey | 860092 | 1121875 | 722485 | 1 | BVC (BG/Big Cedar Vacations, LLC | Quorum Federal Credit Union | BG-CARLSBAD 017807 | 12/18/2019 |
| | | | | 2 | Quorum Federal Credit Union | Big Cedar Vacations, LLC | BG-CARLSBAD 017820 | 6/1/2020 |
| Brandy & Kyle Griffin | 886112 | 2596865 | 2096845 | 1 | Big Cedar Vacations,LLC | Bluegreen/Big Cedar NBA | Non-Written | 9/30/2020 |
| Brenda K. Kern, Cameron Elizabeth Kern, Lyle D. Kern & Lyndon Weslie Kern | 866191 | 2612531 | 2112506 | 1 | Big Cedar Vacations,LLC | Big Cedar Vacations,LLC | Non-Written | 3/9/2020 |
| Brent & Lynette King | 940492 | 2683191 | 2182970 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 4/14/2020 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2020-A | Non-Written | 10/8/2020 |
| | | | | 3 | BXG Receivables Note Trust 2020-A | Bluegreen Corp-Vacation Club | Non-Written | 7/6/2021 |
| Bryan & Elizabeth Catherine Espinosa | 872825 | 1077728 | 697878 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 10/31/2017 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017510 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | Non-Written | 5/20/2020 |
| Candace Hollins-Brokaw & Jeffrey Brokaw | 837200 | 2594593 | 2094575 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 6/24/2019 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2020-A | BG-CARLSBAD 015239 | 10/8/2020 |
| | | | | 3 | BXG Receivables Note Trust 2020-A | BXG Receivables Note Trust 2020-A | Non-Written | 5/17/2021 |
| | | | | 4 | BXG Receivables Note Trust 2020-A | Bluegreen Corp-Vacation Club | Non-Written | 10/15/2021 |
| Celestine G Carter & Haru Carter Jr. | 938862 | 2650947 | 2150749 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 10/30/2019 |
| | | | | 2 | BXG Timeshare Trust I | BXG Timeshare Trust I | Non-Written | 2/21/2020 |
| | | | | 3 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 10/8/2020 |
| Chao Xiong & Aimee Lee | 797304 | 928916 | 615873 | 1 | Bluegreen - BC WC Marketing | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 016301 | 3/17/2016 |
| | | | | 2 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | Non-Written | 11/10/2021 |
| Chao Xiong & Aimee Lee | 797304 | 943748 | 624193 | 1 | Big Cedar Vacations,LLC | Bluegreen Big Cedar Quorum 2012 (4.75% Program) | BG-CARLSBAD 016408 | 1/21/2016 |

D - 0046-0008

| Owner Name(s) | VC # | Contract Number | Mortgage Number | Assn. # | Assignor | Assignee | Bates | Assignment Date |
|---|---|---|---|---|---|---|---|---|
| | | | | 2 | Bluegreen Big Cedar Quorum 2012 (4.75% Program) | Big Cedar Vacations,LLC | Non-Written | 11/30/2021 |
| | | | | 3 | Big Cedar Vacations,LLC | Big Cedar Vacations, LLC | Non-Written | 12/21/2021 |
| Chao Xiong & Aimee Lee | 797304 | 1027037 | 669505 | 1 | Big Cedar Vacations,LLC | Bluegreen/Big Cedar NBA | BG-CARLSBAD 053899 | 5/16/2017 |
| | | | | 2 | Bluegreen/Big Cedar NBA | Bluegreen/Big Cedar NBA | Non-Written | 12/1/2021 |
| | | | | 3 | Bluegreen/Big Cedar NBA | Bluegreen Corp-Vacation Club | Non-Written | 6/30/2022 |
| | | | | 4 | Bluegreen Corp-Vacation Club | Big Cedar Vacations,LLC | Non-Written | 7/6/2022 |
| Chao Xiong & Aimee Lee | 797304 | 2726620 | 2226371 | 1 | Bluegreen Corp-Vacation Club | Bluegreen Corp/CapitalSource Bank | Non-Written | 8/10/2021 |
| | | | | 2 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp/CapitalSource Bank | Non-Written | 11/29/2021 |
| | | | | 3 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp-Vacation Club | Non-Written | 6/30/2022 |
| Charlene & Charly Brown | 739316 | 1042750 | 677954 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 017303 | 6/6/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | Non-Written | 12/17/2019 |
| Charles & Sherry Terry | 840860 | 2660018 | 2159818 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 1/27/2020 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2020-A | BG-CARLSBAD 015402 | 10/8/2020 |
| | | | | 3 | BXG Receivables Note Trust 2020-A | BXG Receivables Note Trust 2020-A | Non-Written | 4/28/2021 |
| Charles Govan | 555869 | 1104638 | 712749 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-Written | 4/26/2018 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017654 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | Non-Written | 6/18/2020 |
| Cheresa & Jose Ramon | 768468 | 868721 | 584006 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 12/22/2014 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2015-A | BG-CARLSBAD 015975; BG-CARLSBAD 016016 | 1/29/2015 |
| | | | | 3 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | Non-Written | 8/20/2018 |
| Cheryll Craigie | 827071 | 990314 | 648842 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-Written | 8/24/2016 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 016549 | 6/6/2017 |
| | | | | 3 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | Non-Written | 1/17/2019 |
| Christopher Dwayne Shivers & Katie Rochelle Shivers | 725740 | 992828 | 649089 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-written | 8/24/2016 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 016709 | 6/6/2017 |
| | | | | 3 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | Non-Written | 3/16/2018 |
| Claribell Soiza | 465764 | 1134323 | 728866 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 8/28/2018 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017898 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | Non-Written | 5/12/2021 |
| | | | | 4 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 5/14/2021 |
| Colleen & David Bolanowski | 796112 | 927037 | 614443 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 10/27/2015 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 016283 | 3/17/2016 |
| | | | | 3 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | Non-Written | 10/2/2019 |
| Cyril & Debra Guild | 104127 | 1075994 | 696939 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 10/31/2017 |
| | | | | 2 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 10/25/2018 |
| Dale Greenley | 842325 | 2588180 | 2088175 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 015222 | 11/30/2018 |
| | | | | 2 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 4/15/2019 |
| Damon L. & Sherita Perry | 806361 | 1029230 | 670686 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 3/2/2017 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 017102 | 6/6/2017 |
| | | | | 3 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | Non-Written | 1/25/2021 |

D - 0046-0009

| Owner Name(s) | VC # | Contract Number | Mortgage Number | Assn. # | Assignor | Assignee | Bates | Assignment Date |
|---|---|---|---|---|---|---|---|---|
| Daniel & Cheryl Burns | 941068 | 2698743 | 2198512 | 1 | Bluegreen Corp-Vacation Club | Bluegreen Corp-Vacation Club | Non-written | 2/26/2021 |
| Danny & Christina Cormier | 744902 | 997956 | 652400 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 9/29/2016 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 016877 | 6/6/2017 |
| | | | | 3 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 4/30/2019 |
| Darrin Hartman | 472056 | 2613390 | 2113365 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 5/21/2019 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2020-A | BG-CARLSBAD 015245 | 10/8/2020 |
| | | | | 3 | BXG Receivables Note Trust 2020-A | Bluegreen Corp-Vacation Club | Non-Written | 3/15/2021 |
| David & Barbara Mitchell Sr. | 716618 | 761672 | 532740 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 6/26/2013 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | BG-CARLSBAD 015799 | 9/26/2013 |
| | | | | 3 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | Non-written | 3/16/2017 |
| David & Karen Sprague | 552595 | 974355 | 638775 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-written | 6/22/2016 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 021349 | 6/6/2017 |
| | | | | 3 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-written | 1/25/2021 |
| Dean & Margaretta Garlinghouse | 803065 | 940556 | 622181 | 1 | Bluegreen - BC WC Marketing | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 016333 | 3/17/2016 |
| | | | | 2 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | Non-Written | 4/16/2018 |
| Deborah Leanne Truelove & Terry Efurd | 779404 | 970810 | 637502 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2012-A | BG-CARLSBAD 016450 | 7/12/2016 |
| | | | | 2 | BXG Receivables Note Trust 2012-A | Bluegreen Corp-Vacation Club | BG-CARLSBAD 016453 | 1/8/2019 |
| | | | | 3 | Bluegreen Corp-Vacation Club | Pacific Western Bank | BG-CARLSBAD 016456 | 2/5/2019 |
| | | | | 4 | Pacific Western Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 016460 | 4/12/2021 |
| Demetrius Baytop & Carla Kitchel | 695206 | 2626207 | 2126024 | 1 | Bluegreen Corp-Vacation Club | Bluegreen Corp/CapitalSource Bank | BG-CARLSBAD 021181 | 7/30/2019 |
| | | | | 2 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp/CapitalSource Bank | Non-Written | 8/17/2020 |
| | | | | 3 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp-Vacation Club | Non-Written | 6/30/2022 |
| Denise Nelson-Smith & Willie E. Smith | 322754 | 1140951 | 733562 | 1 | Bluegreen Corp-Vacation Club | Liberty Bank | BG-CARLSBAD 021987 | 4/9/2020 |
| | | | | 2 | Liberty Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 021990 | 4/30/2021 |
| Dennis D. & Vicki Mitchell | 707398 | 764763 | 534729 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 7/29/2013 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | BG-CARLSBAD 015823 | 9/26/2013 |
| | | | | 3 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | Non-Written | 1/17/2019 |
| | | | | 4 | BXG Receivables Note Trust 2013-A | Bluegreen Corp-Vacation Club | Non-Written | 4/5/2022 |
| Derrick & Debra J. Braswell | 904463 | 1144375 | 735414 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 018077 | 10/30/2018 |
| | | | | 2 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 1/19/2021 |
| Derrick Marshall | 554724 | 1146439 | 735884 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 018096 | 11/15/2018 |
| | | | | 2 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | Non-Written | 1/19/2021 |
| Donald & Lisa Craig | 821441 | 999717 | 653896 | 1 | Bluegreen Corp-Vacation Club | Bluegreen Corp/CapitalSource Bank | BG-CARLSBAD 016879 | 12/21/2016 |
| | | | | 2 | Bluegreen Corp/CapitalSource Bank | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 016884 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 9/30/2019 |
| Donald J. Thomas | 850669 | 1037808 | 675212 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 021763 | 6/6/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 9/12/2019 |
| Donnie & Christine Brown | 827051 | 1066140 | 690231 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 021927 | 8/15/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 1/28/2020 |

| Owner Name(s) | VC # | Contract Number | Mortgage Number | Assn. # | Assignor | Assignee | Bates | Assignment Date |
|---|---|---|---|---|---|---|---|---|
| Donnie & Christine Brown | 827051 | 1113084 | 717277 | 1 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp/CapitalSource Bank | BG-CARLSBAD 021964 | 5/25/2018 |
| | | | | 2 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp/CapitalSource Bank | Non-Written | 1/21/2020 |
| | | | | 3 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp-Vacation Club | Non-Written | 6/30/2022 |
| Dorothy Fizer Lucas & Clifton D. Lucas | 801083 | 1094223 | 707705 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | BG-CARLSBAD 017596; BG-CARLSBAD 017602 | 4/26/2018 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2020-A | Non-Written | 10/8/2020 |
| | | | | 3 | BXG Receivables Note Trust 2020-A | BXG Receivables Note Trust 2020-A | Non-Written | 4/16/2021 |
| Dorothy Hale | 836441 | 1123691 | 723004 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | BG-CARLSBAD 017843 | 7/13/2018 |
| | | | | 2 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 1/16/2020 |
| Earl S. & Caitlin A. Abercrombie | 802511 | 954529 | 628958 | 1 | Bluegreen Corp-Vacation Club | BXG Receivable Note Trust 2016-A | Non-Written | 3/30/2016 |
| | | | | 2 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | Non-Written | 11/15/2017 |
| Eduardo A. & Stacy L. Rodriguez | 796712 | 928442 | 615120 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 10/27/2015 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 016285 | 3/17/2016 |
| | | | | 3 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | Non-Written | 12/17/2019 |
| Eduardo A. & Stacy L. Rodriguez | 796712 | 997463 | 651741 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 9/29/2016 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 016715 | 6/6/2017 |
| | | | | 3 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | Non-Written | 12/17/2019 |
| Elijah T. & Tiffany K. Ireland | 869435 | 1074792 | 695909 | 1 | Big Cedar Vacations,LLC | Nat. B of AZ (NKA ZB) | BG-CARLSBAD 021936 | 8/13/2018 |
| | | | | 2 | ZB Nat. B of AZ | Bluegreen/Big Cedar | BG-CARLSBAD 021948 | 7/29/2021 |
| Elizabeth & Gerardo Sepulveda | 834466 | 1004178 | 656783 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 016928 | 6/6/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | Non-Written | 12/17/2019 |
| Emma Stubblefield | 819623 | 1104162 | 712880 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | BG-CARLSBAD 017666 | 3/15/2018 |
| | | | | 2 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 7/22/2020 |
| Erickson Thomas | 846301 | 1035270 | 674330 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 021753 | 6/6/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 12/24/2019 |
| Erin Marconi & Jeremy McCoy | 907998 | 2586285 | 2086282 | 1 | Big Cedar Vacations,LLC | Nat. B of AZ (NKA ZB) | Non-written | ?? |
| | | | | 2 | ZB Nat. B of AZ | Bluegreen/Big Cedar | BG-CARLSBAD 021176 | 7/29/2021 |
| Ernesto  & Yolanda S. Pacheco | 835514 | 1005414 | 657865 | 1 | Big Cedar Vacations,LLC | Nat. B of AZ (NKA ZB) | BG-CARLSBAD 021701 | 12/12/2016 |
| | | | | 2 | ZB Nat. B of AZ | Bluegreen/Big Cedar | BG-CARLSBAD 021739 | 4/21/2020 |
| Eugene & Brenda K. Combs | 898593 | 1133049 | 728652 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 8/28/2018 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017887 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 3/30/2020 |
| Eva Steskal Thoms & Richard Gordan Thoms | 254371 | 1137197 | 733019 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 9/27/2018 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 018034 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | Non-Written | 11/17/2020 |
| Fetu & William Bruhnke | 796498 | 1094394 | 707703 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 4/27/2018 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017593 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | Non-Written | 4/28/2021 |
| Fidencio Martinez & C. Victoria Llanos | 768351 | 868156 | 583842 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | BG-CARLSBAD 015967 | 1/29/2015 |
| | | | | 2 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 5/4/2020 |
| Frank J & Ingrid H Bernard | 818446 | 1112531 | 717819 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 017730 | 5/15/2018 |

D - 0046-0011

| Owner Name(s) | VC # | Contract Number | Mortgage Number | Assn. # | Assignor | Assignee | Bates | Assignment Date |
|---|---|---|---|---|---|---|---|---|
| | | | | 2 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | Non-Written | 7/16/2019 |
| Garry & Deborah Barrett | 777916 | 890595 | 594344 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-Written | 6/29/2015 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 053769 | 3/17/2016 |
| | | | | 3 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | Non-Written | 9/29/2020 |
| Gayle Turner, Stanley Singleton, Equalla Agee, & Anthony Sykes | 712115 | 751289 | 528111 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 4/24/2013 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | BG-CARLSBAD 015789 | 9/26/2013 |
| | | | | 3 | BXG Receivables Note Trust 2013-A | Bluegreen Corp-Vacation Club | Non-Written | 4/14/2017 |
| Gene & Sharon Ballantyne | 579572 | 2587013 | 2087009 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | Non-Written | 12/27/2018 |
| | | | | 2 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 3/2/2020 |
| George William & Roxane Brown | 901178 | 2589802 | 2089795 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | Non-Written | 12/27/2018 |
| | | | | 2 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | Non-Written | 7/16/2019 |
| Gerald & Sheila Barnett | 755946 | 1110130 | 715778 | 1 | Bluegreen Corp-Vacation Club | Bluegreen Corp/CapitalSource Bank | BG-CARLSBAD 017697 | 5/25/2018 |
| | | | | 2 | Bluegreen Corp/CapitalSource Bank | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017703; BG-CARLSBAD 017706 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 8/5/2020 |
| Glenda Petersen & Michael Bohley | 846752 | 1114115 | 718062 | 1 | Bluegreen Corp-Vacation Club | Liberty Bank | BG-CARLSBAD 021969 | 6/3/2019 |
| | | | | 2 | Liberty Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 021977 | 5/19/2020 |
| Glenwood C. Simmons & Vicki G. Fisher | 618327 | 1134042 | 729116 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 8/28/2018 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017941 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 9/3/2020 |
| Gloria Jean McCutcheon & Cynthia A. Timberlake & William Kenneth McCutcheon | 810958 | 959546 | 631201 | 1 | Bluegreen Corp-Vacation Club | BXG Receivable Note Trust 2016-A | Non-Written | 4/22/2016 |
| | | | | 2 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | Non-Written | 11/17/2017 |
| Gregory Cyrus & Christy Cyrus | 822521 | 998213 | 659294 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-Written | 11/18/2016 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 016937 | 6/6/2017 |
| | | | | 3 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | Non-Written | 10/16/2019 |
| Heather & Justin Wiezorek | 801629 | 938691 | 620750 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | BG-CARLSBAD 016312 | 12/15/2015 |
| | | | | 2 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | Non-Written | 1/19/2021 |
| Heather & Justin Wiezorek | 801629 | 1003009 | 655678 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 12/14/2016 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 016893 | 6/6/2017 |
| | | | | 3 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 1/19/2021 |
| Herman Shannon & Kelly Schmitt | 830495 | 997846 | 652227 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 9/29/2016 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 016875 | 6/6/2017 |
| | | | | 3 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 10/15/2018 |
| Herschel Lee Shawver & Paula Lisle Shawver | 699418 | 724532 | 516180 | 1 | Big Cedar Vacations,LLC | Nat. B of AZ (NKA ZB) | BG-CARLSBAD 021222 | 1/22/2013 |

D - 0046-0012

| Owner Name(s) | VC # | Contract Number | Mortgage Number | Assn. # | Assignor | Assignee | Bates | Assignment Date |
|---|---|---|---|---|---|---|---|---|
| | | | | 2 | ZB Nat. B of AZ | Bluegreen/Big Cedar | BG-CARLSBAD 021227 | 12/27/2019 |
| Ismael Valdespino Ortega & Yesenia Moran Mendoza | 747434 | 2622407 | 2122227 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 6/24/2019 |
| | | | | 2 | BXG Timeshare Trust I | BXG Timeshare Trust I | Non-Written | 9/28/2020 |
| | | | | 3 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 10/12/2020 |
| | | | | 4 | Bluegreen Corp-Vacation Club | Bluegreen Corp-Vacation Club | Non-Written | 7/15/2021 |
| Jack A & Pamela J Rickett | 707538 | 741387 | 523413 | 1 | Big Cedar Vacations,LLC | Bluegreen Big Cedar Quorum 2012 (6% Program) | BG-CARLSBAD 015769 | 3/27/2013 |
| | | | | 2 | Bluegreen Big Cedar Quorum 2012 (6% Program) | Big Cedar Vacations,LLC | Non-Written | 3/31/2017 |
| Jackie Glenn & Brenda Carol Furnace | 624347 | 593807 | 449419 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2007-A | BG-CARLSBAD 015515 | 12/2/2010 |
| | | | | 2 | BXG Receivables Note Trust 2007-A | Bluegreen Corp-Vacation Club | BG-CARLSBAD 015518 | 3/17/2016 |
| James & Debora Davidson | 545052 | 1131730 | 727685 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 8/28/2018 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017877 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 6/28/2021 |
| James & Debra Loveless | 733678 | 801816 | 552812 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 1/30/2014 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2015-A | BG-CARLSBAD 015847 | 1/29/2015 |
| | | | | 3 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 9/15/2020 |
| James F. Cullison & Amanda L. Reatherford | 814913 | 967811 | 635601 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 5/26/2016 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 016415 | 6/6/2017 |
| | | | | 3 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 3/30/2020 |
| James L. & Debra J. Neideffer | 860590 | 1121948 | 722393 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 7/30/2018 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017804 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | Non-Written | 2/18/2021 |
| James R. & Sheila Waltrip | 485267 | 941508 | 622329 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 12/23/2015 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 016333 | 3/17/2016 |
| | | | | 3 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | Non-Written | 2/15/2017 |
| James Taylor Brooks & Jacqueline Smith-Brooks | 794975 | 992079 | 650102 | 1 | Bluegreen Corp-Vacation Club | Liberty Bank | BG-CARLSBAD 021645 | 6/23/2017 |
| | | | | 2 | Liberty Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 021651 | 3/10/2020 |
| Jamie Mayle & Sahara Alonzo | 826525 | 1055446 | 685353 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 9/28/2017 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017427 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 6/14/2019 |
| Jeffrey & Anna Westby | 850800 | 1037243 | 675323 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 017143 | 6/6/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | Non-Written | 5/17/2021 |
| Jeffrey & Jennifer Clark | 766704 | 864926 | 582614 | 1 | Big Cedar Vacations,LLC | Bluegreen Big Cedar Quorum 2012 | BG-CARLSBAD 015963 | 11/21/2014 |
| | | | | 2 | Bluegreen Big Cedar Quorum 2012 | Big Cedar Vacations,LLC | Non-Written | 12/11/2020 |
| | | | | 3 | Big Cedar Vacations,LLC | Bluegreen/Big Cedar NBA | Non-Written | 12/14/2020 |
| | | | | 4 | Bluegreen/Big Cedar NBA | Bluegreen Corp-Vacation Club | Non-Written | 6/30/2022 |
| | | | | 5 | Bluegreen Corp-Vacation Club | Big Cedar Vacations, LLC | Non-Written | 7/6/2022 |
| Jennifer McCullough | 683145 | 762161 | 532887 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2013-A | BG-CARLSBAD 015807 | 9/26/2013 |

D - 0046-0013

| Owner Name(s) | VC # | Contract Number | Mortgage Number | Assn. # | Assignor | Assignee | Bates | Assignment Date |
|---|---|---|---|---|---|---|---|---|
| | | | | 2 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | Non-Written | 2/18/2021 |
| Jeremy & Darla Lathrem | 890477 | 2674038 | 2173824 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 3/27/2020 |
| | | | | 2 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 10/8/2020 |
| | | | | 3 | Bluegreen Corp-Vacation Club | Bluegreen Corp-Vacation Club | Non-Written | 10/28/2020 |
| Jerry & Tammy Johnson | 861230 | 1127507 | 730172 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 9/27/2018 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017994 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 12/17/2019 |
| Jerry Ray Rosewell & Hollye Elaine Rosewell | 730107 | 875223 | 587123 | 1 | Big Cedar Vacations,LLC | Nat. B of AZ (NKA ZB) | BG-CARLSBAD 021243 | 12/7/2015 |
| | | | | 2 | ZB Nat. B of AZ | Bluegreen/Big Cedar | BG-CARLSBAD 021248 | 6/18/2019 |
| Jesse & Jordan Harding | 803988 | 942475 | 623124 | 1 | BVC (BG/Big Cedar Vacations, LLC | Quorum Federal Credit Union | BG-CARLSBAD 016399 | 2/16/2016 |
| | | | | 2 | Quorum Federal Credit Union | Big Cedar Vacations, LLC | BG-CARLSBAD 016404 | 7/22/2020 |
| Jimmy & Mary Phillips | 647636 | 2608281 | 2108258 | 1 | Bluegreen Corp-Vacation Club | BXG Receivable Note Trust 2016-A | Non-Written | 3/15/2019 |
| | | | | 2 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | Non-Written | 12/21/2020 |
| Jody & Diana Jones | 786901 | 981097 | 643104 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-Written | 8/24/2016 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2017-A | Non-Written | 6/6/2017 |
| | | | | 3 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 3/15/2021 |
| John Beth & Cristal Advincula | 615667 | 1114668 | 717779 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 5/31/2018 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017711 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 3/15/2021 |
| John T Carey, Jr & Samantha M Carey | 666267 | 748520 | 526755 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 3/25/2013 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | BG-CARLSBAD 015783 | 9/26/2013 |
| | | | | 3 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | Non-Written | 6/20/2018 |
| John Woods & Harriet Woods | 714559 | 935110 | 619806 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 11/24/2015 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 016306 | 3/17/2016 |
| | | | | 3 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | Non-Written | 9/14/2021 |
| John Woods & Harriet Woods | 714559 | 1098920 | 709918 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | BG-CARLSBAD 017635 | 4/13/2018 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2020-A | Non-Written | 10/8/2020 |
| | | | | 3 | BXG Receivables Note Trust 2020-A | Bluegreen Corp-Vacation Club | Non-Written | 8/23/2021 |
| Jonathan & Samantha Castelblanco | 882037 | 1098801 | 709245 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | BG-CARLSBAD 017631 | 2/15/2018 |
| | | | | 2 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 1/18/2021 |
| Jose Antonio Baez & Beronica Ibarra | 863071 | 1130020 | 726258 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 017867 | 8/15/2018 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | Non-Written | 10/19/2020 |
| Joseph & Rosalie Laskos | 65918 | 1117664 | 719614 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-Written | 6/26/2018 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017732 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 9/14/2020 |
| Joseph & Rosalie Laskos | 65918 | 2591210 | 2091201 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 015228 | 12/27/2018 |
| | | | | 2 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 7/23/2020 |
| Joseph Bernard & Marilou Gamara Tejchman | 838835 | 1081797 | 699900 | 1 | Bluegreen Corp-Vacation Club | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 017553 | 10/13/2017 |

D - 0046-0014

| Owner Name(s) | VC # | Contract Number | Mortgage Number | Assn. # | Assignor | Assignee | Bates | Assignment Date |
|---|---|---|---|---|---|---|---|---|
| | | | | 2 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | Non-Written | 12/15/2020 |
| Joshua & Megan Freed | 825536 | 1137862 | 731174 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017996 | 10/24/2018 |
| | | | | 2 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 8/21/2019 |
| Judith Abbott & Brenda Fox | 652794 | 1138359 | 732165 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 9/27/2018 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 018019 | 10/24/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 10/8/2020 |
| JudyAnn Jones & Harvey Dennis Robinson | 791143 | 918390 | 608850 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 9/25/2015 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 016198 | 6/6/2017 |
| | | | | 3 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | Non-Written | 8/20/2018 |
| JudyAnn Jones & Harvey Dennis Robinson | 791143 | 935073 | 621281 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 12/23/2015 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 016326 | 3/17/2016 |
| | | | | 3 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | Non-Written | 8/20/2018 |
| Julian Laureano Rosales & Guadalupe Coyt | 825100 | 2623236 | 2123056 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 6/24/2019 |
| | | | | 2 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 10/8/2020 |
| Justin Mason & Kaitlyn Pieratt | 910628 | 2672277 | 2172068 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 3/27/2020 |
| | | | | 2 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 10/8/2020 |
| Karen Tibwell Wallace & Aubry Gary Wallace | 783695 | 992734 | 650617 | 1 | Big Cedar Vacations,LLC | Nat. B of AZ (NKA ZB) | BG-CARLSBAD 021653 | 12/12/2016 |
| | | | | 2 | ZB Nat. B of AZ | Bluegreen/Big Cedar | BG-CARLSBAD 021691 | 1/24/2020 |
| Keegan Giles & Lakisha Giles | 861824 | 1121142 | 721977 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-written | 6/26/2018 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017761 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 11/15/2019 |
| Kenneth B, Cardwell & Michelle L. Mock | 828223 | 1049352 | 681900 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 017351 | 6/6/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | Non-Written | 10/16/2019 |
| Kimberly L. Howard | 760734 | 853121 | 577633 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-written | 10/28/2014 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2015-A | BG-CARLSBAD 015942 | 1/29/2015 |
| | | | | 3 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 1/4/2021 |
| Kimberly McClain | 690994 | 1056337 | 684991 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 017399 | 7/28/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | Non-Written | 11/17/2020 |
| Kinda Grant | 522774 | 502906 | 386716 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 5/23/2008 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2010-A | BG-CARLSBAD 015504 | 12/15/2010 |
| | | | | 3 | BXG Receivables Note Trust 2010-A | BXG Receivables Note Trust 2010-A | Non-Written | 3/16/2017 |
| | | | | 4 | BXG Receivables Note Trust 2010-A | Bluegreen Corp-Vacation Club | Non-Written | 4/20/2017 |
| Kinda Grant | 522774 | 832349 | 566949 | 1 | Bluegreen Properties NV | BXG Timeshare Trust I | Non-written | 7/30/2014 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2015-A | Non-Written | 1/29/2015 |
| | | | | 3 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | Non-Written | 3/16/2017 |
| | | | | 4 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 3/5/2020 |
| Kristy & Greg DeMarcus | 549438 | 762147 | 533228 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 6/26/2013 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | BG-CARLSBAD 015817 | 9/26/2013 |

D - 0046-0015

| Owner Name(s) | VC # | Contract Number | Mortgage Number | Assn. # | Assignor | Assignee | Bates | Assignment Date |
|---|---|---|---|---|---|---|---|---|
| | | | | 3 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | Non-Written | 5/5/2021 |
| Kyle Allen | 792593 | 919006 | 610254 | 1 | Bluegreen - BC WC Marketing | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 016212 | 3/17/2016 |
| | | | | 2 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | Non-Written | 12/20/2016 |
| Lauren & Jeffery McCullough | 559885 | 907175 | 603422 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 7/23/2015 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 016072 | 3/17/2016 |
| | | | | 3 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | Non-Written | 11/19/2018 |
| Linda & Manuel Aguinaga | 379355 | 1064055 | 689151 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 021920 | 8/30/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 3/22/2021 |
| Linda M. & Robert L. Mclaughlin | 449742 | 952818 | 627623 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 2/22/2016 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 016413 | 3/17/2016 |
| | | | | 3 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | Non-Written | 10/15/2020 |
| Lisa Billie | 457051 | 2582503 | 1508583 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 015216 | 10/30/2018 |
| | | | | 2 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 4/15/2020 |
| Lisa Oxton | 551103 | 1083165 | 701064 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-written | 11/21/2017 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017556 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 6/25/2020 |
| Londa Byrd | 470519 | 531076 | 406083 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2008-A | BG-CARLSBAD 021209 | 9/12/2008 |
| | | | | 2 | BXG Receivables Note Trust 2008-A | Bluegreen Corp-Vacation Club | Non-Written | 4/5/2016 |
| Maria & Edward Streckfus | 806866 | 948590 | 626231 | 1 | Big Cedar Vacations,LLC | Nat. B of AZ (NKA ZB) | BG-CARLSBAD 021259 | 12/12/2016 |
| | | | | 2 | ZB Nat. B of AZ | Bluegreen/Big Cedar | BG-CARLSBAD 021297 | 11/11/2018 |
| Maria & Edward Streckfus | 806866 | 963159 | 633528 | 1 | Big Cedar Vacations,LLC | Nat. B of AZ (NKA ZB) | BG-CARLSBAD 021304 | 12/12/2016 |
| | | | | 2 | ZB Nat. B of AZ | Bluegreen/Big Cedar | BG-CARLSBAD 021342 | 11/11/2018 |
| Mark & Laura Campbell | 817974 | 1056313 | 685542 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 021855 | 7/28/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 2/15/2019 |
| Mark & Sue Brewer | 662433 | 652482 | 481302 | 1 | Bluegreen - BC WC Marketing | BXG Timeshare Trust I | Non-written | 5/25/2011 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2012-A | BG-CARLSBAD 015542 | 9/13/2012 |
| | | | | 3 | BXG Receivables Note Trust 2012-A | BXG Receivables Note Trust 2012-A | Non-Written | 5/21/2018 |
| Mark A. Loken & Amelia M. Loken | 901872 | 1136753 | 732375 | 1 | Big Cedar Vacations,LLC | Bluegreen Big Cedar Quorum 2018 (4.95% Program) | BG-CARLSBAD 018021 | 9/25/2018 |
| | | | | 2 | Bluegreen Big Cedar Quorum 2018 (4.95% Program) | Big Cedar Vacations,LLC | Non-Written | 1/30/2020 |
| Marvin S. Cook | 400785 | 578234 | 443338 | 1 | Bluegreen Corp-Vacation Club | Liberty Bank | BG-CARLSBAD 021212 | 8/9/2011 |
| | | | | 2 | Liberty Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 021220 | 9/13/2012 |
| | | | | 3 | Bluegreen Corp-Vacation Club | Liberty Bank | BG-CARLSBAD 021215 | 9/26/2012 |
| | | | | 4 | Liberty Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 021218 | 9/27/2012 |
| Marvin S. Cook | 400785 | 853583 | 577176 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | BG-CARLSBAD 015935 | 10/28/2014 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | Bluegreen/Liberty Bank 2010 | Non-Written | 1/12/2015 |
| | | | | 3 | Bluegreen/Liberty Bank 2010 | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 015940; BG-CARLSBAD 015942 | 3/17/2016 |
| | | | | 4 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | Non-Written | 6/20/2018 |
| Mathew L. Spencer & Christie N. Fasick | 883369 | 1101103 | 710807 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 4/27/2018 |

D - 0046-0016

| Owner Name(s) | VC # | Contract Number | Mortgage Number | Assn. # | Assignor | Assignee | Bates | Assignment Date |
|---|---|---|---|---|---|---|---|---|
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 054041 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 3/15/2021 |
| Matthew & Nathalia Timmins | 699300 | 767260 | 536178 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 7/29/2013 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | BG-CARLSBAD 053759 | 9/26/2013 |
| | | | | 3 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | Non-Written | 11/18/2019 |
| Matthew Cody LaDeaux & Stephanie Michelle LaDeaux | 721044 | 771787 | 537333 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 8/27/2013 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | BG-CARLSBAD 015827 | 9/26/2013 |
| | | | | 3 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | Non-Written | 6/16/2017 |
| Megan & Anthony Bunch | 523432 | 1045300 | 681051 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 021852 | 6/6/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 1/23/2020 |
| Melissa & Erik Pond | 822029 | 1082094 | 700516 | 1 | Bluegreen Corp-Vacation Club | Liberty Bank | BG-CARLSBAD 021952 | 12/11/2017 |
| | | | | 2 | Liberty Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 021955 | 3/18/2019 |
| Melissa Stenberg | 526738 | 2719925 | 2219684 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 6/28/2021 |
| | | | | 2 | BXG Timeshare Trust I | BXG Timeshare Trust I | Non-Written | 1/24/2022 |
| | | | | 3 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 4/29/2022 |
| Michael & Ruth Eldridge | 772433 | 877002 | 588014 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | Non-written | 2/12/2015 |
| | | | | 2 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 2/13/2015 |
| | | | | 3 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | BG-CARLSBAD 016046 | 2/24/2015 |
| | | | | 4 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 6/2/2021 |
| Michael B. & Regilyn P. Johnson | 709022 | 742902 | 524977 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 2/27/2013 |
| | | | | | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 10/1/2013 |
| | | | | 3 | Bluegreen Corp-Vacation Club | Bluegreen Corp/CapitalSource Bank | BG-CARLSBAD 015774 | 10/18/2013 |
| | | | | 4 | Bluegreen Corp/CapitalSource Bank | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 015777; BG-CARLSBAD 015780 | 10/23/2018 |
| | | | | 5 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 5/14/2021 |
| Michael B. & Regilyn P. Johnson | 709022 | 808414 | 555588 | 1 | Bluegreen Corp-Vacation Club | Pacific Western Bank | BG-CARLSBAD 015850 | 10/13/2014 |
| | | | | 2 | Pacific Western Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 015854 | 4/27/2021 |
| Michael Denis & Claudia Leon | 452747 | 503885 | 387452 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2007-A | BG-CARLSBAD 021193 | 7/2/2008 |
| | | | | 2 | BXG Receivables Note Trust 2007-A | Bluegreen Corp-Vacation Club | BG-CARLSBAD 021196 | 4/6/2016 |
| | | | | 3 | Bluegreen Corp-Vacation Club | Pacific Western Bank | BG-CARLSBAD 021202 | 5/10/2016 |
| | | | | 4 | Pacific Western Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 021206 | 1/11/2018 |
| MIguel A Astudillo & Gloria Elena Astudillo | 745086 | 821260 | 561844 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 5/27/2014 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2015-A | BG-CARLSBAD 015857 | 1/29/2015 |
| | | | | 3 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | Non-Written | 1/21/2020 |
| Mitchell Leigh Marston & Megan R. Marston | 746197 | 863613 | 582017 | 1 | BVC (BG/Big Cedar Vacations, LLC | Quorum Federal Credit Union | BG-CARLSBAD 015956 | 1/14/2015 |
| | | | | 2 | Quorum Federal Credit Union | Big Cedar Vacations, LLC | BG-CARLSBAD 015959 | 4/9/2020 |
| Nakisha & Sandra Lockhart | 794938 | 916953 | 613100 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-written | 10/26/2015 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 016275 | 3/17/2016 |

D - 0046-0017

| Owner Name(s) | VC # | Contract Number | Mortgage Number | Assn. # | Assignor | Assignee | Bates | Assignment Date |
|---|---|---|---|---|---|---|---|---|
| | | | | 3 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | Non-Written | 11/17/2017 |
| Nancy Lynn Braun & Bobby Earl Braun | 744873 | 1071352 | 694279 | 1 | Bluegreen Corp-Vacation Club | Pacific Western Bank | BG-CARLSBAD 017504 | 2/13/2018 |
| | | | | 2 | Pacific Western Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 017508 | 6/30/2021 |
| Nancy Lynn Braun & Bobby Earl Braun | 744873 | 2676055 | 2175841 | 1 | Bluegreen Louisianna | Bluegreen Corp-Vacation Club | BG-CARLSBAD 015407; BG-CARLSBAD 015408 | 2/17/2020 |
| | | | | 2 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 3/27/2020 |
| | | | | 3 | BXG Timeshare Trust I | BXG Receivables Note Trust 2020-A | BG-CARLSBAD 015410 | 10/8/2020 |
| | | | | 4 | BXG Receivables Note Trust 2020-A | BXG Receivables Note Trust 2020-A | Non-Written | 4/28/2021 |
| Norman K. Athy Jr. & Terri L. Leamy | 812353 | 1108638 | 715482 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 4/27/2018 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017668 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 4/15/2021 |
| Norris & Faye Horton | 408974 | 1064999 | 690248 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 9/28/2017 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017475 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 12/23/2020 |
| Pamela Franklin | 731952 | 2690248 | 2190022 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2020-A | BG-CARLSBAD 015431 | 10/8/2020 |
| | | | | 2 | BXG Receivables Note Trust 2020-A | Bluegreen Corp-Vacation Club | Non-Written | 3/23/2021 |
| Patricia O'Neal-Mellen | 721702 | 2657728 | 2157528 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | Non-Written | 12/13/2019 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 1/7/2021 |
| Paul & Melinda Jacobs | 801184 | 1019337 | 665061 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | BG-CARLSBAD 017097 | 1/13/2017 |
| | | | | 2 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | Non-Written | 4/16/2018 |
| Paul & Shirley Prosek | 382446 | 939932 | 621922 | 1 | Big Cedar Vacations,LLC | Bluegreen Big Cedar Quorum 2012 (4.75% Program) | BG-CARLSBAD 016329 | 12/22/2015 |
| | | | | 2 | Bluegreen Big Cedar Quorum 2012 (4.75% Program) | Bluegreen Corp-Vacation Club | Non-Written | 6/2/2020 |
| Randall E. Owens & Tanya R. Owens | 449924 | 969961 | 637035 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 5/26/2016 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 016422 | 6/6/2017 |
| | | | | 3 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 11/15/2019 |
| Randy C. & Jonnie S. Driver | 238501 | 978144 | 641388 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-written | 6/22/2016 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 021589 | 6/6/2017 |
| | | | | 3 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 5/13/2021 |
| Ray Yorker Jr. | 688745 | 704014 | 506081 | 1 | NEWS PLACE DEVELOPERS | QUORUM/NEWS PLACE DEVELOPERS | Non-Written | 5/29/2012 |
| | | | | 2 | QUORUM/NEWS PLACE DEVELOPERS | NEWS PLACE DEVELOPERS | BG-CARLSBAD 053757 | 10/28/2019 |
| Raymond & Viola Nault, PO BOX 809 | 818578 | 974551 | 639731 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-written | 6/22/2016 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 021429 | 6/6/2017 |
| | | | | 3 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 7/15/2019 |
| Rebecca & Ricky Jones | 807079 | 1118187 | 720350 | 1 | Bluegreen Corp-Vacation Club | Liberty Bank | BG-CARLSBAD 021979 | 6/3/2019 |
| | | | | 2 | Bluegreen Corp-Vacation Club | Liberty Bank | BG-CARLSBAD 021982 | 4/9/2020 |
| | | | | 3 | Liberty Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 021985 | 11/24/2020 |

D - 0046-0018

| Owner Name(s) | VC # | Contract Number | Mortgage Number | Assn. # | Assignor | Assignee | Bates | Assignment Date |
|---|---|---|---|---|---|---|---|---|
| Rhonda & George Dixon | 103275 | 1088722 | 704639 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 021957 | 12/15/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 8/14/2020 |
| Ricky & Lynn Oberlender | 670614 | 2631501 | 2131317 | 1 | Big Cedar Vacations,LLC | Bluegreen Big Cedar Quorum 2019 (5.1% Program) | BG-CARLSBAD 015396 | 7/29/2019 |
| | | | | 2 | Bluegreen Big Cedar Quorum 2019 (5.1% Program) | Big Cedar Vacations,LLC | Non-Written | 12/14/2020 |
| Rita Patient & Charles Butler | 802300 | 938087 | 621189 | 1 | Bluegreen - BC WC Marketing | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 016315 | 3/17/2016 |
| | | | | 2 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | Non-Written | 7/28/2021 |
| Robert N. & Patricia B. Watson | 757420 | 848475 | 574454 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 9/25/2014 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2015-A | BG-CARLSBAD 015894 | 1/29/2015 |
| | | | | 3 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | Non-Written | 3/16/2017 |
| Robert Scott Yaikow & Amy Medders Yaikow | 716828 | 761475 | 532910 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 6/26/2013 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | BG-CARLSBAD 015812 | 9/26/2013 |
| | | | | 3 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | Non-Written | 10/16/2019 |
| Robert Whitaker & Karen Scott | 823205 | 985044 | 644853 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 7/25/2016 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 016543 | 6/6/2017 |
| | | | | 3 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 3/15/2019 |
| Roger P. & Angela B. Hays | 477348 | 1007579 | 658850 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 016934 | 7/28/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | Non-Written | 4/16/2021 |
| Ronald & Loretta Hardeman | 896433 | 2584761 | 2084758 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 015219 | 12/27/2018 |
| | | | | 2 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 3/22/2021 |
| Ronald & Loretta Hardeman | 896433 | 2610646 | 2110623 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-Written | 6/27/2019 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | Bluegreen/Liberty Bank 2010 | Non-Written | 3/30/2021 |
| | | | | 3 | Bluegreen/Liberty Bank 2010 | Bluegreen Corp-Vacation Club | Non-Written | 6/11/2021 |
| | | | | 4 | Bluegreen Corp-Vacation Club | Bluegreen Corp-Vacation Club | Non-Written | 7/15/2021 |
| Ronda & Samuel Herrington | 840467 | 1101279 | 711043 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 3/22/2018 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017645 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | Non-Written | 3/16/2021 |
| Rosana E. Narvaez-Colon | 841181 | 1095608 | 707758 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 3/22/2018 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017608 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 10/19/2020 |
| Roy & Deborah Ashby | 614303 | 2592947 | 2092937 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 015211 | 1/15/2019 |
| | | | | 2 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 1/6/2020 |
| Ruben Ortega & Adriana Cota | 759873 | 888760 | 593280 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | Non-Written | 5/22/2015 |
| | | | | 2 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 8/14/2020 |
| Ryan & Suzanne Mailhiot | 685417 | 697833 | 502779 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 5/25/2012 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2012-A | BG-CARLSBAD 015684 | 9/13/2012 |
| | | | | 3 | BXG Receivables Note Trust 2012-A | Bluegreen Corp-Vacation Club | Non-Written | 7/15/2019 |
| Samuel J. & Dana M. Bollinger | 754117 | 1128307 | 725824 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 8/28/2018 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017856 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 4/9/2021 |
| Sandra & Thomas J. Lawson | 665960 | 660399 | 484854 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 7/26/2011 |

D - 0046-0019

| Owner Name(s) | VC # | Contract Number | Mortgage Number | Assn. # | Assignor | Assignee | Bates | Assignment Date |
|---|---|---|---|---|---|---|---|---|
| | | | | 2 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 9/13/2012 |
| | | | | 3 | Bluegreen Corp-Vacation Club | Bluegreen Corp/CapitalSource Bank | Non-Written | 10/2/2012 |
| | | | | 4 | Bluegreen Corp-Vacation Club | Pacific Western Bank | BG-CARLSBAD 015544 | 3/30/2015 |
| | | | | 5 | Pacific Western Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 015549 | 7/19/2017 |
| Scott & Tammy Bomkamp | 684594 | 742194 | 523685 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 2/27/2013 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | BG-CARLSBAD 015772 | 9/26/2013 |
| | | | | 3 | BXG Receivables Note Trust 2013-A | Bluegreen Corp-Vacation Club | Non-Written | 9/12/2019 |
| Shannon & William Meredith | 925301 | 2624595 | 2124412 | 1 | Big Cedar Vacations,LLC | Bluegreen Big Cedar Quorum 2019 (5.1% Program) | BG-CARLSBAD 015391 | 6/28/2019 |
| | | | | 2 | Bluegreen Big Cedar Quorum 2019 (5.1% Program) | Big Cedar Vacations,LLC | Non-Written | 12/9/2019 |
| Sherry Helton | 208648 | 1065107 | 690216 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 9/28/2017 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017446 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | Non-Written | 11/17/2020 |
| Sierra Tebeau Sherry | 877835 | 1089362 | 704153 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2012-A | BG-CARLSBAD 017563 | 12/26/2017 |
| | | | | 2 | BXG Receivables Note Trust 2012-A | Bluegreen Corp-Vacation Club | BG-CARLSBAD 017567 | 1/8/2019 |
| | | | | 3 | Bluegreen Corp-Vacation Club | Pacific Western Bank | BG-CARLSBAD 017572 | 1/29/2019 |
| | | | | 4 | Pacific Western Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 017579 | 1/21/2021 |
| Sierra Tebeau Sherry | 877835 | 1122472 | 722595 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 7/30/2018 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017824 | 10/23/2018 |
| | | | | 3 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 7/9/2021 |
| Simbarashe Murengami | 911478 | 2678525 | 2178310 | 1 | KING 583 | KING 583/WESTERN ALLIANCE BANK | BG-CARLSBAD 053752 | 3/24/2020 |
| Stuart & Bethany Roberts | 785123 | 1058522 | 686536 | 1 | Big Cedar Vacations,LLC | Bluegreen/Big Cedar NBA | BG-CARLSBAD 021883 | 9/29/2017 |
| | | | | 2 | Bluegreen/Big Cedar NBA | Bluegreen/Big Cedar NBA | Non-Written | 5/25/2021 |
| | | | | 3 | Bluegreen/Big Cedar NBA | Bluegreen Corp-Vacation Club | Non-Written | 6/30/2022 |
| | | | | 4 | Bluegreen Corp-Vacation Club | Big Cedar Vacations, LLC | Non-Written | 7/6/2022 |
| Tamikka Lashaun Portee & Vanessa Shavan Porter | 465990 | 754503 | 529448 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 6/26/2013 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | BG-CARLSBAD 015794 | 9/26/2013 |
| | | | | 3 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | Non-Written | 8/19/2020 |
| Tammy Kay & Phillip Lee Salmans | 855702 | 1038370 | 680444 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 021772 | 6/6/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 3/15/2021 |
| Taury Person & Shannon Person | 742258 | 815966 | 559060 | 1 | Bluegreen Corp-Vacation Club | Pacific Western Bank | BG-CARLSBAD 021236 | 7/2/2014 |
| | | | | 2 | Pacific Western Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 021240 | 10/5/2017 |
| Theresa & David Barnewall | 746789 | 886604 | 592233 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 7/23/2015 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 016050 | 3/17/2016 |
| | | | | 3 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | Non-Written | 3/16/2021 |
| Theresa & Gregory Dunn | 267400 | 916821 | 608930 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-written | 9/25/2015 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 016204 | 3/17/2016 |
| | | | | 3 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | Non-Written | 12/21/2020 |
| Thomas Hollingsworth | 497258 | 987891 | 647209 | 1 | Bluegreen Corp-Vacation Club | Bluegreen Corp/CapitalSource Bank | BG-CARLSBAD 053895 | 12/21/2016 |

D - 0046-0020

| Owner Name(s) | VC # | Contract Number | Mortgage Number | Assn. # | Assignor | Assignee | Bates | Assignment Date |
|---|---|---|---|---|---|---|---|---|
| | | | | 2 | Bluegreen Corp/CapitalSource Bank | BXG Receivables Note Trust 2013-A | Non-Written | 11/28/2018 |
| | | | | 3 | BXG Receivables Note Trust 2013-A | Bluegreen Corp-Vacation Club | Non-Written | 11/19/2019 |
| Thomas Hollingsworth | 497258 | 1134867 | 729830 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017984 | 12/7/2018 |
| | | | | 2 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | BG-CARLSBAD 017991 | 11/25/2019 |
| Tim & Tina Bullock | 788622 | 911214 | 605909 | 1 | Bluegreen - BC WC Marketing | BXG Receivable Note Trust 2016-A | BG-CARLSBAD 016135 | 3/17/2016 |
| | | | | 2 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | Non-Written | 1/18/2018 |
| Timothy C. & Julie A. Creekmur | 808256 | 1094235 | 707214 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 021961 | 12/15/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 10/8/2020 |
| Urban  & Cheryl Lanser | 650089 | 728588 | 517336 | 1 | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | Non-written | 12/21/2012 |
| | | | | 2 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2013-A | BG-CARLSBAD 015760 | 9/26/2013 |
| | | | | 3 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | Non-Written | 7/16/2019 |
| Victor Schexnayder | 772009 | 875825 | 587628 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | Non-written | 2/12/2015 |
| | | | | 2 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 2/13/2015 |
| | | | | 3 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | BG-CARLSBAD 016043 | 2/24/2015 |
| | | | | 4 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 8/26/2019 |
| Victor Schexnayder | 772009 | 1099771 | 710349 | 1 | SECOND CITY | SECOND CITY/LIBERTY | Non-Written | 1/19/2018 |
| | | | | 2 | SECOND CITY/LIBERTY | Accelerated Assets 2018-1 LLC | BG-CARLSBAD 053906 | 6/21/2018 |
| | | | | 3 | Accelerated Assets 2018-1 LLC | Accelerated Assets 2018-1 LLC | Non-Written | 8/26/2019 |
| | | | | 4 | Accelerated Assets 2018-1 LLC | SECOND CITY | Non-Written | 9/13/2019 |
| Victoria & Donald McKenney | 644142 | 1059972 | 687126 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 021911 | 8/30/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | Non-Written | 5/12/2021 |
| | | | | 3 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 10/15/2021 |
| Victoria & Donald McKenney | 644142 | 1128611 | 725369 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | BG-CARLSBAD 017845 | 10/24/2018 |
| | | | | 2 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | Non-Written | 5/12/2021 |
| Wayne & Shirley Norland | 732121 | 791993 | 548243 | 1 | Bluegreen - BC WC Marketing | BXG Receivables Note Trust 2013-A | BG-CARLSBAD 015830 | 12/19/2013 |
| | | | | 2 | BXG Receivables Note Trust 2013-A | Bluegreen Corp-Vacation Club | Non-Written | 7/27/2020 |
| Wendell B. Taylor | 664512 | 1054045 | 683828 | 1 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | BG-CARLSBAD 017354 | 8/30/2017 |
| | | | | 2 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | Non-Written | 5/12/2021 |
| Weylen & Emily Gibson | 763159 | 857493 | 579652 | 1 | Big Cedar Vacations,LLC | Bluegreen Big Cedar Quorum 2012 | BG-CARLSBAD 015952 | 10/23/2014 |
| | | | | 2 | Bluegreen Big Cedar Quorum 2012 | Big Cedar Vacations,LLC | Non-Written | 6/14/2019 |
| | | | | 3 | Big Cedar Vacations,LLC | Big Cedar Vacations, LLC | Non-Written | 6/24/2019 |
| Willie & Velma Waters | 736647 | 801606 | 552805 | 1 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | Non-Written | 1/30/2014 |
| | | | | 2 | BXG Timeshare Trust I | BXG Receivables Note Trust 2015-A | BG-CARLSBAD 015834 | 1/29/2015 |
| | | | | 3 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | Non-Written | 9/18/2018 |

D - 0046-0021

D-54

EX-10.1 2 bxg-20201013xex10_1.htm EX-10.1

**Exhibit 10.1**

BXG RECEIVABLES NOTE TRUST 2020-A,
as Issuer

BLUEGREEN VACATIONS CORPORATION,
as Servicer

VACATION TRUST, INC.,
as Club Trustee

CONCORD SERVICING CORPORATION,
as Backup Servicer

and

U.S. BANK NATIONAL ASSOCIATION,
as Indenture Trustee, Paying Agent and Custodian

———————

**INDENTURE**

Dated as of October 8, 2020

———————

1

Exhibit
Job# 6242193

**Humphrey - 015**

L. Goodall, RPR  10-14-22  Humphrey

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE I. DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION | | 3 |
| SECTION 1.1. | General Definitions and Usage of Terms. | 3 |
| SECTION 1.2. | Compliance Certificates and Opinions. | 3 |
| SECTION 1.3. | Form of Documents Delivered to Indenture Trustee. | 3 |
| SECTION 1.4. | Acts of Noteholders, etc. | 4 |
| SECTION 1.5. | Notice to Noteholders; Waiver. | 5 |
| SECTION 1.6. | Effect of Headings and Table of Contents. | 6 |
| SECTION 1.7. | Successors and Assigns. | 6 |
| SECTION 1.8. | GOVERNING LAW. | 6 |
| SECTION 1.9. | Legal Holidays. | 6 |
| SECTION 1.10. | Execution in Counterparts. | 6 |
| SECTION 1.11. | Inspection. | 6 |
| SECTION 1.12. | Survival of Representations and Warranties. | 7 |
| ARTICLE II. THE NOTES | | 8 |
| SECTION 2.1. | General Provisions. | 8 |
| SECTION 2.2. | Global Notes. | 8 |
| SECTION 2.3. | Definitive Notes. | 9 |
| SECTION 2.4. | Registration, Transfer and Exchange of Notes. | 10 |
| SECTION 2.5. | Mutilated, Destroyed, Lost and Stolen Notes. | 14 |
| SECTION 2.6. | Payment of Interest and Principal; Rights Preserved. | 15 |
| SECTION 2.7. | Persons Deemed Owners. | 16 |
| SECTION 2.8. | Cancellation. | 16 |
| SECTION 2.9. | Noteholder Lists. | 16 |
| SECTION 2.10. | Treasury Notes. | 16 |

1

SECTION 2.11.    Notice to Depository.                                              16

SECTION 2.12.    Confidentiality.                                                   17

ARTICLE III. ACCOUNTS; COLLECTION AND APPLICATION OF MONEYS; REPORTS                17

SECTION 3.1.     Trust Accounts; Investments by Indenture Trustee.                  17

SECTION 3.2.     Establishment and Administration of the Trust Accounts.            19

SECTION 3.3.     Reserved.                                                          23

SECTION 3.4.     Distributions.                                                     23

SECTION 3.5.     Reports to Noteholders.                                            25

SECTION 3.6.     Note Balance Write-Down Amounts.                                  26

SECTION 3.7.     Withholding Taxes.                                                 26

ARTICLE IV. THE TRUST ESTATE                                                        27

SECTION 4.1.     Acceptance by Indenture Trustee.                                   27

SECTION 4.2.     Subsequent Timeshare Loans.                                        28

SECTION 4.3.     Criteria for Subsequent Timeshare Loans.                           28

SECTION 4.4.     Grant of Security Interest; Tax Treatment.                         29

SECTION 4.5.     Further Action Evidencing Assignments.                             30

SECTION 4.6.     Substitution and Repurchase of Timeshare Loans.                    31

SECTION 4.7.     Release of Lien.                                                   33

SECTION 4.8.     Appointment of Custodian and Paying Agent.                         33

SECTION 4.9.     Sale of Timeshare Loans.                                           34

ARTICLE V. SERVICING OF TIMESHARE LOANS                                             34

SECTION 5.1.     Appointment of Servicer and Backup Servicer; Servicing Standard.  34

SECTION 5.2.     Payments on the Timeshare Loans.                                   34

SECTION 5.3.     Duties and Responsibilities of the Servicer.                       35

SECTION 5.4.     Servicer Events of Default.                                        39

SECTION 5.5.     Accountings; Statements and Reports.                               42

2

| SECTION 5.6. | Records. | 44 |
| SECTION 5.7. | Fidelity Bond or Errors and Omissions Insurance. | 44 |
| SECTION 5.8. | Merger or Consolidation of the Servicer. | 45 |
| SECTION 5.9. | Sub-Servicing. | 45 |
| SECTION 5.10. | Servicer Resignation. | 46 |
| SECTION 5.11. | Fees and Expenses. | 46 |
| SECTION 5.12. | Access to Certain Documentation. | 46 |
| SECTION 5.13. | No Offset. | 47 |
| SECTION 5.14. | Account Statements.section5_14 | 47 |
| SECTION 5.15. | Indemnification; Third Party Claim. | 47 |
| SECTION 5.16. | Backup Servicer. | 47 |
| SECTION 5.17. | Aruba Notices. | 48 |
| SECTION 5.18. | Recordation. | 49 |
| ARTICLE VI. EVENTS OF DEFAULT; REMEDIES | | 49 |
| SECTION 6.1. | Events of Default. | 49 |
| SECTION 6.2. | Acceleration of Maturity; Rescission and Annulment. | 50 |
| SECTION 6.3. | Remedies. | 52 |
| SECTION 6.4. | Indenture Trustee May File Proofs of Claim. | 53 |
| SECTION 6.5. | Indenture Trustee May Enforce Claims Without Possession of Notes. | 54 |
| SECTION 6.6. | Application of Money Collected. | 54 |
| SECTION 6.7. | Limitation on Suits. | 57 |
| SECTION 6.8. | Unconditional Right of Noteholders to Receive Principal and Interest. | 57 |
| SECTION 6.9. | Restoration of Rights and Remedies. | 58 |
| SECTION 6.10. | Rights and Remedies Cumulative. | 58 |
| SECTION 6.11. | Delay or Omission Not Waiver. | 58 |
| SECTION 6.12. | Control by Noteholders. | 59 |

3

SECTION 6.13.    Waiver of Events of Default.                                           59

SECTION 6.14.    Undertaking for Costs.                                                 60

SECTION 6.15.    Waiver of Stay or Extension Laws.                                      60

SECTION 6.16.    Sale of Trust Estate.                                                  60

SECTION 6.17.    Action on Notes.                                                       61

SECTION 6.18.    Performance and Enforcement of Certain Obligations.                    61

ARTICLE VII. THE INDENTURE TRUSTEE                                                      62

SECTION 7.1.     Certain Duties.                                                        62

SECTION 7.2.     Notice of Events of Default.                                           63

SECTION 7.3.     Certain Matters Affecting the Indenture Trustee.                       63

SECTION 7.4.     Indenture Trustee Not Liable for Notes or Timeshare Loans.            65

SECTION 7.5.     Indenture Trustee May Own Notes.                                       65

SECTION 7.6.     Indenture Trustee's Fees and Expenses.                                 66

SECTION 7.7.     Eligibility Requirements for Indenture Trustee.                        66

SECTION 7.8.     Resignation or Removal of Indenture Trustee.                           66

SECTION 7.9.     Successor Indenture Trustee.                                           67

SECTION 7.10.    Merger or Consolidation of Indenture Trustee.                          68

SECTION 7.11.    Appointment of Co-Indenture Trustee or Separate Indenture Trustee.    68

SECTION 7.12.    Paying Agent and Note Registrar Rights.                                70

SECTION 7.13.    Authorization.                                                         70

SECTION 7.14.    Maintenance of Office or Agency.                                       71

ARTICLE VIII. COVENANTS OF THE ISSUER                                                   71

SECTION 8.1.     Payment of Principal, Interest and Other Amounts.                      71

SECTION 8.2.     Eligible Timeshare Loans.                                              71

SECTION 8.3.     Money for Payments to Noteholders to Be Held in Trust.                71

SECTION 8.4.     Existence; Merger; Consolidation, etc.                                 73

4

SECTION 8.5.   Protection of Trust Estate; Further Assurances.                73

SECTION 8.6.   Additional Covenants.                                         75

SECTION 8.7.   Restricted Payments.                                          76

SECTION 8.8.   Further Instruments and Acts.                                 77

ARTICLE IX. SUPPLEMENTAL INDENTURES                                          77

SECTION 9.1.   Supplemental Indentures.                                      77

SECTION 9.2.   Supplemental Indentures with Consent of Noteholders.          78

SECTION 9.3.   Execution of Supplemental Indentures.                         79

SECTION 9.4.   Effect of Supplemental Indentures.                            79

SECTION 9.5.   Reference in Notes to Supplemental Indentures.                79

ARTICLE X. REDEMPTION OF NOTES                                               79

SECTION 10.1.  Optional Redemption; Election to Redeem.                      79

SECTION 10.2.  Notice to Indenture Trustee.                                  80

SECTION 10.3.  Notice of Redemption by the Servicer.                         80

SECTION 10.4.  Deposit of Redemption Price.                                  80

SECTION 10.5.  Notes Payable on Redemption Date.                             80

ARTICLE XI. SATISFACTION AND DISCHARGE                                       80

SECTION 11.1.  Satisfaction and Discharge of Indenture.                      80

SECTION 11.2.  Application of Trust Money; Repayment of Money Held by Paying Agent.   82

SECTION 11.3.  Trust Termination Date.                                       82

ARTICLE XII. REPRESENTATIONS AND WARRANTIES AND COVENANTS                    82

SECTION 12.1.  Representations and Warranties of the Issuer.                 82

SECTION 12.2.  Representations and Warranties of the Servicer.               85

SECTION 12.3.  Representations and Warranties of the Indenture Trustee.      88

SECTION 12.4.  Multiple Roles.                                               89

SECTION 12.5.  [Reserved].                                                   90

5

| SECTION 12.6. | Covenants of the Club Trustee. | 90 |
| SECTION 12.7. | Representations and Warranties of the Backup Servicer. | 92 |
| ARTICLE XIII. MISCELLANEOUS | | 95 |
| SECTION 13.1. | Officer's Certificate and Opinion of Counsel as to Conditions Precedent. | 95 |
| SECTION 13.2. | Statements Required in Certificate or Opinion. | 95 |
| SECTION 13.3. | Notices. | 95 |
| SECTION 13.4. | No Proceedings. | 98 |
| SECTION 13.5. | Limitation of Liability of Owner Trustee. | 98 |

| Exhibit A | Form of Notes |
| Exhibit B | Form of Investor Representation Letter |
| Exhibit C | Form of Transfer Certificate For Rule 144A Global Notes to Regulation S Global Notes During The Restricted Period |
| Exhibit D | Form of Transfer Certificate For Rule 144A Global Notes to Regulation S Global Notes After Restricted Period |
| Exhibit E | Form of Transfer Certificate For Regulation S Global Notes To 144A Global Notes During Restricted Period |
| Exhibit F | Form of Transfer Certificate For Regulation S Global Notes During Restricted Period |
| Exhibit G | Credit Policy |
| Exhibit H | Form of Monthly Servicer Report |
| Exhibit I | Servicing Officer's Certificate |
| Exhibit J | Form of Investor Certification |
| Exhibit K | Form of ROAP Waiver Letter |
| Exhibit L | Form of Aruba Notice |
| Exhibit M | [Reserved] |
| Exhibit N | Form of Subsequent Transfer Notice |

6

D - 0054-0007

Exhibit O            Collection Policy

Annex               Standard Definitions

Schedule I          Schedule of Timeshare Loans

7

## INDENTURE

This INDENTURE, dated as of October 8, 2020 (this "**Indenture**"), is among BXG RECEIVABLES NOTE TRUST 2020-A, a statutory trust formed under the laws of the State of Delaware, as issuer (the "**Issuer**"), BLUEGREEN VACATIONS CORPORATION ("**Bluegreen**"), a Florida corporation, in its capacity as servicer (the "**Servicer**"), VACATION TRUST, INC., a Florida corporation, as trustee under the Club Trust Agreement (the "**Club Trustee**"), CONCORD SERVICING CORPORATION, an Arizona corporation, as backup servicer (the "**Backup Servicer**") and U.S. BANK NATIONAL ASSOCIATION, a national banking association, in its capacity as indenture trustee (the "**Indenture Trustee**"), in its capacity as paying agent (the "**Paying Agent**") and in its capacity as custodian (the "**Custodian**").

### RECITALS OF THE ISSUER

WHEREAS, the Issuer has duly authorized the execution and delivery of this Indenture to provide for the issuance of its $48,621,000 1.55% Timeshare Loan-Backed Notes, Series 2020-A, Class A (the "**Class A Notes**"), $47,877,000 2.49% Timeshare Loan-Backed Notes, Series 2020-A, Class B (the "**Class B Notes**") and its $34,549,000 4.22% Timeshare Loan-Backed Notes, Series 2020-A, Class C (the "**Class C Notes**" and together with the Class A Notes and the Class B Notes, the "**Notes**");

WHEREAS, all things necessary to make the Notes, when executed by the Issuer and authenticated and delivered by the Indenture Trustee hereunder, the valid non-recourse obligations of the Issuer, and to make this Indenture a valid agreement of the Issuer, in accordance with its terms, have been done;

WHEREAS, the Servicer has agreed to service and administer the Timeshare Loans securing the Notes and the Backup Servicer has agreed to, among other things, service and administer the Timeshare Loans if the Servicer shall no longer be the Servicer hereunder;

WHEREAS, the Club Trustee is a limited purpose entity which, on behalf of Beneficiaries of the Club, holds title to the Timeshare Properties related to the Club Loans.

### NOW, THEREFORE, THIS INDENTURE WITNESSETH:

For and in consideration of the premises and the purchase of the Notes by the holders thereof, it is mutually covenanted and agreed, for the benefit of the Noteholders, as follows:

### GRANTING CLAUSE

To secure the payment of the principal of and interest on the Notes in accordance with their terms, the payment of all of the sums payable under this Indenture and the performance of the covenants contained in this Indenture, the Issuer hereby Grants to the Indenture Trustee, for the benefit of the Noteholders, all of the Issuer's right, title and interest in and to the following whether now owned or hereafter acquired and any and all benefits accruing

1

to the Issuer from, (i) the Initial Timeshare Loans specified on Schedule I hereto, (ii) any Subsequent Timeshare Loans, (iii) any Qualified Substitute Timeshare Loans, (iv) the Receivables in respect of each Timeshare Loan due after the related Cut-Off Date, (v) the related Timeshare Loan Documents (excluding any rights as developer or declarant under the Timeshare Declaration, the Timeshare Program Consumer Documents or the Timeshare Program Governing Documents), (vi) all Related Security in respect of each Timeshare Loan, (vii) all rights and remedies under the Transfer Agreement, the Bluegreen Purchase Agreement, the Sale Agreement, the Backup Servicing Agreement, the Lockbox Agreement, the Administration Agreement, the Remarketing Agreement and the Custodial Agreement, (viii) all amounts properly deposited into the Lockbox Account (after the related Cut-Off Date), the Collection Account, the General Reserve Account, the Prefunding Account, and the Force Majeure Loan Reserve Account, and (ix) proceeds of the foregoing (including, without limitation, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, insurance proceeds (as applicable), condemnation awards, rights to payment of any and every kind, and other forms of obligations and receivables which at any time constitute all or part or are included in the proceeds of any of the foregoing) (collectively, the "**Trust Estate**").  Notwithstanding the foregoing, the Trust Estate shall not include (i) any Timeshare Loan released from the Lien of this Indenture in accordance with the terms hereof and any Related Security, Timeshare Loan Documents, income or proceeds related to such released Timeshare Loan, (ii) any amount distributed pursuant to Section 3.4 or Section 6.6 hereof or (iii) any Misdirected Deposits.

Such Grant is made in trust to secure (i) the payment of all amounts due on the Notes in accordance with their terms, equally and ratably except as otherwise may be provided in this Indenture, without prejudice, priority, or distinction between any Note of a Class and any other Note of the same Class by reason of differences in time of issuance or otherwise, and (ii) the payment of all other sums payable under the Notes and this Indenture.

The Indenture Trustee acknowledges such Grant, accepts the trusts hereunder in accordance with the provisions hereof, and agrees to perform the duties herein required to the best of its ability and to the end that the interests of the Noteholders may be adequately and effectively protected as hereinafter provided.

The Custodian shall hold the Timeshare Loan Files in trust, for the use and benefit of the Issuer and all present and future Noteholders, and shall retain possession thereof.  The Custodian further agrees and acknowledges that each other item making up the Trust Estate that is physically delivered to the Custodian will be held by the Custodian in the State of Minnesota or in any other location acceptable to the Indenture Trustee and the Servicer.

The Indenture Trustee further acknowledges that in the event that a court of competent jurisdiction were to hold that the conveyance of the Timeshare Loans by the Depositor to the Issuer pursuant to the Sale Agreement constitutes a loan and not a sale as it is intended by all the parties hereto, the Custodian will be holding each of the Timeshare Loans as bailee of the Issuer; provided, however, that with respect to the Timeshare Loans, the Custodian will not act at the direction of the Issuer without the written consent of the Indenture Trustee.

2

ARTICLE I.

DEFINITIONS AND OTHER PROVISIONS
OF GENERAL APPLICATION

SECTION 1.1.   <u>General Definitions and Usage of Terms</u>.

(a)      In addition to the terms defined elsewhere in this Indenture, capitalized terms shall have the meanings given them in the Standard Definitions attached hereto as <u>Annex A</u>.

(b)      With respect to all terms in this Indenture, the singular includes the plural and the plural the singular; words importing any gender include the other genders; references to "writing" include printing, typing, lithography and other means of reproducing words in a visible form; references to agreements and other contractual instruments include all amendments, modifications and supplements thereto or any changes therein entered into in accordance with their respective terms and not prohibited by this Indenture; references to Persons include their successors and assigns; and the term "including" means "including without limitation".

SECTION 1.2.   <u>Compliance Certificates and Opinions</u>.

Upon any written application or request by the Issuer to the Indenture Trustee to take any action under any provision of this Indenture, other than any request that (a) the Indenture Trustee authenticate the Notes specified in such request, (b) the Indenture Trustee invest moneys in any of the Trust Accounts pursuant to the written directions specified in such request or (c) the Indenture Trustee pay moneys due and payable to the Issuer hereunder to the Issuer's assignee specified in such request, the Indenture Trustee shall require the Issuer to furnish to the Indenture Trustee an Officer's Certificate stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with and that the request otherwise is in accordance with the terms of this Indenture, and an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent, if any, have been complied with, except that, in the case of any such requested action as to which other evidence of satisfaction of the conditions precedent thereto is specifically required by any provision of this Indenture, no additional certificate or opinion need be furnished.

SECTION 1.3.   <u>Form of Documents Delivered to Indenture Trustee</u>.

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an officer of the Issuer delivered to the Indenture Trustee may be based, insofar as it relates to legal matters, upon an Opinion of Counsel, unless such officer knows that such Opinion of Counsel with respect to the matters upon which his/her certificate or opinion is based is erroneous.  Any such Officer's Certificate or opinion and any

3

Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of the Issuer as to such factual matters unless such officer or counsel knows that the certificate or opinion or representations with respect to such matters is erroneous. Any Opinion of Counsel may be based on the written opinion of other counsel, in which event such Opinion of Counsel shall be accompanied by a copy of such other counsel's opinion and shall include a statement to the effect that such other counsel believes that such counsel and the Indenture Trustee may reasonably rely upon the opinion of such other counsel.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Wherever in this Indenture, in connection with any application or certificate or report to the Indenture Trustee, it is provided that the Issuer shall deliver any document as a condition of the granting of such application, or as evidence of compliance with any term hereof, it is intended that the truth and accuracy, at the time of the granting of such application or at the effective date of such certificate or report (as the case may be), of the facts and opinions stated in such document shall in such case be conditions precedent to the right of the Issuer to have such application granted or to the sufficiency of such certificate or report. The foregoing shall not, however, be construed to affect the Indenture Trustee's right to rely upon the truth and accuracy of any statement or opinion contained in any such document as provided in Section 7.1(b) hereof.

Whenever in this Indenture it is provided that the absence of the occurrence and continuation of a Default, Event of Default or Servicer Event of Default is a condition precedent to the taking of any action by the Indenture Trustee at the request or direction of the Issuer, then, notwithstanding that the satisfaction of such condition is a condition precedent to the Issuer's right to make such request or direction, the Indenture Trustee shall be protected in acting in accordance with such request or direction if it does not have Knowledge of the occurrence and continuation of such event. For all purposes of this Indenture, the Indenture Trustee shall not be deemed to have Knowledge of any Default, Event of Default or Servicer Event of Default nor shall the Indenture Trustee have any duty to monitor or investigate to determine whether a default has occurred (other than an Event of Default of the kind described in Section 6.1(a) hereof) or Servicer Event of Default has occurred unless a Responsible Officer of the Indenture Trustee shall have Knowledge thereof or shall have been notified in writing thereof by the Issuer, the Servicer or any secured party.

SECTION 1.4.    Acts of Noteholders, etc.

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders in person or by agents duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Indenture Trustee and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein

4

sometimes referred to as the "**Act**" of the Noteholders signing such instrument or instruments.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and (subject to Section 7.1 hereof) conclusive in favor of the Indenture Trustee and the Issuer, if made in the manner provided in this Section 1.4.

(b)        The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof.  Where such execution is by a signer acting in a capacity other than his individual capacity, such certificate or affidavit shall also constitute sufficient proof of his authority.  The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner which the Indenture Trustee deems sufficient.

(c)        Any request, demand, authorization, direction, notice, consent, waiver or other Act of the holder of any Note shall bind every future holder of the same Note and the holder of every Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Indenture Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

(d)        By accepting the Notes issued pursuant to this Indenture, each Noteholder irrevocably appoints the Indenture Trustee hereunder as the special attorney-in-fact for such Noteholder vested with full power on behalf of such Noteholder to effect and enforce the rights of such Noteholder for the benefit of such Noteholder; provided, that nothing contained in this Section 1.4(d) shall be deemed to confer upon the Indenture Trustee any duty or power to vote on behalf of the Noteholders with respect to any matter on which the Noteholders have a right to vote pursuant to the terms of this Indenture.

SECTION 1.5.        Notice to Noteholders; Waiver.

(a)        Where this Indenture provides for notice to Noteholders of any event, or the mailing of any report to Noteholders, such notice or report shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, via first class mail, or sent by private courier or confirmable electronic means to each Noteholder affected by such event or to whom such report is required to be mailed, at its address as it appears in the Note Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice or the mailing of such report.  In any case where a notice or report to Noteholders is mailed, neither the failure to mail such notice or report, nor any defect in any notice or report so mailed, to any particular Noteholder shall affect the sufficiency of such notice or report with respect to other Noteholders.  Where this Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Noteholders shall be filed with the Indenture Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

5

(b)      In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to mail or send notice to Noteholders, in accordance with Section 1.5(a) hereof, of any event or any report to Noteholders when such notice or report is required to be delivered pursuant to any provision of this Indenture, then such notification or delivery as shall be made with the approval of the Indenture Trustee shall constitute a sufficient notification for every purpose hereunder.

SECTION 1.6.      Effect of Headings and Table of Contents.

The Article and Section headings herein and in the Table of Contents are for convenience only and shall not affect the construction hereof.

SECTION 1.7.      Successors and Assigns.

All covenants and agreements in this Indenture by each of the parties hereto shall bind its respective successors and permitted assigns, whether so expressed or not.

SECTION 1.8.      GOVERNING LAW.

**THIS INDENTURE AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK.  UNLESS MADE APPLICABLE IN A SUPPLEMENT HERETO, THIS INDENTURE IS NOT SUBJECT TO THE TRUST INDENTURE ACT OF 1939, AS AMENDED, AND SHALL NOT BE GOVERNED THEREBY AND CONSTRUED IN ACCORDANCE THEREWITH.**

SECTION 1.9.      Legal Holidays.

In any case where any Payment Date or the Stated Maturity or any other date on which principal of or interest on any Note is proposed to be paid shall not be a Business Day, then (notwithstanding any other provision of this Indenture or of the Notes) such payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on such Payment Date, Stated Maturity or other date on which principal of or interest on any Note is proposed to be paid; provided, that no penalty interest shall accrue for the period from and after such Payment Date, Stated Maturity, or any other date on which principal of or interest on any Note is proposed to be paid, as the case may be, until such next succeeding Business Day.

SECTION 1.10.      Signatures; Execution in Counterparts.

This Indenture shall be valid, binding, and enforceable against a party when executed and delivered by an authorized individual on behalf of the party by means of (a) an original manual signature; (b) a faxed, scanned, or photocopied manual signature, or (c) any other electronic signature permitted by the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, and/or any other relevant electronic signatures law, including any relevant provisions of the UCC (collectively,

6

"**Signature Law**"), in each case to the extent applicable.  Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature.  Each party hereto shall be entitled to conclusively rely upon, and shall have no liability with respect to, any electronic signature or faxed, scanned, or photocopied manual signature of any other party and shall have no duty to investigate, confirm or otherwise verify the validity or authenticity thereof.  This Indenture may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute one and the same instrument.  Notwithstanding the foregoing, with respect to any notice provided for in this Indenture or any instrument required or permitted to be delivered hereunder, any party hereto receiving or relying upon such notice or instrument shall be entitled to request execution thereof by original manual signature as a condition to the effectiveness thereof.  In case any provision in or obligation under this Indenture shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. If any party delivers this Agreement or any other certificate, agreement or document related to this transaction to the other parties using an electronic signature service, if requested by another party, such transmitting party will specify the signature service used by such party to the other parties in a separate writing. Any documentation with respect to transfer of the Notes or other securities presented to the Indenture Trustee or any transfer agent must contain original documents with manually executed signatures.

   SECTION 1.11. <u>Inspection</u>.

   The Issuer agrees that, on ten Business Days' prior notice (or, one Business Day's prior notice after the occurrence and during the continuance of an Event of Default or a Servicer Event of Default), it will permit the representatives of the Indenture Trustee or any Noteholder, during the Issuer's normal business hours, to examine all of the books of account, records, reports and other papers of the Issuer, to make copies thereof and extracts therefrom, and to discuss its affairs, finances and accounts with its designated officers, employees and independent accountants in the presence of such designated officers and employees (and by this provision the Issuer hereby authorizes its independent accountants to discuss with such representatives such affairs, finances and accounts), all at such reasonable times and as often as may be reasonably requested for the purpose of reviewing or evaluating the financial condition or affairs of the Issuer or the performance of and compliance with the covenants and undertakings of the Issuer and the Servicer in this Indenture or any of the other documents referred to herein or therein.  Any reasonable expense incident to the exercise by the Indenture Trustee at any time or any Noteholder during the continuance of any Default or Event of Default, of any right under this Section 1.11 shall be borne by the Issuer and distributed in accordance with Section 3.4 or Section 6.6 hereof, as applicable.  Nothing contained herein shall be construed as a duty of the Indenture Trustee to perform such inspection.

   SECTION 1.12. <u>Survival of Representations and Warranties</u>.

   The representations, warranties and certifications of the Issuer made in this Indenture or in any certificate or other writing delivered by the Issuer pursuant hereto shall survive the authentication and delivery of the Notes hereunder.

7

ARTICLE II.

THE NOTES

SECTION 2.1.      General Provisions.

(a)      Form of Notes.  The Notes shall be designated as the "BXG Receivables Note Trust 2020-A, Timeshare Loan-Backed Notes, Series 2020-A".  The Notes, together with their certificates of authentication, shall be in substantially the form set forth in Exhibit A attached hereto, with such appropriate insertions, omissions, substitutions and other variations as are required or are permitted by this Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may consistently herewith, be determined by the officer executing such Notes, as evidenced by such officer's execution of such Notes.

(b)      Denominations.  The Outstanding Note Balance of the Class A Notes, the Class B Notes and the Class C Notes which may be authenticated and delivered under this Indenture is limited to $48,621,000, $47,877,000 and $34,549,000, respectively.  The Notes shall be issuable only as registered Notes, without interest coupons, in the denominations of at least $50,000 and in integral multiples of $1,000; provided,  however, that the foregoing shall not restrict or prevent the transfer in accordance with Section 2.4 hereof of any Note with a remaining Outstanding Note Balance of less than $50,000.

(c)      Execution, Authentication, Delivery and Dating.  The Notes shall be manually executed by an Authorized Officer of the Owner Trustee on behalf of the Issuer.  Any Note bearing the signature of an individual who was at the time of execution thereof an Authorized Officer of the Owner Trustee on behalf of the Issuer shall bind the Issuer, notwithstanding that such individual ceases to hold such office prior to the authentication and delivery of such Note or did not hold such office at the date of such Note.  No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Note a certificate of authentication substantially in the form set forth in Exhibit A hereto, executed by the Indenture Trustee by manual signature, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.  Each Note shall be dated the date of its authentication.  The Notes may from time to time be executed by the Issuer and delivered to the Indenture Trustee for authentication together with an Issuer Order to the Indenture Trustee directing the authentication and delivery of such Notes and thereupon the same shall be authenticated and delivered by the Indenture Trustee in accordance with such Issuer Order.

SECTION 2.2.      Global Notes.

Each of the Notes, upon original issuance, shall be issued in the form of one or more book-entry global certificates (the "**Global Notes**" and each, a "**Global Note**") to be deposited with the Indenture Trustee as custodian for The Depository Trust Company, the initial Depository, by or on behalf of the Issuer.  The Notes sold to non-U.S. persons (as defined in Regulation S) in offshore transactions in reliance on Regulation S will be represented by one or more temporary Global Notes (each, a "**Temporary Regulation S Global Notes**").  Upon the

8

expiration of the Restricted Period, interests in a Temporary Regulation S Global Note will be exchangeable for interests in permanent Global Notes of the same Class (together with a Temporary Regulation S Global Note, a "**Regulation S Global Note**").  The Notes sold to U.S. Persons which are Qualified Institutional Buyers or, with respect to the Closing Date, Institutional Accredited Investors, will be represented by one or more temporary Global Notes (each, a "**Rule 144A Global Note**").  All Global Notes shall be initially registered on the Note Register in the name of Cede & Co., the nominee of The Depository Trust Company, and no Note Owner will receive a definitive note (a "**Definitive Note**") representing such Note Owner's interest in the related Class of Notes, except as provided in Section 2.3 hereof.  Unless and until Definitive Notes have been issued in respect of a Class of Notes pursuant to Section 2.3 hereof:

        (a)      the provisions of this Section 2.2 shall be in full force and effect with respect to such Class of Notes;

        (b)      the Issuer, the Servicer and the Indenture Trustee may deal with the Depository and the Depository Participants for all purposes with respect to such Notes (including the making of distributions on such Notes) as the authorized representatives of the respective Note Owners;

        (c)      to the extent that the provisions of this Section 2.2 conflict with any other provisions of this Indenture, the provisions of this Section 2.2 shall control; and

        (d)      the rights of the respective Note Owners of a Class of Notes shall be exercised only through the Depository and the Depository Participants and shall be limited to those established by law and agreements between the respective Note Owners and the Depository and/or the Depository Participants.  Pursuant to the Depository Agreement, unless and until Definitive Notes are issued in respect of the Notes pursuant to Section 2.3 hereof, the Depository will make book-entry transfers among the Depository Participants and receive and transmit distributions of principal of, and interest on, the Notes to the Depository Participants.

      SECTION 2.3.    <u>Definitive Notes</u>.

        If (a) the Issuer advises the Indenture Trustee in writing that the Depository is no longer willing or able to properly discharge its responsibilities as Depository with respect to the Global Notes and the Indenture Trustee or the Issuer is unable to locate a qualified successor, (b) the Issuer, at its sole option, elects to terminate the book-entry system through the Depository with respect to any or all Classes of Notes or (c) after the occurrence of an Event of Default, Note Owners (other than Bluegreen or an Affiliate thereof) evidencing not less than 66-2/3% of the then Adjusted Note Balance of such Class of Global Notes, advise the Indenture Trustee and the Depository through the Depository Participants in writing that the continuation of a book-entry system with respect to such Class of Global Notes, through the Depository is no longer in the best interest of such Note Owners, the Indenture Trustee shall use its best efforts to notify all affected Note Owners through the Depository of the occurrence of any such event and of the availability of Definitive Notes to such Note Owners.  Neither the Issuer nor the Indenture Trustee shall be liable for any delay in delivery of such instructions and may conclusively rely on, and shall be protected in relying on, such instructions.  Upon the issuance of Definitive Notes, the Issuer, the Indenture Trustee, the Note Registrar and the Servicer shall recognize

9

holders of Definitive Notes as Noteholders hereunder.  Upon the issuance of Definitive Notes, all references herein to obligations imposed upon or to be performed by the Depository shall be deemed to be imposed upon and performed by the Indenture Trustee, to the extent applicable with respect to such Definitive Notes.

SECTION 2.4.    Registration, Transfer and Exchange of Notes.

(a)    The Issuer shall cause to be kept at the Corporate Trust Office a register (the "**Note Register**") for the registration, transfer and exchange of Notes.  The Indenture Trustee is hereby appointed "Note Registrar" for purposes of registering Notes and transfers of Notes as herein provided.  The names and addresses of all Noteholders and the names and addresses of the transferees of any Notes shall be registered in the Note Register; provided, however, in no event shall the Note Registrar be required to maintain in the Note Register the names of the individual participants holding Notes through the Depository.  The Person in whose name any Note is so registered shall be deemed and treated as the sole owner and Noteholder thereof for all purposes of this Indenture and the Note Registrar, the Issuer, the Indenture Trustee, the Servicer and any agent of any of them shall not be affected by any notice or knowledge to the contrary.  A Definitive Note is transferable or exchangeable only upon the surrender of such Note to the Note Registrar at the Corporate Trust Office together with an assignment and transfer (executed by the Noteholder or his duly authorized attorney), subject to the applicable requirements of this Section 2.4.  Upon request of the Issuer, the Indenture Trustee or the Servicer, the Note Registrar shall provide the Issuer, the Indenture Trustee or the Servicer, as applicable, with the names and addresses of the Noteholders.  The Notes are intended to be obligations in registered form for purposes of Section 163(f), Section 871(h)(2) and Section 881(c)(2) of the Code.

(b)    Upon surrender for registration of transfer of any Definitive Note, subject to the applicable requirements of this Section 2.4, the Issuer shall execute and the Indenture Trustee shall duly authenticate in the name of the designated transferee or transferees, one or more Notes in denominations of a like aggregate denomination as the Definitive Note being surrendered.  Each Note surrendered for registration of transfer shall be canceled and consequently destroyed by the Note Registrar.  Each new Note issued pursuant to this Section 2.4 shall be registered in the name of any Person and in the form of Definitive Notes in one of the appropriate forms as the transferring Noteholder may request, subject to the applicable provisions of this Section 2.4.  All Notes issued upon any registration of transfer or exchange of Notes shall be entitled to the same benefits under this Indenture as the Notes surrendered upon such registration of transfer or exchange.

(c)    The issuance of the Notes will not be registered or qualified under the Securities Act or the securities laws of any state.  No resale or transfer of any Note or any interest therein may be made unless such resale or transfer is made pursuant to an effective registration statement under the Securities Act and an effective registration or a qualification under applicable state securities laws, or is made in a transaction that does not require such registration or qualification because such transfer satisfies one of the following: (i) such resale or transfer is in compliance with Rule 144A under the Securities Act to a person who the transferor reasonably believes is a Qualified Institutional Buyer that is purchasing for its own account or for the account of a Qualified Institutional Buyer and to whom notice is given that such resale or

10

transfer is being made in reliance upon Rule 144A under the Securities Act (or, on the Closing Date, Institutional Accredited Investors) as certified by such transferee (other than the Initial Purchasers and their respective initial transferees) in a letter in the form of <u>Exhibit B</u> hereto; (ii) such resale or transfer is in compliance with Regulation S under the Securities Act as certified by such transferee (other than the Initial Purchasers and their respective initial transferees) in a letter in the form of <u>Exhibit B</u> hereto; or (iii) after the appropriate holding period, such resale or transfer is pursuant to an exemption from registration under the Securities Act provided by Rule 144 under the Securities Act, in each case, in accordance with any applicable securities laws of any state of the United States and any other applicable jurisdiction.  Each transferee and each subsequent transferee will be required to notify any subsequent purchaser of such Notes from it of the resale restrictions described herein.  None of the Issuer, the Servicer or the Indenture Trustee is obligated to register or qualify the Notes under the Securities Act or any other securities law or to take any action not otherwise required under this Indenture to permit the transfer of any Note without registration.

(d)     In addition to the applicable provisions of this Section 2.4 and the rules of the Depository, the exchange, transfer and registration of transfer of Global Notes or interests therein shall only be made in accordance with this Section 2.4(d).

(i)     <u>Rule 144A Global Note to Temporary Regulation S Global Note During the Restricted Period</u>.  If, during the Restricted Period, a Note Owner of an interest in a Rule 144A Global Note wishes at any time to transfer its beneficial interest in such Rule 144A Global Note to a Person who wishes to take delivery thereof in the form of a beneficial interest in a Temporary Regulation S Global Note, such Note Owner may, in addition to complying with all applicable rules and procedures of the Depository and Clearstream or Euroclear applicable to transfers by their respective participants (the "**Applicable Procedures**"), transfer or cause the transfer of such beneficial interest for an equivalent beneficial interest in the Temporary Regulation S Global Note only upon compliance with the provisions of this Section 2.4(d)(i).  Upon receipt by the Note Registrar at its Corporate Trust Office of (A) written instructions given in accordance with the Applicable Procedures from a Depository Participant directing the Note Registrar to credit or cause to be credited to another specified Depository Participant's account a beneficial interest in the Temporary Regulation S Global Note in an amount equal to the denomination of the beneficial interest in the Rule 144A Global Note to be transferred, (B) a written order given in accordance with the Applicable Procedures containing information regarding the account of the Depository Participant to be credited with, and the account of the Depository Participant to be debited for, such beneficial interest, and (C) a certification in the form of <u>Exhibit C</u> hereto given by the Note Owner that is transferring such interest, the Note Registrar shall instruct the Depository, to reduce the denomination of the Rule 144A Global Note by the denomination of the beneficial interest in the Rule 144A Global Note to be so transferred and, concurrently with such reduction, to increase the denomination of the Temporary Regulation S Global Note by the denomination of the beneficial interest in the Rule 144A Global Note to be so transferred, and to credit or cause to be credited to the account of the Person specified in such instructions (who shall be a Depository Participant acting for or on behalf of Euroclear or Clearstream, or both, as the case may be) a beneficial interest in the

11

Temporary Regulation S Global Note having a denomination equal to the amount by which the denomination of the Rule 144A Global Note was reduced upon such transfer.

(ii)    <u>Rule 144A Global Note to Regulation S Global Note After the Restricted Period</u>.    If, after the Restricted Period, a Note Owner of an interest in a Rule 144A Global Note wishes at any time to transfer its beneficial interest in such Rule 144A Global Note to a Person who wishes to take delivery thereof in the form of a beneficial interest in a Regulation S Global Note, such Note Owner may, in addition to complying with all Applicable Procedures, transfer or cause the transfer of such beneficial interest for an equivalent beneficial interest in a Regulation S Global Note only upon compliance with the provisions of this Section 2.4(d)(ii). Upon receipt by the Note Registrar at its Corporate Trust Office of (A) written instructions given in accordance with the Applicable Procedures from a Depository Participant directing the Note Registrar to credit or cause to be credited to another specified Depository Participant's account a beneficial interest in the Regulation S Global Note in an amount equal to the denomination of the beneficial interest in the Rule 144A Global Note to be transferred, (B) a written order given in accordance with the Applicable Procedures containing information regarding the account of the Depository Participant (and, the Euroclear or Clearstream account, as the case may be) to be credited with, and the account of the Depository Participant to be debited for, such beneficial interest, and (C) a certification in the form of <u>Exhibit D</u> hereto given by the Note Owner that is transferring such interest, the Note Registrar shall instruct the Depository, to reduce the denomination of the Rule 144A Global Note by the aggregate denomination of the beneficial interest in the Rule 144A Global Note to be so transferred and, concurrently with such reduction, to increase the denomination of the Regulation S Global Note by the aggregate denomination of the beneficial interest in the Rule 144A Global Note to be so transferred, and to credit or cause to be credited to the account of the Person specified in such instructions (who shall be a Depository Participant acting for or on behalf of Euroclear or Clearstream, or both, as the case may be) a beneficial interest in the Regulation S Global Note having a denomination equal to the amount by which the denomination of the Rule 144A Global Note was reduced upon such transfer.

(iii)    <u>Regulation S Global Note to Rule 144A Global Note</u>.    If the Note Owner of an interest in a Regulation S Global Note wishes at any time to transfer its beneficial interest in such Regulation S Global Note to a Person who wishes to take delivery thereof in the form of a beneficial interest in a Rule 144A Global Note, such holder may, in addition to complying with all Applicable Procedures, transfer or cause the transfer of such beneficial interest for an equivalent beneficial interest in a Rule 144A Global Note only upon compliance with the provisions of this Section 2.4(d)(iii). Upon receipt by the Note Registrar at its Corporate Trust Office of (A) written instructions given in accordance with the Applicable Procedures from a Depository Participant directing the Note Registrar to credit or cause to be credited to another specified Depository Participant's account a beneficial interest in the Rule 144A Global Note in an amount equal to the denomination of the beneficial interest in the Regulation S Global Note to be transferred, (B) a written order given in accordance with the Applicable Procedures containing information regarding the account of the Depository Participant to be credited with, and the account of the Depository Participant (or, if such account is held for

12

Euroclear or Clearstream, the Euroclear or Clearstream account, as the case may be) to be debited for such beneficial interest, and (C) with respect to a transfer of a beneficial interest in the Regulation S Global Note for a beneficial interest in the related Rule 144A Global Note (x) during the Restricted Period, a certification in the form of <u>Exhibit E</u> hereto given by the Note Owner, or (y) after the Restricted Period, an Investment Representation Letter in the form of <u>Exhibit B</u> hereto from the transferee to the effect that such transferee is a Qualified Institutional Buyer, the Note Registrar shall instruct the Depository to reduce the denomination of the Regulation S Global Note by the denomination of the beneficial interest in the Regulation S Global Note to be transferred, and, concurrently with such reduction, to increase the denomination of the Rule 144A Global Note by the aggregate denomination of the beneficial interest in the Regulation S Global Note to be so transferred, and to credit or cause to be credited to the account of the Person specified in such instructions (who shall be a Depository Participant acting for or on behalf of Euroclear or Clearstream, or both, as the case may be) a beneficial interest in the Rule 144A Global Note having a denomination equal to the amount by which the denomination of the Regulation S Global Note was reduced upon such transfer.

(iv) <u>Transfers Within Regulation S Global Notes During Restricted Period</u>.   If, during the Restricted Period, the Note Owner of an interest in a Regulation S Global Note wishes at any time to transfer its beneficial interest in such Note to a Person who wishes to take delivery thereof in the form of a Regulation S Global Note, such Note Owner may transfer or cause the transfer of such beneficial interest for an equivalent beneficial interest in such Regulation S Global Note only upon compliance with the provisions of this Section 2.4(d)(iv) and all Applicable Procedures.  Upon receipt by the Note Registrar at its Corporate Trust Office of (A) written instructions given in accordance with the Applicable Procedures from a Depository Participant directing the Note Registrar to credit or cause to be credited to another specified Depository Participant's account a beneficial interest in such Regulation S Global Note in an amount equal to the denomination of the beneficial interest to be transferred, (B) a written order given in accordance with the Applicable Procedures containing information regarding the account of the Depository Participant to be credited with, and the account of the Depository Participant (or, if such account is held for Euroclear or Clearstream, the Euroclear or Clearstream account, as the case may be) to be debited for, such beneficial interest and (C) a certification in the form of <u>Exhibit F</u> hereto given by the transferee, the Note Registrar shall instruct the Depository to credit or cause to be credited to the account of the Person specified in such instructions (who shall be a Depository Participant acting for or on behalf of Euroclear or Clearstream, or both, as the case may be) a beneficial interest in the Regulation S Global Note having a denomination equal to the amount specified in such instructions by which the account to be debited was reduced upon such transfer.

(e) No resale or other transfer of any Note or any interest therein may be made to any purchaser or transferee unless (i) such purchaser or transferee is not, and will not acquire such Note or any interest therein on behalf of or with the assets of, any Benefit Plan or (ii) no "prohibited transaction" under ERISA or Section 4975 of the Code that is not subject to a statutory, regulatory or administrative exemption and no violation of any substantially similar provision of federal, state or local law will occur in connection with purchaser's or such transferee's acquisition, holding or disposition of such Note or any interest therein.  In addition,

13

neither the Notes nor any interest therein may be purchased by or transferred to any Benefit Plan or person acting on behalf of or with assets of any Benefit Plan unless it represents that it is not sponsored (within the meaning of Section 3(16)(B) of ERISA) by the Issuer, the Depositor, the Originators, the Servicer, the Indenture Trustee, the Owner Trustee, the Administrator, the Paying Agent, the Custodian, the Backup Servicer, the Lockbox Bank or the Initial Purchasers, or by any Affiliate of any such Person.

(f)     No fee or service charge shall be imposed by the Note Registrar for its services in respect of any registration of transfer or exchange referred to in this Section 2.4.  The Note Registrar may require payment by each transferor of a sum sufficient to cover any tax, expense or other governmental charge payable in connection with any such transfer.

(g)     None of the Issuer, the Indenture Trustee, the Servicer or the Note Registrar is obligated to register or qualify the Notes under the Securities Act or any other securities law or to take any action not otherwise required under this Indenture to permit the transfer of such Notes without registration or qualification.  Any such Noteholder desiring to effect such transfer shall, and does hereby agree to, indemnify the Issuer, the Indenture Trustee, the Servicer and the Note Registrar against any loss, liability or expense that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.

(h)     The Servicer agrees to cause the Issuer, and the Issuer agrees to provide to the Indenture Trustee such information as required under Rule 144A(d)(4) under the Securities Act so as to allow resales of Notes to Qualified Institutional Buyers in accordance herewith.

(i)     The Notes represent the sole obligation of the Issuer payable from the Trust Estate and do not represent the obligations of the Originators, the Servicer, the Depositor, the Backup Servicer, the Owner Trustee, the Indenture Trustee, the Administrator or the Custodian.

(j)     The Issuer may not, at any time, own any Class of Notes.

(k)     Each Note Owner, by its acceptance of its beneficial interest in a Note, will be deemed to have acknowledged, represented to and agreed with the Issuer and the Initial Purchasers, each of the statements set forth in items 1 through 11 of <u>Exhibit B</u> hereto.

SECTION 2.5.     <u>Mutilated, Destroyed, Lost and Stolen Notes</u>.

(a)     If any mutilated Note is surrendered to the Indenture Trustee, the Issuer shall execute and the Indenture Trustee shall authenticate and deliver in exchange therefor a replacement Note of like tenor and principal amount and bearing a number not contemporaneously outstanding.

(b)     If there shall be delivered to the Issuer and the Indenture Trustee (i) evidence to their satisfaction of the destruction, loss or theft of any Note and (ii) such security or indemnity as may be reasonably required by them to save each of them and any agent of either of them harmless then, in the absence of actual notice to the Issuer or the Indenture Trustee that such Note has been acquired by a bona fide purchaser, the Issuer shall execute and upon its request the Indenture Trustee shall authenticate and deliver, in lieu of any such destroyed, lost or

14

stolen Note, a replacement Note of like tenor and principal amount and bearing a number not contemporaneously outstanding.

(c)     In case the final installment of principal on any such mutilated, destroyed, lost or stolen Note has become or will at the next Payment Date become due and payable, the Issuer, in its discretion, may, instead of issuing a replacement Note, pay such Note.

(d)     Upon the issuance of any replacement Note under this Section 2.5, the Issuer or the Indenture Trustee may require the payment by the Noteholder of a sum sufficient to cover any tax or other governmental charge that may be imposed as a result of the issuance of such replacement Note.

(e)     Every replacement Note issued pursuant to this Section 2.5 in lieu of any destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Issuer, whether or not the destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

(f)     The provisions of this Section 2.5 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

SECTION 2.6.     Payment of Interest and Principal; Rights Preserved.

(a)     Any installment of interest or principal, payable on any Note that is punctually paid or duly provided for by or on behalf of the Issuer on the applicable Payment Date shall be paid to the Person in whose name such Note was registered at the close of business on the Record Date for such Payment Date by check mailed to the address specified in the Note Register, or if a Noteholder has provided wire transfer instructions to the Indenture Trustee at least five Business Days prior to the applicable Payment Date, upon the request of a Noteholder, by wire transfer of federal funds to the account and number specified in the Note Register, in each case on such Record Date for such Person (which shall be, as to each original purchaser of the Notes, the account and number specified by such purchaser to the Indenture Trustee in writing, or, if no such account or number is so specified, then by check mailed to such Person's address as it appears in the Note Register on such Record Date).

(b)     All reductions in the principal amount of a Note effected by payments of principal made on any Payment Date shall be binding upon all Noteholders of such Note and of any Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.  All payments on the Notes shall be paid without any requirement of presentment, but each Noteholder of any Note shall be deemed to agree, by its acceptance of the same, to surrender such Note at the Corporate Trust Office within 30 days after receipt of the final principal payment of such Note.  Payment at or following the Stated Maturity of any Definitive Note, however, will be made only upon presentation and surrender of such Definitive Note at the office or agency specified in the notice of final payment mailed to the Noteholders, including the office of any paying agent specified in such notice.

15

(c)     All outstanding principal of each Note (unless sooner paid) will be due and payable on the Stated Maturity of such Note.

SECTION 2.7.     <u>Persons Deemed Owners</u>.

Prior to due presentment of a Note for registration of transfer, the Issuer, the Indenture Trustee, and any agent of the Issuer or the Indenture Trustee may treat the registered Noteholder as the owner of such Note for the purpose of receiving payment of principal of and interest on such Note and for all other purposes whatsoever, whether or not payment on such Note is overdue, and neither the Issuer, the Indenture Trustee, nor any agent of the Issuer or the Indenture Trustee shall be affected by notice to the contrary.

SECTION 2.8.     <u>Cancellation</u>.

All Notes surrendered for registration of transfer or exchange or following final payment shall, if surrendered to any Person other than the Indenture Trustee, be delivered to the Indenture Trustee and shall be promptly canceled by it.  The Issuer may at any time deliver to the Indenture Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Issuer may have acquired in any manner whatsoever, and all Notes so delivered shall be promptly canceled by the Indenture Trustee.  No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.8, except as expressly permitted by this Indenture.  All canceled Notes held by the Indenture Trustee may be disposed of in the normal course of its business or as directed by an Issuer Order.

SECTION 2.9.     <u>Noteholder Lists</u>.

The Indenture Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of the Noteholders.  In the event the Indenture Trustee no longer serves as the Note Registrar, the Issuer (or any other obligor upon the Notes) shall furnish to the Indenture Trustee at least five Business Days before each Payment Date (and in all events in intervals of not more than six months) and at such other times as the Indenture Trustee may request in writing a list in such form and as of such date as the Indenture Trustee may reasonably require of the names and addresses of the Noteholders.

SECTION 2.10.     <u>Treasury Notes</u>.

In determining whether the Noteholders of the required Outstanding Note Balance  or the Adjusted Note Balance of the Notes have concurred in any direction, waiver or consent, Notes held or redeemed by the Issuer or any other obligor in respect of the Notes or held by an Affiliate of the Issuer or such other obligor shall be considered as though not Outstanding, except that for the purposes of determining whether the Indenture Trustee shall be protected in relying on any such direction, waiver or consent, only Notes which a Responsible Officer of the Indenture Trustee knows are so owned shall be so disregarded.

SECTION 2.11.     <u>Notice to Depository</u>.

Whenever notice or other communication to the holders of Global Notes is required under this Indenture, unless and until Definitive Notes have been issued to the related

16

Note Owners pursuant to Section 2.3 hereof, the Indenture Trustee shall give all such notices and communications specified herein to be given to such Note Owners to the Depository.

SECTION 2.12.   <u>Confidentiality</u>.

Each Noteholder, by acceptance of a Note, agrees and covenants that it shall hold in confidence all Confidential Information; <u>provided</u>, <u>however</u>, that any Noteholder may deliver or disclose Confidential Information to (i) its directors, officers, trustees, managers, employees, agents, attorneys and affiliates (to the extent such disclosure reasonably relates to the investment represented by the Notes), (ii) its financial advisors and other professional advisors who agree to hold confidential such information substantially in accordance with the terms of this Section 2.12, (iii) any other Noteholder, (iv) any institutional investor to which such Noteholder sells or offers to sell such Note or any part thereof or any participation therein (if such Person has agreed in writing prior to its receipt of such confidential information to be bound by the provisions of this Section 2.12), (v) any federal or state regulatory authority having jurisdiction over such Noteholder, (vi) the National Association of Insurance Commissioners or any similar organization, or any nationally recognized rating agencies that requires access to information about such Noteholder's investment portfolio, (vii) the Rating Agencies or (viii) any other Person to which such delivery or disclosure may be necessary or appropriate (w) to effect compliance with any law, rule, regulation or order applicable to such Noteholder, (x) in response to any subpoena or other legal process, (y) in connection with any litigation to which such Noteholder is a party or (z) if an Event of Default has occurred and is continuing, to the extent such Noteholder may reasonably determine such delivery and disclosure to be necessary or appropriate in the enforcement or for the protection of the rights and remedies under the Notes and the Transaction Documents.

ARTICLE III.

ACCOUNTS; COLLECTION AND
APPLICATION OF MONEYS; REPORTS

SECTION 3.1.   <u>Trust Accounts; Investments by Indenture Trustee</u>.

(a)   On or before the Closing Date, the Paying Agent on behalf of the Indenture Trustee shall establish in the name of the Indenture Trustee for the benefit of the Noteholders or, in the case of the Lockbox Account, in the name of the Issuer, as provided in this Indenture, the Trust Accounts, which accounts shall be Eligible Bank Accounts.

Subject to the further provisions of this Section 3.1(a), the Indenture Trustee shall, upon receipt or upon transfer from another account, as the case may be, deposit into such Trust Accounts all amounts and Eligible Investments received by it which are required to be deposited therein in accordance with the provisions of this Indenture.  All such amounts and all investments made with such amounts, including all income and other gain from such investments, shall be held by the Paying Agent in such accounts as part of the Trust Estate as herein provided, subject to withdrawal by the Paying Agent in accordance with, and for the purposes specified in the provisions of, this Indenture.

17

(b)     The Indenture Trustee shall assume that any amount remitted to it in respect of the Trust Estate is to be deposited into the Collection Account pursuant to Section 3.2(a) hereof unless a Responsible Officer of the Indenture Trustee receives written instructions from the Servicer to the contrary.

(c)     None of the parties hereto shall have any right of set-off with respect to any Trust Account or any investment therein.

(d)     So long as no Event of Default shall have occurred and be continuing, all or a portion of the amounts in any Trust Account (other than the Lockbox Account) shall be invested and reinvested by the Indenture Trustee pursuant to an Issuer Order in one or more Eligible Investments.  Subject to the restrictions on the maturity of investments set forth in Section 3.1(f) hereof, each such Issuer Order may authorize the Indenture Trustee to make the specific Eligible Investments set forth therein, to make Eligible Investments from time to time consistent with the general instructions set forth therein, in each case, in such amounts as such Issuer Order may specify.  Until an Issuer Order to the contrary is delivered, the Indenture Trustee shall make the Eligible Investments set forth in Exhibit A to the Administration Agreement.

(e)     In the event that either (i) the Issuer shall have failed to give investment directions to the Indenture Trustee by 9:30 A.M., New York City time on any Business Day on which there may be uninvested cash or (ii) an Event of Default shall be continuing, the Indenture Trustee shall promptly invest and reinvest the funds then in the designated Trust Account to the fullest extent practicable in those obligations or securities described in clause (e) of the definition of "Eligible Investments".  All investments made by the Indenture Trustee shall mature no later than the maturity date therefor permitted by Section 3.1(f) hereof.

(f)     No investment of any amount held in any Trust Account shall mature later than the Business Day immediately preceding the Payment Date which is scheduled to occur immediately following the date of investment.  All income or other gains (net of losses) from the investment of moneys deposited in any Trust Account shall be deposited by the Indenture Trustee in such account promptly upon receipt.

(g)     Subject to Section 3.1(d) hereof, any investment of any funds in any Trust Account shall be made under the following terms and conditions:

(i)     each such investment shall be made or transferred in the name of the Indenture Trustee, in each case in such manner as shall be necessary to maintain the identity of such investments as assets of the Trust Estate; and

(ii)     any certificate or other instrument evidencing such investment shall be delivered directly to the Indenture Trustee, and the Indenture Trustee shall have sole possession of such instrument, and all income on such investment.

(h)     Neither the Indenture Trustee nor the Paying Agent shall be held liable by reason of any insufficiency in any Trust Account resulting from losses on investments made or transferred in accordance with the provisions of this Section 3.1 including, but not limited to, losses resulting from the sale or depreciation in the market value of such investments (but the

18

institution serving as Indenture Trustee or Paying Agent shall at all times remain liable for its own obligations, if any, constituting part of such investments). Neither the Indenture Trustee nor the Paying Agent shall be liable for any investment or liquidation of an investment made by it in accordance with this Section 3.1 on the grounds that it could have made a more favorable investment or a more favorable selection for sale of an investment.

(i)     If at any time a Trust Account shall cease to be an Eligible Bank Account, the Paying Agent on behalf of the Indenture Trustee shall, within 30 days, establish a new Trust Account that is an Eligible Bank Account. The 30-day period may be extended an additional 30 days if the Indenture Trustee provides to each Rating Agency an action plan prior to expiration of the entire 30-day period.

(j)     The parties agree that each Trust Account (other than the Lockbox Account) is a "securities account" within the meaning of Article 8 of the UCC and that all property (including without limitation all uninvested funds, securities and other investment property) at any time deposited or carried in or credited to the Trust Accounts (other than the Lockbox Account) shall be treated as "financial assets" within the meaning of Article 8 of the UCC. The parties agree that (i) U.S. Bank National Association shall be acting as "securities intermediary" within the meaning of Article 8 of the UCC and will at all times act in such capacity with respect to the Trust Accounts and (ii) the Indenture Trustee is the entitlement holder of the Trust Accounts (other than the Lockbox Account). The parties agree that U.S. Bank National Association as "securities intermediary" shall follow all "entitlement orders" (as such term is defined in Article 8 of the UCC) originated by the Indenture Trustee with respect to the Trust Accounts (other than the Lockbox Account) and all financial assets deposited or carried in or credited to any Trust Account (other than the Lockbox Account). The parties agree that the "securities intermediary's jurisdiction", within the meaning of Section 8-110 of the UCC with respect to security entitlements to financial assets credited to the Trust Accounts (other than the Lockbox Account) shall be the State of New York.

SECTION 3.2.     Establishment and Administration of the Trust Accounts.

(a)     Collection Account. The Issuer hereby directs and the Paying Agent on behalf of the Indenture Trustee hereby agrees to cause to be established and maintained an account (the "**Collection Account**") for the benefit of the Noteholders. The Collection Account shall be an Eligible Bank Account initially established at the corporate trust department of the Indenture Trustee, bearing the following designation "BXG Receivables Note Trust 2020-A, Timeshare Loan-Backed Notes, Series 2020-A — Collection Account, U.S. Bank National Association, as Indenture Trustee for the benefit of the Noteholders". The Indenture Trustee on behalf of the Noteholders shall possess all right, title and interest in all funds on deposit from time to time in the Collection Account and in all proceeds thereof. The Collection Account shall be under the sole dominion and control of the Indenture Trustee for the benefit of the Noteholders as their interests appear in the Trust Estate. If, at any time, the Collection Account ceases to be an Eligible Bank Account, the Paying Agent on behalf of the Indenture Trustee shall, in accordance with Section 3.1(i) hereof, establish a new Collection Account (which if not maintained by the Paying Agent on behalf of the Indenture Trustee is subject to an account control agreement satisfactory to the Indenture Trustee) which shall be an Eligible Bank Account, transfer any cash and/or any investments to such new Collection Account, and from the

19

date such new Collection Account is established, it shall be the "Collection Account". The Indenture Trustee agrees to promptly deposit any amounts received by it into the Collection Account. Amounts on deposit in the Collection Account shall be invested in accordance with Section 3.1 hereof. Withdrawals and payments from the Collection Account will be made on each Payment Date as provided in Section 3.4 or Section 6.6 hereof, as applicable. The Paying Agent, at the written direction of the Servicer, shall withdraw (no more than once per calendar week) from the Collection Account and return to the Servicer or as directed by the Servicer, any amounts which (i) were mistakenly deposited in the Collection Account, including, without limitation, amounts representing Misdirected Deposits or (ii) represent Additional Servicing Compensation. The Paying Agent may conclusively rely on such written direction.

(b)      <u>General Reserve Account</u>. The Issuer hereby directs and the Paying Agent on behalf of the Indenture Trustee hereby agrees to cause to be established and maintained an account (the "**General Reserve Account**") for the benefit of the Noteholders. On the Closing Date, the Indenture Trustee shall deposit, from the proceeds from the sale of the Notes, an amount equal to the General Reserve Account Initial Deposit. The General Reserve Account shall be an Eligible Bank Account initially established at the corporate trust department of the Indenture Trustee, bearing the following designation "BXG Receivables Note Trust 2020-A, Timeshare Loan-Backed Notes, Series 2020-A — General Reserve Account, U.S. Bank National Association, as Indenture Trustee for the benefit of the Noteholders". The Indenture Trustee on behalf of the Noteholders shall possess all right, title and interest in all funds on deposit from time to time in the General Reserve Account and in all proceeds thereof. The General Reserve Account shall be under the sole dominion and control of the Indenture Trustee for the benefit of the Noteholders as their interests appear in the Trust Estate. If, at any time, the General Reserve Account ceases to be an Eligible Bank Account, the Paying Agent on behalf of the Indenture Trustee shall, in accordance with Section 3.1(i) hereof, establish a new General Reserve Account (which if not maintained by the Paying Agent on behalf of the Indenture Trustee is subject to an account control agreement satisfactory to the Indenture Trustee) which shall be an Eligible Bank Account, transfer any cash and/or any investments to such new General Reserve Account and from the date such new General Reserve Account is established, it shall be the "General Reserve Account". Amounts on deposit in the General Reserve Account shall be invested in accordance with Section 3.1 hereof. Deposits to the General Reserve Account shall be made in accordance with Section 3.4 hereof. Withdrawals and payments from the General Reserve Account shall be made in the following manner:

(i)      <u>Withdrawals</u>. Subject to Sections 3.2(b)(ii) and (iii) hereof, if on any Payment Date, Available Funds (without giving effect to any deposit from the General Reserve Account) would be insufficient to pay any portion of the Required Payments on such Payment Date, the Paying Agent shall, solely based on the Monthly Servicer Report, withdraw from the General Reserve Account an amount equal to the lesser of such insufficiency and the amount on deposit in the General Reserve Account and deposit such amount into the Collection Account.

(ii)      <u>Trigger Event or Sequential Pay Event</u>. Upon the occurrence of a Trigger Event or Sequential Pay Event, the Paying Agent shall withdraw all amounts on deposit in the General Reserve Account and shall deposit such amounts

20

into the Collection Account for distribution in accordance with Section 3.4 or Section 6.6 hereof, as applicable.

(iii)  <u>Stated Maturity or Payment in Full</u>.  On the earlier to occur of the Stated Maturity and the Payment Date on which the Outstanding Note Balance of all Classes of Notes will be reduced to zero, the Paying Agent shall withdraw all amounts on deposit in the General Reserve Account and shall deposit such amounts into the Collection Account for distribution in accordance with Section 3.4 or Section 6.6 hereof, as applicable.

(iv)  <u>Amounts in Excess of General Reserve Account Required Balance</u>.  If amounts on deposit in the General Reserve Account are greater than the General Reserve Account Required Balance (after giving effect to all other distributions and disbursements on such Payment Date), the Paying Agent shall, based on the Monthly Servicer Report, withdraw funds in excess of the General Reserve Account Required Balance from the General Reserve Account and disburse such amounts to the Certificate Distribution Account to be distributed in accordance with the Trust Agreement.

(c)  <u>Prefunding Account</u>.  The Issuer hereby directs and the Indenture Trustee and Paying Agent hereby agree that the Paying Agent on behalf of the Indenture Trustee will establish and maintain an account (the "**Prefunding Account**") for the benefit of the Noteholders.  On the Closing Date, the Issuer shall cause the Indenture Trustee to deposit into the Prefunding Account an amount equal to the Prefunding Amount Initial Deposit.  The Prefunding Account shall be an Eligible Bank Account initially established at the corporate trust department of the Indenture Trustee, bearing the following designation "BXG Receivables Note Trust 2020-A, Timeshare Loan-Backed Notes, Series 2020-A — Prefunding Account, U.S. Bank National Association, as Indenture Trustee for the benefit of the Noteholders".  The Indenture Trustee on behalf of the Noteholders shall possess all right, title and interest in all funds on deposit from time to time in the Prefunding Account and in all proceeds thereof.  The Prefunding Account shall be under the sole dominion and control of the Indenture Trustee for the benefit of the Noteholders as their interests appear in the Trust Estate.  If, at any time, the Prefunding Account ceases to be an Eligible Bank Account, the Paying Agent on behalf of the Indenture Trustee shall, in accordance with Section 3.1(i) hereof, establish a new Prefunding Account (which if not maintained by the Indenture Trustee is subject to an account control agreement satisfactory to the Indenture Trustee) which shall be an Eligible Bank Account, transfer any cash and/or any investments to such new Prefunding Account and from the date such new Prefunding Account is established, it shall be the "Prefunding Account".  Amounts on deposit in the Prefunding Account shall be invested in accordance with Section 3.1 hereof.  Withdrawals and payments from the Prefunding Account shall be made in the following manner:

(i)  <u>Prefunding Period</u>. At or before 9:00 A.M. New York City time, on each Transfer Date for a transfer of Subsequent Timeshare Loans, (x) the Depositor shall instruct Paying Agent in writing to withdraw the cash portion of the purchase price from the Prefunding Account which is an amount equal to 88% of the Cut-Off Date Loan Balance of the Subsequent Timeshare Loans transferred to the Issuer and to be pledged to the Indenture Trustee as part of the Trust Estate and (y) subject to

21

satisfaction of the conditions specified in Section 4.2 hereof, the Indenture Trustee shall distribute such amounts to the Depositor.

      (ii)   <u>Prefunding Termination Date</u>. On the Prefunding Termination Date, the Paying Agent shall deposit all amounts remaining in the Prefunding Account into the Collection Account and such amounts will be distributed on the following Payment Date as a distribution of principal in accordance with Section 3.4 hereof.

      (iii)   <u>Investment Earnings</u>.  On each Determination Date during the Prefunding Period, the Paying Agent shall withdraw all investment earnings on deposits in the Prefunding Account and deposit such amount into the Collection Account.

    (d)   [Reserved].

    (e)   <u>Force Majeure Loan Reserve Account</u>.  The Issuer hereby directs and the Indenture Trustee and Paying Agent hereby agree that the Paying Agent on behalf of the Indenture Trustee will establish and maintain an account (the "**Force Majeure Loan Reserve Account**") for the benefit of the Noteholders.  The Force Majeure Loan Reserve Account shall be an Eligible Bank Account initially established at the Corporate Trust Office of the Indenture Trustee, bearing the following designation "BXG Receivables Note Trust 2020-A, Timeshare Loan-Backed Notes, Series 2020-A – Force Majeure Loan Reserve Account, U.S. Bank National Association, as Indenture Trustee for the benefit of the Noteholders".  The Indenture Trustee on behalf of the Noteholders shall possess all right, title and interest in all funds on deposit from time to time in the Force Majeure Loan Reserve Account and in all proceeds thereof.  The Force Majeure Loan Reserve Account shall be under the sole dominion and control of the Indenture Trustee for the benefit of the Noteholders as their interests appear in the Trust Estate.  If, at any time, the Force Majeure Loan Reserve Account ceases to be an Eligible Bank Account, the Paying Agent on behalf of the Indenture Trustee shall, in accordance with Section 3.1(i) hereof, establish a new Force Majeure Loan Reserve Account (which if not maintained by the Indenture Trustee is subject to an account control agreement satisfactory to the Indenture Trustee) which shall be an Eligible Bank Account, transfer any cash and/or any investments to such new Force Majeure Loan Reserve Account and from the date such new Force Majeure Loan Reserve Account is established, it shall be the "Force Majeure Loan Reserve Account."  Amounts on deposit in the Force Majeure Loan Reserve Account shall be invested in accordance with Section 3.1 hereof.  Deposits to the Force Majeure Loan Reserve Account shall be made in accordance with Section 3.4(a) hereof such that the amount on deposit therein, if any, is equal to the Force Majeure Required Reserve Amount.  Withdrawals and payments from the Force Majeure Loan Reserve Account shall be made in the following manner:

      (i)   <u>Withdrawals for Deposit into Collection Account</u>.  On each Payment Date, if a Post Grace Period Force Majeure Loan becomes a Defaulted Timeshare Loan (unless such Defaulted Timeshare Loan has been repurchased or substituted by the Club Originator), the Paying Agent shall, based on the Monthly Servicer Report, withdraw from the Force Majeure Loan Reserve Account and deposit into the Collection Account an amount equal to the lesser of (A) such

<div align="center">22</div>

Timeshare Loan's outstanding Loan Balance on such date and (B) the amount on deposit in the Force Majeure Loan Reserve Account.

      (ii)   <u>Withdrawals for Distribution to Owner</u>.  On each Payment Date, if a Post Grace Period Force Majeure Loan ceases to be a Post Grace Period Force Majeure Loan as a result of either (A) the related Obligor having made at least two consecutive current payments or (B) such Post Grace Period Force Majeure Loan becoming a Defaulted Timeshare Loan for which the Seller has repurchased or substituted such Defaulted Timeshare Loan, then the Paying Agent shall, based on the Monthly Servicer Report, distribute to the owners of the beneficial interest in the Issuer, an amount from the Force Majeure Loan Reserve Account equal to the lesser of (A) such Timeshare Loan's outstanding Loan Balance on such date and (B) the amount on deposit in the Force Majeure Loan Reserve Account.

      (f)   <u>Lockbox Account.</u>  The Lockbox Account shall at all times be subject to the Lockbox Agreement.  If at any time, the Lockbox Account ceases to be an Eligible Bank Account, the Indenture Trustee shall terminate the Lockbox Agreement and the Servicer shall, on behalf of the Issuer and the Indenture Trustee, in accordance with Section 3.1(i) hereof, establish a new Lockbox Account and enter into a new lockbox agreement substantially in the form as the Lockbox Agreement.

      SECTION 3.3.   <u>Reserved</u>.

      SECTION 3.4.   <u>Distributions</u>.

      (a)   On each Payment Date, so long as no Sequential Pay Event has occurred, to the extent of Available Funds and based solely on the Monthly Servicer Report, the Paying Agent shall withdraw funds from the Collection Account to make the following disbursements and distributions to the following parties, in the following order of priority:

      (i)   to the Indenture Trustee, the Indenture Trustee Fee and any extraordinary out-of-pocket expenses and indemnities of the Indenture Trustee, plus any accrued and unpaid Indenture Trustee Fees with respect to prior Payment Dates; provided, however, that (i) any payments to the Indenture Trustee as reimbursement for any extraordinary out-of-pocket expenses and indemnities of the Indenture Trustee related to the transfer of servicing to a successor Servicer will be limited to $30,000 per calendar quarter and $100,000 in the aggregate; and (ii) payments to the Indenture Trustee as reimbursement for any other extraordinary out-of-pocket expenses and indemnities of the Indenture Trustee will be limited to $40,000 per calendar year so long as none of the following events has occurred: an Event of Default, acceleration of the Notes or the liquidation of the Trust Estate pursuant to the Indenture;

      (ii)   to the Owner Trustee, the Owner Trustee Fee, if due, plus any accrued and unpaid Owner Trustee Fees with respect to prior Payment Dates;

      (iii)   to the Administrator, the Administrator Fee, plus any accrued and unpaid Administrator Fees with respect to prior Payment Dates;

23

(iv)     to the Custodian, the Custodian Fee, plus any accrued and unpaid Custodian Fees with respect to prior Payment Dates;

(v)     to the Lockbox Bank, the Lockbox Fee, plus any accrued and unpaid Lockbox Fees with respect to prior Payment Dates;

(vi)     to the Servicer, the Servicing Fee, plus any accrued and unpaid Servicing Fees with respect to prior Payment Dates;

(vii)     to the Backup Servicer, the Backup Servicing Fee, plus any accrued and unpaid Backup Servicing Fees with respect to prior Payment Dates (less any amounts received from the Indenture Trustee, as successor Servicer);

(viii)     to the Class A Noteholders, the Class A Interest Distribution Amount;

(ix)     to the Class B Noteholders, the Class B Interest Distribution Amount;

(x)     to the Class C Noteholders, the Class C Interest Distribution Amount;

(xi)     if a Trigger Event shall have occurred and is continuing, to (a) the Class A Noteholders, all remaining Available Funds until the Outstanding Note Balance of the Class A Notes is reduced to zero, then (b) the Class B Noteholders, all remaining Available Funds until the Deferred Interest Amount for such Class, if any, is reduced to zero, then (c) the Class B Noteholders, all remaining Available Funds until the Outstanding Note Balance of the Class B Notes is reduced to zero, then (d) the Class C Noteholders, all remaining Available Funds until the Deferred Interest Amount for such Class, if any, is reduced to zero, and then (e) the Class C Noteholders, all remaining Available Funds until the Outstanding Note Balance of the Class C Notes is reduced to zero;

(xii)     to the Class A Noteholders, the Class A Principal Distribution Amount;

(xiii)     to the Class B Noteholders, the Class B Principal Distribution Amount;

(xiv)     to the Class C Noteholders, the Class C Principal Distribution Amount;

(xv)     to the General Reserve Account, all remaining Available Funds until the amounts on deposit in the General Reserve Account shall be equal to the General Reserve Account Required Balance;

(xvi)     to (a) the Class A Noteholders,(b) the Class B Noteholders and (c) the Class C Noteholders, pari passu and pro rata, the Principal Advance Reduction Amount;

24

(xvii)    if a Lockout Event shall have occurred and is continuing, to (a) the Class A Noteholders,(b) the Class B Noteholders and (c) the Class C Noteholders, pari passu and pro rata, all remaining Available Funds;

(xviii)    to the Class B Noteholders, the Deferred Interest Amount for such Class, if any;

(xix)    to the Class C Noteholders, the Deferred Interest Amount for such Class, if any;

(xx)    to the Force Majeure Loan Reserve Account, all remaining amounts until the amounts on deposit in the Force Majeure Loan Reserve Account shall equal the Force Majeure Required Reserve Amount;

(xxi)    to the Indenture Trustee, any extraordinary out-of-pocket expenses and indemnities owed to the Indenture Trustee not paid in accordance with clause (i) above;

(xxii)    to the Lockbox Bank, any amounts owed under the Lockbox Agreement not paid in accordance with clause (v) above; and

(xxiii)    to the Certificate Distribution Account, any remaining Available Funds for distribution pursuant to the Trust Agreement.

(b)    On and after the Assumption Date, the Indenture Trustee, as successor Servicer, shall pay the Backup Servicing Fee from amounts received in respect of the Servicing Fee.

(c)    Upon the occurrence of a Sequential Pay Event, distributions shall be made in accordance with Section 6.6 hereof.

SECTION 3.5.    Reports to Noteholders.

On each Payment Date, the Indenture Trustee shall report to the Initial Purchasers, each Noteholder, each Note Owner and each Rating Agency the portion of payments then being made which represents principal and the amount which represents interest, and shall contemporaneously advise the Issuer of all such payments.  The Indenture Trustee shall satisfy its obligations under this Section 3.5 by making available electronically the Monthly Servicer Report to the Initial Purchasers, the Noteholders, each Rating Agency and the Issuer; provided,  however, the Indenture Trustee shall have no obligation to provide such information described in this Section 3.5 until it has received the requisite information from the Issuer or the Servicer.  On or before the fifth day prior to the final Payment Date with respect to any Class, the Indenture Trustee shall send notice of such Payment Date to each Rating Agency, the Initial Purchasers and the Noteholders of such Class.  Such notice shall include a statement that if such Notes are paid in full on the final Payment Date, interest shall cease to accrue as of the day immediately preceding such final Payment Date.  In addition, the Indenture Trustee shall deliver to the Note Owners, all notices, compliance reports and other certificates delivered by the Servicer or the

25

Issuer pursuant to this Indenture.  At a Note Owner's request, the Indenture Trustee agrees to provide such Note Owner an accounting of balances in the General Reserve Account.

The Indenture Trustee shall make available to the Noteholders, Note Owners and each Rating Agency, via the Indenture Trustee's internet website (initially located at https://pivot.usbank.com), the Monthly Servicer Report available each month and, with the consent or at the direction of the Issuer, such other information regarding the Notes and/or the Timeshare Loans as the Indenture Trustee may have in its possession, but only with the use of a password provided by the Indenture Trustee or its agent to such Person upon receipt by the Indenture Trustee from such Person of a certification in the form of Exhibit J; provided, however, that the Indenture Trustee or its agent shall provide such password to the parties to this Indenture and each Rating Agency without requiring such certification.  The Indenture Trustee will make no representation or warranties as to the accuracy or completeness of such documents and will assume no responsibility therefor.

The Indenture Trustee's internet website shall be specified by the Indenture Trustee from time to time in writing to the Issuer, the Servicer, the Noteholders and each Rating Agency.  For assistance with this service, Noteholders may call the customer service desk at (800) 934-6802.  In connection with providing access to the Indenture Trustee's internet website, the Indenture Trustee may require registration and the acceptance of a disclaimer.  The Indenture Trustee shall not be liable for the dissemination of information in accordance with this Indenture.

The Indenture Trustee shall have the right to change the way Monthly Servicer Reports are distributed in order to make such distribution more convenient and/or more accessible to the above parties and the Indenture Trustee shall provide timely and adequate notification to all above parties regarding any such changes.

Annually (and more often, if required by applicable law), the Indenture Trustee shall distribute to the Noteholders and submit to the Internal Revenue Service any Form 1099 or similar information returns required by applicable tax law to be distributed to the Noteholders or submitted to the Internal Revenue Service.  The Paying Agent shall prepare or cause to be prepared all such forms and returns for distribution or submission by the Indenture Trustee to the Noteholders or the Internal Revenue Service, as applicable.

SECTION 3.6.      Note Balance Write-Down Amounts.

The Note Balance Write-Down Amount, if any, on each Payment Date shall only be applied in the following order of priority: (i) to the Outstanding Note Balance of the Class C Notes immediately following the distribution of Available Funds on each Payment Date until the Adjusted Note Balance of the Class C Notes is reduced to zero and (ii) to the Outstanding Note Balance of the Class B Notes immediately following the distribution of Available Funds on each Payment Date until the Adjusted Note Balance of the Class B Notes is reduced to zero. The application of the Note Balance Write-Down Amount to the Class B Notes and the Class C Notes, respectively, shall not reduce such Class' entitlement to unpaid Principal Distribution Amounts.

26

D - 0054-0034

SECTION 3.7.    Withholding Taxes.

The Indenture Trustee, on behalf of the Issuer, shall comply with all requirements of the Code and applicable Treasury Regulations promulgated thereunder and applicable state and local law with respect to the withholding from any distributions made by it to any Noteholder of any applicable withholding taxes (including FATCA Withholding Tax) imposed thereon and with respect to any applicable reporting requirements in connection therewith.  Each Noteholder, by acceptance of a Note, thereby agrees that (i) it will provide its Noteholder Tax Identification Information and, to the extent FATCA Withholding Tax is potentially applicable, it will provide its Noteholder FATCA Information to the Indenture Trustee, upon request by the Indenture Trustee, and (ii) the Indenture Trustee has the right to withhold from any amount of interest or other amount (properly withholdable under law and without any corresponding gross up) payable to a Noteholder that fails to comply with the requirements of clause (i) of this Section 3.7.  The Indenture Trustee shall pay over any amount withheld pursuant to this Section 3.7 to the appropriate Governmental Authority.

ARTICLE IV.

THE TRUST ESTATE

SECTION 4.1.    Acceptance by Indenture Trustee.

(a)    Concurrently with the execution and delivery of this Indenture, the Indenture Trustee does hereby acknowledge and accept the conveyance by the Issuer of the assets constituting the Trust Estate.  The Indenture Trustee shall hold the Trust Estate in trust for the benefit of the Noteholders, subject to the terms and provisions hereof.  In connection with the conveyance of the Trust Estate to the Indenture Trustee, the Issuer has delivered or has caused the Depositor to deliver (i) to the Custodian, the Timeshare Loan Files and (ii) to the Servicer, the Timeshare Loan Servicing Files, for each Initial Timeshare Loan conveyed on the Closing Date.  With respect to each Transfer Date and in accordance with the Custodial Agreement, the Issuer will deliver or cause to be delivered (i) to the Custodian, the Timeshare Loan Files, and (ii) to the Servicer, the Timeshare Loan Servicing Files, for each Subsequent Timeshare Loan or Qualified Substitute Timeshare Loan to be conveyed on such Transfer Date.

(b)    The Indenture Trustee shall perform its duties under this Section 4.1 and hereunder on behalf of the Trust Estate and for the benefit of the Noteholders in accordance with the terms of this Indenture and applicable law and, in each case, taking into account its other obligations hereunder, but without regard to:

(i)    any relationship that the Indenture Trustee or any Affiliate of the Indenture Trustee may have with an Obligor;

(ii)    the ownership of any Note by the Indenture Trustee or any Affiliate of the Indenture Trustee;

(iii)    the Indenture Trustee's right to receive compensation for its services hereunder or with respect to any particular transaction; or

27

(iv)    the ownership, or holding in trust for others, by the Indenture Trustee of any other assets or property.

SECTION 4.2.    <u>Subsequent Timeshare Loans</u>.

With respect to Subsequent Timeshare Loans, on each Transfer Date during the Prefunding Period, subject to the satisfaction of the following conditions and the requirements of Section 4.3 hereof, and in consideration of the Indenture Trustee's delivery on such Transfer Date to or upon the order of the Depositor of the Timeshare Loan Acquisition Price, the Depositor shall sell, transfer, assign, set over and otherwise convey without recourse to the Issuer, all right, title and interest of the Depositor in and to each Subsequent Timeshare Loan and the Issuer shall Grant such Subsequent Timeshare Loans to the Indenture Trustee for the benefit of the Noteholders.  Prior to the acceptance by the Indenture Trustee of any Subsequent Timeshare Loan or the release of any funds therefor, the following conditions must be satisfied on or prior to the related Transfer Date:

(a)    the Depositor shall have provided the Indenture Trustee with a notice of a subsequent transfer of Subsequent Timeshare Loans (a "**Subsequent Transfer Notice**"), a form of which is attached hereto as <u>Exhibit N</u> which notice shall be given not less than one Business Day prior to such Transfer Date;

(b)    the Issuer shall have deposited or caused to be deposited in the Collection Account all principal and interest collected after the related Cut-Off Date in respect of such Subsequent Timeshare Loan;

(c)    no Event of Default shall have occurred and is continuing and no such event would result from the conveyance of such Subsequent Timeshare Loan to the Indenture Trustee;

(d)    the Custodian shall have received the Timeshare Loan Files related to such Subsequent Timeshare Loans and shall have given the Indenture Trustee a written certification and receipt in accordance with the Custodial Agreement;

(e)    the Servicer shall have received the Timeshare Loan Servicing Files related to such Subsequent Timeshare Loans;

(f)    the Indenture Trustee shall have received the certification required to be delivered by the Depositor in Section 4.3 hereof; and

(g)    no Responsible Officer of the Indenture Trustee shall have Knowledge or have actually received written notice that any conditions to such transfer (including the requirements in Section 4.3 hereof) have not been fulfilled and the Indenture Trustee shall have received such other documents, opinions, certificates and instruments as the Indenture Trustee may request.

28

SECTION 4.3.    Criteria for Subsequent Timeshare Loans.

No Subsequent Timeshare Loan shall be accepted as part of the Trust Estate on any Transfer Date unless the Indenture Trustee shall have received a certification from the Depositor that (a) the Depositor, as of such Transfer Date, has restated each of the representations and warranties contained in Section 5(a) of the Sale Agreement, (b) each of the conditions in Section 4.2 above has been satisfied, (c) each Subsequent Timeshare Loan is an Eligible Timeshare Loan as of the Transfer Date, and (d) each Subsequent Timeshare Loan satisfies the following criteria (measured by using the relevant data for each Timeshare Loan as of its related Cut-Off Date): (i) that such Subsequent Timeshare Loan was not selected by the Depositor in a manner that the Depositor, in its reasonable business judgment, believes to be materially adverse to the interests of the Noteholders, provided that it is acknowledged by the parties hereto that the certification in this clause (d)(i) is not intended and shall not be construed as a guaranty of the performance of such Subsequent Timeshare Loans and that such Subsequent Timeshare Loan may perform differently than other timeshare loans originated by the related Originator or other Affiliates of the Depositor, (ii) that after the purchase of all Subsequent Timeshare Loans, (A) the weighted average interest rate on all Subsequent Timeshare Loans must be greater than 14.75%, (B) the weighted average months of age on all Timeshare Loans must be greater than 13.25 months, (C) the percentage of Timeshare Loans related to Units at the Resorts is not one percent (1%) less than such percentage on the Closing Date, (D) the percentage of Timeshare Loans related to a Resort as a percentage of all Timeshare Loans does not vary from such percentage on the Closing Date by more than 7% as a percentage of all Timeshare Loans and (E) the aggregate Cut-Off Date Loan Balances of all Subsequent Timeshare Loans with Obligors which are existing owners is equal to or greater than 75.0% of the aggregate Cut-Off Date Loan Balance of all Subsequent Timeshare Loans, (iii) that such Subsequent Timeshare Loan does not have a stated maturity later than February 2031, (iv) the related Obligor has made at least one payment in respect of such Subsequent Timeshare Loan, (v) to the extent the related Obligor has a FICO® score, such Obligor does not have a FICO® score of 600 or below, (vi) the weighted average FICO® score of the Obligors of the Subsequent Timeshare Loans must be greater than 728, (vii) the Obligors of the Subsequent Timeshare Loans with no FICO® scores do not represent more than 0.25% of the aggregate Cut-Off Date Loan Balances of all Subsequent Timeshare Loans, (viii) the Obligors of the Subsequent Timeshare Loans with no FICO® scores and FICO® scores between, and including, 601 to 625 do not represent more than 1.0% of the aggregate Cut-Off Date Loan Balances of all Subsequent Timeshare Loans, (ix) the Obligors of the Subsequent Timeshare Loans with no FICO® scores and FICO® scores between, and including, 601 to 650 do not represent more than 7.0% of the aggregate Cut-Off Date Loan Balances of all Subsequent Timeshare Loans, (x) the Obligors of the Subsequent Timeshare Loans with no FICO® scores and FICO® scores between, and including, 601 to 700 do not represent more than 33.0% of the aggregate Cut-Off Date Loan Balances of all Subsequent Timeshare Loans, (xi) the Obligors of the Subsequent Timeshare Loans with no FICO® scores and FICO® scores between, and including, 601 to 750 do not represent more than 63.0% of the aggregate Cut-Off Date Loan Balances of all Subsequent Timeshare Loans, (xii) the Obligors of the Subsequent Timeshare Loans who are Foreign Obligors do not represent more than 0.25% of the aggregate Cut-Off Date Loan Balances of all Subsequent Timeshare Loans and may only include Foreign Obligors who are residents of Canada, and (xiii) the Obligors of the Subsequent Timeshare Loans with no FICO® scores and the Obligors of the Subsequent Timeshare Loans who are Foreign Obligors

29

do not represent more than 0.25% of the aggregate Cut-Off Date Loan Balances of all Subsequent Timeshare Loans.

SECTION 4.4.    Grant of Security Interest; Tax Treatment.

(a)    The conveyance by the Issuer of the Timeshare Loans to the Indenture Trustee shall not constitute and is not intended to result in an assumption by the Indenture Trustee or any Noteholder of any obligation of the Issuer or the Servicer to the Obligors, the insurers under any insurance policies, or any other Person in connection with the Timeshare Loans.

(b)    It is the intention of the parties hereto that, with respect to all taxes, the Notes will be treated as indebtedness (the "**Intended Tax Characterization**").   The provisions of this Indenture shall be construed in furtherance of the Intended Tax Characterization.  Each of the Issuer, the Servicer, the Indenture Trustee, the Club Trustee and the Backup Servicer by entering into this Indenture, and each Noteholder and Note Owner by acquiring a Note or a beneficial interest therein, agree to (i) treat the Notes as indebtedness for all tax purposes and (ii) to report all payments and transactions with respect to the Notes for purposes of all taxes (including FATCA Withholding Taxes) in a manner consistent with the Intended Tax Characterization, unless otherwise required by applicable law.

(c)    None of the Issuer, the Servicer, the Club Trustee or the Backup Servicer shall take any action inconsistent with the Indenture Trustee's interest in the Timeshare Loans and each such party shall indicate or shall cause to be indicated in its books and records held on its behalf that each Timeshare Loan constituting the Trust Estate has been assigned to the Indenture Trustee on behalf of the Noteholders.

SECTION 4.5.    Further Action Evidencing Assignments.

(a)    The Issuer and the Indenture Trustee each agrees that, from time to time, it will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or appropriate, or that the Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes may reasonably request, in order to perfect, protect or more fully evidence the security interest in the Timeshare Loans or to enable the Indenture Trustee to exercise or enforce any of its rights hereunder.  Without limiting the generality of the foregoing, the Issuer will, without the necessity of a request and upon the request of the Indenture Trustee, execute and file or record (or cause to be executed and filed or recorded) such Assignments of Mortgage, financing or continuation statements, or amendments thereto or assignments thereof, and such other instruments or notices, as may be necessary or appropriate to create and maintain in the Indenture Trustee a first priority perfected security interest, at all times, in the Trust Estate, including, without limitation, recording and filing UCC-1 financing statements, amendments or continuation statements prior to the effective date of any change of the name, identity or structure or relocation of its chief executive office or its jurisdiction of formation or any change that would or could affect the perfection pursuant to any financing statement or continuation statement or assignment previously filed or make any UCC-1 financing statement or continuation statement previously filed pursuant to this Indenture seriously misleading within the meaning of applicable provisions of the UCC (and the Issuer shall give the Indenture Trustee at least 30 Business Days prior notice of the expected occurrence

30

of any such circumstance).  The Issuer shall promptly deliver to the Indenture Trustee file-stamped copies of any such filings.

(b)      (i) The Issuer hereby grants to each of the Servicer and the Indenture Trustee a power of attorney to execute, file and record all documents including, but not limited to, Assignments of Mortgage, UCC-1 financing statements, amendments or continuation statements, on behalf of the Issuer as may be necessary or desirable to effectuate the foregoing and (ii) the Servicer hereby grants to the Indenture Trustee a power of attorney to execute, file and record all documents on behalf of the Servicer as may be necessary or desirable to effectuate the foregoing; provided,  however, that such grant shall not create a duty on the part of the Indenture Trustee or the Servicer to file, prepare, record or monitor, or any responsibility for the contents or adequacy of, any such documents.

SECTION 4.6.      Substitution and Repurchase of Timeshare Loans.

(a)      Mandatory Substitution and Repurchase of Timeshare Loans for Breach of Representation or Warranty.  If at any time, any party hereto obtains Knowledge or is notified in writing by any other party hereto, that any of the representations and warranties of the Depositor in the Sale Agreement were incorrect at the time such representations and warranties were made, then the party discovering such defect, omission, or circumstance shall promptly notify the other parties to this Indenture, each Rating Agency, the Depositor and the Club Originator.  In the event any such representation or warranty of the Depositor is incorrect and materially and adversely affects the value of a Timeshare Loan or the interests of the Noteholders therein, then the Issuer and the Indenture Trustee shall require the Depositor or, pursuant to its rights under the Sale Agreement, the Club Originator, within 60 days after the date it is first notified of, or otherwise obtains Knowledge of such breach, to eliminate or otherwise cure in all material respects the circumstance or condition which has caused such representation or warranty to be incorrect or if the breach relates to a particular Timeshare Loan and is not cured in all material respects (such Timeshare Loan, a "**Defective Timeshare Loan**"), either (a) repurchase such Defective Timeshare Loan at the Repurchase Price or (b) provide one or more Qualified Substitute Timeshare Loans and pay the related Substitution Shortfall Amount, if any.  The Indenture Trustee is hereby appointed attorney-in-fact, which appointment is coupled with an interest and is therefore irrevocable, to act on behalf and in the name of the Issuer to enforce the Depositor's repurchase or substitution obligations if the Depositor has not complied with its repurchase or substitution obligations under the Sale Agreement within 30 days after the end of the aforementioned 60-day period.

(b)      Optional Purchase or Substitution of Club Loans.  Pursuant to the Transfer Agreement and the Bluegreen Purchase Agreement, with respect to any Original Club Loan, on any date, the Club Originator, as designee of the Depositor, will (at its option), if the related Obligor has elected to effect and the Club Originator has agreed to effect an Upgrade, (i) pay to the Collection Account the Repurchase Price for such Original Club Loan or (ii) substitute one or more Qualified Substitute Timeshare Loans for such Original Club Loan and pay the related Substitution Shortfall Amounts, if any; provided,  however, that, in the case of an Obligor's election to upgrade, the option to substitute one or more Qualified Substitute Timeshare Loans for an Original Club Loan is limited on any date to (A) 15% of the Aggregate Closing Date Collateral Balance, less (B) the aggregate Loan Balances of Original Club Loans previously

31

substituted by the Club Originator pursuant to this Section 4.6(b) on prior Transfer Dates.  The Club Originator, as designee of the Depositor, shall deposit the related Repurchase Price and Substitution Shortfall Amounts, if any, into the Collection Account as set forth in Section 4.6(d) hereof.  The Issuer acknowledges that the Club Originator has agreed to use best efforts to exercise its substitution option with respect to exercise of its repurchase option, and to the extent that the Club Originator shall elect to substitute Qualified Substitute Timeshare Loans for an Original Club Loan, the Club Originator shall use best efforts to cause each such Qualified Substitute Timeshare Loan to be, in the following order of priority, (i) the Upgrade Club Loan related to such Original Club Loan and (ii) an Upgrade Club Loan  unrelated to such Original Club Loan.

(c)   <u>Optional Purchase or Substitution of Defaulted Timeshare Loans</u>.  Pursuant to the Transfer Agreement and the Bluegreen Purchase Agreement, with respect to any Defaulted Timeshare Loans, on any date, the Club Originator, as designee of the Depositor, shall have the option, but not the obligation, to either (i) purchase the Defaulted Timeshare Loan at the Repurchase Price for such Defaulted Timeshare Loan or (ii) substitute one or more Qualified Substitute Timeshare Loans for such Defaulted Timeshare Loan and pay the related Substitution Shortfall Amounts, if any; <u>provided</u>, <u>however</u>, that the option to repurchase a Defaulted Timeshare Loan or to substitute one or more Qualified Substitute Timeshare Loans for a Defaulted Timeshare Loan is limited on any date to the Optional Purchase Limit and the Optional Substitution Limit, respectively.  The Club Originator, as designee of the Depositor, shall purchase or substitute Defaulted Timeshare Loans as provided herein and the Club Originator shall deposit the related Repurchase Price and Substitution Shortfall Amounts, if any, into the Collection Account as set forth in Section 4.6(d) hereof.  The Club Originator, may irrevocably waive the Club Originator's option to purchase or substitute a Defaulted Timeshare Loan by delivering or causing to be delivered to the Indenture Trustee a Waiver Letter in the form of <u>Exhibit K</u> attached hereto.

(d)   <u>Payment of Repurchase Prices and Substitution Shortfall Amounts</u>.  The Issuer and the Indenture Trustee shall direct that the Depositor remit or cause to be remitted all amounts in respect of Repurchase Prices and Substitution Shortfall Amounts payable during the related Due Period in immediately available funds to the Indenture Trustee on the Transfer Date for deposit in the Collection Account.

(e)   <u>Schedule of Timeshare Loans</u>.  The Issuer and Indenture Trustee shall direct the Depositor to provide or cause to be provided to the Indenture Trustee on any date on which a Timeshare Loan is purchased, repurchased or substituted with an electronic supplement to the Schedule of Timeshare Loans reflecting the removal and/or substitution of Timeshare Loans and subjecting any Qualified Substitute Timeshare Loans to the provisions thereof.

(f)   <u>Officer's Certificate</u>.  No substitution of a Timeshare Loan shall be effective unless the Issuer and the Indenture Trustee shall have received an Officer's Certificate from the Club Originator indicating that (i) the new Timeshare Loan meets all the criteria of the definition of "Qualified Substitute Timeshare Loan", (ii) the Timeshare Loan Files for such Qualified Substitute Timeshare Loan have been delivered to the Custodian or shall be delivered within five Business Days, and (iii) the Timeshare Loan Servicing Files for such Qualified Substitute Timeshare Loan have been delivered to the Servicer.

32

(g)     Qualified Substitute Timeshare Loans.  Within five Business Days after a Transfer Date, the Issuer and the Indenture Trustee shall direct the Depositor to deliver or cause the delivery of the Timeshare Loan Files of the related Qualified Substitute Timeshare Loans to the Custodian in accordance with the provisions of this Indenture and the Custodial Agreement.

SECTION 4.7.     Release of Lien.

(a)     The Issuer shall be entitled to obtain a release from the Lien of the Indenture for any Timeshare Loan purchased, repurchased or substituted under Section 4.6 hereof, (i) upon satisfaction of each of the applicable provisions of Section 4.6 hereof, (ii) in the case of any purchase or repurchase, after a payment by the Depositor of the Repurchase Price of the related Timeshare Loan, and (iii) in the case of any substitution, after payment by the Depositor of the applicable Substitution Shortfall Amounts, if any, pursuant to Section 4.6 hereof.

(b)     The Issuer shall be entitled to obtain a release from the Lien of the Indenture for any Timeshare Loan which has been paid in full.

(c)     In addition, at the written direction of the Servicer, on any Payment Date if (i) Available Funds are sufficient to pay the Required Payments, (ii) the amount on deposit in the General Reserve Account is at least equal to the General Reserve Account Required Balance, (iii) the amount on deposit in the Force Majeure Loan Reserve Account is at least equal to the Force Majeure Required Reserve Amount, (iv) no Event of Default has occurred and is continuing, (v) the Optional Purchase Limit is greater than zero and (vi) the Aggregate Outstanding Note Balance is not greater than the Principal Advance Rate Percentage times the sum of the Aggregate Loan Balance and the Prefunding Loan Balance, the Indenture Trustee shall release or shall consent to the release of Defaulted Timeshare Loans that have not been purchased, repurchased or substituted under Section 4.6 hereof from the Lien of the Indenture, without additional payment.

(d)     In connection with (a), (b) and (c) above, the Issuer and Indenture Trustee will execute and deliver such releases, endorsements and assignments as are provided to it by the Depositor, in each case, without recourse, representation or warranty, as shall be necessary to vest in the Depositor or its designee, the legal and beneficial ownership of each Timeshare Loan being released pursuant to this Section 4.7.  The Servicer shall deliver a Request for Release to the Custodian with respect to the related Timeshare Loan Files and Timeshare Loan Servicing Files being released pursuant to this Section 4.7, and such files shall be transferred to the Depositor or its designee.

SECTION 4.8.     Appointment of Custodian and Paying Agent.

(a)     The Indenture Trustee may appoint a custodian to hold all or a portion of the Timeshare Loan Files as agent for the Indenture Trustee.  Each custodian shall be a depository institution supervised and regulated by a federal or state banking authority, shall have combined capital and surplus of at least $100,000,000, shall be qualified to do business in the jurisdiction in which it holds any Timeshare Loan File and shall not be the Issuer or an Affiliate of the Issuer.  The initial Custodian shall be U.S. Bank National Association.  The Indenture

33

Trustee shall not be responsible for paying the Custodian Fee or any other amounts owed to the Custodian.

(b)     The Issuer hereby appoints the Indenture Trustee as a Paying Agent.  The Issuer may appoint other Paying Agents from time to time.  Any such other Paying Agent shall be appointed by Issuer Order with written notice thereof to the Indenture Trustee.  Any Paying Agent appointed by the Issuer shall be a Person who would be eligible to be Indenture Trustee hereunder as provided in Section 7.7 hereof.

SECTION 4.9.     Sale of Timeshare Loans.

The parties hereto agree that none of the Timeshare Loans in the Trust Estate may be sold or disposed of in any manner except as expressly provided for herein.

ARTICLE V.

SERVICING OF TIMESHARE LOANS

SECTION 5.1.     Appointment of Servicer and Backup Servicer; Servicing Standard.

(a)     Subject to the terms and conditions herein, the Issuer hereby appoints Bluegreen as the initial Servicer hereunder and the Servicer hereby accepts such appointment.  The Servicer shall service and administer the Timeshare Loans and perform all of its duties hereunder in accordance with the Servicing Standard.

(b)     Subject to the terms and conditions herein and in the Backup Servicing Agreement, the Issuer hereby appoints Concord Servicing Corporation to act as the initial Backup Servicer hereunder.  The Backup Servicer shall service and administer the Timeshare Loans and perform all of its duties hereunder and under the Backup Servicing Agreement in accordance with the Servicing Standard.

SECTION 5.2.     Payments on the Timeshare Loans.

(a)     The Servicer shall, in a manner consistent with the Servicing Standard, collect all payments made under each Timeshare Loan and instruct each applicable Obligor to timely direct all payments in respect of his or her Timeshare Loan to the Lockbox Account maintained at the Lockbox Bank and, with respect to Credit Card Timeshare Loans, direct each applicable credit card vendor to deposit all payments in respect of such Credit Card Timeshare Loans into the Lockbox Account.

(b)     On the Closing Date, the Servicer shall cause to be deposited into the Collection Account all amounts collected and received in respect of the Initial Timeshare Loans after the Initial Cut-Off Date to the day preceding the Closing Date (without deduction for any Liquidation Expenses).

(c)     Subject to subsection (d) below, the Indenture Trustee shall direct the Lockbox Bank to remit all collections in respect of the Timeshare Loans on deposit in the Lockbox Account (other than an amount equal to $20,000 that will remain in the Lockbox

34

Account for administrative purposes) into the Collection Account on each Business Day via automated repetitive wire.

(d)     Liquidation Expenses shall be reimbursed as Additional Servicing Compensation to the Servicer in accordance with Section 3.2(a) hereof.  To the extent that the Servicer has received any Liquidation Expenses as Additional Servicing Compensation and shall subsequently recover any portion of such Liquidation Expenses from the related Obligor, the Servicer shall deposit such amounts into the Collection Account in accordance with Section 5.3(a) hereof.

(e)     The Servicer agrees that to the extent it receives any amounts in respect of any insurance policies which are not payable to the Obligor or otherwise necessary for the intended use, or any other collections relating to the Trust Estate, it shall deposit such amounts into the Collection Account within two Business Days of receipt thereof (unless otherwise expressly provided herein).

SECTION 5.3.     Duties and Responsibilities of the Servicer.

(a)     In addition to any other customary services which the Servicer may perform or may be required to perform hereunder, the Servicer shall perform or cause to be performed through sub-servicers, the following servicing and collection activities in accordance with the Servicing Standard:

(i)     perform standard accounting services and general record keeping services with respect to the Timeshare Loans;

(ii)     respond to telephone or written inquiries of Obligors concerning the Timeshare Loans;

(iii)     keep Obligors informed of the proper place and method for making payment with respect to the Timeshare Loans;

(iv)     contact Obligors to effect collections and to discourage delinquencies in the payment of amounts owed under the Timeshare Loans and doing so by any lawful means;

(v)     report tax information to Obligors and taxing authorities to the extent required by law;

(vi)     take such other action as may be necessary or appropriate in the Servicer's judgment (which shall be consistent with the Servicing Standard) for the purpose of collecting and transferring to the Indenture Trustee for deposit into the Collection Account all payments received by the Servicer or remitted to the Lockbox Account in respect of the Timeshare Loans (except as otherwise expressly provided herein), and to carry out the duties and obligations imposed upon the Servicer pursuant to the terms of this Indenture;

35

(vii)     arrange for Liquidations of Timeshare Properties related to Defaulted Timeshare Loans and remarket such Timeshare Properties as provided in Section 5.3(a)(xiii) hereof;

(viii)     use reasonable best efforts to enforce the purchase and substitution obligations of the Club Originator under the Transfer Agreement or the Bluegreen Purchase Agreement with respect to breaches of representations and warranties related to the Timeshare Loans;

(ix)     refrain from modifying, waiving or amending the terms of any Timeshare Loan; provided, however, the Servicer may modify, waive or amend a Timeshare Loan for which a default on such Timeshare Loan has occurred or is imminent and such modification, amendment or waiver will not (A) materially alter the interest rate on or the principal balance of such Timeshare Loan, (B) shorten the final maturity of, lengthen the timing of payments of either principal or interest, or any other terms of, such Timeshare Loan in any manner which would have a material adverse effect on the Noteholders, (C) adversely affect the Timeshare Property underlying such Timeshare Loan or (D) reduce materially the likelihood that payments of interest and principal on such Timeshare Loan shall be made when due; provided, further, the Servicer may grant a single extension of the final maturity of a Timeshare Loan if the Servicer, in its reasonable discretion determines that (x) such Timeshare Loan is in default or a default on such Timeshare Loan is likely to occur in the foreseeable future and (y) the value of such Timeshare Loan will be enhanced by such extension; provided, further, the Servicer shall not be permitted to modify, waive or amend the terms of any Timeshare Loan (other than a Force Majeure Loan) if the sum of the Cut-Off Date Loan Balance of such Timeshare Loan and the Cut-Off Date Loan Balances of all other Timeshare Loans (other than Force Majeure Loans) for which the Servicer has modified, waived or amended the terms thereof since the Closing Date exceeds 3.00% of the Aggregate Closing Date Collateral Balance; provided, further, that the Servicer may determine that a Timeshare Loan is a Force Majeure Loan and may defer loan payments in accordance with the Servicing Standard, but in no event, more than 2 months, provided, that the Servicer may not, without having first received confirmation from each Rating Agency that such action would not result in a qualification downgrade or withdrawal of any rating assigned to the Notes (and such confirmation shall be deemed if no qualification downgrade or withdrawal of any rating assigned to the Notes occurs after the Servicer provides each Rating Agency 10 days' prior written notice of the same), determine that a Timeshare Loan is a Force Majeure Loan if such determination would cause the aggregate Loan Balance of all Force Majeure Loans to exceed 5.00% of the Aggregate Loan Balance;

(x)     work with Obligors in connection with any transfer of ownership of a Timeshare Property by an Obligor to another Person (to the extent permitted), whereby the Servicer may, only if required by law, consent to the assumption by such Person of the Timeshare Loan related to such Timeshare Property (to the extent permitted); provided, however, in connection with any such assumption, the rate of interest borne by, the maturity date of, the principal amount of, the timing of

36

payments of principal and interest in respect of, and all other material terms of, the related Timeshare Loan shall not be changed other than as permitted in Section 5.3(a)(ix) hereof;

(xi)      to the extent that the Custodian Fees or the Lockbox Fees are, in the Servicer's reasonable business judgment, no longer commercially reasonable, use commercially reasonable efforts to exercise its rights under the Custodial Agreement or the Lockbox Agreement to replace the Custodian or Lockbox Bank, as applicable.  Any such successor shall be reasonably acceptable to the Indenture Trustee;

(xii)     deliver such information and data to the Backup Servicer as is required under the Backup Servicing Agreement;

(xiii)    in the event that a Defaulted Timeshare Loan is not or cannot be released from the Lien of the Indenture pursuant to Section 4.7 hereof, the Servicer shall, in accordance with the Servicing Standard and the Collection Policy, promptly institute collection procedures, which may include, but is not limited to, cancellation, termination or foreclosure proceedings or obtaining a deed-in-lieu of foreclosure (each, a "**Foreclosure Property**").  Upon the Timeshare Property becoming a Foreclosure Property, the Servicer shall cause the Remarketing Agent to promptly attempt to remarket such Foreclosure Property in accordance with and pursuant to the Remarketing Agreement.  The Remarketing Fees due under the Remarketing Agreement shall constitute Liquidation Expenses and upon reimbursement to the Servicer shall be paid by the Servicer to the Remarketing Agent; and

(xiv)    with respect to Timeshare Loans related to Timeshare Properties located in the State of Louisiana, take such action as may be necessary in the applicable jurisdiction to avoid the lapse of a related Mortgage while any such Timeshare Loan remains outstanding.

(b)      The Servicer may not sell any of the Foreclosure Property that is an asset of the Trust Estate except for or as specifically permitted by this Indenture.

(c)      The Servicer shall, for each applicable Credit Card Timeshare Loan, pay the service charge imposed by the applicable credit card vendor for processing the payment due from the Obligor.

(d)      For so long as Bluegreen or any of its Affiliates controls the Resorts, the Servicer shall use commercially reasonable best efforts to cause the Club Managing Entity to maintain or cause to maintain the Resorts in good repair, working order and condition (ordinary wear and tear excepted).

(e)      For so long as Bluegreen or any of its Affiliates controls the Resorts, the manager and the related management contract for each Resort at all times shall be reasonably satisfactory to the Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes.  For so long as Bluegreen or any of its Affiliates controls the Timeshare

37

Association for a Resort, and Bluegreen or an Affiliate thereof is the manager, the related management contract may be amended or modified in a manner that reasonably may be determined to have a material adverse effect on the Noteholders only with the prior written consent of the Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes, which consent shall not be unreasonably withheld or delayed.

(f)    In the event any Lien (other than a Permitted Lien) attaches to any Timeshare Loan or related collateral from any Person claiming from and through Bluegreen or one of its Affiliates which materially adversely affects the Issuer's interest in such Timeshare Loan, Bluegreen shall, within the earlier to occur of ten Business Days after such attachment or the respective lienholders' action to foreclose on such lien, either (i) cause such Lien to be released of record, (ii) provide the Indenture Trustee with a bond in accordance with the applicable laws of the state in which the Timeshare Property is located, issued by a corporate surety acceptable to the Indenture Trustee, in an amount and in form reasonably acceptable to the Indenture Trustee or (iii) provide the Indenture Trustee with such other security as the Indenture Trustee may reasonably require.

(g)    The Servicer shall: (i) promptly notify the Indenture Trustee of (A) any claim, action or proceeding which may be reasonably expected to have a material adverse effect on the Trust Estate, or any material part thereof, and (B) any action, suit, proceeding, order or injunction of which Servicer becomes aware after the date hereof pending or threatened against or affecting Servicer or any Affiliate which may be reasonably expected to have a material adverse effect on the Trust Estate or the Servicer's ability to service the same; (ii) at the request of Indenture Trustee with respect to a claim or action or proceeding which arises from or through the Servicer or one of its Affiliates, appear in and defend, at Servicer's expense, any such claim, action or proceeding which would have a material adverse effect on the Timeshare Loans or the Servicer's ability to service the same; and (iii) comply in all respects, and shall cause all Affiliates to comply in all respects, with the terms of any orders imposed on such Person by any governmental authority the failure to comply with which would have a material adverse effect on the Timeshare Loans or the Servicer's ability to service the same.

(h)    Except as contemplated by the Transaction Documents, the Servicer shall not, and shall not permit the Club Managing Entity to, encumber, pledge or otherwise grant a Lien or security interest in and to the Reservation System (including, without limitation, all hardware, software and data in respect thereof) and furthermore agrees, and shall cause the Club Managing Entity, to use commercially reasonable efforts to keep the Reservation System operational, not to dispose of the same and to allow the Club the use of, and access to, the Reservation System in accordance with the terms of the Club Management Agreement.   Notwithstanding the foregoing, should the Club Managing Entity determine that it is desirable to replace the existing hardware and software related to the Reservation System, it will be allowed to enter into a lease or finance arrangement in connection with the lease or purchase of such hardware and software.

(i)    The Servicer shall comply in all material respects with the Collection Policy in effect on the Closing Date (or, as amended from time to time with the consent of the Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes) and with the terms of the Timeshare Loans.

38

(j)      At the written request of a Rating Agency, the Servicer shall prepare and deliver to such Rating Agency, updated replines in the format set forth in the Offering Circular.

SECTION 5.4.      <u>Servicer Events of Default</u>.

(a)      A "**Servicer Event of Default**" means, the occurrence and continuance of any of the following events:

(i)      any failure by the Servicer to make any required payment, transfer or deposit when due hereunder and the continuance of such default for a period of two Business Days; <u>provided</u>, <u>however</u>, that the period within which the Servicer shall make any required payment, transfer or deposit shall be extended to such longer period as is appropriate in the event of a Force Majeure Delay, <u>provided</u>, <u>further</u>, that such longer period shall not exceed seven Business Days;

(ii)      any failure by the Servicer to provide any required report within five Business Days of when such report is required to be delivered hereunder; <u>provided</u>, <u>however</u>, that the period within which the Servicer shall provide any report shall be extended to such longer period as is appropriate in the event of a Force Majeure Delay, <u>provided</u>, <u>further</u>, that such longer period shall not exceed ten Business Days;

(iii)      any failure by the Servicer to observe or perform in any material respect any other covenant or agreement which has a material adverse effect on the Noteholders and such failure is not remedied within 30 days (or, if the Servicer shall have provided evidence satisfactory to the Indenture Trustee that such covenant cannot be cured in the 30-day period and that it is diligently pursuing a cure, 60 days), after the earlier of (x) the Servicer first acquiring Knowledge thereof and (y) the Indenture Trustee's giving written notice thereof to the Servicer;

(iv)      any representation or warranty made by the Servicer in this Indenture shall prove to be incorrect in any material respect as of the time when the same shall have been made, and such breach is not remedied within 30 days (or, if the Servicer shall have provided evidence satisfactory to the Indenture Trustee that such breach cannot be cured in the 30-day period and that it is diligently pursuing a cure, 60 days) after the earlier of (x) the Servicer first acquiring Knowledge thereof and (y) the Indenture Trustee's giving written notice thereof to the Servicer;

(v)      the entry by a court having competent jurisdiction in respect of the Servicer of (i) a decree or order for relief in respect of the Servicer in an involuntary case or proceeding under any applicable federal or state bankruptcy, insolvency, reorganization, or other similar law or (ii) a decree or order adjudging the Servicer a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment, or composition of or in respect of the Servicer under any applicable federal or state law, or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator, or other similar official of the Servicer, or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order for relief

39

or any such other decree or order unstayed and in effect for a period of 60 consecutive days;

(vi)     the commencement by the Servicer of a voluntary case or proceeding under any applicable federal or state bankruptcy, insolvency, reorganization, or other similar law or of any other case or proceeding to be adjudicated a bankrupt or insolvent, or the consent by either to the entry of a decree or order for relief in respect of the Servicer in an involuntary case or proceeding under any applicable federal or state bankruptcy, insolvency, reorganization, or other similar law or to the commencement of any bankruptcy or insolvency case or proceeding against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under any applicable federal or state law, or the consent by it to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator, or similar official of the Servicer or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the Servicer's failure to pay its debts generally as they become due, or the taking of corporate action by the Servicer in furtherance of any such action; or

(vii)     a Trigger Event that remains uncured for three consecutive Due Periods.

If any Servicer Event of Default shall have occurred and not been waived hereunder or there shall have been a material default by the Servicer of a material obligation of the Servicer for which (i) the Servicer has received written notice of such default, (ii) such default has not been cured by the Servicer or waived in writing and the period for cure has expired and (iii) such default would result in a liability to the Servicer in excess of 5% of the Servicer's consolidated equity at such time as determined in accordance with GAAP, the Indenture Trustee may, and upon notice from Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes shall, terminate, on behalf of the Noteholders, by notice in writing to the Servicer, all of the rights and obligations of the Servicer (other than any obligations of the Servicer that, pursuant to the Transaction Documents, are intended to survive termination), as Servicer under this Indenture.  The Indenture Trustee shall promptly give written notice of such termination to the Backup Servicer.

Unless consented to by the Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes, the Issuer may not waive any Servicer Event of Default.

(b)     Replacement of Servicer.  From and after the receipt by the Servicer of such written termination notice or the resignation of the Servicer pursuant to Section 5.10 hereof, all authority and power of the Servicer under this Indenture, whether with respect to the Timeshare Loans or otherwise, shall, pass to and be vested in the Indenture Trustee, and the Indenture Trustee shall be the successor Servicer hereunder and the duties and obligations of the Servicer shall terminate.  The Servicer shall perform such actions as are reasonably necessary to assist the Indenture Trustee and the Backup Servicer in such transfer.  If the Servicer fails to undertake such action as is reasonably necessary to effectuate such a transfer, the Indenture Trustee is hereby authorized and empowered to execute and deliver, on behalf of and at the

40

expense of the Servicer, as attorney-in-fact or otherwise, any and all documents and other instruments, and to do or accomplish all other acts or things reasonably necessary to effect the purposes of such notice of termination. The Servicer agrees that if it is terminated pursuant to this Section 5.4, it shall promptly (and, in any event, no later than five Business Days subsequent to its receipt of the notice of termination from the Indenture Trustee) provide the Indenture Trustee, the Backup Servicer or their respective designees (with reasonable costs being borne by the Servicer) with all documents and records (including, without limitation, those in electronic form) reasonably requested by it to enable the Indenture Trustee to assume the Servicer's functions hereunder and for the Backup Servicer to assume the functions required by the Backup Servicing Agreement, and the Servicer shall cooperate with the Indenture Trustee in effecting the termination of the Servicer's responsibilities and rights hereunder and the assumption by a successor of the Servicer's obligations hereunder, including, without limitation, the transfer within one Business Day to the Indenture Trustee or its designee for administration by it of all cash amounts which shall at the time or thereafter received by it with respect to the Timeshare Loans (provided, however, that the Servicer shall continue to be entitled to receive all amounts accrued or owing to it under this Indenture on or prior to the date of such termination).  If the Indenture Trustee is unable or unwilling to act as successor Servicer, the Indenture Trustee may appoint or petition a court of competent jurisdiction to appoint a successor Servicer.  The Indenture Trustee shall be entitled to renegotiate the Servicing Fee; provided, however, no change to the Servicing Fee may be made unless the Indenture Trustee shall have received the written consent of Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes.  Notwithstanding anything herein to the contrary, in no event shall the Indenture Trustee or Bluegreen be liable for any Servicing Fee or for any differential in the amount of the Servicing Fee paid hereunder and the amount necessary to induce any successor Servicer to assume the obligations of Servicer under this Indenture.

The Indenture Trustee shall be entitled to be reimbursed by the Servicer, (or by the Trust Estate to the extent set forth in Section 3.4(a)(i) or Section 6.6(a)(i) hereof) if the Servicer is unable to fulfill its obligations hereunder for all Servicer Termination Costs.

The successor Servicer shall have (i) no liability with respect to any obligation which was required to be performed by the terminated Servicer prior to the date that the successor Servicer becomes the Servicer or any claim of a third party based on any alleged action or inaction of the terminated Servicer, (ii) no obligation to perform any repurchase obligations, if any, of the Servicer, (iii) no obligation to pay any taxes required to be paid by the Servicer, (iv) no obligation to pay any of the fees and expenses of any other party involved in this transaction that were incurred by the prior Servicer and (v) no liability or obligation with respect to any Servicer indemnification obligations of any prior Servicer including the original Servicer.

Notwithstanding anything contained in this Indenture to the contrary, any successor Servicer is authorized to accept and rely on all of the accounting, records (including computer records) and work of the prior Servicer relating to the Timeshare Loans (collectively, the "**Predecessor Servicer Work Product**"), without any audit or other examination thereof, and such successor Servicer shall have no duty, responsibility, obligation or liability for the acts and omissions of the prior Servicer.  If any error, inaccuracy, omission or incorrect or non-standard practice or procedure (collectively, "**Errors**") exist in any Predecessor Servicer Work Product and such Errors make it materially more difficult to service or should cause or materially

41

contribute to the successor Servicer making or continuing any Errors (collectively, "**Continued Errors**"), the successor Servicer shall have no duty, responsibility, obligation or liability for such Continued Errors; provided, however, that each successor Servicer shall agree to use its best efforts to prevent further Continued Errors.  In the event that the successor Servicer becomes aware of Errors or Continued Errors, the successor Servicer shall, with the prior consent of the Indenture Trustee, use its best efforts to reconstruct and reconcile such data as is commercially reasonable to correct such Errors and Continued Errors and to prevent future Continued Errors and to recover its costs thereby.

The Indenture Trustee may appoint an Affiliate or the Backup Servicer as the successor Servicer and the provisions of this Section 5.4(b) related to the Indenture Trustee shall apply to such Affiliate or Backup Servicer.

(c)     Any successor Servicer, including the Indenture Trustee, shall not be deemed to be in default or to have breached its duties as successor Servicer hereunder if the predecessor Servicer shall fail to deliver any required deposit into the Collection Account or otherwise fail to cooperate with, or take any actions required by such successor Servicer related to the transfer of servicing hereunder.

(d)     Any successor Servicer appointed pursuant to this Indenture (i) as a condition to any such appointment (other than the Indenture Trustee), shall be a nationally recognized and licensed servicer of timeshare loan receivables that (A) is actively servicing a portfolio of timeshare loans with an aggregate principal balance of not less than $200,000,000, (B) has servicing and collection capabilities for all categories of delinquent and defaulted timeshare loans (including through foreclosure) and (C) is not an Affiliate of any Noteholder, and (ii) shall be subject to all of the terms and conditions of the Servicer under this Indenture (other than such terms and conditions as are unique to the initial Servicer), including, without limitation, the requirement to adhere to the Servicing Standard in the performance of the services to be furnished by it under this Indenture.

SECTION 5.5.     Accountings; Statements and Reports.

(a)     Monthly Servicer Report.  Not later than two Business Days prior to the Payment Date, the Servicer shall deliver to the Issuer, the Indenture Trustee, the Paying Agent, each Rating Agency and the Initial Purchasers, a report (the "**Monthly Servicer Report**") substantially in the form of Exhibit H hereto, detailing certain activity relating to the Timeshare Loans.  The Monthly Servicer Report shall be completed with the information specified therein for the related Due Period and shall contain such other information as may be reasonably requested by the Issuer, the Indenture Trustee, the Paying Agent or the Initial Purchasers in writing at least five Business Days prior to such Determination Date.  Each such Monthly Servicer Report shall be accompanied by an Officer's Certificate of the Servicer in the form of Exhibit I hereto, certifying the accuracy of the computations reflected in such Monthly Servicer Report.

(b)     Certification as to Compliance. The Servicer shall deliver to the Issuer, the Indenture Trustee, each Rating Agency and the Initial Purchasers, an Officer's Certificate on or before June 30 of each year commencing in 2022: (x) to the effect that a review of the activities

42

of the Servicer during the preceding calendar year, and of its performance under this Indenture during such period has been made under the supervision of the officer executing such Officer's Certificate with a view to determining whether during such period, to the best of such officer's knowledge, the Servicer had performed and observed all of its obligations under this Indenture, and (y) either (A) stating that based on such review, no Servicer Event of Default is known to have occurred and is continuing, or (B) if such a Servicer Event of Default is known to have occurred and is continuing, specifying such Servicer Event of Default and the nature and status thereof.

(c)     <u>Annual Accountants' Reports</u>.  On or before each June 30 of each year commencing in 2022, the Servicer shall, at its own expense, cause a firm of independent public accountants to furnish a certificate or statement (and the Servicer shall provide a copy of such certificate or statement to the Issuer, the Indenture Trustee, each Rating Agency and the Initial Purchasers), to the effect that (1) such firm has examined and audited the Servicer's servicing controls and procedures for the previous calendar year and that such independent public accountants have examined certain documents and records (including computer records) and servicing procedures of the Servicer relating to the Timeshare Loans, (2) they have examined the most recent Monthly Servicer Report prepared by the Servicer and three other Monthly Servicer Reports chosen at random by such firm and compared such Monthly Servicer Reports with the information contained in such documents and records, (3) their examination included such tests and procedures as they considered necessary in the circumstances, (4) their examinations and comparisons described under clauses (1) and (2) above disclosed no exceptions which, in their opinion, were material, relating to such Timeshare Loans or such Monthly Servicer Reports, or, if any such exceptions were disclosed thereby, setting forth such exceptions which, in their opinion, were material and (5) on the basis of such examinations and comparisons, such firm is of the opinion that the Servicer has, during the relevant period, serviced the Timeshare Loans in compliance with this Indenture and the other Transaction Documents in all material respects and that such documents and records have been maintained in accordance with this Indenture and the other Transaction Documents in all material respects, except in each case for (A) such exceptions as such firm shall believe to be immaterial and (B) such other exceptions as shall be set forth in such written report. The report will also indicate that such firm is independent of the Servicer within the meaning of the Code of Professional Ethics of the American Institute of Certified Public Accountants.  In the event such independent public accountants require the Indenture Trustee to agree to the procedures to be performed by such firm in any of the reports required to be prepared pursuant to this Section 5.5(c), the Servicer shall direct the Indenture Trustee in writing to so agree; it being understood and agreed that the Indenture Trustee will deliver such letter of agreement in conclusive reliance upon the direction of the Servicer, and the Indenture Trustee has not made any independent inquiry or investigation as to, and shall have no obligation or liability in respect of, the sufficiency, validity or correctness of such procedures.

To the extent the Indenture Trustee is required to agree to the procedures in order to receive the accountants' report, such agreement may include, among other things, (1) an acknowledgement that the Servicer has agreed that the procedures to be performed by the firm are sufficient for the purposes of the Indenture and that such procedures are sufficient for the Indenture Trustee's purposes which are specifically limited to receipt of the accountants' report, (2) releases by the Indenture Trustee (on behalf of itself and the Noteholders) of claims against the firm and acknowledgement of other limitations of liability in favor of the firm, and (3)

43

restrictions or prohibitions on the disclosure of the accountants' report or other information or documents provided to it by such firm to any party, including the Noteholders. Notwithstanding the foregoing, in no event shall the Indenture Trustee be required to execute any agreement in respect of the accountants' report that the Indenture Trustee determines adversely affects it in its individual capacity.

(d)     Report on Proceedings and Servicer Event of Default. (i) Promptly upon a Responsible Officer of the Servicer's obtaining Knowledge of any proposed or pending investigation of it by any Governmental Authority or any court or administrative proceeding which involves or is reasonably likely to have a material and adverse effect affecting the properties, business, prospects, profits or conditions (financial or otherwise) of the Servicer and its subsidiaries, as a whole, the Servicer shall send written notice specifying the nature of such investigation or proceeding and what action the Servicer is taking or proposes to take with respect thereto and evaluating its merits, or (ii) immediately upon obtaining Knowledge of the existence of any condition or event which constitutes a Servicer Event of Default, the Servicer shall send written notice to the Issuer, the Indenture Trustee and the Initial Purchasers describing its nature and period of existence and what action the Servicer is taking or proposes to take with respect thereto.  The Issuer, the Indenture Trustee and the Initial Purchasers acknowledge that if any condition or event referred to in subparagraph (i) above has been disclosed on a timely basis in filings with the Securities and Exchange Commission relating to the Servicer, that such disclosure will satisfy the requirements of subparagraph (i) above.

SECTION 5.6.     Records.

The Servicer shall maintain access to all data for which it is responsible (including, without limitation, computerized tapes or disks) relating directly to or maintained in connection with the servicing of the Timeshare Loans (which data and records shall be clearly marked to reflect that the Timeshare Loans have been Granted to the Indenture Trustee on behalf of the Noteholders and constitute part of the Trust Estate) at the address specified in Section 13.3 hereof or, upon 15 days' notice to the Issuer and the Indenture Trustee, at such other place where any Servicing Officer of the Servicer is located (or upon 24 hours' written notice if an Event of Default or Servicer Event of Default shall have occurred).

SECTION 5.7.     Fidelity Bond or Errors and Omissions Insurance.

The Servicer shall maintain or cause to be maintained fidelity bond and errors and omissions insurance with respect to the Servicer in such form and in amounts as is customary for institutions acting as custodian of funds in respect of timeshare loans or receivables on behalf of institutional investors; provided that such insurance shall be in a minimum amount of $1,000,000 per policy and shall name the Indenture Trustee as a certificateholder.  No provision of this Section 5.7 requiring such fidelity bond or errors and omissions insurance shall diminish or relieve the Servicer from its duties and obligations as set forth in this Indenture.  The Servicer shall be deemed to have complied with this provision if one of its respective Affiliates has such fidelity bond or errors and omissions insurance coverage and, by the terms of such fidelity bond or errors and omissions insurance policy, the coverage afforded thereunder extends to the Servicer.  Upon a request of the Indenture Trustee, the Servicer shall deliver to the Indenture Trustee, a certification evidencing coverage under such fidelity bond or the errors and omissions

44

insurance. Any such fidelity bond and errors and omissions insurance policy shall not be canceled or modified in a materially adverse manner without 30 days' prior written notice to the Servicer (or ten days' prior written notice if the policyholder hasn't timely paid its premium payments), provided, that the Servicer agrees to provide written notice of any cancellation or materially adverse modification initiated by such insurer to the Indenture Trustee within five Business Days of receipt from the applicable insurer of any such notice.

SECTION 5.8.    Merger or Consolidation of the Servicer.

(a)    The Servicer shall promptly provide written notice to the Indenture Trustee and each Rating Agency of any merger or consolidation of the Servicer. The Servicer shall keep in full effect its existence, rights and franchise as a corporation under the laws of the state of its incorporation except as permitted herein, and shall obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Indenture or any of the Timeshare Loans and to perform its duties under this Indenture.

(b)    Any Person into which the Servicer may be merged or consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any Person succeeding to the business of the Servicer, shall be the successor of the Servicer hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided, however, that the successor or surviving Person (i) is a company whose business includes the servicing of assets similar to the Timeshare Loans and shall be authorized to lawfully transact business in the state or states in which the related Timeshare Properties it is to service are situated; (ii) is a U.S. Person, and (iii) delivers to the Indenture Trustee (A) an agreement, in form and substance reasonably satisfactory to the Indenture Trustee, which contains an assumption by such successor entity of the due and punctual performance and observance of each covenant and condition to be performed or observed by the Servicer under this Indenture and the other Transaction Documents to which the Servicer is a party and (B) an Opinion of Counsel as to the enforceability of such agreement. The Servicer shall provide prior written notice of such merger or consolidation to each Rating Agency.

SECTION 5.9.    Sub-Servicing.

(a)    The Servicer may enter into one or more sub-servicing agreements with a sub-servicer upon delivery to the Indenture Trustee of a written confirmation from each Rating Agency that the execution of such sub-servicing agreement and the retention of such sub-servicer would not result in the qualification, downgrade or withdrawal of any rating assigned to a Class of Notes. References herein to actions taken or to be taken by the Servicer in servicing the Timeshare Loans include actions taken or to be taken by a sub-servicer on behalf of the Servicer. Any sub-servicing agreement will be upon such terms and conditions as the Servicer may reasonably agree and as are not inconsistent with this Indenture. The Servicer shall be solely responsible for any sub-servicing fees due and payable to such sub-servicer.

(b)    Notwithstanding any sub-servicing agreement, the Servicer shall remain obligated and liable for the servicing and administering of the Timeshare Loans in accordance

45

with this Indenture, without diminution of such obligation or liability by virtue of such sub-servicing agreement, and to the same extent and under the same terms and conditions as if the Servicer alone were servicing and administering the Timeshare Loans.

SECTION 5.10.    Servicer Resignation.

The Servicer shall not resign from the duties and obligations hereby imposed on it under this Indenture unless and until (i) a successor servicer, acceptable to the Issuer, the Indenture Trustee and the Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes, enters into an agreement in form and substance satisfactory to the Indenture Trustee and the Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes, which contains an assumption by such successor servicer of the due and punctual performance and observance of each covenant and condition to be performed or observed by the Servicer under this Indenture from and after the date of assumption, (ii) the Issuer, the Indenture Trustee and Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes consent to the assumption of the duties, obligations and liabilities of this Indenture by such successor Servicer, and (iii) the ratings of the Notes will not be qualified, downgraded or withdrawn (as evidenced by a letter from each Rating Agency to the Indenture Trustee to such effect, which letter shall be obtained at the expense of the Servicer, without right of reimbursement).  Upon such resignation, the Servicer shall comply with Section 5.4(b) hereof.

Except as provided in the immediately preceding paragraph or elsewhere in this Indenture, or as provided with respect to the survival of indemnifications herein, the duties and obligations of a Servicer under this Indenture shall continue until this Indenture shall have been terminated as provided herein.  The duties and obligations of a Servicer hereunder shall survive the exercise by the Indenture Trustee of any right or remedy under this Indenture or the enforcement by the Indenture Trustee of any provision of this Indenture.

SECTION 5.11.    Fees and Expenses.

As compensation for the performance of its obligations under this Indenture, the Servicer shall be entitled to receive on each Payment Date, from amounts on deposit in the Collection Account and in the priorities described in Sections 3.4 and 6.6 hereof, the Servicing Fee and any Additional Servicing Compensation.  Other than Liquidation Expenses, the Servicer shall pay all expenses incurred by it in connection with its servicing activities hereunder.

SECTION 5.12.    Access to Certain Documentation.

Upon ten Business Days' prior written notice (or, one Business Day's prior written notice after the occurrence and during the continuance of an Event of Default or a Servicer Event of Default), the Servicer will, from time to time during regular business hours, as requested by the Issuer, the Indenture Trustee or any Noteholder and, prior to the occurrence of a Servicer Event of Default, at the expense of the Issuer or such Noteholder and upon the occurrence and continuance of a Servicer Event of Default, at the expense of the Servicer, permit the Issuer, the Indenture Trustee or any Noteholder or its agents or representatives (i) to examine and make copies of and abstracts from all books, records and documents (including, without

46

limitation, computer tapes and disks) in the possession or under the control of the Servicer relating to the servicing of the Timeshare Loans serviced by it and (ii) to visit the offices and properties of the Servicer for the purpose of examining such materials described in clause (i) above, and to discuss matters relating to the Timeshare Loans with any of the officers, employees or accountants of the Servicer having knowledge of such matters.  Nothing in this Section 5.12 shall affect the obligation of the Servicer to observe any applicable law prohibiting disclosure of information regarding the Obligors, and the failure of the Servicer to provide access to information as a result of such obligation shall not constitute a breach of this Section 5.12.  The Servicer may require the Issuer, the Indenture Trustee or any Noteholder or its agents or representatives to execute certain agreements in order to comply with applicable privacy laws.

SECTION 5.13.    No Offset.

Prior to the termination of this Indenture, the obligations of the Servicer under this Indenture shall not be subject to any defense, counterclaim or right of offset which the Servicer has or may have against the Issuer, the Indenture Trustee or any Noteholder, whether in respect of this Indenture, any Timeshare Loan or otherwise.

SECTION 5.14.    Account Statements.

In connection with the Servicer's preparation of the Monthly Servicer Reports, the Indenture Trustee agrees to deliver to the Servicer a monthly statement providing account balances of each of the Trust Accounts.

SECTION 5.15.    Indemnification; Third Party Claim.

The Servicer agrees to indemnify the Issuer, the Indenture Trustee, the Paying Agent and the Noteholders from and against any and all actual damages (excluding economic losses related to the collectibility of any Timeshare Loan), claims, reasonable attorneys' fees and related costs, judgments, and any other costs, fees and expenses that each may sustain because of the failure of the Servicer to service the Timeshare Loans in accordance with the Servicing Standard or otherwise perform its obligations and duties hereunder in compliance with the terms of this Indenture, or because of any act or omission by the Servicer due to its negligence or willful misconduct in connection with its maintenance and custody of any funds, documents and records under this Indenture, or its release thereof except as contemplated by this Indenture, including, but not limited to, the costs of defending any claim or bringing any claim to enforce the indemnification or other obligations of the Servicer.   The Servicer shall immediately notify the Issuer and the Indenture Trustee if it has Knowledge of a claim made by a third party with respect to the Timeshare Loans, and, if such claim relates to the servicing of the Timeshare Loans by the Servicer, the Servicer shall assume, with the consent of the Indenture Trustee, the defense of any such claim and pay all expenses in connection therewith, including reasonable counsel fees, and promptly pay, discharge and satisfy any judgment or decree which may be entered against it.  This Section 5.15 shall survive the termination of this Indenture or the resignation or removal of the Servicer hereunder.

47

SECTION 5.16.    Backup Servicer.

(a)    Backup Servicing Agreement.  The Issuer, the Indenture Trustee, the Servicer, the Depositor and the Backup Servicer hereby agree to execute the Backup Servicing Agreement.  The Backup Servicer shall be responsible for each of the duties and obligations imposed upon it by the provisions of the Backup Servicing Agreement and shall have no duties or obligations under any Transaction Document to which it is not a party.

(b)    Termination of Servicer; Cooperation.  In the event that the Servicer is terminated or resigns in accordance with the terms of this Indenture, the Backup Servicer agrees to continue to perform its duties and obligations hereunder and in the Backup Servicing Agreement without interruption.  The Backup Servicer agrees to cooperate in good faith with any successor Servicer to effect a transition of the servicing obligations by the Servicer to any successor Servicer.  The Indenture Trustee agrees to provide such information regarding the Trust Accounts as the Backup Servicer shall require to produce the Monthly Servicer Report on and after the Assumption Date.

(c)    Backup Servicer Duties After Assumption Date.  In the event that the Servicer is terminated or resigns in accordance with this Indenture, the Backup Servicer agrees that it shall undertake those servicing duties and obligations as set forth in and subject to Section 2 and Schedule V of the Backup Servicing Agreement.  Notwithstanding Section 5.9 hereof, so long as Concord Servicing Corporation is the Backup Servicer, the Indenture Trustee, as successor Servicer, will not be obligated or liable for the servicing and administration activities to the extent that the Backup Servicer is responsible for such activities under the Backup Servicing Agreement.

(d)    Backup Servicing Fee.  Prior to the Assumption Date, the Backup Servicer shall receive its Backup Servicing Fee in accordance with Sections 3.4 or 6.6 hereof, as applicable.  On and after the Assumption Date, the Indenture Trustee, as successor Servicer, will be obligated to distribute the Backup Servicing Fee to the Backup Servicer from amounts received by the Indenture Trustee in respect of the Servicing Fee.

(e)    Termination of Backup Servicer.  Notwithstanding anything to the contrary herein, the Indenture Trustee shall have the right to remove the Backup Servicer with or without cause at any time and replace the Backup Servicer pursuant to the provisions of the Backup Servicing Agreement.  In the event that the Indenture Trustee shall exercise its rights to remove and replace Concord Servicing Corporation as Backup Servicer or Concord Servicing Corporation shall have terminated the Backup Servicing Agreement in accordance with the terms thereof, Concord Servicing Corporation shall have no further obligation to perform the duties of the Backup Servicer under this Indenture.  In the event of a termination of the Backup Servicing Agreement, the Indenture Trustee, at the written direction of Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes, shall appoint a successor Backup Servicer reasonably acceptable to the Indenture Trustee.  Upon the termination or resignation of the Backup Servicer, the Indenture Trustee shall be deemed to represent, warrant and covenant that it will service or engage a subservicer to perform each of the servicing duties and responsibilities described in this Indenture.

48

<u>Aruba Notices</u>.  Within 30 days of the Closing Date (with respect to the Initial Timeshare Loans that are Aruba Club Loans) and the related Transfer Date (with respect to a Subsequent Timeshare Loan or Qualified Substitute Timeshare Loan that is an Aruba Club Loan), the Servicer shall confirm that notices have been mailed out to each related Obligor that such Timeshare Loan has ultimately been transferred and assigned to the Issuer and pledged to the Indenture Trustee, in trust, for the benefit of the Noteholders.  Such notice may include any notice or notices that the Aruba Originator's predecessors in title to the Timeshare Loan may give to the same Obligor with respect to any transfers and assignments of the Timeshare Loan by such predecessors.  Such notice shall be in the form attached hereto as <u>Exhibit L</u>, as the same may be amended, revised or substituted by the Indenture Trustee and the Servicer from time to time.

<u>Recordation</u>.  As soon as practicable after the Closing Date and each Transfer Date, as applicable, but in no event later than ten Business Days after receipt by the Servicer of the original Mortgage, the Servicer shall cause the Assignment of Mortgage in respect of each Timeshare Loan transferred on such date to be sent for recording to the appropriate offices.  The Servicer agrees to cause all evidences of recordation to be delivered to the Custodian to be held as part of the Timeshare Loan Files.

<div align="center">ARTICLE VI.</div>

<div align="center">EVENTS OF DEFAULT; REMEDIES</div>

SECTION 6.1.    <u>Events of Default</u>.

"**Event of Default**" wherever used herein with respect to Notes, means any one of the following events:

(a)    a default in the payment of any Interest Distribution Amount on any Class of Notes within three Business Days after the same becomes due and payable; or

(b)    the failure to reduce the Aggregate Outstanding Note Balance to zero and to pay all unpaid Deferred Interest Amounts at the Stated Maturity; or

(c)    a non-monetary default in the performance, or breach, of any covenant of the Issuer in this Indenture (other than a covenant dealing with a default in the performance of which, or the breach of which, is specifically dealt with elsewhere in this Section 6.1), the continuance of such default or breach for a period of 30 days (or, if the Issuer shall have provided evidence satisfactory to the Indenture Trustee that such covenant cannot be cured in the 30-day period and that it is diligently pursuing a cure, 60 days) after the earlier of (x) the Issuer first acquiring Knowledge thereof, and (y) the Indenture Trustee's giving written notice thereof to the Issuer; <u>provided</u>, <u>however</u>, that if such default or breach is in respect of the negative covenants contained in Section 8.6(a)(i) or (ii) hereof, there shall be no grace period whatsoever; or

(d)    if any representation or warranty of the Issuer made in this Indenture shall prove to be incorrect in any material respect as of the time when the same shall have been made, and such breach is not remedied within 30 days (or, if the Issuer shall have provided evidence

<div align="center">49</div>

satisfactory to the Indenture Trustee that such representation or warranty cannot be cured in the 30-day period and that it is diligently pursuing a cure, 60 days) after the earlier of (x) the Issuer first acquiring Knowledge thereof, and (y) the Indenture Trustee's giving written notice thereof to the Issuer; or

(e)     the entry by a court having jurisdiction over the Issuer of (i) a decree or order for relief in respect of the Issuer in an involuntary case or proceeding under any applicable federal or state bankruptcy, insolvency, reorganization, or other similar law or (ii) a decree or order adjudging the Issuer a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment, or composition of or in respect of the Issuer under any applicable federal or state law, or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator, or other similar official of the Issuer, or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order for relief or any such other decree or order unstayed and in effect for a period of 60 consecutive days; or

(f)     the commencement by the Issuer of a voluntary case or proceeding under any applicable federal or state bankruptcy, insolvency, reorganization, or other similar law or of any other case or proceeding to be adjudicated a bankrupt or insolvent, or the consent by either to the entry of a decree or order for relief in respect of the Issuer in an involuntary case or proceeding under any applicable federal or state bankruptcy, insolvency, reorganization, or other similar law or to the commencement of any bankruptcy or insolvency case or proceeding against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under any applicable federal or state law, or the consent by it to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator, or similar official of the Issuer or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the Issuer's failure to pay its debts generally as they become due, or the taking of corporate action by the Issuer in furtherance of any such action; or

(g)     the Issuer becoming subject to registration as an "investment company" under the Investment Company Act of 1940, as amended (the "'**40 Act**"); or

(h)     the impairment of the validity of any security interest of the Indenture Trustee in the Trust Estate in any material respect, except as expressly permitted hereunder, or the creation of any material encumbrance on or with respect to the Trust Estate or any portion thereof not otherwise permitted, which is not stayed or released within ten days of the Issuer having Knowledge of its creation; or

(i)     the failure by the Club Originator to repurchase any Defective Timeshare Loan or provide a Qualified Substitute Timeshare Loan for a Defective Timeshare Loan to the extent required under the terms of the Transfer Agreement or the Bluegreen Purchase Agreement; or

(j)     the occurrence and continuance of a Servicer Event of Default that is uncured for two consecutive Due Periods.

50

SECTION 6.2.    Acceleration of Maturity; Rescission and Annulment.

(a)    Upon the occurrence and continuance of an Event of Default, if (i) such Event of Default of the kind specified in Section 6.1(e) or Section 6.1(f) hereof occurs, (ii) an Event of Default of the kind specified in Section 6.1(a) hereof occurs and either (x) the Indenture Trustee has, in its good faith judgment after consultation with an expert, determined that the value of the assets comprising the Trust Estate is less than the Aggregate Outstanding Note Balance or (y) such Event of Default continues for two consecutive Payment Dates, then each Class of Notes shall automatically become due and payable at its Outstanding Note Balance together with all accrued and unpaid interest thereon.

(b)    Upon the occurrence and continuance of an Event of Default, if such Event of Default is of the kind specified in Section 6.1(a) hereof (other than as described in Section 6.2(a) above), the Indenture Trustee shall, upon written direction from Noteholders representing at least 66-2/3% of the Adjusted Note Balance of the most senior Class of Notes then Outstanding (and, if payment of interest and principal on the most senior Class of Notes then Outstanding is current, the consent of the Noteholders representing at least 66-2/3% of the Adjusted Note Balance of the most senior Class of Notes which has failed to receive one or more payments of interest or principal), declare each Class of Notes to be immediately due and payable at its Outstanding Note Balance plus all accrued and unpaid interest thereon.

(c)    Upon the occurrence and continuance of an Event of Default, if such Event of Default (other than an Event of Default of the kind described in Sections 6.2(a) or (b) hereof) shall occur and is continuing, the Indenture Trustee shall, upon written direction from Noteholders representing at least 66-2/3% of the Adjusted Note Balance of the most senior Class of Notes then Outstanding, declare each Class of Notes to be immediately due and payable at its Outstanding Note Balance plus all accrued and unpaid interest thereon.

(d)    Upon any such declaration or automatic acceleration, the Outstanding Note Balance of each Class of Notes together with all accrued and unpaid interest thereon shall become immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Issuer.  The Indenture Trustee shall promptly send a notice of any declaration or automatic acceleration to each Rating Agency.

(e)    At any time after such a declaration of acceleration has been made but before a judgment or decree for payment of the money due has been obtained by the Indenture Trustee as hereinafter in this Article VI, provided, the Noteholders representing at least 66-2/3% of the Adjusted Note Balance of the most senior Class Outstanding (and, if the consent of another Class shall have been required for such declaration, Noteholders representing at least 66-2/3% of the Adjusted Note Balance of such Class) by written notice to the Issuer and the Indenture Trustee, may rescind and annul such declaration and its consequences if:

(i)    the Issuer has paid or deposited with the Indenture Trustee a sum sufficient to pay:

(1)    all principal due on any Class of Notes which has become due otherwise than by such declaration of acceleration and interest

51

thereon from the date when the same first became due until the date of payment or deposit,

(2)    all interest due with respect to any Class of Notes and, to the extent that payment of such interest is lawful, interest upon overdue interest from the date when the same first became due until the date of payment or deposit at a rate per annum equal to the applicable Note Rate, and

(3)    all sums paid or advanced by the Indenture Trustee hereunder and the reasonable compensation, expenses, disbursements, and advances of each of the Indenture Trustee and the Servicer, its agents and counsel;

and

(ii)    all Events of Default with respect to the Notes, other than the non-payment of the Outstanding Note Balance of each Class of Notes which became due solely by such declaration of acceleration, have been cured or waived as provided in Section 6.13 hereof.

(f)    An automatic acceleration under Section 6.2(a) hereof may only be rescinded and annulled by Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes then Outstanding.

(g)    Notwithstanding Section 6.2(d) and (e) hereof, (i) if the Indenture Trustee shall have commenced making payments as described in Section 6.6 hereof, no acceleration may be rescinded or annulled and (ii) no rescission shall affect any subsequent Events of Default or impair any rights consequent thereon.

SECTION 6.3.    <u>Remedies</u>.

(a)    If an Event of Default with respect to the Notes occurs and is continuing of which a Responsible Officer of the Indenture Trustee has Knowledge, the Indenture Trustee shall promptly give notice to each Noteholder as set forth in Section 7.2 hereof and shall solicit such Noteholders for advice. The Indenture Trustee shall then take such action as so directed by the Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes then Outstanding subject to the provisions of this Indenture.

(b)    Following any acceleration of the Notes, the Indenture Trustee shall have all of the rights, powers and remedies with respect to the Trust Estate as are available to secured parties under the UCC or other applicable law, subject to the limitations set forth in subsection (d) below and provided such action is not inconsistent with any other provision of this Indenture. Such rights, powers and remedies may be exercised by the Indenture Trustee in its own name as trustee under this Indenture.

(c)    If an Event of Default specified in Section 6.1(a) hereof occurs and is continuing, the Indenture Trustee is authorized to recover judgment in its own name and as

52

trustee under this Indenture against the Issuer for the Aggregate Outstanding Note Balance and interest remaining unpaid with respect to the Notes.

(d)     Subject to the provisions set forth herein, if an Event of Default occurs and is continuing, the Indenture Trustee may, in its discretion, and at the instruction of the Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes shall, proceed to protect and enforce its rights and the rights of the Noteholders by such appropriate judicial or other proceedings as the Indenture Trustee shall deem most effectual to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy.  The Indenture Trustee shall notify the Issuer, each Rating Agency, the Servicer and the Noteholders of any such action.

(e)     If the Indenture Trustee shall have received instructions, within 45 days from the date notice pursuant to Section 6.3(a) hereof is first given, from Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes that such Persons approve of or request the liquidation of all of the Trust Estate, the Indenture Trustee shall to the extent lawful, promptly sell, dispose of or otherwise liquidate all of the Trust Estate in a commercially reasonable manner and on commercially reasonable terms, which shall include the solicitation of competitive bids from third parties including any Noteholder (other than Bluegreen or any Affiliates thereof), such bids to be approved by the Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes.  The Indenture Trustee may obtain a prior determination from any conservator, receiver or liquidator of the Issuer that the terms and manner of any proposed sale, disposition or liquidation are commercially reasonable.  Notwithstanding anything to the contrary herein, neither Bluegreen nor any of its Affiliates may make a bid in connection with the disposition of the Timeshare Loans in accordance with this Section 6.3(e).

SECTION 6.4.     Indenture Trustee May File Proofs of Claim.

(a)     In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding related to the Issuer, or any other obligor in respect of the Notes, or the property of the Issuer, or such other obligor or their creditors, the Indenture Trustee (irrespective of whether the principal of the Notes shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Indenture Trustee shall have made any demand on the Issuer for the payment of overdue principal or interest) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(i)     to file and prove a claim for the whole amount of principal and interest owing and unpaid in respect of the Notes and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee and any predecessor Indenture Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and any predecessor Indenture Trustee, their agents and counsel) and of the Noteholders allowed in such judicial proceeding;

53

(ii)  to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same; and

(iii)  to participate as a member, voting or otherwise, of any official committee of creditors appointed in such matter;

and any custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Noteholder to make such payments to the Indenture Trustee and to pay to the Indenture Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and any predecessor Indenture Trustee, their agents and counsel, and any other amounts due the Indenture Trustee and any predecessor Indenture Trustee under Section 7.6 hereof.

(b)  Nothing herein contained shall be deemed to authorize the Indenture Trustee to authorize, consent to, accept or adopt on behalf of any Noteholder any plan of reorganization, agreement, adjustment or composition affecting the Notes or the rights of any Noteholder thereof or affecting the Timeshare Loans or the other assets constituting the Trust Estate or to authorize the Indenture Trustee to vote in respect of the claim of any Noteholder in any such proceeding.

SECTION 6.5.   <u>Indenture Trustee May Enforce Claims Without Possession of Notes</u>.

All rights of action and claims under this Indenture, the Notes, the Timeshare Loans or the other assets constituting the Trust Estate may be prosecuted and enforced by the Indenture Trustee without the possession of any of the Notes or the production thereof in any proceeding relating thereto, and any such proceeding instituted by the Indenture Trustee shall be brought in its own name as trustee under this Indenture, and any recovery of judgment shall, after provisions for the payment of reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and any predecessor Indenture Trustee, their agents and counsel, be for the benefit of the Noteholders in respect of which such judgment has been recovered, and distributed pursuant to the priorities contemplated by Section 3.4 and Section 6.6 hereof, as applicable.

SECTION 6.6.   <u>Application of Money Collected</u>.

(a)  If a Payment Default Event shall have occurred and the Indenture Trustee has not yet effected the remedies under Section 6.3(d) and Section 6.16 hereof, any money collected by the Indenture Trustee in respect of the Trust Estate (other than any amounts owed to the Servicer as Additional Servicing Compensation) and any other money that may be held thereafter by the Paying Agent as security for the Notes, including, without limitation, the amounts on deposit in the General Reserve Account and the Force Majeure Loan Reserve Account, shall be applied in the following order on each Payment Date:

(i)  to the Indenture Trustee, the Indenture Trustee Fee and any extraordinary out-of-pocket expenses and indemnities owed to the Indenture Trustee, plus any accrued and unpaid Indenture Trustee Fees with respect to prior Payment Dates; provided, however, that (i) any payments to the Indenture Trustee as reimbursement for any extraordinary out-of-pocket expenses and indemnities

54

owed to the Indenture Trustee related to the transfer of servicing to a successor Servicer will be limited to $30,000 per calendar quarter and $100,000 in the aggregate, and (ii) payments to the Indenture Trustee as reimbursement for any other extraordinary out-of-pocket expenses and indemnities owed to the Indenture Trustee will be limited to $40,000 per calendar year so long as none of the following events has occurred: an Event of Default, acceleration of the Notes; or the liquidation of the Trust Estate pursuant to the Indenture;

(ii)     to the Owner Trustee, any accrued and unpaid Owner Trustee Fees;

(iii)    to the Administrator, any accrued and unpaid Administrator Fees;

(iv)    to the Custodian, any accrued and unpaid Custodian Fees;

(v)     to the Lockbox Bank, any accrued and unpaid Lockbox Fees;

(vi)    to the Servicer, any accrued and unpaid Servicing Fees;

(vii)    to the Backup Servicer, any accrued and unpaid Backup Servicing Fees (less any amounts received from the Indenture Trustee, as successor Servicer);

(viii)    to the Class A Noteholders, the Class A Interest Distribution Amount;

(ix)    to the Class B Noteholders, the Class B Interest Distribution Amount;

(x)     to the Class C Noteholders, the Class C Interest Distribution Amount;

(xi)    to the Class A Noteholders, all remaining amounts until the Outstanding Note Balance of the Class A Notes is reduced to zero;

(xii)    to the Class B Noteholders, all remaining amounts until the Outstanding Note Balance of the Class B Notes is reduced to zero;

(xiii)    to the Class C Noteholders, all remaining amounts until the Outstanding Note Balance of the Class C Notes is reduced to zero;

(xiv)    to the Class B Noteholders, the Deferred Interest Amount for such Class, if any;

(xv)    to the Class C Noteholders, the Deferred Interest Amount for such Class, if any;

(xvi)    to the Indenture Trustee, any extraordinary out-of-pocket expenses and indemnities owed to the Indenture Trustee not paid in accordance with clause (i) above;

(xvii)    to the Lockbox Bank, any amounts owed under the Lockbox Agreement not paid in accordance with clause (v) above; and

55

(xviii)   to the Certificate Distribution Account, any remaining Available Funds for distribution pursuant to the Trust Agreement.

(b)   If (i) (A) a Payment Default Event shall have occurred or (B) each Class of Notes shall otherwise have been declared due and payable following an Event of Default and (ii) the Indenture Trustee shall have effected a sale of the Trust Estate under Section 6.3(d) and Section 6.16 hereof ((i) and (ii), a "**Trust Estate Liquidation Event**"), any money collected by the Indenture Trustee in respect of the Trust Estate (other than any amounts to the Servicer as Additional Servicing Compensation) and any other money that may be held thereafter by the Paying Agent as security for the Notes, including without limitation the amounts on deposit in the General Reserve Account and the Force Majeure Loan Reserve Account, shall be applied in the following order on each Payment Date:

(i)   to the Indenture Trustee, any accrued and unpaid Indenture Trustee Fees and out-of-pocket expenses and indemnities incurred and charged and unpaid as of such date;

(ii)   to the Owner Trustee, any accrued and unpaid Owner Trustee Fees;

(iii)   to the Administrator, any accrued and unpaid Administrator Fees;

(iv)   to the Custodian, any accrued and unpaid Custodian Fees;

(v)   to the Lockbox Bank, any accrued and unpaid Lockbox Fees and any other amounts owed to the Lockbox Bank pursuant to the Lockbox Agreement;

(vi)   to the Servicer, any accrued and unpaid Servicing Fees;

(vii)   to the Backup Servicer, any accrued and unpaid Backup Servicing Fees (less any amounts received from the Indenture Trustee, as successor Servicer);

(viii)   to the Class A Noteholders, the Class A Interest Distribution Amount;

(ix)   to the Class A Noteholders, all remaining amounts until the Outstanding Note Balance of the Class A Notes is reduced to zero;

(x)   to the Class B Noteholders, the Class B Interest Distribution Amount;

(xi)   to the Class B Noteholders, the Class B Deferred Interest Amount, if any;

(xii)   to the Class B Noteholders, all remaining amounts until the Outstanding Note Balance of the Class B Notes is reduced to zero;

(xiii)   to the Class C Noteholders, the Class C Interest Distribution Amount;

56

(xiv)    to the Class C Noteholders, the Class C Deferred Interest Amount, if any;

(xv)    to the Class C Noteholders, all remaining amounts until the Outstanding Note Balance of the Class C Notes is reduced to zero; and

(xvi)    to the Certificate Distribution Account, any remaining Available Funds for distribution pursuant to the Trust Agreement.

(c)    Notwithstanding the occurrence and continuation of an Event of Default, prior to the occurrence of a Sequential Pay Event, Noteholders shall continue to be paid in the manner and priorities described in Section 3.4 hereof.

SECTION 6.7.    Limitation on Suits.

No Noteholder shall have any right to institute any proceeding, judicial or otherwise, with respect to this Indenture or for any other remedy hereunder, unless:

(a)    there is a continuing Event of Default and such Noteholder has previously given written notice to the Indenture Trustee of a continuing Event of Default;

(b)    such Noteholder or Noteholders have offered to the Indenture Trustee reasonable indemnity (which may be in the form of written assurances) against the costs, expenses and liabilities to be incurred in compliance with such request;

(c)    the Indenture Trustee, for 30 days after its receipt of such notice, request and offer of indemnity, has failed to institute any such proceeding; and

(d)    no direction inconsistent with such written request has been given to the Indenture Trustee during such 30-day period by the Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes Outstanding;

it being understood and intended that no one or more of such Noteholders shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Noteholders, or to obtain or to seek to obtain priority or preference over any other Noteholders or to enforce any right under this Indenture, except in the manner herein provided and for the ratable benefit of all such Noteholders.  It is further understood and intended that so long as any portion of the Notes remains Outstanding, the Servicer shall not have any right to institute any proceeding, judicial or otherwise, with respect to this Indenture (other than for the enforcement of Section 3.4 hereof) or for the appointment of a receiver or trustee (including without limitation a proceeding under the Bankruptcy Code), or for any other remedy hereunder.  Nothing in this Section 6.7 shall be construed as limiting the rights of otherwise qualified Noteholders to petition a court for the removal of an Indenture Trustee pursuant to Section 7.8 hereof.

57

SECTION 6.8.     <u>Unconditional Right of Noteholders to Receive Principal and Interest</u>.

Notwithstanding any other provision in this Indenture, other than the provisions hereof limiting the right to recover amounts due on the Notes to recoveries from the property comprising the Trust Estate, each Noteholder shall have the absolute and unconditional right to receive payment of the principal of, and interest on, such Note as such payments of principal and interest become due, including on the Stated Maturity, and such right shall not be impaired without the consent of such Noteholder; provided, however, that notwithstanding any other provision of this Indenture to the contrary, the obligation to pay principal and interest on the Notes or any other amount payable to any Noteholder will be without recourse to the Originators, the Administrator, the Servicer, the Backup Servicer, the Indenture Trustee or any Affiliate (other than the Issuer), officer employee or director of any of them, and the obligation of the Issuer to pay principal of or interest on the Notes or any other amount payable to any Noteholder will be subject to the allocation and payment provisions of this Indenture and limited to amounts available from the Trust Estate.  Notwithstanding any other terms of this Indenture, the Notes, any Transaction Documents or otherwise, the obligations of the Issuer under the Notes, this Indenture and each other Transaction Document to which it is a party are limited recourse obligations of the Issuer, payable solely from the Trust Estate, and following realization of the Trust Estate and application of the proceeds thereof in accordance with the terms of this Indenture, none of the Noteholders, the Indenture Trustee or any of the other parties to the Transaction Documents shall be entitled to take any further steps to recover any sums due but still unpaid hereunder or thereunder, all claims in respect of which shall be extinguished and shall not thereafter revive.  It is understood that the foregoing provisions of this paragraph shall not (i) prevent recourse to the Trust Estate for sums due or to become due under any security, instrument or agreement which is part of the Trust Estate, (ii) save as specifically provided therein, constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture.  It is further understood that the foregoing provisions of this paragraph shall not limit the right of any Person, to name the Issuer as a party defendant in any proceeding or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against the Issuer.

SECTION 6.9.     <u>Restoration of Rights and Remedies</u>.

If the Indenture Trustee or any Noteholder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Indenture Trustee or to such Noteholder, then and, in every such case, subject to any determination in such proceeding, the Issuer, the Indenture Trustee and the Noteholders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Indenture Trustee and the Noteholders continue as though no such proceeding had been instituted.

SECTION 6.10.    <u>Rights and Remedies Cumulative</u>.

Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost, or stolen Notes in Section 2.5(f) hereof, no right or remedy herein conferred upon or reserved to the Indenture Trustee or to the Noteholders is intended to be

58

exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

SECTION 6.11.    Delay or Omission Not Waiver.

No delay or omission of the Indenture Trustee or of any Noteholder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article VI or by law to the Indenture Trustee or to the Noteholders may be exercised from time to time, and as often as may be deemed expedient, by the Indenture Trustee or by the Noteholders, as the case may be.

SECTION 6.12.    Control by Noteholders.

Except as may otherwise be provided in this Indenture, until such time as the conditions specified in Sections 11.1(a)(i) and (ii) hereof have been satisfied in full, the Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Indenture Trustee, or exercising any trust or power conferred on the Indenture Trustee, with respect to the Notes.  Notwithstanding the foregoing:

(i)    no such direction shall be in conflict with any rule of law or with this Indenture;

(ii)    the Indenture Trustee shall not be required to follow any such direction which the Indenture Trustee reasonably believes might result in any personal liability on the part of the Indenture Trustee for which the Indenture Trustee is not adequately indemnified; and

(iii)    the Indenture Trustee may take any other action deemed proper by the Indenture Trustee which is not inconsistent with any such direction; provided that the Indenture Trustee shall give notice of any such action to each Noteholder.

SECTION 6.13.    Waiver of Events of Default.

(a)    Unless a Sequential Pay Event shall have occurred, the Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes may, by one or more instruments in writing, waive any Event of Default hereunder and its consequences, except a continuing Event of Default:

(i)    in respect of the payment of the principal of or interest on any Note (which may only be waived by such Noteholder), or

(ii)    in respect of a covenant or provision hereof which under Article IX hereof cannot be modified or amended without the consent of the Noteholder of

59

each Outstanding Note affected (which only may be waived by the Noteholders of all Outstanding Notes affected).

(b)     A copy of each waiver pursuant to Section 6.13(a) hereof shall be furnished by the Issuer to the Indenture Trustee and each Noteholder.  Upon any such waiver, such Event of Default shall cease to exist and shall be deemed to have been cured, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Event of Default or impair any right consequent thereon.

SECTION 6.14.     Undertaking for Costs.

All parties to this Indenture agree (and each Noteholder by its acceptance thereof shall be deemed to have agreed) that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Indenture Trustee for any action taken, suffered or omitted by it as Indenture Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 6.14 shall not apply to (i) any suit instituted by the Indenture Trustee, (ii) to any suit instituted by any Noteholder, or group of Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes Outstanding, or (iii) to any suit instituted by any Noteholder for the enforcement of the payment of the principal of or interest on any Note on or after the maturities for such payments, including the Stated Maturity, as applicable.

SECTION 6.15.     Waiver of Stay or Extension Laws.

The Issuer covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and the Issuer (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Indenture Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

SECTION 6.16.     Sale of Trust Estate.

(a)     The power to effect the sale of the Trust Estate pursuant to Section 6.3 hereof shall continue unimpaired until the entire Trust Estate shall have been sold or all amounts payable on the Notes shall have been paid or losses allocated thereto and borne thereby.  The Indenture Trustee may from time to time, upon directions in accordance with Section 6.12 hereof, postpone any public sale by public announcement made at the time and place of such sale.

(b)     Unless required by applicable law, the Indenture Trustee shall not sell to a third party the Trust Estate, or any portion thereof except as permitted under Section 6.3(e) hereof.

60

      (c)     In connection with a sale of the Trust Estate:

      (i)     any one or more Noteholders (other than Bluegreen or any Affiliates thereof) may bid for and purchase the property offered for sale, and upon compliance with the terms of sale may hold, retain, and possess and dispose of such property, without further accountability, and any Noteholder (other than Bluegreen or any Affiliates thereof) may, in paying the purchase money therefor, deliver in lieu of cash any Outstanding Notes or claims for interest thereon for credit in the amount that shall, upon distribution of the net proceeds of such sale, be payable thereon, and the Notes, in case the amounts so payable thereon shall be less than the amount due thereon, shall be returned to the Noteholders after being appropriately stamped to show such partial payment;

      (ii)     the Indenture Trustee shall execute and deliver an appropriate instrument of conveyance prepared by the Servicer transferring the Indenture Trustee's interest in the Trust Estate without recourse, representation or warranty in any portion of the Trust Estate in connection with a sale thereof;

      (iii)     the Indenture Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey the Issuer's interest in any portion of the Trust Estate in connection with a sale thereof, and to take all action necessary to effect such sale;

      (iv)     no purchaser or transferee at such a sale shall be bound to ascertain the Indenture Trustee's authority, inquire into the satisfaction of any conditions precedent or see to the application of any moneys;

      (v)     the method, manner, time, place and terms of any sale of the Trust Estate shall be commercially reasonable; and

      (vi)     none of Bluegreen or its Affiliates may bid for and purchase the Timeshare Loans offered for sale by the Indenture Trustee in Section 6.16(c)(i) hereof.

      SECTION 6.17.     <u>Action on Notes</u>.

      The Indenture Trustee's right to seek and recover judgment on the Notes or under this Indenture or any other Transaction Document shall not be affected by the seeking, obtaining or application of any other relief under or with respect to this Indenture or any other Transaction Document.  Neither the Lien of this Indenture nor any rights or remedies of the Indenture Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Indenture Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Trust Estate or upon any of the assets of the Issuer.  Any money or property collected by the Indenture Trustee shall be applied in accordance with the provisions of this Indenture.

61

SECTION 6.18.      nPerformance and Enforcement of Certain Obligations.

Promptly following a request from the Indenture Trustee, the Issuer shall take all such lawful action as the Indenture Trustee may request to compel or secure the performance and observance by the Depositor, the Club Originator and the Servicer, as applicable, of each of their respective obligations to the Issuer under or in connection with the Sale Agreement and any other Transaction Document and to exercise any and all rights, remedies, powers and privileges lawfully available to the Issuer under or in connection with the Sale Agreement or any other Transaction Document to the extent and in the manner directed by the Indenture Trustee, including the transmission of notices of default on the part of the Depositor, the Club Originator or the Servicer thereunder and the institution of legal or administrative actions or proceedings to compel or secure performance by the Depositor, the Club Originator or the Servicer of each of their obligations under the Sale Agreement and the other Transaction Documents.

ARTICLE VII.

THE INDENTURE TRUSTEE

SECTION 7.1.      Certain Duties.

(a)      The Indenture Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Indenture Trustee; except as expressly set forth herein, the Indenture Trustee shall have no obligation to monitor the performance of the Servicer under the Transaction Documents.

(b)      In the absence of bad faith on its part, the Indenture Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Indenture Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Indenture Trustee, the Indenture Trustee shall be under a duty to examine the same to determine whether or not they conform on their face to the requirements of this Indenture; provided, however, the Indenture Trustee shall not be required to verify or recalculate the contents thereof.

(c)      In case an Event of Default or a Servicer Event of Default (resulting in the appointment of the Indenture Trustee as successor Servicer) has occurred and is continuing, the Indenture Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs; provided, however, that no provision in this Indenture shall be construed to limit the obligations of the Indenture Trustee to provide notices under Section 7.2 hereof.

(d)      The Indenture Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders pursuant to this Indenture, unless such Noteholders shall have offered to the Indenture Trustee reasonable security or indemnity acceptable to the Indenture Trustee (which

62

may be in the form of written assurances) against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

(e)    No provision of this Indenture shall be construed to relieve the Indenture Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, <u>except</u> that:

(i)    this Section 7.1(e) shall not be construed to limit the effect of Section 7.1(a) and (b) hereof;

(ii)    the Indenture Trustee shall not be liable for any error of judgment made in good faith unless it shall be proved that the Indenture Trustee shall have been negligent in ascertaining the pertinent facts; and

(iii)    the Indenture Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the written direction of the holders of the requisite principal amount of the outstanding Notes, or in accordance with any written direction delivered to it under Sections 6.2(a), (b) or (c) hereof relating to the time, method and place of conducting any proceeding for any remedy available to the Indenture Trustee, or exercising any trust or power conferred upon the Indenture Trustee, under this Indenture.

(f)    Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Indenture Trustee shall be subject to the provisions of this Section 7.1.

(g)    The Indenture Trustee makes no representations or warranties with respect to the Timeshare Loans or the Notes or the validity or sufficiency of any assignment of the Timeshare Loans to the Issuer or to the Trust Estate.

(h)    Notwithstanding anything to the contrary herein, the Indenture Trustee is not required to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or indemnity reasonably satisfactory to the Indenture Trustee against such risk or liability is not reasonably assured to it.

SECTION 7.2.    <u>Notice of Events of Default</u>.

The Indenture Trustee shall promptly (but, in any event, within three Business Days) notify the Issuer, the Servicer, each Rating Agency and the Noteholders upon a Responsible Officer obtaining Knowledge of any event which constitutes an Event of Default or a Servicer Event of Default or would constitute an Event of Default or a Servicer Event of Default but for the requirement that notice be given or time elapse or both.

SECTION 7.3.    <u>Certain Matters Affecting the Indenture Trustee</u>.

Subject to the provisions of Section 7.1 hereof:

63

(a)     The Indenture Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)     Any request or direction of any Noteholders, the Issuer, or the Servicer mentioned herein shall be in writing;

(c)     Whenever in the performance of its duties hereunder the Indenture Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Indenture Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's Certificate or an Opinion of Counsel;

(d)     The Indenture Trustee may consult with counsel, accountants and other experts, and the advice of such counsel, accountants and other experts or any Opinion of Counsel shall be deemed authorization in respect of any action taken, suffered, or omitted by it hereunder in good faith and in reliance thereon;

(e)     Prior to the occurrence of an Event of Default or after the curing of all Events of Default which may have occurred, the Indenture Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper document, unless requested in writing so to do by Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes; provided, however, that if the payment within a reasonable time to the Indenture Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the reasonable opinion of the Indenture Trustee, not reasonably assured to the Indenture Trustee by the security afforded to it by the terms of this Indenture, the Indenture Trustee may require reasonable indemnity against such cost, expense or liability as a condition to such proceeding.  The reasonable expense of every such examination shall be paid by the Servicer or, if paid by the Indenture Trustee, shall be reimbursed by the Servicer upon demand;

(f)     The Indenture Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys or a custodian (which may be an Affiliate of the Indenture Trustee), and the Indenture Trustee shall not be liable for any acts or omissions of such agents, attorneys or custodians appointed with due care by it hereunder; and

(g)     Delivery of any reports, information and documents to the Indenture Trustee provided for herein or any other Transaction Document is for informational purposes only (unless otherwise expressly stated), and the Indenture Trustee's receipt of such shall not constitute constructive knowledge of any information contained therein or determinable from information contained therein, including the Servicer's or the Issuer's compliance with any of its representations, warranties or covenants hereunder (as to which the Indenture Trustee is entitled to rely exclusively on Officer's Certificates).

64

(h)      In no event shall the Indenture Trustee be liable for any special, indirect, punitive or consequential damages.

(i)      In no event shall the Indenture Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation epidemics, pandemics, strikes, work stoppages, act of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications, or computer systems or services.

(j)      To help fight the funding of terrorism and money laundering activities, the Indenture Trustee may obtain, verify, and record information that identifies individuals or entities that establish a  relationship or open an account with the Indenture Trustee; the Indenture Trustee may ask for information reasonably necessary to identify the individual or entity who is establishing the relationship or opening the account; the Indenture Trustee may also ask for formation documents, such as articles of incorporation, an offering memorandum or other identifying document be provided to it.

(k)      Any permissive right to take or refrain from taking action enumerated in this Indenture shall not be construed as a duty or obligation.

(l)      In no event shall the Indenture Trustee have any responsibility to monitor compliance with or enforce compliance with the Risk Retention Rules.  The Indenture Trustee shall not be charged with knowledge of such rules, nor shall it be liable to any Noteholder or other party for violation of such rules now or hereinafter in effect.

SECTION 7.4.    <u>Indenture Trustee Not Liable for Notes or Timeshare Loans</u>.

(a)      The Indenture Trustee makes no representations as to the validity or sufficiency of this Indenture or any Transaction Document, the Notes (other than the authentication thereof) or of any Timeshare Loan.  The Indenture Trustee shall not be accountable for the use or application by the Issuer of funds paid to the Issuer in consideration of conveyance of the Timeshare Loans and related assets to the Trust Estate.

(b)      The Indenture Trustee (in its capacity as Indenture Trustee) shall have no responsibility or liability for or with respect to the validity of any security interest in any property securing a Timeshare Loan; the existence or validity of any Timeshare Loan, the validity of the assignment of any Timeshare Loan to the Trust Estate or of any intervening assignment; the review of any Timeshare Loan, any Timeshare Loan File, the completeness of any Timeshare Loan File, the receipt by the Custodian of any Timeshare Loan, Timeshare Loan File, (it being understood that the Indenture Trustee has not reviewed and does not intend to review such matters); the performance or enforcement of any Timeshare Loan; the compliance by the Servicer or the Issuer with any covenant or the breach by the Servicer or the Issuer of any warranty or representation made hereunder or in any Transaction Document or the accuracy of any such warranty or representation; the acts or omissions of the Servicer, the Issuer or any Obligor; or any action of the Servicer or the Issuer taken in the name of the Indenture Trustee.

65

SECTION 7.5.    <u>Indenture Trustee May Own Notes</u>.

The Indenture Trustee in its individual or any other capacity may become the owner or pledgee of Notes with the same rights as it would have if it were not the Indenture Trustee. Any Paying Agent, Note Registrar, co-registrar or co-paying agent may become the owner or pledgee of Notes with the same rights as it would have if it were not the Paying Agent, Note Registrar, co-registrar or co-paying agent.

SECTION 7.6.    <u>Indenture Trustee's Fees and Expenses</u>.

On each Payment Date, the Indenture Trustee shall be entitled to the Indenture Trustee Fee and reimbursement of out-of-pocket expenses incurred by it in connection with its responsibilities hereunder in the priorities provided in Sections 3.4 or 6.6 hereof, as applicable.

The Issuer shall indemnify, defend and hold the Indenture Trustee harmless from and against any liability, claim, damage, loss, fees or costs or expenses (including reasonable attorneys' fees and extraordinary out-of-pocket expenses) incurred by the Indenture Trustee without negligence or bad faith on its part (as determined by a final non-appeal order from a court of competent jurisdiction), arising out of or in connection with the acceptance or administration of the office of the Indenture Trustee under this Indenture, including the costs of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder and of defending any claim or bringing any claim to enforce the indemnification or other obligations of the Issuer.  The Indenture Trustee's rights to indemnification shall survive the termination of this Indenture and the resignation or removal of the parties hereunder.

SECTION 7.7.    <u>Eligibility Requirements for Indenture Trustee</u>.

The Indenture Trustee, hereunder shall at all times (a) be a corporation, depository institution, national banking association or trust company organized and doing business under the laws of the United States of America or any state thereof authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $100,000,000, (b) be subject to supervision or examination by federal or state authority, (c) be capable of maintaining an Eligible Bank Account, (d) have a long-term unsecured debt rating of not less than "Baa2" from Moody's and "BBB" from S&P, and (e) shall be acceptable to Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes.  If such Person publishes reports of condition at least annually, pursuant to or to the requirements of the aforesaid supervising or examining authority, then for the purpose of this Section 7.7, the combined capital and surplus of such Person shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  In case at any time the Indenture Trustee shall cease to be eligible in accordance with the provisions of this Section 7.7, the Indenture Trustee shall resign in the manner and with the effect specified in Section 7.8 hereof.

SECTION 7.8.    <u>Resignation or Removal of Indenture Trustee</u>.

(a)    The Indenture Trustee may at any time resign and be discharged with respect to the Notes by giving 60 days' written notice thereof to the Servicer, the Issuer, each

66

Rating Agency and the Noteholders.  Upon receiving such notice of resignation, the Issuer shall promptly appoint a successor Indenture Trustee not objected to by Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes within 30 days after prior written notice, by written instrument, with a copy delivered to each of the Issuer, the Servicer, each Rating Agency, the Noteholders, the successor Indenture Trustee and the predecessor Indenture Trustee.  If no successor Indenture Trustee shall have been so appointed and have accepted appointment within 60 days after the giving of such notice of resignation, the resigning Indenture Trustee may petition any court of competent jurisdiction for the appointment of a successor Indenture Trustee.

(b)     If at any time the Indenture Trustee shall cease to be eligible in accordance with the provisions of Section 7.7 hereof and shall fail to resign after written request therefor by the Issuer, or if at any time the Indenture Trustee shall be legally unable to act, fails to perform in any material respect its obligations under this Indenture, or shall be adjudged as bankrupt or insolvent, or a receiver of the Indenture Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Indenture Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then the Issuer or Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes may direct the Issuer to remove the Indenture Trustee upon 30 days' prior written notice.  If it removes the Indenture Trustee under the authority of the immediately preceding sentence, the Issuer shall promptly appoint a successor Indenture Trustee not objected to by Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes, within 30 days after prior written notice, by written instrument, with a copy delivered to each of the Issuer, the Servicer, the Noteholders, each Rating Agency, the successor Indenture Trustee and the predecessor Indenture Trustee.

(c)     Any resignation or removal of the Indenture Trustee and appointment of a successor Indenture Trustee pursuant to any of the provisions of this Section 7.8 shall not become effective until acceptance of appointment by the successor Indenture Trustee as provided in Section 7.9 hereof.

SECTION 7.9.     Successor Indenture Trustee.

(a)     Any successor Indenture Trustee appointed as provided in Section 7.8 hereof shall execute, acknowledge and deliver to each of the Servicer, the Issuer, each Rating Agency, the Noteholders and to its predecessor Indenture Trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor Indenture Trustee shall become effective and such successor Indenture Trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor Indenture Trustee hereunder with like effect as if originally named a Indenture Trustee.  The predecessor Indenture Trustee shall deliver or cause to be delivered to the successor Indenture Trustee or its custodian any Transaction Documents and statements held by it or its custodian hereunder; and the Servicer and the Issuer and the predecessor Indenture Trustee shall execute and deliver such instruments and do such other things as may reasonably be required for the full and certain vesting and confirmation in the successor Indenture Trustee of all such rights, powers, duties and obligations.

67

(b)       In case of the appointment hereunder of a successor Indenture Trustee with respect to the Notes, the Issuer, the retiring Indenture Trustee and each successor Indenture Trustee with respect to the Notes shall execute and deliver an indenture supplemental hereto wherein each successor Indenture Trustee shall accept such appointment and which (i) shall contain such provisions as shall be necessary or desirable to transfer and confirm to, and to vest in, each successor Indenture Trustee all the rights, powers, trusts and duties of the retiring Indenture Trustee with respect to the Notes to which the appointment of such successor Indenture Trustee relates, (ii) if the retiring Indenture Trustee is not retiring with respect to all Notes, shall contain such provisions as shall be deemed necessary or desirable to confirm that all the rights, powers, trusts and duties of the retiring Indenture Trustee with respect to the Notes as to which the retiring Indenture Trustee is not retiring shall continue to be vested in the retiring Indenture Trustee, and (iii) shall add to or change any of the provisions of this Indenture as shall be necessary to provide for or facilitate the administration of the Trust Estate hereunder by more than one Indenture Trustee, it being understood that nothing herein or in such supplemental indenture shall constitute such Indenture Trustees co-trustees of the same allocated trust and that each such Indenture Trustee shall be trustee of a trust or trusts hereunder separate and apart from any trust or trusts hereunder administered by any other such Indenture Trustee; and upon the execution and delivery of such supplemental indenture the resignation or removal of the retiring Indenture Trustee shall become effective to the extent provided therein and each such successor Indenture Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Indenture Trustee with respect to the Notes to which the appointment of such successor Indenture Trustee relates; but, on request of the Issuer or any successor Indenture Trustee, such retiring Indenture Trustee shall duly assign, transfer and deliver to such successor Indenture Trustee all property and money held by such retiring Indenture Trustee hereunder with respect to the Notes of that or those to which the appointment of such successor Indenture Trustee relates.

Upon request of any such successor Indenture Trustee, the Issuer shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor indenture trustee all such rights, powers and trusts referred to in the preceding paragraph.

(c)       No successor Indenture Trustee shall accept appointment as provided in this Section 7.9 unless at the time of such acceptance such successor Indenture Trustee shall be eligible under the provisions of Section 7.7 hereof.

(d)       Upon acceptance of appointment by a successor Indenture Trustee as provided in this Section 7.9, the Servicer shall mail notice of the succession of such Indenture Trustee hereunder to each Noteholder at its address as shown in the Note Register.  If the Servicer fails to mail such notice within ten days after acceptance of appointment by the successor Indenture Trustee, the successor Indenture Trustee shall cause such notice to be mailed at the expense of the Issuer and the Servicer.

SECTION 7.10.    <u>Merger or Consolidation of Indenture Trustee</u>.

Any Person into which the Indenture Trustee may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Indenture Trustee shall be a party, or any Person succeeding to the

68

corporate trust business of the Indenture Trustee, shall be the successor of the Indenture Trustee hereunder, <u>provided</u> such Person shall be eligible under the provisions of Section 7.7 hereof, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

      SECTION 7.11.   <u>Appointment of Co-Indenture Trustee or Separate Indenture Trustee</u>.

      (a)    At any time or times for the purpose of meeting any legal requirement of any jurisdiction in which any part of the Trust Estate may at the time be located or in which any action of the Indenture Trustee may be required to be performed or taken, the Indenture Trustee, the Servicer or the Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes, by an instrument in writing signed by it or them, may appoint, at the reasonable expense of the Issuer and the Servicer, one or more Persons to act as separate trustee or separate trustees or co-trustee, acting jointly with the Indenture Trustee, of all or any part of the Trust Estate, to the full extent that local law makes it necessary for such separate trustee or separate trustees or co-trustee acting jointly with the Indenture Trustee to act.  Notwithstanding the appointment of any separate or co-trustee, the Indenture Trustee shall remain obligated and liable for the obligations of the Indenture Trustee under this Indenture.

      (b)    The Indenture Trustee and, at the request of the Indenture Trustee, the Issuer shall execute, acknowledge and deliver all such instruments as may be required by the legal requirements of any jurisdiction or by any such separate trustee or separate trustees or co-trustee for the purpose of more fully confirming such title, rights, or duties to such separate trustee or separate trustees or co-trustee.  Upon the acceptance in writing of such appointment by any such separate trustee or separate trustees or co-trustee, it, he, she or they shall be vested with such title to the Trust Estate or any part thereof, and with such rights, powers, duties and obligations as shall be specified in the instrument of appointment, and such rights, powers, duties and obligations shall be conferred or imposed upon and exercised or performed by the Indenture Trustee, or the Indenture Trustee and such separate trustee or separate trustees or co-trustees jointly with the Indenture Trustee subject to all the terms of this Indenture, except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Indenture Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations shall be exercised and performed by such separate trustee or separate trustees or co-trustee, as the case may be.  Any separate trustee or separate trustees or co-trustee may, at any time by an instrument in writing, constitute the Indenture Trustee its attorney-in-fact and agent with full power and authority to do all acts and things and to exercise all discretion on its behalf and in its name.  In any case, if any such separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, the title to the Trust Estate and all assets, property, rights, power duties and obligations and duties of such separate trustee or co-trustee shall, so far as permitted by law, vest in and be exercised by the Indenture Trustee, without the appointment of a successor to such separate trustee or co-trustee unless and until a successor is appointed.

      (c)    All provisions of this Indenture which are for the benefit of the Indenture Trustee shall extend to and apply to each separate trustee or co-trustee appointed pursuant to the foregoing provisions of this Section 7.11.

69

(d)      Every additional trustee and separate trustee hereunder shall, to the extent permitted by law, be appointed and act and the Indenture Trustee shall act, subject to the following provisions and conditions:  (i) all powers, duties and obligations and rights conferred upon the Indenture Trustee in respect of the receipt, custody, investment and payment of monies shall be exercised solely by the Indenture Trustee; (ii) all other rights, powers, duties and obligations conferred or imposed upon the Indenture Trustee shall be conferred or imposed and exercised or performed by the Indenture Trustee and such additional trustee or trustees and separate trustee or trustees jointly except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed, the Indenture Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Timeshare Properties in any such jurisdiction) shall be exercised and performed by such additional trustee or trustees or separate trustee or trustees; (iii) no power hereby given to, or exercisable by, any such additional trustee or separate trustee shall be exercised hereunder by such trustee except jointly with, or with the consent of, the Indenture Trustee; and (iv) no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder.

If at any time, the Indenture Trustee shall deem it no longer necessary or prudent in order to conform to such law, the Indenture Trustee shall execute and deliver all instruments and agreements necessary or proper to remove any additional trustee or separate trustee.

(e)      Any request, approval or consent in writing by the Indenture Trustee to any additional trustee or separate trustee shall be sufficient warrant to such additional trustee or separate trustee, as the case may be, to take such action as may be so requested, approved or consented to.

(f)      Notwithstanding any other provision of this Section 7.11, the powers of any additional trustee or separate trustee shall not exceed those of the Indenture Trustee hereunder.

SECTION 7.12.      Paying Agent and Note Registrar Rights.

So long as the Indenture Trustee is the Paying Agent, Trust Paying Agent and Note Registrar, the Paying Agent, Trust Paying Agent and Note Registrar shall be entitled to the rights, benefits and immunities of the Indenture Trustee as set forth in this Article VII to the same extent and as fully as though named in place of the Indenture Trustee herein.  The Paying Agent shall be compensated out of the Indenture Trustee Fee.

SECTION 7.13.      Authorization.

The Issuer hereby authorizes and directs the Indenture Trustee to enter into the Lockbox Agreement.  Pursuant to the Lockbox Agreement, the Indenture Trustee agrees to cause to be established and maintained an account (the "**Lockbox Account**") for the benefit of the Noteholders.  The Lockbox Account will be titled as required by the Lockbox Bank.  The Indenture Trustee is authorized and directed to act as titleholder of the Lockbox Account in accordance with the terms of the Lockbox Agreement for the benefit of the Noteholders with interests in the funds on deposit in such account.  In addition, the Indenture Trustee is hereby

70

authorized to enter into, execute, deliver and perform under, each of the applicable Transaction Documents and the Depository Agreement.  The Lockbox Bank will be required to transfer and will be permitted to withdraw funds from the Lockbox Account in accordance with the Lockbox Agreement.

SECTION 7.14.     Maintenance of Office or Agency.

The Indenture Trustee will maintain in the City of St. Paul, Minnesota, an office or agency where Notes may be surrendered for registration of transfer or exchange, and where notices and demands to or upon the Indenture Trustee in respect of the Notes and this Indenture may be served.  The Indenture Trustee will give prompt written notice to the Issuer, the Servicer and the Noteholders of the location, and of any change in the location, of any such office or agency or shall fail to furnish the Issuer or the Servicer with the address thereof, such surrenders, notices and demands may be made or served at the Corporate Trust Office, and the Issuer hereby appoints the Indenture Trustee as its agent to receive all such surrenders, notices and demands.

ARTICLE VIII.

COVENANTS OF THE ISSUER

SECTION 8.1.     Payment of Principal, Interest and Other Amounts.

The Issuer will cause the due and punctual payment of the principal of, and interest on, the Notes in accordance with the terms of the Notes and this Indenture.

SECTION 8.2.     Eligible Timeshare Loans.

On each Transfer Date, each Subsequent Timeshare Loan or Qualified Substitute Timeshare Loan, as the case may be, shall be an Eligible Timeshare Loan.

SECTION 8.3.     Money for Payments to Noteholders to Be Held in Trust.

(a)     All payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Trust Accounts pursuant to Sections 3.4 or 6.6 hereof shall be made on behalf of the Issuer by the Paying Agent, and no amounts so withdrawn from the Collection Account for payments of the Notes shall be paid over to the Issuer under any circumstances, except as provided in this Section 8.3, in Section 3.4 or Section 6.6 hereof, as the case may be.

(b)     In making payments hereunder, the Paying Agent will hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided.

(c)     Except as required by applicable law, any money held by the Indenture Trustee or the Paying Agent on behalf of the Noteholders for the payment of any amount due with respect to any Note shall not bear interest and if remaining unclaimed for two years after such amount has become due and payable to the Noteholder shall be discharged from such trust

71

and, subject to applicable escheat laws, and so long as no Event of Default has occurred and is continuing, paid to the Issuer upon request; otherwise, such amounts shall be redeposited in the Collection Account as Available Funds, and such Noteholder shall thereafter, as an unsecured general creditor, look only to the Issuer for payment thereof (but only to the extent of the amounts so paid to the Issuer), and all liability of the Indenture Trustee or the Paying Agent with respect to such trust money shall thereupon cease; provided, however, that the Indenture Trustee or the Paying Agent, before being required to make any such repayment, shall cause to be published once, at the expense and direction of the Issuer, in a newspaper published in the English language, customarily published on each Business Day and of general circulation in the City of New York, notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such publication, any unclaimed balance of such money then remaining will be repaid to the Issuer.  The Indenture Trustee or the Paying Agent shall also adopt and employ, at the expense and direction of the Issuer, any other reasonable means of notification of such repayment (including, but not limited to, mailing notice of such repayment to Noteholders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in moneys due and payable but not claimed is determinable) from the records of the Indenture Trustee or of any Paying Agent, at the last address of record for each such Noteholder.

(d)    The Issuer will cause each Paying Agent to execute and deliver to the Indenture Trustee an instrument in which such Paying Agent shall agree with the Indenture Trustee (and if the Indenture Trustee is the Paying Agent, it hereby so agrees), subject to the provisions of this Section 8.3, that such Paying Agent will:

(i)    give the Indenture Trustee notice of any occurrence that is, or with notice or with the lapse of time or both would become, an Event of Default by the Issuer of which it has actual knowledge in the making of any payment required to be made with respect to the Notes;

(ii)    at any time during the continuance of any such occurrence described in clause (i) above, upon the written request of the Indenture Trustee, pay to the Indenture Trustee all sums so held in trust by such Paying Agent;

(iii)    immediately resign as a Paying Agent and forthwith pay to the Indenture Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the standards required to be met by a Paying Agent at the time of its appointment; and

(iv)    comply with all requirements of the Code, Treasury Regulations promulgated thereunder and any applicable state law with respect to the withholding from any payments made by it on any Notes of any applicable withholding taxes (including FATCA Withholding Tax) imposed thereon and with respect to any applicable reporting requirements in connection therewith.

The Issuer may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, by Issuer Order direct any Paying Agent to pay to the Indenture Trustee all sums held in trust by such Paying Agent, such sums to be held by the

72

Indenture Trustee upon the same trusts as those upon which the sums were held by such Paying Agent; and upon such payment by any Paying Agent to the Indenture Trustee, such Paying Agent shall be released from all further liability with respect to such monies.

SECTION 8.4.    Existence; Merger; Consolidation, etc.

(a)    The Issuer will keep in full effect its existence, rights and franchises as a statutory trust under the laws of the State of Delaware, and will obtain and preserve its qualification to do business as a foreign business trust in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Indenture, the Notes or any of the Timeshare Loans.

(b)    The Issuer shall at all times observe and comply in all material respects with (i) all laws applicable to it, (ii) all requirements of law in the declaration and payment of distributions, and (iii) all requisite and appropriate formalities in the management of its business and affairs and the conduct of the transactions contemplated hereby.

(c)    The Issuer shall not (i) consolidate or merge with or into any other Person or convey or transfer its properties and assets substantially as an entirety to any other Person or (ii) commingle its assets with those of any other Person.

(d)    The Issuer shall not become an "investment company" or under the "control" of an "investment company" as such terms are defined in the '40 Act, and the rules and regulations thereunder (taking into account not only the general definition of the term "investment company" but also any available exceptions to such general definition); provided, however, that the Issuer shall be in compliance with this Section 8.4 if it shall have obtained an order exempting it from regulation as an "investment company" so long as it is in compliance with the conditions imposed in such order.

SECTION 8.5.    Protection of Trust Estate; Further Assurances.

(a)    The Issuer will from time to time execute and deliver all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance, and other instruments, and will take such other action as may be necessary or advisable to:

(i)    grant more effectively the assets comprising all or any portion of the Trust Estate;

(ii)    maintain or preserve the Lien of this Indenture or carry out more effectively the purposes hereof;

(iii)    publish notice of, or protect the validity of, any Grant made or to be made by this Indenture and perfect the security interest contemplated hereby in favor of the Indenture Trustee in each of the Timeshare Loans and all other property included in the Trust Estate; provided, that the Issuer shall not be required to cause the recordation of the Indenture Trustee's name as Lien holder on the related title

73

documents for the Timeshare Properties so long as no Event of Default has occurred and is continuing;

(iv)     enforce or cause the Servicer to enforce any of the Timeshare Loans in accordance with the Servicing Standard, provided,  however, the Issuer will not cause the Servicer to obtain on behalf of the Indenture Trustee or the Noteholders, any Timeshare Property or to take any actions with respect to any property the result of which would adversely affect the interests of the Indenture Trustee or the Noteholders (including, but not limited to, actions which would cause the Indenture Trustee or the related Noteholders to be considered a holder of title, mortgagee-in-possession, or otherwise, or an "owner" or "operator" of Property not in compliance with applicable environmental statutes); and

(v)     preserve and defend title to the Timeshare Loans (including the right to receive all payments due or to become due thereunder), the interests in the Timeshare Properties, or other property included in the Trust Estate and preserve and defend the rights of the Indenture Trustee in the Trust Estate (including the right to receive all payments due or to become due thereunder) against the claims of all Persons and parties other than as permitted hereunder.

(b)     The Issuer will not take any action and will use its commercially reasonable efforts not to permit any action to be taken by others that would release any Person from any of such Person's material covenants or obligations under any instrument or agreement included in the Trust Estate or that would result in the amendment, hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, any such instrument or agreement, except as expressly provided in this Indenture or the Custodial Agreement or such other instrument or agreement.

(c)     The Issuer may contract with or otherwise obtain the assistance of other Persons to assist it in performing its duties under this Indenture, and any performance of such duties by a Person identified to the Indenture Trustee in an Officer's Certificate of the Issuer shall be deemed to be action taken by the Issuer, provided,  however, that no appointment of such Person shall relieve the Issuer of its duties and obligations hereunder.  Initially, the Issuer has contracted with the Servicer, the Indenture Trustee and the Custodian pursuant to this Indenture to assist the Issuer in performing its duties under this Indenture and the other Transaction Documents.

(d)     The Issuer will punctually perform and observe all of its obligations and agreements contained in this Indenture, the Transaction Documents and in the instruments and agreements included in the Trust Estate.

(e)     Without derogating from the absolute nature of the assignment granted to the Indenture Trustee under this Indenture or the rights of the Indenture Trustee hereunder, the Issuer agrees (i) that it will not, without the prior written consent of the Indenture Trustee and the Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes, amend, modify, waive, supplement, terminate or surrender, or agree to any amendment, modification, supplement, termination, waiver or surrender of, the terms of any Timeshare Loan

74

(except to the extent otherwise provided in this Indenture or in the Timeshare Loan Documents) or the Transaction Documents, or waive timely performance or observance by the Servicer, the Indenture Trustee, the Custodian, the Paying Agent or the Depositor under this Indenture; and (ii) that any such amendment shall not (A) reduce in any manner the amount of, or accelerate or delay the timing of, distributions that are required to be made for the benefit of the Noteholders or (B) reduce the aforesaid percentage of the Notes that is required to consent to any such amendment, without the consent of the Noteholders of all the Outstanding Notes.  If any such amendment, modification, supplement or waiver shall be so consented to by the Indenture Trustee and the Noteholders, the Issuer agrees, promptly following a request by the Indenture Trustee, to execute and deliver, at its own expense, such agreements, instruments, consents and other documents as the Indenture Trustee may deem necessary or appropriate in the circumstances.

The Issuer, upon the Issuer's failure to do so, hereby irrevocably designates the Indenture Trustee and the Servicer, severally, its agents and attorneys-in-fact to execute any financing statement or continuation statement or Assignment of Mortgage required pursuant to this Section 8.5; provided,  however, that such designation shall not be deemed to create a duty of the Indenture Trustee to monitor the compliance of the Issuer with the foregoing covenants, and provided,  further, that the duty of the Indenture Trustee or the Servicer to execute any instrument required pursuant to this Section 8.5 shall arise only if a Responsible Officer of the Indenture Trustee or the Servicer, as applicable, has Knowledge of any failure of the Issuer to comply with the provisions of this Section 8.5.

SECTION 8.6.    Additional Covenants.

(a)    The Issuer will not:

(i)    sell, transfer, exchange or otherwise dispose of any portion of the Trust Estate except as expressly permitted by this Indenture;

(ii)    claim any credit on, or make any deduction from, the principal of, or interest on, any of the Notes (other than amounts properly withheld from such payments under the Code or any applicable state law);

(iii)    engage in any business or activity other than as permitted by this Indenture, the Trust Agreement and the other Transaction Documents and any activities incidental thereto, or amend the Trust Agreement as in effect on the Closing Date other than in accordance with Article XI thereof;

(iv)    issue debt or obligations under any agreement other than this Indenture;

(v)    incur or assume, directly or indirectly, any indebtedness, except for such indebtedness as may be incurred by the Issuer pursuant to this Indenture, or guaranty any indebtedness or other obligations of any Person (other than the Timeshare Loans), or own, purchase, repurchase or acquire (or agree contingently to do so) any stock, obligations, assets or securities of, or any other interest in, or make any capital contribution to, any other Person (other than the Timeshare Loans);

75

(vi)    dissolve or liquidate in whole or in part or merge or consolidate with any other Person;

(vii)    (A) permit the validity or effectiveness of this Indenture or any Grant hereby to be impaired, or permit the Lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations under this Indenture, except as may be expressly permitted hereby, (B) permit any lien, charge, security interest, mortgage or other encumbrance to be created on or to extend to or otherwise arise upon or burden the Trust Estate or any part thereof or any interest therein or the proceeds thereof (other than tax liens, mechanics; liens and other liens that arise by operation of law, in each case, on any of the Resort Interests and arising solely as a result of an act or omission of the related Obligor) other than the Lien of this Indenture or (C) except as otherwise contemplated in this Indenture, permit the Lien of this Indenture (other than with respect to any Permitted Liens or such tax, mechanic's or other lien) not to constitute a valid first priority security interest in the Trust Estate;

(viii)    take any action or fail to take any actions which action or failure may cause the Issuer to be classified as (A) an association that is taxable as a corporation pursuant to Section 7701 of the Code, (B) a publicly traded partnership that is taxable as a corporation pursuant to Section 7704 of the Code or (C) a taxable mortgage pool that is taxable as a corporation pursuant to Section 7701(i) of the Code; or

(ix)    change the location of its principal place of business or jurisdiction of organization without the prior notice to the Indenture Trustee and the Noteholders.

(b)    <u>Notice of Events of Default</u>.  Immediately upon the Issuer having Knowledge of the existence of any condition or event which constitutes a Default or an Event of Default or a Servicer Event of Default, the Issuer shall deliver to the Indenture Trustee a written notice describing its nature and period of existence and what action the Issuer is taking or proposes to take with respect thereto.

(c)    <u>Report on Proceedings</u>.  Promptly upon the Issuer's becoming aware of (i) any proposed or pending investigation of it by any governmental authority or agency; or (ii) any pending or proposed court or administrative proceeding which involves or is reasonably likely to involve the possibility of materially and adversely affecting the properties, business, prospects, profits or condition (financial or otherwise) of the Issuer, the Issuer shall deliver to the Indenture Trustee a written notice specifying the nature of such investigation or proceeding and what action the Issuer is taking or proposes to take with respect thereto and evaluating its merits.

(d)    <u>Taxes</u>.

The Issuer shall file all required tax returns in a timely manner and pay all taxes when due and payable or levied against its assets, properties or income, including any property that is part of the Trust Estate, except to the extent the Issuer is contesting the same in good faith and has set aside adequate reserves in accordance with GAAP for the payment thereof.

76

SECTION 8.7.    Restricted Payments.

The Issuer shall not, directly or indirectly, (i) pay any dividend or make any distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, to the Owner Trustee or any owner of a beneficial interest in the Issuer or otherwise with respect to any ownership or equity interest to security in or of the Issuer, the Club Originator, the Depositor or to the Servicer, (ii) redeem, purchase, retire or otherwise acquire for value any such ownership or equity interest or security or (iii) set aside or otherwise segregate any amounts for any such purpose; provided,   however, that the Issuer may make, or cause to be made, payments and distributions to or on behalf of the Servicer, the Backup Servicer, the Lockbox Bank, the Club Originator, the Depositor, the Indenture Trustee, the Owner Trustee, the Administrator, the Custodian, the Noteholders and the Certificateholders as contemplated by, and to the extent funds are available for such purpose under, this Indenture, the Sale Agreement, the Trust Agreement or the other Transaction Documents.  The Issuer will not, directly or indirectly, make or cause to be made payments to or distributions from the Collection Account except in accordance with this Indenture and the other Transaction Documents.

SECTION 8.8.    Further Instruments and Acts.

Upon request of the Indenture Trustee, the Issuer will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

ARTICLE IX.

SUPPLEMENTAL INDENTURES

SECTION 9.1.    Supplemental Indentures.

(a)    The Issuer, the Servicer, the Club Trustee, the Backup Servicer, the Indenture Trustee, the Paying Agent and the Custodian, when authorized by an Issuer Order, at any time and from time to time, may enter into one or more indentures supplemental hereto, in form satisfactory to the Indenture Trustee, without the consent of any Noteholder, for any of the following purposes:

(i)    to correct or amplify the description of any property at any time subject to the Lien of this Indenture, or to better assure, convey and confirm unto the Indenture Trustee any property subject or required to be subjected to the Lien of this Indenture; provided, such action pursuant to this clause (i) shall not adversely affect the interests of the Noteholders in any respect; or

(ii)    to evidence and provide for the acceptance of appointment hereunder by a successor Indenture Trustee with respect to the Notes and to add to or change any of the provisions of this Indenture as shall be necessary to provide for or facilitate the administration of the trusts hereunder by more than one Indenture Trustee, pursuant to the requirements of Section 7.9 hereof; or

77

(iii)      to cure any ambiguity, to correct or supplement any provision herein which may be defective or inconsistent with any other provision herein or to conform the provisions herein to the descriptions set forth in the Offering Circular, or to make any other provisions with respect to matters or questions arising under this Indenture;

provided that any action pursuant to clauses (i), (ii) or (iii) shall not adversely affect the interests of any Noteholder.

(b)      The Indenture Trustee shall promptly deliver, at least five Business Days prior to the effectiveness thereof, to each Noteholder and each Rating Agency, a copy of any supplemental indenture entered into pursuant to this Section 9.1(a).

SECTION 9.2.      Supplemental Indentures with Consent of Noteholders.

(a)      With the consent of Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes then Outstanding and by Act of said Noteholders delivered to the Issuer and the Indenture Trustee, the Issuer and the Indenture Trustee may, pursuant to an Issuer Order, enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of modifying in any manner the rights of the Noteholders under this Indenture; provided, that no supplemental indenture shall, without the consent of the Noteholder of each Outstanding Note affected thereby,

(i)      change the Stated Maturity or Payment Date of any Note or the amount of principal payments or interest payments due or to become due on any Payment Date with respect to any Note, or change the priority of payment thereof as set forth herein, or reduce the principal amount thereof or the Note Rate thereon, or change the place of payment where, or the coin or currency in which, any Note or the interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity;

(ii)      reduce the percentage of the Outstanding Note Balance or Adjusted Note Balance, the consent of the Noteholders of which is required for any supplemental indenture, for any waiver of compliance with provisions of this Indenture or Events of Default and their consequences;

(iii)      modify any of the provisions of this Section 9.2 or Section 6.13 hereof except to increase any percentage of Noteholders required for any modification or waiver or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Noteholder of each Outstanding Note affected thereby;

(iv)      modify or alter the provisions of the proviso to the definition of the term "Outstanding"; or

(v)      permit the creation of any lien ranking prior to or on a parity with the Lien of this Indenture with respect to any part of the Trust Estate or terminate the

78

Lien of this Indenture on any property at any time subject hereto or deprive any Noteholder of the security afforded by the Lien of this Indenture;

provided, no such supplemental indenture may modify or change any terms whatsoever of this Indenture that could be construed as increasing the Issuer's or the Servicer's discretion hereunder.

(b)      The Indenture Trustee shall promptly deliver, at least five Business Days prior to the effectiveness thereof to each Noteholder and each Rating Agency, a copy of any supplemental indenture entered into pursuant to Section 9.2(a) hereof.

SECTION 9.3.      Execution of Supplemental Indentures.

In executing, or accepting the additional trusts created by, any supplemental indenture (a) pursuant to Section 9.1 hereof or (b) pursuant to Section 9.2 hereof without the consent of each Noteholder to the execution of the same, or the modifications thereby of the trusts created by this Indenture, the Indenture Trustee shall be entitled to receive, and (subject to Section 7.1 hereof) shall be, fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture and all conditions precedent have been satisfied.  The Indenture Trustee may, but shall not be obligated to, enter into any supplemental indenture which affects the Indenture Trustee's own rights, duties, obligations, or immunities under this Indenture or otherwise.

SECTION 9.4.      Effect of Supplemental Indentures.

Upon the execution of any supplemental indenture under this Article IX, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Noteholder theretofore or thereafter authenticated and delivered hereunder shall be bound thereby.

SECTION 9.5.      Reference in Notes to Supplemental Indentures.

Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article may, and shall if required by the Indenture Trustee, bear a notation in form approved by the Indenture Trustee as to any matter provided for in such supplemental indenture.  New Notes so modified as to conform, in the opinion of the Indenture Trustee and the Issuer, to any such supplemental indenture may be prepared and executed by the Issuer and authenticated and delivered by the Indenture Trustee in exchange for Outstanding Notes.

ARTICLE X.

REDEMPTION OF NOTES

SECTION 10.1.      Optional Redemption; Election to Redeem.

The Servicer shall have the option to redeem not less than all of the Notes and thereby cause the early repayment of the Notes on any date after the Optional Redemption Date

79

by payment of an amount equal to the Redemption Price and any amounts, fees and expenses that are required to be paid pursuant to Section 6.6(b) hereof (unless amounts in the Trust Accounts are sufficient to make such payments).

SECTION 10.2.    Notice to Indenture Trustee.

The Servicer shall give written notice of its intention to redeem the Notes to the Indenture Trustee at least 15 days prior to the Redemption Date (unless a shorter period shall be satisfactory to the Indenture Trustee).

SECTION 10.3.    Notice of Redemption by the Servicer.

Notices of redemption shall be given by the Servicer or by the Indenture Trustee at the Servicer's direction by first class mail, postage prepaid, mailed not less than 15 days prior to the Redemption Date to each Noteholder, at the address listed in the Note Register and to each Rating Agency (unless a shorter period shall be satisfactory to the Indenture Trustee).  All notices of redemption shall state (a) the Redemption Date, (b) the Redemption Price, (c) that on the Redemption Date, the Redemption Price will become due and payable in respect of each Note, and that interest thereon shall cease to accrue if payment is made on the Redemption Date and (d) the office of the Indenture Trustee where the Notes are to be surrendered for payment of the Redemption Price.  Failure to give notice of redemption, or any defect therein, to any Noteholder shall not impair or affect the validity of the redemption of any other Note.

SECTION 10.4.    Deposit of Redemption Price.

On or before the Business Day immediately preceding the Redemption Date, the Servicer shall deposit with the Indenture Trustee an amount equal to the Redemption Price and any amounts, fees and expenses that are required to be paid hereunder (less any portion of such payment to be made from funds held in any of the Trust Accounts).

SECTION 10.5.    Notes Payable on Redemption Date.

Notice of redemption having been given as provided in Section 10.3 hereof and deposit of the Redemption Price with the Paying Agent having been made as provided in Section 10.4 hereof, the Notes shall on the Redemption Date, become due and payable at the Redemption Price, and, on such Redemption Date, such Notes shall cease to accrue interest.  The Paying Agent shall apply all available funds in accordance with Section 6.6(b) hereof and the Noteholders shall be paid the Redemption Price by the Paying Agent on behalf of the Servicer upon presentment and surrender of their Notes at the office of the Indenture Trustee.  If the Servicer shall have failed to deposit the Redemption Price with the Paying Agent, the principal and interest with respect to each Class of Notes shall, until paid, continue to accrue interest at their respective Note Rates.  The Servicer's failure to deposit the Redemption Price shall not constitute an Event of Default hereunder.

80

ARTICLE XI.

SATISFACTION AND DISCHARGE

SECTION 11.1.    Satisfaction and Discharge of Indenture.

(a)    This Indenture shall cease to be of further effect (except as to any surviving rights of registration of transfer or exchange of Notes herein expressly provided for), and the Indenture Trustee, on demand of, and at the expense of, the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when:

(i)    either:

(A)    all Notes theretofore authenticated and delivered (other than (1) Notes which have been destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.5 hereof and (2) Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 8.3(c) hereof) have been delivered to the Indenture Trustee for cancellation; or

(B)    the final installments of principal on all such Notes not theretofore delivered to the Indenture Trustee for cancellation (1) have become due and payable, or (2) will become due and payable at their Stated Maturity, as applicable within one year, and the Issuer has irrevocably deposited or caused to be deposited (out of Available Funds or amounts received pursuant to Article X hereof) with the Indenture Trustee in trust an amount sufficient to pay and discharge the entire indebtedness on such Notes not theretofore delivered to the Indenture Trustee for cancellation, for principal and interest to the date of such deposit (in the case of Notes which have become due and payable) or to the Stated Maturity thereof;

(ii)    the Issuer and the Servicer have paid or caused to be paid (out of Available Funds or amounts received pursuant to Article X hereof) all sums payable hereunder by the Issuer and the Servicer for the benefit of the Noteholders and the Indenture Trustee; and

(iii)    the Issuer has delivered to the Indenture Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with.

At such time, the Indenture Trustee shall deliver to the Issuer or at the Issuer's direction all cash, securities and other property held by it as part of the Trust Estate other than funds deposited with the Indenture Trustee pursuant to Section 11.1(a)(i) hereof, for the payment and discharge of the Notes.

81

(b)      Notwithstanding the satisfaction and discharge of this Indenture, the obligations of the Issuer to the Indenture Trustee under Section 7.6 hereof and, if money shall have been deposited with the Indenture Trustee pursuant to Section 11.1(a)(i) hereof, the obligations of the Indenture Trustee under Sections 11.2 and 8.3(c) hereof shall survive.

SECTION 11.2.      <u>Application of Trust Money; Repayment of Money Held by Paying Agent</u>.

Subject to the provisions of Section 8.3(c) hereof, all money deposited with the Indenture Trustee pursuant to Sections 11.1 and 8.3 hereof shall be held on behalf of the Noteholders and applied by the Indenture Trustee in accordance with the provisions of the Notes, this Indenture and the Trust Agreement, to the payment, either directly or through a Paying Agent, as the Indenture Trustee may determine, to the Persons entitled thereto, of the principal and interest for whose payment such money has been deposited with the Indenture Trustee.

In connection with the satisfaction and discharge of this Indenture, all moneys then held by any Paying Agent other than the Indenture Trustee under the provisions of this Indenture with respect to the Notes shall, upon demand of the Issuer, be paid to the Indenture Trustee to be held and applied according to Section 3.4 hereof and thereupon such Paying Agent shall be released from all further liability with respect to such moneys.

SECTION 11.3.      <u>Trust Termination Date</u>.

Upon the full application of (a) moneys deposited pursuant to this Article XI or (b) proceeds of the Timeshare Loans pursuant to Sections 3.4 or 6.6 hereof, the Trust Estate created by this Indenture shall be deemed to have terminated and all Liens granted hereunder shall be released.

ARTICLE XII.

REPRESENTATIONS AND WARRANTIES AND COVENANTS

SECTION 12.1.      <u>Representations and Warranties of the Issuer</u>.

The Issuer represents and warrants to the Indenture Trustee, the Servicer, the Backup Servicer and the Noteholders as of the Closing Date, as follows:

(a)      <u>Organization and Good Standing</u>.  The Issuer has been duly formed and is validly existing and in good standing under the laws of the State of Delaware, with power and authority to own its properties and to conduct its business as presently conducted and has the power and authority to own and convey all of its properties and to execute and deliver this Indenture and the other Transaction Documents and to perform the transactions contemplated hereby and thereby.

(b)      <u>Binding Obligation</u>.  This Indenture and the other Transaction Documents to which it is a party have each been duly executed and delivered on behalf of the Issuer and this Indenture and each other Transaction Document to which it is a party constitutes a legal, valid and binding obligation of the Issuer enforceable in accordance with its terms except as may be

82

limited by bankruptcy, insolvency, moratorium or other similar laws affecting creditors' rights and by general principles of equity.

(c)     No Consents Required.  No consent of, or other action by, and no notice to or filing with, any Governmental Authority or any other party, is required for the due execution, delivery and performance by the Issuer of this Indenture or any of the other Transaction Documents or for the perfection of or the exercise by the Indenture Trustee or the Noteholders of any of their rights or remedies thereunder which have not been duly obtained.

(d)     No Violation.  The consummation of the transaction contemplated by this Indenture and the fulfillment of the terms hereof shall not conflict with, result in any material breach of any of the terms and provisions of, nor constitute (with or without notice or lapse of time) a default under, the organizational documents of the Issuer, or any indenture, agreement or other instrument to which the Issuer is a party or by which it is bound; nor result in the creation or imposition of any Lien upon any of its properties pursuant to the terms of any such indenture, agreement or other instrument (other than this Indenture).

(e)     No Proceedings.  There is no pending or, to the Issuer's Knowledge, threatened action, suit or proceeding, nor any injunction, writ, restraining order or other order of any nature against or affecting the Issuer, its officers or directors, or the property of the Issuer, in any court or tribunal, or before any arbitrator of any kind or before or by any Governmental Authority (i) asserting the invalidity of this Indenture or any of the other Transaction Documents, (ii) seeking to prevent the sale and assignment of any Timeshare Loan or the consummation of any of the transactions contemplated thereby, (iii) seeking any determination or ruling that might materially and adversely affect (A) the performance by the Issuer of this Indenture or any of the other Transaction Documents or the interests of the Noteholders, (B) the validity or enforceability of this Indenture or any of the other Transaction Documents, (C) any Timeshare Loan, or (D) the Intended Tax Characterization, or (iv) asserting a claim for payment of money adverse to the Issuer or the conduct of its business or which is inconsistent with the due consummation of the transactions contemplated by this Indenture or any of the other Transaction Documents.

(f)     Issuer Not Insolvent.  The Issuer is solvent and will not become insolvent after giving effect to the transactions contemplated by this Indenture and each of the other Transaction Documents.

(g)     Name.  The legal name of the Issuer is as set forth in the signature page of this Indenture and the Issuer does not have any trade names, fictitious names, assumed names or "doing business as" names.

(h)     Eligible Timeshare Loans.  Each Timeshare Loan subject to the Lien of this Indenture is an Eligible Timeshare Loan.

(i)     Notes Authorized, Executed, Authenticated, Validly Issued and Outstanding.  The Notes have been duly and validly authorized, and when duly and validly executed by the Issuer and authenticated by the Indenture Trustee in accordance with the terms

83

of this Indenture and delivered to and paid for by each Noteholder as provided herein, will be validly issued and outstanding and entitled to the benefits hereof.

(j)      Accuracy of Information.  The representations and warranties of the Issuer in the Transaction Documents are true and correct in all material respects as of the Closing Date and, except for representations and warranties expressly made as of a different date, each Transfer Date.

(k)      Special Purpose.  The Issuer shall engage in no business, and take no actions with respect to any other transaction than the transactions contemplated by the Transaction Documents and will otherwise maintain its existence separate from the Depositor and all other entities as provided in its organizational documents.

(l)      Securities Laws.  The Issuer (i) is not required to register as an "investment company" or a company "controlled" by an "investment company" within the meaning of the '40 Act, (ii) will be relying on an exclusion or exemption from the definition of "investment company" under the '40 Act contained in Section 3(c)(5) of the '40 Act or Rule 3a-7 under the '40 Act, although there may be additional exclusions or exemptions available to the Issuer, and (iii) is not a "covered fund" under Section 13 of the Bank Holding Company Act of 1956, as amended.

(m)      Representations and Warranties Regarding Security Interest and Timeshare Loan Files.

(i)      Payment of principal and interest on the Notes in accordance with their terms and the performance by the Issuer of all its obligations under this Indenture are secured by the Trust Estate.  The Grant contained in the "Granting Clause" of this Indenture creates a valid and continuing security interest (as defined in the applicable UCC) in the Trust Estate in favor of the Indenture Trustee, which security interest is prior to all other Liens arising under the UCC, and is enforceable as such against creditors of the Issuer, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(ii)      The Timeshare Loans and the documents evidencing such Timeshare Loans constitute either "accounts", "chattel paper", "instruments" or "general intangibles" within the meaning of the applicable UCC.

(iii)      The Issuer owns and has good and marketable title to the Trust Estate free and clear of any Lien, claim or encumbrance of any Person, except for Permitted Liens.

(iv)      The Issuer has caused or will have caused, within ten days of the Closing Date, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest in the Trust Estate granted to the Indenture Trustee hereunder.

84

(v)        All original executed copies of each Mortgage Note (or an executed Lost Note Affidavit related to such Mortgage Note) that constitute or evidence the Trust Estate have been or will be delivered to the Custodian and a Custodian's Certification therefor has been or will be issued, in accordance with the terms of the Custodial Agreement, to Bluegreen and the Indenture Trustee.

(vi)        Other than the security interest granted to the Indenture Trustee pursuant to this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Trust Estate.  The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering the Trust Estate other than any financing statement relating to the security interest granted to the Indenture Trustee hereunder or that has been terminated.

(vii)        All financing statements filed or to be filed against the Issuer in favor of the Indenture Trustee in connection herewith describing the Trust Estate contain a statement to the following effect: "A purchase of or security interest in any collateral described in this financing statement will violate the rights of the Secured Party."

(viii)        None of the Mortgage Notes that constitute or evidence the Trust Estate has any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Indenture Trustee.

The foregoing representations and warranties in Section 12.01(m)(i) – (viii) shall remain in full force and effect and shall not be waived or amended until the Notes are paid in full or otherwise released or discharged.

(n)        <u>FATCA</u>.

(i)        To the Issuer's knowledge, without investigation, the Indenture Trustee is not obligated, in respect of any payments to be made by it pursuant to this Indenture, to make any withholding or deduction of FATCA Withholding Tax.

(ii)        The Issuer will request that Noteholders provide Noteholder Tax Identification Information and, to the extent FATCA Withholding Tax is potentially applicable, Noteholder FATCA Information to the Indenture Trustee.

(iii)        The Issuer will require each Noteholder to agree that the Indenture Trustee has the right to withhold from any amount of interest or other amount (properly withholdable under law and without any corresponding gross-up for amounts properly withheld and remitted to the appropriate Governmental Authority) payable to a Noteholder that fails to comply with the requirements of Section 3.7(i), which requirement the Issuer will have satisfied by virtue of Section 3.7 hereof.

85

SECTION 12.2.    <u>Representations and Warranties of the Servicer</u>.

The initial Servicer hereby represents and warrants to the Indenture Trustee, the Issuer, the Backup Servicer and the Noteholders, as of the Closing Date, the following:

(a)    <u>Organization and Authority</u>.  The Servicer:

(i)    is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida;

(ii)    has all requisite power and authority to own and operate its properties and to conduct its business as currently conducted and as proposed to be conducted as contemplated by the Transaction Documents to which it is a party, to enter into the Transaction Documents to which it is a party and to perform its obligations under the Transaction Documents to which it is a party;

(iii)    has made all filings and holds all material franchises, licenses, permits and registrations which are required under the laws of each jurisdiction in which the properties owned (or held under lease) by it or the nature of its activities makes such filings, franchises, licenses, permits or registrations necessary, except where the failure to make such filing will not have a material adverse effect on the Servicer's activities or its ability to perform its obligations under the Transaction Documents; and

(iv)    is duly qualified to do business as a foreign corporation and in good standing under the laws of each jurisdiction where the character of its property, the nature of its business or the performance of its obligations under the Indenture makes such qualification necessary, except where the failure to be so qualified will not have a material adverse effect on its business or its ability to perform its obligations under this Indenture or any other Transaction Document to which it is a party or under the transactions contemplated hereunder or thereunder or the validity or enforceability of any Timeshare Loans.

(b)    <u>Place of Business</u>.  The address of the principal place of business and chief executive office of the Servicer is 4960 Conference Way North, Suite 100, Boca Raton, Florida 33431 and there have been no other such locations during the immediately preceding four months.

(c)    <u>No Consents</u>.  No consent, approval, order or authorization of, and no filing with or notice to, any court or other Governmental Authority in respect of the Servicer is required which has not been obtained in connection with the authorization, execution, delivery or performance by the Servicer of this Indenture or any of the other Transaction Documents to which the Servicer is a party or under the transactions contemplated hereunder or thereunder.

(d)    <u>Compliance with Other Instruments, etc</u>.  The Servicer is not in violation of any term of its certificate of incorporation or by-laws.  The execution, delivery and performance by the Servicer of the Transaction Documents to which it is a party do not and will not (i) conflict with or violate the organizational documents of the Servicer, (ii) conflict with or

86

result in a breach of any of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any Lien on any of the properties or assets of the Servicer pursuant to the terms of any instrument or agreement to which the Servicer is a party or by which it is bound where such conflict would have a material adverse effect on the Servicer's activities or its ability to perform its obligations under the Transaction Documents or (iii) require any consent of or other action by any trustee or any creditor of, any lessor to or any investor in the Servicer.

(e)  <u>Compliance with Law</u>.  The Servicer is in material compliance with all statutes, laws and ordinances and all governmental rules and regulations to which it is subject, the violation of which, either individually or in the aggregate, could materially adversely affect its business, earnings, properties or condition (financial or other).  The internal policies and procedures employed by the Servicer are in material compliance with all applicable statutes, laws and ordinances and all governmental rules and regulations.  The execution, delivery and performance of the Transaction Documents to which it is a party do not and will not cause the Servicer to be in violation of any law or ordinance, or any order, rule or regulation, of any federal, state, municipal or other governmental or public authority or agency where such violation would, either individually or in the aggregate, materially adversely affect its business, earnings, properties or condition (financial or other).

(f)  <u>Pending Litigation or Other Proceedings</u>.  Except as specified in the Offering Circular, there is no pending or, to the best of the Servicer's Knowledge, threatened action, suit, proceeding or investigation before any court, administrative agency, arbitrator or governmental body against or affecting the Servicer which, if decided adversely, would materially and adversely affect (i) the condition (financial or otherwise), business or operations of the Servicer, (ii) the ability of the Servicer to perform its obligations under, or the validity or enforceability of this Indenture or any other documents or transactions contemplated under this Indenture, (iii) any Timeshare Loan or title of any Obligor to any Timeshare Property pursuant to the applicable Owner Beneficiary Agreement or (iv) the Indenture Trustee's ability to foreclose or otherwise enforce the Liens of the Timeshare Loans.

(g)  <u>Taxes</u>.  Except as described in SEC filings relating to the Servicer, the Servicer has timely filed all tax returns (federal, state and local) which are required to be filed and has paid all taxes that have become due and payable, other than those which are being contested in good faith or where the failure to file or pay would not have a material adverse effect on the Servicer's activities or its ability to perform its obligations under the Transaction Documents.

(h)  <u>Transactions in Ordinary Course</u>.  The transactions contemplated by this Indenture are in the ordinary course of business of the Servicer.

(i)  <u>Securities Laws</u>.  The Servicer is not an "investment company" or a company "controlled" by an "investment company" within the meaning of the '40 Act.

(j)  <u>Proceedings</u>.  The Servicer has taken all action necessary to authorize the execution and delivery by it of the Transaction Documents to which it is a party and the performance of all obligations to be performed by it under the Transaction Documents.

87

(k)  Defaults.  The Servicer is not in default under any material agreement, contract, instrument or indenture to which it is a party or by which it or its properties is or are bound, or with respect to any order of any court, administrative agency, arbitrator or governmental body, which default would have a material adverse effect on the transactions contemplated hereunder; and to the Servicer's Knowledge, no event has occurred which with notice or lapse of time or both would constitute such a default with respect to any such agreement, contract, instrument or indenture, or with respect to any such order of any court, administrative agency, arbitrator or governmental body.

(l)  Insolvency.  The Servicer is solvent.  Prior to the date hereof, the Servicer did not, and is not about to, engage in any business or transaction for which any property remaining with the Servicer would constitute an unreasonably small amount of capital.  In addition, the Servicer has not incurred debts that would be beyond the Servicer's ability to pay as such debts matured.

(m)  No Consents.  No prior consent, approval or authorization of, registration, qualification, designation, declaration or filing with, or notice to any federal, state or local governmental or public authority or agency, is, was or will be required for the valid execution, delivery and performance by the Servicer of the Transaction Documents to which it is a party.  The Servicer has obtained all consents, approvals or authorizations of, made all declarations or filings with, or given all notices to, all federal, state or local governmental or public authorities or agencies which are necessary for the continued conduct by the Servicer of its respective businesses as now conducted, other than such consents, approvals, authorizations, declarations, filings and notices which, neither individually nor in the aggregate, materially and adversely affect, or in the future will materially and adversely affect, the business, earnings, prospects, properties or condition (financial or other) of the Servicer.

(n)  Name.  The legal name of the Servicer is as set forth in the signature page of this Indenture and the Servicer does not have any trade names, fictitious names, assumed names or "doing business as" names other than "Bluegreen Corporation of Massachusetts" in Louisiana.

(o)  Information.  No document, certificate or report furnished by the Servicer, in writing, pursuant to this Indenture or in connection with the transactions contemplated hereby, contains or will contain when furnished any untrue statement of a material fact or fails or will fail to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading.  There are no facts relating to the Servicer as of the Closing Date which when taken as a whole, materially adversely affect the financial condition or assets or business of the Servicer, or which may impair the ability of the Servicer to perform its obligations under this Indenture, which have not been disclosed herein or in the certificates, the Offering Circular and other documents furnished by or on behalf of the Servicer pursuant hereto or thereto specifically for use in connection with the transactions contemplated hereby or thereby.

(p)  [Reserved].

88

SECTION 12.3.    <u>Representations and Warranties of the Indenture Trustee</u>.

The Indenture Trustee hereby represents and warrants to the Servicer, the Issuer, the Backup Servicer and the Noteholders as of the Closing Date, the following:

(a)    The Indenture Trustee is a national banking association duly organized and validly existing under the laws of the United States.

(b)    The execution and delivery of this Indenture and the other Transaction Documents to which the Indenture Trustee is a party, and the performance and compliance with the terms of this Indenture and the other Transaction Documents to which the Indenture Trustee is a party by the Indenture Trustee, will not violate the Indenture Trustee's organizational documents or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, or result in a breach of, any material agreement or other material instrument to which it is a party or by which it is bound.

(c)    Except to the extent that the laws of certain jurisdictions in which any part of the Trust Estate may be located require that a co-trustee or separate trustee be appointed to act with respect to such property as contemplated herein, the Indenture Trustee has the full power and authority to carry on its business as now being conducted and to enter into and consummate all transactions contemplated by this Indenture and the other Transaction Documents, has duly authorized the execution, delivery and performance of this Indenture and the other Transaction Documents to which it is a party, and has duly executed and delivered this Indenture and the other Transaction Documents to which it is a party.

(d)    This Indenture, assuming due authorization, execution and delivery by the other parties hereto, constitutes a valid and binding obligation of the Indenture Trustee, enforceable against the Indenture Trustee in accordance with the terms hereof, subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally and the rights of creditors of banks and (ii) general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law.

(e)    The Indenture Trustee is not in violation of, and its execution and delivery of this Indenture and the other Transaction Documents to which it is a party and its performance and compliance with the terms of this Indenture and the other Transaction Documents to which it is a party will not constitute a violation of, any law, any order or decree of any court or arbiter, or any order, regulation or demand of any federal, state or local governmental or regulatory authority, which violation, in the Indenture Trustee's good faith and reasonable judgment, is likely to affect materially and adversely the ability of the Indenture Trustee to perform its obligations under any Transaction Document to which it is a party.

(f)    No litigation is pending or, to the best of the Indenture Trustee's knowledge, threatened against the Indenture Trustee that, if determined adversely to the Indenture Trustee, would prohibit the Indenture Trustee from entering into any Transaction Document to which it is a party or, in the Indenture Trustee's good faith and reasonable

89

judgment, is likely to materially and adversely affect the ability of the Indenture Trustee to perform its obligations under any Transaction Document to which it is a party.

(g)       Any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery and performance by the Indenture Trustee of or compliance by the Indenture Trustee with the Transaction Documents to which it is a party or the consummation of the transactions contemplated by the Transaction Documents has been obtained and is effective.

SECTION I.1. <u>Multiple Roles</u>.

The parties expressly acknowledge and consent to U.S. Bank National Association, acting in the multiple roles of Indenture Trustee, the Paying Agent, the Note Registrar, the successor Servicer (in the event the Backup Servicer shall not serve as the successor Servicer) and the Custodian.  U.S. Bank National Association may, in such capacities, discharge its separate functions fully, without hindrance or regard to conflict of interest principles, duty of loyalty principles or other breach of fiduciary duties to the extent that any such conflict or breach arises from the performance by U.S. Bank National Association of express duties set forth in this Indenture in any of such capacities, all of which defenses, claims or assertions are hereby expressly waived by the other parties hereto, except in the case of negligence (other than errors in judgment) and willful misconduct by U.S. Bank National Association.

SECTION I.2. [<u>Reserved</u>].

SECTION 12.4.    <u>Covenants of the Club Trustee</u>.

Until the date on which each Class of Notes has been paid in full, the Club Trustee hereby covenants that:

(a)       <u>No Conveyance</u>.  The Club Trustee agrees not to convey any Resort Interest (as defined in the Club Trust Agreement) in the Club relating to a Timeshare Loan unless the Indenture Trustee shall have issued an instruction to the Club Trustee pursuant to Section 8.07(c) of the Club Trust Agreement in connection with its exercise of its rights as an Interest Holder Beneficiary (as defined in the Club Trust Agreement) under Section 7.02 of the Club Trust Agreement.

(b)       <u>Separate Corporate Existence</u>.  The Club Trustee shall:

(i) maintain its own deposit account or accounts, separate from those of any Affiliate, with commercial banking institutions. The funds of the Club Trustee will not be diverted to any other Person or for other than trust or corporate uses of the Club Trustee, as applicable;

(ii) ensure that, to the extent that it shares the same officers or other employees as any of its stockholders, beneficiaries or Affiliates, the salaries of and the expenses related to providing benefits to such officers and other employees shall be fairly allocated among such entities, and each

90

such entity shall bear its fair share of the salary and benefit costs associated with all such common officers and employees;

(iii) ensure that, to the extent that the Club Trustee and the Servicer (together with their respective stockholders or Affiliates) jointly do business with vendors or service providers or share overhead expenses, the costs incurred in so doing shall be allocated fairly among such entities, and each such entity shall bear its fair share of such costs. To the extent that the Club Trustee and the Servicer (together with their respective shareholders or Affiliates) do business with vendors or service providers when the goods and services provided are partially for the benefit of any other Person, the costs incurred in so doing shall be fairly allocated to or among such entities for whose benefit the goods and services are provided, and each such entity shall bear its fair share of such costs. All material transactions between Club Trustee and any of its Affiliates shall be only on an arms' length basis;

(iv) to the extent that the Club Trustee and any of its stockholders, beneficiaries or Affiliates have offices in the same location, there shall be a fair and appropriate allocation of overhead costs among them, and each such entity shall bear its fair share of such expenses; and

(v) conduct its affairs strictly in accordance with the Club Trust Agreement or its amended and restated articles of incorporation, as applicable, and observe all necessary, appropriate and customary corporate formalities, including, but not limited to, holding all regular and special shareholders', trustees' and directors' meetings appropriate to authorize all trust and corporate action, keeping separate and accurate minutes of its meetings, passing all resolutions or consents necessary to authorize actions taken or to be taken, and maintaining accurate and separate books, records and accounts, including, but not limited to, payroll and intercompany transaction accounts.

(c)     Merger or Consolidation.  The Club Trustee shall not consolidate with or merge into any other Person or convey, transfer or lease substantially all of its assets as an entirety to any Person unless the Person formed by such consolidation or into which the Club Trustee, as the case may be, has merged or the Person which acquires by conveyance, transfer or lease substantially all the assets of the Club Trustee, as the case may be, as an entirety, can lawfully perform the obligations of the Club Trustee hereunder and executes and delivers to the Indenture Trustee an agreement in form and substance reasonably satisfactory to the Indenture Trustee which contains an assumption by such successor entity of the due and punctual performance and observance of each covenant and condition to be performed or observed by the Club Trustee under this Indenture.

(d)     Corporate Matters.  Notwithstanding any other provision of this Section 12.6 and any provision of law, the Club Trustee shall not do any of the following:

91

(i) engage in any business or activity other than as set forth herein or in or as contemplated by the Club Trust Agreement or its amended and restated articles of incorporation, as applicable;

(ii) without the affirmative vote of a majority of the members of the board of directors (or Persons performing similar functions) of the Club Trustee (which must include the affirmative vote of at least one duly appointed Independent Director (as defined in the Club Trust Agreement)), (A) dissolve or liquidate, in whole or in part, or institute proceedings to be adjudicated bankrupt or insolvent, (B) consent to the institution of bankruptcy or insolvency proceedings against it, (C) file a petition seeking or consent to reorganization or relief under any applicable federal or state law relating to bankruptcy, (D) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the corporation or a substantial part of its property, (E) make a general assignment for the benefit of creditors, (F) admit in writing its inability to pay its debts generally as they become due, (G) terminate the Club Managing Entity as manager under the Club Management Agreement or (H) take any corporate action in furtherance of the actions set forth in clauses (A) through (G) above; provided, however, that no director may be required by any shareholder or beneficiary of the Club Trustee to consent to the institution of bankruptcy or insolvency proceedings against the Club Trustee so long as it is solvent;

(iii) merge or consolidate with any other corporation, company or entity or sell all or substantially all of its assets or acquire all or substantially all of the assets or capital stock or other ownership interest of any other corporation, company or entity; or

(iv) with respect to the Club Trustee, amend or otherwise modify its amended and restated articles of incorporation or any definitions contained therein in a manner adverse to the Indenture Trustee or any Noteholder without the prior written consent of the Indenture Trustee.

(e)    The Club Trustee shall not incur any indebtedness other than (i) trade payables and operating expenses (including taxes) incurred in the ordinary course of business or (ii) in connection with servicing Resort Interests included in the Club's trust estate in the ordinary course of business consistent with past practices; provided, that in no event shall the Club Trustee incur indebtedness for borrowed money.

SECTION 12.5.    Representations and Warranties of the Backup Servicer.

The Backup Servicer hereby represents and warrants to the Indenture Trustee, the Issuer, the Servicer and the Noteholders, as of the Closing Date, the following:

(a)    Corporate Representations.

92

(i)    is a corporation duly organized, validly existing and in good standing under the laws of the State of Arizona;

(ii)    has all requisite power and authority to own and operate its properties and to conduct its business as currently conducted and as proposed to be conducted as contemplated by the Transaction Documents to which it is a party, to enter into the Transaction Documents to which it is a party and to perform its obligations under the Transaction Documents to which it is a party; and

(iii)    has made all filings and holds all material franchises, licenses, permits and registrations which are required under the laws of each jurisdiction in which the properties owned (or held under lease) by it or the nature of its activities makes such filings, franchises, licenses, permits or registrations necessary, except where the failure to make such filing will not have a material adverse effect on the Backup Servicer activities or its ability to perform its obligations under the Transaction Documents.

(f)    <u>Place of Business</u>.  The address of the principal place of business and chief executive office of the Backup Servicer is as set forth in Section 13.3 hereof and there have been no other such locations during the immediately preceding four months.

(g)    <u>Compliance with Other Instruments, etc</u>.  The Backup Servicer is not in violation of any term of its certificate of incorporation and by-laws.  The execution, delivery and performance by the Backup Servicer of the Transaction Documents to which it is a party do not and will not (i) conflict with or violate the organizational documents of the Backup Servicer, (ii) conflict with or result in a breach of any of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any Lien on any of the properties or assets of the Backup Servicer pursuant to the terms of any instrument or agreement to which the Backup Servicer is a party or by which it is bound where such conflict would have a material adverse effect on the Backup Servicer's activities or its ability to perform its obligations under the Transaction Documents or (iii) require any consent of or other action by any trustee or any creditor of, any lessor to or any investor in the Backup Servicer.

(h)    <u>Compliance with Law</u>.  The Backup Servicer is in material compliance with all statutes, laws and ordinances and all governmental rules and regulations to which it is subject, the violation of which, either individually or in the aggregate, could materially adversely affect its business, earnings, properties or condition (financial or other).  The internal policies and procedures employed by the Backup Servicer are in material compliance with all applicable statutes, laws and ordinances and all governmental rules and regulations.  The execution, delivery and performance of the Transaction Documents to which it is a party do not and will not cause the Backup Servicer to be in violation of any law or ordinance, or any order, rule or regulation, of any federal, state, municipal or other governmental or public authority or agency where such violation would, either individually or in the aggregate, materially adversely affect its business, earnings, properties or condition (financial or other).

(i)    <u>Pending Litigation or Other Proceedings</u>.  There is no pending or, to the best of the Backup Servicer's Knowledge, threatened action, suit, proceeding or investigation

93

before any court, administrative agency, arbitrator or governmental body against or affecting the Backup Servicer which, if decided adversely, would materially and adversely affect (i) the condition (financial or otherwise), business or operations of the Backup Servicer, (ii) the ability of the Backup Servicer to perform its obligations under, or the validity or enforceability of this Indenture or any other documents or transactions contemplated under this Indenture, (iii) any property or title of any Obligor to any property or (iv) the Indenture Trustee's ability to foreclose or otherwise enforce the Liens of the Timeshare Loans.

(j)     Taxes.  The Backup Servicer has timely filed all tax returns (federal, state and local) which are required to be filed and has paid all taxes that have become due and payable, other than those which are being contested in good faith or where the failure to file or pay would not have a material adverse effect on the Backup Servicer's activities or its ability to perform its obligations under the Transaction Documents.

(k)     Transactions in Ordinary Course.  The transactions contemplated by this Indenture are in the ordinary course of business of the Backup Servicer.

(l)     Securities Laws.  The Backup Servicer is not an "investment company" or a company "controlled" by an "investment company" within the meaning of the '40 Act.

(m)     Proceedings.  The Backup Servicer has taken all action necessary to authorize the execution and delivery by it of the Transaction Documents to which it is a party and the performance of all obligations to be performed by it under the Transaction Documents.

(n)     Defaults.  The Backup Servicer is not in default under any material agreement, contract, instrument or indenture to which it is a party or by which it or its properties is or are bound, or with respect to any order of any court, administrative agency, arbitrator or governmental body, which default would have a material adverse effect on the transactions contemplated hereunder; and to the Backup Servicer's Knowledge, no event has occurred which with notice or lapse of time or both would constitute such a default with respect to any such agreement, contract, instrument or indenture, or with respect to any such order of any court, administrative agency, arbitrator or governmental body.

(o)     Insolvency.  The Backup Servicer is solvent.  Prior to the date hereof, the Backup Servicer did not, and is not about to, engage in any business or transaction for which any property remaining with the Backup Servicer would constitute an unreasonably small amount of capital.  In addition, the Backup Servicer has not incurred debts that would be beyond the Backup Servicer's ability to pay as such debts matured.

(p)     No Consents.  No prior consent, approval or authorization of, registration, qualification, designation, declaration or filing with, or notice to any federal, state or local governmental or public authority or agency, is, was or will be required for the valid execution, delivery and performance by the Backup Servicer of the Transaction Documents to which it is a party.  The Backup Servicer has obtained all consents, approvals or authorizations of, made all declarations or filings with, or given all notices to, all federal, state or local governmental or public authorities or agencies which are necessary for the continued conduct by the Backup Servicer of its respective businesses as now conducted, other than such consents, approvals,

94

authorizations, declarations, filings and notices which, neither individually nor in the aggregate, materially and adversely affect, or in the future will materially and adversely affect, the business, earnings, prospects, properties or condition (financial or other) of the Backup Servicer.

(q)     Name.  The legal name of the Backup Servicer is as set forth in the signature page of this Indenture.  Except for Blackwell Recovery, the Backup Servicer does not have any trade names, fictitious names, assumed names or "doing business as" names.

(r)     Information.  No document, certificate or report furnished by the Backup Servicer, in writing, pursuant to this Indenture or in connection with the transactions contemplated hereby, contains or will contain when furnished any untrue statement of a material fact or fails or will fail to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading.  There are no facts relating to the Backup Servicer as of the Closing Date which when taken as a whole, materially adversely affect the financial condition or assets or business of the Backup Servicer, or which may impair the ability of the Backup Servicer to perform its obligations under this Indenture or any other Transaction Document to which it is a party, which have not been disclosed herein or in the certificates and other documents furnished by or on behalf of the Backup Servicer pursuant hereto or thereto specifically for use in connection with the transactions contemplated hereby or thereby.

ARTICLE XIII.

MISCELLANEOUS

SECTION 13.1.     Officer's Certificate and Opinion of Counsel as to Conditions Precedent.

Upon any request or application by the Issuer (or any other obligor in respect of the Notes) to the Indenture Trustee to take any action under this Indenture, the Issuer (or such other obligor) shall furnish to the Indenture Trustee:

(a)     an Officer's Certificate (which shall include the statements set forth in Section 13.2 hereof) stating that all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(b)     at the request of the Indenture Trustee, an Opinion of Counsel (which shall include the statements set forth in Section 13.2 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been complied with.

SECTION 13.2.     Statements Required in Certificate or Opinion.

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include:

(a)     a statement that the Person making such certificate or opinion has read such covenant or condition;

95

(b)      a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)      a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him/her to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d)      a statement as to whether or not, in the opinion of such Person, such condition or covenant has been complied with.

SECTION 13.3.      Notices.

(a)      All communications, instructions, directions and notices to the parties thereto shall be (i) in writing (which may be by facsimile transmission or electronic confirmable means, followed by delivery of original documentation within one Business Day), (ii) effective when received and (iii) delivered or mailed first class mail, postage prepaid to it at the following address:

If to the Issuer:

BXG Receivables Note Trust 2020-A
c/o Wilmington Trust Company
1100 North Market Street
Wilmington, Delaware 19890-0001
Attention: Corporate Trust Administration
Fax: (302) 636-4140

with a copy to:

Taylor English Duma LLP
1600 Parkwood Circle Suite 400
Atlanta, Georgia 30339
Attention: Mark I. Sanders, Esq.
Fax: (770) 434-7376

If to the Club Trustee:

Vacation Trust, Inc.
4950 Communication Avenue
Suite 900
Boca Raton, Florida 33431
Attention: John Raney, President
Fax: (561) 912-7999

If to the Servicer:

96

Bluegreen Vacations Corporation
4960 Conference Way North, Suite 100
Boca Raton, Florida 33431
Attention:  Raymond S. Lopez, Executive Vice President, COO, CFO and Treasurer
E-Mail: ray.lopez@bluegreenvacations.com

with a copy to:

Taylor English Duma LLP
1600 Parkwood Circle Suite 400
Atlanta, Georgia 30339
Attention: Mark I. Sanders, Esq.
Fax: (770) 434-7376

If to the Backup Servicer:

Concord Servicing Corporation
4150 North Drinkwater Blvd
Suite 200
Scottsdale, Arizona 85251
Attention: General Counsel
Email Address: syurkiw@concordservicing.com

If to the Indenture Trustee and Paying Agent:

(a) for Note transfer purposes and presentment of the Notes for final payment thereon, the corporate
office of the Indenture Trustee:

U.S. Bank National Association
111 Fillmore Avenue East
EP-MN-WS2N
St. Paul, Minnesota 55107
Attention: Bondholder Services, Ref: BXG 2020-A

(b) for all other purposes, the corporate office of the Indenture Trustee:

U.S. Bank National Association
190 S. LaSalle St.,  7th Floor MK-IL-SL7C
Chicago, IL 60603
Attention: Global Structured Finance – BXG 2020-A
Telephone Number: (312) 332-6573
Email Address: eric.ott@usbank.com

If to the Rating Agencies:

97

S&P Global Ratings, a business unit of Standard & Poor's Financial Services, LLC
55 Water Street
New York, New York 10041-0003
Attention: Structured Credit Surveillance
Email Address: Servicer_Reports@standardandpoors.com

DBRS, Inc.
140 Broadway, 43rd Floor
New York, NY 10005
Attention: ABS Surveillance
Email Address: abs_surveillance@dbrs.com

**The parties hereto agree that all communications, reports, notices and any other item sent to the Rating Agencies pursuant to this Indenture shall simultaneously be emailed to bxgnt2020auy5r@17g5.com.**

or at such other address as the party may designate by notice to the other parties hereto, which shall be effective when received.

(b)     All communications and notices described hereunder to a Noteholder shall be in writing and delivered or mailed first class mail, postage prepaid or overnight courier at the address shown in the Note Register.  The Indenture Trustee agrees to deliver or mail to each Noteholder upon receipt, all notices and reports that the Indenture Trustee may receive hereunder and under any Transaction Documents.  Unless otherwise provided herein, the Indenture Trustee may consent to any requests received under such documents or, at its option, follow the directions of Noteholders representing at least 66-2/3% of the Adjusted Note Balance of each Class of Notes within 30 days after prior written notice to the Noteholders.  All notices to Noteholders (or any Class thereof) shall be sent simultaneously.  Expenses for such communications and notices shall be borne by the Servicer.

SECTION 13.4.     No Proceedings.

The Noteholders, the Servicer, the Indenture Trustee, the Custodian, the Club Trustee and the Backup Servicer each hereby agrees that it will not, directly or indirectly institute, or cause to be instituted, against the Issuer, the Trust Estate or the Depositor any proceeding of the type referred to in Sections 6.1(d) and (e) hereof, so long as there shall not have elapsed one year plus one day after payment in full of the Notes.

SECTION 13.5.     Limitation of Liability of Owner Trustee.

Notwithstanding anything contained herein or in any other Transaction Document to the contrary, it is expressly understood and agreed by the parties hereto that (a) this Indenture is executed and delivered by Wilmington Trust Company, not individually or personally, but solely as Owner Trustee on behalf of the Issuer, in the exercise of the powers and authority conferred and vested in it under the Trust Agreement, (b) each of the representations, undertakings and agreements herein made on the part of the Issuer is made and intended not as a

98

personal representation, undertaking or agreement by Wilmington Trust Company but is made and intended for the purpose for binding only the Issuer and the Trust Estate, and (c) under no circumstances shall Wilmington Trust Company be personally liable for the payment of any indebtedness or expenses of the Issuer or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Issuer under this Indenture or any other related documents.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the day and year first above written.

BXG RECEIVABLES NOTE TRUST 2020-A,

By: Wilmington Trust Company, as Owner Trustee

By: /s/ Lester E. Hendrix
Name: Lester E. Hendrix
Title: Vice President

BLUEGREEN VACATIONS CORPORATION,
as Servicer

By: /s/ Raymond Lopez
Name: Raymond S. Lopez
Title: Executive Vice President, COO, CFO and Treasurer

CONCORD SERVICING CORPORATION,
as Backup Servicer

By: /s/ Sonja Yurkiw
Name: Sonja Yurkiw
Title: COO and General Counsel

VACATION TRUST, INC.,
as Club Trustee

By: /s/ John P. Raney
Name: John P. Raney
Title: President

U.S. BANK NATIONAL ASSOCIATION,
as Indenture Trustee and Paying Agent

By: /s/ Eric Ott
Name: Eric Ott
Title: Vice President

1

U.S. BANK NATIONAL ASSOCIATION,
as Custodian


By: /s/ Michelle Hoff
Name: Michelle Hoff
Title: Vice President

---

D-55

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2020

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from _____ to _____

Commission file number 001-09071

## BLUEGREEN VACATIONS HOLDING CORPORATION
(Exact name of registrant as specified in its charter)

| **Florida** | **59-2022148** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**4960 Conference Way North, Suite 100, Boca Raton, FL 33341**
(Address of principal executive offices) (Zip Code)

Registrant's telephone number, including area code: (954) 940-4900

Securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934:

| Title of Each class | Trading Symbol(s) | Name of Each Exchange on Which Registered |
|---|---|---|
| Common Stock, $0.01 par value (including associated Preferred Share Purchase Rights) | BVH | New York Stock Exchange |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated Filer ☒ |
| Non-accelerated filer ☐ | Smaller reporting company ☒ |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.   ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

The aggregate market value of the registrant's common stock held by non-affiliates of the registrant as of June 30, 2020, the last trading day of the registrant's most recently completed second fiscal quarter, was $153.9 million (based on the closing sale price of the common stock on that date on the New York Stock Exchange).

The number of shares outstanding of each of the registrant's classis of common stock as of February 26, 2021 is as follows:

Class A Common Stock of $.01 par value, 15,624,123 shares outstanding.
Class B Common Stock of $.01 par value, 3,693,596 shares outstanding.



Exhibit
Job# 6242193
**Humphrey - 016**
L. Goodall, RPR  10-14-22  Humphrey

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive proxy statement for its 2021 Annual Meeting of Shareholders, to be filed with the Securities and Exchange Commission pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended, are incorporated by reference into Part III of this Annual Report on Form 10-K.

2

**BLUEGREEN VACATIONS HOLDING CORPORATION**
**FORM 10-K TABLE OF CONTENTS**
**YEAR ENDED DECEMBER 31, 2020**

|  |  | Page |
|---|---|---|
| | **PART I** | |
| Item 1. | Business | 9 |
| Item 1A. | Risk Factors | 28 |
| Item 1B. | Unresolved Staff Comments | 49 |
| Item 2. | Properties | 49 |
| Item 3. | Legal Proceedings | 49 |
| Item 4. | Mine Safety Disclosures | 49 |
| | **PART II** | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 50 |
| Item 6. | Selected Financial Data | 51 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 51 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 87 |
| Item 8. | Financial Statements and Supplementary Data | 89 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 142 |
| Item 9A. | Controls and Procedures | 142 |
| Item 9B. | Other Information | 144 |
| | **PART III** | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 145 |
| Item 11. | Executive Compensation | 145 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 145 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 145 |
| Item 14. | Principal Accountant Fees and Services | 145 |
| | **PART IV** | |
| Item 15. | Exhibits, Financial Statement Schedules | 145 |
| Item 16. | Form 10-K Summary | 154 |
| SIGNATURES | | 155 |

3

*Cautionary Note Regarding Forward-Looking Statements*

This Annual Report on Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

Forward-looking statements include all statements that do not relate strictly to historical or current facts and can be identified by the use of words such as "anticipates," "estimates," "expects," "intends," "plans," "believes," "projects," "predicts," "seeks," "will," "should," "would," "may," "could," "outlook," "potential," and similar expressions or words and phrases of similar import. Forward-looking statements include, among others, statements relating to BVH and Bluegreen's future financial performance, business prospects and strategy, anticipated financial position, liquidity and capital needs and other similar matters. These statements are based on management's current expectations and assumptions about future events, which are inherently subject to uncertainties, risks and changes in circumstances that are difficult to predict. Actual results may differ materially from those expressed in, or implied by, the forward-looking statements as a result of various factors, including, among others the following:

These risks and uncertainties include, but are not limited to:

- ⊙ the Company has limited sources of cash and is dependent upon dividends from Bluegreen to fund its operations; Bluegreen has suspended regular payments of quarterly dividends and there is no assurance that Bluegreen will resume payments of dividends;
- ⊙ risks associated with the Company's indebtedness, including that the Company will be required to utilize cash flow to service its indebtedness, that indebtedness may make the Company more vulnerable to economic downturns, that indebtedness may subject the Company to covenants and restrictions on its operations and activities and the payment of dividends;
- ⊙ the Company's shareholders' interests will be diluted to the extent additional shares of its common stock are issued;
- ⊙ the Company has suspended regular payments of quarterly dividends in light of Coronavirus Disease 2019 ("COVID-19") and there is no assurance that the Company will resume payments of dividends;
- ⊙ the impact of economic conditions on the Company, including the impact of the COVID-19 pandemic, the price and liquidity of the Company's Class A Common Stock and Class B Common Stock, and the Company's ability to obtain additional capital, including the risk that if the Company's needs or otherwise believes it is advisable to issue debt or equity securities or to incur indebtedness in order to fund the Company's operations or investments, it may not be able to issue any such securities or obtain such indebtedness on favorable terms, or at all;
- ⊙ if the Company does not maintain compliance with the listing requirements of the NYSE, which includes, among other things, a minimum average closing price, share volume, and market capitalization, BVH's Class A common stock will not remain listed for trading on the NYSE;
- ⊙ adverse conditions in the stock market, the public debt market, and other capital markets and the impact of such conditions on the Company;
- ⊙ risks of cybersecurity threats, including the potential misappropriation of assets or confidential information, corruption of data or operational disruptions;
- ⊙ risks related to potential business expansion or other opportunities that Bluegreen may pursue, including that they may involve significant costs and the incurrence of significant indebtedness and may not be successful;

4

- the impact on BVH's consolidated financial statements and internal control over financial reporting of the adoption of new accounting standards;
- risks associated with legal proceedings and other regulatory proceedings, examinations or audits of the Company's operations, including claims of noncompliance with applicable regulations or for development related defects, and the impact they may have on the Company's financial condition and operating results, including the costs associated with regulatory compliance; and
- the preparation of financial statements in accordance with U.S. generally accepted accounting principles ("GAAP") involves making estimates, judgments and assumptions, and any changes in estimates, judgments and assumptions used could have a material adverse impact on the financial condition and operating results of the Company or its subsidiaries.

With respect to Bluegreen, whose results are consolidated into the Company's financial statements the risks and uncertainties include, but are not limited to:

- adverse trends or disruptions in economic conditions generally or in the vacation ownership, vacation rental and travel industries;
- risks relating to public health issues, including in particular the COVID-19 pandemic and the effects of the pandemic. These risks include resort closures, travel and business restrictions, volatility in the international and national economy and credit markets, worker absenteeism, quarantines and other health-related restrictions; the length and severity of the COVID-19 pandemic and Bluegreen's ability to successfully resume full business operations thereafter, governmental and agency orders, mandates and guidance in response to the COVID-19 pandemic and the duration thereof, which is uncertain and will impact Bluegreen's ability to fully utilize resorts, sales centers and other marketing activities, and the pace of recovery following the COVID-19 pandemic; other risks include competitive conditions; liquidity and the availability of capital; Bluegreen's ability to successfully implement its strategic plans and initiatives to navigate the COVID-19 pandemic; risks that Bluegreen's current or future marketing alliances may not be available to us in the future; risks that default rates may increase and exceed Bluegreen's expectations; risks related to Bluegreen's indebtedness, including the potential for accelerated maturities and debt covenant violations; the impact of the pandemic on Bluegreen's dividend policy; the risk of heightened litigation as a result of actions taken in response to the COVID-19 pandemic; the impact of the COVID-19 pandemic on consumers, including their income, their level of discretionary spending both during and after the pandemic, and their views regarding travel and the vacation ownership industries; and the risk that Bluegreen's resort management fees and finance operations may not continue to generate recurring sources of cash during or following the pandemic to the extent anticipated or at all;
- adverse changes to, expirations or terminations of, or interruptions in, and other risks relating to Bluegreen's business and strategic relationships, management contracts, exchange networks or other strategic marketing alliances, and the risk that Bluegreen's business relationship with Bass Pro under the revised terms of the parties' marketing agreement and its relationship with Choice Hotels may not be as profitable as anticipated, or at all, or otherwise result in the benefits anticipated
- the risks of the real estate market and the risks associated with real estate development, including a decline in real estate values and a deterioration of other conditions relating to the real estate market and real estate development;
- adverse events or trends in vacation destinations and regions where the resorts in Bluegreen's network are located, including weather-related events and adverse conditions related to the COVID-19 pandemic;
- decreased demand from prospective purchasers of vacation ownership interests ("VOIs");
- Bluegreen's ability to maintain adequate/sufficient/desired amounts of inventory of VOIs for sale;
- the availability of financing, Bluegreen's ability to sell, securitize or borrow its VOI notes receivable on acceptable terms; and Bluegreen's ability to successfully increase its credit facility capacity or enter into capital market transactions or other alternatives to provide for sufficient available cash for a sustained period of time;
- Bluegreen's indebtedness may impact Bluegreen and, in turn BVH's, financial condition and results of operations, and the terms of Bluegreen's indebtedness may limit, among other things, Bluegreen's activities and ability to pay dividends, and Bluegreen may not comply with the terms of its indebtedness;
- changes in Bluegreen's senior management;

5

- ⊙ Bluegreen's ability to comply with regulations applicable to the vacation ownership industry or Bluegreen's other activities, and the costs of compliance efforts or a failure to comply;
- ⊙ Bluegreen's ability to successfully implement its growth strategy and plans and the impact they may have on its results and financial conditions, including that any increased developed VOI sales efforts may not be successful and may adversely impact Bluegreen's cash flows;
- ⊙ Bluegreen's ability to compete effectively in the highly competitive vacation ownership industry and against hotel and other hospitality and lodging alternatives;
- ⊙ Bluegreen's ability to offer or further enhance the Vacation Club experience for Bluegreen's Vacation Club owners and risks related to Bluegreen's efforts and expenses in connection therewith, including that they may not result in the benefits anticipated and that expenses may be greater than anticipated;
- ⊙ Bluegreen's customers' compliance with their payment obligations under financing provided by Bluegreen, the increased presence and efforts of "timeshare-exit" firms and the success of actions which Bluegreen may take in connection therewith, and the impact of defaults on the Bluegreen's and, in turn BVH's, operating results and liquidity position;
- ⊙ the ratings of third-party rating agencies, including the impact of any downgrade on Bluegreen's ability to obtain, renew or extend credit facilities, or otherwise raise funds;
- ⊙ changes in Bluegreen's business model and marketing efforts, plans or strategies, which may cause marketing expenses to increase or adversely impact Bluegreen's, and in turn BVH's, revenue, operating results and financial condition, and such expenses as well as Bluegreen's investments, including investments in new and expanded sales offices, and other sales and marketing initiatives, including screening methods and data driven analysis, may not achieve the desired results;
- ⊙ technology and other changes and factors which may impact Bluegreen's telemarketing efforts, including new cell phone technologies that identify or block marketing vendor calls;
- ⊙ the impact of the resale market for VOIs on Bluegreen's business, operating results and financial condition;
- ⊙ risks associated with Bluegreen's relationships with third-party developers, including that third-party developers who provide VOIs to be sold by Bluegreen pursuant to fee-based services or just-in-time arrangements may not provide VOIs when planned and that may not fulfill their obligations to Bluegreen's or to the homeowners associations that maintain the resorts they developed;
- ⊙ risks associated with legal proceedings and regulatory proceedings, examinations or audits of Bluegreen's operations, including claims of noncompliance with applicable regulations or for development related defects, and the impact they may have on Bluegreen's, and in turn BVH's, financial condition and operating results;
- ⊙ audits of Bluegreen or its subsidiaries' tax returns, including that they may result in the imposition of additional taxes;
- ⊙ environmental liabilities, including claims with respect to mold or hazardous or toxic substances, and their impact on Bluegreen, and in turn BVH's, financial condition and operating results;
- ⊙ risks that natural disasters, including hurricanes, earthquakes, fires, floods and windstorms may adversely impact Bluegreen, and in turn BVH's, financial condition and operating results, including due to any damage to physical assets or interruption of access to physical assets or operations resulting therefrom, and the frequency or severity of natural disasters may increase due to climate change or other factors;
- ⊙ Bluegreen's ability to maintain the integrity of internal or customer data, the failure of which could result in damage to its reputation and/or subject Bluegreen to costs, fines or lawsuits; and
- ⊙ the updating of, and developments with respect to, technology, including the cost involved in updating technology and the impact that any failure to keep pace with developments in technology could have on Bluegreen's operations or competitive position, and Bluegreen's information technology expenditures may not result in the expected benefits.

In addition to the foregoing, references made to the other risks and uncertainties discussed in the "Risk Factors" section of, and elsewhere in, this Annual Report on Form 10-K including those inherent to Bluegreen's business and the vacation ownership industry and risks related to ownership of BVH's stock.

These and other risks and uncertainties disclosed in this Annual Report on Form 10-K are not necessarily all of the important factors that could cause the Company's actual results to differ materially from those expressed in or implied

6

by any of the forward-looking statements. Other unknown or unpredictable factors could cause actual results to differ materially from those expressed in any of the forward-looking statements. In addition, past performance may not be indicative of future results, and comparisons of results for current and any prior periods are not intended to express any future trends or indications of future performance, and all such information should only be viewed as historical data.

Given these uncertainties, you are cautioned not to place undue reliance on forward-looking statements. You should read this Annual Report on Form 10-K with the understanding that actual future results, levels of activity, performance, trends, and events and circumstances may be materially different from what the Company expects. The Company qualifies all forward-looking statements by these cautionary statements.

Forward-looking statements speak only as of the date of this Annual Report on Form 10-K.

*Market and Industry Data*

Market and industry data used in this Annual Report on Form 10-K have been obtained from Bluegreen's internal surveys, industry publications, unpublished industry data and estimates, discussions with industry sources and other currently available information. The sources for this data include, without limitation, the American Resort Development Association. Industry publications generally state that the information contained therein has been obtained from sources believed to be reliable, but there can be no assurance as to the accuracy or completeness of such information. Bluegreen has not independently verified such data. Similarly, Bluegreen's internal surveys, while believed by Bluegreen to be reliable, have not been verified by any independent sources. Accordingly, such data may not prove to be accurate. Forecasts and other forward-looking information obtained from these sources are subject to the same qualifications and uncertainties as the other forward-looking statements contained in this Annual Report on Form 10-K, as described above.

*Trademarks, Service Marks and Trade Names*

Bluegreen owns or has rights to use a number of registered and common law trademarks, trade names and service marks in connection with its business, including, but not limited to, Bluegreen, Bluegreen Resorts, Bluegreen Vacations, Bluegreen Traveler Plus, Bluegreen Vacation Club, Bluegreen Wilderness Club at Big Cedar and the Bluegreen Logo. This Annual Report on Form 10-K also refers to trademarks, trade names and service marks of other organizations. Without limiting the generality of the preceding sentence, World Golf Village is registered by World Golf Foundation, Inc.; Big Cedar, Cabela's and Bass Pro Shops are registered by Bass Pro Trademarks, LP; Ascend, Ascend Hotel Collection, Ascend Resort Collection, Choice Privileges, Comfort Inn, Comfort Suites, Quality, Sleep Inn, Clarion, Cambria, MainStay Suites, Econo Lodge and Rodeway Inn are registered by Choice Hotels International, Inc.; and Suburban Extended Stay Hotel is registered by Suburban Franchise Systems, Inc. All trademarks, service marks or trade names referred to in this Annual Report on Form 10-K are the property of their respective holders. Solely for convenience, the trademarks, trade names and service marks referred to in this Annual Report on Form 10-K appear without the ® and ™ symbols, but such references are not intended to indicate in any way that the owner will not assert, to the fullest extent under applicable law, all rights to such trademarks, trade names and service marks.

*Summary of Risk Factors*

The following is a summary of the material risks described in Part I, Item 1A "Risk Factors" of this Annual Report on Form 10-K. While the Company believes that the risks described in the "Risk Factors" section are those that are material to investors, other factors not presently known to the Company or that it currently believes are immaterial may also adversely affect the Company, perhaps materially. The following summary should not be considered an exhaustive summary of the material risks facing the Company, and it should be read in conjunction with the "Risk Factors" section and the other information contained in this Annual Report on Form 10-K. The items discussed below and in the "Risk Factors" section of this Annual Report on Form 10-K involve or contain forward-looking statements. You should refer to the explanation of the qualifications and limitations on forward-looking statements described above.

7

D - 0055-0007

Risks Related to BVH at its Holding Company Level and to Ownership of its Class A Common Stock and Class B Common Stock

- ⊘ As a result of the spin-off of BBX Capital, BVH is a Bluegreen holding company and will rely primarily on dividends from Bluegreen to service its debt, including its $75 million note to BBX Capital, and fund its other cash requirements.
- ⊘ The control position of Alan B. Levan, John E. Abdo, Jarett S. Levan and Seth M. Wise may adversely affect the market price of BVH's Class A Common Stock and Class B Common Stock.
- ⊘ The relative fixed voting percentages of BVH's Class A Common Stock and Class B Common Stock may have an adverse impact on the market price of such securities.
- ⊘ Provisions in BVH's Amended and Restated Articles of Incorporation and Bylaws as well as BVH's recently adopted shareholder rights plan may make it difficult for a third party to acquire BVH and could impact the price of BVH's Class A Common Stock and Class B Common Stock.
- ⊘ Acquisitions may reduce earnings, require additional financing and expose BVH to additional risks.
- ⊘ Substantial sales of BVH's Class A Common Stock or Class B Common Stock (or the perception of future sales) could adversely affect the market prices of such securities.
- ⊘ BVH has suspended the payment of regular quarterly cash dividends and may not resume paying dividends in the future.

Risks Related to Bluegreen and its Business

- ⊘ Bluegreen is subject to the business, financial and operating risks inherent to the vacation ownership industry.
- ⊘ Bluegreen's business and operations, including its ability to market VOIs, may be adversely affected by general economic conditions and conditions affecting the vacation ownership industry and the availability of financing.
- ⊘ The COVID-19 pandemic has adversely impacted Bluegreen's business and results, and the future effects of the pandemic are uncertain and will depend on future developments.
- ⊘ Bluegreen may not be able to compete successfully in the highly competitive vacation ownership industry.
- ⊘ Bluegreen generates significant sales from its strategic partnerships and relationships and is subject to risks related to those partnerships and arrangements, including if they are terminated or not renewed, or are not as successful as anticipated.
- ⊘ Bluegreen is subject to risks related to its ability to comply with applicable laws, rules and regulations, the costs of compliance or any failure to comply, and changes in laws, rules and regulations.
- ⊘ Bluegreen's business and results may be impacted if financing is not available on favorable terms, or at all.
- ⊘ Bluegreen's results and liquidity would be adversely impacted if they experience increased defaults on its notes receivable portfolio.
- ⊘ The ratings of third-party rating agencies could adversely impact Bluegreen's ability to obtain, renew or extend credit facilities, or otherwise raise funds.
- ⊘ Bluegreen may not market products and services successfully and efficiently.
- ⊘ Bluegreen may be unable to develop or acquire VOI inventory or enter into and maintain fee-based relationships to source VOI inventory.
- ⊘ Bluegreen's capital-light business activities may not be successful.
- ⊘ Bluegreen is subject to risks associated with its management of resort properties and, with respect to properties not managed by them, risks associated with its dependence on the managers of those resorts.
- ⊘ Bluegreen may not continue to participate in, and Bluegreen's customers may not be satisfied with its, exchange networks and other strategic alliances.
- ⊘ Bluegreen's business and results could be adversely impacted if maintenance fees increase.
- ⊘ Strategic transactions which Bluegreen may pursue may not be successful and may have adverse impacts, including diversion of management attention and the incurrence of significant expenses.
- ⊘ The resale market for VOIs could adversely affect Bluegreen's business.
- ⊘ Bluegreen's insurance policies may not cover all potential losses.

8

ⓣ Bluegreen's business may be adversely impacted by negative publicity, including information spread through social media.

Risks Related to the Real Estate Market and Real Estate Development
ⓣ Bluegreen is subject to the risks of the real estate market and real estate development, including a decline in real estate values, a deterioration of other conditions relating to the real estate market and real estate development, and potential environmental liabilities.

Risks Related to our Indebtedness
ⓣ The Company's, including Bluegreen's, indebtedness could limit its activities and adversely impact its results and financial condition.
ⓣ Changes to and replacement of the LIBOR benchmark interest rate could adversely affect the Company's, including Bluegreen's, results of operations and liquidity.

Risks Related to Technology, Privacy and Intellectual Property Rights
ⓣ Bluegreen would be adversely impacted if they fail to maintain the integrity of internal or customer data.
ⓣ Bluegreen may not be able to keep pace with technological developments, and the cost involved in updating technology may be significant.
ⓣ A failure to protect Bluegreen or its business partners' intellectual property rights could adversely affect Bluegreen's business.

General Risks
ⓣ Legal and regulatory proceedings could adversely affect the Company's financial condition and operating results.
ⓣ The loss of key management or personnel could adversely affect the Company's business.
ⓣ The preparation of the Company's financial statements in accordance with GAAP involves estimates, judgments and assumptions, as to which there are inherent uncertainties, and changes thereto could adversely impact the Company's operating results and financial condition.
ⓣ The Company's stock price may be volatile or may decline regardless of the Company's operating performance.
ⓣ A failure to maintain proper and effective internal controls could have adverse impacts.
ⓣ The Company's shareholders' interests may be diluted by future stock issuances.
ⓣ If securities or industry analysts do not publish research or publish unfavorable research about the Company's business, the Company's stock price and trading volume could decline.

**Item 1. Business.**

*Overview*

As a result of the spin-off of the Company's other businesses and investments on September 30, 2020 discussed below (which are now reported as discontinued operations), the Company is a "pure" holding company whose primary asset is its ownership of approximately 93% of the outstanding common stock of Bluegreen Vacations Corporation, a leading vacation ownership company that markets and sells vacation ownership interests ("VOIs") and manages resorts in popular leisure and urban destinations.  Except as otherwise noted or where the context requires otherwise, references in this Annual Report on Form 10-K to "BVH," "the Company," "we," "us" and "our" refers to Bluegreen Vacations Holding Corporation together with its consolidated subsidiaries.

*Spin-Off*

On September 30, 2020, BVH completed the spin-off of its wholly-owned subsidiary, BBX Capital, Inc. ("BBX Capital"). The spin-off separated BVH's businesses, activities, and investments into two separate, publicly-traded companies: (i) BVH, which continues to hold approximately 93% of Bluegreen's outstanding common stock, and (ii) BBX Capital, which now holds all of the businesses and investments previously held by BVH other than Bluegreen.

9

These include BBX Capital Real Estate LLC ("BBX Capital Real Estate" or "BBXRE"), BBX Sweet Holdings, LLC ("BBX Sweet Holdings"), and Renin Holdings, LLC ("Renin"). BBX Capital and its subsidiaries are presented as discontinued operations in the Company's financial statements. Subsequent to the spin-off, BVH's operating expenses, excluding the interest on the debt described below, are limited to executive compensation and public company costs, which in the aggregate are expected to be approximately $2.0 million annually.

In connection with the spin-off, the Company's name was changed from BBX Capital Corporation to Bluegreen Vacations Holding Corporation.  In connection with the spin-off the Company also issued a $75.0 million note payable to BBX Capital that accrues interest at a rate of 6% per annum and requires payments of interest on a quarterly basis. Under the terms of the note, the Company has the option in its discretion to defer interest payments under the note, with interest on the entire outstanding balance thereafter to accrue at a cumulative, compounded rate of 8% per annum until such time as the Company is current on all accrued payments under the note, including deferred interest. All outstanding amounts under the note will become due and payable in five years or earlier upon certain other events.

*COVID-19 Pandemic*

The COVID-19 pandemic has had, and is expected to continue to have, an adverse impact on Bluegreen's business and, in turn, the Company's results and financial condition due to its disruption of the U.S. economy and, in particular, the travel, hospitality and vacation ownership industries. See "Impact of the COVID-19 Pandemic" below for additional information regarding the impact of the pandemic on Bluegreen's business and certain measures taken by Bluegreen in response thereto.

*Reverse Stock Split*

In July 2020, the Company effected a one-for-five reverse split of its Class A Common Stock and Class B Common Stock. The share and per share amounts have been retroactively adjusted to reflect the one-for-five reverse stock split as if it had occurred as of the earliest period presented.

*Our Business*

As a result of the previously disclosed spin-off of the Company's other businesses and investments on September 30, 2020 (which are now reported as discontinued operations), the Company is a "pure" holding company whose primary asset is its ownership of approximately 93% of the outstanding common stock of Bluegreen, a leading vacation ownership company that markets and sells vacation ownership interests ("VOIs") and manages resorts in popular leisure and urban destinations.

Bluegreen is a leading vacation ownership company that markets and sells VOIs and manages resorts in popular leisure and urban destinations. Bluegreen's resort network includes 45 Club Resorts (resorts in which owners in the Bluegreen Vacation Club ("Vacation Club") have the right to use most of the units in connection with their VOI ownership) and 23 Club Associate Resorts (resorts in which owners in its Vacation Club have the right to use only a limited number of units in connection with their VOI ownership). Bluegreen's Club Resorts and Club Associate Resorts are primarily located in high-volume, "drive-to" vacation locations, including Orlando, Las Vegas, Myrtle Beach, Charleston and New Orleans, among others. Through Bluegreen's points-based system, the approximately 218,000 owners in Bluegreen's Vacation Club have the flexibility to stay at units available at any of Bluegreen's resorts and have access to nearly 11,300 other hotels and resorts through partnerships and exchange networks. Bluegreen has a robust sales and marketing platform supported by marketing relationships with nationally-recognized consumer brands, such as Bass Pro and Choice Hotels. These marketing relationships are intended to drive sales within Bluegreen's core demographic, which is described below.

Prior to 2009, Bluegreen's vacation ownership business consisted solely of the sale of VOIs in resorts that Bluegreen had developed or acquired ("developed VOI sales"). While Bluegreen continues to conduct such sales and development activities, Bluegreen also derives a significant portion of its revenue from its capital-light business model, with the goal of utilizing its expertise and infrastructure to generate both VOI sales and recurring revenue from third parties without the significant capital investment generally associated with the development and acquisition of resorts. Bluegreen's capital-light business activities include sales of VOIs owned by third-party developers pursuant

10

to which Bluegreen is paid a commission ("fee-based sales") and sales of VOIs that it purchases under just-in-time ("JIT") arrangements with third-party developers or from secondary market sources. In addition, Bluegreen provides resorts and resort developers other fee-based services, including resort management, mortgage servicing, title services and construction management. Bluegreen also offer financing to qualified VOI purchasers, which generates significant interest income.

**2020 Revenue** [(1)]



67% Capital-Light Businesses

(1)   Excludes "Other Income, Net".

Bluegreen's Vacation Club has grown from approximately 170,000 owners as of December 31, 2012 to approximately 218,000 owners as of December 31, 2020. The typical Vacation Club owner is 48 years old and has an average annual household income of approximately $81,000. According to U.S. census data, households with an annual income of $50,000 to $100,000 represents approximately 29% of the total population. Bluegreen believes its ability to effectively scale the transaction size to suit its customer, as well as their high-quality, conveniently-located, "drive-to" resorts are key to attracting their core target demographic.

**Products**

Vacation Ownership Interests

Since entering the vacation ownership industry in 1994, Bluegreen has generated over 733,000 VOI sales transactions, including over 181,000 fee-based sales transactions. Bluegreen's Vacation Club owners receive an annual or biennial allotment of "points" in perpetuity (supported by an underlying deeded VOI held in trust for the owner) that may be used to stay at any of Bluegreen's 45 Club Resorts and 23 Club Associate Resorts. Vacation Club owners can use their points to stay in resorts for varying lengths of time, starting at a minimum of two nights. The number of points required for a stay at a resort depends on a variety of factors, including resort location, size of the unit, vacation season and the days of the week. Under this system, Vacation Club owners can select vacations according to their schedules, space needs and available points. Subject to certain restrictions and fees, Vacation Club owners are typically allowed to carry over any unused points for one year and to "borrow" points from the next year.

Each of Bluegreen's Club Resorts and Club Associate Resorts is managed by an HOA, which is governed by a board of directors or trustees. The board hires a management company to which it delegates many of the rights and responsibilities of the HOA, including landscaping, security, housekeeping, garbage collection, utilities, insurance procurement, laundry and repairs and maintenance. Vacation Club owners pay annual maintenance fees which cover the costs of operating all of the resorts in the Vacation Club system, including fees for real estate taxes and reserves for capital improvements. If a Vacation Club owner does not pay such charges, his or her use rights may be suspended and ultimately terminated, subject to the applicable lender's first mortgage lien, if any, on such owner's VOI. Bluegreen provides management services to 49 resorts and the Vacation Club through contractual arrangements with HOAs. Bluegreen has a 100% renewal rate on management contracts from Bluegreen's Club Resorts.

Bluegreen's Vacation Club's points-based platform offers owners significant flexibility. As reflected in the chart below, basic Vacation Club ownership entitles owners to use their points to stay at any of its 45 Club Resorts and 23 Club Associate Resorts, as well as to access more than 4,200 resorts available through the Resort Condominiums

11

D - 0055-0011

International, LLC ("RCI") exchange networks. For a nominal annual fee and transaction fees, Vacation Club owners can join and utilize their Traveler Plus program, which enables them to use their points to access an additional 44 direct exchange resorts, and other vacation experiences.  Vacation Club owners can convert their Vacation Club points into Choice Privileges points, which can be used for stays in Choice Hotels' properties. In addition, Traveler Plus members can directly use their Vacation Club points for stays in Choice Hotels' Ascend Hotel Collection properties, a network of historic and boutique hotels located in the United States, Canada, Europe, Australia and Latin America. Overall, there are more than 7,100 hotels in the Choice Hotels network, located in over 40 countries and territories, and Choice Hotels' brands include the Ascend Hotel Collection, Comfort Inn, Comfort Suites, Quality, Sleep Inn, Clarion, Clarion Pointe, Cambria Hotels and Suites, MainStay Suites, Suburban Extended Stay Hotel, Econo Lodge, Rodeway Inn, WoodSpring Suites and Everhome Suites. Bluegreen continuously seek new ways to provide value to its Vacation Club owners, including enhanced product offerings, new resort locations, broader vacation experiences and further technological innovation, all of which are designed to increase guest satisfaction.



(1)    Requires annual payment of maintenance fees and club dues to the Vacation Club.
(2)    Ability to borrow additional points for 1 year and in most cases rollover up to 1 year's worth of points for a one-time fee.
(3)    Membership as of December 31, 2020.

Approximately 64% of Vacation Club owners were enrolled in Traveler Plus as of December 31, 2020. During the year ended December 31, 2020, approximately 4% of Vacation Club owners utilized the RCI exchange network.  Historically, the owner utilization of RCI has been between 4% and 7%.

Vacation Club Resort Locations

As shown in the map below, Bluegreen's Vacation Club resorts are primarily located on the U.S. East Coast and Midwest. The 44 direct-exchange resorts available to Traveler Plus members are concentrated along the West Coast and Hawaii. Bluegreen believes that, together, this provides a broad geographic offering of resorts available to its Vacation Club owners.

12



Vacation Club resorts are primarily "drive-to" resort destinations as approximately 88% of Bluegreen's Vacation Club owners live within a four-hour drive of at least one resort.  Bluegreen resorts are generally located in popular vacation destinations, such as Florida, South Carolina, North Carolina, Tennessee, Virginia, Texas, Louisiana, and Nevada, and represent a diverse mix of resort and urban destinations, allowing Vacation Club owners the ability to customize their vacation experience.  In addition, Bluegreen offers its Vacation Club owners access to Aruba.

Bluegreen's resort network also offers a diverse mix of experiences and accommodations.  Unlike some of Bluegreen's competitors that maintain static brand design standards across resorts and geographies, Bluegreen seeks to design resorts that capture the uniqueness of a particular location. The goal of Bluegreen's resorts is to offer an authentic experience and connection to the resorts' unique and varied locations.

Bluegreen resorts typically feature condominium-style accommodations with amenities such as fully equipped kitchens, entertainment centers and in-room laundry appliances. Many resorts feature a clubhouse (including a pool, game room, lounge), hotel-type staff and concierge services.

Bluegreen also owns a 51% interest in Bluegreen/Big Cedar Vacations, which develops, markets and sells VOIs at three premier wilderness-themed resorts adjacent to Table Rock Lake near Branson, Missouri: The Bluegreen Wilderness Club at Big Cedar, The Cliffs at Long Creek and Paradise Point. The remaining 49% interest in Bluegreen/Big Cedar Vacations is held by Big Cedar, LLC ("BC LLC"), an affiliate of Bass Pro. As a result of Bluegreen's controlling interest in Bluegreen/Big Cedar Vacations, the Company's consolidated financial statements include the results of operations and financial condition of Bluegreen/Big Cedar Vacations.

13

Vacation Club Resorts

| | Club Resorts | Location | Total units [1] | Managed by Bluegreen [2] | Fee-Based or JIT sales [3] | Sales center [6] |
|---|---|---|---|---|---|---|
| 1 | Cibola Vista Resort and Spa | Peoria, Arizona | 343 | ✓ | | ✓ |
| 2 | La Cabana Beach Resort & Casino [4] | Oranjestad, Aruba | 449 | | | |
| 3 | The Club at Big Bear Village | Big Bear Lake, California | 38 | ✓ | ✓ | |
| 4 | The Innsbruck Aspen | Aspen, Colorado | 17 | ✓ | | |
| 5 | Via Roma Beach Resort | Bradenton Beach, Florida | 28 | ✓ | | |
| 6 | Daytona SeaBreeze | Daytona Beach Shores, Florida | 78 | ✓ | | ✓ |
| 7 | Resort Sixty-Six | Holmes Beach, Florida | 28 | ✓ | | |
| 8 | The Hammocks at Marathon | Marathon, Florida | 58 | ✓ | | |
| 9 | The Fountains, Lake Eve and Oasis Lakes | Orlando, Florida | 842 | ✓ | ✓ | ✓ |
| 10 | Orlando's Sunshine Resort I & II | Orlando, Florida | 84 | ✓ | | |
| 11 | Casa del Mar Beach Resort | Ormond Beach, Florida | 118 | ✓ | | |
| 12 | Grande Villas at World Golf Village & The Resort at World Golf Village | St. Augustine, Florida | 214 | ✓ | | ✓ |
| 13 | Bluegreen at Tradewinds | St. Pete Beach, Florida | 160 | ✓ | ✓ | ✓ |
| 14 | Solara Surfside | Surfside, Florida | 60 | ✓ | | |
| 15 | Studio Homes at Ellis Square | Savannah, Georgia | 28 | ✓ | ✓ | |
| 16 | The Hotel Blake | Chicago, Illinois | 160 | ✓ | ✓ | |
| 17 | Bluegreen Club La Pension | New Orleans, Louisiana | 64 | ✓ | | [7] |
| 18 | Marquee | New Orleans, Louisiana | 94 | ✓ | | |
| 19 | The Soundings Seaside Resort | Dennis Port, Massachusetts | 69 | ✓ | ✓ | ✓ |
| 20 | Mountain Run at Boyne & Hemlock | Boyne Falls, Michigan | 205 | ✓ | | |
| 21 | The Falls Village | Branson, Missouri | 293 | ✓ | | |
| 22 | Paradise Point Resort [5] | Hollister, Missouri | 150 | ✓ | | |
| 23 | Bluegreen Wilderness Club at Big Cedar [5] | Ridgedale, Missouri | 433 | ✓ | | ✓ |
| 24 | The Cliffs at Long Creek [5] | Ridgedale, Missouri | 106 | ✓ | | |
| 25 | Bluegreen Club 36 | Las Vegas, Nevada | 476 | ✓ | | |
| 26 | South Mountain Resort | Lincoln, New Hampshire | 116 | ✓ | ✓ | |
| 27 | Blue Ridge Village I,II and III | Banner Elk, North Carolina | 132 | ✓ | | ✓ |
| 28 | Club Lodges at Trillium | Cashiers, North Carolina | 54 | ✓ | ✓ | |
| 29 | The Suites at Hershey | Hershey, Pennsylvania | 78 | ✓ | | |
| 30 | The Lodge Alley Inn | Charleston, South Carolina | 90 | ✓ | | |
| 31 | King 583 | Charleston, South Carolina | 50 | ✓ | ✓ | |
| 32 | Carolina Grande | Myrtle Beach, South Carolina | 118 | ✓ | | ✓ |
| 33 | Harbour Lights | Myrtle Beach, South Carolina | 324 | ✓ | | ✓ |
| 34 | Horizon at 77th | Myrtle Beach, South Carolina | 88 | ✓ | ✓ | |
| 35 | SeaGlass Tower | Myrtle Beach, South Carolina | 136 | ✓ | | ✓ |
| 36 | Shore Crest Vacation Villas I & II | North Myrtle Beach, South Carolina | 240 | ✓ | | ✓ |
| 37 | MountainLoft I & II | Gatlinburg, Tennessee | 394 | ✓ | | ✓ |
| 38 | Laurel Crest | Pigeon Forge, Tennessee | 298 | ✓ | | ✓ |
| 39 | Eilan Hotel and Spa | San Antonio, Texas | 163 | ✓ | | ✓ |
| 40 | Shenandoah Crossing | Gordonsville, Virginia | 136 | ✓ | | ✓ |
| 41 | Bluegreen Wilderness Traveler at Shenandoah | Gordonsville, Virginia | 146 | ✓ | | |
| 42 | BG Patrick Henry Square | Williamsburg, Virginia | 130 | ✓ | ✓ | ✓ |
| 43 | Parkside Williamsburg Resort | Williamsburg, Virginia | 107 | ✓ | ✓ | |
| 44 | Bluegreen Odyssey Dells & Pirate's Lodge | Wisconsin Dells, Wisconsin | 92 | ✓ | | |
| 45 | Christmas Mountain Village | Wisconsin Dells, Wisconsin | 381 | ✓ | | ✓ |
| | **Total Units** | | **7,868** | | | |

14

| | Club Associate Resorts | Location | Managed by Bluegreen [2] | Fee-Based or JIT sales [3] |
|---|---|---|---|---|
| 1 | Paradise Isle Resort | Gulf Shores, Alabama | | |
| 2 | Shoreline Towers Resort | Gulf Shores, Alabama | | |
| 3 | Dolphin Beach Club | Daytona Beach Shores, Florida | ✓ | |
| 4 | Fantasy Island Resort II | Daytona Beach Shores, Florida | ✓ | |
| 5 | Mariner's Boathouse and Beach Resort | Fort Myers Beach, Florida | | |
| 6 | Tropical Sands Resort | Fort Myers Beach, Florida | | |
| 7 | Windward Passage Resort | Fort Myers Beach, Florida | | |
| 8 | Gulfstream Manor | Gulfstream, Florida | ✓ | |
| 9 | Outrigger Beach Club | Ormond Beach, Florida | | |
| 10 | Landmark Holiday Beach Resort | Panama City Beach, Florida | | |
| 11 | Ocean Towers Beach Club | Panama City Beach, Florida | | |
| 12 | Panama City Resort & Club | Panama City Beach, Florida | | |
| 13 | Surfrider Beach Club | Sanibel Island, Florida | | |
| 14 | Petit Crest Villas and Golf Club Villas at Big Canoe | Marble Hill, Georgia | | |
| 15 | Pono Kai Resort | Kapaa (Kauai), Hawaii | | |
| 16 | The Breakers | Dennis Port, Massachussetts | ✓ | ✓ |
| 17 | Lake Condominiums at Big Sky | Big Sky, Montana | | |
| 18 | Foxrun Townhouses | Lake Lure, North Carolina | | |
| 19 | Sandcastle Village II | New Bern, North Carolina | | |
| 20 | Waterwood Townhouses | New Bern, North Carolina | | |
| 21 | Bluegreen at Atlantic Palace | Atlantic City, New Jersey | | |
| 22 | The Manhattan Club | New York, New York | | |
| 23 | Players Club | Hilton Head Island, South Carolina | | |

(1)   Represents the total number of units at the Club Resort. Owners in the Vacation Club have the right to use most of the units at each Club Resort in connection with Bluegreen's VOI ownership.
(2)   Resorts managed by Bluegreen Resorts Management, Inc., Bluegreen's wholly-owned subsidiary ("Bluegreen Resorts Management").
(3)   These resorts, or a portion thereof, were developed by third-parties, and Bluegreen has arrangements to sell VOIs on behalf of the developer or acquire such VOIs as part of its capital-light business strategy.
(4)   This resort is managed by Casa Grande Cooperative Association I, which has contracted with Bluegreen Resorts Management to provide management consulting services to the resort. The services provided by Bluegreen Resorts Management to this resort pursuant to such agreement are similar in nature to, but less extensive than, the services provided by Bluegreen or its subsidiaries to the other resorts listed in the table as "Managed by Bluegreen."
(5)   This resort is developed, marketed and sold by Bluegreen/Big Cedar Vacations.
(6)   In addition to the sales centers identified in the table, Bluegreen also operates a sales center in Memphis, Tennessee.
(7)   Due to local restrictions resulting from the COVID-19 pandemic, this sales center was consolidated with the Marquee sales center, which is close in proximity to Bluegreen Club La Pension sales center.

**Marketing and Sale of Inventory**

VOI sales are typically generated by attracting prospective customers to tour a resort and attend a sales presentation. Bluegreen's sales and marketing platforms utilize a variety of methods to attract prospective customers, drive tour flow and sell VOIs in its Vacation Club. Bluegreen primarily utilizes marketing alliances with nationally-recognized brands, which provide access to venues which target consumers generally matching Bluegreen's core demographic. In addition, sales prospects are sourced through programs which generate leads at high-traffic venues and in high-density tourist locations and events, as well as through telemarketing and referrals from existing owners and other guests at Bluegreen's properties.

Many of Bluegreen's marketing programs intended to attract new customers involve the sale of a discounted vacation package that typically includes a two to three night stay in close proximity to one of Bluegreen's resort sales offices and requires participation in a sales presentation (a sales tour). Vacation packages are typically sold either in retail brick and mortar establishments, such as Bass Pro and Cabela's stores and malls, through Bluegreen's call transfer program with Choice, or via telemarketing. During the year ended December 31, 2020, Bluegreen sold approximately 132,000 vacation packages and 19% of its VOI sales were made to customers who had previously purchased a vacation package and attended a sales presentation. As of December 31, 2020, Bluegreen had a pipeline of over 121,000 vacation packages sold to prospective new customers. In addition, Bluegreen had pipeline of nearly 15,000 of vacation packages that were purchased by customers who already toured and indicated that they intend to tour again.

15

While in the past historical performance provided a basis for estimating VOI sales based on packages sold, as a result of the COVID-19 pandemic, this has not been the case as purchasers of packages have not traveled to the same extent as they did previously pre-pandemic.

Bluegreen Vacations Unlimited ("BVU"), Bluegreen's wholly-owned subsidiary, has an exclusive marketing agreement with Bass Pro, a nationally-recognized retailer of fishing, marine, hunting, camping and sports gear, that provides them with the right to market and sell vacation packages at kiosks in Bass Pro's and Cabela's retail locations and through other means.  Bluegreen believes that Bass Pro has a loyal customer base that strongly matches Bluegreen's core demographic.

During the years ended December 31, 2020, 2019, and 2018, VOI sales to prospects and leads generated by the agreement with Bass Pro accounted for approximately 12%, 13% and 14%, respectively, of Bluegreen's VOI sales volume. As of December 31, 2019, Bluegreen had sales and marketing operations at a total of 83 Bass Pro and Cabela's Stores. In March 2020 as a result of the COVID-19 pandemic, Bluegreen temporarily closed its retail marketing operations at Bass Pro and Cabela's stores. Beginning in mid-May 2020, Bluegreen started the process of recommencing its sales and marketing operations and by December 31, 2020, Bluegreen was operating marketing kiosks in a total of 98 Bass Pro and Cabela's stores.

Bluegreen also has an exclusive strategic relationship with Choice Hotels that involves several areas of Bluegreen's business, including a sales and marketing alliance that enables Bluegreen to leverage Choice Hotels' brands, customer relationships and marketing channels to sell vacation packages. Vacation packages are sold through customer reservation calls transferred to Bluegreen from Choice Hotels and through outbound telemarketing methods utilizing Choice Hotels customer database. Bluegreen's strategic relationship with Choice Hotels began in 2013 and was extended in August 2017 for a 15 year term, with an additional 15-year renewal term thereafter unless either party elects not to renew the arrangement.

Bluegreen believes that its diverse strategic marketing alliances (including those with Bass Pro, Choice Hotels and other retail operators and entertainment providers) provides a potential strategic advantage over certain of its competitors that rely primarily on relationships with their affiliated hotel brands to drive lead generation and new owner growth. Bluegreen's goal is to identify marketing partners with brands that attract Bluegreen's targeted owner demographic and to build successful marketing relationships with those partners. In addition to the programs described above, Bluegreen may also engage in other local and national marketing programs from time to time.

In addition to sales to new customers, Bluegreen also seeks to sell additional VOI points to its existing Vacation Club owners. These sales generally have lower marketing costs and result in higher operating margins than sales generated through other marketing channels. During the years ended December 31, 2020, 2019, and 2018, sales to existing Vacation Club owners accounted for 64%, 55% and 52%, respectively, of Bluegreen's system-wide sales of VOIs. Bluegreen targets a balanced mix of new customer and existing Vacation Club owner sales to support its goal of sustainable long-term growth. Bluegreen believes that the variety of its marketing relationships has historically facilitated a healthy mix of new owner sales vs. existing owner sales that compare favorably to its competitors.

Bluegreen operates 24 sales offices, typically located adjacent to Bluegreen's resorts and staffed with sales representatives and sales managers. As of December 31, 2020, Bluegreen had over 2,400 employees dedicated to VOI sales and marketing.  Bluegreen typically utilizes a uniform sales process and offers ongoing training for its sales personnel with the goal of maintaining strict quality control policies. During the year ended December 31, 2020, 97% of Bluegreen sales were generated from 20 of Bluegreen's sales offices which focus on both new customer and existing Vacation Club owner sales. Bluegreen's remaining 4 sales offices are primarily focused on sales to existing Vacation Club owners staying at the respective resort. Bluegreen also utilize its telesales operations to sell additional VOIs to Vacation Club owners.

**Flexible Business Model**

Bluegreen's business model is designed to give it potential flexibility to capitalize on opportunities and adapt to changing market environments. Bluegreen has the ability to adjust its targeted mix of capital-light vs. developed VOI sales, sales to new customers vs. existing Vacation Club owners, and cash vs. financed sales. While Bluegreen may

16

pursue opportunities that impact its short-term results, the long-term goal is to achieve sustained growth while maximizing earnings and cash flow.



Note: Cash sales represent the portion of Bluegreen's system-wide sales of VOIs that is received from the customer in cash within 30 days of purchase.

**VOI Sales Mix**

Bluegreen VOI sales include:

- Developed VOI sales, or sales of VOIs in resorts that it develops or acquires (excluding inventory acquired pursuant to JIT and secondary market arrangements);
- Fee-based sales of VOIs owned by third-party developers pursuant to which Bluegreen is paid a commission;
- JIT sales of VOIs Bluegreen acquires from third-party developers in close proximity to when it intends to sell such VOIs; and
- Secondary market sales of VOIs Bluegreen acquires from HOAs or other owners.

During 2020, sales of VOIs were comprised of the following:



17

*Developed VOI Sales*

Developed VOI sales are sales of VOIs in resorts that Bluegreen has developed or acquired (excluding inventory acquired pursuant to JIT and secondary market arrangements). During the year ended December 31, 2020, developed VOI sales accounted for 33% of Bluegreen's system-wide sales of VOIs. Bluegreen holds the notes receivable originated in connection with developed VOI sales. Bluegreen also typically holds the HOA management contract associated with these resorts.

*Fee-Based Sales*

Bluegreen offers sales and marketing services to third-party developers for a commission. Under these fee-based sales arrangements, which are typically entered into on a non-committed basis, Bluegreen sells the third-party developers' VOIs as Vacation Club interests through Bluegreen's sales and marketing platform. Bluegreen also provides third-party developers with administrative services, periodic reporting and analytics through Bluegreen's proprietary software platform. Bluegreen seeks to structure the fee for these services to cover selling and marketing costs, plus an operating profit. Historically Bluegreen has targeted a commission rate of 65% to 75% of the VOI sales price. Fee-Based Sales comprised 37% of system-wide sales of VOIs during the year ended December 31, 2020.  Notes receivable originated in connection with fee-based sales are held by the third-party developer and, in certain cases, are serviced by Bluegreen for an additional fee.  In connection with fee-based sales, Bluegreen is not at risk for development financing and has no capital requirements, thereby increasing return on invested capital, or ROIC. Bluegreen also typically holds the HOA management contract associated with these resorts.

*Just-In-Time (JIT) VOI Sales*

Bluegreen enters into JIT inventory acquisition agreements with third-party developers that allows Bluegreen to buy VOI inventory in close proximity to when it intends to sell such VOIs. While Bluegreen typically enters into such arrangements on a non-committed basis, Bluegreen may engage in committed arrangements under certain circumstances. Similar to fee-based sales, JIT sales does not expose Bluegreen to risk for development financing. However, unlike fee-based sales, Bluegreen holds the consumer finance receivables originated in connection with JIT sales. While JIT sales accounted for only 7% of system-wide sales of VOIs for the year ended December 31, 2020, JIT arrangements are often entered into in connection with fee-based sales arrangements. In general, acquisition of VOI inventory through JIT segments are at a higher cost compared to developed VOIs of secondary market sources.  Bluegreen also typically hold the HOA management contract associated with these resorts.

*Secondary Market VOI Sales*

Bluegreen acquires VOI inventory from HOAs and other owners generally on a non-committed basis. These VOIs are typically obtained by the applicable HOA through foreclosure or termination in connection with HOA maintenance fee defaults or charities from which a consumer has donated their VOI. In these cases, Bluegreen generally purchases VOIs from secondary market sources at a significant discount to retail price. During the year ended December 31, 2020, secondary market sales accounted for 23% of Bluegreen's system-wide sales of VOIs.

18

*Future VOI Sales*

The retail value of Bluegreen completed VOI inventory increases or decreases from period to period due to the acquisition of inventory through JIT and secondary market arrangements, development of new VOI units, reacquisition of VOIs through notes receivable defaults and changes to sales prices and completed sales. As of December 31, 2020 and 2019, Bluegreen owned completed VOI inventory (excluding units not currently being marketed as VOIs, such as model units) and had access to additional completed VOI inventory through fee-based and JIT arrangements having a retail sales value as follows (dollars in thousands) and represent the then-estimated retail sales value):

| Inventory Source | | As of December 31, | | |
| --- | --- | --- | --- | --- |
| | | **2020** | | **2019** |
| Owned completed VOI inventory | $ | 1,111,277 | $ | 1,115,822 |
| Inventory accessible through fee-based | | | | |
| and JIT arrangements | | 293,056 | | 312,816 |
| **Total** | $ | 1,404,333 | $ | 1,428,638 |

Based on current estimates and expectations, Bluegreen believes this inventory, combined with inventory being developed by Bluegreen or its third-party developer clients, and inventory that it may reacquire in connection with mortgage and maintenance fee defaults, can support its VOI sales at its current levels for approximately four years. Bluegreen maintains relationships with numerous third-party developers and expects additional fee-based and JIT relationships to continue to provide VOI inventory to support its sales efforts. In addition, Bluegreen is focused on strategically expanding its inventory through development at certain of its resorts over the next several years. Bluegreen intends to continue to strategically evaluate opportunities to develop or acquire VOI inventory in key strategic markets where it identifies growing demand and where Bluegreen currently has or expects to have a significant marketing and sales networks.

During the years ended December 31, 2020 and 2019, the estimated retail sales value and cash purchase price of the VOIs Bluegreen acquired through secondary market arrangements were as follows (dollars in thousands):

| | | Year Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | **2020** | | **2019** |
| Estimated retail sales value | $ | 103,134 | $ | 228,632 |
| Cash purchase price | $ | 4,558 | $ | 15,962 |

Active development activities consist primarily of additional VOI units being developed at The Cliffs at Long Creek and The Bluegreen Wilderness Club at Big Cedar in Ridgedale, Missouri.

**Management and Other Fee-Based Services**

Bluegreen earns recurring management fees for providing services to HOAs. These management services include oversight of housekeeping services, maintenance and certain accounting and administrative functions. Bluegreen believes its management contracts yield highly predictable cash flows that do not have the traditional risks associated with hotel management contracts that are linked to daily rate or occupancy. Bluegreen's management contracts are typically structured as "cost-plus" management fees, pursuant to which it generally earns fees equal to 10% to 12% of the costs to operate the applicable resort.  These agreements generally have an initial term of three years with automatic one year renewals. As of December 31, 2020, Bluegreen provided management services to 49 resorts. Bluegreen also earns recurring management fees for providing services to the Vacation Club. These services include managing the reservation system and providing owner billing and collection services. Bluegreen's management contract with the Vacation Club currently provides for reimbursement of its costs plus a fee equal to $10 per VOI owner. Bluegreen may seek to expand its management services business, including to provide hospitality management services to hotels for third parties.

19

D - 0055-0019

In addition to HOA and club management services, Bluegreen also provides other fee-based services that produce revenue without the significant capital investment generally associated with the development and acquisition of resorts. These services include title and escrow services for fees in connection with the closing of VOI sales, servicing notes receivable held by third parties (typically a fee equal to 1.5% of the principal balance of the serviced portfolio), and construction management services for third-party developers (typically fees equal to 4% of the cost of construction of the project). Bluegreen also receives revenue from retail and food and beverage operations at certain resorts.

**Customer Financing**

Bluegreen generally offers qualified purchasers financing for up to 90% of the purchase price of VOIs. The typical financing provides for a term of ten years and a fixed interest rate that is determined by the FICO score of the borrower and the amount of the down payment and existing ownership, is fully amortizing in equal installments, and may be prepaid without penalty. Purchasers may receive an additional 1% discount on the interest rate by participating in Bluegreen's pre-authorized payment plan. As of December 31, 2020, approximately 92% of Bluegreen serviced VOI notes receivable participated in its pre-authorized payment plan. During the year ended December 31, 2020, the weighted-average interest rate on Bluegreen's VOI notes receivable was 15.0%.

VOI purchasers are generally required to make a down payment of at least 10% of the sales price. As part of Bluegreen's efforts to manage operating cash flows, it currently incentivizes its sales associates to encourage cash sales and higher down payments on financed sales, with a target of 40-45% of the VOI sales price collected in cash. Bluegreen also promotes a point-of-sale credit card program sponsored by a third-party financial institution. As a result of these efforts, Bluegreen has increased both the percentage of sales that are fully paid in cash and the average down payment on financed sales as compared to historical levels. Including down payments received on financed sales, approximately 42% of Bluegreen's system-wide sales of VOIs during the year ended December 31, 2020 were paid in cash within approximately 30 days from the contract date.

See "Sales/Financing of Receivables" below for additional information regarding Bluegreen's receivable financing activities.

*Loan Underwriting*

Bluegreen generally does not originate financing to customers with FICO scores below 575. However, Bluegreen may provide financing to customers with no FICO score if the customer makes a minimum down payment of 20%. For loans made during 2020, the borrowers' weighted-average FICO score after a 30-day, "same as cash" period from the point of sale was 725. Further information is set forth in the following table:

| FICO Score | Percentage of originated and serviced VOI receivables |
|---|---|
| No Score [1] | 1.0% |
| <600 | 2.0% |
| 600 - 699 | 32.0% |
| 700+ | 65.0% |

(1)   Financing to customers for which the obligor did not have a FICO score.

*Collection Policies*

Financed VOI sales originated by Bluegreen typically utilize a note and mortgage. Collection efforts related to these VOI loans are managed by Bluegreen. Collectors are incentivized through a performance-based compensation program.

Bluegreen generally pursues collection efforts with respect to Vacation Club owners with outstanding loans secured by their VOI by mail, telephone and email (as early as 10 days past due). At 30 days past due, Bluegreen mails a collection letter to the owner if a U.S. resident advising that if the loan is not brought current, the delinquency will be reported to a credit reporting agency. At 60 days past due, Bluegreen mails a letter to the owner advising that he or she may be prohibited from making future reservations for lodging at a resort. At 90 days past due, Bluegreen stops

20

D - 0055-0020

the accrual of, and reverse previously accrued but unpaid, interest on the note receivable and typically mail a notice informing the owner that unless the delinquency is cured within 30 days, Bluegreen may terminate the underlying VOI ownership. If an owner fails to bring the account current within the given timeframe, the loan is typically defaulted and the owner's VOI is terminated. In that case, Bluegreen mails a final letter, typically at approximately 127 days past due, notifying the owner of the loan default and the termination of his or her beneficial interest in the VOI property. Thereafter, Bluegreen may seek to resell the VOI to a new purchaser. In certain cases, at its discretion, Bluegreen may not default the loan and terminate the underlying VOI, in which case the loan would remain delinquent.

*Allowance for Loan Losses*

Bluegreen estimates uncollectible VOI notes receivable based on historical amounts for similar VOI notes receivable and does not consider the value of the underlying collateral. Bluegreen holds large pools of homogeneous VOI notes receivable and assesses uncollectibility based on pools of receivables as Bluegreen does not believe there are significant concentrations of credit risk with any individual counterparty or groups of counterparties. In estimating future loan losses, management does not use a single primary indicator of credit quality, but instead evaluates Bluegreen's VOI notes receivable based upon a combination of factors, including a static pool analysis that incorporates the aging of the respective receivables, default trends, and prepayment rates by origination year, as well as the FICO scores of borrowers.

Substantially all defaulted VOI notes receivable result in the holder of such receivable acquiring the related VOI that secured such receivable, typically soon after default and at little or no cost. The reacquired VOI is then available for resale in the normal course of business.

See "Management's Discussion and Analysis of Financial Condition and Results of Operations" for additional information about the performance of Bluegreen's notes receivable portfolio.

*Sales/Financing of Receivables*

Bluegreen's ability to sell or borrow against its VOI notes receivable has historically been an important factor in meeting its liquidity requirements. The vacation ownership business generally involves sales where a buyer is only required to pay 10% of the purchase price up front, while at the same time selling and marketing expenses related to such sales are primarily cash expenses that exceed the down payment amount. For the year ended December 31, 2020, Bluegreen's sales and marketing expenses totaled approximately 59% of system-wide sales of VOIs. Accordingly, having facilities for the sale or hypothecation of VOI notes receivable, along with periodic term securitization transactions, has been a critical factor in meeting Bluegreen's short and long-term cash needs. There are no assurances that sales, hypothecation or securitization of VOIs will be available to Bluegreen in the future at acceptable terms or at all. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" for additional information about Bluegreen's VOI notes receivable purchase facilities and term securitizations.

*Receivables Servicing*

Receivables servicing includes collecting payments from borrowers and remitting the funds to the owners, lenders or investors in such receivables, accounting for principal and interest on such receivables, making advances when required, contacting delinquent borrowers, terminating a Vacation Club ownership in the event that defaults are not timely remedied and performing other administrative duties.

Bluegreen receives fees for servicing its securitized notes receivable. These fees are included as a component of interest income. Additionally, Bluegreen earns servicing fee income from third-party developers in connection with its servicing of their loan portfolios under certain fee-based services arrangements, which is netted against the cost of Bluegreen's mortgage servicing operations.

21

**Bluegreen's Core Operating and Growth Strategies**

*Grow VOI sales*

Bluegreen's goal is to utilize its sales and marketing platform to achieve VOI sales growth through the expansion of existing alliances, continued development of new marketing programs and additional VOI sales to Bluegreen's existing Vacation Club owners. Bluegreen believes there are a number of opportunities within its existing marketing alliances to drive future growth, including the potential expansion of its marketing efforts with Bass Pro. In addition, through Bluegreen's agreement with Choice Hotels, Bluegreen plans to enhance its marketing program through Choice Hotels' call-transfer programs. In addition to existing programs, Bluegreen hopes to utilize its sales and marketing expertise to identify unique marketing relationships with nationally-recognized brands that resonate with its core demographic. Bluegreen will also continue to actively seek to sell additional VOI points to its existing Vacation Club owners, which typically involve significantly lower marketing costs and have higher conversion rates compared to sales to new customers. Bluegreen's goal continues to be to expand and update its sales offices to more effectively convert tours generated by its marketing programs into sales. To this end Bluegreen has focused on identifying high traffic resorts where it believes increased investment in sales office infrastructure will yield strong sales results.

*Continue to enhance Bluegreen's Vacation Club experience*

Bluegreen believes its Vacation Club offers owners exceptional value. Bluegreen's Vacation Club offers owners access to its 45 Club Resorts and 23 Club Associate Resorts in popular vacation destinations, as well as access to nearly 11,300 other hotels and resorts and other vacation experiences, through partnerships and exchange networks. Bluegreen continues to seek to add value and flexibility to its Vacation Club membership and enhance the vacation experience of its Vacation Club owners, including through the addition of new destinations, the expansion of its exchange programs and the addition of new partnerships offering increased vacation options. Bluegreen also continuously seeks to improve its technology, including websites and applications, to enhance its Vacation Club owners' experiences. Bluegreen believes its focus, combined with its high-quality customer service, will continue to enhance the Vacation Club experience, supporting Bluegreen's objective to entice guests to vacation and drive sales to new owners and additional sales to existing Vacation Club owners.

*Increase higher-margin, cash generating businesses*

Bluegreen seeks to grow its ancillary businesses, including resort management, title services and loan servicing. Bluegreen believes these businesses can grow with little additional investment in infrastructure and potentially produce higher-margin revenue.

*Increase sales and operating efficiencies across all customer touch-points*

Bluegreen is actively seeking to improve its operational execution across all aspects of its business. Bluegreen's sales and marketing platform utilizes a variety of screening methods and data-driven analyses intended to identify and attract high-quality prospects to its sales offices in an effort to increase volume per guest ("VPG"), an important measure of sales efficiency. Bluegreen intends to seek to leverage its size, infrastructure and expertise to increase its operating efficiency and profitability and hopes to gain further operational efficiencies by streamlining its support operations, such as call centers, customer service, administration and information technology.

*Maintain operational flexibility while growing Bluegreen's business*

Bluegreen has built a flexible business model that allows Bluegreen to capitalize on opportunities and adapt to changing market environments. Bluegreen intends to continue to pursue growth through what it believes to be an appropriate mix of capital-light sales vs. developed VOI sales, sales to new customers vs. sales to existing Vacation Club owners and cash sales vs. financed sales, all based on market factors, Bluegreen's financial condition and operating needs, and other factors that Bluegreen's management may deem relevant.

22

*Pursue strategic transactions*

As part of our growth strategy, the Company or Bluegreen may seek to acquire other VOI companies, resort assets, sales and marketing platforms, management companies and contracts, and other assets, properties and businesses, particularly where significant synergies and cost savings may be available. These acquisitions may be pursued directly or in partnership with third-party developers or others, including pursuant to arrangements where third-party developers purchase the resort assets and Bluegreen sells the VOIs in the acquired resort on a commission basis. The Company believes Bluegreen's flexible sales and marketing platform may make these transactions possible in a variety of economic conditions.

*Impact of the COVID-19 pandemic*

*Initial Impact and Response*

The COVID-19 pandemic has resulted in an unprecedented disruption in the U.S. economy and the travel, hospitality and vacation ownership industries due to, among other things, resort closures, travel restrictions and restrictions on business operations, including government guidance and restrictions with respect to travel, public accommodations, social gatherings and related matters. The Company's operations have been and continue to be adversely impacted by the pandemic.  On March 23, 2020, Bluegreen temporarily closed all of its VOI sales centers, its retail marketing operations at Bass Pro Shops and Cabela's stores and outlet malls, and its Choice Hotels call transfer program. In connection with these actions Bluegreen canceled existing owner reservations through May 15, 2020 and new prospect guest tours through June 30, 2020.  Further, some of Bluegreen's Club Resorts and Club Associate Resorts were closed in accordance with government mandates and advisories. Beginning in mid-May 2020, Bluegreen recommenced its sales and marketing operations and its closed resorts began to welcome guests as government mandates were lifted.  By December 31, 2020, Bluegreen was operating marketing kiosks in a total of 98 Bass Pro and Cabela's stores, Bluegreen had reactivated its Choice Hotels call transfer program, all of its resorts were open, and all but two of its VOI sales centers were open.  However, there is no assurance that Bluegreen's marketing operations at Bass Pro or Cabela's stores, or its VOI sales centers will remain open, including in the event of an increase in COVID-19 cases. Additionally, reflecting the temporary cessation of marketing activities in the beginning months of COVID-19 pandemic in general, Bluegreen's pipeline of vacation packages was 121,900 at December 31, 2020 compared to 169,300 at December 31, 2019.  However, utilization of the packages has been significantly lower as purchasers have not traveled at the same pace as was traveled pre-pandemic. For more detailed information please see "Results of Operations" included in Part II – Item 7: Management's Discussion and Analysis of Financial Condition and Results of Operations.

As a result of the effect of the pandemic, Bluegreen implemented steps to mitigate its costs beginning in March 2020, including reductions of over 1,700 positions and the placement of another approximate 3,200 of Bluegreen's associates on temporary furlough or reduced work hours.  As of December 31, 2020, approximately 3,200 associates had returned to work on a full-time basis for a total of approximately 4,600 full-time associates compared to approximately 5,900 full-time associates as of December 31, 2019.  As a result of the effect of the COVID-19 pandemic, during the year ended December 31, 2020, Bluegreen incurred $5.0 million in severance and $14.3 million of payroll and payroll benefit expense relating to employees on temporary furlough or reduced work hours. These payments and expenses are included in selling, general and administrative expenses in the Company's consolidated statements of operations and comprehensive income for the year ended December 31, 2020. While Bluegreen paid a special cash dividend of $1.19 per share during August 2020, it suspended the payment of regular quarterly cash dividends during the second quarter of 2020 and there is no assurance that Bluegreen will recommence paying regular dividends or pay additional special dividends in the future.

As a precautionary measure to provide additional liquidity if needed, in March 2020, Bluegreen drew down $60.0 million under its lines-of-credit and pledged or sold receivables under certain of its receivable backed facilities to increase its cash position. As of December 31, 2020, Bluegreen repaid the $60.0 million borrowed under Bluegreen's lines-of-credit. Also, in June 2020, Bluegreen amended its Liberty Bank Facility to extend the advance period and maturity date, reduced the outstanding borrowings from $50.0 million to $40.0 million, decreased the advance rate from 85% for qualified conforming receivables to 80% effective September 2020 and, commencing July 1, 2020, changed the interest rate from the Prime Rate with a floor of 4.00% to the Prime Rate minus 0.10% with a floor of 3.40%. In September 2020, Bluegreen amended its NBA Receivables Facility to extend the advance period

23

and maturity date, decreased the advance rate from 85% for qualified receivables to 80%, and changed the interest rate from one month LIBOR plus 2.75% (with an interest rate floor of 3.50%) to one month LIBOR plus 2.25% (with an interest rate floor of 3.00%). In October 2020, Bluegreen completed the 2020-A Term Securitization, a private offering and sale of approximately $131.0 million of investment-grade, VOI receivable backed notes (the "Notes") at an overall blended interest rate of approximately 2.60%. The gross advance rate for this transaction was 88.0% and the Notes mature in February 2036. Proceeds from the 2020-A Term Securitization were used to paydown approximately $82.1 million owed on existing receivable-backed facilities, (thus creating additional availability on those facilities), to capitalize a reserve fund, to pay fees and expenses associated with the transaction, and for general corporate purposes. In December 2020, Bluegreen amended its Quorum Purchase Facility to extend the advance period from December 2020 to December 2022 and extend the maturity date from December 2032 to December 2034. Bluegreen continues to actively pursue additional credit facility capacity and capital market transactions. For more detailed information please see "Liquidity and Capital Resources" included in Part II – Item 7: Management's Discussion and Analysis of Financial Condition and Results of Operations.

Bluegreen has historically provided financing to customers for a majority of its sales of VOIs, and accordingly, our results are subject to the risk of defaults by its customers. GAAP requires sales of VOIs are reduced by Bluegreen's estimate of uncollectible VOI notes receivable. The COVID-19 pandemic has had a material adverse impact on unemployment in the United States and economic conditions in general and the impact may continue for some time. Bluegreen believes that the COVID-19 pandemic will continue to have an impact on the collectability of Bluegreen's VOI notes receivable. Accordingly, the estimate of defaults for the 2021 year was increased by approximately $6.0 million, based on historical experience, forbearance requests received from customers, and other factors, including but not limited to, the seasoning of the notes receivable and FICO scores of the customers. The impact of the COVID-19 pandemic on Bluegreen's default or delinquency rates as it is rapidly changing and highly uncertain.

The Coronavirus Aid, Relief, and Economic Securities Act ("CARES Act") was signed into law on March 27, 2020 in response to the COVID-19 pandemic. As of December 31, 2020, the Company evaluated the income tax provisions of the CARES Act and determined they had no significant effect on the computation of the Company's estimated effective tax rate for the year ended December 31, 2020. However, the Company has taken advantage of the deferral of the employer portion of the tax withholding amounts and the employee retention tax credits provided for in the CARES Act. During the year ended December 31, 2020, the Company recorded a tax withholding deferral of $8.7 million and employee retention tax credits of $7.1 million, which is included in selling, general and administrative expenses in its consolidated statements of operations and comprehensive income for the year ended December 31, 2020.

*Continued Impact of COVID-19 on our Business*

Bluegreen continues to experience lower travel rates especially to high traffic destinations such as Orlando and Las Vegas. The occupancy rates at resorts with sales centers during the fourth quarter of 2020 was approximately 71% as compared to 80% during the fourth quarter of 2019. This trend of reduced travel was also reflected in utilization of vacation packages especially for those vacation packages sold prior to the COVID-19 pandemic.

**Industry Overview**

The vacation ownership, or timeshare, industry is a growing segment of the global travel and tourism sector. By purchasing a VOI, the purchaser typically acquires either (i) a fee simple interest in a property (an ownership of properties) providing annual usage rights at the owner's home resort (where the owner's VOI is deeded), or (ii) an annual or biennial allotment of points that can be redeemed for stays at properties included in the vacation ownership company's resort network or for other vacation options available through exchange programs. Compared to hotel rooms, vacation ownership units typically offer more spacious floor plans and residential features, such as living rooms, fully equipped kitchens, laundry appliances and dining areas. Compared to owning a vacation home in its entirety, the key advantages of vacation ownership products typically include a lower up-front acquisition cost and annual expenses, resort-style features and services and, often, an established infrastructure to exchange usage rights for stays across multiple locations.

The vacation ownership industry was historically highly fragmented, with a large number of local and regional resort developers and operators having small resort portfolios of varying quality. Bluegreen believes that growth in the

24

vacation ownership industry has been driven by increased interest from resort developers and globally-recognized lodging and entertainment brands, increased interest from consumers seeking flexible vacation options, continued product evolution and geographic expansion. Approximately 9.9 million families (approximately 7.7% of U.S. households) own at least one VOI.

The average VOI owner is 40 years old and married and 81% have either graduated from or attended college. VOI owners have an average household income of over $85,000.

**Regulation**

The vacation ownership and real estate industries are subject to extensive and complex governmental regulation and as a consequence, the Company and Bluegreen are subject to various federal, state, local, foreign, environmental, zoning, consumer protection and other laws, rules and regulations, including those regarding the acquisition, marketing and sale of VOIs, as well as various aspects of its financing operations. At the federal level, the Federal Trade Commission has taken an active regulatory role through the Federal Trade Commission Act, which prohibits unfair or deceptive acts or unfair competition in interstate commerce. In addition, many states have what are known as "Little FTC Acts" that apply to intrastate activity.

In addition to the laws applicable to Bluegreen customer financing and other operations discussed below, the Company and Bluegreen may be subject to the Fair Housing Act and various other federal laws, rules and regulations. Bluegreen is also subject to various foreign laws with respect to La Cabana Beach Resort and Casino in Oranjestad, Aruba and Blue Water Resort at Cable Beach in Nassau, Bahamas. The cost of complying with applicable laws and regulations may be significant and while efforts are in place to monitor compliance, those efforts may not at all times be successful. Any failure to comply with current or future applicable laws or regulations could have a material adverse effect on the Company and Bluegreen's results and operations.

The vacation ownership product is subject to various regulatory requirements, including state and local approvals. In most states Bluegreen is required to file with the jurisdictions a detailed offering statement describing Bluegreen's business and all material aspects of the project and sale of VOIs with the designated state authority. In addition, when required by state law, Bluegreen provides its VOI purchasers with a public offering disclosure statement that contains, among other items, detailed information about the VOI product and the purchaser's rights and obligations as a VOI owner. Laws in each state where Bluegreen sells VOIs generally grant the purchaser of a VOI the right to cancel a purchase contract at any time within a specified rescission period following the earlier of the date the contract was signed or the date the purchaser received the last of the documents required to be provided by Bluegreen. Most states have other laws that regulate Bluegreen's activities, which may include real estate licensure requirements, sellers of travel licensure requirements, anti-fraud laws, telemarketing laws, prize, gift and sweepstakes laws, and labor laws.

Under various federal, state and local laws, ordinances and regulations, the owner of real property is generally liable for the costs of removal or remediation of certain hazardous or toxic substances located on or in, or emanating from, the property, as well as related costs of investigation and property damage. These laws often impose liability without regard to whether the property owner knew of the presence of such hazardous or toxic substances. The presence of these substances, or the failure to properly remediate these substances, may adversely affect a property owner's ability to sell or lease a property or to borrow using the real property as collateral. Other federal and state laws require the removal or encapsulation of asbestos-containing material when such material is in poor condition or in the event of construction, demolition, remodeling or renovation. Other statutes may require the removal of underground storage tanks. Noncompliance with any of these and other environmental, health or safety requirements may result in the need to cease or alter operations or development at a property. In addition, certain state and local laws may impose liability on property developers including Bluegreen with respect to construction defects discovered on the property or repairs made by future owners of such property. The development, management and operation of Bluegreen's resorts are also subject to the Americans with Disabilities Act.

Bluegreen's marketing, sales and customer financing activities are also subject to extensive regulation, which can include, but is not limited to: the Truth-in-Lending Act and Regulation Z; the Fair Housing Act; the Fair Debt Collection Practices Act; the Equal Credit Opportunity Act and Regulation B; the Electronic Funds Transfer Act and Regulation E; the Home Mortgage Disclosure Act and Regulation C; the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act"); Unfair or Deceptive Acts or Practices and Regulation AA;

25

D - 0055-0025

the Patriot Act; the Right to Financial Privacy Act; the Gramm-Leach-Bliley Act; the Fair and Accurate Credit Transactions Act; and anti-money laundering laws. Pursuant to the Dodd Frank Act, the Consumer Financial Protection Bureau (the "CFPB") was created. The CFPB's mandate is to protect consumers by carrying out federal consumer financial laws and to publish rules and forms that facilitate understanding of the financial implications of the transactions consumers enter into. Consistent with this mission, the CFPB amended Regulations X and Z to establish new disclosure requirements and forms pursuant to Regulation Z for most closed-end consumer credit transactions secured by real property. The practical impact upon Bluegreen is the requirement to use a new Integrated Mortgage Disclosure Statement in lieu of the separate Good Faith Estimate and Closing Statement. In addition, Bluegreen's term securitization transactions must comply with certain requirements of the Dodd-Frank Act, including risk retention rules.

Bluegreen's management of, and dealings with, HOAs, including the purchase of defaulted inventory from HOAs in connection with secondary market arrangements, is subject to state laws and resort rules and regulations, including those with respect to the establishment of budgets and expenditures, rule-making and the imposition of maintenance assessments.

During the year ended December 31, 2020, approximately 4% of Bluegreen's VOI sales were generated by marketing to prospective purchasers obtained through internal and third-party vendors' outbound telemarketing efforts. Bluegreen attempts to monitor the actions and legal and regulatory compliance of these third parties, but there are risks associated with Bluegreen's and such third parties' telemarketing efforts. In recent years, state and federal regulators have increased regulations and enforcement actions related to telemarketing operations, including requiring the adherence to state "do not call" laws. In addition, the Federal Trade Commission and Federal Communications Commission have implemented national "do not call" legislation. Bluegreen has attempted to mitigate the risks associated with telemarketing through the use of "permission based marketing," whereby Bluegreen obtains the permission of prospective purchasers to contact them in the future, thereby exempting such calls from the various "do not call" laws. Bluegreen has also implemented policies and procedures that it believes reduce the possibility that individuals who have requested to be placed on a "do not call" list are not contacted, but such policies and procedures ensure strict regulatory compliance.

To date, no material fines or penalties have been imposed on Bluegreen as a result of its telemarketing operations. However, Bluegreen has been the subject of proceedings for violation of the telemarketing laws and other laws applicable to the marketing and sale of VOIs. See "Note 12 to the Audited Consolidated Financial Statements included in Part II Item 8 for additional information."

## Competition

Bluegreen competes with various high profile and well-established companies, many of which have greater liquidity and financial resources than Bluegreen. Many of the world's most recognized lodging, hospitality and entertainment companies develop and sell VOIs in resort properties. Major companies that now operate vacation ownership resorts directly, through subsidiaries or through strategic relationships include Marriott Vacations Worldwide Corporation, the Walt Disney Company, Hilton Grand Vacations, Travel + Leisure Co. (formerly Wyndham Destinations), and Diamond Resorts International. Bluegreen also competes with numerous smaller owners and operators of vacation ownership resorts and from alternative lodging options available to consumers through both traditional methods of delivery as well as new web portals and applications, including private rentals of homes, apartments or condominium units, which have increased in popularity in recent years. Bluegreen's ability to remain competitive and to attract and retain customers depends on its customers' satisfaction with Bluegreen's products and services as well as on distinguishing the quality, value, and efficiency of its products and services from those offered by its competitors. In Bluegreen's fee-based services business, Bluegreen typically competes with Hilton Grand Vacations and Travel + Leisure Co. In addition to competing for sales leads, prospects and fee-based service clients, Bluegreen competes with other VOI developers for marketing, sales and resort management personnel.

## Seasonality

Bluegreen has historically experienced, and expects to continue to experience, seasonal fluctuations in its revenue and results of operations. This seasonality has resulted, and may continue to result, in fluctuations in its quarterly operating results. Due to consumer travel patterns, Bluegreen typically sees more tours and experience higher VOI sales during

26

the second and third quarters.  However, due to the impact of the COVID-19 pandemic, including the temporary closures of Bluegreen marketing operations and VOI sales centers, Bluegreen experienced significantly decreased sales of VOIs in the second, third and fourth quarters of 2020 as compared to prior years and currently expect such adverse impact to continue into 2021.

**Human Resources**

As of December 31, 2020, the Company (including Bluegreen) had 4,637 employees, 458 of whom were located at Bluegreen's headquarters in Boca Raton, Florida, compared to 5,873 and 520, respectively, as of December 31, 2019. As of December 31, 2020, a total of 27 of Bluegreen employees were covered by two collective bargaining agreements, which address the terms and conditions of their employment, including pay rates, working hours, certain employee benefits and procedures for settlement of labor disputes.   We believe that our employee relations are good and that Bluegreen's employees are important to achieving Bluegreen's business objectives.

On March 23, 2020, Bluegreen temporarily closed all of its VOI sales centers and its marketing operations in connection with the COVID-19 pandemic. Further, some of its corporate offices, Club Resorts and Club Associate Resorts were closed in accordance with government mandates and advisories in connection with the COVID-19 pandemic. Bluegreen also commenced remote work protocols for those employees that, based on their position, were capable of working from home.  Beginning in mid-May 2020, Bluegreen started the process of recommencing its sales and marketing operations and its closed resorts began to reopen as government mandates were lifted. Upon reopening, Bluegreen had COVID-19 prevention protocols in place designed to minimize the spread of COVID-19 at its resorts and workplaces. These protocols, which remain in place, meet or exceed the Centers for Disease Control guidelines and where applicable, state mandates. Bluegreen continues to encourage a remote work protocol for portions of its workforce due to the continuing pandemic. Further, Bluegreen continuously evaluates its operations in light of recent resurgences of COVID-19, federal, state and local guidance, evolving data concerning the pandemic and the best interests of its employees and customers.

Bluegreen seeks to offer market competitive compensation and benefit programs for our employees in an effort to attract and retain superior talent. In addition to competitive base wages, additional programs include: Incentive Compensation Plans, Long-Term Incentive Plans, a company matched 401(k) plan, healthcare and insurance benefits, a tuition assistance program, health savings and flexible spending accounts, paid time off, family leave, and employee assistance programs.

The Company is committed to fostering an inclusive work environment that supports its workforce and the communities it serves. It is the Company and Bluegreen's policy to seek to hire the best qualified employees regardless of gender, ethnicity or other protected traits and to fully comply with all laws applicable to discrimination in the workplace.

**Where You Can Find More Information**

BVH's website address is www.bvhcorp.com. Information on, or that may be accessed through, BVH's website is not incorporated by reference herein. BVH files reports with the SEC, including annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, and, in certain cases, amendments to these reports. Copies of these reports are available free of charge on BVH's website as soon as reasonably practicable after it files the reports with the SEC. The SEC also maintains a website at www.sec.gov that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC.

27

D - 0055-0027

Item 1A. Risk Factors

*The Company is subject to various risks and uncertainties relating to Bluegreen's business, factors relating to BVH at its holding company level and to the ownership and value of its stock, and general business, economic, financing, legal, regulatory, and other factors and conditions. New risk factors emerge from time to time, and it is not possible for management to either predict all risk factors or assess all potential impacts of any factor, or combination of factors. The risks discussed below also include forward-looking statements, and actual results and events may differ substantially from those expressed in, or implied by, the forward-looking statements. See "Cautionary Note Regarding Forward-Looking Statements."*

**BVH is a Bluegreen holding company and will rely primarily on dividends from Bluegreen to service its debt, including its $75 million note to BBX Capital, and fund its other cash requirements**

On September 30, 2020, BVH completed the spin-off its wholly owned subsidiary at the time, BBX Capital. As a result of the spin-off, BBX Capital became a separate public company and holds all of the investments and businesses previously held by BVH other than BVH's investment in Bluegreen, including BBX Capital Real Estate, BBX Sweet Holdings and Renin. BVH no longer holds any interest in BBX Capital and, accordingly, is not a diversified holding company with a portfolio of investments. Rather, BVH is a Bluegreen holding company. As such, BVH is more susceptible to the risks of Bluegreen's business described below.

Further, in connection with the spin-off, BVH issued a $75.0 million promissory note in favor of BBX Capital. The note payable to BBX Capital accrues interest at a rate of 6% per annum and requires payments of interest on a quarterly basis; provided, however, that interest payments may be deferred at the option of BVH, with interest on the entire outstanding balance thereafter to accrue at a cumulative, compounded rate of 8% per annum until such time as BVH is current on all accrued payments under the note, including deferred interest. All outstanding amounts under the note will become due and payable in five years or earlier upon certain events. BVH's indebtedness also includes $66.3 million of junior subordinated debentures issued by Woodbridge Holdings Corporation ("Woodbridge"), the wholly owned subsidiary of BVH through which BVH holds its investment in Bluegreen. Woodbridge's junior subordinated debentures accrue interest at a rate of 3-month LIBOR plus a spread ranging from 3.80% to 3.85%, mature between 2035 and 2036, and require payments of interest on a quarterly basis. BVH may also incur additional indebtedness in the future. BVH's indebtedness increases its vulnerability to adverse economic conditions, as well as conditions in the credit markets generally, and may limit funds available for other purposes, including for acquisitions or investments, to pay dividends, and for other general corporate purposes.

It is currently expected that BVH, at its parent company level, will incur approximately $2.0 million annually in executive compensation and public company costs and annual interest expense of approximately $7.2 million associated with Woodbridge's junior subordinated debentures and the note payable to BBX Capital. These amounts are estimates only and are based on current expectations and assumptions, currently available information and, with respect to interest expense on Woodbridge's junior subordinated debentures, interest rates as of December 31, 2020. Such assumptions and expectations may not prove to be accurate, interest rates may increase and, accordingly or otherwise, actual expenses may exceed the amounts expected. In addition, BVH may incur additional expenses, including costs associated with certain tax and compliance filings.

Prior to the spin-off, BVH's principal sources of liquidity were historically its available cash, cash equivalents and short-term investments, distributions from real estate joint ventures and sales of real estate assets held by BBX Capital Real Estate (which are now unavailable to BVH as a result of the spin-off), and dividends from Bluegreen. While BVH believes that it will have sufficient cash and cash equivalents to satisfy its cash requirements for approximately two years, it will be dependent on the payment of dividends by Bluegreen to fund its operations and satisfy its debt service requirements and other liabilities, including its note payable to BBX Capital, in future periods. As previously described, the COVID-19 pandemic has adversely impacted Bluegreen's operations and cash flow and, as a result, Bluegreen suspended its payment of regular quarterly dividends during the second quarter of 2020. There is no assurance that Bluegreen will resume the payment of regular dividends or otherwise pay any dividends in the future. BVH may also in the future seek additional funds from third party sources, including traditional bank financing, secured or unsecured indebtedness, or the issuance of equity and/or debt securities. However, these alternatives may not be available to BVH on attractive terms, in the amounts needed, or at all. The inability to receive dividends from

28

Bluegreen or to obtain funds from third party sources would have a material adverse effect on BVH's financial condition.

***Alan B. Levan, John E. Abdo, Jarett S. Levan and Seth M. Wise's control position may adversely affect the market price of BVH's Class A Common Stock and Class B Common Stock.***

Alan B. Levan, the Chairman, President and Chief Executive Officer of BVH and Bluegreen, John E. Abdo, the Vice Chairman of BVH and Bluegreen, Jarett S. Levan, the son of Mr. Alan Levan and a director of BVH and Bluegreen and former President of BVH, and Seth M. Wise, a director of Bluegreen and former director and Executive Vice President of BVH, currently collectively beneficially own shares of BVH's Class A Common Stock and Class B Common Stock representing approximately 79% of the total voting power of BVH's Class A Common Stock and Class B Common Stock. Accordingly, and because holders of BVH's Class A Common Stock and Class B Common Stock vote as a single class on most matters, including the election of directors, as described below, Mr. Alan Levan, Mr. Abdo, Mr. Jarett Levan and Mr. Wise, without the vote or consent of any other shareholder of BVH, have the voting power to elect BVH's directors and to control the outcome of any other vote of BVH's shareholders, except in limited circumstances where Florida law mandates that the holders of BVH's Class A Common Stock vote as a separate class. This control position may have an adverse effect on the market price of BVH's Class A Common Stock and Class B Common Stock. In addition, their interests may conflict with the interests of BVH's other shareholders.

***BVH's Amended and Restated Articles of Incorporation provide for fixed relative voting percentages between BVH's Class A Common Stock and Class B Common Stock.***

In addition to its Shareholders Rights Plan, BVH's Amended and Restated Articles of Incorporation provide for holders of BVH's Class A Common Stock and Class B Common Stock to generally vote together as a single class, including with respect to the election of directors, with holders of BVH's Class A Common Stock possessing in the aggregate 22% of the total voting power of all common stock and holders of BVH's Class B Common Stock possessing in the aggregate the remaining 78% of the total voting power. These relative voting percentages will remain fixed unless the number of shares of BVH's Class B Common Stock outstanding decreases to 360,000 shares, at which time the aggregate voting power of BVH's Class A Common Stock will increase to 40% and the aggregate voting power of BVH's Class B Common Stock will decrease to 60%. If the number of shares of BVH's Class B Common Stock outstanding decreases to 280,000 shares, then the aggregate voting power of BVH's Class A Common Stock will increase to 53% and the aggregate voting power of BVH's Class B Common Stock will decrease to 47%. If the number of shares of BVH's Class B Common Stock outstanding decreases to 100,000 shares, then the fixed voting percentages will be eliminated and each share of BVH's Class A Common Stock and Class B Common Stock will be entitled to one vote per share. The share thresholds set forth above are subject to equitable adjustment to reflect any stock split, reverse stock split or similar transaction. The changes in the relative voting power represented by each class of BVH's common stock are based only on the number of shares of Class B Common Stock outstanding, thus issuances of Class A Common Stock will have no effect on these provisions. If additional shares of BVH's Class A Common Stock are issued without a comparative increase in the number of outstanding shares of BVH's Class B Common Stock, the disparity between the equity interest represented by BVH's Class B Common Stock and its voting power will widen. In addition, shareholders who hold shares of both BVH's Class A Common Stock and Class B Common Stock, including Alan B. Levan, John E. Abdo, Jarett S. Levan and Seth M. Wise, are able to sell shares of BVH's Class A Common Stock without affecting in any material respect their overall voting interest. The fixed voting percentages between BVH's Class A Common Stock and Class B Common Stock may have an adverse impact on the market price of such securities.

29

*Provisions in BVH's Amended and Restated Articles of Incorporation and Bylaws, the shareholder rights plan adopted recently by BVH, and provisions of Florida law may make it difficult for a third party to acquire BVH and could impact the price of, or otherwise adversely impact, BVH's Class A Common Stock and Class B Common Stock.*

BVH's Amended and Restated Articles of Incorporation and Bylaws contain provisions that could delay, defer or prevent a change of control of BVH or its management. These provisions could make it more difficult for shareholders to elect directors and take other corporate actions. As a result, these provisions could limit the price that investors are willing to pay in the future for shares of BVH's Class A Common Stock or Class B Common Stock. These provisions include:

- the provisions in BVH's Amended and Restated Articles of Incorporation regarding the special voting rights of BVH's Class B Common Stock;
- subject to the special class voting rights of BVH's Class B Common Stock under certain circumstances, the authority of BVH's Board of Directors to issue additional shares of common or preferred stock and to fix the relative rights and preferences of the preferred stock without shareholder approval, as described in further detail below; and
- advance notice procedures to be complied with by shareholders in order to make shareholder proposals or nominate directors.

In addition, in light of the COVID-19 pandemic, BVH's Board of Directors adopted a shareholder rights plan during June 2020 in an effort to protect against investors seeking short-term gains by taking advantage of current market conditions at the expense of BVH and its long-term investors. The rights plan is similar to plans adopted by other public companies in light of the pandemic and generally provides a deterrent to any person or group from acquiring 5% or more of BVH's Class A Common Stock, Class B Common Stock, or total combined common stock without the prior approval of BVH's Board of Directors. Accordingly, while the rights plan was not adopted in response to any effort to acquire control of BVH, the rights plan may have an anti-takeover effect and will be an impediment to a proposed takeover which is not approved by BVH's Board of Directors.

Further, due to the control position of Mr. Alan Levan, Mr. Abdo, Mr. Jarett Levan and Mr. Wise with respect to BVH's Class A Common Stock and Class B Common Stock, as described above, a change of control or sale of BVH, or any other action which requires the affirmative vote of holders of shares of BVH's Class A Common Stock and Class B Common Stock representing a majority of the voting power of such stock, will be impossible without the consent of Mr. Alan Levan, Mr. Abdo, Mr. Jarett Levan and Mr. Wise, and Mr. Alan Levan, Mr. Abdo, Mr. Jarett Levan and Mr. Wise's interests may conflict with the interests of BVH's other shareholders. Further, subject to certain limited exceptions set forth therein, the rights plan prevents other shareholders from acquiring a greater than 5% ownership position in BVH's Class A Common Stock, Class B Common Stock or total combined common stock and, accordingly, may prevent a meaningful challenge to the influence of Mr. Alan Levan, Mr. Abdo, Mr. Jarett Levan and Mr. Wise over BVH, including matters submitted for shareholder approval.

Additionally, pursuant to BVH's Amended and Restated Articles of Incorporation and Florida law, except as may be required by applicable securities exchange rules and subject to the separate voting rights of BVH's Class B Common Stock in certain circumstances, BVH's Board of Directors may, without the consent of BVH's shareholders, approve the issuance of authorized but unissued shares of BVH's securities and fix the relative rights and preferences of preferred stock. If BVH issues additional shares of its Class A Common Stock, Class B Common Stock or other securities, its shareholders would experience dilution. In addition, any preferred stock declared and issued could include dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which may be greater than the rights of BVH's Class A Common Stock or Class B Common Stock or otherwise adversely affect the holders of BVH's Class A Common Stock or Class B Common Stock, including the likelihood that holders of BVH's Class A Common Stock or Class B Common Stock would receive dividend payments and payments on liquidation, or the amounts thereof. The issuance of preferred stock, while providing flexibility in connection with possible acquisitions, financing transactions and other corporate purposes, could also, among other things, have the effect of delaying, deferring or preventing a change in control or other corporate actions, and might adversely affect the market price of BVH's Class A Common Stock or Class B Common Stock.

30

In addition, as a Florida corporation, BVH is also subject to the provisions of the Florida Business Corporation Act (the "FBCA"), including those limiting the voting rights of "control shares." Under the FBCA, subject to certain exceptions, including mergers and acquisitions effected in accordance with the FBCA, the holder of "control shares" of a Florida corporation that has (i) 100 or more shareholders, (ii) its principal place of business, its principal office or substantial assets in Florida and (iii) either more than 10% of its shareholders residing in Florida, more than 10% of its shares owned by Florida residents or 1,000 shareholders residing in Florida, will not have the right to vote those shares unless the acquisition of the shares was approved by a majority of each class of voting securities of the corporation, excluding those shares held by interested persons. "Control shares" are defined in the FBCA as shares acquired by a person, either directly or indirectly, that when added to all other shares of the issuing corporation owned by that person, would entitle that person to exercise, either directly or indirectly, voting power within any of the following ranges: (i) 20% or more but less than 33% of all voting power of the corporation's voting securities; (ii) 33% or more but less than a majority of all voting power of the corporation's voting securities; or (iii) a majority or more of all of the voting power of the corporation's voting securities.

***Acquisitions pursued by BVH may reduce earnings, require it to obtain additional financing and expose it to additional risks.***

BVH may in the future pursue a transaction to increase its ownership in Bluegreen, including a transaction or transactions which would result in Bluegreen once again becoming an indirect wholly-owned subsidiary of BVH, or seek to make other acquisitions or other strategic investments. To the extent pursued and completed, acquisitions and investments may not result in the benefits anticipated or otherwise prove to be successful. Acquisitions or investments will also expose BVH to the risks of the businesses acquired or invested in and entail numerous other risks, including, but not limited to:

- risks associated with achieving profitability;
- diversion of management attention;
- integration difficulties;
- losses and unforeseen expenses or liabilities;
- risks associated with entering new markets, if applicable;
- the potential loss of key employees or management; and
- risks associated with transferred assets and liabilities.

In addition, there may be significant competition for investments and acquisitions, which could increase the costs associated with the investment or acquisition. Substantial costs would be incurred in connection with the evaluation of potential acquisition and investment opportunities whether or not the acquisition or investment is ultimately consummated. Further, the funding of such investments or acquisitions may require additional debt or equity financing. If BVH requires additional financing in the future, the financing may not be available when needed or on favorable terms, if at all. Additionally, BVH does not intend to seek shareholder approval of any investments or acquisitions unless required by law or regulation, including applicable securities exchange rules, or by BVH's Amended and Restated Articles of Incorporation or Bylaws.

***Future sales of BVH's Class A Common Stock or Class B Common Stock, or the perception in the public markets that these sales may occur, may cause the market price of such securities to decline.***

Substantial sales of BVH's Class A Common Stock or Class B Common Stock, including sales of shares by controlling shareholders and management, or the perception that such sales may occur, could adversely affect the market prices of such securities. Management has in the past and may in the future enter into Rule 10b5-1 plans pursuant to which a significant number of shares are sold into the open market.  In addition, as described above, due to the fixed voting percentages of BVH's Class A Common Stock and Class B Common Stock of 22% and 78%, respectively, holders of BVH's Class B Common Stock who also own shares of BVH's Class A Common Stock, including Alan B. Levan, John E. Abdo, Jarett S. Levan and Seth M. Wise, may sell a significant number of shares of the Class A Common Stock that they own without significantly decreasing their voting power.

31

***BVH's Bylaws contain an exclusive forum provision, which could impair the ability of shareholders to obtain a favorable judicial forum for certain disputes with BVH or its directors, officers or other employees and be cost-prohibitive to shareholders.***

BVH's Bylaws contain an exclusive forum provision which provides that, unless its Board of Directors consents to the selection of an alternative forum, the Circuit Court located in Broward County, Florida (or, if such Circuit Court does not have jurisdiction, another Circuit Court located within Florida or, if no Circuit Court located within Florida has jurisdiction, the federal district court for the Southern District of Florida) will be the sole and exclusive forum for "Covered Proceedings," which include: (i) any derivative action or proceeding brought on BVH's behalf; (ii) any action asserting a claim of breach of a fiduciary duty owed by any of BVH's directors, officers or other employees to BVH or its shareholders; (iii) any action asserting a claim against BVH or any of its directors, officers or other employees arising pursuant to any provision of the FBCA, or BVH's Amended and Restated Articles of Incorporation or Bylaws (in each case, as may be amended or amended and restated from time to time); and (iv) any action asserting a claim against BVH or any of its directors, officers or other employees governed by the internal affairs doctrine of the State of Florida. To the extent within the categories set forth in the preceding sentence, Covered Proceedings include causes of action under the Exchange Act and the Securities Act. The exclusive forum provision will also provide that if any Covered Proceeding is filed in a court other than a court located within Florida in the name of any shareholder, then such shareholder shall be deemed to have consented to (a) the personal jurisdiction of the state and federal courts located within Florida in connection with any action brought in any such court to enforce the exclusive forum provision and (b) having service of process made upon such shareholder in any such enforcement action by service upon such shareholder's counsel in the action as agent for such shareholder. Notwithstanding the foregoing, shareholders cannot waive compliance with the federal securities laws and the rules and regulations thereunder. The exclusive forum provision may limit a shareholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with BVH or its directors, officers or other employees or be cost-prohibitive to shareholders, which may discourage such lawsuits against BVH or its directors, officers and other employees. However, there is uncertainty regarding whether a court would enforce the exclusive forum provision. If a court were to find the exclusive forum provision to be inapplicable or unenforceable in an action, BVH may incur additional costs associated with resolving such action in other jurisdictions, which could adversely affect BVH's financial condition and operating results.

***BVH may not resume regular quarterly dividends or otherwise pay dividends on its Class A Common Stock and Class B Common Stock in the future.***

BVH's paid regular quarterly cash dividends from June 2016 through the first quarter of 2020.  However, in April 2020, BVH suspended its regular quarterly dividend due to the impacts of the COVID-19 pandemic and Bluegreen's suspension of regular quarterly dividends.  BVH does not expect to pay dividends unless it receives dividends from Bluegreen, and there is no assurance that Bluegreen will resume paying regular quarterly dividends or otherwise make any dividend payments in the future.  Further, even if BVH receives dividends from Bluegreen, the payments of dividends by BVH, if any, will depend on many factors considered by its Board of Directors, including, without limitation, its financial condition and results of operations, liquidity requirements, market opportunities, and contractual constraints. The terms of BVH's indebtedness may also restrict it from paying cash dividends on its stock under certain circumstances.

<u>Risks Related to Bluegreen's Business and the Vacation Ownership Industry</u>

Bluegreen is subject to a number of business, financial and operating risks inherent to the vacation ownership industry, including, without limitation:

- Business, financial and operating risks inherent to the vacation ownership industry.
- Bluegreen's business and operations, including its ability to market VOIs, may be adversely affected by general economic conditions and conditions affecting the vacation ownership industry and the availability of financing.
- The COVID-19 pandemic has adversely impacted Bluegreen's business and results, and the future effects of the pandemic are uncertain and will depend on future developments.
- Bluegreen may not be able to compete successfully in the highly competitive vacation ownership industry.

32

- ⓘ Bluegreen generates significant sales from strategic partnerships and relationships and are subject to risks related to those partnerships and arrangements, including if they are terminated or not renewed, or are not as successful as anticipated.
- ⓘ Bluegreen is subject to risks related to its ability to comply with applicable laws, rules and regulations, the costs of compliance or any failure to comply, and changes in laws, rules and regulations.
- ⓘ Bluegreen's business and results may be impacted if financing is not available on favorable terms, or at all.
- ⓘ Bluegreen's results and liquidity would be adversely impacted if it experiences increased defaults on its notes receivable portfolio.
- ⓘ The ratings of third-party rating agencies could adversely impact Bluegreen's ability to obtain, renew or extend credit facilities, or otherwise raise funds.
- ⓘ Bluegreen may not market products and services successfully or efficiently.
- ⓘ Bluegreen may be unable to develop or acquire VOI inventory or enter into and maintain fee-based relationships to source VOI inventory.
- ⓘ Bluegreen's capital-light business activities may not be successful.
- ⓘ Risks associated with Bluegreen's management of resort properties and, with respect to properties not managed by Bluegreen, risks associated with Bluegreen's dependence on the managers of those resorts.
- ⓘ Bluegreen may not continue to participate in, and its customers may not be satisfied with Bluegreen's exchange networks and other strategic alliances.
- ⓘ Bluegreen's business and results could be adversely impacted if maintenance fees increase.
- ⓘ Strategic transactions which Bluegreen may pursue may not be successful and may have adverse impacts, including diversion of management attention and the incurrence of significant expenses.
- ⓘ The resale market for VOIs could adversely affect Bluegreen's business.
- ⓘ Bluegreen's insurance policies may not cover all potential losses.
- ⓘ Bluegreen's business may be adversely impacted by negative publicity, including information spread through social media.

***Bluegreen is subject to the business, financial and operating risks inherent to the vacation ownership industry, any of which could adversely impact the Company's business, prospects and results.***

Bluegreen is subject to a number of business, financial and operating risks inherent to the vacation ownership industry, including, without limitation:

- ⓘ significant competition from other vacation ownership businesses and hospitality and alternative lodging providers;
- ⓘ market and/or consumer perception of vacation ownership companies and the industry in general;
- ⓘ increases in operating and other costs (as a result of inflation or otherwise), including marketing costs, employee compensation and benefits, interest expense and insurance, which may not be offset by price or fee increases in Bluegreen's business;
- ⓘ Bluegreen's ability to maintain, enhance or expand, or achieve the benefits achieved from, its marketing arrangements and relationships;
- ⓘ changes in taxes and governmental regulations, including those that influence or set wages, prices, interest rates or construction and maintenance procedures and costs;
- ⓘ the costs and efforts associated with complying with applicable laws and regulations, and the costs and consequences of non-compliance;
- ⓘ risks related to the development or acquisition of resorts and inventory, including delays in, or cancellations of, planned or future resort development or inventory acquisition activities;
- ⓘ shortages of labor or labor disruptions;
- ⓘ the availability and cost of capital necessary for Bluegreen and third-party developers with whom Bluegreen does business to fund investments and capital expenditures and to service debt obligations;
- ⓘ Bluegreen's ability to securitize the receivables that Bluegreen originates in connection with VOI sales;
- ⓘ relationships with and the performance and the financial condition of third-party developers with whom Bluegreen does business;

33

- relationships with the Vacation Club owners and HOAs;
- changes in the supply and demand for Bluegreen's products and services;
- lack of security over, or unauthorized access to, customer or Company records;
- private resales of VOIs and the sale of VOIs in the secondary market;
- the increased presence and effort of "timeshare-exit" firms and their impact on borrower default rates; and
- unlawful or deceptive third-party VOI resale, cease and desist, or vacation package sales schemes, and reputational risk associated therewith.

Any of these factors could increase Bluegreen's costs, limit or reduce the prices Bluegreen is able to charge for its products and services, adversely affect Bluegreen's ability to develop or acquire new resorts, or otherwise adversely impact Bluegreen's business, prospects and results which would in turn adversely impact the Company's business, prospects and results.

***Bluegreen's business and operations, including its ability to market VOIs, may be adversely affected by general economic conditions and conditions affecting the vacation ownership industry and the availability of financing.***

Bluegreen's business is subject to risks related to general economic and industry conditions and trends. Bluegreen's results, operations and financial condition  were and continue to be adversely impacted by the COVID-19 pandemic (as described below) and may be adversely affected by unfavorable general economic and industry conditions, such as high unemployment rates and job insecurity, declines in discretionary spending, declines in real estate values, the continuance of the COVID-19 pandemic and the occurrence of any other public health crisis in the future, adverse weather or geopolitical conflicts, including if these or other factors adversely impact the availability of financing for Bluegreen or its customers or the ability of its customers to otherwise pay amounts owed under notes receivable. Further, adverse changes affecting the vacation ownership industry, such as an oversupply of vacation ownership units, a reduction in demand for such units, changes in travel and other consumer preferences, demographic and vacation patterns, changes in governmental regulation of the industry, imposition of increased taxes by governmental authorities, the declaration of bankruptcy and/or credit defaults by other vacation ownership companies and negative publicity for the industry, could also have a material adverse effect on Bluegreen's business. This includes risks relating to conditions that negatively shape public perception of Bluegreen's resorts or of travel or the vacation ownership or hospitality industry generally, including travel-related accidents, disease outbreaks, whether in regions generally, at third party properties or at Bluegreen's resorts (including reputational damage, remediation costs and other potential liability and adverse impact of any such outbreak at Bluegreen's resorts).  Bluegreen's operations and results may be negatively impacted if Bluegreen is unable to update its business strategy over time and from time to time in response to changing economic and industry conditions.

***The COVID-19 pandemic has had, and the current and uncertain future outlook of the pandemic are expected to continue to have, a significant adverse effect on Bluegreen's business, financial condition, liquidity and results of operations.***

The COVID-19 pandemic has resulted in, and continues to be, an unprecedented disruption in the U.S. economy and its rapid spread, as well as the escalating measures governments and private organizations have implemented in order to stem the spread of this pandemic, have had, and are expected to continue to have, a material adverse impact on Bluegreen's business, operating results and financial condition, including, without limitation, due to government guidance and restrictions with respect to travel, public accommodations, social gatherings and related matters.  Moreover, additional currently unknown restrictions or other events adversely impacting the vacation ownership industry may occur and the adverse effects of the COVID-19 pandemic on Bluegreen's business, operating results and financial condition may otherwise be lengthened or exacerbated.

In connection with the COVID-19 pandemic, on March 23, 2020, Bluegreen temporarily closed all of its VOI sales centers; its retail marketing operations at Bass Pro Shops and Cabela's stores (a total of 89 stores at the time) and outlet malls; and its Choice Hotels call transfer program. In connection with these actions Bluegreen canceled existing owner reservations through May 15, 2020 and new prospect guest tours through June 30, 2020. Further, some of Bluegreen's Club and Club Associate Resorts were closed in accordance with government mandates and advisories. Beginning in mid-May 2020, Bluegreen started the process of recommencing its sales and marketing operations and

34

its closed resorts began to welcome guests as government mandates were lifted.  By December 31, 2020, Bluegreen was operating marketing kiosks in a total of 84 Bass Pro and Cabela's stores, Bluegreen reactivated its Choice Hotels call transfer program, all of its resorts were open, and all but two of its VOI sales centers were open. However, there is no assurance that Bluegreen's marketing operations at Bass Pro or Cabela's stores, or its VOI sales centers will remain open, including in the event of an increase in COVID-19 cases.

In light of the pandemic, Bluegreen also suspended the payment of regular quarterly cash dividends, reduced its new inventory acquisition and development expenditures and drew down $60 million under its lines-of-credit, all of which was repaid as of December 31, 2020.

While these steps were implemented to mitigate the effects of the pandemic on Bluegreen's business, the measures themselves had and may continue to have negative consequences with respect to Bluegreen's business and operations, including by reducing sales. In addition, cost savings from these measures were not recognized immediately and will not completely offset the decrease in revenues and other adverse impacts of the pandemic.

In addition, Bluegreen has historically financed a majority of its sales of VOIs, and accordingly, is subject to the risk of defaults by its customers.  While Bluegreen does not believe that the full impact of COVID – 19 is reflected in its default or delinquency rates as of December 31, 2020, Bluegreen believes that the COVID-19 pandemic will continue to have an impact on the collectability of its VOI notes receivable.  Accordingly, Bluegreen increased its estimate of customer defaults for 2021 as a result of the COVID–19 pandemic by approximately $6.0 million, based on its historical experience, forbearance requests received from its customers, and other factors, including but not limited to, the seasoning of the notes receivable and FICO scores of the customers. Bluegreen continues to evaluate the impact of the COVID-19 pandemic on its default or delinquency rates as it is rapidly changing and highly uncertain. Accordingly, and due to other risks and uncertainties associated with assumptions and changing market conditions, Bluegreen's allowance may not prove to be accurate and may be increased in future periods, which will adversely impact its operating results for those periods.

Further, the COVID-19 pandemic has resulted in instability and volatility in the financial markets. Bluegreen's ability to borrow against or sell its VOI notes receivable has historically been a critical factor in its liquidity.  If Bluegreen is unable to renew credit facilities or obtain new credit facilities, its business, results of operations, liquidity, or financial condition may be materially, adversely impacted.

Bluegreen's operations could also be negatively affected further if its employees are quarantined or sickened as a result of exposure to COVID-19, or if they are subject to governmental COVID-19 curfews or "shelter in place" health orders. Measures restricting the ability of employees to come to work may impair Bluegreen's service or operations, all of which could negatively affect its business.

Bluegreen is unable to predict how long these conditions will persist, what additional measures may be introduced by governments or private parties or what effect any such additional measures may have on its business. Furthermore, not only is the duration of the pandemic and combative measures unknown, the overall situation is extremely fluid, and it is impossible to predict the timing of future changes in the situation and what their impact may be on Bluegreen's business and in turn the Company. Neither Bluegreen nor the Company can predict whether the COVID-19 pandemic will result in permanent changes to its customers' or general consumer behavior, which may include, without limitation, continued or permanent decreases in discretionary spending and reductions in travel or vacation ownership stays or purchases, each of which would have a material adverse impact on our business, operating results and financial condition.

35

*Bluegreen's business and properties are subject to extensive federal, state and local laws, regulations and policies. Changes in these laws, regulations and policies, as well as the cost of complying with new or existing laws, regulations and policies and the imposition of additional taxes on operations, as well as new cell phone technologies that automatically identify or block marketing vendor calls, could adversely affect Bluegreen's business. Further, jurisdictions are increasingly seeking to identify additional sources of tax revenue and results of audits of Bluegreen's tax returns or those of its subsidiaries may also have a material adverse impact on its financial condition.*

The federal government and the state and local jurisdictions in which Bluegreen operates have enacted extensive regulations that affect the manner in which Bluegreen markets and sells VOIs and conducts its other business operations. In addition, federal, state and local regulators may enact new laws and regulations that may adversely affect Bluegreen's results or require Bluegreen to modify its business practices substantially. Many states, including Florida and South Carolina, where certain of Bluegreen's resorts are located, extensively regulate VOI and timeshare-related activities, including the sale of VOIs, the creation and management of resorts, the marketing and sale of properties, the escrow of purchaser funds prior to the completion of construction and closing, the content and use of advertising materials and promotional offers, the delivery of an offering memorandum and the creation and operation of exchange programs and multi-site timeshare plan reservation systems. Moreover, with regard to sales conducted in South Carolina, the closing of real estate and mortgage loan transactions must be conducted under the supervision of an attorney licensed in South Carolina and otherwise in accordance with South Carolina's Timesharing Transaction Procedures Act.

Most states also have other laws that are applicable to Bluegreen's activities, such as timeshare project registration laws, real estate licensure laws, mortgage licensure laws, sellers of travel licensure laws, anti-fraud laws, consumer protection laws, telemarketing laws, prize, gift and sweepstakes laws, and consumer credit laws. Bluegreen's management of, and dealings with, HOAs, including its purchase of defaulted inventory from HOAs in connection with its secondary market sales, are also subject to state laws and resort rules and regulations, including those with respect to the establishment of budgets and expenditures, rule-making, and the imposition of maintenance assessments.

Bluegreen is authorized to market and sell VOIs in all locations at which its marketing and sales activities are conducted. If Bluegreen's agents or employees violate applicable regulations or licensing requirements, their acts or omissions could cause the states where the violations occurred to revoke or refuse to renew Bluegreen's licenses, render its sales contracts void or voidable, or impose fines on Bluegreen based on past activities.

In addition, the federal government and the state and local jurisdictions in which Bluegreen conducts business have generally enacted extensive regulations relating to direct marketing and telemarketing, including the federal government's national "do not call" list, the making of marketing and related calls to cell phone users, a significant development in light of cell phone usage becoming the primary method of communication, the Telemarketing Sales Rule, the Telephone Consumer Protection Act and the CAN-SPAM Act of 2003. These regulations, as well as international data protection laws, have impacted Bluegreen's marketing of VOIs. While Bluegreen has taken steps designed to achieve compliance with applicable regulations, these steps are expected to continue to increase Bluegreen's marketing costs and may not prevent failures in compliance. Additionally, adoption of new state or federal laws regulating marketing and solicitation, new case law, and changes to existing laws, could adversely affect current or planned marketing activities and cause Bluegreen to change its marketing strategy. If this occurs, Bluegreen may not be able to develop adequate alternative marketing strategies, which could affect the amount and timing of its VOI sales. Bluegreen cannot predict the impact that these legislative initiatives or any other legislative measures that may be proposed or enacted in the future may have on its marketing strategies and results. Further, from time to time, complaints are filed against Bluegreen by individuals claiming that they received calls in violation of applicable regulations. See "Item 3. Legal Proceedings". Technology advances, including new cellphone technologies that automatically identify or block marketing vendor calls, may also adversely impact Bluegreen's telemarketing efforts or otherwise cause Bluegreen to change its marketing strategy.

Most states have taxed VOIs as real estate, imposing property taxes that are billed to the respective HOAs that maintain the related resorts, and have not sought to impose sales tax upon the sale of the VOI or accommodations tax upon the use of the VOI. From time to time, however, various states have attempted to promulgate new laws or apply existing laws impacting the taxation of VOIs to require that sales or accommodations taxes be collected. Should new state or

36

local laws be implemented or interpreted to impose sales or accommodations taxes on VOIs, Bluegreen's business could be materially adversely affected.

From time to time in the ordinary course of Bluegreen's business, consumers file complaints against Bluegreen. Bluegreen may be required to incur significant costs to resolve these complaints or enter into consents with regulators regarding its activities, including requiring the refund of all or a portion of the purchase price paid by the customer for the VOI. If Bluegreen is found to have not complied with applicable federal, state and local laws and regulations, such violations may have adverse implications on Bluegreen, including rendering its VOI sales contracts void or voidable, negative publicity, potential litigation and regulatory fines or other sanctions. The expense, negative publicity and potential sanctions associated with any failure to comply with applicable laws or regulations could have a material adverse effect on Bluegreen's business, results of operations or financial position.

Under the Americans with Disabilities Act of 1990 and the Accessibility Guidelines promulgated thereunder (collectively, the "ADA"), all public accommodations, including Bluegreen's properties, must meet various federal requirements related to access and use by disabled persons. Compliance with the ADA's requirements could require removal of access barriers or other renovations, and non-compliance could result in the imposition of fines or penalties, or awards of damages, against Bluegreen. Bluegreen's properties are also subject to various federal, state and local regulatory requirements, such as state and local fire and life safety requirements. Further, various laws govern Bluegreen's resort management activities, including laws and regulations regarding community association management, public lodging, food and beverage services, liquor licensing, labor, employment, health care, health and safety, accessibility, discrimination, immigration, and the environment (including climate change).

Bluegreen's lending activities are also subject to a number of laws and regulations, including laws and regulations related to consumer loans, retail installment contracts, mortgage lending, fair debt collection and credit reporting practices, consumer collection practices, contacting debtors by telephone, mortgage disclosure, lender licenses and money laundering. The Consumer Finance Protection Bureau, created under the Dodd-Frank Act, has emphasized new regulatory focus on areas of Bluegreen's business such as consumer mortgage servicing and debt collection, credit reporting and consumer financial disclosures, all of which affect the manner in which Bluegreen may provide financing to the purchasers of its VOIs and conduct its lending and loan servicing operations.

***The vacation ownership and hospitality industries are highly competitive, and Bluegreen may not be able to compete successfully.***

Bluegreen competes with various high profile and well-established operators, many of which have greater liquidity and financial resources than Bluegreen. Many of the world's most recognized lodging, hospitality and entertainment companies develop and sell timeshare units or VOIs in resort properties. Bluegreen also competes with numerous smaller owners and operators of vacation ownership resorts and also face competition from alternative lodging options available to consumers through both traditional methods of delivery as well as new web portals and applications, including private rentals of homes, apartments or condominium units, which have increased in popularity in recent years. Bluegreen's ability to remain competitive and to attract and retain customers depends on its customers' satisfaction with Bluegreen's products and services as well as on distinguishing the quality, value, and efficiency of Bluegreen's products and services from those offered by its competitors. Customer dissatisfaction with experiences at Bluegreen's resorts or otherwise as a Vacation Club owner, including due to an inability to use points for desired stays, could result in negative publicity and/or a decrease in sales, or otherwise adversely impact Bluegreen's ability to successfully compete in the vacation ownership and hospitality industries. Bluegreen may not be able to timely and sufficiently identify and remediate the cause of customer dissatisfaction. Any of these events could materially and adversely impact Bluegreen's operating results and financial condition.

***There are risks associated with Bluegreen's strategic partnerships and arrangements.***

Bluegreen generates a significant portion of its new sales prospects and leads through its arrangements with various third parties, including Bass Pro and Choice Hotels, and are dependent upon these relationships in order to acquire new customers. VOI sales to prospects and leads generated by Bluegreen's marketing arrangement with Bass Pro accounted for approximately 12% and 13% of Bluegreen's VOI sales volume during the years ended December 31, 2020 and 2019, respectively. If Bluegreen's agreement with Bass Pro, or any other significant marketing arrangement, does not generate a sufficient number of prospects and leads or is terminated or limited and not replaced by another

37

comparable source of sales prospects and leads, Bluegreen may not be able to successfully market and sell its products and services at current sales levels, at anticipated levels or at levels required in order to offset the costs associated with its marketing efforts. In addition, Bluegreen's business relationship with Bass Pro under the revised terms of its marketing agreement entered into in June 2019 may not be as profitable as under the prior terms, or at all, or otherwise result in the benefits anticipated.

**Bluegreen's business and results may be impacted if financing is not available on favorable terms, or at all.**

In connection with VOI sales, Bluegreen generally offers financing to the purchaser of up to 90% of the purchase price of the VOI. However, Bluegreen incurs selling, marketing and administrative cash expenses prior to and concurrent with the sale. These costs, along with the cost of the underlying VOI, generally exceed the down payment received at the time of the sale. Accordingly, Bluegreen's ability to borrow against or sell its notes receivable has historically been a critical factor in Bluegreen's continued liquidity, and Bluegreen therefore has depended on funds from its credit facilities and securitization transactions to finance its operations. If Bluegreen's pledged receivables facilities terminate or expire and Bluegreen is unable to extend them or replace them with comparable facilities, or if Bluegreen is unable to continue to participate in securitization-type transactions and "warehouse" facilities on acceptable terms, its liquidity, cash flow and profitability would be materially and adversely affected. Credit market disruptions have in the past, including in connection with the COVID-19 pandemic, adversely impacted the willingness of banks and other finance companies to provide "warehouse" lines of credit for VOI notes receivable and resulted from time to time in the term securitization market being unavailable. Future credit market disruptions may have similar effects or otherwise make obtaining additional and replacement external sources of liquidity more difficult and more costly, if available at all.

In addition, financing for real estate acquisition and development and the capital markets for corporate debt is cyclical. While Bluegreen has increased its focus on encouraging higher down payments in connection with sales, there is no assurance that this initiative will enhance its financial position or otherwise be successful in the long-term.

Bluegreen anticipates that it will continue to seek and use external sources of liquidity, including borrowings under its existing credit facilities, under credit facilities that Bluegreen may obtain in the future, under securitizations in which Bluegreen may participate in the future or pursuant to other borrowing arrangements, to:

- support Bluegreen's operations and, subject to declaration by its board of directors and contractual limitations, including limitations contained in its credit facilities, pay dividends;
- finance the acquisition and development of VOI inventory or property and equipment;
- finance a substantial percentage of its sales; and
- satisfy its debt and other obligations.

Bluegreen's ability to service or refinance its indebtedness or to obtain additional financing (including Bluegreen's ability to consummate future term securitizations) depends on the credit markets and on Bluegreen's future performance, which is subject to a number of factors, including the success of its business, its results of operations, leverage, financial condition and business prospects, prevailing interest rates, general economic conditions, the performance of its receivables portfolio, and perceptions about the vacation ownership and real estate industries.

As of December 31, 2020, Bluegreen had $12.2 million of indebtedness scheduled to become due during 2021. Historically, much of its debt has been renewed or refinanced in the ordinary course of business. However, there is no assurance that Bluegreen will be able to renew, extend or refinance all or any portion of its outstanding debt or otherwise obtain sufficient external sources of liquidity, in each case, on attractive terms, or at all. If Bluegreen is unable to do so, its liquidity and financial condition may be materially, adversely impacted.

In addition, Bluegreen has and intends to continue to enter into arrangements with third-party developers pursuant to which Bluegreen sells its VOI inventory for a fee. These arrangements enable Bluegreen to generate fees from the marketing and sales services Bluegreen provides, and in certain cases from its provision of management services, without requiring Bluegreen to fund development and acquisition costs. If these third-party developers are not able to obtain or maintain financing necessary for Bluegreen's development activities or other operations, Bluegreen may not be able to enter into these fee-based arrangements or have access to Bluegreen's VOI inventory when anticipated, which would adversely impact Bluegreen's results.

38

**_Bluegreen would suffer substantial losses and its liquidity position could be adversely impacted if an increasing number of customers to whom Bluegreen provides financing default on its obligations._**

Adverse conditions in the mortgage industry, including credit availability, borrowers' financial profiles, prepayment rates and other factors, including those outside of Bluegreen's control may increase the default rates Bluegreen experiences or otherwise negatively impact the performance of its notes receivable. In addition, in recent years, third parties have been discouraging certain borrowers from staying current on Bluegreen's note payments. Although in many cases Bluegreen may have recourse against a buyer for the unpaid purchase price, certain states have laws that limit Bluegreen's ability to recover personal judgments against customers who have defaulted on Bluegreen's loans or Bluegreen may determine that the cost of doing so may not be justified. Historically, Bluegreen had generally not pursued such recourse against its customers. In the case of Bluegreen's notes receivable secured by VOIs, if Bluegreen is unable to collect the defaulted amount due, Bluegreen traditionally terminated the customer's interest in the Vacation Club and then remarketed the recovered VOI. Irrespective of its remedy in the event of a default, Bluegreen cannot recover the marketing, selling and administrative costs associated with the original sale and such costs generally exceed the cash received by Bluegreen from the buyer at the time of the sale. In addition, Bluegreen will need to incur such costs again in order to resell the VOI. Bluegreen updates its estimates of such future losses each quarter, and consequently, the charge against sales in a particular period may be impacted, favorably or unfavorably, by a change in expected losses related to notes originated in prior periods. In addition, defaults may cause buyers of, or lenders whose loans are secured by, Bluegreen's VOI notes receivable to reduce the amount of availability or advance rates under receivables purchase and credit facilities, or result in an increase in the interest costs associated with such facilities. In such an event, the cost of financing may increase and Bluegreen may not be able to secure replacement or alternative financing on terms acceptable to Bluegreen, if at all, which would adversely affect Bluegreen's earnings, financial position and liquidity.

Bluegreen's VOI notes receivable financing facilities could be adversely affected if a particular VOI note receivable pool fails to meet certain performance ratios, which could occur if the default rate or other credit metrics of the underlying VOI notes receivable deteriorate. In addition, if Bluegreen offers financing to purchasers of VOIs with terms longer than those generally offered in the industry, Bluegreen may not be able to securitize those VOI financing receivables. Bluegreen's ability to sell securities backed by its VOI notes receivable depends on the continued ability and willingness of capital market participants to invest in such securities. Asset-backed securities issued in its term securitization transactions could be downgraded by credit agencies in the future. If a downgrade occurs, Bluegreen's ability to complete other securitization transactions on acceptable terms or at all could be jeopardized, and it could be forced to rely on other potentially more expensive and less attractive funding sources, to the extent available. Similarly, if other operators of vacation ownership products were to experience significant financial difficulties, or if the vacation ownership industry as a whole were to contract, Bluegreen could experience difficulty in securing funding on acceptable terms. The occurrence of any of the foregoing could adversely impact Bluegreen's business and results, including, without limitation, by reducing the amount of financing Bluegreen is able to provide to VOI purchasers, which in turn may result in a reduction in VOI sales. As described above, the COVID-19 pandemic has had an adverse impact on its VOI notes receivable portfolio, which has resulted in an increase in Bluegreen's allowance for loan losses and may result in additional increases or other adverse impacts in the future.

In addition, under the terms of Bluegreen's pledged and receivable sale facilities, Bluegreen may be required, under certain circumstances, to replace receivables or to pay down the loan to within permitted loan-to-value ratios. Additionally, the terms of Bluegreen's securitization transactions require it to repurchase or replace loans if it breaches any of the representations and warranties Bluegreen made at the time it sold the receivables. These agreements also often include terms providing for substantially all of its cash flow from Bluegreen's retained interest in the receivable portfolios sold to be paid to the parties who purchased the receivables from Bluegreen in the event of defaults or delinquencies by customers in excess of stated thresholds, or if other performance thresholds are not met.

**_The ratings of third-party rating agencies could adversely impact Bluegreen's ability to obtain, renew or extend credit facilities, or otherwise raise funds._**

Rating agencies from time to time review prior specific transaction ratings in light of tightened ratings criteria.  Further, specific securitization transactions are reviewed by third-party rating agencies. If rating agencies were to downgrade Bluegreen's original ratings on certain bond classes in Bluegreen's securitizations, holders of such bonds

39

may be required to sell bonds in the marketplace, and such sales could occur at a discount, which could impact the perceived value of the bonds and Bluegreen's ability to sell future bonds on favorable terms or at all. While Bluegreen is not aware of any reasonably likely downgrades to the ratings of bond classes in its securitizations, such ratings changes can occur without advance notice.

***Bluegreen's future success depends on its ability to market Bluegreen's products and services successfully and efficiently, and Bluegreen's marketing expenses have increased and may continue to increase in the future.***

As previously described, Bluegreen competes for customers with hotel and resort properties, other vacation ownership resorts and alternative lodging options, including private rentals of homes, apartments or condominium units. The identification of sales prospects and leads, and the marketing of Bluegreen's products and services to them are essential to Bluegreen's success. Bluegreen incurs expenses associated with marketing programs in advance of the closing of sales. If Bluegreen's lead identification and marketing efforts do not yield enough leads or Bluegreen is unable to successfully convert sales leads to sales, Bluegreen may be unable to recover the expense of its marketing programs and systems and its business, operating results and financial condition would be adversely affected. In addition, while sales to existing owners have increased recently, Bluegreen also continues to focus its marketing efforts on selling to new customers, which typically involves a relatively higher marketing cost compared to sales to existing owners.  These efforts may result in increases in Bluegreen's sales and marketing expenses. If Bluegreen is not successful in offsetting the cost increase with greater sales revenue, its operating results and financial condition would be adversely impacted. In addition, Bluegreen's marketing efforts are subject to the risk of changing consumer behavior. Changes in consumer behavior may adversely impact the effectiveness of marketing efforts and strategies which Bluegreen has in place and it may not be able to timely and effectively respond to such changes.  In addition, Bluegreen may not be able to continue to increase or maintain its level of sales to existing owners.

***If Bluegreen is unable to develop or acquire VOI inventory or enter into and maintain fee-based service agreements or other arrangements to source VOI inventory, its business and results would be adversely impacted.***

In addition to developed VOI sales, Bluegreen sources VOIs as part of its capital-light business strategy through fee-based service agreements with third-party developers and through JIT and secondary market arrangements. If Bluegreen is unable to develop or acquire resorts at the levels or in the time frames anticipated, or are unsuccessful in entering into agreements with third-party developers or others to source VOI inventory in connection with its capital-light business strategy, Bluegreen may experience a decline in VOI supply or an increase in VOI cost, which could have a negative impact on its results and operations and/or a decrease in sales. In addition, a decline in VOI supply and sales could result in a decrease in financing revenue that is generated by VOI sales and fee and rental revenue that is generated by Bluegreen's management services.

***Bluegreen's capital-light activities, including fee-based sales and marketing arrangements, and JIT and secondary market sales activities, may not be successful or profitable, which would have an adverse impact on its results of operations and financial condition.***

Bluegreen offers fee-based marketing, sales, resort management and other services to third-party developers, which Bluegreen believes enables it to leverage its expertise in sales and marketing, resort management, mortgage servicing, construction management and title services. Bluegreen intends to continue its capital-light business activities as such activities generally produce positive cash flow and typically require less capital investment than its traditional vacation ownership business. Bluegreen has attempted to structure these activities to cover its costs and generate a profit. Sales of third-party developers' VOIs must generate sufficient cash to comply with the terms of Bluegreen's financing obligations as well as to pay the fees or commissions due to Bluegreen. The third-party developers may not be able to obtain or maintain financing necessary to meet Bluegreen's requirements, which could impact its ability to sell the developers' inventory. While Bluegreen could attempt to utilize other arrangements, including JIT arrangements, where Bluegreen would utilize its receivable credit facilities in order to provide fee-based marketing and sales services, this would reduce the credit otherwise available to Bluegreen and impact profitability. Bluegreen commenced its capital-light activities largely during the "Great Recession" in response to poor economic conditions and its fee-based and other capital-light business activities in the future may be adversely impacted by changes in economic conditions such as the adverse impact of the COVID-19 pandemic. When Bluegreen performs fee-based sales and marketing services, it sells VOIs in resorts developed by third parties as an interest in the Vacation Club. This subjects Bluegreen to a number of risks typically associated with selling products developed by others under its own brand name,

40

including litigation risks. Further, these arrangements may expose Bluegreen to additional risk as Bluegreen will not control development activities or timing of development completion. If third parties with whom it enters into agreements are not able to fulfill their obligations to Bluegreen, the inventory Bluegreen expects to acquire or market and sell on their behalf may not be available when expected or at all, or may not otherwise meet agreed-upon specifications. Further, if these third parties do not perform as expected and Bluegreen does not have access to the expected inventory or obtain access to inventory from alternative sources on a timely basis, its ability to maintain or increase sales levels would be adversely impacted.

Bluegreen also sells VOI inventory through secondary market arrangements which require low levels of capital deployment. In connection with secondary market sales, Bluegreen acquires VOI inventory from Bluegreen's resorts' HOAs, generally on a non-committed basis, in close proximity to the timing of when it intend to sell such VOIs. VOIs purchased from HOAs are typically obtained by the HOAs through foreclosure in connection with maintenance fee defaults and are generally acquired by Bluegreen at a discount. While Bluegreen intends to increase its secondary market sales efforts in the future, Bluegreen may not be successful in doing so, and these efforts may not result in Bluegreen achieving anticipated results. Further Bluegreen's secondary market sales activities may subject it to negative publicity, which could adversely impact its reputation and business.

***Bluegreen is subject to certain risks associated with its management of resort properties.***

Through Bluegreen's management of resorts and ownership of VOIs, Bluegreen is subject to certain risks related to the physical condition and operation of the managed resort properties in its network, including:

- the presence of construction or repair defects or other structural or building damage at any of these resorts, or resorts Bluegreen may develop in the future;
- any noncompliance with or liabilities under applicable environmental, health or safety regulations or requirements or building permit requirements relating to these resorts;
- any costs or damage to physical assets or interruption of access to physical assets or operations resulting from an outbreak of contagious diseases, such as the COVID-19 outbreak, or from natural disasters, such as hurricanes, earthquakes, fires, floods and windstorms, which may increase in frequency or severity due to climate change or other factors; and
- claims by employees, members and their guests for injuries sustained on these resort properties.

Some of these risks may be more significant in connection with the properties for which Bluegreen recently acquired management agreements, particularly any management agreements which were acquired from operators in financial distress. If an uninsured loss or a loss in excess of insured limits occurs as a result of any of the foregoing, Bluegreen may be forced to incur significant costs.

Additionally, a number of U.S. federal, state and local laws, including the Fair Housing Amendments Act of 1988 and the ADA, impose requirements related to access to and use by disabled persons of a variety of public accommodations and facilities. A determination that Bluegreen managed resorts are subject to, and that they are not in compliance with, these accessibility laws could result in a judicial order requiring compliance, imposition of fines or an award of damages to private litigants. If one of its managed resorts was required to make significant improvements as a result of non-compliance with these accessibility laws, assessments might be needed to fund such improvements, which additional costs may cause Bluegreen's VOI owners to default on its consumer loans from Bluegreen or cease making required maintenance fee or assessment payments. Also, to the extent that Bluegreen holds interests in a particular resort, Bluegreen would be responsible for its pro rata share of the costs of such improvements. In addition, any new legislation may impose further burdens or restrictions on property owners with respect to access by disabled persons.

The resort properties that Bluegreen manages are subject to federal, state and local laws and regulations relating to the protection of the environment, natural resources and worker health and safety, including laws and regulations governing and creating liability relating to the management, storage and disposal of hazardous substances and other regulated materials and the cleanup of contaminated sites. The resorts are also subject to various environmental laws and regulations that govern certain aspects of Bluegreen's ongoing operations. These laws and regulations control such things as the nature and volume of wastewater discharges, quality of water supply and waste management practices. To the extent that Bluegreen holds interests in a particular resort, Bluegreen would be responsible for its pro rata share of losses sustained by such resort as a result of a violation of any such laws and regulations.

41

In addition, Bluegreen may from time to time have disagreements with VOI owners and HOAs relating to the management services it provides. Failure to resolve such disagreements may result in litigation and additional costs. Further, disagreements with HOAs could also result in the loss of management contracts, which would negatively affect its revenue and results, and may also have an adverse impact on its ability to generate sales from existing VOI owners.

Bluegreen's management contracts are typically structured as "cost-plus," with an initial term of three years and automatic one year renewals. If a management contract is terminated or not renewed on favorable terms or is renegotiated in a manner adverse to Bluegreen, its revenue and cash flows would be adversely affected.

***Bluegreen's results of operations and financial condition may be materially and adversely impacted if Bluegreen does not continue to participate in exchange networks and other strategic alliances with third parties or if its customers are not satisfied with the networks in which Bluegreen participates or its strategic alliances.***

Bluegreen believes that its participation in exchange networks and other strategic alliances and its Traveler Plus program make ownership of its VOIs more attractive by providing owners with the ability to take advantage of vacation experiences in addition to stays at its resorts. Bluegreen's participation in the RCI exchange network allows Vacation Club owners to use their points to stay at over 4,200 participating resorts, based upon availability and the payment of a variable exchange fee. During the year ended December 31, 2020, approximately 4% of Vacation Club owners utilized the RCI exchange network for a stay of two or more nights. Bluegreen also has an exclusive strategic arrangement with Choice Hotels pursuant to which, subject to payments and conditions, certain of its resorts have been branded as part of Choice Hotels' Ascend Hotel Collection. Vacation Club owners can convert their Vacation Club points into Choice Privileges points. Choice Privileges points can be used for stays at Choice Hotels' properties. For a nominal annual fee and transactional fees, Vacation Club owners may also participate in Bluegreen's Traveler Plus program, which enables them to use points to access an additional 44 direct exchange resorts and for other vacation experiences such as cruises.  In addition, Traveler Plus members can directly use their Vacation Club points for stays at Choic e Hotels' Ascend Hotel Collection properties, a network of historic and boutique hotels in the United States, Canada, Scandinavia and Latin America. Bluegreen may not be able to or desire to continue to participate in the RCI or direct exchange networks in the future or maintain or extend its other marketing and strategic networks, alliances and relationships. In addition, these networks, alliances and relationships, and Bluegreen's Traveler Plus program, may not continue to operate effectively, and Bluegreen's customers may not be satisfied with them. In addition, Bluegreen may not be successful in identifying or entering into new strategic relationships in the future. If any of these events should occur, Bluegreen's results of operations and financial condition may be materially and adversely impacted.

***If maintenance fees at Bluegreen's resorts and/or Vacation Club dues are required to be increased, Bluegreen's product could become less attractive, defaults could increase and its business could be harmed.***

The maintenance fees, special assessments and Vacation Club dues that are levied by HOAs and the Vacation Club on VOI owners may increase as the costs to maintain and refurbish properties, and to keep properties in compliance with Bluegreen's standards and applicable regulations, increase. Increases in such fees, assessments or dues could negatively affect customer satisfaction with its Vacation Club or otherwise adversely impact VOI sales to both new customers and existing VOI owners or could contribute to additional defaults.

***Bluegreen's strategic transactions and relationships may not be successful and may divert its management's attention and consume significant resources.***

Bluegreen intends to continue its strategy of selectively pursuing complementary strategic transactions and relationships. Bluegreen may also purchase management contracts, including from resort operators facing financial distress, and purchase VOI inventory at resorts that it does not manage, with the goal of acquiring sufficient VOI ownership at such a resort to become the manager of that resort. The successful execution of this strategy will depend on Bluegreen's ability to identify and enter into the agreements necessary to take advantage of these potential opportunities, and to obtain any necessary financing. Bluegreen may not be able to do so successfully. In addition, Bluegreen's management may be required to devote substantial time and resources to pursue these opportunities, which may divert their attention away from Bluegreen's other operations.

42

D - 0055-0042

Acquisitions and new strategic relationships involve numerous additional risks, including: (i) difficulty in integrating the operations and personnel of the acquired business or assets; (ii) potential disruption of Bluegreen's ongoing business and the distraction of management from its day-to-day operations; (iii) difficulty entering markets and relationships in which Bluegreen has limited or no prior experience and in which competitors have a stronger market position; (iv) difficulty maintaining the quality of services that Bluegreen historically provided across new acquisitions; (v) potential legal and financial responsibility for liabilities of the acquired business or assets; (vi) potential overpayment in connection with transactions; (vii) increased expenses associated with transactions or an acquisition and amortizing any acquired intangible assets; (viii) risks associated with any debt incurred in connection with the financing of transaction; and (ix) challenges in implementing uniform standards, controls, procedures and policies throughout an acquired business.

***Bluegreen is dependent on the managers of resorts not managed, owned or operated by Bluegreen to ensure that those properties meet its customers' expectations.***

In addition to stays at Bluegreen's resorts, Vacation Club owners have access to other resorts and hotels as a result of Bluegreen's participation in exchange programs and its other strategic alliances. Accordingly, Vacation Club owners have access to resorts that Bluegreen does not manage, own or operate. If those resorts are not maintained in a manner consistent with Bluegreen's standards of quality or its Vacation Club owners are otherwise dissatisfied with those resorts, Bluegreen may be subject to customer complaints and its reputation and brand could be damaged. In addition, Bluegreen's agreements with these resorts or their owners may expire, be terminated or not be renewed, or may be renegotiated in a manner adverse to Bluegreen, and Bluegreen may be unable to enter into new agreements that provide Vacation Club owners with equivalent access to additional resorts, any or all of which could materially adversely impact its business, operating results and financial condition.

***The resale market for VOIs could adversely affect Bluegreen's business.***

Bluegreen believes that resales of VOIs in the secondary market generally are made at net sales prices below the original customer purchase prices. The relatively lower sales prices are partly attributable to the high marketing and sales costs associated with the initial sales of such VOIs. Accordingly, the initial purchase price of a VOI may be less attractive to prospective buyers and Bluegreen may compete with buyers who seek to resell their VOIs. While VOI resale clearing houses or brokers currently do not have a material impact on Bluegreen's business, the availability of resale VOIs at lower prices, particularly if an organized and liquid secondary market develops, could adversely affect Bluegreen's level of sales and sales prices, which in turn would adversely affect its business, financial condition and results of operations.

***Bluegreen's insurance policies may not cover all potential losses.***

Bluegreen maintains insurance coverage for liability, property and other risks with respect to its operations and activities. While Bluegreen has comprehensive property and liability insurance policies with coverage features and insured limits that it believes are customary, market forces beyond Bluegreen's control may limit the scope of the insurance coverage it can obtain or its ability to obtain coverage at reasonable rates. The cost of insurance may increase and Bluegreen's coverage levels may decrease, which may affect its ability to maintain customary insurance coverage and deductibles at acceptable costs.

There is a limit as well as various sub-limits on the amount of insurance proceeds Bluegreen will receive in excess of applicable deductibles. If an insurable event occurs that affects more than one of its properties, the claims from each affected property may be considered together to determine whether the individual occurrence limit, annual aggregate limit or sub-limits, depending on the type of claim, have been reached. If the limits or sub-limits are exceeded, each affected property may only receive a proportional share of the amount of insurance proceeds provided for under the policy. Further, certain types of losses, generally of a catastrophic nature, such as earthquakes, hurricanes and floods, terrorist acts, and certain environmental matters, may be outside the general coverage limits of Bluegreen's policies, subject to large deductibles, deemed uninsurable or too cost-prohibitive to justify insuring against. In addition, in the event of a substantial loss, the insurance coverage Bluegreen carries may not be sufficient to pay the full market value or replacement cost of the affected resort or in some cases may not provide a recovery for any part of a loss. As a result, Bluegreen could lose some or all of the capital it has invested in a property, as well as the anticipated future

43

marketing, sales or revenue opportunities from the property. Further, Bluegreen could remain obligated under guarantees or other financial obligations related to the property despite the loss of product inventory, and its VOI owners could be required to contribute toward deductibles to help cover losses.

***Bluegreen's business may be adversely impacted by negative publicity, including information spread through social media.***

The proliferation and global reach of social media continues to expand rapidly and could cause us to suffer reputational harm. The continuing evolution of social media presents new challenges and requires Bluegreen to keep pace with new developments, technology and trends. Negative posts or comments about Bluegreen, the properties it manages or its brands on any social networking or user-generated review website, including travel and vacation property websites, could affect consumer opinions of Bluegreen and its products, and Bluegreen cannot guarantee that it will timely or adequately redress such instances.

## Risks Related to the Company's Indebtedness

***Changes to and replacement of the LIBOR benchmark interest rate could adversely affect the results of operations and liquidity.***

In July 2017, the Financial Conduct Authority (the regulatory authority over LIBOR) stated they will plan for a phase out of regulatory oversight of LIBOR interest rate indices after 2021 to allow for an orderly transition to an alternate reference rate. The Alternative Reference Rates Committee ("ARRC") has proposed that the Secured Overnight Financing Rate ("SOFR") is the rate that represents best practice as the alternative to LIBOR for promissory notes or other contracts that are currently indexed to LIBOR. The ARRC has proposed a market transition plan to SOFR from LIBOR and organizations are currently working on transition plans as it relates to derivatives and cash markets exposed to LIBOR. Although Bluegreen's VOIs notes receivable are not indexed to LIBOR, as of December 31, 2020, the Company had $177.1 million of LIBOR indexed junior subordinated debentures, $40.5 million of LIBOR indexed receivable-backed notes payable and lines of credit and $127.5 million of LIBOR indexed lines of credit and notes payable (which are not receivable-backed) maturing in 2021 and after. The Company is evaluating the potential impact that the eventual replacement of the LIBOR benchmark interest rate could have on its results of operations and liquidity.

***The Company's existing indebtedness, or indebtedness that it may incur in the future, could adversely impact its financial condition and results of operations, and the terms of its indebtedness may limit its activities.***

The Company's level of debt and debt service requirements have several important effects on its operations. Significant debt service cash requirements reduce the funds available for operations and future business opportunities and increase the vulnerability of the Company and Bluegreen to adverse economic and industry conditions, as well as conditions in the credit markets generally. In addition, Bluegreen's leverage position increases its vulnerability to economic and competitive pressures and may limit funds available for acquisitions, working capital, capital expenditures, dividends, and other general corporate purposes. If new debt or other liabilities are added to Bluegreen's current debt levels, the related risks that it faces could intensify. Further, the financial covenants and other restrictions contained in indentures, credit agreements and other agreements relating to Bluegreen's indebtedness require Bluegreen to meet certain financial tests and may limit its ability to, among other things, pay dividends, borrow additional funds, dispose of assets or make investments. If Bluegreen fails to comply with the terms of its debt instruments, such debt may become due and payable immediately, which would have a material adverse impact on its cash position and financial condition. Significant resources may be required to monitor compliance with debt instruments (from a quantitative and qualitative perspective), and such monitoring efforts may not be effective in all cases. The Company may also incur substantial additional indebtedness in the future.

To the extent inflationary trends, tightened credit markets or other factors affect interest rates, the Company debt service costs may increase. If interest rates increased one percentage point, the effect on interest expense related to The Company's variable-rate debt would be an annual increase of $3.0 million, based on balances as of December 31, 2020.

44

*BVH or its subsidiaries may incur additional indebtedness.*

BVH and its subsidiaries including Bluegreen have in the past and may in the future incur significant amounts of debt, including at Bluegreen. Further, additional indebtedness could have important effects on the Company, including that debt service requirements will reduce cash available for operations, future investment and acquisition opportunities and payments of dividends, and that increased leverage could impact the Company's liquidity and increase its vulnerability to adverse economic or market conditions. Additionally, agreements relating to additional indebtedness could contain financial covenants and other restrictions limiting BVH's operations and its ability to pay dividends, borrow additional funds or acquire or dispose of assets, and expose BVH to the risks of being in default of such covenants.

**Risks Related to the Real Estate Industry and Real Estate Development**

***Bluegreen is subject to the risks of the real estate market and the risks associated with real estate development, including a decline in real estate values and a deterioration of other conditions relating to the real estate market and real estate development.***

Real estate markets are cyclical in nature and highly sensitive to changes in national and regional economic conditions, including:

- levels of unemployment;
- levels of discretionary disposable income;
- levels of consumer confidence;
- the availability of financing;
- overbuilding or decreases in demand;
- interest rates; and
- federal, state and local taxation methods.

A deterioration in general economic conditions or in the real estate market would have a material adverse effect on Bluegreen's business and in turn on the Company.

Bluegreen expects to seek to acquire more real estate inventory in the future. The availability of land for development of resort properties at favorable prices will be critical to Bluegreen's profitability and the ability to cover its significant selling, general and administrative expenses, cost of capital and other expenses. If Bluegreen is unable to acquire such land or resort properties at a favorable cost, Bluegreen's results of operations may be materially, adversely impacted. The profitability of Bluegreen's real estate development activities is also impacted by the cost of construction, including the costs of materials and labor and other services. Should the cost of construction materials and services rise, the ultimate cost of Bluegreen's future resorts inventory when developed could increase and have a material, adverse impact on its results of operations. Bluegreen is also exposed to other risks associated with development activities, including, without limitation:

- adverse conditions in the capital markets may limit its ability to raise capital for completion of projects or for development of future properties;
- construction delays, zoning and other local, state or federal governmental approvals, cost overruns, lender financial defaults, or natural disasters, such as earthquakes, hurricanes, floods, fires, volcanic eruptions and oil spills, increasing overall construction costs, affecting timing of project completion or resulting in project cancellations;
- any liability or alleged liability or resulting delays associated with latent defects in design or construction of projects Bluegreen developed or construct in the future adversely affecting its business, financial condition and reputation;
- failure by third-party contractors to perform for any reason, exposing Bluegreen to operational, reputational and financial harm; and
- the existence of any title defects in properties Bluegreen acquires.

45

In addition, the third-party developers from whom Bluegreen sources VOI inventory as part of its capital-light business strategy are exposed to such development-related risks and, therefore, the occurrence of such risks may adversely impact Bluegreen's ability to acquire VOI inventory from them when expected or at all.

***Environmental liabilities, including claims with respect to mold or hazardous or toxic substances, could have a material adverse impact on Bluegreen's, and in turn the Company's, financial condition and operating results.***

Under various federal, state and local laws, ordinances and regulations, as well as common law, Bluegreen  may be liable for the costs of removal or remediation of certain hazardous or toxic substances, including mold, located on, in or emanating from property that Bluegreen owns, lease or operate, as well as related costs of investigation and property damage at such property. These laws often impose liability without regard to whether Bluegreen knew of, or were responsible for, the presence of the hazardous or toxic substances. The presence of such substances, or the failure to properly remediate such substances, may adversely affect Bluegreen's ability to sell or lease its property or to borrow money using such property or receivables generated from the sale of such property as collateral. Noncompliance with environmental, health or safety requirements may require Bluegreen to cease or alter operations at one or more of its properties. Further, Bluegreen may be subject to common law claims by third parties based on damages and costs resulting from violations of environmental regulations or from contamination associated with one or more of its properties.

## Risks Related to Technology, Privacy and Intellectual Property Rights

***Failure to maintain the integrity of internal or customer data could result in faulty business decisions or operational inefficiencies, damage the Company's reputation and/or subject us to costs, fines or lawsuits.***

Bluegreen collects and retains large volumes of internal and customer data, including social security numbers, credit card numbers and other personally identifiable information of Bluegreen's customers in various internal information systems and information systems of its service providers. Bluegreen also maintains personally identifiable information about its employees. The integrity and protection of that customer, employee and company data is critical to Bluegreen. Bluegreen could make faulty decisions if that data is inaccurate or incomplete. Bluegreen's customers and employees also have a high expectation that Bluegreen and its service providers will adequately protect their personal information. The regulatory environment as well as the requirements imposed on Bluegreen by the payment card industry surrounding information, security and privacy is also increasingly demanding, in both the United States and other jurisdictions in which Bluegreen operates. Bluegreen's systems may be unable to satisfy changing regulatory and payment card industry requirements and employee and customer expectations, or may require significant additional investments or time in order to do so.

Bluegreen's information systems and records, including those Bluegreen maintains with its service providers, may be subject to security breaches, cyber attacks, system failures, viruses, operator error or inadvertent releases of data. A significant theft, loss, or fraudulent use of customer, employee or company data maintained by Bluegreen or by a service provider could adversely impact its reputation and could result in remedial and other expenses, fines or litigation. A breach in the security of Bluegreen's information systems or those of its service providers could lead to an interruption in the operation of its systems, resulting in operational inefficiencies and a loss of profits.

***The cost involved in updating technology may be significant, and the failure to keep pace with developments in technology could impair Bluegreen's operations or competitive position.***

The vacation ownership and hospitality industries require the utilization of technology and systems, including technology utilized for sales and marketing, mortgage servicing, property management, brand assurance and compliance, and reservation systems. This technology requires continuous updating and refinements, including technology required to remain competitive and to comply with the legal requirements such as privacy regulations and requirements established by third parties. Bluegreen is taking steps to update its information technology platform, which has required, and is likely to continue to require, significant capital expenditures. Older systems which have not yet been updated may increase the risk of operational inefficiencies, financial loss and non-compliance with applicable legal and regulatory requirements and Bluegreen may not be successful in updating such systems in the time frame or at the cost anticipated. Further, as a result of the rapidly changing technological environment, systems which Bluegreen has put in place or expect to put in place in the near term may become outdated requiring new

46

D - 0055-0046

technology and Bluegreen may not be able to replace those systems as quickly as its competition or within budgeted costs and time frames. Further, Bluegreen may not achieve the benefits that may have been anticipated from any new technology or system.

In addition, conversions to new information technology systems require effective change management processes and may result in cost overruns, delays or business interruptions. If Bluegreen's information technology systems are disrupted, become obsolete or do not adequately support its strategic, operational or compliance needs, Bluegreen's business, financial position, results of operations or cash flows may be adversely affected.

***Bluegreen's intellectual property rights, and the intellectual property rights of its business partners, are valuable, and the failure to protect those rights could have a significant adverse effect.***

Bluegreen's intellectual property rights, including existing and future trademarks, trade secrets and copyrights, are and will continue to be valuable and important assets of its business. Bluegreen believes that its proprietary technology, as well as Bluegreen's other technologies and business practices, are competitive advantages and that any duplication by competitors would harm its business. Measures taken to protect Bluegreen's intellectual property may not be sufficient or effective. Additionally, intellectual property laws and contractual restrictions may not prevent misappropriation of Bluegreen's intellectual property. Finally, even if Bluegreen is able to successfully protect its intellectual property, others may develop technologies that are similar or superior to its technology. Bluegreen also generates a significant portion of its new sales prospects and leads through arrangements with third parties, including Bass Pro. The failure by Bluegreen or these third parties to protect their intellectual property rights could have a significant adverse effect.

## General Risks

***The market price of BVH's Class A Common Stock and Class B Common Stock may be volatile or may decline regardless of BVH's results.***

The market price of BVH's Class A Common Stock and Class B Common Stock may be volatile due to a number of factors, many of which are beyond BVH's control, including those discussed in this "Risk Factors" section and under "Cautionary Note Regarding Forward-Looking Statements," as well as the following:

- the failure of securities analysts to cover BVH's Class A Common Stock or Class B Common Stock, or changes in financial estimates by analysts;
- the inability to meet the financial estimates of analysts who follow BVH's Class A Common Stock or Class B Common Stock;
- strategic actions by BVH, Bluegreen or Bluegreen's competitors;
- risks related to Bluegreen's business and industry, including announcements by Bluegreen or its competitors of significant issues or significant acquisitions, joint marketing relationships, joint ventures or other transactions;
- introduction of new products or services by Bluegreen or its competitors;
- variations in BVH's and Bluegreen's quarterly operating results and those of Bluegreen's competitors, including seasonal fluctuations;
- additions or departures of key personnel;
- general economic and stock market conditions;
- changes in conditions or trends in Bluegreen's industry, markets or customers;
- regulatory and legal proceedings, investigations and developments;
- political developments;
- changes in accounting principles;
- changes in tax legislation and regulations;
- terrorist acts;
- accumulation of publicly held shares and the timing and amount of future purchase or sales of BVH's Class A Common Stock, Class B Common Stock or other securities;
- defaults under agreements governing BVH's or Bluegreen's indebtedness; and

47

ⓘ   investor perceptions with respect to BVH's Class A Common Stock and Class B Common Stock relative to other investment alternatives.

***Adverse outcomes in legal or other regulatory proceedings, including claims of non-compliance with applicable regulations or development-related defects, could adversely affect the Company's financial condition and operating results.***

In the ordinary course of business, the Company is subject to litigation and other legal and regulatory proceedings, which result in significant expenses and devotion of time and the Company may agree to indemnify third parties or Bluegreen's strategic partners from damages or losses associated with such risks. In addition, litigation is inherently uncertain and adverse outcomes could adversely affect the Company's financial condition and operating results.

Bluegreen engages third-party contractors to construct its resorts. However, customers may assert claims against Bluegreen for construction defects or other perceived development defects, including, without limitation, structural integrity, the presence of mold as a result of leaks or other defects, water intrusion, asbestos, electrical issues, plumbing issues, road construction, water and sewer defects and defects in the engineering of amenities. In addition, certain state and local laws may impose liability on property developers with respect to development defects discovered in the future. Bluegreen could have to accrue a significant portion of the cost to repair such defects in the quarter when such defects arise or when the repair costs are reasonably estimable.

Costs associated with litigation, including claims for development-related defects, and the outcomes thereof could adversely affect the Company's liquidity, financial condition and operating results.

***The loss of the services of key management and personnel could adversely affect the business.***

The success of Bluegreen and in turn the Company will depend on its ability to attract and retain experienced and knowledgeable management and other professional staff, and it may not be successful in doing so. If its efforts to retain and attract key management and other personnel are unsuccessful, its business, prospects, and the Company's results of operations and financial condition may be materially and adversely impacted.

***There are inherent uncertainties involved in estimates, judgments and assumptions used in the preparation of financial statements in accordance with GAAP. Any changes in estimates, judgments and assumptions used could have a material adverse impact on the Company's operating results and financial condition.***

Consolidated financial statements prepared in accordance with GAAP involve making estimates, judgments and assumptions. These estimates, judgments and assumptions include, but are not limited to, those related to future cash flows, which in turn are based upon expectations of future performance given current and projected forecasts of the economy in general and the real estate markets. If any estimates, judgments or assumptions change in the future, including in the event that the Company's performance does not otherwise meet its expectations, the Company may be required to record impairment charges against its earnings, which could have a material adverse impact on the Company's operating results and financial condition. In addition, GAAP requirements as to how certain estimates are made may result, for example, in asset valuations which ultimately would not be realized if the Company were to attempt to sell the asset.

***If the Company fails to maintain proper and effective internal controls, the Company's ability to produce accurate and timely financial statements could be impaired, which could harm its operating results, the Company's ability to operate its business and its reputation.***

As a Securities and Exchange Commission ("SEC") reporting company, the Company is required to, among other things, maintain a system of effective internal control over financial reporting and to provide annual management reports on the effectiveness of the Company's internal control over financial reporting. Ensuring that the Company has adequate internal financial and accounting controls and procedures in place so that the Company can produce accurate financial statements on a timely basis is a costly and time-consuming effort that needs to be re-evaluated frequently. Substantial work and expenses may continue to be required to implement, document, assess, test and, as necessary, remediate the Company's system of internal controls.

48

If the Company's internal controls over financial reporting are not effective, if the Company is not able to issue its financial statements in a timely manner or if the Company is not able to obtain the required audit or review of its financial statements by the Company's independent registered public accounting firm in a timely manner, the Company will not be able to comply with the periodic reporting requirements of the SEC and the listing requirements of the NYSE. If these events occur, the listing of the Company's common stock on the NYSE could be suspended or terminated and the Company's stock price could materially suffer. In addition, the Company or members of its management could be subject to investigation and sanction by the SEC and other regulatory authorities and to shareholder lawsuits, which could impose significant additional costs on the Company and divert management attention.

**Item 1B.   Unresolved Staff Comments.**

None.

**Item 2.   Properties.**

BVH's principal executive office is currently located at 401 East Las Olas Boulevard, Suite 800, Fort Lauderdale, Florida, 33301, and is occupied under a lease with an expiration date of February 28, 2021. Starting March 1, 2021, it is anticipated that BVH's principal executive office location will be the same as Bluegreen's principal executive office location detailed below.

Bluegreen's principal executive office is located at 4960 Conference Way North, Suite 100, Boca Raton, Florida 33431, and consists of approximately 120,838 square feet of leased space.  At December 31, 2020, Bluegreen also maintained sales offices at or near 24 of its resorts as well as regional administrative offices in Orlando, Florida, Knoxville, Tennessee and Indianapolis, Indiana.  For information regarding resort properties that are a part of Bluegreen's Vacation Club, please see "Item 1. Business - Products - Vacation Club Resorts."

**Item 3.   Legal Proceedings.**

For a description of material pending legal proceedings, please see Note 12, Commitments and Contingencies, to the Company's audited consolidated financial statements included in Part II, Item 8 of this Annual Report on Form 10-K, which is incorporated by reference into this "Legal Proceedings" section.

**Item 4.   Mine Safety Disclosures.**

Not applicable.

49

**Item 5.   Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

BVH's Class A Common Stock and Class B Common Stock have substantially identical terms, except as follows:

⏺ Under Florida law and BVH's Articles of Incorporation and Bylaws, holders of BVH's Class A Common Stock and Class B Common Stock vote together as a single class on most matters presented for a shareholder vote. On such matters, holders of BVH's Class A Common Stock are entitled to one vote for each share held, with all holders of Class A Common Stock possessing in the aggregate 22% of the total voting power. Holders of Class B Common Stock have the remaining 78% of the total voting power. If the number of shares of Class B Common Stock outstanding decreases to 360,000 shares, the Class A Common Stock's aggregate voting power will increase to 40%, and the Class B Common Stock will have the remaining 60%. If the number of shares of Class B Common Stock outstanding decreases to 280,000 shares, the Class A Common Stock's aggregate voting power will increase to 53%, and the Class B Common Stock will have the remaining 47%. If the number of shares of Class B Common Stock outstanding decreases to 100,000 shares, the fixed voting percentages will be eliminated, and holders of BVH's Class A Common Stock and holders of BVH's Class B Common Stock will each be entitled to one vote per share.

⏺ Each share of Class B Common Stock is convertible at the option of the holder thereof into one share of Class A Common Stock.

In addition to any other approval required by Florida law, the voting structure described in the first bullet point above may not be amended without the approval of holders of a majority of the outstanding shares of BVH's Class B Common Stock, voting as a separate class. Holders of BVH's Class B Common Stock also have certain other special voting rights with respect to matters affecting BVH's capital structure and the Class B Common Stock.

## Market Information

BVH's Class A Common Stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BVH," and BVH's Class B Common Stock is quoted on the OTCQX Best Market under the ticker symbol "BVHBB."

On February 26, 2021, there were approximately 171 record holders of BVH's Class A Common Stock and approximately 69 record holders of BVH's Class B Common Stock.

**Issuer Purchases of Equity Securities**

On June 13, 2017, BVH's board of directors approved a share repurchase program which authorizes the repurchase of up to 1,000,000 shares of BVH's Class A Common Stock and Class B Common Stock at an aggregate cost of up to $35 million. The June 2017 repurchase program authorizes management, at its discretion, to repurchase shares from time to time subject to market conditions and other factors.

As of December 31, 2020, 950,097 shares of BVH's Class A Common Stock have been repurchased for approximately $25.4 million under the June 2017 share repurchase program, of which 64,319 shares were repurchased in 2017 for an aggregate purchase price of $2.4 million, 240,000 shares were repurchased in 2018 for an aggregate purchase price of $7.6 million, and 645,778 shares were repurchased in 2019 for an aggregate purchase price of $15.4 million.

In April 2018, BVH completed a cash tender offer pursuant to which it purchased and retired 1,297,297 shares of its Class A Common Stock at a purchase price of $46.25 per share for an aggregate purchase price of approximately $60.1 million, inclusive of acquisition costs.

**Equity Compensation Plan Information**

The following table lists awards previously granted and outstanding, and securities authorized for issuance, under BVH's equity compensation plans at December 31, 2020:

| Plan category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants or Rights | Weighted-Average Exercise Price of Outstanding Options, Warrants or Rights | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Outstanding Options, Warrants, or Rights) |
|---|---|---|---|
| Equity compensation plans approved by shareholders | — | — | 75,054 |
| Equity compensation plans not approved by share holders | — | — | — |
| Total | — | — | 75,054 |

Prior to the spin-off of BBX Capital, BVH's Compensation Committee approved the acceleration of vesting of all unvested restricted Class A and Class B Common Stock awards that were previously granted by BVH, all of which were held by BVH's executive officers. While equity based compensation decisions are determined by BVH's Compensation Committee, it is not currently anticipated that BVH will grant equity-based compensation in the future.

**Item 6. Selected Financial Data.**

Not applicable.

**Item 7.   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*You should read the following discussion and analysis together with the Company's audited consolidated financial statements and related notes included in Item 8 of this Annual Report on Form 10-K. The following discussion contains forward-looking statements, including those that reflect or implied by plans, estimates and beliefs. Actual results could differ materially from those discussed in or implied by the forward-looking statements. Factors that could cause or contribute to these differences include, without limitation, those discussed below and elsewhere in this Annual Report on Form 10-K, particularly in "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements."*

**Company Overview**

As a result of the spin-off of the Company's other businesses and investments on September 30, 2020 discussed below (which are now reported as discontinued operations), the Company is a "pure" holding company whose primary asset is its ownership of approximately 93% of the outstanding common stock of Bluegreen Vacations Corporation, a leading vacation ownership company that markets and sells vacation ownership interests ("VOIs") and manages resorts in popular leisure and urban destinations.

51

As of December 31, 2020, the Company had total consolidated assets of approximately $1.3 billion and shareholders' equity of approximately $187.9 million.

**Spin-Off**

On September 30, 2020, the Company completed the spin-off of its wholly-owned subsidiary, BBX Capital, Inc. ("BBX Capital"). The spin-off separated BVH's businesses, activities, and investments into two separate, publicly-traded companies: (i) the Company, which continues to hold BVH's investment in Bluegreen, and (ii) BBX Capital, which holds all of BVH's other previous businesses and investments, including BBX Capital Real Estate LLC ("BBX Capital Real Estate" or "BBXRE"), BBX Sweet Holdings, LLC ("BBX Sweet Holdings"), and Renin Holdings, LLC ("Renin"). BBX Capital and its subsidiaries are presented as discontinued operations in the Company's financial statements.  Subsequent to the spin-off, BVH's operating expenses, excluding the interest on the debt described below, are limited to executive compensation and public company costs, which in the aggregate are expected to be approximately $2.0 million annually.

The spin-off was effected through a distribution of shares of BBX Capital's common stock to the Company's shareholders on September 30, 2020. The BVH shareholders received one share of BBX Capital's Class A Common Stock for each share of BVH's Class A Common Stock and one share of BBX Capital's Class B Common Stock for each share of BVH's Class B Common Stock held on September 22, 2020, the record date. As a result, BVH ceased to have any ownership interest in BBX Capital following the Spin-Off.

In connection with the spin-off, BVH changed its name from BBX Capital Corporation to Bluegreen Vacations Holding Corporation, and BBX Capital was converted to a Florida corporation and changed its name from BBX Capital Florida LLC to BBX Capital, Inc. In addition, in connection with the spin-off BVH issued a $75.0 million note payable to BBX Capital that accrues interest at a rate of 6% per annum and requires payments of interest on a quarterly basis. Under the terms of the note, BVH has the option in its discretion to defer interest payments under the note, with interest on the entire outstanding balance thereafter to accrue at a cumulative, compounded rate of 8% per annum until such time as BVH is current on all accrued payments under the note, including deferred interest. All outstanding amounts under the note will become due and payable in five years or earlier upon certain other events.

**Reverse Stock Split**

In July 2020, the Company effected a one-for-five reverse split of its Class A Common Stock and Class B Common Stock. The share and per share amounts described herein have been retroactively adjusted to reflect the one-for-five reverse stock split as if it had occurred as of the earliest period presented.

52

**Summary of Consolidated Results of Operations**

*Consolidated Results*

The following summarizes key financial highlights for the year ended December 31, 2020 compared to the year ended 2019:

- Total consolidated revenues of $519.5 million, a 29.6% decrease compared to 2019.
- Loss before income taxes from continuing operations of $46.8 million compared to income of $8.2 million during 2019.
- Net loss attributable to common shareholders of $80.5 million compared to income of $17.7 million during 2019.
- Diluted loss per share from continuing operations of $2.82 compared to a diluted earnings per share of $0.75 in 2019.

The Company's consolidated results from continuing operations for the year ended December 31, 2020 compared to 2019 were significantly impacted by the following:

- A decrease in the Company's revenues primarily attributable to the impact of the COVID-19 pandemic on its operations.
- A net decrease in selling, general and administrative expenses primarily attributable to steps taken to mitigate costs implemented by Bluegreen in the 2020 period in response to the COVID-19 pandemic, including permanent and temporary reductions in workforce.
- An increase in Bluegreen's allowance for loan losses in 2020 based on the estimated impact of the COVID-19 pandemic.
- The recognition of a $39.1 million charge in 2019 associated with Bluegreen's settlement agreement with Bass Pro in June 2019.

The following summarizes key financial highlights for the year ended December 31, 2019 compared to the year ended 2018:

- Total consolidated revenues of $737.8 million, a 0.5% increase compared to 2018.
- Income before income taxes from continuing operations of $8.2 million compared to income of $73.8 million in 2018.
- Net loss attributable to common shareholders of $17.7 million, a 49.6% decrease compared to 2018.
- Diluted loss per share from continuing operations of $0.75 pr diluted share compared to a diluted earnings per share from continuing operations of $1.39 in 2018.

The Company's consolidated results from continuing operations for the year ended December 31, 2019 compared to the same 2018 period were significantly impacted by the following:

- The recognition of a $39.1 million charge in the 2019 period associated with Bluegreen's settlement agreement with Bass Pro in June 2019.
- An increase in Bluegreen's net carrying cost of VOI inventory primarily due to Bluegreen's acquisition of the Éilan Hotel and Spa during April 2018 and higher net costs associated with Bluegreen's owning a larger amount of inventory and increasing the allocation of available inventory to marketing guests.
- A net decrease in Bluegreen's system-wide sales of VOIs and an increase in the provision for loan losses.

**Segment Results**

As a result of the previously described spin-off of its non-Bluegreen assets and businesses on September 30, 2020, BVH currently reports the results of its business activities through the following reportable segments: Sales of VOIs and financing and Resort Operations and Club Management.

53

Information regarding income before income taxes by reportable segment is set forth in the table below:

| | For the Years Ended December 31, | | |
|---|---|---|---|
| *(in thousands)* | **2020** | **2019** | **2018** |
| Sales of VOIs and financing | $ **35,670** | $ 96,868 | $ 164,237 |
| Resort operations and club management | **63,240** | 52,459 | 51,800 |
| Corporate and other | **(80,081)** | (91,063) | (87,144) |
| BVH corporate | **(65,603)** | (50,085) | (55,107) |
| (Loss) income before income taxes from continuing operations | **(46,774)** | 8,179 | 73,786 |
| Benefit (provision) for income taxes | **2,368** | (7,525) | (26,393) |
| Net (loss) income from continuing operations | **(44,406)** | 654 | 47,393 |
| Discontinued operations | **(32,759)** | 31,449 | 8,400 |
| Net (loss) income | **(77,165)** | 32,103 | 55,793 |
| Less: Net income (loss) attributable to noncontrolling interest - continued operations | **8,186** | 14,636 | 20,956 |
| Less: Net income (loss) attributable to noncontrolling interest - discontinued operations | **(4,822)** | (224) | (265) |
| Net (loss) income attributable to shareholders | **(80,529)** | 17,691 | 35,102 |

**Executive Overview**

The Company is a Florida holding Company which owns approximately 93% of Bluegreen. Substantially all of its operating and activities related to the operations and activities of Bluegreen. Bluegreen is a leading vacation ownership company that markets and sells VOIs and manages resorts in popular leisure and urban destinations. Bluegreen's resort network includes 45 Club Resorts (resorts in which owners in its Vacation Club have the right to use most of the units in connection with their VOI ownership) and 23 Club Associate Resorts (resorts in which owners in its Vacation Club have the right to use a limited number of units in connection with their VOI ownership). These Club Resorts and Club Associate Resorts are primarily located in high-volume, "drive-to" vacation locations, including Orlando, Las Vegas, Myrtle Beach, Charleston and New Orleans, among others. Through Bluegreen's points-based system, the approximately 218,000 owners in Bluegreen's Vacation Club have the flexibility to stay at units available at any of Bluegreen's resorts and have access to over 11,300 other hotels and resorts through partnerships and exchange networks. Bluegreen's sales and marketing platform is supported by marketing relationships with nationally-recognized consumer brands, such as Bass Pro and Choice Hotels. These marketing relationships drive sales within the Company's core demographic.

*Impact of the COVID-19 Pandemic*

*Initial Impact and Response*

The COVID-19 pandemic has resulted in an unprecedented disruption in the U.S. economy and the travel, hospitality and vacation ownership industries due to, among other things, resort closures, travel restrictions and restrictions on business operations, including government guidance and restrictions with respect to travel, public accommodations, social gatherings and related matters. The Company's operations have been and continue to be adversely impacted by the pandemic. On March 23, 2020, Bluegreen temporarily closed all of its VOI sales centers, its retail marketing operations at Bass Pro Shops and Cabela's stores and its Choice Hotels call transfer program. In connection with these actions Bluegreen canceled existing owner reservations through May 15, 2020 and new prospect guest tours through June 30, 2020. Further, some of Bluegreen's Club Resorts and Club Associate Resorts were closed in accordance with government mandates and advisories. Beginning in mid-May 2020, Bluegreen recommenced its sales and marketing operations and its closed resorts began to welcome guests as government mandates were lifted. By December 31, 2020, Bluegreen was operating marketing kiosks in a total of 98 Bass Pro and Cabela's stores, Bluegreen had reactivated its Choice Hotels call transfer program, all of its resorts were open, and all but two of its VOI sales centers were open. However, there is no assurance that Bluegreen's marketing operations at Bass Pro or Cabela's stores, or its VOI sales centers will remain open, including in the event of an increase in COVID-19 cases. Additionally, reflecting the temporary cessation of marketing activities in the beginning months of COVID-19

54

pandemic in general, Bluegreen's pipeline of vacation packages was 121,300 at December 31, 2020 compared to 169,300 at December 31, 2019.  However, utilization of the packages has been significantly lower as purchasers have not traveled at the same pace as they traveled pre-pandemic. For more detailed information please see "Results of Operations" included in Part II – Item 7: Management's Discussion and Analysis of Financial Condition and Results of Operations.

As a result of the effect of the pandemic, Bluegreen implemented steps to mitigate its costs beginning in March 2020, including reductions of over 1,700 positions and the placement of another approximate 3,200 of Bluegreen's associates on temporary furlough or reduced work hours.  As of December 31, 2020, approximately 3,200 associates had returned to work on a full-time basis for a total of approximately 4,600 full-time associates compared to approximately 5,900 full-time associates as of December 31, 2019.  As a result of the effect of the COVID-19 pandemic, during the year ended December 31, 2020, Bluegreen incurred $5.0 million in severance and $14.3 million of payroll and payroll benefit expense relating to employees on temporary furlough or reduced work hours. These payments and expenses are included in selling, general and administrative expenses in the Company's consolidated statements of operations and comprehensive income for the year ended December 31, 2020. While Bluegreen paid a special cash dividend of $1.19 per share during August 2020, it suspended the payment of regular quarterly cash dividends during the second quarter of 2020 and there is no assurance that Bluegreen will recommence paying regular dividends or pay additional special dividends in the future.

As a precautionary measure to provide additional liquidity if needed, in March 2020, Bluegreen drew down $60.0 million under its lines-of-credit and pledged or sold receivables under certain of its receivable backed facilities to increase its cash position. As of December 31, 2020, Bluegreen repaid the $60.0 million borrowed under Bluegreen's lines-of-credit. Also, in June 2020, Bluegreen amended its Liberty Bank Facility to extend the advance period and maturity date, reduced the outstanding borrowings from $50.0 million to $40.0 million, decreased the advance rate from 85% for qualified conforming receivables to 80% effective September 2020 and, commencing July 1, 2020, changed the interest rate from the Prime Rate with a floor of 4.00% to the Prime Rate minus 0.10% with a floor of 3.40%. In September 2020, Bluegreen amended its NBA Receivables Facility to extend the advance period and maturity date, decreased the advance rate from 85% for qualified receivables to 80%, and changed the interest rate from one month LIBOR plus 2.75% (with an interest rate floor of 3.50%) to one month LIBOR plus 2.25% (with an interest rate floor of 3.00%).  In October 2020, Bluegreen completed the 2020-A Term Securitization, a private offering and sale of approximately $131.0 million of investment-grade, VOI receivable backed notes (the "Notes") at an overall blended interest rate of approximately 2.60%.  The gross advance rate for this transaction was 88.0% and the Notes mature in February 2036.  Proceeds from the 2020-A Term Securitization were used to paydown approximately $82.1 million owed on existing receivable-backed facilities, (thus creating additional availability on those facilities), to capitalize a reserve fund, to pay fees and expenses associated with the transaction, and for general corporate purposes.  In December 2020, Bluegreen amended its Quorum Purchase Facility to extend the advance period from December 2020 to December 2022 and extend the maturity date from December 2032 to December 2034.  Bluegreen continues to actively pursue additional credit facility capacity and capital market transactions. For more detailed information please see "Liquidity and Capital Resources" included in Part II – Item 7: Management's Discussion and Analysis of Financial Condition and Results of Operations.

Bluegreen has historically provided financing to customers for a majority of its sales of VOIs, and accordingly, our results are subject to the risk of defaults by its customers. GAAP requires sales of VOIs are reduced by Bluegreen's estimate of uncollectible VOI notes receivable.  The COVID-19 pandemic has had a material adverse impact on unemployment in the United States and economic conditions in general and the impact may continue for some time.  Bluegreen believes that the COVID-19 pandemic will continue to have an impact on the collectability of Bluegreen's VOI notes receivable.  Accordingly, the estimate of defaults for the 2021 year was increased by approximately $6.0 million, based on historical experience, forbearance requests received from customers, and other factors, including but not limited to, the seasoning of the notes receivable and FICO scores of the customers. The impact of the COVID-19 pandemic on Bluegreen's default or delinquency rates as it is rapidly changing and highly uncertain.

The Coronavirus Aid, Relief, and Economic Securities Act ("CARES Act") was signed into law on March 27, 2020 in response to the COVID-19 pandemic.  As of December 31, 2020, the Company evaluated the income tax provisions of the CARES Act and determined they had no significant effect on the computation of the Company's estimated effective tax rate for the year ended December 31, 2020.  However, the Company has taken advantage of the deferral of the employer portion of the tax withholding amounts and the employee retention tax credits provided for in the

55

CARES Act. During the year ended December 31, 2020, Bluegreen recorded a tax withholding deferral of $8.0 million and employee retention tax credits of $9.7 million, which is included in selling, general and administrative expenses in its consolidated statements of operations and comprehensive income for the year ended December 31, 2020.

*Continued Impact of COVID-19 on our Business*

Bluegreen continues to experience lower travel rates especially to high traffic destinations such as Orlando and Las Vegas.  The occupancy rates at resorts with sales centers during the fourth quarter of 2020 was approximately 71% as compared to 80% during the fourth quarter of 2019.  This trend of reduced travel was also reflected in utilization of vacation packages especially for those vacation packages sold prior to the COVID-19 pandemic.

*VOI Sales and Financing*

Bluegreen's primary business is the marketing and selling of deeded VOIs, developed either by Bluegreen or third parties. Customers who purchase these VOIs receive an annual allotment of points, which can be redeemed for stays at one of Bluegreen's resorts or at 11,300 other hotels and resorts available through partnerships and exchange networks. Historically, VOI companies have funded the majority of the capital investment in connection with resort development with internal resources and acquisition and development financing. In 2009, Bluegreen began selling VOIs on behalf of third-party developers and successfully diversified from a business model focused on capital-intensive resort development to a flexible model with a balanced mix of developed and capital-light inventory as determined by management to be appropriate from time to time based on market and economic conditions, available cash, and other factors. Bluegreen's relationships with third-party developers enable it to generate fees from the sales and marketing of their VOIs without incurring the significant upfront capital investment generally associated with resort acquisition or development. While sales of acquired or developed inventory typically result in a greater contribution to EBITDA and Adjusted EBITDA, fee-based sales typically do not require an initial investment or involve development financing risk. Both acquired or developed VOI sales and fee-based VOI sales drive recurring, incremental and long-term fee streams by adding owners to Bluegreen's Vacation Club and new resort management contracts. Fee-based sales of VOIs comprised 37% and 50% of system-wide sales of VOIs during the year ended December 31, 2020 and 2019, respectively. While Bluegreen intends to remain flexible with respect to its sales of the different categories of its VOI inventory in the future based on economic conditions, business initiatives and other considerations, Bluegreen currently expects that its percentage of fee-based sales will continue to decrease over time.  In conjunction with Bluegreen VOI sales, Bluegreen also generates interest income by providing financing to qualified purchasers. Collateralized by the underlying VOIs, Bluegreen's loans are generally structured as 10-year, fully-amortizing loans with a fixed interest rate ranging from approximately 12% to approximately 18% per annum. As of December 31, 2020, the weighted-average interest rate on Bluegreen's VOI notes receivable was 15%. In addition, Bluegreen earns fees for various other services, including title and escrow services in connection with the closing of VOI sales, and mortgage servicing.

*Resort Operations and Club Management*

Bluegreen enters into management agreements with the homeowner associations ("HOAs") that maintain most of the resorts and earns fees for providing management services to those HOAs and Bluegreen's approximately 218,000 Vacation Club owners. These resort management services include oversight of housekeeping services, maintenance, and certain accounting and administration functions. Bluegreen's management contracts yield highly predictable, recurring cash flows and do not have the traditional risks associated with hotel management contracts that are linked to daily rate or occupancy. Bluegreen's management contracts are typically structured as "cost-plus," with an initial term of three years and automatic one year renewals. In connection with the management services provided to the Vacation Club, Bluegreen manages the reservation system and provides owner, billing and collection services. In addition to resort and club management services, Bluegreen earns fees for various other services that produce recurring, predictable and long term-revenue, including construction management services to third-party developers. As described above, while some of Bluegreen's Club Resorts and Club Associate Resorts were closed during March 2020 in response to the COVID-19 pandemic, all were subsequently reopened as of December 31, 2020 and currently remain open.

56

**Principal Components Affecting the Our Results of Operations**

*Principal Components of Revenue*

*Fee-Based Sales.*  Represent sales of third-party VOIs where Bluegreen is paid a commission.

*JIT Sales.*  Represent sales of VOIs acquired from third parties in close proximity to when Bluegreen intends to sell such VOIs.

*Secondary Market Sales.*  Represent sales of VOIs acquired from HOAs or other owners, typically in connection with maintenance fee defaults. This inventory is generally purchased at a greater discount to retail price compared to developed VOI sales and VOIs purchased by Bluegreen for sale as part of its JIT sales activities.

*Developed VOI Sales.*  Represent sales of VOIs in resorts that Bluegreen has developed or acquired (not including inventory acquired through JIT and secondary market arrangements).

*Financing Revenue.*  Represents revenue from the financing of VOI sales, which includes interest income and loan servicing fees. Bluegreen also earns fees from providing mortgage servicing to certain third-party developers relating to VOIs sold by them.

*Resort Operations and Club Management Revenue.*  Represents recurring fees from managing the Vacation Club and transaction fees for Traveler Plus and other member services. Bluegreen also earns recurring management fees under its management agreements with HOAs for day-to-day management services, including oversight of housekeeping services, maintenance, and certain accounting and administrative functions.

*Other Fee-Based Services.*  Represents revenue earned from various other services that produce recurring, predictable and long-term revenue, such as title services.

*Principal Components of Expenses*

*Cost of VOIs Sold.*  Represents the cost at which Bluegreen's owned VOIs sold during the period were relieved from inventory. In addition to inventory from Bluegreen's VOI business, Bluegreen's owned VOIs also include those that were acquired by Bluegreen under JIT and secondary market arrangements. Compared to the cost of Bluegreen's developed VOI inventory, VOIs acquired in connection with JIT arrangements typically have a relatively higher associated cost of sales as a percentage of sales while those acquired in connection with secondary market arrangements typically have a lower cost of sales as a percentage of sales as secondary market inventory is generally obtained from HOAs at a significant discount to retail price. Cost of VOIs sold as a percentage of sales of VOIs varies between periods based on the relative costs of the specific VOIs sold in each period and the size of the point packages of the VOIs sold (primarily due to offered volume discounts, and taking into account consideration of cumulative sales to existing owners). Additionally, the effect of changes in estimates under the relative sales value method, including estimates of projected sales, future defaults, upgrades and incremental revenue from the resale of repossessed VOI inventory, are reflected on a retrospective basis in the period the change occurs. Cost of sales is typically favorably impacted in periods where a significant amount of secondary market VOI inventory is acquired and actual defaults and equity trades are higher and the resulting change in estimate is recognized. While Bluegreen believes that there is additional inventory that can be obtained through the secondary market at favorable prices to Bluegreen in the future, there is no assurance that such inventory will be available.

*Net Carrying Cost of VOI Inventory.*  Represents the maintenance fees and developer subsidies for unsold VOI inventory paid or accrued to the HOAs that maintain the resorts. Bluegreen attempts to offset this expense, to the extent possible, by generating revenue from renting its VOIs and through utilizing them in Bluegreen's sampler programs. Bluegreen nets such revenue from this expense item.

*Selling and Marketing Expense.*  Represents costs incurred to sell and market VOIs, including costs relating to marketing and incentive programs, tours, and related wages and sales commissions. Revenue from vacation package sales are netted against selling and marketing expenses.

57

*Financing Expense.*  Represents financing interest expense related to Bluegreen's receivable-backed debt, amortization of the related debt issuance costs and other expenses incurred in providing financing and servicing loans, including administrative costs associated with mortgage servicing activities for Bluegreen's loans and the loans of certain third-party developers.  Mortgage servicing activities include, among other things, payment processing, reporting and collection services.

*Resort Operations and Club Management Expense.*  Represents costs incurred to manage resorts and the Vacation Club, including payroll and related costs and other administrative costs to the extent not reimbursed by the Vacation Club or HOAs.

*General and Administrative Expense.*  Primarily represents compensation expense for personnel supporting Bluegreen's business and operations, professional fees (including consulting, audit and legal fees), and administrative and related expenses.

**Key Business and Financial Metrics Used by Management**

*Operating Metrics*

*Sales of VOIs.*  Represent sales of Bluegreen's owned VOIs, including developed VOIs and those acquired through JIT and secondary market arrangements, reduced by equity trade allowances and an estimate of uncollectible VOI notes receivable. In addition to the factors impacting system-wide sales of VOIs (as described below), sales of VOIs are impacted by the proportion of system-wide sales of VOIs sold on behalf of third-parties on a commission basis, which are not included in sales of VOIs.

*System-wide Sales of VOIs.*  Represents all sales of VOIs, whether owned by Bluegreen or a third party immediately prior to the sale. Sales of VOIs owned by third parties are transacted as sales of VOIs in Bluegreen's Vacation Club through the same selling and marketing process Bluegreen uses to sell Bluegreen's VOI inventory. Bluegreen considers system-wide sales of VOIs to be an important operating measure because it reflects all sales of VOIs by Bluegreen's sales and marketing operations without regard to whether Bluegreen or a third party owned such VOI inventory at the time of sale. System-wide sales of VOIs is not a recognized term under GAAP and should not be considered as an alternative to sales of VOIs or any other measure of financial performance derived in accordance with GAAP or to any other method of analyzing Bluegreen's results as reported under GAAP.

*Guest Tours.*  Represents the number of sales presentations given at Bluegreen's sales centers during the period.

*Sale to Tour Conversion Ratio.*  Represents the rate at which guest tours are converted to sales of VOIs and is calculated by dividing guest tours by number of VOI sales transactions.

*Average Sales Volume Per Guest ("VPG").*  Represents the sales attributable to tours at Bluegreen's sales locations and is calculated by dividing VOI sales by guest tours. Bluegreen considers VPG to be an important operating measure because it measures the effectiveness of Bluegreen's sales process, combining the average transaction price with the sale-to-tour conversion ratio.

For further information see Item 8. Financial Statements and Supplementary Data – Note 2: *Basis of Presentation and Recently Issued Accounting Pronouncements*

*EBITDA and Adjusted EBITDA*

*EBITDA, Adjusted EBITDA, and Adjusted EBITDA Attributable to Shareholders.*  Bluegreen's EBITDA is defined as earnings, or net income, before taking into account interest income (excluding interest earned on VOI notes receivable), interest expense (excluding interest expense incurred on debt secured by Bluegreen's VOI notes receivable), income and franchise taxes and depreciation and amortization.  Bluegreen Adjusted EBITDA is defined as its EBITDA, adjusted to exclude amounts of loss (gain) on assets held for sale, and other items that Bluegreen believes are not representative of ongoing operating results.  Accordingly, Bluegreen excludes certain items such as severance charges net of employee retention tax credits, incremental costs associated with the COVID-19 pandemic, and amounts accrued or incurred in connection with the Bass Pro settlement in June 2019. Bluegreen Adjusted

58

EBITDA Attributable to Shareholders is defined as its Adjusted EBITDA excluding amounts attributable to the non-controlling interest in Bluegreen Big Cedar Vacations (in which Bluegreen owns a 51% interest). For purposes of Bluegreen's calculation of EBITDA, Adjusted EBITDA and Adjusted EBITDA Attributable to Shareholders for each period presented, no adjustments were made for interest income earned on Bluegreen's VOI notes receivable or the interest expense incurred on debt that is secured by such notes receivable because they are both considered to be part of the ordinary operations of Bluegreen's business.

The Company considers Bluegreen's EBITDA, Adjusted EBITDA, and Adjusted EBITDA Attributable to Shareholders and Segment Adjusted EBITDA to be indicators of operating performance, and they are used by the Company to measure its ability to service debt, fund capital expenditures and expand its business. EBITDA and Adjusted EBITDA are also used by companies, lenders, investors and others because they exclude certain items that can vary widely across different industries or among companies within the same industry. For example, interest expense can be dependent on a company's capital structure, debt levels and credit ratings. Accordingly, the impact of Bluegreen's interest expense on earnings can vary significantly among companies. The tax positions of companies can also vary because of their differing abilities to take advantage of tax benefits and because of the tax policies of the jurisdictions in which they operate. As a result, effective tax rates and provision for income taxes can vary considerably among companies. EBITDA, Adjusted EBITDA, and Adjusted EBITDA Attributable to Shareholders also exclude depreciation and amortization because companies utilize productive assets of different ages and use different methods of both acquiring and depreciating productive assets. These differences can result in considerable variability in the relative costs of productive assets and the depreciation and amortization expense among companies.

EBITDA, Adjusted EBITDA and Adjusted EBITDA Attributable to Shareholders are not recognized terms under GAAP and should not be considered as an alternative to net income (loss) or any other measure of financial performance or liquidity, including cash flow, derived in accordance with GAAP, or to any other method or analyzing results as reported under GAAP. The limitations of using Bluegreen's EBITDA , Adjusted EBITDA or Adjusted EBITDA Attributable to Shareholders as an analytical tool include, without limitation, that they do not reflect (i) changes in, or cash requirements for, working capital needs; (ii) Bluegreen's interest expense, or the cash requirements necessary to service interest or principal payments on its indebtedness (other than as noted above); (iii) Bluegreen's tax expense or the cash requirements to pay taxes; (iv) historical cash expenditures or future requirements for capital expenditures or contractual commitments; or (v) the effect on earnings or changes resulting from matters that does not believe to be indicative of Bluegreen's future operations or performance. Further, although depreciation and amortization are non-cash charges, the assets being depreciated and amortized will often have to be replaced in the future, and Bluegreen's EBITDA, Adjusted EBITDA, and Adjusted EBITDA Attributable to Shareholders do not reflect any cash that may be required for such replacements. In addition, the definition of Bluegreen's Adjusted EBITDA, or Adjusted EBITDA Attributable to Shareholders may not be comparable to definitions of Adjusted EBITDA, Adjusted EBITDA Attributable to Shareholders or other similarly titled measures used by other companies.

**Reportable Segments Results of Operations**

***Adjusted EBITDA Attributable to Shareholders for the years ended December 31, 2020, 2019 and 2018***

The Company considers Segment Adjusted EBITDA in connection with its evaluation of Bluegreen's business segments as described in Note 17: Segment Reporting to the Company's consolidated financial statements included in Item 8 of this Annual Report on Form 10-K. See above for a discussion of definition of Bluegreen's Adjusted EBITDA Attributable to Shareholders, how management uses it to manage Bluegreen's business, and material limitations on its usefulness. The following tables set forth the Bluegreen's Segment Adjusted EBITDA, Adjusted EBITDA, Adjusted EBITDA Attributable to Shareholders, EBITDA and a reconciliation of Bluegreen's EBITDA, Adjusted EBITDA, and Adjusted EBITDA Attributable to Shareholders to Bluegreen's net income, the most comparable GAAP financial measure:

59

| (in thousands) | | 2020 | | 2019 | | 2018 |
|---|---|---|---|---|---|---|
| Adjusted EBITDA - sales of VOIs and financing | $ | 46,909 | $ | 143,581 | $ | 170,668 |
| Adjusted EBITDA - resort operations and club management | | 65,435 | | 59,878 | | 53,561 |
| Total Segment Adjusted EBITDA | | 112,344 | | 203,459 | | 224,229 |
| Less: Corporate and other | | (55,331) | | (70,000) | | (69,941) |
| Less: Adjusted EBITDA attributable to non-controlling interest in Bluegreen/Big Cedar Vacations | | (7,596) | | (11,670) | | (12,468) |
| Total Bluegreen Adjusted EBITDA attributable to shareholders | $ | 49,417 | $ | 121,789 | $ | 141,820 |

| | | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| (in thousands) | | 2020 | | 2019 | | 2018 |
| Bluegreen Net income attributable to its shareholders | $ | 8,225 | $ | 34,851 | $ | 87,962 |
| Net income attributable to the non-controlling interest in Bluegreen/Big Cedar Vacations | | 7,392 | | 11,273 | | 12,390 |
| Bluegreen Net Income | | 15,617 | | 46,124 | | 100,352 |
| Add: Depreciation and amortization | | 15,563 | | 14,114 | | 12,392 |
| Less: Interest income (other than interest earned on VOI notes receivable) | | (3,484) | | (7,191) | | (6,044) |
| Add: Interest expense - corporate and other | | 15,030 | | 19,035 | | 15,195 |
| Add: Franchise taxes | | 169 | | 193 | | 199 |
| Add:  Provision for income taxes | | 3,212 | | 12,140 | | 28,541 |
| EBITDA | | 46,107 | | 84,415 | | 150,635 |
| Loss on assets held for sale | | 1,247 | | 3,656 | | 3 |
| Add: Severance and other [1] | | 9,659 | | 6,267 | | 3,650 |
| Add: Bass Pro settlement | | — | | 39,121 | | — |
| Adjusted EBITDA | | 57,013 | | 133,459 | | 154,288 |
| Adjusted EBITDA attributable to the non-controlling interest in Bluegreen/Big Cedar Vacations | | (7,596) | | (11,670) | | (12,468) |
| Bluegreen Adjusted EBITDA attributable to shareholders | $ | 49,417 | $ | 121,789 | $ | 141,820 |

(1)   Severance and other for the year ended December 31, 2020 consisted of severance, net of employee retention credits, of $5.5 million, a special bonus paid to all non-executive employees of $3.3 million and COVID-19 incremental costs of $0.9 million. Amounts for the years ended December 31, 2019 and December 31, 2018 consisted of severance costs.

The following tables reconcile system-wide sales of VOIs to gross sales of VOIs, the most comparable GAAP financial measure.

| | | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| (in thousands) | | 2020 | | 2019 | | 2018 |
| Gross sales of VOIs | $ | 230,938 | $ | 311,076 | $ | 305,530 |
| Add: Fee-based sales | | 136,060 | | 308,032 | | 318,540 |
| System-wide sales of VOIs | $ | 366,998 | $ | 619,108 | $ | 624,070 |

60

D - 0055-0060

*For the year ended December 31, 2020 compared to the year ended December 31, 2019*

Sales of VOIs and Financing

| (dollars in thousands) | For the Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2020 | | | 2019 | |
| | Amount | % of System-wide sales of VOIs[5] | | Amount | % of System-wide sales of VOIs[5] |
| Developed VOI sales [1] | $ 177,508 | 48% | $ | 355,353 | 57% |
| Secondary Market sales | 117,023 | 32 | | 234,883 | 38 |
| Fee-Based sales | 136,060 | 37 | | 308,032 | 50 |
| JIT sales | 25,911 | 7 | | 11,641 | 2 |
| Less: Equity trade allowances [6] | (89,504) | (24) | | (290,801) | (47) |
| System-wide sales of VOIs | 366,998 | 100% | | 619,108 | 100% |
| Less: Fee-Based sales | (136,060) | (37) | | (308,032) | (50) |
| Gross sales of VOIs | 230,938 | 63 | | 311,076 | 50 |
| Provision for loan losses [2] | (56,941) | (25) | | (55,701) | (18) |
| Sales of VOIs | 173,997 | 47 | | 255,375 | 41 |
| Cost of VOIs sold [3] | (13,597) | (8) | | (21,845) | (9) |
| Gross profit [3] | 160,400 | 92 | | 233,530 | 91 |
| Fee-Based sales commission revenue [4] | 89,965 | 66 | | 207,832 | 67 |
| Financing revenue, net of financing expense | 61,883 | 17 | | 60,454 | 10 |
| Other (expense) income, net | (942) | — | | 3,068 | — |
| Other fee-based services, title operations and other, net | 3,745 | 1 | | 7,274 | 1 |
| Net carrying cost of VOI inventory | (34,626) | (9) | | (23,816) | (4) |
| Selling and marketing expenses | (217,408) | (59) | | (321,216) | (52) |
| General and administrative expenses - sales and marketing | (27,347) | (7) | | (70,258) | (11) |
| Operating profit - sales of VOIs and financing | 35,670 | 10% | | 96,868 | 16% |
| Add: Depreciation and amortization | 5,852 | | | 6,118 | |
| Add: Severance and other | 4,445 | | | 1,416 | |
| Add: Bass Pro Settlement | — | | | 39,121 | |
| Add: Loss on assets held for sale | 942 | | | 58 | |
| Adjusted EBITDA - sales of VOIs and financing | $ 46,909 | | $ | 143,581 | |

(1) Developed VOI sales represent sales of VOIs acquired or developed by Bluegreen. Developed VOI sales do not include Secondary Market sales, Fee-Based sales or JIT sales.
(2) Percentages for provision for loan losses are calculated as a percentage of gross sales of VOIs, which excludes Fee-Based sales (and not of system-wide sales of VOIs).
(3) Percentages for costs of VOIs sold and gross profit are calculated as a percentage of sales of VOIs (and not based on system-wide sales of VOIs).
(4) Percentages for Fee-Based sales commission revenue are calculated as a percentage of Fee-Based sales (and not based on system-wide sales of VOIs).
(5) Represents the applicable line item, calculated as a percentage of system-wide sales of VOIs, unless otherwise indicated in the above footnotes.
(6) Equity trade allowances are amounts granted to customers upon trading in their existing VOIs in connection with the purchase of additional VOIs. Subject to certain exceptions, equity trade allowances were generally eliminated in June 2020.

*Sales of VOIs.* Sales of VOIs were $174.0 million and $255.4 million during the years ended December 31, 2020 and 2019, respectively. Sales of VOIs were impacted by the factors described in the discussion of system-wide sales of VOIs below, primarily the adverse impact of the COVID-19 pandemic. Gross sales of VOIs were reduced by $56.9 million and $55.7 million during the years ended December 31, 2020 and 2019, respectively, for the provision

61

for loan losses. The provision for loan losses varies based on the amount of financed, non-fee based sales during the period and changes in Bluegreen's estimates of future notes receivable performance for existing loans. Bluegreen's provision for loan losses as a percentage of gross sales of VOIs was 25% and 18% during the years ended December 31, 2020 and 2019, respectively.  The percentage of Bluegreen's sales which were realized in cash within 30 days from sale was 42% during the years ended December 31, 2020 and 2019.

The increase in the provision for loan losses during the year ended December 31, 2020 as compared to 2019 was primarily due to an increase in defaults experienced during the 2020 year and the increased defaults expected to result based on the COVID-19 pandemic.  Bluegreen believes that the COVID-19 pandemic will continue to have an impact on Bluegreen's VOI notes receivable.  Accordingly, Bluegreen increased its estimate of defaults for the 2021 year  by approximately $6.0 million, based on Bluegreen's historical experience, forbearance requests received from its customers, and other factors, including, but not limited to, the seasoning of the notes receivable and FICO scores of the customers. The impact of the COVID-19 pandemic on default and delinquency rates is rapidly changing and highly uncertain.  In March 2020, Bluegreen began receiving requests from borrowers requesting modifications of their VOI notes receivable due to financial hardship resulting from the economic impact of the COVID-19 pandemic. Hardship requests declined in June 2020 and the program was discontinued on June 30, 2020.  Prior to discontinuing the program approximately 4.1% of Bluegreen's portfolio was granted up to a three-month deferral or extension of payments, approximately 86% of which as of December 31, 2020 had subsequently resumed payments under the newly modified terms.  In addition to the COVID-19 pandemic, the provision for loan losses continues to be impacted by defaults which Bluegreen believes are attributable to the receipt of letters from third parties and attorneys who purport to represent certain VOI owners and who have encouraged such owners to become delinquent and ultimately default on their obligations.  Defaults associated with such letters during the year ended December 31, 2020 remained consistent compared with 2019. See Note 12: Commitments and Contingencies to the Company's consolidated financial statements included in Item 8 of this report for additional information regarding such letters and actions Bluegreen has taken in connection with such letters. The impact of the COVID-19 pandemic and the continued impact of actions taken by timeshare exit firms are highly uncertain and there is no assurance that Bluegreen's steps taken to mitigate the impact of the pandemic or actions taken by timeshare exit firms will be successful. As a result, actual defaults may differ from Bluegreen's estimates and the allowance for loan losses may not prove to be adequate.

In addition to the factors described below impacting system-wide sales of VOIs, sales of VOIs are also impacted by the number of system-wide sales of VOIs sold on behalf of third parties on a commission basis, which are not included in sales of VOIs.

The average annual default rates and delinquency rates (more than 30 days past due) on Bluegreen's VOI notes receivable were as follows:

| | Year Ended December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| Average annual default rates [1] | **9.79%** | 8.73% |

| | As of December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| Delinquency rates [1] | **3.26%** | 3.62% |

(1)   The Average Default Rates in the table above includes VOIs which have been defaulted but had not yet charged off due to the provisions of certain of our receivable-backed notes payable transactions, as well as certain third-party and attorney represented cease and desist loans over 127 days delinquent.  Accordingly, these have been removed from the Delinquency Rates above.

*System-wide sales of VOIs.*  System-wide sales of VOIs were $367.0 million and $619.1 million during the years ended December 31, 2020 and 2019, respectively. System-wide sales of VOIs depend on the number of guests who attend a timeshare sale presentation, with each guest counted as a "tour", that Bluegreen can potentially convert to a sale of VOI.  The number of guest tours is driven by the number of existing owner guests Bluegreen has staying at a resort with a sales center and the number of new guest arrivals that agree to attend a sales presentation.  As a result of COVID-19 pandemic, the number of owners and guests willing to travel was decreased significantly, which lowered the number of tours Bluegreen completed.  Further, the temporary closure of all marketing operations and VOI sales centers as a result of the COVID-19 pandemic and other adverse impacts of the pandemic is expected to continue to

62

significantly impact system-wide sales of VOIs in the near-term and possibly longer. The ultimate impact, including the extent and duration of the impact, cannot be predicted at this time.

Included in system-wide sales are Fee-Based Sales, JIT Sales, Secondary Market Sales and developed VOI sales. Sales by category are tracked based on which deeded VOI is conveyed in each transaction. The individual VOIs sold is based on several factors, including the needs of fee-based clients, Bluegreen's debt service requirements and default resale requirements under term securitizations and similar transactions. These factors and business initiatives contribute to fluctuations in the amount of sales by category from period to period. Fee-Based Sales comprised 37% and 50% of system-wide sales of VOIs during the year ended December 31, 2020 and 2019, respectively. While Bluegreen intends to remain flexible with respect to the sales of the different categories of Bluegreen's VOI inventory in the future based on economic conditions, business initiatives and other considerations, Bluegreen currently expects that the percentage of fee-based sales will continue to decrease over time as Bluegreen increases its efforts to generate Bluegreen's developed VOI sales and secondary market VOI sales. Actual trends may differ from current expectations.

The following table sets forth certain information for system-wide sales of VOIs for 2020 and 2019:

| | | For the Year Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | **2020** | **2019** | **% Change** |
| Number of sales centers open at period-end [1] | | **24** | 26 | (8) |
| Number of active sales arrangements with third-party clients at period-end | | **15** | 15 | — |
| Total number of VOI sales transactions | | **22,188** | 40,703 | (45) |
| Average sales price per transaction | $ | **16,586** | $ 15,307 | 8 |
| Number of total guest tours | | **120,801** | 235,842 | (49) |
| Sale-to-tour conversion ratio– total marketing guests | | **18.4%** | 17.3% | 6 |
| Number of new guest tours | | **59,469** | 142,130 | (58) |
| Sale-to-tour conversion ratio– new marketing guests | | **14.6%** | 14.1% | 4 |
| Percentage of sales to existing owners | | **63.6%** | 54.5% | 17 |
| Average sales volume per guest | $ | **3,046** | $ 2,642 | 15 |

(1)   Due to the COVID-19 pandemic in 2020, two sales centers were consolidated and one has not reopened.

*Cost of VOIs Sold.* During the years ended December 31, 2020 and 2019, cost of VOIs sold was $13.6 million and $21.8 million, respectively, and represented 8% and 9%, respectively, of sales of VOIs. Cost of VOIs sold as a percentage of sales of VOIs varies between periods based on the relative costs of the specific VOIs sold in each period and the size of the point packages of the VOIs sold (due to offered volume discounts, including consideration of cumulative sales to existing owners). Additionally, the effect of changes in estimates under the relative sales value method, including estimates of sales, future defaults, upgrades and incremental revenue from the resale of repossessed VOI inventory, are reflected on a retrospective basis in the period the change occurs. Therefore, cost of sales is typically favorably impacted in periods where a significant amount of Secondary Market VOI inventory is acquired or actual defaults and equity trades are higher than anticipated and the resulting change in estimate is recognized. Cost of VOIs sold as a percentage of sales of VOIs decreased during the year ended December 31, 2020, as compared to 2019, primarily due to the impact of anticipated higher future defaults partially offset by lower cost secondary market purchases.

*Fee-Based Sales Commission Revenue.* During the years ended December 31, 2020 and 2019, Bluegreen sold $136.1 million and $308.0 million, respectively, of third-party VOI inventory under commission arrangements and earned sales and marketing commissions of $90.0 million and $207.8 million, respectively, in connection with those sales. The decreases in sales of third-party developer inventory on a commission basis during 2020 was due primarily to the temporary closure of VOI sales centers as a result of the COVID-19 pandemic and other factors described above. Bluegreen earned an average sales and marketing commission of 66% and 67% during the years ended December 31, 2020 and 2019, respectively, which is net of a reserve for commission refunds in connection with early defaults and cancellations pursuant to the terms of certain of Bluegreen's fee-based service arrangements. The decrease in sales and marketing commissions as a percentage of fee-based sales for the year ended December 31, 2020 as compared to 2019 was primarily related to an increase in Bluegreen's reserve for cancellations coupled with the decrease in fee-based sales described above.

63

D - 0055-0063

*Financing Revenue, Net of Financing Expense — Sales of VOIs.* Interest income on VOI notes receivable was $77.5 million and $80.0 million during the years ended December 31, 2020 and 2019, respectively, which was partially offset by interest expense on receivable backed debt of $17.0 million and $20.5 million, respectively. The increase in finance revenue, net of finance expense during 2020 as compared to 2019 is primarily due to lower outstanding receivable-backed debt balances and a lower weighted-average cost of borrowings attributable to the lower interest rates in 2020 partially offset by lower notes receivable balances as a result of lower VOI sales due to the COVID-19 pandemic and other factors described above. Revenue from mortgage servicing during the years ended December 31, 2020 and 2019 of $5.9 million and $6.2 million, respectively, are included in financing revenue, net of mortgage servicing expenses of $4.6 million and $5.3 million, respectively.

*Other Fee-Based Services — Title Operations, net.* During the years ended December 31, 2020 and 2019, revenue from Bluegreen's title operations was $7.6 million and $14.2 million, respectively, which was partially offset by expenses directly related to Bluegreen's title operations of $3.8 million and $7.0 million, respectively. Resort title fee revenue varies based on VOI sales volumes as well as the relative title costs in the jurisdictions where the inventory being sold is located. The decrease in 2020 is due to lower VOI sales as a result of the COVID-19 pandemic and other factors described above.

*Net Carrying Cost of VOI Inventory.* The carrying cost of Bluegreen's inventory was $40.8 million and $35.6 million during the years ended December 31, 2020 and 2019, respectively, which was partially offset by rental and sampler revenue of $6.2 million and $11.8 million, respectively. The increase in net carrying costs of VOI inventory was primarily related to decreased rentals of developer inventory and decreased sampler stays due to, among other things, reduced travel associated with the COVID-19 pandemic as well as increased maintenance fees and developer subsidies associated with the increase in VOI inventory. In certain circumstances, Bluegreen offsets marketing costs by using inventory for marketing guest stays.

*Selling and Marketing Expenses.* Selling and marketing expenses were $217.4 million and $321.2 million during the years ended December 31, 2020 and 2019, respectively. As a percentage of system-wide sales of VOIs, selling and marketing expenses were 59% and 52% during the years ended December 31, 2020 and 2019. The increase in selling and marketing expenses as a percentage of system-wide sales of VOIs during the year ended December 31, 2020 compared to the year ended December 31, 2019, is primarily attributable to certain fixed costs inherent in Bluegreen's sales and marketing operations and the costs of maintaining certain sales and marketing associates on furlough despite the temporary closure of Bluegreen's VOI sales sites and marketing operations in connection with the COVID-19 pandemic as discussed above. During the year ended December 31, 2020, Bluegreen incurred $3.2 million in severance and $13.6 million of payroll and benefits expenses relating to employees on temporary furlough or reduced work hours as a result of the impact of the COVID-19 pandemic. In addition, since reopening activities commenced, Bluegreen incurred costs associated with the reopening of 88 Bass Pro and Cabela's stores that were open prior to the COVID-19 pandemic and the commencement of marketing operations at 10 additional Cabela's stores. Bluegreen utilizes these stores to sell mini-vacation packages to customers for future travel which require the customers to attend a timeshare presentation. During 2020 Bluegreen incurred costs associated with redesigning its sales and marketing platform including updating its sales offices, refreshing its marketing collateral and adding new sales and marketing senior leadership positions. Further, Bluegreen has invested in various local and national marketing programs to attract new customers. These programs may not be successful or generate a sufficient number of prospects to offset the program costs incurred.

64

The following table sets forth certain new customer marketing information, excluding sampler and other returning owner vacation packages, for 2020 and 2019:

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2019** | **% Change** |
| Number of Bass Pro and Cabela's marketing locations at period-end | **98** | 83 | 18 |
| Number of vacation packages outstanding, beginning of the period [1] | **169,009** | 163,100 | 4 |
| Number of vacation packages sold | **131,970** | 205,161 | (36) |
| Number of vacation packages outstanding, end of the period [1] | **121,915** | 169,294 | (28) |
| % of Bass Pro vacation packages at period end | **53%** | 43% | 23 |
| % of Cabela's vacation packages at period end | **15%** | 3% | 400 |
| % of Choice Hotel vacation packages at period end | **20%** | 29% | (31) |
| % of Other vacation packages at period end | **12%** | 25% | (52) |

(1) Excludes vacation packages sold to customers more than one year prior to the period presented and vacation packages sold to customers who had already toured but purchased an additional vacation package.

During 2020, Bluegreen eliminated certain of its lower performing mini-vacation programs, including a lead generation operation at various malls.  While the elimination of this program did result in lower sales of mini-vacation packages in 2020 and in the short-term, Bluegreen believes its expansion into Cabela's and other programs will make up for the lost mini-vacation packages in the future.  Additionally, package sales generated through Bluegreen's Choice call transfer program declined 50% compared to 2019, reflecting lower occupancy throughout Choice's system.

Bluegreen's agreement with Bass Pro previously provided for the payment of a variable commission upon the sale of a VOI to a marketing prospect obtained through the Bass Pro marketing channels.  As previously disclosed, during June 2019, Bluegreen entered into a settlement agreement and amended marketing agreement with Bass Pro.  Pursuant to the settlement agreement and amended marketing arrangement with Bass Pro the settlement payment and a portion of the ongoing annual marketing fees are fixed costs and/or are subject to annual minimums regardless of the volume of VOI sales produced from the resulting marketing prospects generated from the amended agreement.  If Bluegreen's marketing operations pursuant to the amended agreement with Bass Pro does not generate a sufficient number of prospects and leads or is terminated or limited, Bluegreen may not be able to successfully market and sell its products and services at anticipated levels or at levels required in order to offset the costs associated with Bluegreen's marketing efforts.   In addition, the amended arrangement with Bass Pro has resulted in an increase in Bluegreen's marketing costs as a percentage of sales from the program, based on increases in program fixed costs and anticipated VOI sales volumes from this marketing channel.  In light of the decrease in sales due to the COVID-19 pandemic, the increase in cost of this marketing program has adversely impacted Bluegreen's results of operations and cash flow and may continue to have an adverse impact if sales continue to be below expected levels. See Note 12: Commitments and Contingencies to the Company's consolidated financial statements included in Item 8 of this report for additional information regarding the terms of the Bass Pro settlement and amended marketing agreement.

In addition to vacation packaged sold to new prospects, we also sell vacation packages to customers who indicated they would tour again.  As of December 31, 2020, the pipeline of such packages was approximately 15,000.

*General and Administrative Expenses — Sales and Marketing Operations.*  General and administrative expenses, representing expenses directly attributable to sales and marketing operations, were $27.3 million and $70.3 million during the years ended December 31, 2020 and 2019, respectively. As a percentage of system-wide sales of VOIs, general and administrative expenses directly attributable to sales and marketing operations were 7% and 11% during the years ended December 31, 2020 and 2019, respectively. Included in general and administrative expenses attributable to sales and marketing operations for the year ended December 31, 2019 was approximately $39.1 million related to the settlement of the dispute with Bass Pro in June 2019.  Net of the June 2019 Bass Pro settlement, general and administrative expenses attributable to sales and marketing operations decreased during the year ended

65

December 31, 2020 compared to the year ended December 31, 2019 primarily as a result of lower branding, licensing, and marketing fees for Bluegreen/Big Cedar vacations as a result of decreased sales of VOIs described above.

Resort Operations and Club Management

| (dollars in thousands) | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2020 | | | 2019 | |
| Resort operations and club management revenue | $ | 168,560 | | $ 174,887 | |
| Resort operations and club management expense | | (105,320) | | (122,428) | |
| Operating profit - resort operations and club management | | 63,240 | 38% | 52,459 | 30% |
| Add: Depreciation and amortization | | 796 | | 1,294 | |
| Add: Severance | | 1,369 | | 238 | |
| Add: Loss on assets held for sale | | 30 | | 5,887 | |
| Adjusted EBITDA - resort operations and club management | $ | 65,435 | | $ 59,878 | |

*Resort Operations and Club Management Revenue.* Resort operations and club management revenue decreased 4% during the year ended December 31, 2020 as compared to the year ended December 31, 2019. Cost reimbursement revenue, which consists of payroll and other expenses which Bluegreen incurs and passes to the HOAs to operate, was flat during the year ended December 31, 2020 as compared to the year ended December 31, 2019 reflecting the temporary closure of many resorts related to the COVID-19 pandemic, as described above. Net of cost reimbursement revenue, resort operations and club management revenues decreased 6% during the year ended December 31, 2020 as compared to the year ended December 31, 2019 primarily as a result of decreases in revenues from Bluegreen's Traveler Plus program, other owner programs, resort retail operations and third-party rental commissions as a result of lower activity due to the COVID-19 pandemic. Bluegreen's resort network includes 68 Club and Club Associate Resorts as of December 31, 2020 compared to a total of 69 resorts at December 31, 2019. Bluegreen managed 49 resort properties as of both December 31, 2020 and December 31, 2019.

*Resort Operations and Club Management Expense.* During 2020, resort operations and club management expense decreased 14% compared to 2019. The decrease was primarily due to steps taken to reduce costs in the first quarter of 2020 in addition to lower costs related to the Traveler Plus program, other owner programs and resort retail operations in 2020 as compared to 2019, in each case, as a result of or in response to the COVID-19 pandemic. Additionally, in December 2019 Bluegreen conveyed the ski and golf operations and related property at one of its resorts to the HOA, which resulted in a non-cash loss on the disposal of approximately $5.6 million.

Bluegreen Corporate and Other

| (in thousands) | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2020 | | 2019 | |
| General and administrative expenses - corporate and other | $ | (68,165) | $ | (81,128) |
| Other (expense) income, net | | (370) | | 1,909 |
| Franchise taxes | | 169 | | 193 |
| Loss (gain) on assets held for sale | | 275 | | (2,289) |
| Add: Depreciation and amortization | | 8,915 | | 6,702 |
| Add: Severance and other | | 3,845 | | 4,613 |
| Adjusted EBITDA - Corporate and other | $ | (55,331) | $ | (70,000) |

*General and Administrative Expenses — Corporate and Other.* General and administrative expenses directly attributable to corporate overhead were $68.2 million and $81.1 million during the years ended December 31, 2020 and 2019, respectively. The decrease was primarily due to a $7.1 million employee retention credit earned in 2020 under the CARES Act ($2.2 million of which was earned on severance) and an overall $7.7 million reduction in payroll expense due to lower headcount as a result of steps taken to reduce costs in the first quarter. These decreases were

66

partially offset by $1.9 million in severance cost for corporate employees during the year ended December 31, 2020 ($1.2 million was due to severance related to steps taken to reduce costs in the first quarter attributable to the COVID-19 pandemic) and a $3.3 million special bonus paid to all non-executive employees during 2020.

*Other (Expense) Income, net.* Other (expense) income, net was ($0.4) million and $1.9 million during the years ended December 31, 2020 and 2019, respectively. This decrease was primarily related to a land sale during June 2019 resulting in a gain of $2.0 million, with no such transaction in 2020.

<u>Interest Expense</u> Interest expense not related to Bluegreen's receivable-backed debt was $15.0 million and $19.0 million during the years ended December 31, 2020 and 2019, respectively. The decrease in interest expense during the year ended December 31, 2020 was primarily due to a lower weighted-average cost of borrowing, partially offset by higher outstanding debt balances as compared to the year ended December 31, 2019.

<u>Adjusted EBITDA Attributable to Non-Controlling Interest in Bluegreen/Big Cedar Vacations.</u>  The Company includes in its consolidated financial statements the results of operations and financial condition of Bluegreen/Big Cedar Vacations, Bluegreen's 51%-owned subsidiary. The non-controlling interest in Adjusted EBITDA of Bluegreen/Big Cedar Vacations is the portion of Bluegreen/Big Cedar Vacations' Adjusted EBITDA that is attributable to Big Cedar LLC, which holds the remaining 49% interest in Bluegreen/Big Cedar Vacations. Adjusted EBITDA attributable to the non-controlling interest in Bluegreen/Big Cedar Vacations was $7.6 million and $11.7 million during the years ended December 31, 2020 and 2019, respectively. The decrease in Adjusted EBITDA attributable to the non-controlling interest in Bluegreen/Big Cedar Vacations for the year ended December 31, 2020 was primarily related to the impact of the COVID-19 pandemic, including the temporary closure of Bluegreen's VOI sales centers in connection with the COVID-19 pandemic as described above.

**BVH Corporate**

BVH Corporate in the Company's segment information primarily includes the following:

- BVH's corporate general and administrative expenses;
- Interest expense associated with Woodbridge's junior subordinated debentures and the note payable to BBX Capital; and
- Interest income on interest-bearing cash accounts.

*Corporate General and Administrative Expenses*

BVH's corporate general and administrative expenses consist primarily of costs associated with administering the various support functions at its corporate headquarters, including executive compensation, legal, accounting, human resources, investor relations, and executive offices lease payments. BVH's corporate general and administrative expenses for the years ended December 31, 2020 and 2019 were $59.3 million and $42.2 million, respectively.  The increase in corporate general and administrative expenses for 2020 as compared to 2019 primarily reflects the acceleration of the vesting of unvested restricted stock awards and payments relating to BVH's long-term incentive program for 2020, in each case, in connection with the spin-off of BBX Capital during the third quarter of 2020, which in the aggregate resulted in $32.6 million of compensation expense for the year ended December 31, 2020.  In addition, included in BVH corporate general and administrative expenses for year ended December 31, 2020 was $1.8 million of other costs associated with the spin-off.  The increase in corporate general and administrative expenses for the year ended December 31, 2020 compared to 2019 was partially offset by lower 2020 fourth quarter expenses as the support functions at BVH corporate headquarters, including legal, accounting, and human resources, remained with BBX Capital subsequent to the spin-off.

*Interest Expense*

BVH's interest expense (excluding interest expense related to the $80.0 million note payable to Bluegreen which was repaid in full during August 2020) for the years ended December 31, 2020 and 2019 was $4.8 million and $5.8 million, respectively. The decrease in interest expense during the year ended December 31, 2020 compared to 2019 primarily resulted from the repayment of BVH's mandatorily redeemable cumulative preferred stock in December 2019 and lower interest expense on Woodbridge's junior subordinated debentures reflecting variable rates of interest on such

67

debt during 2020 partially offset by $1.1 million of interest expense on the $75.0 million promissory note that was issued to BBX Capital in connection with the spin-off.

BVH's interest expense on the $80.0 million note payable to Bluegreen for the years ended December 31, 2020 and 2019 was $2.5 million and $4.8 million, respectively. The decrease in interest expense reflects the repayment of the note in August 2020 from proceeds received from a special cash dividend paid by Bluegreen.  The interest expense on this note and the related interest income recognized by Bluegreen are eliminated in the Company's consolidated statements of operations.

*Interest Income*

During the year ended December 31, 2020, the Company recognized $0.9 million of interest and investment income from its interest-bearing cash accounts and other investments compared to $2.3 million recognized during 2019. The decline in interest income reflects lower interest rates on interest earning assets during 2020.

*Benefit/Provision for Income Taxes from continuing operations*

The benefit for income taxes was $2.4 million for the year ended December 31, 2020 compared to a provision for income taxes of $7.5 million during the year ended December 31, 2019. The Company's effective income tax rate was approximately 5%  and 92% for the years ended December 31, 2020 and 2019, respectively.  The effective income tax rate differed than the expected federal income tax rate of 21% due to the impact of the Company's nondeductible executive compensation and state income taxes.

*Discontinued Operations*

Discontinued operations represent the activities of  BBX Capital, the former wholly owned subsidiary of the Company which was spun off  on September 30, 2020. BBX Capital's businesses include all of BVHs previous businesses other than Bluegreen, including BBX Capital Real Estate, BBX Sweet Holdings, and Renin.

Loss from discontinued operations before income taxes for the year ended December 31, 2020 was $41.6 million compared to income from discontinued operations for the year ended December 31, 2019 of $40.6 million, which reflects $30.7 million of impairment losses primarily resulting from the impact of the COVID-19 pandemic on BBX Capital's businesses, including IT'SUGAR, and a reduction in equity in net earnings from unconsolidated real estate joint ventures of $37.2 million due to sales of real estate in 2019 by unconsolidated joint ventures in which BBX Capital Real Estate had investments.

*Net Income or Loss from Continuing Operations Attributable to Noncontrolling Interests*

The Company's consolidated financial statements include the results of operations and financial position of  partially-owned subsidiaries in which it holds a controlling financial interest, including Bluegreen and Bluegreen/Big Cedar Vacations.  As a result, the Company is required to attribute net income or loss to the noncontrolling interests in these subsidiaries.

Net income from continuing operations attributable to noncontrolling interests during the years ended December 31, 2020 and 2019 was $8.2 million and $14.6 million, respectively.  The decrease in net income attributable to noncontrolling interests for the year ended December 31, 2020 compared to 2019 was primarily due to a decrease in the net income of Bluegreen and Bluegreen/Big Cedar Vacations.

68

*For the year ended December 31, 2019 compared to the year ended December 31, 2018*

Sales of VOIs and Financing

| (dollars in thousands) | For the Years Ended December 31, | | | |
| | 2019 | | 2018 | |
| | Amount | % of System-wide sales of VOIs[5] | Amount | % of System-wide sales of VOIs[5] |
|---|---|---|---|---|
| Developed VOI sales [1] | $ 355,353 | 57% | $ 287,292 | 46% |
| Secondary Market sales | 234,883 | 38 | 230,960 | 37 |
| Fee-Based sales | 308,032 | 50 | 318,540 | 51 |
| JIT sales | 11,641 | 2 | 55,993 | 9 |
| Less: Equity trade allowances [6] | (290,801) | (47) | (268,715) | (43) |
| System-wide sales of VOIs | 619,108 | 100% | 624,070 | 100% |
| Less: Fee-Based sales | (308,032) | (50) | (318,540) | (51) |
| Gross sales of VOIs | 311,076 | 50 | 305,530 | 49 |
| Provision for loan losses [2] | (55,701) | (18) | (51,305) | (17) |
| Sales of VOIs | 255,375 | 41 | 254,225 | 41 |
| Cost of VOIs sold [3] | (21,845) | (9) | (23,813) | (9) |
| Gross profit [3] | 233,530 | 91 | 230,412 | 91 |
| Fee-Based sales commission revenue [4] | 207,832 | 67 | 216,422 | 68 |
| Financing revenue, net of financing expense | 60,454 | 10 | 59,609 | 10 |
| Other income, net | 3,068 | (1) | — | — |
| Other fee-based services - title operations and other, net | 7,274 | 1 | 7,614 | 1 |
| Net carrying cost of VOI inventory | (23,816) | (4) | (11,358) | (2) |
| Selling and marketing expenses | (321,216) | (52) | (310,614) | (50) |
| General and administrative expenses - sales and marketing | (70,258) | (11) | (27,848) | (4) |
| Operating profit - sales of VOIs and financing | 96,868 | 16% | 164,237 | 26% |
| Add: Depreciation and amortization | 6,118 | | 6,335 | |
| Add: Severance | 1,416 | | 96 | |
| Add: Bass Pro Settlement | 39,121 | | — | |
| Add: Loss on assets held for sale | 58 | | — | |
| Adjusted EBITDA - sales of VOIs and financing | $ 143,581 | | $ 170,668 | |

(1)  Developed VOI sales represent sales of VOIs acquired or developed by Bluegreen. Developed VOI sales do not include Secondary Market sales, Fee-Based sales or JIT sales.
(2)  Percentages for provision for loan losses are calculated as a percentage of gross sales of VOIs, which excludes Fee-Based sales (and not of system-wide sales of VOIs).
(3)  Percentages for costs of VOIs sold and gross profit are calculated as a percentage of sales of VOIs (and not based on system-wide sales of VOIs).
(4)  Percentages for Fee-Based sales commission revenue are calculated as a percentage of Fee-Based sales (and not based on system-wide sales of VOIs).
(5)  Represents the applicable line item, calculated as a percentage of system-wide sales of VOIs, unless otherwise indicated in the above footnotes.
(6)  Equity trade allowances are amounts granted to customers upon trading in their existing VOIs in connection with the purchase of additional VOIs. Subject to certain exceptions, equity trade allowances were generally eliminated in June 2020.

*Sales of VOIs.* Sales of VOIs were $255.4 million and $254.2 million during the years ended December 31, 2019 and 2018, respectively. Sales of VOIs are impacted by the factors described below in system-wide sales of VOIs. Gross sales of VOIs were reduced by $55.7 million and $51.3 million during the years ended December 31, 2019 and 2018, respectively, for the provision for loan losses. The provision for loan losses varies based on the amount of financed,

69

non-fee-based sales during the period and changes in Bluegreen's estimates of future notes receivable performance for existing loans. Bluegreen's provision for loan losses as a percentage of gross sales of VOIs was 18% and 17% during the years ended December 31, 2019 and 2018, respectively.  The percentage of Bluegreen's sales which were realized in cash within 30 days from sale was 42% during both the years ended December 31, 2019 and 2018.  The increase in the provision for loan losses was primarily due to an increase in the average annual default rates, which Bluegreen believes is due in large part to the receipt of letters from attorneys who purport to represent certain VOI owners and who have encouraged such owners to become delinquent and ultimately default on their obligations.  Defaults associated with such letters in 2019 increased 26% compared to 2018, with a significant portion of such increase attributable to default activity for Bluegreen's resorts and owners located in Missouri, where Bluegreen believes certain attorneys are currently targeting Bluegreen's customers.  See "Item 3. Legal Proceedings" for additional information regarding such letters and actions taken by Bluegreen in connection therewith. While Bluegreen believes its notes receivable are adequately reserved at this time, actual defaults may differ from the estimates and the reserve may not be adequate, whether due to actions by Bluegreen's attorneys or otherwise. In addition to the factors described below impacting system-wide sales of VOIs, sales of VOIs are impacted by the proportion of system-wide sales of VOIs sold on behalf of third parties on a commission basis, which are not included in sales of VOIs.

The average annual default rates and delinquency rates (more than 30 days past due) on Bluegreen's VOI notes receivable were as follows:

| | Year Ended December 31, | |
| --- | --- | --- |
| | **2019** | **2018** |
| Average annual default rates | **8.73%** | 8.41% |

| | As of December 31, | |
| --- | --- | --- |
| | **2019** | **2018** |
| Delinquency rates | **3.62%** | 2.91% |

*System-wide sales of VOIs.*   System-wide sales of VOIs were $619.1 million and $624.1 million during the years ended December 31, 2019 and 2018, respectively. System-wide sales decreased during 2019 due to a decrease in the number of guest tours.  Bluegreen believes the decrease was due in part to disruptions in staffing and operations at certain of its sales offices related to the issues with Bass Pro which were resolved when the parties entered into a settlement agreement in June 2019.

Included in system-wide sales are Fee-Based Sales, JIT Sales, Secondary Market Sales and developed VOI sales. Sales by category are tracked based on which deeded VOI is conveyed in each transaction.  Bluegreen manages which VOIs are sold based on several factors, including the needs of fee-based clients, Bluegreen's debt service requirements and default resale requirements under term securitization and similar transactions. These factors contribute to fluctuations in the amount of sales by category from period to period. Fee-Based Sales comprised 50% and 51% of system-wide sales of VOIs during the years ended December 31, 2019 and 2018, respectively.

70

The following table sets forth certain information for system-wide sales of VOIs for 2019 and 2018:

| (dollars in thousands, except average sales volume per guest) | | For the Year Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | **2019** | 2018 | % Change |
| Number of sales offices at period-end | | **26** | 26 | — |
| Number of Bass Pro and Cabela's marketing locations at period-end | | **83** | 69 | 20 |
| Number of active sales arrangements with third-party clients at period-end | | **15** | 15 | — |
| Total number of VOI sales transactions | | **40,703** | 40,087 | 2 |
| Average sales price per transaction | $ | **15,307** | $ 15,692 | (2) |
| Number of total guest tours | | **235,842** | 238,141 | (1) |
| Sale-to-tour conversion ratio– total marketing guests | | **17.3%** | 16.8% | 3 |
| Number of new guest tours | | **142,130** | 146,623 | (3) |
| Sale-to-tour conversion ratio– new marketing guests | | **14.1%** | 14.3% | (1) |
| Percentage of sales to existing owners | | **54.5%** | 51.6% | 6 |
| Average sales volume per guest | $ | **2,642** | $ 2,642 | — |

*Cost of VOIs Sold.* During the years ended December 31, 2019 and 2018, cost of VOIs sold was $21.8 million and $23.8 million, respectively, and represented 9% of sales of VOIs during each year. Cost of VOIs sold as a percentage of sales of VOIs varies between periods based on the relative costs of the specific VOIs sold in each period and the size of the point packages of the VOIs sold (due to offered volume discounts, including consideration of cumulative sales to existing owners). Additionally, the effect of changes in estimates under the relative sales value method, including estimates of project sales, future defaults, upgrades and incremental revenue from the resale of repossessed VOI inventory, are reflected on a retrospective basis in the period the change occurs. Therefore, cost of sales will typically be favorably impacted in periods where a significant amount of Secondary Market VOI inventory is acquired or actual defaults and equity trades are higher than anticipated and the resulting change in estimate is recognized. During 2019, Bluegreen acquired more Secondary Market VOI inventory compared to 2018 due to a temporary suspension of Secondary Market VOI inventory purchases in September 2018 in connection with a system conversion involving Bluegreen's sales and inventory process. In addition, during 2019 Bluegreen's cost of sales benefited from sales of relatively lower cost VOIs as compared to 2018. Further, in 2018 Bluegreen increased the average selling price of VOIs by approximately 3%. As a result of this pricing change in 2018, Bluegreen also increased its estimate of total gross margin on the sale of its VOI inventory under the relative sales value method. Under the relative sales value method prescribed for timeshare developers to relieve the cost of VOI inventory, changes to the estimate of gross margin expected to be generated on the sale of VOI inventory are recognized on a retrospective basis in earnings. Accordingly, during 2018, Bluegreen recognized a benefit to cost of VOIs sold of $3.6 million ($2.7 million net of tax, $0.04 EPS).

*Fee-Based Sales Commission Revenue.* During the years ended December 31, 2019 and 2018, Bluegreen sold $308.0 million and $318.5 million, respectively, of third-party VOI inventory under commission arrangements and earned sales and marketing commissions of $207.8 million and $216.4 million, respectively, in connection with those sales. Bluegreen earned an average sales and marketing commission of 67% and 68% during the years ended December 31, 2019 and 2018, respectively, which is net of a reserve for commission refunds in connection with early defaults and cancellations pursuant to the terms of certain of Bluegreen's fee-based service arrangements. The decrease in sales and marketing commission as a percentage of fee-based sales for 2019 as compared to 2018 is primarily related to the mix of developer sales at higher commission rates in 2018 as well as higher reserves for early defaults in 2019, which Bluegreen refunds to the third-party developers in certain circumstances.

*Financing Revenue, Net of Financing Expense — Sales of VOIs.* Interest income on VOIs notes receivable was $80.0 million and $79.4 million during the years ended December 31, 2019 and 2018, respectively, which was partially offset by interest expense on receivable backed debt of $20.5 million and $19.5 million, respectively. The increase in finance revenue net of finance expense in 2019 as compared to 2018 is a result of an increase in Bluegreen's notes receivable portfolio partially offset by Bluegreen's higher debt outstanding balances. Revenue from mortgage servicing during the years ended December 31, 2019 and 2018 of $6.2 million and $6.0 million, respectively, are included in financing revenue, net of mortgage servicing expenses of $5.3 million and $6.2 million, respectively.

71

*Other Fee-Based Services — Title Operations, net.*  During the years ended December 31, 2019 and 2018, revenue from Bluegreen's title operations was $14.2 million and $12.2 million, respectively, which was partially offset by expenses directly related to Bluegreen's title operations of $7.0 million and $4.6 million, respectively. Resort title fee revenue varies based on sales volumes as well as the relative title costs in the jurisdictions where the inventory being sold is located.

*Net Carrying Cost of VOI Inventory.*  The carrying cost of Bluegreen's inventory was $35.6 million and $27.4 million during the years ended December 31, 2019 and 2018, respectively, which was partially offset by rental and sampler revenue of $11.8 million and $16.1 million, respectively. The increase in net carrying costs of VOI inventory was primarily related to Bluegreen's acquisition of the Éilan Hotel and Spa during April 2018, increased maintenance fees and developer subsidies associated with Bluegreen's increase in VOI inventory and decreased rentals of developer inventory. In certain circumstances, Bluegreen offsets the marketing costs by using its inventory for marketing guest stays.

*Selling and Marketing Expenses.*  Selling and marketing expenses were $321.2 million and $310.6 million during the years ended December 31, 2019 and 2018, respectively. As a percentage of system-wide sales of VOIs, selling and marketing expenses were 52% and 50% during the years ended December 31, 2019 and 2018, respectively.  The increase in selling and marketing expenses as a percentage of system-wide sales of VOIs is primarily attributable to higher costs per guest tour, higher fees to Bass Pro as well as a change in the timing of expense recognition under the settlement agreement with Bass Pro discussed below, additional costs related to Bluegreen's marketing operations in 15 new Cabela's stores in 2019 and additional costs associated with testing new traditional and digital marketing programs.  In addition, 2019 includes severance of $0.6 million pursuant to an agreement entered into with an executive during 2019 and is included in severance within the Sales of VOI and Financing segment.

Bluegreen's agreement with Bass Pro previously provided for the payment of a variable commission upon the sale of a VOI to a marketing prospect obtained through the Bass Pro marketing channels.  As discussed herein, pursuant to the settlement agreement and amended marketing arrangement with Bass Pro, the settlement payment and a portion of the ongoing annual marketing fees are fixed and/or are subject to annual minimums regardless of the volume of VOI sales produced from the resulting marketing prospects generated from the amended agreement.  In addition, the amended arrangement with Bass Pro is expected to result in an annual 9% increase in Bluegreen's marketing costs as a percentage of sales from the program, based on increases in program fixed costs and anticipated VOI sales volumes from this marketing channel.  Should Bluegreen's VOI sales volumes be below expectations, the increase in cost of this marketing program would be higher than expected and Bluegreen's results of operations and cash flows would be adversely impacted.

*General and Administrative Expenses — Sales and Marketing Operations.*  General and administrative expenses, representing expenses directly attributable to sales and marketing operations, were $70.3 million and $27.8 million during the years ended December 31, 2019 and 2018, respectively. As a percentage of system-wide sales of VOIs, general and administrative expenses directly attributable to sales and marketing operations were 11% and 4% during the years ended December 31, 2019 and 2018, respectively.  Included in general and administrative expenses attributable to sales and marketing operations for the year ended December 31, 2019 was approximately $39.1 million related to the settlement of the dispute with Bass Pro in June 2019. In addition, 2019 includes severance of $0.8 million pursuant to an agreement entered into with an executive during 2019 and is included in severance within the Sales of VOIs and Financing segment.

72

Resort Operations and Club Management

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| *(dollars in thousands)* | **2019** | | **2018** | |
| Resort operations and club management revenue | $ 174,887 | | $ 168,353 | |
| Resort operations and club management expense | (122,428) | | (116,553) | |
| Operating profit - resort operations and club management | 52,459 | 30% | 51,800 | 31% |
| Add: Depreciation and amortization | 1,294 | | 1,719 | |
| Add: Severance | 238 | | 42 | |
| Add: Loss on assets held for sale | 5,887 | | — | |
| Adjusted EBITDA - resort operations and club management | $ 59,878 | | $ 53,561 | |

*Resort Operations and Club Management Revenue.* Resort operations and club management revenue increased 4% during the year ended December 31, 2019 as compared to the year ended December 31, 2018. Cost reimbursement revenue, which primarily consists of payroll and payroll related expenses for management of the HOAs and other services Bluegreen provides where Bluegreen is the employer, increased 2% during the year ended December 31, 2019 as compared to the year ended December 31, 2018. Net of cost reimbursement revenue, resort operations and club management revenues increased 5% during the year ended December 31, 2019 as compared to the year ended December 31, 2018. Resort operations and club management revenues, net of cost reimbursement revenues, increased during 2019 compared to 2018 primarily as a result of the receipt of management fees for the full year in 2019 related to two managed resorts added during 2018 and higher third-party rental commissions. Bluegreen managed 49 resort properties as of both December 31, 2019 and December 31, 2018.

*Resort Operations and Club Management Expense.* During 2019, resort operations and club management expense increased 5% compared to 2018. This increase was primarily due to increased cost reimbursement expense and the addition of new managed resorts during 2018 described above. Additionally, in December 2019 Bluegreen conveyed the ski and golf operations and related property at one of its resorts to the HOA, which resulted in a non-cash loss on the disposal of approximately $5.6 million.

Corporate and Other

| | For the Years Ended December 31, | | |
|---|---|---|---|
| *(in thousands)* | **2019** | | **2018** |
| General and administrative expenses - corporate and other | $ (81,128) | $ | (79,194) |
| Other income, net | 1,909 | | 1,201 |
| Franchise taxes | 193 | | 199 |
| (Gain) loss on assets held for sale | (2,289) | | 3 |
| Depreciation and amortization | 6,702 | | 4,338 |
| Severance | 4,613 | | 3,512 |
| Corporate and other | $ (70,000) | $ | (69,941) |

*General and Administrative Expenses — Corporate and Other.* General and administrative expenses directly attributable to corporate overhead were $81.1 million and $79.2 million during the years ended December 31, 2019 and 2018, respectively. The increase in 2019 was primarily attributable to increased severance costs pursuant to agreements entered into with certain executives during 2019 compared to 2018, partially offset by lower self-insured health care costs, lower legal expense and lower information technology costs.

*Other Income, net.* Other income, net was $1.9 million and $1.2 million during the years ended December 31, 2019 and 2018, respectively. This increase was primarily related to a land sale during June 2019 resulting in a gain of $2.0 million.

73

<u>Interest Expense</u>. Interest expense not related to receivable-backed debt was $19.0 million and $15.2 million during the years ended December 31, 2019 and 2018, respectively. The increase in interest expense is primarily due to a higher outstanding debt balances during the 2019 periods as compared to the 2018 periods. Additionally, in September 2019, Bluegreen paid off its 2013 Notes Payable and in connection with this repayment, Bluegreen wrote off unamortized debt issuance costs of $0.4 million.

<u>Adjusted EBITDA Attributable to Non-Controlling Interest in Bluegreen/Big Cedar Vacations.</u>  Bluegreen includes in its consolidated financial statements the results of operations and financial condition of Bluegreen/Big Cedar Vacations, its 51%-owned subsidiary. The non-controlling interest in Adjusted EBITDA of Bluegreen/Big Cedar Vacations is the portion of Bluegreen/Big Cedar Vacations' Adjusted EBITDA that is attributable to Big Cedar LLC, which holds the remaining 49% interest in Bluegreen/Big Cedar Vacations. Adjusted EBITDA attributable to the non-controlling interest in Bluegreen/Big Cedar Vacations was $11.7 million and $12.5 million during the years ended December 31, 2019 and 2018, respectively.

**BVH Corporate**

BVH Corporate in the Company's segment information includes the following:

- ⑦ BVH's corporate general and administrative expenses;
- ⑦ Interest expense associated with Woodbridge's junior subordinated debentures; and
- ⑦ Interest income on interest-bearing cash accounts.

*Corporate General and Administrative Expenses*

BVH's corporate general and administrative expenses consist primarily of costs associated with administering the various support functions at its corporate headquarters, including executive compensation, legal, accounting, human resources, investor relations, and executive offices. BVH's corporate general and administrative expenses for the years ended December 31, 2019 and 2018 were $42.2 million and $45.9 million, respectively.  Corporate general and administrative expenses for the year ended December 31, 2019 compared to 2018 decreased by $3.7 million, which primarily reflects lower costs related to executive incentive bonuses and share-based compensation expense and lower professional fees, partially offset by higher severance costs.

*Interest Expense*

BVH's interest expense (excluding interest expense related to the $80.0 million note payable to Bluegreen) for the year ended December 31, 2019 was $5.8 million compared to $6.6 million for 2018 which was repaid in full in August 2020.  The decrease in interest expense during the year ended December 31, 2019 compared 2018 primarily resulted from BVH's repayment of the outstanding balance of $30.0 million on its $50.0 million revolving line of credit in January 2019.

*Interest Income*

During the year ended December 31, 2019, the Company recognized $2.3 million of interest and investment income from its interest-bearing cash accounts and other investments compared to $2.0 million during 2018.

*Provision for Income Taxes from continuing operations*

The provision for income taxes was $7.5 million for the year ended December 31, 2019 compared to $26.4 million during the year ended December 31, 2018. The Company's effective income tax rate was approximately 92% and 36% for the years ended December 31, 2019 and 2018, respectively.  The effective income tax rate differed from the expected federal income tax rate of 21% due to the impact of the Company's nondeductible executive compensation and state income taxes.

74

*Discontinued Operations*

Discontinued operations represent the activities of BBX Capital, the former wholly owned subsidiary of the Company which was spun off on September 30, 2020. BBX Capital's businesses include all of BVHs previous businesses other than Bluegreen, including BBX Capital Real Estate, BBX Sweet Holdings, and Renin.

Income from discontinued operations before income taxes for the year ended December 31, 2019 was $40.6 million compared to $13.6 million for the year ended December 31, 2018, which reflects an increase in equity in net earnings from unconsolidated real estate joint ventures of $23.7 million due to the sales of real estate by joint ventures mentioned above.

*Net Income or Loss from Continuing Operations Attributable to Noncontrolling Interests*

BVH's consolidated financial statements include the results of operations and financial position of partially-owned subsidiaries in which it holds a controlling financial interest, including Bluegreen and Bluegreen/Big Cedar Vacations. As a result, the Company is required to attribute net income or loss to the noncontrolling interests in these subsidiaries.

Net income from continuing operations attributable to noncontrolling interests during the years ended December 31, 2019 and 2018 was $14.6 million and $21.0 million, respectively. The decrease in net income attributable to noncontrolling interests for the year ended December 31, 2019 compared to 2018 was primarily due to a decrease in the net income of Bluegreen and Bluegreen/Big Cedar Vacations.

75

**Changes in Financial Condition**

The following table summarizes the Company's cash flows for the years ended December 31, 2020, 2019, and 2018 (in thousands):

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2019** | **2018** |
| Cash flows provided by operating activities | $ 29,079 | 78,242 | 86,639 |
| Cash flows (used in) provided by investing activities | (13,969) | 16,319 | (31,063) |
| Cash flows used in financing activities | (164,876) | (108,788) | (43,726) |
| Net (decrease) increase in cash, cash equivalents and restricted cash | $ (149,766) | (14,227) | 11,850 |
| Cash, cash equivalents and restricted cash at beginning of period | 406,870 | 421,097 | 409,247 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 257,104 | 406,870 | 421,097 |

*Cash Flows from Operating Activities*

The Company's operating cash flow decreased $49.2 million during the year ended December 31, 2020 compared to 2019 due primarily to increased operating losses as a result of the impact of the COVID-19 pandemic, including decreases in cash proceeds from sales and marketing activities due to the initial and continuing impact of the COVID-19 pandemic, and lower distributions from unconsolidated real estate joint ventures, partially offset by a reduction in spending on the acquisition and development of VOI and real estate inventory during 2020 as compared to 2019, lower payments of interest on debt of $5.3 million, and a $16.0 million reduction in settlement payments made by Bluegreen to Bass Pro pursuant to the settlement agreement entered into in June 2019.

*Cash Flows from Investing Activities*

The Company's cash used in investing activities increased $30.3 million during the year ended December 31, 2020 compared to 2019, primarily due to decreased distributions from unconsolidated real estate joint ventures and decreased proceeds from the sale of real estate and property and equipment, partially offset by decreased investments in unconsolidated real estate joint ventures and decreased spending by Bluegreen for property and equipment.

*Cash Flows from Financing Activities*

The Company's cash used in financing activities increased $56.1 million during the year ended December 31, 2020 compared to 2019, primarily associated with assets spun off in August 2020, primarily due to $96.8 million of cash transferred in the spin-off and Bluegreen's repurchase of $11.7 million of its common stock in a private transaction during 2020 partially offset by a $17.6 million increase in net borrowings on the Company's notes payable and other borrowings, and $20.0 million of purchases of the Company's Class A Common Stock and a $10.0 million payment to redeem the Company's redeemable 5% cumulative preferred stock in 2019.

For additional information on the availability of cash from existing credit facilities, as well as repayment obligations, see "Liquidity and Capital Resources" below.

**Seasonality**

Bluegreen has historically experienced, and expects to continue to experience, seasonal fluctuations in its revenues and results of operations. This seasonality has resulted, and may continue to result, in fluctuations in Bluegreen's quarterly operating results. Due to consumer travel patterns, Bluegreen typically experienced more tours and higher VOI sales during the second and third quarters. However, due to the impact of the COVID-19 pandemic, including the temporary closures of its marketing operations and VOI sales centers as described above, Bluegreen experienced significantly decreased sales of VOIs in the second quarter, third, and fourth quarters of 2020 as compared to prior years and currently expect such adverse impact to continue in the near term and possibly longer.

76

**Liquidity and Capital Resources**

*The Company, excluding Bluegreen*

As of December 31, 2020, the Company, excluding Bluegreen, had cash, cash equivalents, and short-term investments of approximately $22.2 million. BVH believes that its primary source of liquidity for the foreseeable future will be its available cash, cash equivalents, and short-term investments and that it has sufficient liquidity to fund anticipated working capital and debt service requirements for at least two years based on current interest rates (assuming that BVH does not exercise its right to defer interest under the terms of the BBX Capital promissory note).

BVH's principal sources of liquidity have historically been its available cash and short-term investments, dividends received from Bluegreen, and borrowings. However, as described below, the COVID-19 pandemic has impacted or otherwise resulted in uncertainty regarding many of these sources of liquidity.  Prior to the spin-off of BBX Capital, BVH also from time to time received funds from distributions by BBX Capital Real Estate; however this source of funds is no longer available due to the spin-off of BBX Capital.

In connection with the spin-off, BVH issued a $75.0 million note payable to BBX Capital that accrues interest at a rate of 6% per annum and requires payments of interest on a quarterly basis. Under the terms of the note, BVH has the option in its discretion to defer interest payments under the note, with interest on the entire outstanding balance thereafter to accrue at a cumulative, compounded rate of 8% per annum until such time as BVH is current on all accrued payments under the note, including deferred interest. All outstanding amounts under the note will become due and payable in five years or earlier upon certain other events.

The Company's wholly owned subsidiary, Woodbridge, had $66.3 million in junior subordinated debentures outstanding as of December 31, 2020. Woodbridge's junior subordinated debentures accrue interest at a rate of 3-month LIBOR plus a spread ranging from 3.80% to 3.85%, mature between 2035 and 2036, and require interest payments on a quarterly basis.

BVH is a Bluegreen holding company with limited operations, and it is currently expected that it will incur approximately $2.0 million annually in executive compensation expenses and public company costs and annual interest expense of approximately $7.2 million associated with Woodbridge's junior subordinated debentures and the note payable to BBX Capital. These amounts are based on current expectations and assumptions, currently available information and, with respect to interest expense on Woodbridge's junior subordinated debentures, interest rates as of December 31, 2020. Such assumptions and expectations may not prove to be accurate, interest rates may increase and, accordingly or otherwise, actual expenses may exceed the amounts expected. BVH will rely primarily on cash on hand and cash equivalents, as well as dividends that may be provided by Bluegreen in the future, to fund its operations and satisfy its debt service requirements and other liabilities, including its note payable to BBX Capital. As discussed above, the COVID-19 pandemic has resulted in Bluegreen's suspension of its regular quarterly dividend, and while BVH believes that it will have sufficient cash and cash equivalents to fund its operations for approximately two years following the spin-off, it will be dependent on the resumption of dividends from Bluegreen to fund its operations in future periods. There is no assurance that Bluegreen will resume the payment of dividends.

For the years ended December 31, 2020 and 2019, BVH received dividends from Bluegreen of $8.7 million and $42.9 million, respectively. The resumption of dividends payments by Bluegreen, the recovery for the COVID-19 pandemic following its cessation (the timing of which is highly uncertain), as well as the amount and timing of such dividends, if any, will be based upon factors that Bluegreen's board of directors deems to be appropriate, including Bluegreen's operating results, financial condition, cash position, and operating and capital needs. Except as otherwise noted, the debts and obligations of Bluegreen are not direct obligations of BVH and generally are non-recourse to BVH. Similarly, the assets of Bluegreen are not available to BVH absent a dividend or distribution. Furthermore, certain of Bluegreen's credit facilities contain terms which could limit the payment of cash dividends without the lender's consent or waiver, and Bluegreen may only pay dividends subject to such restrictions as well as the declaration of dividends by its board of directors. BVH may also seek additional liquidity in the future from outside sources, including traditional bank financing, secured or unsecured indebtedness, or the issuance of equity and/or debt

77

D - 0055-0077

securities. However, these alternatives may not be available to BVH on attractive terms, if at all. The inability to raise funds through such sources when and as needed would have a material adverse effect on the Company's business, results of operations, and financial condition.

On July 22, 2020, Bluegreen declared a special cash dividend of $1.19 per share on its common stock, or $86.3 million in the aggregate. BVH used its proceeds from the special cash dividend of approximately $80.0 million to repay BVH's $80.0 million note owed to Bluegreen.

BVH has also historically received funds from its subsidiaries, including Bluegreen, in connection with the parties' tax sharing agreement to the extent that a subsidiary utilized BVH's tax benefits in BVH's consolidated tax return. However, BVH did not receive any tax sharing payments during the year ended December 31, 2020 primarily as a result of the impact of COVID-19 on the Company's operations. As of December 31, 2020 and 2019, $1.0 million and $9.0 million, respectively, was due to Bluegreen from BVH pursuant to the Agreement.   BBX Capital and its subsidiaries are no longer parties to the tax sharing agreement as a result of the spin-off.

BVH paid regular quarterly dividends on its Class A and Class B Common Stock totaling $0.25 per share, or $4.8 million in the aggregate, during the year ended December 31, 2019. However, following the first quarter dividend, in April 2020, the Company suspended its regular quarterly dividend due to the impact of the COVID-19 pandemic and the suspension of dividend payments by Bluegreen as discussed above. BVH does not expect to resume payments in the near term and any future declaration and payment of cash dividends with respect to the Company's common stock, if any, will be determined in light of the then-current financial condition of the Company, its operating and capital needs, its debt covenants, and other factors deemed relevant by the board of directors.

In June 2017, the Company's board of directors approved a share repurchase program which replaced the September 2009 share repurchase program and authorizes the repurchase of up to 1,000,000 shares of the Company's Class A Common Stock and Class B Common Stock at an aggregate cost of up to $35.0 million. During the years ended December 31, 2019, and 2018, the Company repurchased 645,778 and 240,000 shares, respectively, of its Class A Common Stock for approximately $15.4 million and $7.6 million, respectively. There were no share repurchases during the year ended December 31, 2020. As of December 31, 2020, subject to the dollar cap on repurchases, 49,903 shares of the Company's Class A or Class B Common Stock remained available for repurchase under the June 2017 share repurchase program.

### *Bluegreen*

Bluegreen believes that it has sufficient liquidity from the sources described below to fund its operations, including its anticipated working capital, capital expenditure, debt service requirements and impacts associated with the COVID-19 pandemic challenges for the foreseeable future, subject to the success of its ongoing mitigating measures to manage through current challenges caused by the COVID-19 pandemic, as discussed in this report, including cost and capital expenditure reductions and the ongoing availability of credit.

Bluegreen's primary sources of funds from internal operations are: (i) cash sales; (ii) down payments on VOI sales which are financed; (iii) proceeds from the sale of, or borrowings collateralized by, notes receivable; (iv) cash from finance operations, including mortgage servicing fees and principal and interest payments received on the purchase money mortgage loans arising from sales of VOIs; and (v) net cash generated from sales and marketing fee-based services and other fee-based services, including resort management operations.

While the vacation ownership business has historically been capital intensive and Bluegreen has in the past and may in the future pursue transactions or activities which may require significant capital investment, Bluegreen has sought to focus on the generation of "free cash flow" (defined as cash flow from operating activities, less capital expenditures) by: (i) incentivizing Bluegreen's sales associates and creating programs with third-party credit card companies to generate a higher percentage of sales in cash; (ii) maintaining sales volumes that focus on efficient marketing channels; (iii) limiting Bluegreen's capital and inventory expenditures; (iv) utilizing sales and marketing, mortgage servicing, resort management services, title and construction expertise to pursue fee-based-service business relationships that generally require minimal up-front capital investment and have the potential to produce incremental

78

cash flows, and (v) by selling VOIs obtained through secondary market or JIT arrangements. Bluegreen considers free cash flow to be a measure of cash generated by operating activities that can be used for future investing and financing activities, however, is not a guarantee that Bluegreen will use excess cash flows for such purposes. While Bluegreen intends to remain flexible with its sales of different categories of VOI inventory in the future, Bluegreen currently expects that its mix of fee-based inventory will decrease over time.

Bluegreen has $20.1 million of required contractual obligations coming due to be paid within one year, as well as two financing facilities with advance periods that will expire in 2021. While there is no assurance that Bluegreen will be successful, Bluegreen intends to seek to renew or extend its debt and extend the advance periods on certain facilities.

The ability to sell and/or borrow against notes receivable from VOI buyers has been critical to Bluegreen's continued liquidity. A financed VOI buyer is generally only required to pay a minimum of 10% to 20% of the purchase price in cash at the time of sale; however, selling, marketing and administrative expenses attributable to the sale are primarily cash expenses that generally exceed a buyer's minimum required down payment. Accordingly, having financing facilities available for the hypothecation, sale or transfer of Bluegreen's VOI notes receivable has been critical to its ability to meet its short and long-term cash needs. Bluegreen has attempted to maintain a number of diverse financing facilities. Historically, Bluegreen has relied on its ability to sell receivables in the term securitization market in order to generate liquidity and create capacity in its receivable facilities. Bluegreen has historically financed a majority of its sales of VOIs, and accordingly, are subject to the risk of defaults by its customers. While Bluegreen does not believe that the full impact of COVID – 19 is reflected in its default or delinquency rates as of December 31, 2020, and believes that the COVID-19 pandemic will continue to have an impact on the collectability of its VOI notes receivable.

Further, the COVID-19 pandemic has resulted in instability and volatility in the financial markets. As described above, Bluegreen's ability to borrow against or sell its VOI notes receivable has historically been a critical factor in Bluegreen's liquidity. If Bluegreen is unable to renew credit facilities or obtain new credit facilities, Bluegreen's business, results of operations, liquidity, or financial condition would be materially, adversely impacted.

In connection with Bluegreen's capital-light business activities, Bluegreen has entered into agreements with third-party developers that allow Bluegreen to buy VOI inventory, typically on a non-committed basis, prior to when it intends to sell such VOIs. Bluegreen's capital-light business strategy also includes secondary market sales, pursuant to which Bluegreen enters into secondary market arrangements with certain HOAs and others generally on a non-committed basis, which allows Bluegreen to acquire VOIs generally at a significant discount, as such VOIs are typically obtained by the HOAs through foreclosure in connection with maintenance fee defaults. Acquisition of JIT and secondary market inventory in 2021 is expected to range between $10.0 million to $15.0 million.

In October 2020, Bluegreen completed the 2020-A Term Securitization, a private offering and sale of approximately $131.0 million of investment-grade, VOI receivable backed notes (the "Notes"), including approximately $48.6 million of Class A Notes, approximately $47.9 million of Class B Notes and approximately $34.5 million of Class C Notes with interest rates of 1.55%, 2.49%, and 4.22%, respectively, which blends to an overall interest rate of approximately 2.60%. The gross advance rate for this transaction was 88.0%. The Notes mature in February 2036.   KeyBanc Capital Markets Inc. ("KeyCM") and Barclays Capital Inc. acted as co-lead managers and were the initial purchasers of the Notes. KeyCM also acted as structuring agent for the transaction.

Subject to the performance of the collateral, Bluegreen will receive any excess cash flows generated by the receivables transferred under the 2020-A Term Securitization (excess meaning after payments of customary fees, interest, and principal under the 2020-A Term Securitization) on a pro-rata basis as borrowers make payments on their VOI loans.

While ownership of the VOI receivables included in the 2020-A Term Securitization is transferred and sold for legal purposes, the transfer of these receivables is accounted for as a secured borrowing for financial accounting purposes. Accordingly, no gain or loss was recognized as a result of this transaction.

In October 2020, Bluegreen repaid in full the notes payable issued in connection with the 2012 Term Securitization. Accordingly, the related unamortized debt issuance costs of $0.1 million were written off during the fourth quarter of 2020.

79

D - 0055-0079

Bluegreen's level of debt and debt service requirements have several important effects on its operations and in turn on the Company, including that: (i) significant debt service cash requirements reduce the funds available for operations and future business opportunities and increase Bluegreen's vulnerability to adverse economic and industry conditions, as well as conditions in the credit markets, generally; (ii) Bluegreen's leverage position increases its vulnerability to economic and competitive pressures; (iii) the financial covenants and other restrictions contained in indentures, credit agreements and other agreements relating to its indebtedness require Bluegreen to meet certain financial tests and may restrict Bluegreen's ability to, among other things, pay dividends, borrow additional funds, dispose of assets or make investments; and (iv) Bluegreen's leverage position may limit funds available for acquisitions, working capital, capital expenditures, dividends and other general corporate purposes.  Certain of Bluegreen's competitors operate on a less leveraged basis and have greater operating and financial flexibility than Bluegreen does.

*Credit Facilities for Receivables with Future Availability*

Bluegreen maintains various credit facilities with financial institutions which allow Bluegreen to borrow against or sell its VOI notes receivable.  As of December 31, 2020, Bluegreen had the following credit facilities with future availability, all of which are subject to revolving availability terms during the advance period and therefore provide for additional availability as the facility is paid down, subject in each case to compliance with covenants, eligible collateral and applicable terms and conditions during the advance period (dollars in thousands):

| | Borrowing Limit as of December 31, 2020 | Outstanding Balance as of December 31, 2020 | Availability as of December 31, 2020 | Advance Period Expiration; Borrowing Maturity as of December 31, 2020 | Borrowing Rate; Rate as of December 31, 2020 |
|---|---|---|---|---|---|
| Liberty Bank Facility | $ 40,000 | $ 12,316 | $ 27,684 | June 2021; June 2024 | Prime Rate - 0.10%; floor of 3.40%; 3.40% |
| NBA Receivables Facility | 70,000 | 31,862 | 38,138 | September 2023; March 2028 | 30 day LIBOR+2.25% to 2.75%; floor of 3.00% to 3.50%; 3.32% [1] |
| Pacific Western Facility | 40,000 | 8,623 | 31,377 | September 2021; September 2024 | 30 day LIBOR+2.75% to 3.00%; 3.15% |
| KeyBank/DZ Purchase Facility | 80,000 | — | 80,000 | December 2022; December 2024 | 30 day LIBOR or CP +2.25% [2] |
| Quorum Purchase Facility | 50,000 | 29,788 | 20,212 | December 2022; December 2034 | [3] |
| | $ 280,000 | $ 82,589 | $ 197,411 | | |

(1)  As described in further detail below, borrowings prior to September 25, 2020 accrue interest at a rate equal to one month LIBOR plus 2.75% (with an interest rate floor of 3.50%), provided that the rate shall decrease to one-month LIBOR plus 2.25% (with an interest rate floor of 3.00%) on the then remaining balance of borrowing prior to September 25, 2020 if new advances subsequent to September 25, 2020 are at least $25.0 million by June 30, 2021. Borrowings after September 25, 2020 accrue interest at one-month LIBOR plus 2.25% (with an interest rate floor of 3.00%).
(2)  Borrowings accrue interest at a rate equal to either LIBOR, a "Cost of Funds" rate or commercial paper ("CP") rates plus 2.25% (with an interest rate floor of 0.25%). As described in further detail below, the interest rate will increase to the applicable rate plus 3.25% upon the expiration of the advance period (with an interest rate floor of 0.25%).
(3)  Of the amounts outstanding under the Quorum Purchase Facility at December 31, 2020, $2.2 million accrues interest at a rate per annum of 4.75%, $15.3 million accrues interest at a fixed rate of 4.95%, and $12.3 million accrues interest at a fixed rate of 5.10%.

*Liberty Bank Facility.*  Since 2008, Bluegreen has maintained a revolving VOI notes receivable hypothecation facility (the "Liberty Bank Facility") with Liberty Bank which provides for advances on eligible receivables pledged under the Liberty Bank Facility, subject to specified terms and conditions, during the revolving credit period. On June 25, 2020, Bluegreen amended the Liberty Bank Facility to extend the revolving credit period from June 2020 to June

80

2021, and the maturity from March 2023 to June 2024. In addition, the amendment decreased the advance rate with respect to Qualified Timeshare Loans from 95% to 90% of the unpaid principal balance of the Qualified Timeshare Loans. The advance rate is 83% of the unpaid principal balance of Non-Conforming Qualified Timeshare Loans. The amendment also reduced the maximum permitted outstanding borrowings from $50.0 million to $40.0 million, subject to the terms of the facility, and effective July 1, 2020, decreased the interest rate to the Prime Rate minus 0.10% with a floor of 3.40% from the Prime Rate with a floor of 4.00%. In addition, recourse to Bluegreen under the amended facility was reduced to $10.0 million, with certain exceptions set forth in the facility. Subject to the terms of the facility, principal and interest due under the Liberty Bank Facility are paid as cash is collected on the pledged receivables, with the remaining balance being due by maturity.

*NBA Receivables Facility.* Bluegreen/Big Cedar Vacations has a revolving VOI hypothecation facility (the "NBA Receivables Facility") with National Bank of Arizona ("NBA") which was amended and restated on September 25, 2020. The Amended and Restated NBA Receivables Facility extended the revolving advance period from September 2020 to September 2023 and the maturity date from March 2025 to March 2028. In addition, the interest rate on all new advances made under the facility will be one month LIBOR plus 2.25% (with an interest rate floor of 3.00%). Further, if new advances of at least $25.0 million are made by June 30, 2021, the interest rate on borrowings under the facility at September 25, 2020, to the extent then remaining outstanding, will be reduced from the current rate of one month LIBOR plus 2.75% (with an interest rate floor of 3.50%) to one month LIBOR plus 2.25% (with an interest rate floor of 3.00%). The Amended and Restated NBA Receivables Facility provides for advances at a rate of 80% on eligible receivables pledged under the facility (decreased from the prior rate of 85%), subject to eligible collateral and specified terms and conditions, during the revolving credit period. The maximum borrowings allowed under the facility remains at $70.0 million. In addition, recourse to Bluegreen/Big Cedar under the amended facility was reduced to $19.9 million as of December 31, 2020 and will be reduced by $1.3 million per month until it reaches a floor of $10.0 million. Subject to the terms of the facility, principal and interest payments received on pledged receivables are applied to principal and interest due under the facility, with the remaining outstanding balance being due by maturity.

*Pacific Western Facility.* Bluegreen has a revolving VOI notes receivable hypothecation facility (the "Pacific Western Facility") with Pacific Western Bank, which provides for advances on eligible VOI notes receivable pledged under the facility, subject to specified terms and conditions, during a revolving credit period. Maximum outstanding borrowings under the Pacific Western Facility are $40.0 million, subject to eligible collateral and customary terms and conditions. The revolving advance period expires in September 2021 and the Pacific Western Facility matures in September 2024 (in each case, subject to an additional 12-month extension at the option of Pacific Western Bank). Eligible "A" VOI notes receivable that meet certain eligibility and FICO score requirements, which Bluegreen believes are typically consistent with loans originated under its current credit underwriting standards, are subject to an 85% advance rate. The Pacific Western Facility also allows for certain eligible "B" VOI notes receivable (which have less stringent FICO score requirements) to be funded at a 53% advance rate. All borrowings outstanding under the Pacific Western Facility accrue interest at an annual rate equal to 30-day LIBOR plus 3.00%; provided, however, that a portion of the borrowings, to the extent such borrowings are in excess of established debt minimums, will accrue interest at 30-day LIBOR plus 2.75%. Subject to the terms of the facility, principal repayments and interest on borrowings under the Pacific Western Facility are paid as cash is collected on the pledged VOI notes receivable, subject to future required decreases in the advance rates after the end of the revolving advance period, with the remaining outstanding balance being due by maturity. The facility has limited recourse not to exceed $10.0 million.

*KeyBank/DZ Purchase Facility.* Bluegreen has a VOI notes receivable purchase facility (the "KeyBank/DZ Purchase Facility") with DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt AM Main ("DZ"), and KeyBank National Association ("KeyBank") which permits maximum outstanding financings of up to $80.0 million and provides for an advance rate of 80% with respect to VOI receivables securing amounts financed. On December 27, 2019, the KeyBank/DZ Purchase Facility was amended to extend the advance period to December 2022 from December 2019. The KeyBank/DZ Purchase Facility will mature and all outstanding amounts will become due 24 months after the revolving advance period has expired, or earlier under certain circumstances set forth in the facility. Interest on amounts outstanding under the facility is tied to an applicable index rate of the LIBOR rate, in the case of amounts funded by KeyBank, and a cost of funds rate or commercial paper rates, in the case of amounts funded by or through DZ. Pursuant to the amendment, the interest rate payable under the facility decreased from 2.75% to the applicable index rate plus 2.25% (with an interest rate index floor of 0.25%) until the expiration of the revolving advance period, and thereafter decreased from 4.75% to equal the applicable index rate plus 3.25% (with an interest rate index floor of 0.25%). Subject to the terms of the facility, Bluegreen will receive the excess cash flows generated

81

D - 0055-0081

by the VOI notes receivable sold (excess meaning after payments of customary fees, interest and principal under the facility) until the expiration of the VOI notes receivable advance period, at which point all of the excess cash flow will be paid to the note holders until the outstanding balance is reduced to zero. While ownership of the VOI notes receivable included in the facility is transferred and sold for legal purposes, the transfer of these VOI notes receivable is accounted for as a secured borrowing for financial reporting purposes. The facility is nonrecourse.

*Quorum Purchase Facility.* Bluegreen/Big Cedar Vacations has a VOI notes receivable purchase facility (the "Quorum Purchase Facility") with Quorum Federal Credit Union ("Quorum"), pursuant to which Quorum has agreed to purchase eligible VOI notes receivable in an amount of up to an aggregate $50.0 million purchase price, subject to certain conditions precedent and other terms of the facility. On December 18, 2020, the Quorum Purchase Facility was amended to extend the advance period to December 2022 from December 2020 and the maturity date to December 2034 from December 2032. The interest rate on each advance is set at the time of funding based on rates mutually agreed upon by the parties. Of the amounts outstanding under the Quorum Purchase Facility at December 31, 2020, $2.2 million accrues interest at a rate per annum of 4.75%, $15.3 million accrues interest at a fixed rate of 4.95%, and $12.3 million accrues interest at a fixed rate of 5.10%. The Quorum Purchase Facility provides for an 85% advance rate on eligible receivables sold under the facility, however Quorum can modify this advance rate on future purchases subject to the terms and conditions of the Quorum Purchase Facility. Eligibility requirements for VOI notes receivable sold include, among others, that the obligors under the VOI notes receivable sold be members of Quorum at the time of the note sale. Subject to performance of the collateral, Bluegreen or Bluegreen/Big Cedar Vacations, as applicable, will receive any excess cash flows generated by the VOI notes receivable transferred to Quorum under the facility (excess meaning after payment of customary fees, interest and principal under the facility) on a pro-rata basis as borrowers make payments on their VOI notes receivable. While ownership of the VOI notes receivable included in the Quorum Purchase Facility is transferred and sold for legal purposes, the transfer of these VOI notes receivable is accounted for as a secured borrowing for financial reporting purposes. The facility is nonrecourse.

### *Other Credit Facilities*

*Fifth Third Syndicated Line-of-Credit and Fifth Third Syndicated Term Loan.* In December 2016, Bluegreen entered into a $100.0 million syndicated credit facility with Fifth Third Bank, as administrative agent and lead arranger, and certain other bank participants as lenders. In October 2019, Bluegreen amended the facility and increased the facility to $225.0 million. The amended facility includes a $100.0 million term loan (the "Fifth Third Syndicated Term Loan") with quarterly amortization requirements and a $125.0 million revolving line of credit (the "Fifth Third Syndicated Line-of-Credit"). Borrowings under the amended facility generally bear interest at LIBOR plus 2.00% - 2.50% (with a LIBOR floor of 0.25%), depending on Bluegreen's leverage ratio, are collateralized by certain of Bluegreen's VOI inventory, sales center buildings, management fees, short-term receivables and cash flows from residual interests relating to certain term securitizations, and will mature in October 2024. During March 2020, in an effort to assure adequate liquidity for a sustained period given the effect and uncertainties associated with the COVID-19 pandemic, Bluegreen drew down $60.0 million under its line-of-credit which it has repaid as of December 31, 2020. As of December 31, 2020, outstanding borrowings under the facility totaled $123.8 million, including $93.8 million under the Fifth Third Syndicated Term Loan with an interest rate of 2.25%, and $30.0 million under the Fifth Third Syndicated Line of Credit with an interest rate of 2.25%.

Bluegreen also has outstanding obligations under various credit facilities and securitizations that have no remaining future availability as the advance periods have expired.

82

*Commitments*

The Company's material commitments as of December 31, 2020 included the required payments due on receivable-backed debt, notes payable and other borrowings, junior subordinated debentures, commitments to complete certain projects based on its sales contracts with customers, subsidy advances to certain HOAs, and commitments under non-cancelable operating leases.

The following table summarizes the contractual minimum principal and interest payments required on all of the Company's outstanding debt, non-cancelable operating leases and inventory purchase commitments by period due date, as of December 31, 2020 (in thousands):

| | | | | | | Payments Due by Period | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Contractual Obligations** | | **Less than 1 year** | | **1 – 3 Years** | | **4 – 5 Years** | **After 5 Years** | **Unamortized Debt Issuance Costs** | | **Total** |
| Receivable-backed notes payable | $ | — | $ | — | $ | 33,843 | $ 366,484 | $ (5,994) | $ | 394,333 |
| Notes payable and other borrowings | | 12,200 | | 24,953 | | 102,500 | — | (1,267) | | 138,386 |
| Note payable to BBX Capital, Inc. | | — | | — | | 75,000 | — | — | | 75,000 |
| Jr. subordinated debentures [1] | | — | | — | | — | 177,129 | (1,057) | | 176,072 |
| Noncancelable operating leases [2] | | 4,025 | | 12,561 | | 5,770 | 25,435 | — | | 47,791 |
| Bass Pro Settlement [3] | | 4,000 | | 8,000 | | 4,000 | — | — | | 16,000 |
| Total contractual obligations | | 20,225 | | 45,514 | | 221,113 | 569,048 | (8,318) | | 847,582 |
| | | | | | | | | | | |
| **Interest Obligations** [4] | | | | | | | | | | |
| Receivable-backed notes payable | | 13,229 | | 26,458 | | 25,108 | 92,245 | — | | 157,040 |
| Notes payable and other borrowings | | 3,320 | | 5,276 | | 1,871 | — | — | | 10,467 |
| Note payable to BBX Capital, Inc. | | 4,500 | | 9,000 | | 7,875 | — | — | | 21,375 |
| Jr. subordinated debentures | | 8,294 | | 16,586 | | 16,586 | 84,203 | — | | 125,669 |
| Total contractual interest | | 29,343 | | 57,320 | | 51,440 | 176,448 | — | | 314,551 |
| Total contractual obligations | $ | 49,568 | $ | 102,834 | $ | 272,553 | $ 745,496 | $ (8,318) | $ | 1,162,133 |

(1) Amounts do not include purchase accounting adjustments for junior subordinated debentures of $37.9 million.
(2) Amounts represent the cash payment for leases and includes interest of $11.9 million. The increase in noncancelable operating leases is primarily the result of 2 new leases executed in December 2020.
(3) Amounts represent the $4.0 million annual cash payment to Bass Pro during each of 2021, 2022, 2023, and 2024 pursuant to the June 2019 settlement agreement and include imputed interest of $2.7 million.
(4) Assumes that the scheduled minimum principal payments are made in accordance with the table above and the interest rate on variable rate debt remains the same as the rate at December 31, 2020.

The future commitments of the Company, excluding Bluegreen, relate to the Woodbridge's junior subordinated debentures and the note payable to BBX Capital, including interest thereon. The Company will rely primarily on cash on hand and cash equivalents, as well as dividends that may be provided by Bluegreen in the future, in order to satisfy the principal payments required on its contractual obligations. As discussed above, the COVID-19 pandemic has resulted in Bluegreen's suspension of its regular quarterly dividend, and while the Company believes that it will have sufficient cash and cash equivalents to fund its operations for approximately two years following the spin-off, it will be dependent on the resumption of dividends from Bluegreen to fund its operations in future periods. There is no assurance that Bluegreen will resume the payment of dividends.

In December 2019, Bluegreen's then-serving President and Chief Executive Officer resigned. In connection with his resignation, Bluegreen agreed to make payments totaling $3.5 million over a period of 18 months, $1.2 million of which remained payable as of December 31, 2020.

83

In lieu of paying maintenance fees for unsold VOI inventory, Bluegreen may enter into subsidy agreements with certain HOAs. During the years ended December 31, 2020, 2019 and 2018, Bluegreen made payments related to such subsidies of $24.0 million, $24.9 million, and $12.6 million, respectively, which are included within cost of other fee-based services in the Company's consolidated statements of operations and comprehensive income. As of December 31, 2020 and December 31, 2019, Bluegreen had no accrued liabilities for such subsidies.

Bluegreen intends to use cash on hand and cash flow from operations, including cash received from the sale or pledge of VOI notes receivable, and cash received from new borrowings under existing or future credit facilities in order to satisfy the principal payments and interest required on its contractual obligations.

Bluegreen believes that its existing cash, anticipated cash generated from operations, anticipated future permitted borrowings under existing or future credit facilities, and anticipated future sales of notes receivable under existing, future or replacement purchase facilities will be sufficient to meet its anticipated working capital, capital expenditure and debt service requirements, including the contractual payment of the Bluegreen obligations set forth above, for the foreseeable future, subject to the success of its ongoing business strategies, the ongoing availability of credit and the impact of the COVID-19 pandemic and success of the actions Bluegreen has taken in response thereto. Bluegreen will continue its efforts to renew, extend or replace any credit and receivables purchase facilities that have expired or that will expire in the near term. Bluegreen may, in the future, also obtain additional credit facilities and may issue corporate debt or equity securities. Any debt incurred or issued may be secured or unsecured, bear interest at fixed or variable rates and may be subject to such terms as the lender may require and management believes acceptable. There can be no assurance that Bluegreen's efforts to renew or replace credit facilities or receivables purchase facilities which have expired or which are scheduled to expire in the near term will be successful or that sufficient funds will be available from operations or under existing, proposed or future revolving credit or other borrowing arrangements or receivables purchase facilities to meet Bluegreen's cash needs, including debt service obligations. To the extent Bluegreen is unable to sell notes receivable or borrow under such facilities, its ability to satisfy its obligations would be materially adversely affected.

Bluegreen's receivables purchase facilities, credit facilities, indentures and other outstanding debt instruments include what Bluegreen believes to be customary conditions to funding, eligibility requirements for collateral, cross-default and other acceleration provisions and certain financial and other affirmative and negative covenants, including, among others, limits on the incurrence of indebtedness, payment of dividends, investments in joint ventures and other restricted payments, the incurrence of liens and transactions with affiliates, as well as covenants concerning net worth, fixed charge coverage requirements, debt-to-equity ratios, portfolio performance requirements and cash balances, and events of default or termination. In the future, Bluegreen may be required to seek waivers of such covenants, but may not be successful in obtaining waivers, and such covenants may limit its ability to raise funds, sell receivables or satisfy or refinance its obligations, or otherwise adversely affect Bluegreen's financial condition and results of operations, as well as its ability to pay dividends. During April 2020, Bluegreen's board of directors suspended regular quarterly cash dividends on Bluegreen's common stock due to the impact of the COVID-19 pandemic. While Bluegreen paid a special dividend during August 2020, no regular or any other special cash dividends are currently anticipated. Bluegreen's future operating performance and ability to meet its financial obligations will be subject to future economic conditions and to financial, business and other factors, many of which may be beyond its control.

Pursuant to a settlement agreement Bluegreen entered into with Bass Pro and its affiliates during June 2019, Bluegreen paid Bass Pro $20.0 million and agreed to make five annual payments to Bass Pro of $4.0 million, which commenced in January 2020.  Additionally, in lieu of the previous commission arrangement, Bluegreen agreed to pay Bass Pro a fixed annual fee of $70,000 for each Bass Pro and Cabela's retail store that it is accessing (excluding sales at retail stores which are designated to provide tours to Bluegreen/Big Cedar Vacations, or "Bluegreen/Big Cedar feeder stores"), plus $32.00 per net vacation package sold (less cancellations or refunds within 45 days of sale). Bluegreen also agreed to contribute to the Wonders of Wildlife Foundation $5.00 per net package sold (less certain cancellations and refunds within 45 days of sale), subject to an annual minimum of $700,000.  Subject to the terms and conditions of the settlement agreement, Bluegreen is generally required to pay the fixed annual fee with respect to at least 59 Bass Pro retail stores and a minimum number of Cabela's retail stores that increases over time to a total of at least 60 Cabela's retail stores by the end of 2021. During 2020, Bluegreen paid $5.7 million for this fixed fee, which is included in selling, general and administrative expenses within the Company's consolidated statement of operations and comprehensive income. Notwithstanding the foregoing, the minimum number of Bass Pro and Cabela's retail stores for purposes of the fixed annual fee may be reduced under certain circumstances set forth in the agreement,

84

including as a result of a reduction of traffic in the stores in excess of 25% year-over-year. In March 2020 as a result of the COVID-19 pandemic, Bluegreen temporarily closed its retail marketing operations at Bass Pro Shops and Cabela's stores. Beginning mid-May 2020, Bluegreen started the process of recommencing its sales and marketing operations and by December 31, 2020, Bluegreen had recommenced operating marketing kiosks at 88 Bass Pro Shops and Cabela's stores and commenced operating marketing kiosks at 10 new Cabela's stores, for a total of 98 Bass Pro Shops and Cabela's stores.

*Off-balance-sheet Arrangements*

As of December 31, 2020 and December 31, 2019, the Company did not have any "off-balance sheet" arrangements.

**Critical Accounting Policies and Estimates**

The Company's discussion and analysis of results of operations and financial condition are based upon its  consolidated financial statements, which have been prepared in accordance with GAAP. The preparation of these financial statements requires it to make estimates and judgments that affect the reported amounts of assets, liabilities, revenue and expenses, and related disclosure of commitments and contingencies. On an ongoing basis, the Company evaluates its estimates, including those that relate to the estimated future sales value of inventory, the recognition of revenue and its allowance for loan losses.  The Company bases its  estimates on historical experience and on various other assumptions that it believes to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ materially from these estimates if different assumptions and conditions were utilized. If actual results differ significantly from its estimates, its results of operations and financial condition could be materially, adversely impacted.

*Revenue Recognition for Sales of VOIs*

Bluegreen generally offers qualified purchasers financing for up to 90% of the purchase price of VOIs. The typical financing provides for a term of ten years and a fixed interest rate, is fully amortizing in equal installments and may be prepaid without penalty. For sales of VOIs for which Bluegreen provides financing, it has reduced the transaction price for expected loan losses, which Bluegreen considers to be variable consideration. To the extent Bluegreen determines that it is probable that a significant reversal of cumulative revenue recognized may occur, it records an estimate of variable consideration as a reduction to the transaction price of the sales of VOIs until the uncertainty associated with the variable consideration is resolved. Bluegreen's estimate of variable consideration is based on the results of its static pool analysis, which relies on historical payment data for similar VOI notes receivable and tracks uncollectibles for each period's sales over the entire life of the VOI notes receivable. Bluegreen also considers whether historical economic conditions are comparable to then current economic conditions, as well as variations in underwriting standards. Bluegreen's policies regarding the estimation of variable consideration on its notes receivable are discussed in further detail under "Allowance for Loan Losses on VOI Notes Receivable" below.

*Allowance for Loan Losses on VOI Notes Receivable*

The allowance for loan losses is related to the notes receivable generated in connection with financing Bluegreen's VOI sales. Bluegreen holds large amounts of homogeneous VOI notes receivable and assess uncollectibility based on pools of receivables as there are no significant concentrations of credit risk with any individual counterparty or groups of counterparties. In estimating future loan losses, Bluegreen does not use a single primary indicator of credit quality but instead evaluates its VOI notes receivable based upon a static pool analysis that incorporates the age of the respective receivables, default trends and prepayment rates by origination year, as well as the FICO scores of the borrowers.

 *Inventory and Cost of Sales*

Bluegreen carries its completed inventory at the lower of:  (i) cost, including costs of improvements and amenities incurred subsequent to acquisition, capitalized interest, real estate taxes and other costs incurred during construction, or (ii) estimated fair market value, less costs to sell. Bluegreen uses the relative sales value method for establishing the cost of its VOI sales and relieving inventory, which requires it to make estimates subject to significant uncertainty.

85

D - 0055-0085

Under the relative sales value method required by timeshare accounting rules, cost of sales is calculated as a percentage of net sales using a cost-of-sales percentage based on the ratio of total estimated development costs to total estimated VOI revenue, including estimated incremental revenue from the resale of VOI inventory repossessed, generally as a result of the default of the related receivable. Also, pursuant to timeshare accounting rules, Bluegreen does not relieve inventory for VOI cost of sales related to anticipated loan losses. Accordingly, no adjustment is made when inventory is reacquired upon default of the related receivable. The effect of changes in estimates under the relative sales value method, including estimates of projected sales, future defaults, upgrades and incremental revenue from the resale of repossessed VOI inventory, are reflected on a retrospective basis in the period the change occurs.

86

**ITEM 7A.  QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

The Company is exposed to market risks in the ordinary course of its business. These risks primarily include interest rate risk and risks relating to inflation and changing prices.

The market price of the Company's Class A Common Stock and Class B Common Stock and Bluegreen's common stock are important to the Company's valuation and financing capability.

*Interest Rate Risk*

The Company is subject to interest rate risk on Woodbridge's junior subordinated debentures. The interest rates for Woodbridge's $66.3 million of junior subordinated debentures are variable rates based upon the prevailing 3-month LIBOR rates. For variable rate financial instruments, interest rate changes do not generally affect the market value of the debt, but they do impact future earnings and cash flows, assuming other factors are held constant. If interest rates were to increase one percentage point, the effect on interest expense related to Woodbridge's variable-rate debt would be an annual increase of approximately $0.7 million, based on December 31, 2020 balances.

As of December 31, 2020, Bluegreen had fixed interest rate debt of approximately $341.5 million and floating interest rate debt of approximately $300.2 million, excluding purchase accounting adjustments for junior subordinated debentures of $37.9 million. The floating interest rates are subject to floors and are generally based either upon the prevailing prime or LIBOR rates. For floating rate financial instruments, interest rate changes generally do not affect the market value of the debt, but do impact earnings and cash flows relating to the debt, assuming other factors are held constant. Conversely, for fixed rate financial instruments, interest rate changes affect the market value of the debt but do not impact earnings or cash flows relating to the debt, assuming other factors are held constant.

To the extent inflationary trends, tightened credit markets or other factors affect interest rates, the Company's debt service costs may increase. If interest rates increased one percentage point, the effect on interest expense related to Bluegreen's floating rate debt would be an annual increase of approximately $3.0 million based on December 31, 2020 balances and interest rates. Due to the interest rate floors on Bluegreen's floating rate debt, if interest rates decreased one percentage point, the effect on interest expense related to Bluegreen's floating rate debt would be an annual decrease of approximately $1.3 million based on December 31, 2020 balances and interest rates. In addition, a one percentage point increase or decrease in interest rates would affect the total fair value of Bluegreen's fixed rate debt by an immaterial amount. This analysis does not consider the effects of changes in the level of overall economic activity that could result due to interest rate changes. Further, in the event of a significant change in interest rates, Bluegreen may pursue actions in order to mitigate any exposure to the change. However, due to the uncertainty of the specific actions that may be taken and their possible effects, the foregoing sensitivity analysis assumes no changes in Bluegreen's financial structure. Further, in the event of tightened credit markets, there may a significant tightening of availability under Bluegreen's existing lines, Bluegreen may be unable to renew its lines of credit or obtain new facilities. In addition, Bluegreen's ability to borrow against or sell its VOI notes receivable has historically been a critical factor in its liquidity. As a result, instability or volatility in the financial markets restricting the availability of credit, including any tightening of the credit markets in connection with the continuation or worsening of the COVID-19 pandemic, may adversely impact its, business, results of operations, liquidity, or financial condition.

*Risks Relating to Inflation and Changing Prices*

The Company is subject to significant interest rate risk on outstanding debt. As a result, interest rates have a more significant impact on the Company's performance than the effects of general price levels, although interest rates generally move in the same direction as inflation, the magnitude of such changes varies.

Inflation and changing prices have had and may in the future have a material impact on the Company's revenue and results of operations. Bluegreen has increased the sales prices of its VOIs periodically and has experienced increases in construction and development costs. Bluegreen may not be able to increase or maintain the current level of its sales prices, and increased construction and development costs may have a material adverse impact on gross margin. In addition, to the extent that inflation or increased prices for VOIs adversely impacts consumer demand, Bluegreen's results of operations could be adversely impacted.

87

*Changes to and replacement of the LIBOR benchmark interest rate could adversely affect the Company's results of operations and liquidity.*

In July 2017, the Financial Conduct Authority (the regulatory authority over LIBOR) stated it plans for a phase out of regulatory oversight of LIBOR interest rate indices after 2021 to allow for an orderly transition to an alternate reference rate. The Alternative Reference Rates Committee ("ARRC") has proposed that the Secured Overnight Financing Rate ("SOFR") is the rate that represents best practice as the alternative to LIBOR for promissory notes or other contracts that are currently indexed to LIBOR. The ARRC has proposed a market transition plan to SOFR from LIBOR and organizations are currently working on transition plans as it relates to derivatives and cash markets exposed to LIBOR. In March 2020, the FASB issued ASU 2020-04, "Reference Rate Reform (Topic 848): Facilitation of the Effect of Reference Rate Reform on Financial Reporting" ("ASU 2020-04"), which provides relief for companies preparing for discontinuation of LIBOR in response to the Financial Conduct Authority (the regulatory authority over LIBOR) plan for a phase out of regulatory oversight of LIBOR interest rate indices after 2021 to allow for an orderly transition to an alternate reference rate. Although Bluegreen's VOIs notes receivable from its borrowers are not indexed to LIBOR, the Company (including Bluegreen) currently has $177.1 million of LIBOR indexed junior subordinated debentures, $40.5 million of LIBOR indexed receivable-backed notes payable and lines of credit and $127.5 million of LIBOR indexed lines of credit and notes payable (which are not receivable-backed) maturing in 2021 and after. The Company is evaluating the potential impact that the eventual replacement of the LIBOR benchmark interest rate could have on the Company's results of operations and liquidity.

88

D - 0055-0088

ITEM 8.  FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

**BLUEGREEN VACATIONS HOLDING CORPORATION AND SUBSIDIARIES**
**INDEX TO FINANCIAL STATEMENTS**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | 90 |
| Consolidated Balance Sheets as of December 31, 2020 and 2019 | 92 |
| Consolidated Statements of Operations and Comprehensive Income for the years ended December 31, 2020, 2019 and 2018 | 93 |
| Consolidated Statements of Shareholders' Equity for the years ended December 31, 2020, 2019 and 2018 | 95 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2020, 2019 and 2018 | 97 |
| Notes to Consolidated Financial Statements | 99 |

89

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors and Shareholders
Bluegreen Vacations Holding Corporation

**Opinion on the financial statements**

We have audited the accompanying consolidated balance sheets of Bluegreen Vacations Holding Corporation (a Florida corporation) and subsidiaries (the "Company") as of December 31, 2020 and 2019, the related consolidated statements of operations and comprehensive income, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2020, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2020, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2020 based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), and our report dated March 1, 2021 expressed an unqualified opinion.

**Basis for opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical audit matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Allowance for loan losses*

As described in Note 2 to the consolidated financial statements, for sales of vacation ownership interests ("VOIs") for which the Company provides financing, the Company records an estimate of variable consideration for expected loan losses as a reduction of the transaction price. The Company's estimates of variable consideration are based on projected default rates that are the result of a static pool analysis, which relies on historical payment data for similar VOI notes receivable, and tracks uncollectible loans for each period's sales over the entire life of the VOI notes receivable. A further qualitative analysis is performed by the Company which considers whether any economic, market or portfolio specific conditions exist that may indicate an adjustment is necessary to properly reflect the impact on the allowance for loan losses. We identified the determination of the allowance for loan losses as a critical audit matter.

90

Auditing the allowance for loan losses was challenging given the significant and complex judgement required to accurately predict future losses over the life of the VOI notes receivable, including the determination of whether any qualitative adjustments are necessary.

Our audit procedures related to the allowance for loan losses included the following, among others.

⊙   We obtained an understanding, evaluated the design, and tested the operating effectiveness of controls over the Company's allowance for loan losses on VOI notes receivable process, including controls over management's review of the static pool analysis, as well as the data and assumptions utilized in applying the static pool analysis.

⊙   We tested management's process for determining the allowance as follows:

  o   We tested the completeness and accuracy of the underlying historical loss data used by the Company in the static pool analysis.
  o   We compared the projected default rates from the static pool analysis to historical and current default rates.
  o   We evaluated qualitative adjustments made to the allowance, which included assessing the basis for those adjustments and the reasonableness of the significant assumptions used.
  o   We performed a retrospective review of the prior year allowance to evaluate the reliability of the Company's estimates of future defaults.

/s/ GRANT THORNTON LLP

We have served as the Company's auditor since 2015.

Fort Lauderdale, Florida
March 1, 2021

91

**BLUEGREEN VACATIONS HOLDING CORPORATION**
**CONSOLIDATED BALANCE SHEETS**
**(In thousands, except share and per share data)**

| | As of December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| **ASSETS** | | |
| Cash and cash equivalents | $ 221,118 | $ 335,846 |
| Restricted cash ($20,469 and $22,534 in VIEs at December 31, 2020 and December 31, 2019, respectively) | 35,986 | 49,896 |
| Notes receivable | 551,393 | 589,198 |
| Less: Allowance for loan loss | (142,044) | (140,630) |
| Notes receivable, net ($292,021 and $292,590 in VIEs at December 31, 2020 and December 31, 2019, respectively) | 409,349 | 448,568 |
| Vacation ownership interest ("VOI") inventory | 347,122 | 346,937 |
| Property and equipment, net | 90,049 | 99,670 |
| Intangible assets, net | 61,431 | 61,515 |
| Operating lease assets | 34,415 | 21,498 |
| Other assets | 50,649 | 68,477 |
| Discontinued operations total assets | — | 360,861 |
| Total assets | $ 1,250,119 | $ 1,793,268 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Liabilities** | | |
| Accounts payable | $ 10,559 | $ 16,662 |
| Deferred income | 15,745 | 18,074 |
| Escrow deposits | 13,435 | 22,711 |
| Other liabilities | 80,536 | 99,320 |
| Receivable-backed notes payable - recourse | 38,500 | 78,569 |
| Receivable-backed notes payable - non-recourse (in VIEs) | 355,833 | 344,246 |
| Note payable to BBX Capital, Inc. | 75,000 | — |
| Notes payable and other borrowings | 138,386 | 146,160 |
| Junior subordinated debentures | 138,177 | 137,254 |
| Operating lease liabilities | 35,904 | 22,957 |
| Deferred income taxes | 85,314 | 89,855 |
| Discontinued operations total liabilities | — | 173,381 |
| Total liabilities | 987,389 | 1,149,189 |
| Commitments and contingencies (See Note 12) | | |
| Redeemable noncontrolling interest | — | 4,009 |
| **Shareholders' Equity** | | |
| Preferred stock of $0.01 par value; authorized 10,000,000 shares | — | — |
| Class A Common Stock of $0.01 par value; authorized 30,000,000 shares; issued and outstanding 15,624,091 in 2020 and 15,106,067 in 2019 | 156 | 151 |
| Class B Common Stock of $0.01 par value; authorized 4,000,000 shares; issued and outstanding 3,693,596 in 2020 and 3,191,571 in 2019 | 37 | 32 |
| Additional paid-in capital | 177,104 | 153,507 |
| Accumulated earnings | 10,586 | 394,551 |
| Accumulated other comprehensive income | — | 1,554 |
| Total Bluegreen Vacations Holding shareholders' equity | 187,883 | 549,795 |
| Non-controlling interest | 74,847 | 90,275 |
| Total shareholders' equity | 262,730 | 640,070 |
| Total liabilities and shareholders' equity | $ 1,250,119 | $ 1,793,268 |

*See accompanying notes to consolidated financial statements.*

92

**BLUEGREEN VACATIONS HOLDING CORPORATION**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**AND COMPREHENSIVE INCOME**
(In thousands, except per share data)

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | 2019 | 2018 |
| **Revenues:** | | | |
| Sales of VOIs | $ **173,997** | $ 255,375 | $ 254,225 |
| Fee-based sales commission revenue | **89,965** | 207,832 | 216,422 |
| Other fee-based services revenue | **111,823** | 125,244 | 118,024 |
| Cost reimbursements | **64,305** | 63,889 | 62,534 |
| Interest income | **79,381** | 85,431 | 83,081 |
| Other revenue | **—** | 67 | 16 |
| Total revenues | **519,471** | 737,838 | 734,302 |
| **Costs and Expenses:** | | | |
| Cost of VOIs sold | **13,597** | 21,845 | 23,813 |
| Cost of other fee-based services | **79,434** | 83,440 | 69,968 |
| Cost reimbursements | **64,305** | 63,889 | 62,534 |
| Interest expense | **36,795** | 45,365 | 41,277 |
| Selling, general and administrative expenses | **370,935** | 514,528 | 464,338 |
| Total costs and expenses | **565,066** | 729,067 | 661,930 |
| Other (expense) income | **(1,179)** | (592) | 1,414 |
| (Loss) income before income taxes | **(46,774)** | 8,179 | 73,786 |
| Benefit (provision) for income taxes | **2,368** | (7,525) | (26,393) |
| Net (loss) income from continuing operations | **(44,406)** | 654 | 47,393 |
| Discontinued operations | | | |
| (Loss) income from operations | **(41,593)** | 40,582 | 13,646 |
| Benefit (provision) for income taxes | **8,834** | (9,133) | (5,246) |
| Net (loss) income from discontinued operations | **(32,759)** | 31,449 | 8,400 |
| Net (loss) income | **(77,165)** | 32,103 | 55,793 |
| Less: Income attributable to noncontrolling interests - continuing operations | **8,186** | 14,636 | 20,956 |
| Less: (Loss) attributable to noncontrolling interests - discontinued operations | **(4,822)** | (224) | (265) |
| **Net (loss) income attributable to shareholders** | $ **(80,529)** | $ 17,691 | $ 35,102 |
| | | | |
| Basic (loss) earnings per share from continuing operations | $ **(2.82)** | $ (0.75) | $ 1.39 |
| Basic (loss) earnings per share from discontinued operations | **(1.50)** | 1.71 | 0.45 |
| **Basic (loss) earnings per share** | $ **(4.32)** | $ 0.96 | $ 1.84 |
| Diluted (loss) earnings per share from continuing operations | $ **(2.82)** | $ (0.75) | $ 1.35 |
| Diluted (loss) earnings per share from discontinued operations | **(1.50)** | 1.71 | 0.44 |
| **Diluted (loss) earnings per share** | $ **(4.32)** | $ 0.96 | $ 1.79 |
| Basic weighted average number of common shares outstanding | **18,661** | 18,526 | 19,060 |
| Diluted weighted average number of common and common equivalent shares outstanding | **18,661** | 18,526 | 19,572 |
| **Cash dividends declared per Class A common share** | $ **—** | $ 0.25 | $ 0.20 |
| **Cash dividends declared per Class B common share** | $ **—** | $ 0.25 | $ 0.20 |

93

**BLUEGREEN VACATIONS HOLDING CORPORATION**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**AND COMPREHENSIVE INCOME—(Continued)**
**(In thousands, except per share data)**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | **2020** | **2019** | **2018** |
| **Net (loss) income** | $ (77,165) | $ 32,103 | $ 55,793 |
| **Other comprehensive income (loss), net of tax:** | | | |
| Foreign currency translation adjustments | 19 | 287 | (194) |
| Unrealized (loss) gain on securities available for sale | (198) | 52 | (47) |
| Other comprehensive (loss) income, net | (179) | 339 | (241) |
| **Comprehensive (loss) income, net of tax** | (77,344) | 32,442 | 55,552 |
| Less: Comprehensive income attributable to noncontrolling interests | 3,364 | 14,412 | 20,691 |
| **Comprehensive (loss) income attributable to shareholders** | $ (80,708) | $ 18,030 | $ 34,861 |

*See accompanying notes to consolidated financial statements.*

94

**BLUEGREEN VACATIONS HOLDING CORPORATION**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**
(In thousands)

| | Shares of Common Stock Outstanding Class | | Common Stock Class | | Additional Paid-in Capital | Accumulated Earnings | Accumulated Other Comprehensive Income | Total Shareholders' Equity | Non-controlling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | A | B | | | | | | |
| Balance, December 31, 2017 | 17,138 | 2,793 $ | 171 $ | 28 $ | 229,129 $ | 354,432 $ | 1,708 $ | 585,468 $ | 82,054 $ | 667,522 |
| Cumulative effect from the adoption of ASU 2016-01 | — | — | — | — | — | 252 | (252) | — | — | — |
| Net income excluding $370 of loss attributable to redeemable noncontrolling interest | — | — | — | — | — | 35,102 | — | 35,102 | 21,061 | 56,163 |
| Other comprehensive income | — | — | — | — | — | — | (241) | (241) | — | (241) |
| Distributions to noncontrolling interests | — | — | — | — | — | — | — | — | (14,284) | (14,284) |
| Bluegreen purchase and retirement of its common stock | — | — | — | — | (2,124) | — | — | (2,124) | (1,876) | (4,000) |
| Increase in noncontrolling interest from loan foreclosure | — | — | — | — | — | — | — | — | 704 | 704 |
| Purchase of noncontrolling interests | — | — | — | — | (587) | — | — | (587) | 329 | (258) |
| Class A common stock cash dividends declared | — | — | — | — | — | (3,281) | — | (3,281) | — | (3,281) |
| Class B common stock cash dividends declared | — | — | — | — | — | (716) | — | (716) | — | (716) |
| Purchase and retirement of common stock from tender offer | (1,297) | — | (13) | — | (60,128) | — | — | (60,141) | — | (60,141) |
| Purchase and retirement of common stock | (398) | (101) | (4) | (1) | (17,001) | — | — | (17,006) | — | (17,006) |
| Conversion of common stock from Class B to Class A | 8 | (8) | — | — | — | — | — | — | — | — |
| Issuance of common stock from vesting of restricted stock awards | 220 | 284 | 3 | 3 | (6) | — | — | — | — | — |
| Issuance of common stock from exercise of options | 5 | — | — | — | 245 | — | — | 245 | — | 245 |
| Share-based compensation | — | — | — | — | 12,901 | — | — | 12,901 | — | 12,901 |
| Balance, December 31, 2018 | 15,676 | 2,968 $ | 157 $ | 30 $ | 162,429 $ | 385,789 $ | 1,215 $ | 549,620 $ | 87,988 $ | 637,608 |
| Cumulative effect from the adoption of ASU 2016-02, net of income taxes and redeemable noncontrolling interest | — | — | — | — | — | (2,202) | — | (2,202) | — | (2,202) |
| Net income excluding $326 of loss attributable to redeemable noncontrolling interest | — | — | — | — | — | 17,691 | — | 17,691 | 14,738 | 32,429 |
| Accretion of redeemable noncontrolling interest | — | — | — | — | — | (1,902) | — | (1,902) | — | (1,902) |
| Purchase and retirement of common stock | (690) | (150) | (7) | (2) | (20,030) | — | — | (20,039) | — | (20,039) |
| Other comprehensive income | — | — | — | — | — | — | 339 | 339 | — | 339 |
| Bluegreen purchase and retirement of its common stock | — | — | — | — | (332) | — | — | (332) | (503) | (835) |
| Distributions to noncontrolling interests | — | — | — | — | — | — | — | — | (11,948) | (11,948) |
| Class A common stock cash dividends declared | — | — | — | — | — | (3,878) | — | (3,878) | — | (3,878) |
| Class B common stock cash dividends declared | — | — | — | — | — | (947) | — | (947) | — | (947) |
| Conversion of common stock from Class B to Class A | 7 | (7) | — | — | — | — | — | — | — | — |
| Issuance of common stock from vesting of restricted stock awards | 113 | 381 | 1 | 4 | (5) | — | — | — | — | — |
| Share-based compensation | — | — | — | — | 11,445 | — | — | 11,445 | — | 11,445 |
| Balance, December 31, 2019 | 15,106 | 3,192 $ | 151 $ | 32 $ | 153,507 $ | 394,551 $ | 1,554 $ | 549,795 $ | 90,275 $ | 640,070 |

95

**BLUEGREEN VACATIONS HOLDING CORPORATION**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**
**(In thousands)**

| | Shares of Common Stock Outstanding Class | | Common Stock Class | | Additional Paid-in Capital | Accumulated Earnings | Accumulated Other Comprehensive Income | Total Shareholders' Equity | Non-controlling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | A | B | | | | | | |
| **Balance, December 31, 2019** | 15,106 | 3,192 $ | 151 $ | 32 $ | 153,507 $ | 394,551 $ | 1,554 $ | 549,795 $ | 90,275 $ | 640,070 |
| Net loss excluding $4,073 of loss attributable to redeemable noncontrolling interest | — | — | — | — | — | (80,529) | — | (80,529) | 7,437 | (73,092) |
| Accretion of redeemable noncontrolling interest | — | — | — | — | — | (1,247) | — | (1,247) | — | (1,247) |
| Reversal of accretion of redeemable noncontrolling interest | — | — | — | — | — | 3,150 | — | 3,150 | — | 3,150 |
| Other comprehensive loss | — | — | — | — | — | — | (179) | (179) | — | (179) |
| Bluegreen purchase and retirement of common stock | — | — | — | — | (1,167) | — | — | (1,167) | (10,574) | (11,741) |
| Distributions to noncontrolling interests | — | — | — | — | — | — | — | — | (12,094) | (12,094) |
| Conversion of common stock from Class B to Class A | 27 | (27) | — | — | — | — | — | — | — | — |
| Spin-off of BBX Capital, Inc. | — | — | — | — | (643) | (305,339) | (1,375) | (307,357) | (197) | (307,554) |
| Accelerated vesting of restricted stock awards | 491 | 529 | 5 | 5 | 18,740 | — | — | 18,750 | — | 18,750 |
| Share-based compensation | — | — | — | — | 6,667 | — | — | 6,667 | — | 6,667 |
| **Balance, December 31, 2020** | 15,624 | 3,694 $ | 156 $ | 37 $ | 177,104 $ | 10,586 $ | — $ | 187,883 $ | 74,847 $ | 262,730 |

*See accompanying notes to consolidated financial statements.*

96

**BLUEGREEN VACATIONS HOLDING CORPORATION**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(In thousands)

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| **Operating activities:** | | | |
| Net (loss) income | $ (77,165) | $ 32,103 | $ 55,793 |
| Adjustment to reconcile net (loss) income to net cash provided by operating activities: | | | |
| Recoveries from loan losses, net | (5,844) | (5,428) | (8,653) |
| Provision for notes receivable allowances | 56,941 | 55,677 | 51,236 |
| Depreciation, amortization and accretion, net | 24,771 | 27,720 | 25,739 |
| Share-based compensation expense | 25,417 | 11,445 | 12,901 |
| Net losses (gains) on sales of real estate and property and equipment | 1,428 | (9,396) | (4,563) |
| Equity earnings of unconsolidated real estate joint ventures | (49) | (37,898) | (14,194) |
| Return on investment in unconsolidated real estate joint ventures | 3,933 | 39,043 | 17,679 |
| Loss on the deconsolidation of IT'SUGAR, LLC | 3,326 | — | — |
| (Decrease) increase in deferred income tax liability | (9,243) | 2,072 | 27,444 |
| Impairment losses | 31,588 | 6,938 | 4,718 |
| Interest accretion on redeemable 5% cumulative preferred stock | — | 1,028 | 1,061 |
| (Increase) in notes receivable | (17,722) | (65,672) | (63,545) |
| Increase in VOI inventory | (185) | (12,788) | (32,022) |
| Decrease (increase) in trade inventory | 279 | (2,733) | 3,882 |
| Decrease (increase) in real estate inventory | 925 | (7,445) | 12,001 |
| Net change in operating lease asset and operating lease liability | (935) | 1,444 | — |
| Decrease (increase) in other assets | 14,051 | 19,315 | (1,607) |
| (Decrease) increase in other liabilities | (22,437) | 22,817 | (1,231) |
| Net cash provided by operating activities | $ 29,079 | $ 78,242 | $ 86,639 |
| | | | |
| **Investing activities:** | | | |
| Return of investment in unconsolidated real estate joint ventures | 4,631 | 31,442 | 12,080 |
| Investments in unconsolidated real estate joint ventures | (14,009) | (25,179) | (29,070) |
| Proceeds from repayment of loans receivable | 6,127 | 6,171 | 19,394 |
| Proceeds from sales of real estate | 2,151 | 23,512 | 17,431 |
| Proceeds from sales of property and equipment | 190 | 16,642 | 569 |
| Additions to real estate | (70) | (600) | (1,221) |
| Purchases of property and equipment | (11,779) | (35,580) | (45,550) |
| Decrease in cash from other investing activities | (1,210) | (81) | (4,696) |
| Net cash (used in) provided by investing activities | $ (13,969) | $ 16,319 | $ (31,063) |
| | | (Continued) | |

97

**BLUEGREEN VACATIONS HOLDING CORPORATION**
**CONSOLIDATED STATEMENTS OF CASH FLOWS—(Continued)**
(In thousands)

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| **Financing activities:** | | | |
| Repayments of notes payable and other borrowings | $ (317,952) | $ (258,198) | $ (279,737) |
| Proceeds from notes payable and other borrowings | 278,091 | 200,781 | 336,951 |
| Payments for debt issuance costs | (3,194) | (3,428) | (1,121) |
| Payments of interest of redeemable 5% cumulative preferred stock | — | (500) | (563) |
| Payments to redeem redeemable 5% cumulative preferred stock | — | (10,000) | — |
| Purchase and retirement of Class A common stock | — | (20,039) | (77,147) |
| Purchase of noncontrolling interest | — | — | (258) |
| Cash transferred in spin-off of BBX Capital, Inc. | (96,842) | — | — |
| Proceeds from the exercise of stock options | — | — | 245 |
| Purchase and retirement of subsidiary common stock | (11,741) | (835) | (4,000) |
| Dividends paid on common stock | (1,144) | (4,621) | (3,812) |
| Distributions to noncontrolling interests | (12,094) | (11,948) | (14,284) |
| Net cash used in financing activities | $ (164,876) | $ (108,788) | $ (43,726) |
| **Net (decrease) increase in cash and cash equivalents** | | | |
| **and restricted cash** | (149,766) | (14,227) | 11,850 |
| Cash, cash equivalents and restricted cash at beginning of period | 406,870 | 421,097 | 409,247 |
| Cash, cash equivalents and restricted cash at end of period | $ 257,104 | $ 406,870 | $ 421,097 |
| | | | |
| **Supplemental cash flow information:** | | | |
| Interest paid on borrowings, net of amounts capitalized | $ 33,083 | $ 40,306 | $ 37,424 |
| Income taxes refunded | 8,018 | | |
| Income taxes paid | 913 | 11,381 | 3,801 |
| **Supplementary disclosure of non-cash investing and financing activities:** | | | |
| Construction funds receivable transferred to real estate | — | 18,318 | 14,548 |
| Acquisition of VOI inventory, property and equipment for notes payable | — | — | 24,258 |
| Loans receivable transferred to real estate | — | 333 | 1,673 |
| Reduction in note receivable for holder of redeemable 5% cumulative preferred stock | — | — | (5,000) |
| Reduction in redeemable 5% cumulative preferred stock | — | — | 4,862 |
| Operating lease assets recognized upon adoption of ASC 842 | — | 113,183 | — |
| Operating lease liabilities recognized upon adoption of ASC 842 | — | 123,240 | — |
| Operating lease assets obtained in exchange for new operating lease liabilities | 24,402 | 27,715 | — |
| Increase in other assets upon issuance of Community Development District Bonds | 827 | 8,110 | 15,996 |
| Assumption of Community Development District Bonds by homebuilders | 3,837 | 1,035 | 5,572 |
| **Reconciliation of cash, cash equivalents and restricted cash:** | | | |
| Cash and cash equivalents | 221,118 | 335,846 | 337,189 |
| Restricted cash | 35,986 | 49,896 | 53,826 |
| Discontinued operations cash | — | 21,128 | 30,082 |
| **Total cash, cash equivalents, and restricted cash** | $ 257,104 | $ 406,870 | $ 421,097 |

*See accompanying notes to consolidated financial statements.*

98

**BLUEGREEN VACATIONS HOLDING CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### 1. Organization

*Our Business*

Bluegreen Vacations Holding Corporation (formerly BBX Capital Corporation) and its subsidiaries (the "Company" or, unless otherwise indicated or the context otherwise requires, "we," "us," or "our") is a Florida-based holding company. Bluegreen Vacations Holding Corporation as a standalone entity without its subsidiaries is referred to as "BVH".

The Company whose primary asset is its approximately 93% ownership interest in Bluegreen Vacations Corporation ("Bluegreen"). Bluegreen is a leading vacation ownership company that markets and sells vacation ownership interests ("VOIs") and manages resorts in popular leisure and urban destinations. Bluegreen's resorts are primarily located in high-volume, "drive-to" vacation locations, including Orlando, Las Vegas, Myrtle Beach, Charleston and New Orleans, among others. The resorts in which Bluegreen markets, sells, and manages VOIs were either developed or acquired by Bluegreen, or were developed and are owned by third parties. Bluegreen earns fees for providing sales and marketing services to third party developers. Bluegreen also earns fees for providing management services to the Vacation Club and homeowners' associations ("HOAs"), mortgage servicing, VOI title services, reservation services, and construction design and development services. In addition, Bluegreen provides financing to qualified VOI purchasers, which generates significant interest income.

The Company's operations and activities have been materially adversely impacted by the COVID-19 pandemic as discussed further below under Note 2 and elsewhere herein.

*Spin-Off*

On September 30, 2020, BVH completed the spin-off of its wholly-owned subsidiary at the time, BBX Capital, Inc. ("BBX Capital"). The spin-off separated BVH's businesses, activities, and investments into two separate, publicly-traded companies: (i) BVH, which continues to hold its investment in Bluegreen, and (ii) BBX Capital, which holds all of BVH's other previous businesses and investments, including BBX Capital Real Estate LLC ("BBX Capital Real Estate" or "BBXRE"), BBX Sweet Holdings, LLC ("BBX Sweet Holdings"), and Renin Holdings, LLC ("Renin"). BBX Capital and its subsidiaries are presented as discontinued operations in the Company's financial statements.

The spin-off was effected through a distribution of shares of BBX Capital's common stock to BVH's shareholders on September 30, 2020. The BVH shareholders received one share of BBX Capital's Class A Common Stock for each share of BVH's Class A Common Stock and one share of BBX Capital's Class B Common Stock for each share of BVH's Class B Common Stock held on September 22, 2020, the record date. As a result, BVH ceased to have any ownership interest in BBX Capital following the spin-off.

In connection with the spin-off, BVH changed its name from BBX Capital Corporation to Bluegreen Vacations Holding Corporation. In addition, in connection with the spin-off BVH issued a $75.0 million note payable to BBX Capital that accrues interest at a rate of 6% per annum and requires payments of interest on a quarterly basis. Under the terms of the note, BVH has the option in its discretion to defer interest payments under the note, with interest on the entire outstanding balance thereafter to accrue at a cumulative, compounded rate of 8% per annum until such time as BVH is current on all accrued payments under the note, including deferred interest. All outstanding amounts under the note will become due and payable in five years or earlier upon certain other events.

*Stock Split*

In July 2020, BVH effected a one-for-five reverse split of its Class A Common Stock and Class B Common Stock. In connection with the reverse stock split, the number of authorized shares of the Company's Class A Common Stock was reduced from 150,000,000 shares to 30,000,000 shares, and the number of authorized shares of the Company's Class B Common Stock was reduced from 20,000,000 shares to 4,000,000 shares. The share and per share amounts

99

included in this report, including the accompanying consolidated financial statements, have been retroactively adjusted to reflect the one-for-five reverse stock split as if it had occurred as of the earliest period presented.

In June 2020, BVH adopted a shareholder rights plan in light of the ongoing novel coronavirus disease ("COVID-19") pandemic, the significant market volatility and uncertainties associated with the pandemic, and the impact on the Company and the market price of BVH's Class A Common Stock and Class B Common Stock. The shareholder rights plan is similar to plans recently adopted by other public companies in light of the current environment and generally provides a deterrent to any person or group from acquiring 5% or more of BVH's Class A Common Stock, Class B Common Stock or total common stock without the prior approval of BVH's Board of Directors.

**2. Basis of Presentation and Recently Issued Accounting Pronouncements**

*Principles of Consolidation and Basis of Presentation*

Our consolidated financial statements are prepared in conformity with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of all of BVH's wholly-owned subsidiaries, other entities in which BVH or its wholly-owned subsidiaries hold controlling financial interests, and any variable interest entities ("VIEs") in which BVH or one of its consolidated subsidiaries deemed the primary beneficiary of the VIE. All significant inter-company accounts and transactions have been eliminated in consolidation.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and  assumptions about current and, for some estimates, future economic and market conditions which affect reported amounts and related disclosures in our financial statements. Although our current estimates contemplate current and expected future conditions, as applicable, actual conditions could differ from our expectations, which could materially affect our results of operations and financial position. In particular, a number of estimates may be impacted and will continue to be affected by the ongoing COVID-19 pandemic. The severity, magnitude and duration, as well as the economic consequences of, the COVID-19 pandemic are uncertain, rapidly changing and difficult to predict. As a result, the Company's accounting estimates and assumptions may change over time in response to the impact of COVID-19. Such changes could result in, among other adjustments, future impairments of intangibles and long-lived assets, incremental credit losses on VOI notes receivable, a decrease in the carrying amount of the Company's tax assets, or an increase in other obligations as of the time of a relevant measurement event.

On an ongoing basis, management evaluates its estimates, including those that relate to the estimated future sales value of inventory; the recognition of revenue; the allowance for loan losses; the recovery of the carrying value of real estate inventories; the fair value of assets measured at, or compared to, fair value on a non-recurring basis such as intangible assets and other long-lived assets; the estimate of contingent liabilities related to litigation and other claims and assessments; and deferred income taxes. Management bases its estimates on historical experience and on various other assumptions that it believes to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ materially from these estimates under different assumptions and conditions.

Certain amounts for prior periods have been reclassified to conform to the presentation in the current period. The reclassifications had no impact on our statements of operations and comprehensive income or statements of cash flows.

*Initial Impact and Response*

The COVID-19 pandemic has resulted in an unprecedented disruption in the U.S. economy and the travel, hospitality and vacation ownership industries due to, among other things, resort closures, travel restrictions and restrictions on business operations, including government guidance and restrictions with respect to travel, public accommodations, social gatherings and related matters. The Company's operations have been and continue to be adversely impacted by the pandemic.  On March 23, 2020, Bluegreen temporarily closed all of its VOI sales centers, its retail marketing operations at Bass Pro Shops and Cabela's stores and outlet malls, and its Choice Hotels call transfer program. In connection with these actions Bluegreen canceled existing owner reservations through May 15, 2020 and new prospect guest tours through June 30, 2020.  Further, some of Bluegreen's Club Resorts and Club Associate Resorts were closed

100

in accordance with government mandates and advisories. Beginning in mid-May 2020, Bluegreen recommenced its sales and marketing operations and its closed resorts began to welcome guests as government mandates were lifted. By December 31, 2020, Bluegreen was operating marketing kiosks in a total of 98 Bass Pro and Cabela's stores, Bluegreen had reactivated its Choice Hotels call transfer program, all of its resorts were open, and all but two of its VOI sales centers were open. However, there is no assurance that Bluegreen's marketing operations at Bass Pro or Cabela's stores, or its VOI sales centers will remain open, including in the event of an increase in COVID-19 cases. Additionally, reflecting the temporary cessation of marketing activities in the beginning months of COVID-19 pandemic in general, Bluegreen's pipeline of vacation packages was 121,900 at December 31, 2020 compared to 169,300 at December 31, 2019. However, utilization of the packages has been significantly lower as purchasers have not traveled at the same pace as was traveled pre-pandemic. For more detailed information please see "Results of Operations" included in Part II – Item 7: Management's Discussion and Analysis of Financial Condition and Results of Operations.

As a result of the effect of the pandemic, Bluegreen implemented steps to mitigate its costs beginning in March 2020, including reductions of over 1,700 positions and the placement of another approximate 3,200 of Bluegreen's associates on temporary furlough or reduced work hours. As of December 31, 2020, approximately 3,200 associates had returned to work on a full-time basis for a total of approximately 4,600 full-time associates compared to approximately 5,900 full-time associates as of December 31, 2019. As a result of the effect of the COVID-19 pandemic, during the year ended December 31, 2020, Bluegreen incurred $5.0 million in severance and $14.3 million of payroll and payroll benefit expense relating to employees on temporary furlough or reduced work hours. These payments and expenses are included in selling, general and administrative expenses in the Company's consolidated statements of operations and comprehensive income for the year ended December 31, 2020. While Bluegreen paid a special cash dividend of $1.19 per share during August 2020, it suspended the payment of regular quarterly cash dividends during the second quarter of 2020 and there is no assurance that Bluegreen will recommence paying regular dividends or pay additional special dividends in the future.

As a precautionary measure to provide additional liquidity if needed, in March 2020, Bluegreen drew down $60.0 million under its lines-of-credit and pledged or sold receivables under certain of its receivable backed facilities to increase its cash position. As of December 31, 2020, Bluegreen repaid the $60.0 million borrowed under Bluegreen's lines-of-credit. Also, in June 2020, Bluegreen amended its Liberty Bank Facility to extend the advance period and maturity date, reduced the outstanding borrowings from $50.0 million to $40.0 million, decreased the advance rate from 85% for qualified conforming receivables to 80% effective September 2020 and, commencing July 1, 2020, changed the interest rate from the Prime Rate with a floor of 4.00% to the Prime Rate minus 0.10% with a floor of 3.40%. In September 2020, Bluegreen amended its NBA Receivables Facility to extend the advance period and maturity date, decreased the advance rate from 85% for qualified receivables to 80%, and changed the interest rate from one month LIBOR plus 2.75% (with an interest rate floor of 3.50%) to one month LIBOR plus 2.25% (with an interest rate floor of 3.00%). In October 2020, Bluegreen completed the 2020-A Term Securitization, a private offering and sale of approximately $131.0 million of investment-grade, VOI receivable backed notes (the "Notes") at an overall blended interest rate of approximately 2.60%. The gross advance rate for this transaction was 88.0% and the Notes mature in February 2036. Proceeds from the 2020-A Term Securitization were used to paydown approximately $82.1 million owed on existing receivable-backed facilities, (thus creating additional availability on those facilities), to capitalize a reserve fund, to pay fees and expenses associated with the transaction, and for general corporate purposes. In December 2020, Bluegreen amended its Quorum Purchase Facility to extend the advance period from December 2020 to December 2022 and extend the maturity date from December 2032 to December 2034. Bluegreen continues to actively pursue additional credit facility capacity and capital market transactions. For more detailed information please see "Liquidity and Capital Resources" included in Part II – Item 7: Management's Discussion and Analysis of Financial Condition and Results of Operations.

Bluegreen has historically provided financing to customers for a majority of its sales of VOIs, and accordingly, our results are subject to the risk of defaults by its customers. GAAP requires sales of VOIs are reduced by Bluegreen's estimate of uncollectible VOI notes receivable. The COVID-19 pandemic has had a material adverse impact on unemployment in the United States and economic conditions in general and the impact may continue for some time. Bluegreen believes that the COVID-19 pandemic will continue to have an impact on the collectability of Bluegreen's VOI notes receivable. Accordingly, the estimate of defaults for the 2021 year was increased by approximately $6.0 million, based on historical experience, forbearance requests received from customers, and other factors,

101

including but not limited to, the seasoning of the notes receivable and FICO scores of the customers. The impact of the COVID-19 pandemic on Bluegreen's default or delinquency rates as it is rapidly changing and highly uncertain.

The Coronavirus Aid, Relief, and Economic Securities Act ("CARES Act") was signed into law on March 27, 2020 in response to the COVID-19 pandemic.  As of December 31, 2020, the Company evaluated the income tax provisions of the CARES Act and determined they had no significant effect on the computation of the Company's estimated effective tax rate for the year ended December 31, 2020.  However, the Company has taken advantage of the deferral of the employer portion of the tax withholding amounts and the employee retention tax credits provided for in the CARES Act. During the year ended December 31, 2020, the Company recorded a tax withholding deferral of $8.7 million and employee retention tax credits of $7.1 million, which is included in selling, general and administrative expenses in its consolidated statements of operations and comprehensive income for the year ended December 31, 2020.

*Continued Impact of COVID-19 on our Business*

Bluegreen continues to experience lower travel rates especially to high traffic destinations such as Orlando and Las Vegas.  The occupancy rates at resorts with sales centers during the fourth quarter of 2020 was approximately 71% as compared to 80% during the fourth quarter of 2019.  This trend of reduced travel was also reflected in utilization of vacation packages especially for those vacation packages sold prior to the COVID-19 pandemic.

***Significant Accounting Policies***

*Cash and Cash Equivalents*

Cash in excess of the Company's immediate operating requirements are generally invested in short-term time deposits and money market instruments, typically with original maturities at the date of purchase of three months or less. Cash and cash equivalents are maintained at various financial institutions. These financial institutions are located throughout the United States and in Aruba. However, a significant portion of the Company's unrestricted cash is maintained with a single bank and, accordingly, the Company is subject to credit risk. Periodic evaluations of the relative credit standing of financial institutions maintaining the Company's deposits are performed to evaluate and, if necessary, take actions in an attempt to mitigate credit risk.

*Restricted Cash*

Restricted cash consists primarily of customer deposits held in escrow accounts and cash collected on pledged/secured notes receivable not yet remitted to lenders.

*Revenue Recognition*

*Sales of VOIs.* Revenue is recognized for sales of VOIs after control of the VOI is deemed transferred to the customer, which is when the legal rescission period has expired on a binding executed VOI sales agreement and the collectability of the note receivable from the buyer, if any, is reasonably assured. Transfer of control of the VOI to the buyer is deemed to occur when the legal rescission period expires as the risk and rewards associated with VOI ownership are transferred to the buyer at that time. The Company records Bluegreen's customer deposits from contracts within the legal rescission period in restricted cash and escrow deposits in its consolidated balance sheets as such amounts are refundable until the legal rescission period has expired. In cases where construction and development of Bluegreen's developed resorts has not been completed, Bluegreen defers all of the revenue and associated expenses for the sales of VOIs until construction is complete and the resort may be occupied.

Bluegreen generally offers qualified purchasers financing for up to 90% of the purchase price of VOIs. The typical financing provides for a term of ten years and a fixed interest rate, is fully amortizing in equal installments and may be prepaid without penalty. For sales of VOIs for which Bluegreen provides financing, Bluegreen reduces the transaction price for expected loan losses, which it considers to be variable consideration. Bluegreen's estimates of the variable consideration are based on the results of its static pool analysis, which relies on historical payment data for similar VOI notes receivable. Policies regarding the estimation of variable consideration on notes receivable are

102

discussed in further detail under "Notes Receivable" below. VOI sales where no financing was provided do not have any significant payment terms

*Fee-based sales commission revenue.* Bluegreen enters into fee-based sales arrangements with third-party developers to sell VOIs through its sales and marketing platform for which Bluegreen earn a commission. Commission revenue is recognized to the extent that, it is probable that a significant reversal of such revenue will not occur and the related consumer rescission period has expired. Commission revenue is recognized over time as the third-party developer receives and consumes the benefits of the services.

*Other fee-based services revenue and cost reimbursements.* Revenue in connection with Bluegreen's other fee-based services (which are described below) is recognized as follows:

- ⊙ Resort and club management revenue is recognized as services are rendered. These services provided to the resort HOAs are comprised of day-to-day services to operate the resort, including management services and certain accounting and administrative functions. Management services provided to the Vacation Club include managing the reservation system and providing owner, billing and collection services. Bluegreen's management contracts are typically structured as cost-plus with an initial term of three years and automatic one year renewals. Bluegreen believes these services to be a series of distinct goods and services to be accounted for as a single performance obligation over time and recognize revenue as the customer receives the benefits of its services. Bluegreen allocates variable consideration to the distinct good or service within the series, such that revenue from management fees and cost reimbursements is recognized in each period as the uncertainty with respect to such variable consideration is resolved.
- ⊙ Cost reimbursements are received for performing day to day management services, based on agreements with the HOAs. These costs primarily consist of payroll and payroll related costs for management of the HOAs and other services provided where Bluegreen is the employer. Cost reimbursements are based upon actual expenses and are billed to the HOA on a monthly basis. Bluegreen recognizes cost reimbursements when they incur the related reimbursable costs as the HOA receives and consumes the benefits of the management services.
- ⊙ Resort title fee revenue is recognized when escrow amounts are released and title documents are completed.
- ⊙ Rental revenue is recognized on a daily basis which is consistent with the period for which the customer benefits from such service.
- ⊙ Mortgage servicing revenue is recognized as services are rendered.

Fees received in advance are generally included in deferred income in the Company's consolidated balance sheets until such time as the related service is rendered and revenue is recognized as stated above.

Under timeshare accounting rules, rental operations, including accommodations provided through the use of Bluegreen's sampler program, are accounted for as incidental operations whereby incremental carrying costs in excess of incremental revenue are expensed as incurred. Revenue from the sampler program is deferred and typically recognized within a year from sale as guests complete stays at the resorts. During each of the years presented, Bluegreen's aggregate rental revenue and sampler revenue was less than the aggregate carrying cost of its VOI inventory. Accordingly, Bluegreen recorded such revenue as a reduction to the carrying cost of VOI inventory, which is included in cost of other fee-based services in the Company's consolidated statements of operations and comprehensive income for each year.

103

D - 0055-0103

*Interest Income.* Bluegreen provides financing for a significant portion of sales of its owned VOIs. Bluegreen recognizes interest income from financing VOI sales on the accrual method as earned based on the outstanding principal balance, interest rate and terms stated in each individual financing agreement. See "Notes Receivable" below for further discussion of the policies applicable to VOI notes receivable.

*Notes Receivable*

Bluegreen's notes receivable are carried at amortized cost less an allowance for loan losses.  Interest income is suspended, and previously accrued but unpaid interest income is reversed, on all delinquent notes receivable when principal or interest payments are more than 90 days contractually past due and not resumed until such loans are less than 90 days past due.  As of December 31, 2020 and December 31, 2019, $24.0 million and $25.5 million, respectively, of Bluegreen's VOI notes receivable were more than 90 days past due, and accordingly, consistent with Bluegreen's policy, were not accruing interest income.  After approximately 127 days, Bluegreen's VOI notes receivable are generally written off against the allowance for loan loss.

To the extent Bluegreen determines that it is probable that a significant reversal of cumulative revenue recognized may occur, Bluegreen records an estimate of variable consideration as a reduction to the transaction price of the sales of VOIs until the uncertainty associated with the variable consideration is resolved. Bluegreen's estimates of the variable consideration are based on the results of its static pool analysis, which relies on historical payment data for similar VOI notes receivable and tracks uncollectibles for each period's sales over the entire life of the notes. Bluegreen also considers whether historical economic conditions are comparable to then current economic conditions, as well as variations in underwriting standards. Bluegreen reviews its estimate of variable consideration on at least a quarterly basis. Loan origination costs are deferred and recognized over the life of the related notes receivable. See above for further discussion of the impact of the COVID-19 pandemic on Bluegreen's allowance for loan losses.

*VOI Inventory*

Bluegreen's VOI inventory consists of completed VOIs, VOIs under construction and land held for future VOI development. Completed VOI inventory is carried at the lower of  (i) cost, including costs of improvements and amenities incurred subsequent to acquisition, capitalized interest, real estate taxes and other costs incurred during construction, or (ii) estimated fair market value, less costs to sell. VOI inventory and cost of sales are accounted for under timeshare accounting rules, which require the use of a specific method of the relative sales value method for relieving VOI inventory and recording cost of sales. Under the relative sales value method required by timeshare accounting rules, cost of sales is calculated as a percentage of net sales using a cost-of-sales percentage - the ratio of total estimated development costs to total estimated VOI revenue, including the estimated incremental revenue from the resale of VOI inventory repossessed, generally as a result of the default of the related receivable. Also, pursuant to timeshare accounting rules, Bluegreen does not relieve inventory for VOI cost of sales related to anticipated loan losses. Accordingly, no adjustment is made when inventory is reacquired upon default of the related receivable.

*Property and Equipment*

Property and equipment is recorded at acquisition cost.  The Company records depreciation and amortization in a manner that recognizes the cost of its depreciable assets over their estimated useful lives using the straight-line method.  Leasehold improvements are amortized over the shorter of the terms of the underlying leases or the estimated useful lives of the improvements.

The Company capitalizes the costs of software developed for internal use in accordance with the guidance for accounting for costs of computer software developed or obtained for internal use.  Capitalization of software developed for internal use commences during the development phase of the project and ends when the asset is ready for its intended use.  Software developed or obtained for internal use is generally amortized on a straight-line basis over 3 to 5 years and included within property and equipment on the Company's consolidated balance sheet. Capitalized costs of software for internal use for the years ended December 31, 2020 and 2019 were $3.5 million and $9.6 million, respectively. Costs of internal development time and the costs of software under cloud computing arrangements that are service contracts are capitalized and included in prepaids on the Company's consolidated balance sheet.  Costs of these service contracts are amortized over the life of the contract and included in selling, general and administrative

104

expenses in the Company's consolidated statement of operations. Unamortized capital costs of software service contracts was $7.8 million as of December 31, 2020.

*Intangible Assets*

Intangible assets consist primarily of indefinite-lived management contracts recognized upon the consolidation of Bluegreen in November 2009. Bluegreen's management contracts are reviewed for impairment on at least an annual basis, or more frequently if events or changes in circumstances indicate that the related carrying amounts may not be recoverable. Bluegreen did not record any impairment charges during the years ended December 31, 2020, 2019 or 2018.

*Impairment of Long-Lived Assets*

The Company evaluates the recoverability of the carrying amounts of its long-lived assets under the guidelines of ASC 360, *Property, Plant and Equipment* ("ASC 360"), which provides guidance relating to the accounting for the impairment or disposal of long-lived assets. The Company reviews the carrying amounts of the Company's long-lived assets for possible impairment whenever events or changes in circumstances indicate that the carrying amount of such assets may not be recoverable. The Company assesses impairment by comparing the undiscounted cash flows of the assets to their carrying amounts. If estimated cash flows are insufficient to recover the investment, an impairment loss is recognized to write-down the carrying value of the asset to the estimated fair value less any costs of disposition. No impairment charges were recorded during any of the years presented.

*Deferred Financing Costs*

Deferred financing costs are comprised of costs incurred in connection with obtaining financing from third-party lenders and are presented in the consolidated balance sheets as other assets or as a direct deduction from the carrying value of the associated debt liability. These costs are capitalized and amortized to interest expense over the terms of the related financing arrangements. As of December 31, 2020, and 2019, unamortized deferred financing costs totaled $13.7 million and $13.4 million, respectively. Interest expense from the amortization of deferred financing costs for the years ended December 31, 2020, 2019, and 2018 was $3.5 million, $4.8 million and $4.2 million, respectively.

*Advertising Expense*

The Company expense advertising costs, which are primarily marketing costs, as incurred. Advertising expense was $97.0 million, $146.0 million, and $138.9 million for the years ended December 31, 2020, 2019 and 2018, respectively, and is included in selling, general and administrative expenses in the accompanying consolidated statements of operations and comprehensive income.

Bluegreen has entered into marketing arrangements with various third parties. For the years ended December 31, 2020 2019, and 2018, sales of VOIs to prospects and leads generated by Bluegreen's marketing agreement with Bass Pro accounted for approximately 12%, 13% and 14%, respectively, of Bluegreen's total VOI sales volume. There can be no guarantee that Bluegreen will be able to maintain this agreement in accordance with its terms or extend or renew this agreement on similar terms, or at all, nor is there any assurance that Bluegreen's business relationship with Bass Pro under the revised terms of Bluegreen's marketing agreement entered into in June 2019 will be as profitable as under the prior terms, or at all. See Note 12: Commitments and Contingencies for a description of the revised terms of Bluegreen's marketing agreement with Bass Pro.

*Income Taxes*

BVH and our subsidiaries in which the Company owns 80% or more of the voting power and value of the subsidiary's stock file a consolidated U.S. Federal and Florida income tax return. Other than Florida, our subsidiaries and us file separate or unitary state income tax returns for each jurisdiction. Subsidiaries in which the Company owns less than 80% of the outstanding equity are not included in our consolidated U.S. Federal or Florida state income tax return.

The provision for income taxes is based on income before taxes reported for financial statement purposes after adjustment for transactions that do not have tax consequences. Deferred tax assets and liabilities are recognized

105

according to the estimated future tax consequences attributable to differences between the carrying value of existing assets and liabilities and their respective tax basis. Deferred tax assets and liabilities are measured using the enacted tax rates as of the date of the statement of financial condition. The effect of a change in tax rates on deferred tax assets and liabilities is reflected in the period that includes the statutory enactment date. A deferred tax asset valuation allowance is recorded when it has been determined that it is more likely than not that deferred tax assets will not be realized. If a valuation allowance is recorded, a subsequent change in circumstances that causes a change in judgment about the realization of the related deferred tax amount could result in the reversal of the deferred tax valuation allowance.

An uncertain tax position is defined as a position taken or expected to be taken in a tax return that is not based on clear and unambiguous tax law and which is reflected in measuring current or deferred income tax assets and liabilities for interim or annual periods. The Company may recognize the tax benefit from an uncertain tax position only if it believes that it is more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position. The Company measures the tax benefits recognized based on the largest benefit that has a greater than 50% likelihood of being realized upon ultimate resolution. The Company recognizes interest and penalties related to unrecognized tax benefits in its provision for income taxes.

*Noncontrolling Interests*

Noncontrolling interests reflect third parties' ownership interests in entities that are consolidated in the Company's financial statements but are less than 100% owned by the Company. Noncontrolling interests are recognized as equity in the Company's consolidated balance sheet and presented separately from the equity attributable to BVH's shareholders, while noncontrolling interests that are redeemable for cash at the holder's option or upon a contingent event outside of the Company's control are classified as redeemable noncontrolling interests and presented in the mezzanine section between total liabilities and equity in the consolidated balance sheet. The Company measures redeemable noncontrolling interests on an ongoing basis by accreting changes in the estimated redemption value of such interests from the date of issuance to the earliest redemption date and adjust the carrying amount of such interests to the calculated value in the event that it is in excess of the carrying amount of such interests at such time. Upon the deconsolidation of an entity with redeemable noncontrolling interest, the accretion to the estimated redemption value recognized in prior periods is reversed into accumulated earnings prior to the deconsolidation.

The amounts of consolidated net income and comprehensive income attributable to BVH's shareholders and noncontrolling interests are separately presented in the Company's consolidated statements of operations and comprehensive income.

*Accounting for Loss Contingencies*

Loss contingencies, including those arising from legal actions, are recorded as liabilities when the likelihood of loss is probable and an amount or range of loss can be reasonably estimated.

*Earnings Per Share*

Basic earnings per share ("EPS") is calculated by dividing the earnings available to common shareholders by the weighted average number of common shares outstanding for the period. Diluted earnings per share is computed in the same manner as basic earnings per share but also reflects potential dilution that could occur if options to acquire BVH's common shares were exercised or if restricted stock awards issued by BVH were vested. Common stock options and restricted stock awards, if dilutive, are considered in the weighted average number of dilutive common shares outstanding based on the treasury stock method. As a result of the vesting of all share based compensation awards in August 2020 in contemplation of the spin-off, there were no potentially dilutive securities outstanding subsequent to such date.

*Stock-Based Compensation*

Compensation cost for unvested restricted stock awards is based on the fair value of the award on the measurement date, which is generally the grant date, and is recognized on a straight-line basis over the requisite service period of the award, which is generally four years for unvested restricted stock awards. The fair value of unvested restricted

106

stock awards is generally determined based on the market price of the Company's common stock on the grant date. In contemplation of the spin-off, in August 2019 the Company's Compensation Committee approved the acceleration of vesting of all of the Company's restricted stock awards as further discussed in Note 14.

*Recently Adopted Accounting Standards*

In June 2016, the FASB issued ASU 2016-13, "Financial Instruments – Credit Losses (Topic 326)" ("ASU 2016-13"), which introduces an approach of estimating credit losses on certain types of financial instruments based on expected losses. ASU 2016-13 also expands the disclosure requirements regarding an entity's assumptions, models, and methods for estimating the allowance for loan losses. Further, the standard requires that public entities disclose the amortized cost balance for each class of financial asset by credit quality indicator, disaggregated by the year of origination (i.e. by vintage year). The Company adopted this standard on January 1, 2020 using a modified retrospective method. The adoption did not have a material impact on the Company's consolidated financial statements or related disclosures and no cumulative adjustment was recorded primarily due to the fact Bluegreen's VOI notes receivable are recorded net of an allowance that is calculated in accordance with ASC 606, *Revenue from Contracts with Customers*. The Company also elected the practical expedient to not measure an allowance for credit losses for accrued interest receivables, as its interest income is suspended and previously accrued but unpaid interest income is reversed on all delinquent notes receivable when principal or interest payments are more than 90 days contractually past due and not resumed until such loans are less than 90 days past due.

In August 2018, the FASB issued ASU 2018-15, "Intangibles – Goodwill and Other – Internal–Use Software (Subtopic 350-40)" ("ASU 2018-15"), which requires a customer in a cloud computing arrangement that is a service contract ("CCA") to follow internal-use software guidance in ASC 350-40 to determine which implementation costs to capitalize as assets or expense as incurred. ASU 2018-15 also requires companies to present implementation costs related to a CCA in the same financial statement line items as the CCA service fees. The Company adopted this standard on January 1, 2020 and is applying the transition guidance as of the date of adoption prospectively, under the current period adjustment method. Upon adoption of the standard, the Company reclassified $1.9 million of capitalized implementation costs related to a CCA that was in the implementation phase as of January 1, 2020 from property and equipment to prepaid expenses.

***Accounting Standards Not Yet Adopted***

The FASB has issued the following accounting pronouncement and guidance relevant to the Company's operations which had not yet been adopted as of December 31, 2020:

In March 2020, the FASB issued ASU 2020-04, "Reference Rate Reform (Topic 848): Facilitation of the Effect of Reference Rate Reform on Financial Reporting" ("ASU 2020-04"), which provides relief for companies preparing for discontinuation of LIBOR in response to the Financial Conduct Authority (the regulatory authority over LIBOR) plan for a phase out of regulatory oversight of LIBOR interest rate indices after 2021 to allow for an orderly transition to an alternate reference rate. The Alternative Reference Rates Committee ("ARRC") has proposed that the Secured Overnight Financing Rate ("SOFR") is the rate that represents best practice as the alternative to LIBOR for promissory notes or other contracts that are currently indexed to LIBOR. The ARRC has proposed a market transition plan to SOFR from LIBOR and organizations are currently working on transition plans as it relates to derivatives and cash markets indexed to LIBOR. Although Bluegreen's VOIs notes receivable from its borrowers are not indexed to LIBOR, as of December 31, 2020 the Company had $177.1 million of LIBOR indexed junior subordinated debentures, $40.5 million of LIBOR indexed receivable-backed notes payable and lines of credit and $127.5 million of LIBOR indexed lines of credit and notes payable (which are not receivable-backed) maturing in 2021 and after. Companies can apply ASU 2020-04 immediately. However, the guidance will only be available for a limited time, generally through December 31, 2022. The Company has not yet adopted this standard and is evaluating the potential impact that the eventual replacement of the LIBOR benchmark interest rate could have on its results of operations, liquidity and consolidated financial statements.

107

D - 0055-0107

**3. Revenue From Contracts with Customers**

The table below sets forth the Company's disaggregated revenue by category from contracts with customers (in thousands).

| | For the Years Ended December 31, | | |
| | 2020 | 2019 | 2018 |
|---|---|---|---|
| Sales of VOIs [1] | $ 173,997 | $ 255,375 | $ 254,225 |
| Fee-based sales commission revenue [1] | 89,965 | 207,832 | 216,422 |
| Resort and club management revenue [2] | 98,233 | 103,470 | 99,535 |
| Cost reimbursements [2] | 64,305 | 63,889 | 62,534 |
| Title fees and other [1] | 7,568 | 14,246 | 12,205 |
| Other revenue [2] | 6,022 | 7,528 | 6,284 |
| Revenue from customers | 440,090 | 652,340 | 651,205 |
| Interest income [3] | 79,381 | 85,431 | 83,081 |
| Other income, net | — | 67 | 16 |
| Total revenue | $ 519,471 | $ 737,838 | $ 734,302 |

(1) Included in the Company's Sales of VOIs and financing segment described in Note 17.
(2) Included in the Company's resort operations and club management segment described in Note 17.
(3) Interest income of $77.5 million, $80.0 million, and $79.4 million is included in the Company's 2020, 2019, and 2018 sales of VOIs and financing segment described in Note 17.

**4. Notes Receivable**

The table below provides information relating to Bluegreen's notes receivable and its allowance for loan losses (dollars in thousands):

| | As of December 31, | |
| | 2020 | 2019 |
|---|---|---|
| **Notes receivable secured by VOIs:** | | |
| VOI notes receivable - non-securitized | $ 156,078 | $ 203,872 |
| VOI notes receivable - securitized | 395,315 | 385,326 |
| | 551,393 | 589,198 |
| Allowance for loan losses - non-securitized | (38,750) | (47,894) |
| Allowance for loan losses - securitized | (103,294) | (92,736) |
| Allowance for loan losses | (142,044) | (140,630) |
| VOI notes receivable, net | $ 409,349 | $ 448,568 |
| Allowance as a % of VOI notes receivable | 26% | 24% |

The weighted-average interest rate charged on Bluegreen's notes receivable secured by VOIs was 15.0% and 14.9% at December 31, 2020 and 2019, respectively.  All of Bluegreen's VOI loans bear interest at fixed rates.  Bluegreen's VOI notes receivable are generally secured by property located in Florida, Missouri, Nevada, South Carolina, Tennessee, and Wisconsin.

Future principal payments due on Bluegreen's notes receivable as of December 31, 2020 are as follows (in thousands):

| | | |
|---|---|---|
| 2021 | $ | 62,985 |
| 2022 | | 62,858 |
| 2023 | | 66,429 |
| 2024 | | 68,655 |
| 2025 | | 69,333 |
| Thereafter | | 221,133 |
| Total | $ | 551,393 |

108

*Allowance for Loan Losses*

The activity in Bluegreen's allowance for loan losses was as follows (in thousands):

| | For the Year Ended December 31, | |
|---|---|---|
| | **2020** | 2019 |
| Balance, beginning of year | $ **140,630** | $ 134,133 |
| Provision for loan losses | **56,941** | 55,701 |
| Less: defaults | **(55,527)** | (49,204) |
| Balance, end of year | $ **142,044** | $ 140,630 |

Bluegreen monitors the credit quality of its receivables on an ongoing basis. Bluegreen holds large amounts of homogeneous VOI notes receivable and assess uncollectibility based on pools of receivables as it does not believe that there are significant concentrations of credit risk with any individual counterparty or groups of counterparties. In estimating loan losses, Bluegreen does not use a single primary indicator of credit quality but instead evaluates its VOI notes receivable based upon a static pool analysis that incorporates the aging of the respective receivables, default trends and prepayment rates by origination year, as well as the FICO scores of the borrowers.

The COVID – 19 pandemic has had a material adverse impact on unemployment in the United States and economic conditions in general and the impact may continue for some time. Bluegreen believes that the COVID-19 pandemic will continue to have an impact on its VOI notes receivable. Accordingly, the estimate of defaults for the 2021 year was increased by $6.0 million, based on historical experience, forbearance requests received from customers, and other factors, including, but not limited to, the seasoning of the notes receivable and FICO scores of the customers. Bluegreen continues to evaluate the impact of the COVID-19 pandemic on its default or delinquency rates as it is rapidly changing and highly uncertain. Bluegreen's estimates may not prove to be correct and its allowance for loan losses may need to be further increased in future periods.

Additional information about Bluegreen's VOI notes receivable by year of origination is as follows as of December 31, 2020 (in thousands):

| | Year of Origination | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2020** | **2019** | **2018** | **2017** | **2016** | **2015 and Prior** | **Total** |
| By FICO Score: | | | | | | | |
| 701+ | $ 70,874 | $ 85,294 | $ 56,490 | $ 37,371 | $ 27,638 | $ 35,693 | $ 313,360 |
| 601-700 | 42,660 | 45,533 | 34,896 | 25,259 | 23,300 | 35,976 | 207,624 |
| <601 (1) | 3,172 | 3,630 | 2,288 | 1,554 | 1,544 | 2,757 | 14,945 |
| Other (2) | 29 | 567 | 3,805 | 3,476 | 2,336 | 5,251 | 15,464 |
| Total | $ 116,735 | $ 135,024 | $ 97,479 | $ 67,660 | $ 54,818 | $ 79,677 | $ 551,393 |
| | | | | | | | |
| Defaults | $ 1,678 | $ 13,678 | $ 14,297 | $ 9,331 | $ 7,299 | $ 9,244 | $ 55,527 |
| Allowance for loan loss | $ 33,441 | $ 37,845 | $ 27,552 | $ 16,794 | $ 12,097 | $ 14,315 | $ 142,044 |
| | | | | | | | |
| Delinquency status: | | | | | | | |
| Current | $ 113,954 | $ 129,817 | $ 89,744 | $ 61,279 | $ 50,671 | $ 71,646 | $ 517,111 |
| 31-60 days | 1,040 | 1,531 | 1,093 | 925 | 547 | 642 | 5,778 |
| 61-90 days | 807 | 1,137 | 931 | 777 | 365 | 524 | 4,541 |
| Over 91 days (2) | 934 | 2,539 | 5,711 | 4,679 | 3,235 | 6,865 | 23,963 |
| Total | $ 116,735 | $ 135,024 | $ 97,479 | $ 67,660 | $ 54,818 | $ 79,677 | $ 551,393 |

(1) Includes VOI notes receivable attributable to borrowers without a FICO score (who are primarily foreign borrowers).

(2) Includes $11.4 million related to VOI notes receivable that, as of December 31, 2020, had defaulted, but the related VOI note receivable balance had not yet been charged off in accordance with the provisions of certain of Bluegreen's receivable-backed notes payable transactions. These VOI notes receivable have been reflected in the allowance for loan losses.

109

Additional information about Bluegreen's VOI notes receivable by year of origination is as follows as of December 31, 2019 (in thousands):

| | Year of Origination | | | | | | |
| | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 and Prior | Total |
|---|---|---|---|---|---|---|---|
| 701+ | $ 115,753 | $ 77,992 | $ 50,443 | $ 37,807 | $ 23,670 | $ 29,069 | $ 334,734 |
| 601-700 | 57,447 | 46,157 | 33,540 | 30,656 | 22,724 | 27,854 | 218,378 |
| <601 [1] | 5,315 | 4,153 | 2,719 | 3,132 | 2,279 | 3,632 | 21,230 |
| Other [2] | 269 | 2,762 | 2,806 | 2,423 | 2,772 | 3,824 | 14,856 |
| Total by FICO score | $ 178,784 | $ 131,064 | $ 89,508 | $ 74,018 | $ 51,445 | $ 64,379 | $ 589,198 |
| | | | | | | | |
| Defaults | $ 1,487 | $ 13,858 | $ 11,820 | $ 9,348 | $ 6,911 | $ 5,780 | $ 49,204 |
| Allowance for loan loss | $ 44,961 | $ 34,477 | $ 20,908 | $ 16,370 | $ 13,695 | $ 10,219 | $ 140,630 |
| | | | | | | | |
| Delinquency status: | | | | | | | |
| Current | $ 174,530 | $ 122,283 | $ 82,464 | $ 68,007 | $ 46,395 | $ 58,021 | $ 551,700 |
| 31-60 days | 1,790 | 1,672 | 1,337 | 763 | 551 | 630 | 6,743 |
| 61-90 days | 875 | 1,362 | 960 | 1,050 | 472 | 494 | 5,213 |
| Over 91 days [2] | 1,589 | 5,747 | 4,747 | 4,198 | 4,027 | 5,234 | 25,542 |
| Total | $ 178,784 | $ 131,064 | $ 89,508 | $ 74,018 | $ 51,445 | $ 64,379 | $ 589,198 |

(1)  Includes VOI notes receivable attributable to borrowers without a FICO score (who are primarily foreign borrowers).

(2)  Includes $10.6 million related to VOI notes receivable that, as of December 31, 2019, had defaulted, but the related VOI note receivable balance had not yet been charged off in accordance with the provisions of certain of Bluegreen's receivable-backed notes payable transactions. These VOI notes receivable have been reflected in the allowance for loan losses.

The percentage of gross notes receivable outstanding by FICO score at origination for both December 31, 2020 and 2019 were as follows:

| | As of December 31, |
|---|---|
| **FICO Score** | |
| No Score [1] | 1 % |
| <600 | 3 |
| 600-699 | 37 |
| 700+ | 59 |
| Total | 100 % |

(2)  VOI notes receivable without a FICO score are primarily related to foreign borrowers.

Bluegreen's notes receivable are carried at amortized cost less allowance for loan losses.  Interest income is suspended, and previously accrued but unpaid interest income is reversed, on all delinquent notes receivable when principal or interest payments are more than 90 days contractually past due and not resumed until such loans are less than 90 days past due.  As of December 31, 2020 and 2019, $24.0 million and $25.5 million, respectively, of Bluegreen's VOI notes receivable were more than 90 days past due, and, accordingly, consistent with its policy, were not accruing interest income.  After approximately 127 days, Bluegreen's VOI notes receivable are generally written off against the allowance for loan loss.  Accrued interest was $3.9 million and $5.3 million as of December 31, 2020 and 2019, respectively, and is included within other assets in the Company's consolidated balance sheets herein.

**5.  Variable Interest Entities**

Bluegreen sells VOI notes receivable through special purpose finance entities. These transactions are generally structured as non-recourse to Bluegreen and are designed to provide liquidity for Bluegreen and to transfer the economic risks and benefits of the notes receivable to third parties. In a securitization, various classes of debt securities

110

are issued by the special purpose finance entities that are generally collateralized by a single tranche of transferred assets, which consist of VOI notes receivable. Bluegreen services the securitized notes receivable for a fee pursuant to servicing agreements negotiated with third parties based on market conditions at the time of the securitization.

In these securitizations, Bluegreen generally retains a portion of the securities and continue to service the securitized notes receivable. Under these arrangements, the cash payments received from obligors on the receivables sold are generally applied monthly to pay fees to service providers, make interest and principal payments to investors, and fund required reserves, if any, with the remaining balance of such cash retained by us; however, to the extent the portfolio of receivables fails to satisfy specified performance criteria (as may occur due to, among other things, an increase in default rates or credit loss severity) or other trigger events occur, the funds received from obligors are required to be distributed on an accelerated basis to investors. Depending on the circumstances and the transaction, the application of the accelerated payment formula may be permanent or temporary until the trigger event is cured. As of December 31, 2020, Bluegreen was in compliance with all material terms under Bluegreen's securitization transactions, and no trigger events had occurred.

In accordance with applicable accounting guidance for the consolidation of VIEs, Bluegreen analyzes its variable interests, which may consist of loans, servicing rights, guarantees, and equity investments, to determine if an entity in which Bluegreen has a variable interest is a VIE. The analysis includes a review of both quantitative and qualitative factors. Bluegreen bases its quantitative analysis on the forecasted cash flows of the entity, and it bases its qualitative analysis on the structure of the entity, including its decision-making ability and authority with respect to the entity, and relevant financial agreements. Bluegreen also uses its qualitative analysis to determine if it must consolidate a VIE as the primary beneficiary. In accordance with applicable accounting guidance, Bluegreen has determined these securitization entities to be VIEs of which it is the primary beneficiary and, therefore, Bluegreen consolidates the entities into its financial statements.

Under the terms of certain of Bluegreen's VOI notes receivable sales, Bluegreen has the right to repurchase or substitute a limited amount of defaulted notes for new notes receivable at the outstanding principal balance plus accrued interest. Voluntary repurchases and substitutions by Bluegreen of defaulted notes receivable during 2020, 2019 and 2018 were $14.5 million, $11.5 million and $13.7 million, respectively. Bluegreen's maximum exposure to loss relating to its non-recourse securitization entities is the difference between the outstanding VOI notes receivable and the notes payable, plus cash reserves and any additional residual interest in future cash flows from collateral.

The assets and liabilities of Bluegreen's consolidated VIEs are as follows (in thousands):

|  | As of December 31, | |
|  | 2020 | 2019 |
|---|---|---|
| Restricted cash | $ 20,469 | $ 22,534 |
| Securitized notes receivable, net | $ 292,021 | $ 292,590 |
| Receivable backed notes payable - non-recourse | $ 355,833 | $ 344,246 |

The restricted cash and the securitized notes receivable balances disclosed in the table above are restricted to satisfy obligations of the VIEs.

## 6. VOI Inventory

Bluegreen's VOI inventory consists of the following (in thousands):

|  | As of December 31, | |
|  | 2020 | 2019 |
|---|---|---|
| Completed VOI units | $ 268,686 | $ 269,847 |
| Construction-in-progress | — | 3,946 |
| Real estate held for future development | 78,436 | 73,144 |
|  | $ 347,122 | $ 346,937 |

111

D - 0055-0111

The interest expense reflected in the Company's consolidated statements of operations and comprehensive income is net of capitalized interest. Interest capitalized to VOI inventory was $0.1 million, $0.5 million and $1.3 million at December 31, 2020, 2019, and 2018, respectively.

**7. Leases**

BVH and Bluegreen are the lessees under various operating leases for certain sales offices, call centers, office space, equipment and vehicles. Some leases include one or more options to renew, at the Company's discretion, for renewal terms of one year or more. Certain of the Company's lease agreements include rental payments based on a percentage of sales generated at the location, and others include rental payments adjusted periodically for inflation. The Company's lease agreements do not contain residual value guarantees or restrictive covenants which the Company believes to be material.

The Company recognizes operating lease assets and operating lease liabilities associated with lease agreements with an initial term of 12 months or greater, while lease agreements with an initial term of 12 months or less are not recorded in the Company's consolidated balance sheets. The Company generally does not include lease payments associated with renewal options, including those that are exercisable at its discretion, in the measurement of its operating lease assets and liabilities as it is not reasonably certain that such options will be exercised.  The table below sets forth information regarding the Company's lease agreements with an initial term of greater than 12 months (dollars in thousands):

| | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2020** | | **2019** | |
| Operating Lease Asset | $ | 34,415 | $ | 21,498 |
| Operating Lease Liability | | 35,904 | | 22,957 |
| Weighted Average Lease Term (in years) [1] | | 3.4 | | 3.7 |
| Weighted Average Discount Rate [2] | | 4.77% | | 5.30% |

(1)  The Company's weighted average lease term excludes two real estate leases that expire in December 2034 and May 2056.
(2)  As most of the Company's leases do not provide an implicit rate, the Company uses its incremental borrowing rate based on the information available at commencement date in determining the present value of future lease payments.  To estimate incremental borrowing rates, the Company considers various factors, including the rates applicable to the Company's recently issued debt and credit facilities and prevailing financial market conditions. The Company used the incremental borrowing rate as of January 1, 2019 for operating leases that commenced prior to that date.

The Company generally recognizes lease costs associated with its operating leases on a straight-line basis over the lease term, while variable lease payments that do not depend on an index or rate are recognized as variable lease costs in the period in which the obligation for those payments is incurred.  The table below sets forth information regarding the Company's lease costs which are included as selling, general and administrative expenses in the Company's consolidated statement of operations and comprehensive income for the year ended December 31, 2020 (in thousands):

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2020** | | **2019** | |
| Fixed rental costs | $ | 7,516 | $ | 8,147 |
| Short-term lease cost | | 1,831 | | 5,144 |
| Variable lease cost | | 2,448 | | 3,079 |
| Total operating lease costs | $ | 11,795 | $ | 16,370 |

112

The table below sets forth information regarding the maturity of the Company's operating lease liabilities (in thousands):

| As of December 31, | Operating Lease Liabilities |
|---|---|
| 2021 | $ 4,025 |
| 2022 | 6,703 |
| 2023 | 5,858 |
| 2024 | 3,618 |
| 2025 | 2,152 |
| After 2025 | 25,435 |
| Total lease payments | $ 47,791 |
| Less: Interest | 11,887 |
| Present value of operating lease liabilities | $ 35,904 |

The above operating lease payments exclude $0.9 million of required minimum lease payments for lease agreements executed but not yet commenced, as the Company has not received possession of the leased property as of December 31, 2020. Included in the Company's statement of cash flows under operating activities for the years ended December 31, 2020 and 2019 was $6.6 million and $7.6 million, respectively, of cash paid for amounts included in the measurement of lease liabilities. During the year ended December 31, 2020 and 2019, the Company obtained $19.4 million and $1.6 million, respectively, of right-of-use assets in exchange for new operating lease liabilities. The increase in the right-of-use assets and operating lease liabilities in 2020 as compared to 2019 was primarily due to 2 leases executed in December 2020.

**8. Property and Equipment**

The Company's property and equipment consists of the following (dollars in thousands):

| | Useful Lives | As of December 31, | |
|---|---|---|---|
| | | **2020** | **2019** |
| Land, buildings and building improvements | 3-31 years | **72,041** | 71,575 |
| Computer hardware and software | 1-5 years | **67,639** | 70,377 |
| Furniture, fixtures and equipment | 3-14 years | **21,218** | 24,430 |
| Leasehold improvements | 3-14 years | **9,326** | 11,215 |
| Transportation and equipment | 5 years | **680** | 837 |
| | | **170,904** | 178,434 |
| Accumulated depreciation and amortization | | **(80,855)** | (78,764) |
| Total | | $ **90,049** | $ 99,670 |

Depreciation and amortization expense related to the Company's property and equipment was $15.5 million, $14.0 million and $12.3 million for the years ended December 31, 2020, 2019 and 2018, respectively. In December 2019, Bluegreen conveyed the ski and golf operations and related property at one of its resorts to the HOA, which resulted in a loss on the disposal of approximately $5.6 million.

113

**9. Intangible Assets**

Intangible assets and related amortization expense were as follows (in thousands):

| Class | As of December 31, | |
|---|---|---|
| | **2020** | **2019** |
| **Intangible assets:** | | |
| Management agreements | $ **61,708** | $ 61,708 |
| Accumulated amortization | **(277)** | (193) |
| **Total intangible assets** | $ **61,431** | $ 61,515 |

| Year | Future Amortization Expense |
|---|---|
| 2021 | $ 83 |
| 2022 | 56 |
| | $ 139 |

**10. Debt**

Contractual minimum principal payments required on the Company's debt, net of unamortized discount, by type, for each of the five years subsequent to December 31, 2020 and thereafter are shown below (in thousands):

| | Notes payable and other borrowings | Note payable to BBX Capital, Inc. | Recourse receivable-backed notes payable | Non-recourse receivable-backed notes payable | Junior subordinated debentures | Total |
|---|---|---|---|---|---|---|
| 2021 | $ 12,200 | $ — | $ — | $ — | $ — | $ 12,200 |
| 2022 | 14,625 | — | — | — | — | 14,625 |
| 2023 | 10,328 | — | — | — | — | 10,328 |
| 2024 | 102,500 | — | 25,718 | — | — | 128,218 |
| 2025 | — | 75,000 | 8,125 | — | — | 83,125 |
| Thereafter | — | — | 18,958 | 347,526 | 177,129 | 543,613 |
| Unamortized debt issuance costs | (1,267) | — | — | (5,994) | (1,057) | (8,318) |
| Adjustment [1] | — | — | (14,301) | 14,301 | — | — |
| Purchase accounting adjustment | — | — | — | — | (37,895) | (37,895) |
| Total | $ 138,386 | $ 75,000 | $ 38,500 | $ 355,833 | $ 138,177 | $ 745,896 |

(1)  Represents the non-recourse balances of the Liberty Bank Facility, NBA Receivables Facility, and the Pacific Western Facility as described below.

The minimum contractual payments set forth in the table above may differ from actual payments due to the timing of principal payments required upon (1) the sale of real estate assets that serve as collateral on certain debt (release payments) and (2) cash collections of pledged or transferred notes receivable.

*Lines-of-Credit and Notes Payable*

Bluegreen has outstanding borrowings with various financial institutions and other lenders.  Financial data related to Bluegreen's lines of credit and notes payable (other than receivable-backed notes payable) as of December 31, 2020 and 2019 was as follows (dollars in thousands):

114

| | As of December 31, | | | | | |
| | **2020** | | | **2019** | | |
| | **Balance** | **Interest Rate** | **Carrying Amount of Pledged Assets** | **Balance** | **Interest Rate** | **Carrying Amount of Pledged Assets** |
|---|---|---|---|---|---|---|
| NBA Éilan Loan | $ 15,903 | 4.75% | $ 28,491 | $ 18,820 | 4.95% | $ 31,259 |
| Fifth Third Syndicated LOC | 30,000 | 2.25% | 50,822 | 30,000 | 3.85% | 49,062 |
| Fifth Third Syndicated Term | 93,750 | 2.25% | 158,817 | 98,750 | 3.71% | 161,497 |
| Unamortized debt issuance costs | (1,267) | | — | (1,410) | | — |
| Total | $ 138,386 | | $ 238,130 | $ 146,160 | | $ 241,818 |

*NBA Éilan Loan.* In April 2018, Bluegreen purchased the Éilan Hotel & Spa in San Antonio, Texas for $34.3 million. In connection with the acquisition, Bluegreen entered into a non-revolving acquisition loan (the "NBA Éilan Loan") with NBA, which provided for advances of up to $27.5 million, $24.3 million of which was used to fund the acquisition of the resort and $2.1 million of which was used to fund certain improvement costs. Principal payments are effected through release payments from sales of VOIs at the Éilan Hotel & Spa that serve as collateral for the NBA Éilan Loan, subject to a minimum amortization schedule, with the remaining balance due at maturity in April 2023. Borrowings under the NBA Éilan Loan bear interest at an annual rate equal to one-month LIBOR plus 3.25%, subject to a floor of 4.75%. As of December 31, 2020, there was $15.9 million outstanding on the NBA Éilan Loan.

*Fifth Third Syndicated Line-of-Credit and Fifth Third Syndicated Term Loan.* In December 2016, Bluegreen entered into a $100.0 million syndicated credit facility with Fifth Third Bank, as administrative agent and lead arranger, and certain other bank participants as lenders. In October 2019, Bluegreen amended and increased the facility to $225.0 million. The amended facility includes a $100.0 million term loan (the "Fifth Third Syndicated Term Loan") with quarterly amortization requirements and a $125.0 million revolving line of credit (the "Fifth Third Syndicated Line-of-Credit"). Borrowings under the amended facility generally bear interest at LIBOR plus 2.00% - 2.50% (with a LIBOR floor of 0.25%), depending on Bluegreen's leverage ratio, are collateralized by certain of Bluegreen's VOI inventory, sales center buildings, management fees, short-term receivables and cash flows from residual interests relating to certain term securitizations, and will mature in October 2024. During March 2020, in an effort to assure adequate liquidity for a sustained period given the effect and uncertainties associated with the COVID-19 pandemic, Bluegreen drew down $60.0 million under its line of credit which Bluegreen has repaid as of December 31, 2020. As of December 31, 2020, outstanding borrowings under the facility totaled $123.8 million, including $93.8 million under the Fifth Third Syndicated Term Loan with an interest rate of 2.25%, and $30.0 million under the Fifth Third Syndicated Line of Credit with an interest rate of 2.25%.

*Iberia Revolving Line of Credit.* BVH previously had a $50.0 million revolving line of credit with IberiaBank. Effective September 30, 2020, the loan agreement was terminated at the request of BVH in connection with the completion of the spin-off of BBX Capital. In connection with the termination, IberiaBank released the security interest over all collateral granted to lenders of the facility.

115

*Receivable-Backed Notes Payable*

Financial data related to Bluegreen's receivable-backed notes payable facilities was as follows (dollars in thousands):

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2020** | | | **2019** | | |
| | **Debt Balance** | **Interest Rate** | **Principal Balance of Pledged/ Secured Receivables** | **Debt Balance** | **Interest Rate** | **Principal Balance of Pledged/ Secured Receivables** |
| **Receivable-backed notes payable - recourse:** | | | | | | |
| Liberty Bank Facility [(1)] | $ **10,000** | **3.40%** | $ **13,970** | $ 25,860 | 4.75% | $ 31,681 |
| NBA Receivables Facility [(2)] | **19,877** | **3.32%** | **26,220** | 32,405 | 4.55% | 39,787 |
| Pacific Western Facility [(3)] | **8,623** | **3.15%** | **13,131** | 20,304 | 4.68% | 25,332 |
| Total | **38,500** | | **53,321** | 78,569 | | 96,800 |
| **Receivable-backed notes payable - non-recourse:** | | | | | | |
| Liberty Bank Facility [(1)] | $ **2,316** | **3.40%** | $ **3,235** | $ — | — | $ — |
| NBA Receivables Facility [(2)] | **11,985** | **3.32%** | **15,809** | — | | — |
| Pacific Western Facility [(3)] | **—** | **—** | **—** | 10,000 | 4.68% | 12,477 |
| KeyBank/DZ Purchase Facility | **—** | **—** | **—** | 31,708 | 3.99% | 39,448 |
| Quorum Purchase Facility | **29,788** | **4.75-5.10%** | **34,651** | 44,525 | 4.75-5.50% | 49,981 |
| 2012 Term Securitization | **—** | **0.00%** | **—** | 8,638 | 2.94% | 9,878 |
| 2013 Term Securitization | **11,922** | **3.20%** | **13,483** | 18,219 | 3.20% | 19,995 |
| 2015 Term Securitization | **22,560** | **3.02%** | **24,475** | 31,188 | 3.02% | 33,765 |
| 2016 Term Securitization | **35,700** | **3.35%** | **40,221** | 48,529 | 3.35% | 54,067 |
| 2017 Term Securitization | **51,470** | **3.12%** | **58,907** | 65,333 | 3.12% | 74,219 |
| 2018 Term Securitization | **72,486** | **4.02%** | **84,454** | 91,231 | 4.02% | 103,974 |
| 2020 Term Securitization | **123,600** | **2.60%** | **139,052** | — | | — |
| Unamortized debt issuance costs | **(5,994)** | | **—** | (5,125) | | — |
| Total | **355,833** | | **414,287** | 344,246 | | 397,804 |
| **Total receivable-backed debt** | $ **394,333** | | $ **467,608** | $ 422,815 | | $ 494,604 |

(1)  Pursuant to the February 11, 2020 amendment described below, recourse on the Liberty Bank Facility is limited to $10.0 million, subject to certain exceptions.

(2)  Pursuant to the September 25, 2020 amendment described below, recourse to Bluegreen/Big Cedar Vacations was reduced to $19.9 million as of December 31, 2020 and will be reduced by $1.3 million per month until it reaches a floor of $10.0 million.

(3)  Recourse on the Pacific Western Facility is limited to $10.0 million, subject to certain exceptions.

*Liberty Bank Facility.*  Since 2008, Bluegreen has maintained a revolving VOI notes receivable hypothecation facility (the "Liberty Bank Facility") with Liberty Bank which provides for advances on eligible receivables pledged under the Liberty Bank Facility, subject to specified terms and conditions, during the revolving credit period. On June 25, 2020, Bluegreen amended the Liberty Bank Facility to extend the revolving credit period from June 2020 to June 2021, and the maturity from March 2023 to June 2024.  In addition, the amendment decreased the advance rate with respect to Qualified Timeshare Loans from 85% to 80% of the unpaid principal balance of the Qualified Timeshare Loans.  The advance rate is 60% of the unpaid principal balance of Non-Conforming Qualified Timeshare Loans. The amendment also reduced the maximum permitted outstanding borrowings from $50.0 million to $40.0 million, subject to the terms of the facility, and effective July 1, 2020, decreased the interest rate to the Prime Rate minus 0.10% with a floor of 3.40% from the Prime Rate with a floor of 4.00%. In addition, recourse to Bluegreen under the amended facility was reduced to $10.0 million, subject to certain exceptions set forth in the facility. Subject to the terms of the

116

D - 0055-0116

facility, principal and interest due under the Liberty Bank Facility are paid as cash is collected on the pledged receivables, with the remaining balance being due by maturity.

*NBA Receivables Facility.* Bluegreen/Big Cedar Vacations has a revolving VOI hypothecation facility (the "NBA Receivables Facility") with National Bank of Arizona ("NBA") which was amended and restated on September 25, 2020. The Amended and Restated NBA Receivables Facility extended the revolving advance period from September 2020 to September 2023 and the maturity date from March 2025 to March 2028. In addition, the interest rate on all new advances made under the facility will be one month LIBOR plus 2.25% (with an interest rate floor of 3.00%). Further, if new advances of at least $25.0 million are made by June 30, 2021, the interest rate on borrowings under the facility at September 25, 2020, to the extent then remaining outstanding, will be reduced from the currently effective rate of one month LIBOR plus 2.75% (with an interest rate floor of 3.50%) to one month LIBOR plus 2.25% (with an interest rate floor of 3.00%). The Amended and Restated NBA Receivables Facility provides for advances at a rate of 80% on eligible receivables pledged under the facility (decreased from the prior rate of 85%), subject to eligible collateral and specified terms and conditions, during the revolving credit period. The maximum borrowings allowed under the facility remains at $70.0 million. In addition, recourse to Bluegreen/Big Cedar under the amended facility was reduced to $19.9 million as of December 31, 2020 and will be reduced by $1.3 million per month until it reaches a floor of $10.0 million. Subject to the terms of the facility, principal and interest payments received on pledged receivables are applied to principal and interest due under the facility, with the remaining outstanding balance being due by maturity.

*Pacific Western Facility.* Bluegreen has a revolving VOI notes receivable hypothecation facility (the "Pacific Western Facility") with Pacific Western Bank, which provides for advances on eligible VOI notes receivable pledged under the facility, subject to specified terms and conditions, during a revolving credit period. Maximum outstanding borrowings under the Pacific Western Facility are $40.0 million, subject to eligible collateral and customary terms and conditions. The revolving advance period expires in September 2021 and the Pacific Western Facility matures in September 2024 (in each case, subject to an additional 12-month extension at the option of Pacific Western Bank). Eligible "A" VOI notes receivable that meet certain eligibility and FICO score requirements, which Bluegreen believes are typically consistent with loans originated under its current credit underwriting standards, are subject to an 85% advance rate. The Pacific Western Facility also allows for certain eligible "B" VOI notes receivable (which have less stringent FICO score requirements) to be funded at a 53% advance rate. Borrowings outstanding under the Pacific Western Facility accrue interest at an annual rate equal to 30-day LIBOR plus 3.00%; provided, however, that a portion of the borrowings, to the extent such borrowings are in excess of established debt minimums, will accrue interest at 30-day LIBOR plus 2.75%. Subject to the terms of the facility, principal repayments and interest on borrowings under the Pacific Western Facility are paid as cash is collected on the pledged VOI notes receivable, subject to future required decreases in the advance rates after the end of the revolving advance period, with the remaining outstanding balance being due by maturity. The facility has limited recourse not to exceed $10.0 million.

*KeyBank/DZ Purchase Facility.* Bluegreen has a VOI notes receivable purchase facility (the "KeyBank/DZ Purchase Facility") with DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt AM Main ("DZ"), and KeyBank National Association ("KeyBank") which permits maximum outstanding financings of up to $80.0 million and provides for an advance rate of 80% with respect to VOI receivables securing amounts financed. The KeyBank/DZ Purchase Facility's advance period will expire in December 2022 and will mature and all outstanding amounts will become due 24 months after the revolving advance period has expired, or earlier under certain circumstances set forth in the facility. Interest on amounts outstanding under the facility is tied to an applicable index rate of the LIBOR rate, in the case of amounts funded by KeyBank, and a cost of funds rate or commercial paper rates, in the case of amounts funded by or through DZ. The interest rate under the facility is the applicable index rate plus 2.25% (with an interest rate floor of 0.25%) until the expiration of the revolving advance period and thereafter will equal the applicable index rate plus 3.25% (with an interest rate floor of 0.25%). Subject to the terms of the facility, Bluegreen will receive the excess cash flows generated by the VOI notes receivable sold (excess meaning after payments of customary fees, interest and principal under the facility) until the expiration of the VOI notes receivable advance period, at which point all of the excess cash flow will be paid to the note holders until the outstanding balance is reduced to zero. While ownership of the VOI notes receivable included in the facility is transferred and sold for legal purposes, the transfer of these VOI notes receivable is accounted for as a secured borrowing for financial reporting purposes. The facility is nonrecourse.

117

*Quorum Purchase Facility.* Bluegreen/Big Cedar Vacations has a VOI notes receivable purchase facility (the "Quorum Purchase Facility") with Quorum Federal Credit Union ("Quorum"), pursuant to which Quorum has agreed to purchase eligible VOI notes receivable in an amount of up to an aggregate $50.0 million purchase price, subject to certain conditions precedent and other terms of the facility. On December 18, 2020, the Quorum Purchase Facility was amended to extend the advance period to December 2022 from December 2020 and the maturity date to December 2034 from December 2032. The interest rate on each advance is set at the time of funding based on rates mutually agreed upon by the parties. Of the amounts outstanding under the Quorum Purchase Facility at December 31, 2020, $2.2 million accrues interest at a rate per annum of 4.75%, $15.3 million accrues interest at a fixed rate of 4.95%, and $12.3 million accrues interest at a fixed rate of 5.10%. The Quorum Purchase Facility provides for an 85% advance rate on eligible receivables sold under the facility, however Quorum can modify this advance rate on future purchases subject to the terms and conditions of the Quorum Purchase Facility. Eligibility requirements for VOI notes receivable sold include, among others, that the obligors under the VOI notes receivable sold be members of Quorum at the time of the note sale. Subject to performance of the collateral, Bluegreen or Bluegreen/Big Cedar Vacations, as applicable, will receive any excess cash flows generated by the VOI notes receivable transferred to Quorum under the facility (excess meaning after payment of customary fees, interest and principal under the facility) on a pro-rata basis as borrowers make payments on their VOI notes receivable. While ownership of the VOI notes receivable included in the Quorum Purchase Facility is transferred and sold for legal purposes, the transfer of these VOI notes receivable is accounted for as a secured borrowing for financial reporting purposes. The facility is nonrecourse.

*2012 Term Securitization.* In October 2020, Bluegreen repaid in full the notes payable issued in connection with the 2012 Term Securitization. Accordingly, the related unamortized debt issuance costs of $0.1 million were written off in 2020.

*2020 Term Securitization.* In October 2020, Bluegreen completed the 2020-A Term Securitization, a private offering and sale of $131.0 million of investment-grade, VOI receivable backed notes (the "Notes"), including $48.6 million of Class A Notes, $47.9 million of Class B Notes and $34.5 million of Class C Notes with interest rates of 1.55%, 2.49%, and 4.22%, respectively, which blends to an overall interest rate of approximately 2.60%. The gross advance rate for this transaction was 88.0%. The Notes mature in February 2036. KeyBanc Capital Markets Inc. ("KeyCM") and Barclays Capital Inc. acted as co-lead managers and were the initial purchasers of the Notes. KeyCM also acted as structuring agent for the transaction.

The amount of the VOI receivables sold to BXG Receivables Note Trust 2020-A (the "Trust") in the transaction was $148.9 million, $138.9 million of which was sold to the Trust at closing and the remaining $10.0 million of which (the "Prefunded Receivables") was sold to the Trust by December 31, 2020. The gross proceeds of such sales to the Trust were $131.0 million. A portion of the proceeds received at closing were used to: repay KeyBank National Association ("KeyBank") and DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt am Main ("DZ Bank") $61.1 million, representing all amounts outstanding (including accrued interest) the KeyBank/DZ Purchase Facility; repay Liberty Bank $6.4 million under the Liberty Bank Facility; repay Pacific Western Bank $14.6 million under the Pacific Western Bank Facility; capitalize a reserve fund; and pay fees and expenses associated with the transaction. The remainder of the gross proceeds from the 2020-A Term Securitization were used for general corporate purposes.

While ownership of the VOI receivables included in the 2020-A Term Securitization is transferred and sold for legal purposes, the transfer of these receivables is accounted for as a secured borrowing for financial accounting purposes. Accordingly, no gain or loss was recognized as a result of this transaction.

*Other Non-Recourse Receivable-Backed Notes Payable.* In addition to the above described facilities, Bluegreen has a number of other nonrecourse receivable-backed notes payable facilities, as set forth in the table above. During 2020 and 2019, Bluegreen repaid $67.8 million and $62.6 million, respectively, under these additional receivable-backed notes payable facilities.

*Junior Subordinated Debentures*

Woodbridge and Bluegreen have each formed statutory business trusts (collectively, the "Trusts"), each of which issued trust preferred securities as part of a larger pooled trust securities offering which was not registered under the Securities Act of 1933 and invested the proceeds thereof in its junior subordinated debentures. The Trusts are variable interest entities in which Woodbridge and Bluegreen are not the primary beneficiaries. Accordingly, the Company

118

and its subsidiaries do not consolidate the operations of the Trusts; instead, the beneficial interests in the Trusts are accounted for under the equity method of accounting. The maximum exposure to loss as a result of Bluegreen and Woodbridge's involvement with the Trusts is limited to the carrying amount of the equity method investment. Included in other assets as of December 31, 2020 and 2019 was $2.1 million of equity in the Trusts. Interest on the junior subordinated debentures and distributions on the trust preferred securities are payable quarterly in arrears at the same interest rate.

The table below sets forth information regarding the Company's junior subordinated debentures (dollars in thousands):

| | December 31, 2020 | | | December 31, 2019 | | |
|---|---|---|---|---|---|---|
| | Carrying Amounts | Effective Interest Rates [1] | | Carrying Amounts | Effective Interest Rates [1] | Maturity Years [2] |
| Woodbridge - Levitt Capital Trusts I - IV | $ 66,302 | 4.01 - 4.04% | $ | 66,302 | 5.74 - 5.95% | 2035 - 2036 |
| Bluegreen Statutory Trusts I - VI | 110,827 | 5.01 - 5.12% | | 110,827 | 6.74 - 6.86% | 2035 - 2037 |
| Unamortized debt issuance costs | (1,057) | | | (1,129) | | |
| Unamortized purchase discount | (37,895) | | | (38,746) | | |
| **Total junior subordinated debentures** | $ 138,177 | | $ | 137,254 | | |

[1] The Company's junior subordinated debentures bear interest at three-month LIBOR (subject to quarterly adjustment) plus a spread ranging from 3.80% to 4.90%.

[2] All of the junior subordinated debentures were eligible for redemption by Woodbridge and Bluegreen, as applicable, as of December 31, 2020 and 2019.

As of December 31, 2020, BVH and its subsidiaries were in compliance with all financial debt covenants under its debt instruments. Bluegreen had availability of approximately $292.4 million under its receivable-backed purchase and credit facilities, inventory lines of credit and corporate credit line, subject to eligible collateral and the terms of the facilities, as applicable, as of December 31, 2020.

*Note payable to BBX Capital, Inc.*

In connection with its spin-off, BVH issued a $75.0 million note payable to BBX Capital that accrues interest at a rate of 6% per annum and requires payments of interest on a quarterly basis. Under the terms of the note, BVH has the option in its discretion to defer interest payments under the note, with interest on the outstanding balance thereafter to accrue at a compounded rate of 8% per annum until such time as BVH is current on all accrued payments under the note, including deferred interest. All outstanding amounts will become due and payable in five years or earlier upon certain other events.  Included in other liabilities as accrued interest payable in BVH's consolidated statement of financial condition was $1.1 million of accrued interest payable in connection with this note payable.

119

**11. Fair Value of Financial Instruments**

*ASC 820 Fair Value Measurements and Disclosures* (Topic 820) defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date (exit price). The inputs used to measure fair value are classified into the following hierarchy:

Level 1:    Unadjusted quoted prices in active markets for identical assets or liabilities

Level 2:    Unadjusted quoted prices in active markets for similar assets or liabilities, or unadjusted quoted prices for identical or similar assets or liabilities in markets that are not active, or inputs other than quoted prices that are observable for the asset or liability

Level 3:    Unobservable inputs for the asset or liability

The carrying amounts of financial instruments included in the consolidated financial statements and their estimated fair values are as follows (in thousands):

|  | As of December 31, 2020 | | As of December 31, 2019 | |
| --- | --- | --- | --- | --- |
|  | Carrying Amount | Estimated Fair Value | Carrying Amount | Estimated Fair Value |
| Cash and cash equivalents | $ 221,118 | $ 221,118 | $ 335,846 | $ 335,846 |
| Restricted cash | 35,986 | 35,986 | 49,896 | 49,896 |
| Notes receivable, net | 409,349 | 549,819 | 448,568 | 587,000 |
| Note payable to BBX Capital, Inc. | 75,000 | 78,218 | — | — |
| Lines-of-credit, notes payable, and receivable-backed notes payable | 532,719 | 547,400 | 568,975 | 589,300 |
| Junior subordinated debentures | 138,177 | 133,500 | 137,254 | 146,000 |

*Cash and cash equivalents.* The amounts reported in the consolidated balance sheets for cash and cash equivalents approximate fair value.

*Restricted cash.* The amounts reported in the consolidated balance sheets for restricted cash approximate fair value.

*Notes receivable, net.* The fair value of Bluegreen's notes receivable is estimated using Level 3 inputs and is based on estimated future cash flows considering contractual payments and estimates of prepayments and defaults, discounted at a market rate.

*Note Payable to BBX Capital, Inc.* The fair value of the note payable to BBX Capital, Inc was determined using Level 3 inputs by discounting the net cash outflows estimated to be used to repay the debt.

*Lines-of-credit, notes payable, and receivable-backed notes payable.* The amounts reported in the Company's consolidated balance sheets for lines of credit, notes payable, and receivable-backed notes payable, approximate fair value for indebtedness that provides for variable interest rates. The fair value of the Company's fixed-rate, receivable-backed notes payable was determined using Level 3 inputs by discounting the net cash outflows estimated to be used to repay the debt. These obligations are to be satisfied using the proceeds from the consumer loans that secure the obligations.

*Junior subordinated debentures.* The fair value of the Company's junior subordinated debentures is estimated using Level 3 inputs based on the contractual cash flows discounted at a market rate or based on market price quotes from the over-the-counter bond market.

120

D - 0055-0120

**12. Commitments and Contingencies**

*Litigation Matters*

In the ordinary course of business, BVH and its subsidiaries are parties to lawsuits as plaintiff or defendant involving its operations and activities. Bluegreen is subject to claims or proceedings from time to time relating to the purchase, sale, marketing, or financing of VOIs and other business activities. Additionally, from time to time in the ordinary course of business, the Company is involved in disputes with existing and former employees, vendors, taxing jurisdictions, and other individuals and entities, and it also receives individual consumer complaints as well as complaints received through regulatory and consumer agencies, including Offices of State Attorneys General. The Company takes these matters seriously and attempts to resolve any such issues as they arise. The Company may also become subject to litigation related to the COVID-19 pandemic, including with respect to any actions the Company takes as a result thereof.

Reserves are accrued for matters in which management believes it is probable that a loss will be incurred and the amount of such loss can be reasonably estimated. Management does not believe that the aggregate liability relating to known contingencies in excess of the aggregate amounts accrued will have a material impact on the Company's results of operations or financial condition. However, litigation is inherently uncertain and the actual costs of resolving legal claims, including awards of damages, may be substantially higher than the amounts accrued for these claims and may have a material adverse impact on the Company's results of operations or financial condition.

Management is not at this time able to estimate a range of reasonably possible losses with respect to matters in which it is reasonably possible that a loss will occur. In certain matters, management is unable to estimate the loss or reasonable range of loss until additional developments provide information sufficient to support an assessment of the loss or range of loss. Frequently in these matters, the claims are broad and the plaintiffs have not quantified or factually supported their claim.

*BVH Litigation*

There were no material pending legal proceedings against BVH or its subsidiaries other than proceedings against Bluegreen as of December 31, 2020.

*Bluegreen Litigation*

The following is a description of certain material pending legal proceedings involving Bluegreen:

On September 22, 2017, Stephen Potje, Tamela Potje, Sharon Davis, Beafus Davis, Matthew Baldwin, Tammy Baldwin, Arnor Lee, Angela Lee, Gretchen Brown, Paul Brown, Jeremy Estrada, Emily Estrada, Michael Oliver, Carrie Oliver, Russell Walters, Elaine Walters, and Mike Ericson, individually and on behalf of all other similarly situated, filed a purported class action lawsuit against Bluegreen which asserts claims for alleged violations of the Florida Deceptive and Unfair Trade Practices Act and the Florida False Advertising Law. In the complaint, the plaintiffs alleged the making of false representations in connection with Bluegreen's sales of VOIs. The purported class action lawsuit was dismissed without prejudice after mediation. However, on or about April 24, 2018, plaintiffs re-filed their individual claims in Palm Beach County Circuit Court. Subsequently, on October 15, 2019, the Court entered an order granting summary judgment in Bluegreen's favor and dismissed all claims. Bluegreen has moved for reimbursement of its attorneys' fees. Plaintiffs have appealed the summary judgement order.

On February 28, 2018, Oscar Hernandez and Estella Michael filed a purported class action lawsuit in San Bernardino Superior Court against BVU. Plaintiffs sought to represent a class of approximately 660 hourly, non-exempt employees who worked in the state of California since March 1, 2014. The central claims in the complaint, as amended during June 2018, include alleged failures to pay overtime and wages at termination and to provide meal and rest periods, claims relating to non-compliant wage statements and unreimbursed business expenses, and a claim under the Private Attorney's General Act. In April 2019, the parties mediated and agreed to settle the matter for an immaterial amount. Final approval of the settlement was granted by the court on January 21, 2021.

121

On June 28, 2018, Melissa S. Landon, Edward P. Landon, Shane Auxier and Mu Hpare, individually and on behalf of all others similarly situated, filed a purported class action lawsuit against Bluegreen and Bluegreen Vacations Unlimited, Inc. ("BVU") asserting claims for alleged violations of the Wisconsin Timeshare Act, Wisconsin law prohibiting illegal referral selling, and Wisconsin law prohibiting illegal attorney's fee provisions. Plaintiffs allegations include that Bluegreen failed to disclose the identity of the seller of real property at the beginning of Bluegreen's initial contact with the purchaser; that Bluegreen misrepresented who the seller of the real property was; that Bluegreen misrepresented the buyer's right to cancel; that Bluegreen included an illegal attorney's fee provision in the sales document(s); that Bluegreen offered an illegal "today only" incentive to purchase; and that Bluegreen utilized an illegal referral selling program to induce the sale of VOIs. Plaintiffs seek certification of a class consisting of all persons who, in Wisconsin, purchased from Bluegreen one or more VOIs within six years prior to the filing of this lawsuit. Plaintiffs seek statutory damages, attorneys' fees and injunctive relief. Bluegreen moved to dismiss the case, and on November 27, 2019, the Court issued a ruling granting the motion in part. Bluegreen has answered the remaining claims. Bluegreen believes the lawsuit is without merit and intend to vigorously defend the action.

On January 7, 2019, Shehan Wijesinha filed a purported class action lawsuit alleging violations of the Telephone Consumer Protection Act (the "TCPA"), specifically that BVU called plaintiff's cell phone for telemarketing purposes using an automated dialing system, and that plaintiff did not give BVU his express written consent to do so. Plaintiffs seek certification of a class comprised of other persons in the United States who received similar calls from or on behalf of BVU without the person's consent. Plaintiff seeks monetary damages, attorneys' fees and injunctive relief. Bluegreen believes the lawsuit is without merit and intend to vigorously defend the action. On July 15, 2019, the court entered an order staying this case pending a ruling from the Federal Communications Commission ("FCC") clarifying the definition of an automatic telephone dialing system under the TCPA and the decision of the Eleventh Circuit in a separate action brought against a VOI company by a plaintiff alleging violations of the TCPA. On January 7, 2020, the Eleventh Circuit issued a ruling consistent with BVU's position, and on June 26, 2020, the FCC also issued a favorable ruling. The case currently remains stayed.

On July 18, 2019, Eddie Boyd, et al. filed an action alleging that BVU and co-defendants violated the Missouri Merchandise Practices Act for allegedly making false statements and misrepresentations with respect to the sale of VOIs. Plaintiffs further have filed a purported class action allegation that BVU's charging of an administrative processing fee constitutes the unauthorized practice of law, and have also asserted that Bluegreen and its outside counsel engaged in abuse of process by filing a lawsuit against plaintiffs' counsel (The Montgomery Law Firm). Plaintiffs seek monetary damages, attorneys' fees and injunctive relief. On August 31, 2020, the court certified a class regarding the unauthorized practice of law claim and dismissed the claims regarding abuse of process. On January 11, 2021, the Court issued an order that the class members are not entitled to rescission of their contracts because they have failed to plead fraud in the inducement. Bluegreen believes the lawsuit is without merit and intend to move to decertify the class.

On July 7, 2020, Robert Barban and approximately 172 other plaintiffs filed an action against Bluegreen's subsidiaries, Bluegreen Resorts Management, Inc. ("BRM") and Vacation Trust, Inc. ("VTI"), seeking a financial review. Plaintiffs allege that the allocation system in place does not allow them to freely and easily use, occupy, and enjoy the accommodations and facilities. They also allege that BRM has unreasonably escalated operating costs and that VTI failed to protect the plaintiffs from these costs. While Bluegreen believes the case is without merit, Bluegreen is in discussion with plaintiffs' counsel to voluntarily move this case to individual arbitration claims in Broward County, Florida. If the discussions are not successful, Bluegreen intends to file a motion to dismiss.

On July 14, 2020, Kenneth Johansen, individually and on behalf of all others similarly situated, filed a purported class action against BVU for alleged violations of the TCPA. Specifically, the named plaintiff alleges that he received numerous telemarketing calls from BVU while he was on the National Do Not Call Registry. Bluegreen filed a motion to dismiss, and plaintiff in response filed an amended complaint on September 18, 2020. On February 18, 2021 plaintiff filed a motion for class certification seeking to certify a class of thousands of individuals proposed class members. Bluegreen intends to oppose the class certification and vigorously defend the action.

On August 30, 2020, over 100 VOI owners at The Manhattan Club ("TMC") sued BVU and certain unaffiliated entities (the "Non-Bluegreen Defendants"). The complaint includes claims arising out of alleged misrepresentations made during the sale of VOIs at TMC and certain post-sale operational practices, including allegedly charging owners excessive annual maintenance fees and implementing reservation policies that the restrict the ability of VOI owners

122

to use their points to access the resort while allowing the general public to make reservations. The plaintiffs assert in the complaint that Bluegreen acquired operational control of TMC from the Non-Bluegreen Defendants in 2018 and assumed joint liability for any prior wrongdoing by them. Bluegreen believes this assertion to be erroneous and that the claims against BVU are without merit.  Accordingly, Bluegreen has moved to dismiss the claims against BVU.

Commencing in 2015, it came to Bluegreen's attention that its collection efforts with respect to its VOI notes receivable were being impacted by a then emerging, industry-wide trend involving the receipt of "cease and desist" letters from exit firms and their attorneys purporting to represent certain VOI owners. Following receipt of these letters, Bluegreen is unable to contact the owners unless allowed by law. Bluegreen believes these exit firms have encouraged such owners to become delinquent and ultimately default on their obligations and that such actions and Bluegreen's inability to contact the owners are a primary contributor to the increase in its annual default rates. Bluegreen's average annual default rates have increased from 6.9% in 2015 to 9.8% in 2020. Bluegreen also estimates that approximately 9.2% of the total delinquencies on its VOI notes receivable as of December 31, 2020 related to VOI notes receivable are subject to this issue. Bluegreen has, in a number of cases pursued, and Bluegreen may in the future pursue, legal action against the VOI owners, and as described below, against the exit firms.

On December 21, 2018, Bluegreen filed a lawsuit against timeshare exit firm Totten Franqui and certain of its affiliates ("TPEs"). In the complaint, Bluegreen alleged that the TPEs, through various forms of deceptive advertising, as well as inappropriate direct contact with VOI owners, made false statements about Bluegreen and provided misleading information to the VOI owners. The TPEs have encouraged nonpayment by consumers and exacted fees for doing so. Bluegreen believes the consumers are paying fees to the TPEs in exchange for illusory services. Bluegreen has asserted claims against the TPEs under the Lanham Act, as well as tortious interference with contractual relations, civil conspiracy to commit tortious interference and other claims.  During the course of the litigation, the TPEs and Totten Franqui filed for bankruptcy, which resulted in the litigation being stayed. Bluegreen has reached favorable settlements with the TPE principals and the court has approved the settlement with the bankruptcy trustee, which allowed 100% of Bluegreen's claims against the TPEs and Totten Franqui (which are in excess of $1.0 million). Bluegreen agreed to subordinate its claims to the claims of its timeshare owners. The settlement with the principals includes findings of fact against the defendants regarding their business practices and a permanent injunction prohibiting the principals of the Totten Franqui from working again in the timeshare exit space.

On November 13, 2019, Bluegreen filed a lawsuit against timeshare exit firm The Montgomery Law Firm and certain of its affiliates. In the complaint, Bluegreen alleged that through various forms of deceptive advertising, as well as inappropriate direct contact with VOI owners, such firm and its affiliates made false statements about Bluegreen and provided misleading information to the VOI owners and encouraged nonpayment by consumers. Bluegreen believes the consumers are paying fees to the firm and its affiliates in exchange for illusory services. Bluegreen has asserted claims under the Lanham Act, as well as tortious interference with contractual relations, civil conspiracy to commit tortious interference and other claims.  Defendants' motion to dismiss was denied. Discovery is ongoing.

On November 13, 2020, Bluegreen filed a lawsuit against timeshare exit firm, Carlsbad Law Group, LLP, and certain of its associated law firms and affiliates. On December 30, 2020, Bluegreen filed a lawsuit against timeshare exit firm, The Molfetta Law Firm, and certain of its associated law firms and affiliates. In both of these actions, Bluegreen makes substantially the same claims against the timeshare exit firms and its associated law firms and affiliates as those made in Bluegreen's action against The Montgomery Law Firm described above.

123

*Other Commitments, Contingencies and Guarantees*

Bluegreen, indirectly through BVU, its wholly-owned subsidiary, has an exclusive marketing agreement with Bass Pro, a nationally-recognized retailer of fishing, marine, hunting, camping and sports gear, that provides us with the right to market and sell vacation packages at kiosks in each of Bass Pro's retail locations and through other means. Pursuant to a settlement agreement Bluegreen entered into with Bass Pro and its affiliates during June 2019, Bluegreen paid Bass Pro $20.0 million and agreed to, among other things, make five annual payments to Bass Pro of $4.0 million each commencing in 2020. In June 2019, Bluegreen accrued for the net present value of the settlement, plus attorney's fees and costs, totaling approximately $39.1 million. The first $4.0 million annual payment was made during January 2020. As of December 31, 2020, $14.7 million was accrued for the remaining payments required by the settlement agreement (including the second annual payment of $4.0 million on January 2021), which are included in accrued liabilities and other in the consolidated balance sheets as of December 31, 2020.

During the year ended December 31, 2020 and 2019, VOI sales to prospects and leads generated by the agreement with Bass Pro accounted for approximately 12% and 13%, respectively, of Bluegreen's VOI sales volume. Subject to the terms and conditions of the settlement agreement, Bluegreen will generally be required to pay the fixed annual fee with respect to at least 59 Bass Pro retail stores and a minimum number of Cabela's retail stores that increases over time to a total of at least 60 Cabela's retail stores by the end of 2021. During 2020, Bluegreen paid $5.7 million for this fixed fee, which is included in selling, general and administrative expenses within its consolidated statements of operations and comprehensive income. Notwithstanding the foregoing, the minimum number of Bass Pro and Cabela's retail stores for purposes of the fixed annual fee may be reduced under certain circumstances set forth in the agreement, including as a result of a reduction of traffic in the stores in excess of 25% year-over-year. In March 2020 as a result of the COVID-19 pandemic, Bluegreen temporarily closed its retail marketing operations at Bass Pro Shops and Cabela's stores. Beginning in mid-May 2020, Bluegreen started the process of recommencing its sales and marketing operations and by December 31, 2020, Bluegreen recommenced operating marketing kiosks at 88 Bass Pro Shops and Cabela's stores and commenced operating marketing kiosks at 10 new Cabela's stores, for a total of 98 Bass Pro Shops and Cabela's stores.

In December 2019, Bluegreen's then-serving President and Chief Executive Officer resigned. In connection with his resignation, Bluegreen agreed to make payments totaling $3.5 million over a period of 18 months, $1.2 million of which remained payable as of December 31, 2020.

In lieu of paying maintenance fees for unsold VOI inventory, Bluegreen may enter into subsidy agreements with certain HOAs. During the years ended December 31, 2020, 2019 and 2018, Bluegreen made subsidy payments related to such subsidies of $24.0 million, $24.9 million, and $12.6 million, respectively, which are included within cost of other fee-based services in the Company's consolidated statements of operations and comprehensive income. As of December 31, 2020 and December 31, 2019, Bluegreen had no accrued liabilities for such subsidies.

124

**13. Income Taxes**

The Company's (benefit) provision for income taxes from continuing operations consists of the following (in thousands):

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2020** | | **2019** | | **2018** |
| Federal: | | | | | | |
| Current | $ | **2,775** | $ | 3,934 | $ | (3,082) |
| Deferred | | **(3,048)** | | 752 | | 21,839 |
| | $ | **(273)** | $ | 4,686 | $ | 18,757 |
| | | | | | | |
| State and Other: | | | | | | |
| Current | $ | **567** | $ | 1,175 | $ | 3,335 |
| Deferred | | **(2,662)** | | 1,664 | | 4,301 |
| | | **(2,095)** | | 2,839 | | 7,636 |
| Total | $ | **(2,368)** | $ | 7,525 | $ | 26,393 |

The difference between the Company's (benefit) provision for income taxes from continuing operations and the results of applying the federal statutory tax rate to income before (benefit) provision for income taxes relates to (in thousands):

| | | For the Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2020** | | **2019** | | **2018** |
| Income tax (benefit) provision at expected federal income tax rate [1] | $ | **(9,823)** | $ | 1,718 | $ | 15,494 |
| **Increase (decrease) resulting from:** | | | | | | |
| (Benefit) provision for state taxes, net of federal effect | | **(1,655)** | | 2,244 | | 6,125 |
| Taxes related to noncontrolling interests in subsidiaries not consolidated for income tax purposes | | **(1,552)** | | (2,367) | | (2,602) |
| Non-deductible executive compensation | | **10,205** | | 5,572 | | 8,421 |
| Other - net | | **457** | | 358 | | (1,045) |
| (Benefit) provision for income taxes | $ | **(2,368)** | $ | 7,525 | $ | 26,393 |

(1)   Expected tax is computed based upon income before taxes from continuing operations.

125

The Company's deferred income taxes from continuing and discontinuing operations consist of the following components (in thousands):

| | As of December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **Deferred tax assets:** | | |
| Allowance for loan losses, tax certificate losses and | $ | |
| write-downs for financial statement purposes | 30,155 | 30,644 |
| Federal and State NOL and tax credit carryforward | 89,039 | 95,970 |
| Real estate valuation | 5,472 | 6,575 |
| Expenses recognized for books and deferred for tax | 7,063 | 7,827 |
| Other | 2,961 | 6,261 |
| Total gross deferred tax assets | 134,690 | 147,277 |
| Valuation allowance | (80,218) | (86,435) |
| Total deferred tax assets | 54,472 | 60,842 |
| **Deferred tax liabilities:** | | |
| Installment sales treatment of notes | 100,479 | 107,551 |
| Intangible assets | 14,197 | 14,760 |
| Junior subordinated debentures | 8,886 | 9,124 |
| Deferral of VOI sales and costs under timeshare accounting | 9,857 | 10,511 |
| Property and equipment | 5,465 | 4,985 |
| Other | 902 | 1,469 |
| Total gross deferred tax liabilities | 139,786 | 148,400 |
| Net deferred tax liability | $ 85,314 | 87,558 |

126

*Valuation Allowance on Deferred Tax Assets*

The Company evaluates its deferred tax assets to determine if valuation allowances are required. In the evaluation, management considers net operating loss ("NOL") carryback availability, expectations of sufficient future taxable income, trends in earnings, existence of taxable income in recent years, the future reversal of temporary differences, and available tax planning strategies that could be implemented, if required. Valuation allowances are established based on the consideration of all available evidence using a more likely than not standard. As of December 31, 2020, the Company established a valuation allowance of $80.2 million relating to the deferred tax asset of $89.0 million for federal and state NOL and tax credit carryforwards, as the Company's ability to utilize a portion of these carryforwards to reduce future tax liability income is subject to significant limitations. The spin-off of BBX Capital and subsidiaries reduced the Company's federal and state NOL carryforward and valuation allowance by approximately $6.5 million. The table below sets forth information regarding the federal and state NOL and tax credit carryforwards and the applicable valuation allowance as of December 31, 2020 (in thousands):

| | Federal and State NOL and Credit Carryforward | Gross Deferred Tax Asset | Valuation Allowance | Net Deferred Tax Asset | Year Expires |
|---|---|---|---|---|---|
| Non-Florida State NOLs | $ 226,858 | $ 10,299 | $ 3,156 | $ 7,143 | 2021-2040 |
| Federal NOL SRLY Limitation | 210,330 | 44,170 | 44,170 | — | 2026-2034 |
| Florida NOL SRLY Limitation | 702,433 | 30,521 | 30,521 | — | 2026-2034 |
| Other Federal tax credits-SRLY Limitation | 2,371 | 2,371 | 2,371 | — | 2025-2031 |
| Federal NOL Section 382 Limitation | 7,097 | 1,490 | — | 1,490 | 2023-2029 |
| Florida NOL Section 382 Limitation | 4,614 | 188 | — | 188 | 2024-2029 |
| **Total** | | $ 89,039 | $ 80,218 | $ 8,821 | |

The Company evaluated all positive and negative evidence available as of the reporting date, including tax planning strategies, the ability to file a consolidated return with its subsidiaries, the expected future reversal of existing taxable temporary differences, and expected future taxable income (primarily from Bluegreen) exclusive of reversing temporary differences and carry forwards. Based on this evaluation, the Company has determined that it is more likely than not that it will be able to realize $8.8 million of the deferred tax asset that is attributed to the Company's federal and state NOL and credit carryforwards.

As of December 31, 2020, Bluegreen had non-Florida state NOL carryforwards of $226.9 million which expire from 2021 through 2040. These NOLs can only be utilized against Bluegreen's (or a subsidiary of Bluegreen) income allocable to the state in which the NOL was generated. A valuation allowance is maintained for those state NOLs where the NOL is not more likely than not realizable.

As of December 31, 2020, the Company had federal and Florida NOL carryforwards and federal tax credit carryforwards that can only be utilized if the separate entity that generated them has separate company taxable income (the "SRLY Limitation"). These carryforwards cannot be utilized against most of the Company's subsidiaries' taxable income, including Bluegreen. As such, a full valuation allowance has been established for these carryforwards.

In addition, as a result of the Company's merger with Woodbridge in September 2009, the Company experienced a "change of ownership" as that term is defined in the Internal Revenue Code. This change of ownership resulted in a significant limitation of the amount of the Company's pre-merger NOLs that can be utilized by the Company annually (the "Section 382 limitation"). The federal and Florida annual limit is approximately $788,000 and $513,000, respectively. As a result, the amounts in the table represent the NOLs that more likely than not can be utilized before expiration.

127

*Impact of the Tax Reform Act*

On December 22, 2017, the Tax Reform Act was signed into law. In addition to changes or limitations to certain tax deductions, including limitations on the deductibility of interest payable to related and unrelated lenders and further limiting deductible executive compensation, the Tax Reform Act permanently lowered the federal corporate tax rate to 21% from the previous maximum rate of 35%, effective for tax years commencing January 1, 2018. During the year ended December 31, 2018, the Company completed its analysis of the tax effects of the Tax Reform Act and reduced the provisional tax benefit recognized for the year ended December 31, 2017 by $2.8 million as a result of its analysis of the impact of the Tax Reform Act on the deductibility of certain compensation to covered employees. The $2.8 million adjustment recognized during the year ended December 31, 2018 is included in nondeductible executive compensation in the above table that reconciles the Company's expected income tax provision to its actual income tax provision.

The Tax Reform Act also repealed the alternative minimum tax effective in 2018 and allows credits associated with the alternative minimum tax to be applied to fully offset regular income taxes. Any credits that are not used to reduce regular income taxes are 50% refundable for the years 2019 through 2020 and 100% refundable in 2021. The Company had alternative minimum tax credit carryforwards of $11.2 million as of December 31, 2018 that were fully utilized during the year ended December 31, 2019.

*Other*

The Coronavirus Aid, Relief, and Economic Securities Act ("CARES Act") was signed into law on March 27, 2020 in response to the COVID-19 pandemic. As of December 31, 2020, the Company evaluated the income tax provisions of the CARES Act and determined it had no significant effect on the computation of the Company's estimated effective tax rate for the year ended December 31, 2020. However, the Company has taken advantage of the deferral of the employer portion of the tax withholding amounts and the employee retention tax credits provided for in the CARES Act. During the year ended December 31, 2020, the Company recorded a tax withholding deferral of $8.7 million and employee retention tax credits of $7.1 million, which is included in selling, general and administrative expenses in the consolidated statements of operations and comprehensive income for the year ended December 31, 2020.

The Company evaluates its tax positions based upon guidelines of ASC 740, which clarifies the accounting for uncertainty in tax positions. Based on an evaluation of uncertain tax provisions, the Company is required to measure tax benefits based on the largest amount of benefit that is greater than 50% likely of being realized upon settlement. There were no unrecognized tax benefits at December 31, 2020, 2019, or 2018 and as of December 31, 2020, the Company did not recognize any interest or penalties related to ASC 740-10.

The Company is no longer subject to federal or Florida income tax examinations by tax authorities for tax years before 2017. Several of the Company's subsidiaries are no longer subject to income tax examinations in certain state, local, and non-U.S. jurisdictions for tax years before 2016.

Certain of the Company's state income tax filings are under routine examination. While there is no assurance as to the results of these audits, the Company does not currently anticipate any material adjustments in connection with these examinations.

**14.  Common and Preferred Stock**

*Common Stock*

The Company's Articles of Incorporation authorize the Company to issue both Class A Common Stock, par value $0.01 per share, and Class B Common Stock, par value $0.01 per share. Under Florida law and the Company's Articles of Incorporation, holders of Class A Common Stock and Class B Common Stock vote together as a single class on most matters presented to a vote of the Company's shareholders. On such matters, holders of Class A Common Stock are entitled to one vote for each share held, with all holders of Class A Common Stock possessing in the aggregate 22% of the total voting power, while holders of Class B Common Stock possess the remaining 78% of the total voting power. If the number of shares of Class B Common Stock outstanding decreases to 360,000 shares, the Class A Common Stock's aggregate voting power will increase to 40%, and the Class B Common Stock will have the

128

remaining 60%. If the number of shares of Class B Common Stock outstanding decreases to 280,000 shares, the Class A Common Stock's aggregate voting power will increase to 53%, and the Class B Common Stock will have the remaining 47%. These fixed voting percentages will remain fixed unless the number of shares of Class B Common Stock outstanding decreases to 100,000 shares or less, at which time the fixed voting percentages will be eliminated, and holders of Class A Common Stock and holders of Class B Common Stock would then each be entitled to one vote per share held. Each share of Class B Common Stock is convertible into one share of Class A Common Stock at any time at the option of the holder. The percentage of total common equity represented by the Company's Class A and Class B common stock was 81% and 19%, respectively, at December 31, 2020.

*Share Repurchase Program*

In June 2017, the Company's board of directors approved a share repurchase program which authorizes the repurchase of up to 1,000,000 shares of the Company's Class A Common Stock and Class B Common Stock at an aggregate cost of up to $35.0 million. During the years ended December 31, 2019 and 2018, the Company repurchased 645,778 and 240,000 shares, respectively, of its Class A Common Stock for approximately $15.4 million and $7.6 million, respectively. There were no share repurchases during the year ended December 31, 2020 subject to the dollar cap on repurchases. As of December 31, 2020, subject to the dollar cap on repurchases, 49,903 shares of the Company's Class A or Class B Common Stock remained available to be repurchased under the Company's share repurchase program.

*Cash Tender Offer*

In April 2018, the Company completed a cash tender offer pursuant to which the Company purchased and retired 1,297,297 shares of its Class A Common Stock at a purchase price of $46.25 per share for an aggregate purchase price of approximately $60.1 million, inclusive of acquisition costs. As of April 19, 2018, the shares purchased in the tender offer represented approximately 7.6% of the total number of outstanding shares of the Company's Class A Common Stock and 6.3% of the Company total issued and outstanding equity (which includes the issued and outstanding shares of the Company's Class B Common Stock).

**Restricted Stock and Stock Option Plans**

The Company's Amended and Restated 2014 Incentive Plan, as amended (the "2014 Plan"), allows for the issuance of restricted stock awards of the Company Class A Common Stock and Class B Common Stock, the grant of options to purchase shares of the Company's Class A Common Stock and Class B Common Stock, and the grant of performance-based cash awards.

The 2014 Plan permits the issuance of awards for up to 660,000 shares of the Company's Class A Common Stock and up to 2,140,000 shares of the Company's Class B Common Stock. Awards for up to 75,054 shares of Class A Common Stock remained available for grant under the 2014 Plan as of December 31, 2020.

Vesting terms of awards granted under the 2014 Plan is established by the Compensation Committee of BVH's board of directors in connection with each grant of restricted stock awards or stock options. The maximum term of incentive and non-qualifying stock options issuable under the 2014 Plan is ten years.

In contemplation of the spin-off of BBX Capital, BVH's Compensation Committee approved the acceleration of vesting of 488,503 and 528,484 of unvested restricted Class A and Class B Common Stock awards, respectively, that were previously granted by BVH, all of which were held by BVH's executive officers. In connection with such vesting acceleration in August 2020, BVH recognized compensation expense during 2020 of approximately $19.8 million (which represented the unrecognized compensation expenses associated with the restricted stock awards as of June 30, 2020). The fair value of the restricted stock awards that vested were $16.7 million based on the fair value of BVH's common stock on the vesting date. There were no restricted stock awards or stock options outstanding as of December 31, 2020, and while future grants are at the discretion of BVH's compensation committee, it is not currently contemplated that BVH will grant equity-based compensation in the near future.

The Company also previously maintained a 2005 Restricted Stock and Option Plan and 2014 Stock Incentive Plan. The 2005 Restricted Stock and Option Plan was terminated during 2018 when the last option previously granted under

129

the plan was exercised, and the 2019 Stock Incentive Plan was terminated during 2019 when the final stock-based award previously granted under the plan vested.

*Restricted Stock Activity*

The table below sets forth information regarding the Company's unvested restricted stock award activity for the year ended December 31, 2020:

| | Unvested Restricted Stock | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| **Unvested balance outstanding, beginning of period** | 528,484 | $ | 32.65 |
| Granted | 488,503 | | 20.95 |
| Vested | (1,016,987) | | 27.04 |
| Forfeited | - | | - |
| **Unvested balance outstanding, end of period** | - | $ | - |
| **Available for grant at December 31, 2020** | 75,054 | | |

The table below sets forth information regarding the restricted stock awards granted during the years ended December 31, 2020, 2019 and 2018:

| Plan Name | Grant Date | Number of Awards Granted | Per Share Weighted Average Grant Date Fair Value | Requisite Service Period [2] | Vesting Date [1] |
|---|---|---|---|---|---|
| BBX Capital Corporation 2014 Incentive Plan | 1/9/2018 | 297,410 | 43.50 | 4 years | Annually each October |
| BBX Capital Corporation 2014 Incentive Plan | 1/8/2019 | 384,795 | 30.60 | 4 years | Annually each October |
| BBX Capital Corporation 2014 Incentive Plan | 1/21/2020 | 488,503 | 20.95 | 4 years | Annually each October |

(1)   Vesting of outstanding awards granted during the years ended December 31, 2020, 2019 and 2018 was accelerated in contemplation of the spin-off.
(2)   Prior to acceleration in connection with the September 30, 2020 spin-off, the awards vest ratably in annual installments over the requisite service period.

In October 2019, award recipients surrendered a total of 44,570 shares of Class A Common Stock and 149,671 shares of Class B Common Stock to the Company to satisfy the $4.5 million tax withholding obligation associated with the vesting of 493,623 restricted shares. The Company retired the surrendered shares.

The fair value of the Company's restricted stock awards that vested during the years ended December 31, 2020, 2019, and 2018, was $16.7 million, $11.5 million, and $24.0 million, respectively, based on the fair value of its common stock on the applicable vesting dates.

The Company recognized restricted stock compensation expense included in selling general and administrative expenses in the Company's statements of operations and comprehensive income related to its restricted stock awards of approximately $25.4 million, $11.4 million, and $12.9 million during the years ended December 31, 2020, 2019, and 2018, respectively. There were no tax benefits recognized on restricted stock compensation expense for these awards.

130

*Stock Option Activity*

There were no options granted to employees or non-employee directors during each of the years in the three-year period ended December 31, 2020.

During the year ended December 31, 2018, the Company received net proceeds of approximately $245,000, upon the exercise of stock options, and the total intrinsic value of exercised options during 2018 was $6,000. There were no stock options issued or outstanding during the year ended December 31, 2020.

*Redeemable 5% Cumulative Preferred Stock*

The Company's shares of mandatorily redeemable 5% Cumulative Preferred Stock were redeemable at the Company's option at a redemption price of $1,000 per share and were classified as a liability in the Company's consolidated balance sheets while such shares were outstanding due to the mandatory redemption feature.

In December 2013, the Company made a $5.0 million loan to the holders of the 5% Cumulative Preferred Stock and in March 2018, the Company redeemed 5,000 shares of the 5% Cumulative Preferred Stock in exchange for the cancellation of the $5.0 million loan to the holders of the 5% Cumulative Preferred Stock.

In December 2019, the Company redeemed the remaining 10,000 shares of the 5% Cumulative Preferred Stock at their stated value of $10.0 million.

For the years ended December 31, 2019 and 2018, the Company recorded interest expense related to the 5% Cumulative Preferred Stock of $1.0 million and $1.1 million, respectively, in the Company consolidated statements of operations and comprehensive income.

**15. Employee Benefit Plans and Incentive Compensation Programs**

The Company's Employee Retirement Plans are Internal Revenue Code Section 401(k) Retirement Savings Plans.  Generally, all U.S.-based employees at least 21 years of age with at least three months of employment are eligible to participate in the Company's 401(k) plans.  The Company's 401(k) plan provides for an annual employer matching contribution equal to 100% of each participant's contributions not exceeding 3% of each participant's compensation, plus 50% of the participant's contributions in excess of 3% but not in excess of 5% of the participant's compensation.  Further, Bluegreen may make additional discretionary matching contributions to its plan not to exceed 4% of each participant's compensation.  For the years ended December 31, 2020, 2019 and 2018, the Company recorded expense for contributions to the 401(k) plans totaling $5.7 million, $5.9 million and $5.3 million, respectively.

**16. Related Party Transactions**

BVH may be deemed to be controlled by Alan B. Levan, Chairman, Chief Executive Officer and President of BVH and Bluegreen, John E. Abdo, Vice Chairman of BVH and Bluegreen, Jarett S. Levan, a director of BVH and Bluegreen and former President of BVH, and Seth M. Wise, a director of Bluegreen and former director and Executive Vice President of BVH. Together, they may be deemed to beneficially own shares of BVH's Class A Common Stock and Class B Common Stock representing approximately 79% of BVH's total voting power. In addition, Raymond S. Lopez, BVH's Executive Vice President and Chief Financial Officer, also serves as Bluegreen's Chief Financial Officer and Chief Operating Officer. Mr. Alan Levan, Mr. Abdo and Mr. Lopez receive a significant portion of their compensation from Bluegreen. Further, following the spin-off, Mr. Jarett Levan became the Chief Executive Officer and President and a director of BBX Capital, Mr. Alan Levan became the Chairman of the Board of BBX Capital, Mr. John E. Abdo became Vice Chairman of BBX Capital and Seth M. Wise became Vice President and director of BBX Capital.

BVH indirectly through Woodbridge, a wholly-owned subsidiary of BVH, owns approximately 93% of Bluegreen's outstanding common stock.

Bluegreen paid or reimbursed BVH $1.5 million, $1.7 million and $1.6 million during 2020, 2019, and 2018, respectively, for management advisory, risk management, administrative and other services. BVH paid or reimbursed

131

Bluegreen $0.2 million, $0.2 million and $0.4 million for other shared services during 2020, 2019, and 2018, respectively.  As of December 31, 2019, $0.1 million was due to Bluegreen from BVH for these services.  No amounts were due to Bluegreen from BVH for these services as of December 31, 2020.

In April 2015, pursuant to a Loan Agreement and Promissory Note, a wholly-owned subsidiary of Bluegreen provided an $80.0 million loan to BVH. Amounts outstanding bore interest at a rate of 6% per annum until April 17, 2020, at which time the interest rate was decreased to 4% per annum.  Interest only payments were required on a quarterly basis, with all outstanding months becoming due and payable at maturity.  In March 2020, the Loan Agreement and Promissory Note was amended to extend the maturity date from April 17, 2020 to April 17, 2021.  During the years ended December 31, 2020, 2019 and 2018, BVH recognized $2.5 million, $4.8 million, and $4.8 million, respectively, of interest expense on the loan from Bluegreen. The loan balance and related interest expense were eliminated in consolidation in the Company's consolidated financial statements. During August 2020, Bluegreen paid a special cash dividend of $1.19 per share on its common stock. BVH utilized its proceeds from the special cash dividend to repay the loan in full.

During 2015, BVH, Woodbridge, Bluegreen, BBX Capital, and their respective subsidiaries entered into an Agreement to Allocate Consolidated Income Tax Liability and Benefits pursuant to which, among other customary terms and conditions, the parties agreed to file consolidated federal tax returns. Pursuant to the Agreement, the parties calculate their respective income tax liabilities and attributes as if each of them were a separate filer. If any tax attributes are used by another party to the Agreement to offset its tax liability, the party providing the benefit will receive an amount for the tax benefits realized. During the years ended December 31, 2020, 2019, and 2018, Bluegreen paid BVH $0, $13.0 million, and $23.1 million, respectively, and in 2020 BVH provided a $8.0 million refund to Bluegreen, pursuant to this agreement. These amounts are eliminated in consolidation in the Company's consolidated financial statements. The Agreement was terminated with respect to the subsidiaries of BVH other than Woodbridge and Bluegreen in connection with BVH's spin-off of BBX Capital on September 30, 2020.

In connection with its spin-off, BVH issued a $75.0 million note payable to BBX Capital.  See Note 10 for a description of the of terms of BVH's note payable to BBX Capital.

In connection with the spin-off, BVH also entered into a Transition Services Agreement, Tax Matters Agreement and Employee Matters Agreement with BBX Capital.

The Transition Services Agreement generally sets out the respective rights, responsibilities and obligations of BVH and BBX Capital with respect to the support services to be provided to one another after the spin-off, as may be necessary to ensure an orderly transition.  The Transition Services Agreement establishes a baseline charge for certain categories or components of services to be provided, which will be at cost unless the parties mutually agree to a different charge. The Transition Services Agreement was effective on September 30, 2020 and will continue for a minimum term of one year, provided that after that year, BVH or BBX Capital may terminate the Transition Services Agreement with respect to any or all services provided thereunder at any time upon thirty days prior written notice to the other party. Either party may renew or extend the term of the Transition Services Agreement with respect to the provision of any service which has not been previously terminated.  During the year ended December 31, 2020, BBX Capital reimbursed BVH $0.3 million under this agreement.

The Tax Matters Agreement generally sets out the respective rights, responsibilities, and obligations of BVH and BBX Capital with respect to taxes (including taxes arising in the ordinary course of business and taxes incurred as a result of the spin-off), tax attributes, tax returns, tax contests, and certain other related tax matters. The Tax Matters Agreement allocates responsibility for the preparation and filing of certain tax returns (and the payment of taxes reflected thereon). Under the Tax Matters Agreement, BVH will generally be liable for its own taxes and taxes of all of its subsidiaries (other than the taxes of BBX Capital and its subsidiaries, for which BBX Capital shall be liable) for all tax periods (or portion thereof) ending on September 30, 2020, the effective date of the spin-off. BBX Capital will be responsible for its taxes, including for taxes of its subsidiaries, as well as for taxes of BVH arising as a result of the spin-off (including any taxes resulting from an election under Section 336(e) of the Internal Revenue Code of 1986, as amended (the "Code") in connection with the spin-off).  BBX Capital, Inc. will bear liability for any transfer taxes incurred in the spin-off.  Each of BVH and BBX Capital will indemnify each other against any taxes to the extent paid by one party but allocated to the other party under the Tax Matters Agreement, or arising from any breach of its covenants thereunder, and related out-of-pocket costs and expenses.

132

The Employee Matters Agreement sets out the respective rights, responsibilities, and obligations of BVH and BBX Capital with respect to the transfer of certain employees of the businesses of BBX Capital and related matters, including benefit plans, terms of employment, retirement plans and other employment-related matters. Under the Employee Matters Agreement, BBX Capital or its subsidiaries will generally assume or retain responsibility as employer of employees whose duties primarily relate to their respective businesses as well as all obligations and liabilities with respect thereto.  During the year ended December 31, 2020, BVH paid BBX Capital $0.1 million under this agreement.

During each of the years ended December 31, 2020, 2019 and 2018, BVH paid Abdo Companies, Inc. approximately $230,000, $306,000, and $306,000, respectively, in exchange for certain management services. John E. Abdo, the Company's Vice Chairman, is the principal shareholder and Chief Executive Officer of Abdo Companies, Inc.

**17.  Segment Reporting**

Operating segments are defined as components of an enterprise about which separate financial information is available that is regularly reviewed by the chief operating decision maker ("CODM") in assessing performance and deciding how to allocate resources. Reportable segments consist of one or more operating segments with similar economic characteristics, products and services, production processes, type of customer, distribution system or regulatory environment.

Prior to BVH's spin-off of BBX Capital on September 30, 2020, BVH's reportable segments were: Bluegreen, BBX Capital Real Estate, BBX Sweet Holdings, and Renin. However, as a result of the spin-off of BBX Capital, BVH is a Bluegreen holding company and BVH's CODM, who is also Bluegreen's CODM, has determined that he will manage BVH's operations in a manner consistent with how he manages Bluegreen's operations. As a result, the Company's results of operations are reported through two reportable segments: (i) Sales of VOIs and financing; and (ii) Resort operations and club management.

The sales of VOIs and financing segment includes Bluegreen's marketing and sales activities related to the VOIs that Bluegreen owns, Bluegreen's VOIs they acquire under just-in-time and secondary market inventory arrangements, Bluegreen's sales of VOIs through fee-for-service arrangements with third-party developers, Bluegreen's consumer financing activities in connection with sales of VOIs that Bluegreen owns, and Bluegreen's title services operations through a wholly-owned subsidiary.

The Resort operations and club management segment includes Bluegreen's provision of management services activities for Bluegreen's Vacation Club and for a majority of the HOAs of the resorts within Bluegreen's Vacation Club. In connection with those services, Bluegreen also provides club reservation services, services to owners and billing and collections services to the Bluegreen Vacation Club and certain HOAs. Additionally, this segment includes revenue from Bluegreen's Traveler Plus program, food and beverage and other retail operations, Bluegreen's rental services activities, and management of construction activities for certain of Bluegreen's fee-based developer clients.

The amount set forth in the column "Bluegreen Corporate and Other" and in the column entitled "BVH Corporate" are general and administrative expenses that consist primarily of costs associated with administering the various support functions at its corporate headquarters, including executive compensation, legal, accounting, human resources, investor relations, and executive offices including corporate overhead for discontinued operations. Included in BVH Corporate selling and general administrative expenses are spin-off related costs associated with the acceleration of the vesting of unvested restricted stock awards and payments to settle BVH's long-term incentive program for 2020 which in the aggregate resulted in $31.3 million of compensation expense for the year ended December 31, 2020.

The information provided for segment reporting is obtained from internal reports utilized by management. The presentation and allocation of results of operations may not reflect the actual economic costs of the segments as standalone businesses. Due to the nature of the Company's business, assets are not allocated to a particular segment, and therefore management does not evaluate the balance sheet by segment. If a different basis of allocation were utilized, the relative contributions of the segments might differ but the relative trends in the segments' operating results would, in management's view, likely not be impacted.

133

The table below sets forth the Company's segment information for the year ended December 31, 2020 (in thousands):

| | Sales of VOIs and financing | Resort operations and club management | Bluegreen Corporate and other | BVH Corporate | Elimination | Total |
|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | |
| Sales of VOIs | $ 173,997 | $ — | $ — | $ — | $ — | $ 173,997 |
| Fee-based sales commission revenue | 89,965 | | | | | 89,965 |
| Other fee-based services revenue | 7,568 | 104,255 | | | | 111,823 |
| Cost reimbursements | — | 64,305 | | | | 64,305 |
| Mortgage servicing revenue | 5,873 | | | | (5,873) | — |
| Interest income | 77,538 | | 3,484 | 883 | (2,524) | 79,381 |
| Other income, net | | | | | | |
| Total revenue | 354,941 | 168,560 | 3,484 | 883 | (8,397) | 519,471 |
| **Costs and expenses:** | | | | | | |
| Cost of VOIs sold | 13,597 | — | — | — | — | 13,597 |
| Net carrying cost of VOI inventory | 34,626 | — | — | — | (34,626) | — |
| Cost of other fee-based services | 3,823 | 40,985 | — | — | 34,626 | 79,434 |
| Cost reimbursements | — | 64,305 | — | — | | 64,305 |
| Selling, general and administrative expenses | 244,755 | — | 68,165 | 59,310 | (1,295) | 370,935 |
| Mortgage servicing expense | 4,578 | — | — | — | (4,578) | — |
| Interest expense | 16,950 | — | 15,030 | 7,339 | (2,524) | 36,795 |
| Total costs and expenses | 318,329 | 105,290 | 83,195 | 66,649 | (8,397) | 565,066 |
| Other expense, net | 942 | 30 | 370 | (163) | | 1,179 |
| Income (loss) before non-controlling interest and provision for income taxes | $ 35,670 | $ 63,240 | $ (80,081) | $ (65,603) | $ — | $ (46,774) |
| | | | | | | |
| Add: Depreciation and amortization | 5,852 | 796 | | | | |
| Add: Severance | 4,445 | 1,369 | | | | |
| Add: Loss on assets held for sale | 942 | 30 | | | | |
| Segment Adjusted EBITDA [1] | $ 46,909 | $ 65,435 | | | | |

(1) See Management's Discussion and Analysis of Financial Condition and Results of Operations for information regarding Adjusted EBITDA, including the definition of Adjusted EBITDA and a reconciliation of Adjusted EBITDA to net income.

134

The table below sets forth the Company's segment information for the year ended December 31, 2019 (in thousands):

| | Sales of VOIs and financing | Resort operations and club management | Bluegreen Corporate and other | BVH Corporate | Elimination | Total |
|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | |
| Sales of VOIs | $ 255,375 | $ — | $ — | $ — | $ — | $ 255,375 |
| Fee-based sales commission revenue | 207,832 | | | | | 207,832 |
| Other fee-based services revenue | 14,246 | 110,998 | | | | 125,244 |
| Cost reimbursements | — | 63,889 | | | | 63,889 |
| Mortgage servicing revenue | 6,223 | — | — | — | (6,223) | — |
| Interest income | 80,010 | — | 7,892 | 2,329 | (4,800) | 85,431 |
| Other income, net | 3,068 | — | 1,909 | 67 | (4,977) | 67 |
| Total revenue | 566,754 | 174,887 | 9,801 | 2,396 | (16,000) | 737,838 |
| | | | | | | |
| **Costs and expenses:** | | | | | | |
| Cost of VOIs sold | 21,845 | — | — | — | — | 21,845 |
| Net carrying cost of VOI inventory | 23,816 | | | | (23,816) | |
| Cost of other fee-based services | 6,972 | 52,652 | — | — | 23,816 | 83,440 |
| Cost reimbursements | — | 63,889 | | | | 63,889 |
| Selling, general and administrative expenses | 391,474 | — | 81,829 | 42,172 | (947) | 514,528 |
| Mortgage servicing expense | 5,276 | — | — | — | (5,276) | — |
| Interest expense | 20,503 | — | 19,035 | 10,627 | (4,800) | 45,365 |
| Total costs and expenses | 469,886 | 116,541 | 100,864 | 52,799 | (11,023) | 729,067 |
| Other expense, net | — | 5,887 | — | (318) | (4,977) | 592 |
| Income (loss) before non-controlling interest and provision for income taxes | $ 96,868 | $ 52,459 | $ (91,063) | $ (50,085) | $ — | $ 8,179 |
| | | | | | | |
| Add: Depreciation and amortization | 6,118 | 1,294 | | | | |
| Add: Severance | 1,416 | 238 | | | | |
| Add: Bass Pro Settlement | 39,121 | — | | | | |
| Add: Loss on assets held for sale | 58 | 5,887 | | | | |
| Segment Adjusted EBITDA [(1)] | $ 143,581 | $ 59,878 | | | | |

(1) See Management's Discussion and Analysis of Financial Condition and Results of Operations for information regarding Adjusted EBITDA, including the definition of Adjusted EBITDA and a reconciliation of Adjusted EBITDA to net income.

135

D - 0055-0135

The table below sets forth the Company's segment information for the year ended December 31, 2018 (in thousands):

| | Sales of VOIs and financing | Resort operations and club management | Bluegreen Corporate and other | BVH Corporate | Elimination | Total |
|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | |
| Sales of VOIs | $ 254,225 | $ — | $ — | $ — | $ — | $ 254,225 |
| Fee-based sales commission revenue | 216,422 | — | — | — | — | 216,422 |
| Other fee-based services revenue | 12,205 | 105,819 | — | — | — | 118,024 |
| Cost reimbursements | — | 62,534 | — | — | — | 62,534 |
| Mortgage servicing revenue | 5,951 | — | — | — | (5,951) | — |
| Interest income | 79,377 | — | 6,537 | 1,967 | (4,800) | 83,081 |
| Other income, net | — | — | — | 16 | — | 16 |
| Total revenue | 568,180 | 168,353 | 6,537 | 1,983 | (10,751) | 734,302 |
| **Costs and expenses:** | | | | | | |
| Cost of VOIs sold | 23,813 | — | — | — | — | 23,813 |
| Net carrying cost of VOI inventory | 11,358 | — | — | — | (11,358) | — |
| Cost of other fee-based services | 4,591 | 54,019 | — | — | 11,358 | 69,968 |
| Cost reimbursements | — | 62,534 | — | — | — | 62,534 |
| Selling, general and administrative expenses | 338,462 | — | 79,687 | 45,935 | 254 | 464,338 |
| Mortgage servicing expense | 6,205 | — | — | — | (6,205) | — |
| Interest expense | 19,514 | — | 15,195 | 11,368 | (4,800) | 41,277 |
| Total costs and expenses | 403,943 | 116,553 | 94,882 | 57,303 | (10,751) | 661,930 |
| Other income, net | — | — | 1,201 | 213 | — | 1,414 |
| Income (loss) before non-controlling interest and provision for income taxes | $ 164,237 | $ 51,800 | $ (87,144) | $ (55,107) | $ — | $ 73,786 |
| Add: Depreciation and amortization | 6,335 | 1,719 | | | | |
| Add: Severance | 96 | 42 | | | | |
| Segment Adjusted EBITDA [1] | 170,668 | $ 53,561 | | | | |

(1) See Management's Discussion and Analysis of Financial Condition and Results of Operations for information regarding Adjusted EBITDA, including the definition of Adjusted EBITDA and a reconciliation of Adjusted EBITDA to net income.

136

**18. (Loss) Earnings Per Share**

The following table presents the calculation of the Company's basic and diluted EPS:

| (in thousands, except per share data) | For The Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| **Basic earnings per common share** | | | |
| **Numerator:** | | | |
| Net (loss) income from continuing operations | $ (44,406) | $ 654 | $ 47,393 |
| Less: income attributable to noncontrolling interests - continuing operations | 8,186 | 14,636 | 20,956 |
| Net income from continuing operations available to shareholders | $ (52,592) | $ (13,982) | $ 26,437 |
| **Discontinued operations** | | | |
| Net (loss) income from discontinued operations | (32,759) | 31,449 | 8,400 |
| Less: loss attributable to noncontrolling interests - discontinued operations | (4,822) | (224) | (265) |
| Net income from discontinued operations available to shareholders | (27,937) | 31,673 | 8,665 |
| Net (loss) income | $ (80,529) | $ 17,691 | $ 35,102 |
| | | | |
| **Denominator:** | | | |
| **Basic - weighted average number of common share outstanding** | 18,661 | 18,526 | 19,060 |
| | | | |
| Basic - weighted average number of common share outstanding | 18,661 | 18,526 | 19,060 |
| Dilutive effect of restricted stock awards | — | — | 512 |
| **Diluted weighted average number of common shares outstanding** | 18,661 | 18,526 | 19,572 |
| | | | |
| **Basic (loss) earnings per share:** | | | |
| Continuing operations | $ (2.82) | $ (0.75) | $ 1.39 |
| Discontinued operations | (1.50) | 1.71 | 0.45 |
| **Basic (loss) earnings per share** | $ (4.32) | $ 0.96 | $ 1.84 |
| | | | |
| **Diluted (loss) earnings per share:** | | | |
| Continuing operations | $ (2.82) | $ (0.75) | $ 1.35 |
| Discontinued operations | (1.50) | 1.71 | 0.44 |
| **Diluted (loss) earnings per share** | $ (4.32) | $ 0.96 | $ 1.79 |

137

**19. Selected Quarterly Financial Information (unaudited)**

The following table sets forth the historical unaudited quarterly financial data for the periods indicated. The information for each of these periods has been prepared on the same basis as the audited consolidated financial statements and, in the Company's opinion, reflects all adjustments necessary to present fairly the Company's financial results. Operating results for previous periods do not necessarily indicate results that may be achieved in any future period.

| | | 2020 | | | |
| --- | --- | --- | --- | --- | --- |
| *(in thousands, except per share data)* | **First Quarter** | **Second Quarter** | **Third Quarter** | **Fourth Quarter** | **Year** |
| Total revenue | $ 156,103 | $ 67,893 | $ 144,245 | $ 151,230 | $ 519,471 |
| Total operating expenses | 165,313 | 91,044 | 169,043 | 139,666 | 565,066 |
| (Loss) income from continuing operations before non-controlling interest and provision for income taxes | (9,016) | (22,820) | (25,137) | 10,199 | (46,774) |
| (Loss) income from continuing operations | (7,563) | (24,513) | (25,338) | 13,008 | (44,406) |
| Discontinued operations | (23,252) | (12,138) | 2,864 | (233) | (32,759) |
| Net (loss) income | (30,815) | (36,651) | (22,474) | 12,775 | (77,165) |
| Basic and diluted (loss) earnings per share from continuing operations | $ (0.47) | $ (1.34) | $ (1.53) | $ 0.46 | (2.82) |
| Basic and diluted (loss) earnings per share from discontinued operations | $ (1.08) | $ (0.62) | $ 0.18 | $ (0.01) | (1.50) |
| Basic and diluted (loss) earnings per share | $ (1.55) | $ (1.96) | $ (1.35) | $ 0.45 | (4.32) |
| Basic Shares | 18,298 | 18,298 | 18,731 | 19,318 | 18,661 |
| Diluted Shares | 18,298 | 18,298 | 18,731 | 19,318 | 18,661 |

| | | 2019 | | | |
| --- | --- | --- | --- | --- | --- |
| *(in thousands, except per share data)* | **First Quarter** | **Second Quarter** | **Third Quarter** | **Fourth Quarter** | **Year** |
| Total revenue | $ 164,748 | $ 189,589 | $ 200,037 | $ 183,464 | $ 737,838 |
| Total operating expenses | 157,376 | 215,835 | 185,662 | 170,194 | 729,067 |
| Income (loss) from continuing operations before non-controlling interest and provision for income taxes | 7,508 | (24,136) | 16,579 | 8,228 | 8,179 |
| Income (loss) from continuing operations | 5,181 | (18,538) | 8,427 | 5,584 | 654 |
| Discontinued operations | (543) | 10,913 | 18,073 | 3,006 | 31,449 |
| Net income (loss) | 4,638 | (7,625) | 26,500 | 8,590 | 32,103 |
| Basic earnings (loss) per share from continuing operations | $ 0.11 | $ (1.21) | $ 0.23 | $ 0.13 | (0.75) |
| Diluted earnings (loss) per share from continuing operations | $ 0.11 | $ (1.21) | $ 0.22 | $ 0.13 | (0.75) |
| Basic (loss) earnings per share from discontinued operations | $ (0.03) | $ 0.59 | $ 0.98 | $ 0.17 | 1.71 |
| Diluted (loss) earnings per share from discontinued operations | $ (0.03) | $ 0.59 | $ 0.97 | $ 0.17 | 1.71 |
| Basic earnings per share | $ 0.08 | $ (0.62) | $ 1.21 | $ 0.30 | 0.96 |
| Diluted earnings per share | $ 0.08 | $ (0.62) | $ 1.19 | $ 0.30 | 0.96 |

138

**20. Discontinued Operations**

As previously described in Note 1, on September 30, 2020, BVH completed the spin-off its formerly wholly owned subsidiary, BBX Capital. BVH continues to hold its investment in Bluegreen, and BBX Capital became a separate public company as a result of the spin-off and holds all of the other businesses and investments previously owned by BVH, including BBX Capital Real Estate, BBX Sweet Holdings, and Renin. BVH no longer holds any interest in BBX Capital.

BBX Capital and its subsidiaries' operations are presented as discontinued operations in the Company's financial statements.

The carrying amount of major classes of assets and liabilities included as part of discontinued operations is as follows (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **Assets** | | |
| Cash and cash equivalents | $        — | $        20,758 |
| Restricted cash | — | 370 |
| Trade inventory | — | 22,843 |
| Real estate | — | 65,818 |
| Investments in and advances to unconsolidated real estate joint ventures | — | 57,330 |
| Property and equipment, net | — | 29,836 |
| Goodwill | — | 37,248 |
| Intangible assets, net | — | 6,671 |
| Operating lease assets | — | 87,854 |
| Deferred income taxes | — | 2,297 |
| Other assets | — | 29,836 |
| **Discontinued operations total assets** | $        — | $        360,861 |
| | | |
| **Liabilities** | | |
| Accounts payable | $        — | $        9,294 |
| Other liabilities | — | 21,043 |
| Notes payable and other borrowings | — | 42,571 |
| Operating lease liabilities | — | 100,473 |
| **Discontinued operations total liabilities** | — | 173,381 |

139

The major components of loss from discontinued operations are as follows (in thousands):

| | 2020 | 2019 | 2018 |
|---|---|---|---|
| **Revenues:** | | | |
| Trade sales | $ **99,628** | $ 186,337 | $ 179,486 |
| Sales of real estate inventory | **14,248** | 5,049 | 21,771 |
| Interest income | **586** | 894 | 2,420 |
| Net gains on sales of real estate assets | **130** | 13,616 | 4,578 |
| Other revenue | **2,398** | 3,136 | 3,356 |
| **Total revenues** | **116,990** | 209,032 | 211,611 |
| **Costs and Expenses:** | | | |
| Cost of trade sales | **80,154** | 127,720 | 125,640 |
| Cost of real estate inventory sold | **9,473** | 2,643 | 14,116 |
| Interest expense | **—** | 417 | 798 |
| Recoveries from loan losses, net | **(5,844)** | (5,428) | (8,653) |
| Impairment losses | **31,588** | 6,937 | 4,718 |
| Selling, general and administrative expenses | **40,342** | 74,658 | 75,887 |
| Total costs and expenses | **155,713** | 206,947 | 212,506 |
| Equity in net earnings (losses) of unconsolidated real estate joint ventures | **50** | 37,898 | 14,193 |
| Foreign exchanges gain (loss) | **214** | (75) | 68 |
| Loss on the deconsolidation of IT'SUGAR, LLC | **(3,326)** | — | — |
| Other income | **192** | 674 | 280 |
| (Loss) income from discontinued operations before income taxes | $ **(41,593)** | $ 40,582 | $ 13,646 |

140

The major components of the statement of cash flows from discontinued operations are as follows (in thousands):

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2020** | **2019** | **2018** |
| **Operating activities:** | | | |
| Net (loss) income | $ (32,759) | $ 31,449 | $ 8,400 |
| **Adjustment to reconcile net (loss) income to net cash** | | | |
| **(used in) provided by operating activities:** | | | |
| Recoveries from loan losses, net | **(5,844)** | (5,428) | (8,653) |
| Depreciation, amortization and accretion, net | **5,468** | 8,008 | 8,322 |
| Net gains on sales of real estate and property and equipment | **(130)** | (13,305) | (4,563) |
| Equity earnings of unconsolidated real estate joint ventures | **(49)** | (37,898) | (14,194) |
| Return on investment in unconsolidated real estate joint ventures | **3,933** | 39,043 | 17,679 |
| Loss from the deconsolidation of IT'SUGAR, LLC | **3,326** | — | — |
| (Increase) decrease in deferred income tax asset | **(8,834)** | (9,133) | (5,246) |
| Impairment losses | **31,588** | 6,938 | 4,718 |
| Increase in trade inventory | **(279)** | (2,733) | 3,882 |
| (Increase) decrease in trade receivables | **(2,336)** | 5,190 | (2,323) |
| Decrease (increase) in real estate inventory | **925** | (7,445) | 12,001 |
| Net change in operating lease assets and liabilities | **(964)** | — | — |
| (Increase) decrease in other assets | **(1,388)** | 6,817 | 2,197 |
| (Decrease) increase in other liabilities | **6,512** | 3,826 | (436) |
| Net cash (used in) provided by operating activities | $ **(831)** | $ 25,329 | $ 21,784 |
| **Investing activities:** | | | |
| Return of investment in unconsolidated real estate joint ventures | **4,631** | 31,442 | 12,080 |
| Investments in unconsolidated real estate joint ventures | **(14,009)** | (25,179) | (29,187) |
| Proceeds from repayment of loans receivable | **5,960** | 6,339 | 19,394 |
| Proceeds from sales of real estate | **2,151** | 23,512 | 17,431 |
| Proceeds from sales of property and equipment | **—** | 11,762 | 569 |
| Additions to real estate | **(70)** | (600) | (1,221) |
| Purchases of property and equipment | **(4,032)** | (11,091) | (12,796) |
| Decrease in cash from other investing activities | **(1,065)** | (222) | (4,696) |
| Net cash (used in) provided by investing activities | $ **(6,434)** | $ 35,963 | $ 1,574 |

**21.  Subsequent Events**

Subsequent events have been evaluated through the date the financial statements were available to be issued.  As of such date, other than described herein, there were no subsequent events identified that required recognition or disclosure.

141

**Item 9.   CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**Item 9A.   CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

We have established disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) to make known material information concerning the Company, including its subsidiaries, to those officers who certify our financial reports and to other members of our senior management. As of December 31, 2020, our management evaluated, with the participation of our Chief Executive Officer and Chief Financial Officer, our disclosure controls and procedures. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2020, our disclosure controls and procedures were effective to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission and is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

Our management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls and procedures and internal control over financial reporting will prevent all errors and all improper conduct. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of improper conduct, if any, have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple error or mistake. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the control. Further, the design of any control system is based in part upon assumptions about the likelihood of future events, and there can be no assurance that any such design will succeed in achieving its stated goals under all potential future conditions.

***Management's Report on Internal Control Over Financial Reporting***
Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rules 13a- 15(f) and 15d-15(f). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. There were no changes in our internal control over financial reporting during the quarter ended December 31, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.  As of December 31, 2020, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our internal control over financial reporting based on the framework in Internal Control – Integrated Framework – 2013 issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2020.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Grant Thornton LLP, our independent registered public accounting firm, has audited our internal control over financial reporting as of December 31, 2020 and has issued an attestation report on our internal control over financial reporting, which is included below.

142

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors and Shareholders
Bluegreen Vacations Holding Corporation

**Opinion on internal control over financial reporting**

We have audited the internal control over financial reporting of Bluegreen Vacations Holding Corporation (a Florida corporation) and subsidiaries (the "Company") as of December 31, 2020, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2020, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by COSO.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated financial statements of the Company as of and for the year ended December 31, 2020, and our report dated March 1, 2021 expressed an unqualified opinion on those financial statements.

**Basis for opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and limitations of internal control over financial reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/S/ GRANT THORNTON LLP

Fort Lauderdale, Florida
March 1, 2021

143

**Item 9B.   OTHER INFORMATION**

None.

144

**PART II**

**Item 10.   Directors, Executive Officers and Corporate Governance**

The information required by this item will be provided by incorporating such information by reference to our definitive proxy statement for our 2021 Annual Meeting of Shareholders if filed with the SEC within 120 days after December 31, 2020.

**Item 11.   Executive Compensation**

The information required by this item will be provided by incorporating such information by reference to our definitive proxy statement for our 2021 Annual Meeting of Shareholders if filed with the SEC within 120 days after December 31, 2020.

**Item 12.   Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

See Part II Item 5 for information regarding compensation plans under which our equity securities are authorized for issuance.  The other information required by this item will be provided by incorporating such information by reference to our definitive proxy statement for our 2021 Annual Meeting of Shareholders if filed with the SEC within 120 days after December 31, 2020.

**Item 13.   Certain Relationships and Related Transactions, and Director Independence**

The information required by this item will be provided by incorporating such information by reference to our definitive proxy statement for our 2021 Annual Meeting of Shareholders if filed with the SEC within 120 days after December 31, 2020.

**Item 14.   Principal Accountant Fees and Services**

The information required by this item will be provided by incorporating such information by reference to our definitive proxy statement for our 2021 Annual Meeting of Shareholders if filed with the SEC within 120 days after December 31, 2020.

**PART IV**

**Item 15.   Exhibits, Financial Statement Schedules**

The following documents are filed as part of this Annual Report on Form 10-K:

1.   All financial statements. See Index to Consolidated Financial Statements on page 89 of this Annual Report on Form 10-K.

2.   Financial Statement Schedules. None required.

3.   Exhibits. The following exhibits are either filed as part of or furnished with this Annual Report on Form 10-K or are incorporated herein by reference to documents previously filed, as indicated below.

145

| Exhibit Number | Description | Reference |
|---|---|---|
| 3.1 | Amended and Restated Articles of Incorporation, effective October 8, 1997 | Exhibit 3.1 of Registrant's Registration Statement on Form 8-A filed October 16, 1997 |
| 3.2 | Amendment to the Amended and Restated Articles of Incorporation, effective June 18, 2002 | Exhibit 4 of Registrant's Current Report on Form 8-K filed June 27, 2002 |
| 3.3 | Amendment to the Amended and Restated Articles of Incorporation, effective April 18, 2003 | Appendix B of Registrant's Definitive Proxy Statement on Schedule 14A filed April 18, 2003 |
| 3.4 | Amendment to the Amended and Restated Articles of Incorporation, effective February 7, 2005 | Appendix A of Registrant's Definitive Information Statement on Schedule 14C filed January 18, 2005 |
| 3.5 | Amendment to the Amended and Restated Articles of Incorporation, effective June 22, 2004, as amended on December 17, 2008 | Exhibit 3.1 of Registrant's Current Report on Form 8-K filed December 18, 2008 |
| 3.6 | Amendment to the Amended and Restated Articles of Incorporation, effective May 19, 2009 | Appendix A of Registrant's Current Report on Form 8-K filed April 29, 2009 |
| 3.7 | Amendment to the Amended and Restated Articles of Incorporation, effective September 21, 2009 | Annex D of the Joint Proxy Statement/Prospectus that forms a part of Amendment No. 1 to Registrant's Registration Statement on Form S-4 filed August 14, 2009 |
| 3.8 | Amendment to the Amended and Restated Articles of Incorporation, effective September 21, 2009 | Exhibit 3.8 of Registrant's Current Report on Form 8-K filed September 25, 2009 |
| 3.9 | Amendment to the Amended and Restated Articles of Incorporation, effective December 19, 2013 | Exhibit 3.1 of Registrant's Current Report on Form 8-K filed December 23, 2013 |
| 3.10 | Amendment to the Amended and Restated Articles of Incorporation, effective January 30, 2017 | Exhibit A of the Registrant's Definitive Information Statement on Schedule 14C filed January 9, 2017 |
| 3.11 | Articles of Amendment of the Company's Amended and Restated Articles of Incorporation, as amended, effective July 22, 2020 | Exhibit 3.1 of Registrant's Current Report of Form 8-K filed on July 22, 2020 |
| 3.12 | Articles of Amendment to the Amended and Restated Articles of Incorporation of BBX Capital Corporation | Exhibit 3.1 of Registrant's Current Report on Form 8-K filed on October 2, 2020 |
| 3.13 | Bylaws, as amended | Exhibit 3.1 of Registrant's Current Report on Form 8-K filed February 12, 2015 |
| 4.1 | Specimen Class A Common Stock Certificate | Exhibit 4.1 of Registrant's Annual Report on Form 10-K for the year ended December 31, 2016 filed on March 15, 2017 |
| 4.2 | Specimen Class B Common Stock Certificate | Exhibit 4.2 of Registrant's Annual Report on Form 10-K for the year ended December 31, 2016 filed on March 15, 2017 |
| 4.3 | Rights Agreement, dated as of June 17, 2020, between the Bluegreen Vacations Holding Corporation and American Stock Transfer & Trust Company, LLC, as Rights Agent | Exhibit 4.1 of Registrant's Current Report on Form 8-K filed on June 18, 2020 |
| 4.4 | Description of Registrant's Securities | Filed with this report |
| 10.1 | Amended and Restated BBX Capital 2014 Incentive Plan, as amended | Appendix A to the Registrant's Definitive Proxy Statement on Schedule 14A filed on April 15, 2019 |
| 10.7 | Employment agreement of Alan B. Levan | Exhibit 10.1 of Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2012 filed on November 14, 2012 |
| 10.8 | Employment agreement of John E. Abdo | Exhibit 10.2 of Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2012 filed on November 14, 2012 |
| 10.11 | Employment agreement of Ray S. Lopez | Exhibit 10.1 of Registrants Quarterly Report on Form 10-Q for the quarter ended March 31, 2015 filed on May 8, 2015 |
| 10.17 | Tax Sharing Agreement dated as of May 8, 2015, by and among BFC Financial Corporation, BBX Capital and Bluegreen | Exhibit 10.2 of Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2015 filed on May 8, 2015 |
| 10.20 | Indenture between BXG Receivables Note Trust 2012-A as Issuer, Bluegreen Corporation as Servicer, Vacation Trust, Inc. as Club Trustee, Concord Servicing Corporation as Backup Servicer and U.S. Bank National Association, as Indenture Trustee, Paying Agent and Custodian, dated as of August 15, 2012. | Exhibit 10.101 of Bluegreen Corporation's Form 8-K filed with the SEC on September 14, 2012 |

146

| 10.21 | Sale Agreement by and among BRFC 2012-A LLC as Depositor and BXG Receivables Note Trust 2012-A as Issuer dated as of August 15, 2012 | Exhibit 10.102 of Bluegreen Corporation's Form 8-K filed with the SEC on September 14, 2012 |
| 10.22 | Transfer Agreement by and among Bluegreen Corporation, BXG Timeshare Trust I as Seller and BRFC 2012-A LLC as Depositor, dated as of August 15, 2012 | Exhibit 10.103 of Bluegreen Corporation's Form 8-K filed with the SEC on September 14, 2012 |
| 10.23 | Purchase and Contribution Agreement by and among Bluegreen Corporation, as Seller and BRFC 2012-A LLC as Depositor, dated as of August 15, 2012 | Exhibit 10.104 of Bluegreen Corporation's Form 8-K filed with the SEC on September 14, 2012 |
| 10.24 | Note Purchase and Collateral Trust and Security Agreement by and among Bluegreen Corporation, Bluegreen Vacations Unlimited, Inc., Bluegreen Resorts Managements, Inc., and TFRI 2013-1 LLC as Obligors, Bluegreen Nevada, LLC as Guarantor, and US National Bank as Collateral Agent, Note Registrar and Paying Agent, and AIG Asset Management (U.S.) LLC as Designated Representative, dated March 26, 2013 | Exhibit 10.1 of Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2013 filed on May 15, 2013 |
| 10.25 | BXG Receivables Note Trust 2013-A, Standard Definitions | Exhibit 10.1 of Registrant's Current Report on Form 8-K filed on October 2, 2013 |
| 10.26 | Indenture between BXG Receivables Note Trust 2013-A, as Issuer, Bluegreen Corporation, as Servicer, Vacation Trust, Inc. as Club Trustee, Concord Servicing Corporation, as Backup Servicer, and U.S. Bank National Association, as Indenture Trustee, Paying Agent and Custodian, dated as of September 15, 2013 | Exhibit 10.2 of Registrant's Current Report on Form 8-K filed on October 2, 2013 |
| 10.27 | Sale Agreement by and among BRFC 2013-A LLC, as Depositor, and BXG Receivables Note Trust 2013-A, as Issuer, dated as of September 15, 2013 | Exhibit 10.3 of Registrant's Current Report on Form 8-K filed on October 2, 2013 |
| 10.28 | Transfer Agreement by and among Bluegreen Corporation, BXG Timeshare Trust I, as Seller, and BRFC 2013-A LLC, as Depositor, dated as of September 15, 2013 | Exhibit 10.4 of Registrant's Current Report on Form 8-K filed on October 2, 2013 |
| 10.29 | Purchase and Contribution Agreement by and among Bluegreen Corporation, as Seller and BRFC 2013-A LLC as Depositor, dated as of September 15, 2013 | Exhibit 10.5 of Registrant's Current Report on Form 8-K filed on October 2, 2013 |
| 10.30 | Second Amended and Restated Purchase and Contribution Agreement, dated as of May 1, 2017, between Bluegreen Corporation and Bluegreen Timeshare Finance I | Exhibit 10.1 to Registrant's Current Report on Form 8-K filed on May 24, 2017 |
| 10.31 | Second Amended and Restated Sale Agreement, dated as of May 1, 2017, between Bluegreen Timeshare Finance I and BXG Timeshare Trust I | Exhibit 10.2 to Registrant's Current Report on Form 8-K filed on May 24, 2017 |

147

| 10.32 | Sixth Amended and Restated Indenture, dated as of May 1, 2017, among BXG Timeshare Trust I, Bluegreen Corporation, Vacation Trust, Inc., Concord Servicing Corporation, U.S. Bank National Association, KeyBank National Association and DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt AM Main | Exhibit 10.3 to Registrant's Current Report on Form 8-K filed on May 24, 2017 |
|---|---|---|
| 10.33 | Sixth Amended and Restated Note Funding Agreement, dated as of May 1, 2017, by and among Bluegreen Corporation, BXG Timeshare Trust I, Bluegreen Timeshare Finance Corporation I, the purchasers from time to time parties thereto and KeyBank National Association and DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt AM Main | Exhibit 10.4 to Registrant's Current Report on Form 8-K filed on May 24, 2017 |
| 10.34 | Second Amended and Restated Trust Agreement, dated as of May 19, 2017, by and among Bluegreen Timeshare Finance I, GSS Holdings, Inc. and Wilmington Trust Company | Exhibit 10.5 to Registrant's Current Report on Form 8-K filed on May 24, 2017 |
| 10.35 | Seventh Amended and Restated Standard Definitions to the Transaction Documents filed as Exhibit 10.1 through 10.5 to Registrant's Current Report on Form 8-K filed May 19, 2017 | Exhibit 10.6 to Registrant's Current Report on Form 8-K filed on May 24, 2017 |
| 10.36 | Credit Agreement dated November 5, 2014, among Bluegreen Corporation, as Borrower, Fifth Third Bank, as Administrative Agent and L/C Issuer, and Guarantors and Lenders party thereto | Exhibit 10.1 of Registrant's Quarterly Report on Form 10-Q filed on November 10, 2014 |
| 10.37 | Indenture, dated as of January 15, 2015, between BXG Receivables Note Trust 2015-A, as Issuer, Bluegreen Corporation, as Servicer, Vacation Trust, Inc. as Club Trustee, Concord Servicing Corporation, as Backup Servicer, and U.S. Bank National Association, as Indenture Trustee, Paying Agent and Custodian | Exhibit 10.1 of Registrant's Current Report on Form 8-K filed on February 3, 2015 |
| 10.38 | Sale Agreement, dated as of January 15, 2015, by and among BRFC 2015-A LLC, as Depositor, and BXG Receivables Note Trust 2015-A, as Issuer | Exhibit 10.2 of Registrant's Current Report on Form 8-K filed on February 3, 2015 |
| 10.39 | Transfer Agreement, dated as of January 15, 2015, by and among Bluegreen Corporation, BXG Timeshare Trust I, as Seller, and BRFC 2015-A LLC, as Depositor | Exhibit 10.3 of Registrant's Current Report on Form 8-K filed on February 3, 2015 |
| 10.40 | Purchase and Contribution Agreement, dated as of January 15, 2015, by and among Bluegreen Corporation, as Seller, and BRFC 2015-A LLC, as Depositor | Exhibit 10.4 of Registrant's Current Report on Form 8-K filed on February 3, 2015 |
| 10.41 | BXG Receivables Note Trust 2015-A, Standard Definitions | Exhibit 10.5 of Registrant's Current Report on Form 8-K filed on February 3, 2015 |
| 10.42 | Second Amended and Restated Secured Promissory Note dated June 25, 2015, by and among Bluegreen Vacations Unlimited, Inc., as Borrower, and Pacific Western Bank, as Lender | Exhibit 10.1 of Registrant's Current Report on Form 8-K filed on June 30, 2015 |
| 10.43 | Second Amendment to Amended and Restated Loan and Security Agreement dated June 25, 2015, by and among Bluegreen Corporation, as Borrower, and Pacific Western Bank, as Lender | Exhibit 10.2 of Registrant's Current Report on Form 8-K filed on June 30, 2015 |
| 10.44 | Third Amended and Restated Revolving Promissory Note (Hypothecation Facility) dated June 30, 2015, by and among Bluegreen / Big Cedar Vacations, LLC, as Borrower, and National Bank of Arizona, as Lender | Exhibit 10.1 of Registrant's Current Report on Form 8-K filed on July 7, 2015 |

148

| | | |
|---|---|---|
| 10.45 | First Amended and Restated Loan and Security Agreement (Hypothecation Facility) dated June 30, 2015, by and among Bluegreen / Big Cedar Vacations, LLC, as Borrower and National Bank of Arizona, as Lender | Exhibit 10.2 of Registrant's Current Report on Form 8-K filed on July 7, 2015 |
| 10.46 | First Amended and Restated Promissory Note (Inventory Loan) dated June 30, 2015, by and among Bluegreen / Big Cedar Vacations, LLC, as Borrower, and National Bank of Arizona, as Lender | Exhibit 10.3 of Registrant's Current Report on Form 8-K filed on July 7, 2015 |
| 10.47 | First Amended and Restated Loan Agreement (Inventory Loan) dated June 30, 2015, by and among Bluegreen / Big Cedar Vacations, LLC, as Borrower, and National Bank of Arizona, as Lender | Exhibit 10.4 of Registrant's Current Report on Form 8-K filed on July 7, 2015 |
| 10.48 | Fourth Amended and Restated Revolving Promissory Note (Hypothecation Facility) dated September 28, 2017, by and among Bluegreen / Big Cedar Vacations, LLC, as Borrower, and ZB, N.A. dba National Bank of Arizona, as Lender | Exhibit 10.1 of Registrant's Current Report on Form 8-K filed on October 4, 2017 |
| 10.481 | Fifth Amended and Restated Revolving Promissory Note (Hypothecation Facility) dated September 28, 2017, by and among Bluegreen / Big Cedar Vacations, LLC, as Borrower, and ZB, N.A. dba National Bank of Arizona, as Lender | Exhibit 10.2 of Registrant's Current Report on Form 8-K filed on October 1, 2020 |
| 10.49 | Second Amended and Restated Loan and Security Agreement (Hypothecation Facility) dated September 28, 2017, by and among Bluegreen / Big Cedar Vacations, LLC, as Borrower, and ZB, N.A. dba National Bank of Arizona, as Lender | Exhibit 10.2 of Registrant's Current Report on Form 8-K filed on October 4, 2017 |
| 10.491 | Third Amended and Restated Loan and Security Agreement (Hypothecation Facility) dated September 25, 2020, by and among Bluegreen / Big Cedar Vacations, LLC, as Borrower, and ZB, N.A. dba National Bank of Arizona, as Lender | Exhibit 10.1 of Registrant's Current Report on Form 8-K filed on October 1, 2020 |
| 10.50 | Second Amended and Restated Promissory Note (Inventory Loan) dated September 28, 2017, by and among Bluegreen / Big Cedar Vacations, LLC, as Borrower, and ZB, N.A. dba National Bank of Arizona, as Lender | Exhibit 10.3 of Registrant's Current Report on Form 8-K filed on October 4, 2017 |
| 10.51 | Second Amended and Restated Loan Agreement (Inventory Loan) dated September 28, 2017, by and among Bluegreen / Big Cedar Vacations, LLC, as Borrower, and ZB, N.A. dba National Bank of Arizona, as Lender | Exhibit 10.4 of Registrant's Current Report on Form 8-K filed on October 4, 2017 |
| 10.52 | Full Guaranty (Hypothecation Facility) dated September 28, 2017, by Bluegreen Corporation, as Guarantor, in favor of National Bank of Arizona, as Lender (incorporated by reference to Exhibit 10.102 to Bluegreen's Quarterly Report on Form 10-Q for the quarter ended September 30, 2010, filed with the SEC on November 10, 2010) | Exhibit 10.6 of Registrant's Current Report on Form 8-K filed on October 4, 2017 |
| 10.53 | Guarantor Consent and Ratification and Confirmation of and Amendment to Full Guaranty (Hypothecation Facility) dated September 28, 2017, by Bluegreen Vacations Corporation, as Guarantor, in favor of Z.B., National Bank of Arizona, as Lender | Exhibit 10.6 of Registrant's Current Report on Form 8-K filed on October 4, 2017 |
| 10.54 | Full Guaranty (Inventory Loan) dated December 13, 2013, by Bluegreen Corporation, as Guarantor, in favor of National Bank of Arizona, as Lender | Exhibit 10.7 of Registrant's Current Report on Form 8-K filed on October 4, 2017 |

149

| 10.55 | Guarantor Consent and Ratification and Confirmation of and Amendment to Full Guaranty (Inventory Loan) dated September 28, 2017, by Bluegreen Vacations Corporation, as Guarantor, in favor of Z.B., National Bank of Arizona, as Lender | Exhibit 10.8 of Registrant's Current Report on Form 8-K filed on October 4, 2017 |
| 10.56 | Indenture dated as of March 17, 2016, between BXG Receivables Note Trust 2016-A, as Issuer, Bluegreen Corporation, as Servicer, Vacation Trust, Inc., as Club Trustee, Concord Servicing Corporation, as Backup Servicer, and U.S. Bank National Association, as Indenture Trustee, Paying Agent and Custodian | Exhibit 10.1 to Registrant's Current Report on Form 8-K filed on March 23, 2016 |
| 10.57 | Sale Agreement, dated as of March 17, 2016, by and among BRFC 2016-A LLC, as Depositor, and BXG Receivables Note Trust 2016-A, as Issuer | Exhibit 10.2 to Registrant's Current Report on Form 8-K filed on March 23, 2016 |
| 10.58 | Transfer Agreement, dated as of March 17, 2016, by and among Bluegreen Corporation, BXG Timeshare Trust I, as Seller, and BRFC 2016-A LLC, as Depositor | Exhibit 10.3 to Registrant's Current Report on Form 8-K filed on March 23, 2016 |
| 10.59 | Purchase and Contribution Agreement, dated as of March 17, 2016, by and among Bluegreen Corporation, as Seller, and BRFC 2016-A LLC, as Depositor | Exhibit 10.4 to Registrant's Current Report on Form 8-K filed on March 23, 2016 |
| 10.60 | BXG Receivables Note Trust 2016-A, Standard Definitions | Exhibit 10.5 to Registrant's Current Report on Form 8-K filed on March 23, 2016 |
| 10.61 | Amended and Restated Credit Agreement dated as of December 16, 2016, by and among Bluegreen Corporation, as Borrower and Fifth Third Bank, as Administrative Agent and L/C Issuer | Exhibit 10.1 to Registrant's Current Report on Form 8-K filed on December 22, 2016 |
| 10.62 | Amended and Restated Security Agreement, dated as of December 16, 2016, by and among Bluegreen Corporation, as Borrower, Bluegreen Vacations Unlimited, Inc. and Bluegreen Resorts Management, Inc. as Grantors, and Fifth Third Bank, as Administrative Agent | Exhibit 10.2 to Registrant's Current Report on Form 8-K filed on December 22, 2016 |
| 10.63 | Indenture, dated as of June 6, 2017, between BXG Receivables Note Trust 2017-A, as Issuer, Bluegreen Corporation, as Servicer, Vacation Trust, Inc. as Club Trustee, Concord Servicing Corporation, as Backup Servicer, and U.S. Bank National Association, as Indenture Trustee, Paying Agent and Custodian | Exhibit 10.1 to Registrant's Current Report on Form 8-K filed on June 9, 2017 |
| 10.64 | Sale Agreement, dated as of June 6, 2017, by and among BRFC 2017-A LLC, as Depositor, and BXG Receivables Note Trust 2017-A, as Issuer | Exhibit 10.2 to Registrant's Current Report on Form 8-K filed on June 9, 2017 |
| 10.65 | Transfer Agreement, dated as of June 6, 2017, by and among Bluegreen Corporation, BXG Timeshare Trust I, as Seller, and BRFC 2017-A LLC, as Depositor | Exhibit 10.3 to Registrant's Current Report on Form 8-K filed on June 9, 2017 |
| 10.66 | Purchase and Contribution Agreement, dated as of June 6, 2017, by and among Bluegreen Corporation, as Seller, and BRFC 2017-A LLC, as Depositor | Exhibit 10.4 to Registrant's Current Report on Form 8-K filed on June 9, 2017 |
| 10.67 | BXG Receivables Note Trust 2017-A, Standard Definitions | Exhibit 10.5 to Registrant's Current Report on Form 8-K filed on June 9, 2017 |
| 10.68 | Loan and Security Agreement, dated March 6, 2018, by and among BBX Capital, BBX Sweet Holdings, Food for Thought Restaurant Group-Florida, LLC, BBX Capital Florida, LLC and Woodbridge, collectively, as borrowers, and Iberiabank, as administrative agent and lender | Exhibit 10.66 to Registrant's Annual Report on Form 10-K filed on March 9, 2018 |
| 10.69 | Second Amended and Restated Receivables Loan Agreement, dated as of March 12, 2018, by and among Bluegreen Vacations Corporation, as Borrower, and Liberty Bank, as Lender and Administrative and Collateral Agent | Exhibit 10.1 to Registrant's Current Report on Form 8-K filed on March 16, 2018 |
| 10.70 | Second Amended and Restated Receivables Loan Note, dated as of March 12, 2018, by Bluegreen Vacations Corporation in favor of Liberty Bank | Exhibit 10.2 to Registrant's Current Report on Form 8-K filed on March 16, 2018 |

150

| | | |
|---|---|---|
| 10.701 | The First Amendment to Second Amended and Restated Receivables Loan Agreement effective June 30, 2020 by Bluegreen Vacations Corporation in favor of Liberty Bank | Exhibit 10.1 to Registrant's Current Report on Form 8-K filed on July 2, 2020 |
| 10.702 | Third Amended and Restated Receivables Loan Note effective June 30, 2020 by Bluegreen Vacations Corporation in favor of Liberty Bank | Exhibit 10.2 to Registrant's Current Report on Form 8-K filed on July 2, 2020 |
| 10.71 | Eighth Commitment Amendment to Loan Sale and Servicing Agreement, dated as of April 6, 2018, by and among BBCV Receivables-Q 2010 LLC, as Seller, Quorum Federal Credit Union, as Buyer, Vacation Trust, Inc., as Club Trustee, U.S. Bank National Association, as Custodian, Bluegreen Vacations Corporation, as Servicer, and Concord Servicing Corporation as Backup Servicer. | Exhibit 10.1 to Registrant's Current Report on Form 8-K filed on April 12, 2018 |
| 10.72 | Commitment Purchase Period Terms Letter, dated as of April 6, 2018, by BBCV Receivables-Q 2010 LLC, as Seller, and Quorum Federal Credit Union, as Buyer. | Exhibit 10.2 to Registrant's Current Report on Form 8-K filed on April 12, 2018 |
| 10.73 | Eighth Commitment Amendment to Loan Sale and Servicing Agreement, dated as of April 6, 2018, by and among BRFC-Q 2010 LLC, as Seller, Quorum Federal Credit Union, as Buyer, Vacation Trust, Inc., as Club Trustee, U.S. Bank National Association, as Custodian, Bluegreen Vacations Corporation, as Servicer, and Concord Servicing Corporation as Backup Servicer. | Exhibit 10.3 to Registrant's Current Report on Form 8-K filed on April 12, 2018 |
| 10.74 | Commitment Purchase Period Terms Letter, dated as of April 6, 2018, by BRFC-Q 2010 LLC, as Seller, and Quorum Federal Credit Union, as Buyer. | Exhibit 10.4 to Registrant's Current Report on Form 8-K filed on April 12, 2018 |
| 10.75 | Promissory Note, dated as of April 17, 2018, by Bluegreen Vacations Corporation and Bluegreen Vacations Unlimited, Inc., jointly and severally, in favor of ZB, N.A. | Exhibit 10.2 to Registrant's Current Report on Form 8-K filed on April 23, 2018 |
| 10.76 | Fifth Amendment to Amended and Restated Loan and Security Agreement, dated as of August 15, 2018, by and among Bluegreen Vacations Corporation, the Borrower, each of the financial institutions from time to time party thereto, and Pacific Western Bank, as Agent. | Exhibit 10.1 to Registrant's Current Report on Form 8-K filed on August 21, 2018 |
| 10.77 | Indenture, dated as of October 15, 2018, among BXG Receivables Note Trust 2018-A, as Issuer, Bluegreen Vacations Corporation, as Servicer, Vacation Trust, Inc. as Club Trustee, Concord Servicing Corporation, as Backup Servicer, and U.S. Bank National Association, as Indenture Trustee, Paying Agent and Custodian | Exhibit 10.1 to Registrant's Current Report on Form 8-K files on October 29, 2018 |
| 10.78 | Sale Agreement, dated as of October 15, 2018, by and between BRFC 2018-A LLC, as Depositor, and BXG Receivables Note Trust 2018-A, as Issuer | Exhibit 10.2 to Registrant's Current Report on Form 8-K filed on October 29, 2018 |
| 10.79 | Transfer Agreement, dated as of October 15, 2018, by and among Bluegreen Vacations Corporation, BXG Timeshare Trust I, as Seller, and BRFC 2018-A LLC, as Depositor | Exhibit 10.3 to Registrant's Current Report on Form 8-K filed on October 29, 2018 |
| 10.80 | Purchase and Contribution Agreement, dated as of October 15, 2018, by and between Bluegreen Vacations Corporation, as Seller, and BRFC 2018-A LLC, as Depositor | Exhibit 10.4 to Registrant's Current Report on Form 8-K filed on October 29, 2018 |
| 10.81 | BXG Receivables Note Trust 2018-A, Standard Definitions | Exhibit 10.5 to Registrant's Current Report on Form 8-K filed on October 29, 2018 |
| 10.82 | Acquisition Loan Agreement, dated as of April 17, 2018, by and among Bluegreen Vacations Corporation and Bluegreen Vacations Unlimited, Inc., jointly and severally as Borrower, and ZB, N.A, as Lender | Exhibit 10.1 to Registrant's Current Report on Form 8-K filed on April 23, 2018 |

151

| 10.83 | Second Amended and Restated Credit Agreement dated as of October 23, 2019, by and among Bluegreen Vacations Corporation, as Borrower, the Guarantors from time to time party, the Lenders from time to time party, and Fifth Third Bank, as Administrative Agent and L/C Issuer. | Exhibit 10.1 to Registrant's Current Report on Form 8-K filed on October  29, 2019 |
| 10.84 | Second Amended and Restated Security Agreement, dated as of October 23, 2019, by and among Bluegreen Vacations Corporation, as Borrower, Bluegreen Vacations Unlimited, Inc., Bluegreen Resorts Management, Inc., Bluegreen Nevada, LLC, Bluegreen Louisiana, LLC, Bluegreen New Jersey, LLC and TFRI 2013-1 LLC and each other guarantor party from time to time, as Grantors, and Fifth Third Bank, as Administrative Agent | Exhibit 10.2 to Registrant's Current Report on Form 8-K filed on October  29, 2019 |
| 10.85 | Pledge Agreement, dated as of October 23, 2019, by and among Bluegreen Vacations Corporation, as Pledgor, in favor of Fifth Third Bank, as Administrative Agent | Exhibit 10.3 to Registrant's Current Report on Form 8-K filed on October  29, 2019 |
| 10.86 | Omnibus Amendment No. 2, dated as of December 27, 2019, by and among BXG Timeshare Trust I, Bluegreen Vacations Corporation, Vacation Trust, Inc., Concord Servicing Corporation, U.S. Bank National Association, KeyBank National Association and DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt AM Main | Exhibit 10.1 to Registrant's Current Report on Form 8-K filed on January 3, 2020 |
| 10.87 | Loan Extension and Modification Agreement by and among BBX Capital, BBX Sweet Holdings, Food for Thought Restaurant Group-Florida, LLC, BBX Capital Florida, LLC and Woodbridge, collectively, as borrowers, and Iberiabank, as administrative agent and lender | Exhibit 10.1 to Registrant's Current Report on Form 8-K filed on July 19, 2019 |
| 10.871 | Lenders' letter confirming the termination of the Loan and Security Agreement dated March 6, 2018, with Iberiabank, as administrative agent and a lender, as amended by the Loan Extension and Modification Agreement, dated July 17, 2019 | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed on October 2, 2020 |
| 10.88 | Amended and Restated Marketing and Promotions Agreement by and among Bass Pro and affiliates and Bluegreen and affiliates, dated as of December 31, 2007 | Exhibit 10.1 of Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2019 filed on August 7, 2019 |
| 10.89 | First Amendment to Amended and Restated Marketing and Promotions Agreement by and among Bass Pro and affiliates and Bluegreen and affiliates, dated as of June 26, 2010 | Exhibit 10.2 of Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2019 filed on August 7, 2019 |
| 10.90 | Second Amendment to Amended and Restated Marketing and Promotions Agreement by and among Bass Pro and affiliates and Bluegreen and affiliates, dated as of October 1, 2010 | Exhibit 10.3 of Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2019 filed on August 7, 2019 |
| 10.91 | Amended and Restated Operating Agreement of Bluegreen/Big Cedar Vacations, LLC, dated as of December 31, 2007 | Exhibit 10.4 of Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2019 filed on August 7, 2019 |
| 10.92 | First Amendment to Amended and Restated Operating Agreement of Bluegreen/Big Cedar Vacations, LLC, dated as of October 1, 2010 | Exhibit 10.5 of Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2019 filed on August 7, 2019 |
| 10.93 | Amendment No. 2 to Amended and Restated Operating Agreement of Bluegreen/Big Cedar Vacations, LLC, dated as of August 31, 2016 | Exhibit 10.6 of Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2019 filed on August 7, 2019 |

152

| 10.94 | Settlement Agreement and Amendment No. 3 to the Amended and Restated Marketing and Promotions Agreement, dated as of June 13, 2019, by and among Bluegreen Vacations Unlimited, Inc., Bass Pro, Inc., Big Cedar, L.L.C., and Bluegreen/Big Cedar Vacations, LLC | Exhibit 10.7 of Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2019 filed on August 7, 2019 |
|---|---|---|
| 10.95 | Separation and Distribution Agreement, dated September 25, 2020, between BBX Capital Corporation and BBX Capital Florida LLC | Exhibit 10.1 of Registrant's Current Report on Form 8-K filed on September 29, 2020 |
| 10.96 | Tax Matters Agreement, dated September 25, 2020, between BBX Capital Corporation and BBX Capital Florida LLC | Exhibit 10.2 of Registrant's Current Report on Form 8-K filed on September 29, 2020 |
| 10.97 | Employee Matters Agreement, dated September 25, 2020, between BBX Capital Corporation and BBX Capital Florida LLC | Exhibit 10.3 of Registrant's Current Report on Form 8-K filed on September 29, 2020 |
| 10.98 | Transition Services Agreement dated September 25, 2020, between BBX Capital Corporation and BBX Capital Florida LLC | Exhibit 10.4 of Registrant's Current Report on Form 8-K filed on September 29, 2020 |
| 10.99 | $75.0 million promissory note dated September 30, 2020 issued by Bluegreen Vacations Holding Corporation in favor of BBX Capital, Inc. | Exhibit 10.1 of Registrant's Current Report on Form 8-K filed on October 1, 2020 |
| 10.100 | Indenture, dated as of October 8, 2020, among BXG Receivables Note Trust 2020-A, as Issuer, Bluegreen Vacations Corporation, as Servicer, Vacation Trust, Inc., as Club Trustee, Concord Servicing Corporation, as Backup Servicer, and U.S. Bank National Association, as Indenture Trustee, Paying Agent and Custodian. | Exhibit 10.1 of Registrant's Current Report on Form 8-K filed on October 14, 2020 |
| 10.101 | Sale Agreement, dated as of October 8, 2020, by and between BRFC 2020-A LLC, as Depositor, and BXG Receivables Note Trust 2020-A, as Issuer. | Exhibit 10.2 of Registrant's Current Report on Form 8-K filed on October 14, 2020 |
| 10.102 | Transfer Agreement, dated as of October 8, 2020, by and among Bluegreen Vacations Corporation, BXG Timeshare Trust I, as Seller, and BRFC 2020-A LLC, as Depositor. | Exhibit 10.3 of Registrant's Current Report on Form 8-K filed on October 14, 2020 |
| 10.103 | Purchase and Contribution Agreement, dated as of October 8, 2020, by and between Bluegreen Vacations Corporation, as Seller, and BRFC 2020-A LLC, as Depositor. | Exhibit 10.4 of Registrant's Current Report on Form 8-K filed on October 14, 2020 |
| 10.104 | BXG Receivables Note Trust 2020-A, Standard Definitions. | Exhibit 10.5 of Registrant's Current Report on Form 8-K filed on October 14, 2020 |
| 10.105 | Ninth Commitment Amendment to Loan Sale and Servicing Agreement, effective as of March 16, 2020, by and among BRFC-Q 2010 LLC, as seller, Quorum Federal Credit Union, as buyer, Vacation Trust, Inc., as Club Trustee, U.S. Bank National Association, as custodian and paying agent, Bluegreen Corporation, as servicer, and Concord Servicing Corporation, as backup servicer  referenced therein, dated as of March 16, 2020 | Filed with this report |
| 10.106 | Ninth Commitment Amendment to Loan Sale and Servicing Agreement, effective as of March 17, 2020, by and among BBCV Receivables-Q 2010 LLC, as seller, Quorum Federal Credit Union, as buyer, Vacation Trust, Inc., as Club Trustee, U.S. Bank National Association, as custodian and paying agent, Bluegreen Corporation, as servicer, and Concord Servicing Corporation, as backup servicer referenced therein, dated March 17, 2020 | Filed with this report |

153

| | | |
|---|---|---|
| 10.107 | Tenth Commitment Amendment to Loan Sale and Servicing Agreement, effective as of December 18, 2020, by and among BBCV Receivables-Q 2010 LLC, as seller, Quorum Federal Credit Union, as buyer, Vacation Trust, Inc., as Club Trustee, U.S. Bank National Association, as custodian and paying agent, Bluegreen Corporation, as servicer, and Concord Servicing Corporation, as backup servicer referenced therein, December 18, 2020 | Filed with this report |
| 10.108 | Transfer Agreement by and among Bluegreen Corporation, BXG Timeshare Trust I, as Seller, and BRFC 2013-A LLC, as Depositor, dated as of September 15, 2013 | Filed with this report |
| 10.109 | Fourth Amendment to Amended and Restated Loan and Security Agreement dated October 19, 2017, by and among Bluegreen Vacations Corporation fka Bluegreen Corporation, as Borrower, and Pacific Western Bank, as successor-by-merger to CapitalSource Bank, as lender referenced therein, dated October 19, 2017 | Filed with this report |
| 10.110 | Fifth Amendment to Amended and Restated Loan and Security Agreement dated August 15, 2018, by and among Bluegreen Vacations Corporation fka Bluegreen Corporation, as Borrower, and Pacific Western Bank, as successor-by-merger to CapitalSource Bank, as lender referenced therein, dated August 15, 2018 | Filed with this report |
| 21.1 | Subsidiaries of the Registrant | Filed with this report |
| 23.1 | Consent of Grant Thornton LLP | Filed with this report |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | Filed with this report |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | Filed with this report |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | Furnished with this report |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | Furnished with this report |
| 101.INS | XBRL Instance Document | Filed with this Report |
| 101.SCH | XBRL Taxonomy Extension Schema Document | Filed with this Report |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | Filed with this Report |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document | Filed with this Report |
| 101.LAB | XBRL Taxonomy Extension Labels Linkbase Document | Filed with this Report |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | Filed with this Report |

**Item 16.    Form 10-K Summary**

None

154

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

BLUEGREEN VACATIONS HOLDING
CORPORATION

March 1, 2021

By: /s/ Alan B. Levan
Alan B. Levan
Chairman of the Board of Directors,
Chief Executive Officer and President

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Alan B. Levan<br>Alan B. Levan | Chairman of the Board of Directors, Chief Executive Officer and President | March 1, 2021 |
| /s/ Raymond S. Lopez<br>Raymond S. Lopez | Chief Financial Officer | March 1, 2021 |
| /s/ John E. Abdo<br>John E. Abdo | Vice Chairman of the Board of Directors | March 1, 2021 |
| /s/ Jarett S. Levan<br>Jarett S. Levan | Director | March 1, 2021 |
| /s/ Lawrence A. Cirillo<br>Lawrence A. Cirillo | Director | March 1, 2021 |
| /s/ Darwin Dornbush<br>Darwin Dornbush | Director | March 1, 2021 |
| /s/Joel Levy<br>Joel Levy | Director | March 1, 2021 |
| /s/ William Nicholson<br>William Nicholson | Director | March 1, 2021 |

155

Exhibit 4.4

### DESCRIPTION OF SECURITIES

*The following is a summary of the material terms of the capital stock of Bluegreen Vacations Holding Corporation (the "Company," "we," "us" or "our"). The following summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, our Amended and Restated Articles of Incorporation, as amended, our Bylaws, as amended, and our Rights Agreement (as defined below), each of which is included as an exhibit to our Annual Report on Form 10-K. The terms of our capital stock may also be affected by Florida law.*

**Authorized Capital Stock; Shares Issued and Outstanding**

Under our Amended and Restated Articles of Incorporation, our authorized capital stock consists of 30,000,000 shares of Class A Common Stock, par value $0.01 per share, 5,000,000 shares of Class B Common Stock, par value $0.01 per share, and 10,000,000 shares of preferred stock, par value $0.01 per share, 2,000,000 of which has been designated as Series A Junior Participating Preferred Stock As of February 28, 2021, approximately 15,624,091 shares of our Class A Common Stock and 3,693,596 shares of our Class B Common Stock were issued and outstanding. We do not have any outstanding shares of preferred stock.

**Class A Common Stock and Class B Common Stock**

*Voting Rights*

Except as provided by Florida law or as specifically provided in our Amended and Restated Articles of Incorporation, holders of our Class A Common Stock and Class B Common Stock vote as a single group on matters presented to them for a shareholder vote. With respect to each such matter, each share of our Class A Common Stock is entitled to one vote, with all of the shares of Class A Common Stock representing in the aggregate 22% of the total voting power of our Class A Common Stock and Class B Common Stock, and each share of our Class B Common Stock is entitled to the number of votes per share so that all of the shares of Class B Common Stock will represent in the aggregate 78% of the total voting power of our Class A Common Stock and Class B Common Stock. These fixed voting percentages will remain in effect until the total number of outstanding shares of our Class B Common Stock falls below 360,000 shares. If the total number of outstanding shares of our Class B Common Stock is less than 360,000 shares but greater than 280,000 shares, then our Class A Common Stock will hold a voting percentage equal to 40% and our Class B Common Stock will hold a voting percentage equal to the remaining 60%. If the total number of outstanding shares of our Class B Common Stock is less than 280,000 shares but greater than 100,000 shares, then our Class A Common Stock will hold a voting percentage equal to 53% and our Class B Common Stock will hold a voting percentage equal to the remaining 47%. If the total number of outstanding shares of our Class B Common Stock is less than 100,000 shares, then each share of our Class A Common Stock and Class B Common Stock will be entitled to one vote on each matter presented to a vote of our shareholders. Each of the above-described share thresholds will be ratably adjusted in connection with any stock split, reverse stock split or similar transaction effected by us.

Under Florida law, holders of our Class A Common Stock are entitled to vote as a separate voting group on amendments to our Amended and Restated Articles of Incorporation which require the approval of our shareholders under Florida law and would:

· effect an exchange or reclassification of all or part of the shares of our Class A Common Stock into shares of another class;
· effect an exchange or reclassification, or create a right of exchange, of all or part of the shares of another class into shares of our Class A Common Stock;
· change the designation, rights, preferences, or limitations of all or part of the shares of our Class A Common Stock;
· change all or part of the shares of our Class A Common Stock into a different number of shares of Class A Common Stock;
· create a new class of shares which have rights or preferences with respect to distributions or to dissolution that are prior or superior to our Class A Common Stock;
· increase the rights, preferences or number of authorized shares of any class that, after giving effect to the amendment, have rights or preferences with respect to distributions or to dissolution that are prior or superior to our Class A Common Stock;
· limit or deny any existing preemptive right of all or part of the shares of our Class A Common Stock; or
· cancel or otherwise affect rights to distributions or dividends that have accumulated but not yet been declared on all or part of the shares of our Class A Common Stock.

However, if a proposed amendment that would otherwise entitle the holders of our Class A Common Stock to vote as a separate voting group as a result of the amendment having one of the effects described above would affect the holders of our Class B Common Stock or any of our other securities outstanding from time to time in the same or substantially similar way, then the holders of our

Class A Common Stock will not be entitled to vote as a separate voting group on the proposed amendment but instead will vote together with the other similarly affected shareholders as a single voting group on the amendment.

Under Florida law, holders of our Class B Common Stock are entitled to vote as a separate voting group on any amendment to our Amended and Restated Articles of Incorporation which requires the approval of our shareholders under Florida law and would affect the rights of the holders of our Class B Common Stock in substantially the same manner as described above with respect to our Class A Common Stock. Holders of our Class A Common Stock and Class B Common Stock are also entitled to vote as a separate voting group on any plan of merger or plan of share exchange that requires the approval of our shareholders under Florida law and contains a provision which, if included in a proposed amendment to our Amended and Restated Articles of Incorporation, would require their vote as a separate voting group.

In addition to the rights afforded to our shareholders under Florida law, our Amended and Restated Articles of Incorporation provide that the approval of the holders of our Class B Common Stock, voting as a separate voting group, is required before any of the following actions may be taken:

· the issuance of any additional shares of our Class B Common Stock, other than a stock dividend issued to holders of our Class B Common Stock;
· a reduction in the number of outstanding shares of our Class B Common Stock, except for any reduction by virtue of a conversion of shares of our Class B Common Stock into shares of our Class A Common Stock or a voluntary disposition to us; or
· any amendments of the voting rights provisions of our Amended and Restated Articles of Incorporation.

Our Amended and Restated Articles of Incorporation do not provide for cumulative voting on the election of directors.

*Convertibility*

Under our Amended and Restated Articles of Incorporation, holders of our Class B Common Stock possess the right, at any time, to convert any or all of their shares of our Class B Common Stock into shares of our Class A Common Stock on a share-for-share basis. Our Class A Common Stock is not convertible into any other class or series of our securities.

*Dividends and Other Distributions*

Holders of our Class A Common Stock and Class B Common Stock are entitled to receive cash dividends, when and as declared by our Board of Directors out of legally available assets, subject to preferences that may apply to any shares of our preferred stock outstanding from time to time. Any distribution per share with respect to our Class A Common Stock must be identical to the distribution per share with respect to our Class B Common Stock, except that a stock dividend or other non-cash distribution to holders of our Class A Common Stock may be declared and issued in the form of Class A Common Stock while a dividend or other non-cash distribution to holders of our Class B Common Stock may be declared and issued in the form of either Class A Common Stock or Class B Common Stock.

*Liquidation Rights*

Upon any liquidation, the assets legally available for distribution to our shareholders after payment of liabilities and any liquidation preference of any shares of our preferred stock outstanding from time to time will be distributed ratably among the holders of our Class A Common Stock and Class B Common Stock.

*Fully Paid and Non-Assessable*

All outstanding shares of our Class A Common Stock and Class B Common Stock are fully paid and non-assessable.

*No Preemptive Rights, Redemption Rights or Sinking Fund Provision*

The holders of our Class A Common Stock and Class B Common Stock have no preemptive rights, and our Class A Common Stock and Class B Common Stock is not subject to any redemption or sinking fund provisions.

*Additional Shares of Common Stock*

We may issue additional authorized shares of our Class A Common Stock or Class B Common Stock as authorized by our Board of Directors from time to time, without shareholder approval, subject to any limitations imposed by applicable national securities exchange rules.

*Transfer Agent and Registrar*

The transfer agent and registrar for our Class A Common Stock and Class B Common Stock is American Stock Transfer & Trust Company, LLC.

*Listing*

Our Class A Common Stock is listed for trading on the New York Stock Exchange under the ticker symbol "BVH." Our Class B Common Stock is traded on the OTCQX market under the trading symbol "BVHBB."

**Preferred Stock**

Under our Amended and Restated Articles of Incorporation, and as permitted by Florida law, our Board of Directors may authorize the issuance of preferred stock in one or more series, establish from time to time the number of shares to be included in each series and fix the designation, powers, preferences and rights of the shares of each series and any of its qualifications, limitations or restrictions, in each case, without vote or action by our shareholders except to the extent required by applicable national securities exchange rules. These rights, preferences and privileges could include dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which may be greater than the rights of our Class A Common Stock or Class B Common Stock or otherwise adversely affect the voting power or other rights of the holders of our Class A Common Stock or Class B Common Stock, including the likelihood that holders of our Class A Common Stock or Class B Common Stock would receive dividend payments and payments on liquidation, or the amounts thereof. The issuance of preferred stock, while providing flexibility in connection with possible acquisitions, financing transactions and other corporate purposes, could also, among other things, have the effect of delaying, deferring or preventing a change in control or other corporate actions, and might adversely affect the market price of our Class A Common Stock or Class B Common Stock.

2,000,000 shares of our authorized preferred stock has been designated as Series A Junior Participating Preferred Stock, none of which are currently outstanding.  See "Rights Agreement - Series A Junior Participating Preferred Stock Provisions" below for additional information regarding our Series A Junior Participating Preferred Stock.

**Rights Agreement**

*General*

On June 17, 2020, we entered into a Rights Agreement with American Stock Transfer & Trust Company, LLC, as Rights Agent (the "Rights Agreement"), in an effort to protect against investors seeking short-term gains by taking advantage of adverse market conditions resulting from the COVID-19 pandemic at the expense of our Company and our long-term investors. The following is a summary of the terms of the Rights Agreement.  The following summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the Rights Agreement,  which is included as an exhibit to our Annual Report on Form 10-K.

*The Rights*

Under the terms and conditions of the Rights Agreement, one preferred share purchase right (a "Right") was issued with respect to each share of our Class A Common Stock and Class B Common Stock outstanding as of the close of business on June 29, 2020, the record date for the distribution. In addition, new Rights will accompany any new shares of our Class A Common Stock and Class B Common Stock issued after such record date until the earlier of the Distribution Date described below or the redemption or exchange of the Rights or other termination or expiration of the Rights Agreement. Prior to exercise, the Rights will not give their holders any dividend, voting, liquidation or any other rights of a shareholder of our Company.

Prior to the Distribution Date (as defined under "Exercisability" below), each Right will be transferred with and only with the share of our Class A Common Stock or Class B Common Stock with respect to which the Right was issued. Until the Distribution Date (or earlier expiration of the Rights), the surrender for transfer of any shares of our Class A Common Stock or Class B Common Stock will also constitute the transfer of the Rights associated with such shares. After the Distribution Date, the Rights will separate from our Class A Common Stock and Class B Common Stock and be evidenced by book-entry credits or by Rights certificates to be mailed to all eligible holders of our Class A Common Stock or Class B Common Stock. Any Rights beneficially owned by an Acquiring Person and any of the Acquiring Person's Affiliates, Associates and other Related Persons (as such terms are defined in the Rights Agreement), and certain subsequent transferees of such persons, will become null and void and may not be exercised.

*Exercise Price*

Once the Rights become exercisable, each Right will allow its holder to purchase from us one one-hundredth of a share of our Series A Junior Participating Preferred Stock for $50.00 (as such amount may be adjusted in accordance with the terms of the Rights Agreement, the "Purchase Price").

*Series A Junior Participating Preferred Stock Provisions*

The value of one one-hundredth of a share of Series A Junior Participating Preferred Stock is intended to approximate the value of one share of our Class A Common Stock. Each one one-hundredth of a share of Series A Junior Participating Preferred Stock, if issued:

·   will not be redeemable;
·   will entitle holders to, when, as and if declared by our Board of Directors, dividend payments of $0.01, or an amount equal to the dividend paid on one share of our Class A Common Stock, whichever is greater;
·   will entitle holders upon liquidation either to receive $1.00 or an amount equal to the payment made on one share of our Class A Common Stock, whichever is greater;
·   will have the same voting power as one share of our Class A Common Stock (with all outstanding shares of our Class A Common Stock and Series A Junior Participating Preferred Stock representing, in the aggregate, 22% of the general voting power of our stock, subject to adjustment in accordance with our Amended and Restated Articles of Incorporation, as described above); and
·   will entitle holders to a payment equal to the payment made on one share of our Class A Common Stock if shares of our Class A Common Stock are exchanged via merger, consolidation, or a similar transaction.

*Exercisability*

The Rights will not be exercisable until the "Distribution Date," which is the earlier to occur of (i) 10 business days following a public announcement that a person or group of affiliated or associated persons or person(s) acting in concert therewith has acquired, or obtained the right to acquire, beneficial ownership of 5% or more of the outstanding shares of our Class A Common Stock, Class B Common Stock or total combined common stock or (ii) 10 business days (or such later date as may be determined by action of our Board of Directors) following the commencement of, or announcement of an intention to make, a tender offer or exchange offer the consummation of which would result in the beneficial ownership by a person or group of 5% or more of the outstanding shares of our Class A Common Stock, Class B Common Stock or total combined common stock.

*Exemptions*

Persons who beneficially owned 5% or more of our Class A Common Stock, Class B Common Stock or total combined common stock as of the record date for the distribution of the rights were not required to divest any shares and will not trigger exercisability of the Rights so long as they do not become the beneficial owner of one or more additional shares of our Class A Common Stock or Class B Common Stock (other than pursuant to certain limited exceptions expressly set forth in the Rights Agreement) which results in their beneficial ownership of 5% or more of the outstanding shares of our Class A Common Stock, Class B Common Stock or total combined common stock. Additionally, if our Board of Directors determines that a person or group who would otherwise be an Acquiring Person exceeded any of the 5% thresholds inadvertently and without any intention of obtaining, changing or influencing control of our Company, then such person or group will not be deemed to be or to have become an Acquiring Person in such case provided such person or group divests itself, as soon as practicable (as determined by our Board of Directors), of beneficial ownership of a sufficient number of shares of our Class A Common Stock or Class B Common Stock (as determined by our Board of Directors) so that such person or group would no longer otherwise qualify as an Acquiring Person. The Board will consider requests for a waiver on a case by case basis.Further, if we repurchase shares of our Class A Common Stock or Class B Common Stock and, as a result, a person or group's holdings constitute 5% or more of the remaining outstanding shares of our Class A Common Stock, Class B Common Stock or total combined common stock, that person or group will not be an Acquiring Person so long as they do not become the beneficial owner of one or more additional shares of our Class A Common Stock or Class B Common Stock (other than pursuant to certain limited exceptions expressly set forth in the Rights Agreement) which results in their beneficial ownership of 5% or more of the outstanding shares of our Class A Common Stock, Class B Common Stock or total combined common stock. The Rights will also not become exercisable solely as a result of any unilateral grant of a security by us, including our grant of stock awards, restricted stock awards, options, warrants, rights or similar interests to our directors, officers or employees, or as a result of the vesting or exercise of any such security. In addition, a person or group will not become an Acquiring Person solely as the result of the acquisition by such person or group of shares of our Class A Common Stock or Class B Common Stock from an individual who beneficially owned 5% or more of our Class A Common Stock, Class B Common Stock or total combined common stock then outstanding if such shares are received upon such individual's death pursuant to such individual's will or pursuant to a charitable trust created by such individual for estate planning purposes. We and our subsidiaries, any employee benefit plan of us or any of our subsidiaries, or any entity or trustee holding (or acting in a fiduciary capacity in respect of) shares of our Class A Common Stock or Class B Common Stock for or pursuant to the terms of any such plan or for the purpose of funding any such plan or funding other employee benefits for our employees or the employees of any of our subsidiaries are excepted from the provisions of the Rights Agreement.

*Consequences of a Person or Group Becoming an Acquiring Person*

If a person or group becomes an Acquiring Person, all holders of Rights (except the Acquiring Person, each Related Person of the Acquiring Person, and certain of their respective transferees, whose Rights will have become void) may, for the Purchase Price, purchase from us a number of shares of our Class A Common Stock or equivalent securities having a market value at that time of twice the Purchase Price.

If, after a person or group has become an Acquiring Person, we are acquired in a merger or other business combination transaction or 50% or more of our consolidated assets or earning power are sold, proper provisions will be made so that each holder of a Right (other than Rights beneficially owned by the Acquiring Person, each Related Person of the Acquiring Person, and certain of their respective transferees, all of which Rights will have become void) will thereafter have the right to receive upon the exercise of a Right that number of shares of common stock of the person with whom we have engaged in the foregoing transaction (or its parent) that at the time of such transaction having a market value of two times the Purchase Price.

*Exchange*

From the date, if any, on which any person or group becomes an Acquiring Person until the expiration of the Rights Agreement, our Board of Directors will have the right to extinguish the Rights by exchanging the Rights (other than Rights beneficially owned by the Acquiring Person, each Related Person of the Acquiring Person, and certain of their respective transferees, all of which Rights will have become void), in whole or in part, at an exchange ratio of one share of our Class A Common Stock, or a fractional share of Series A Junior Participating Preferred Stock (or other class or series of our preferred stock having similar rights, preferences and privileges as the Series A Junior Participating Preferred Stock) of equivalent value, per Right (subject to adjustment in accordance with the terms of the Rights Agreement).

*Redemption*

At any time prior to the Distribution Date, our Board of Directors may redeem the Rights, in whole but not in part, at a price of $0.0001 per Right (the "Redemption Price"), payable, at our option, in cash, shares of Class A Common Stock or Class B Common Stock or such other form of consideration as our Board of Directors shall determine. The redemption of the Rights may be made effective at such time, on such basis and with such conditions as our Board of Directors, in its sole discretion, may establish.

Immediately upon any redemption of the Rights, the right to exercise the Rights will terminate, and the holders of Rights will thereafter only have the right to receive the Redemption Price.

*Adjustments*

The Purchase Price, the Redemption Price, the number of shares issuable in exchange for or upon exercise of the Rights and the number of outstanding Rights will be subject to adjustment in accordance with the terms of the Rights Agreement to prevent dilution that may occur as a result of certain events, including, among others, a stock dividend, a stock split or a reclassification of our capital stock. No adjustments to the Purchase Price of less than 1% will be made.

*Amendments*

For so long as the Rights are redeemable, we may amend the Rights Agreement in any manner without the approval of any holders of Rights or of our Class A Common Stock or Class B Common Stock. After such time as the Rights are no longer redeemable, we may amend the Rights Agreement in any manner without the consent of any holders of Rights, except that no such amendment may (i) adversely affect the interests of the holders of Rights as such (other than an Acquiring Person, any Related Person of an Acquiring Person and certain of their transferees), (ii) cause the Rights Agreement again to become amendable other than in accordance with this sentence, or (iii) cause the Rights again to become redeemable.

*Term*

The Rights Agreement has a term of two years, expiring on June 17, 2022, subject to earlier termination upon redemption or exchange of the Rights or otherwise at the discretion our Board of Directors, or extension of the Rights Agreement by our Board of Directors in accordance with the terms of the Rights Agreement.

**Certain Anti-Takeover Effects**

The terms of our Class A Common Stock and Class B Common Stock will make the sale or transfer of control of our Company or the removal of our directors unlikely without the concurrence of the holders of our Class B Common Stock. In addition, the sale or transfer of control of our Company or the removal of our directors will be impossible without the consent of Alan B. Levan, John E. Abdo, Jarett S. Levan and Seth M. Wise so long as they own shares of our Class A Common Stock and Class B Common Stock representing a majority of our total voting power.

Our Amended and Restated Articles of Incorporation and Bylaws also contain other provisions that may discourage, delay or prevent a merger, acquisition or other change in control. These provisions include those which permit our Board of Directors to establish the number of directors and fill any vacancies and newly created directorships and specify advance notice procedures that must be complied with by shareholders in order to make shareholder proposals or nominate directors. The Rights Agreement may also have an anti-takeover effect as it will provide a deterrent to any person or group from acquiring 5% or more of our outstanding Class A Common Stock, Class B Common Stock or total combined common stock, although the Rights Agreement should not interfere with any merger or other business combination approved by our Board of Directors.

In addition, the authorized but unissued shares of our common stock and preferred stock are available for future issuance without shareholder approval, subject to any limitations imposed by applicable national securities exchange rules. These additional shares may be used for a variety of corporate finance transactions, acquisitions and employee benefit plans. The existence of authorized but unissued common stock and preferred stock (and our Board of Directors' authority to establish the rights, preferences and limitation of the preferred stock, as described above) could make more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise.

As a Florida corporation, we are also subject to the provisions of Florida law, including those limiting the voting rights of "control shares." Under Florida law, subject to certain exceptions, including mergers and acquisitions effected in accordance with Florida law, the holder of "control shares" of a Florida corporation that has (i) 100 or more shareholders, (ii) its principal place of business, its principal office or substantial assets in Florida and (iii) either more than 10% of its shareholders residing in Florida, more than 10% of its shares owned by Florida residents or 1,000 shareholders residing in Florida, will not have the right to vote those shares unless the acquisition of the shares was approved by a majority of each class of voting securities of the corporation, excluding those shares held by interested persons. "Control shares" are defined as shares acquired by a person, either directly or indirectly, that when added to all other shares of the issuing corporation owned by that person, would entitle that person to exercise, either directly or indirectly, voting power within any of the following ranges: (i) 20% or more but less than 33% of all voting power of the corporation's voting securities; (ii) 33% or more but less than a majority of all voting power of the corporation's voting securities; or (iii) a majority or more of all of the voting power of the corporation's voting securities.

**Exclusive Forum Provision**

Our Bylaws contain an exclusive forum provision which provides that, unless our Board of Directors consents to the selection of an alternative forum, the Circuit Court located in Broward County, Florida (or, if such Circuit Court does not have jurisdiction, another Circuit Court located within Florida or, if no Circuit Court located within Florida has jurisdiction, the federal district court for the Southern District of Florida) shall be the sole and exclusive forum for "Covered Proceedings," which include: (i) any derivative action or proceeding brought on our behalf; (ii) any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers or other employees to us or our shareholders; (iii) any action asserting a claim against us or any of our directors, officers or other employees arising pursuant to any provision of the Florida Business Corporation Act, or our Amended and Restated Articles of Incorporation or Bylaws (in each case, as may be amended or amended and restated from time to time); and (iv) any action asserting a claim against us or any of our directors, officers or other employees governed by the internal affairs doctrine of the State of Florida. To the extent within the categories set forth in the preceding sentence, Covered Proceedings include causes of action under the Exchange Act and the Securities Act. The exclusive forum provision will also provide that if any Covered Proceeding is filed in a court other than a court located within Florida in the name of any shareholder, then such shareholder shall be deemed to have consented to (a) the personal jurisdiction of the state and federal courts located within Florida in connection with any action brought in any such court to enforce the exclusive forum provision and (b) having service of process made upon such shareholder in any such enforcement action by service upon such shareholder's counsel in the action as agent for such shareholder. Notwithstanding the foregoing, shareholders cannot waive compliance with the federal securities laws and the rules and regulations thereunder.

The exclusive forum provision may limit a shareholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers or other employees or be cost-prohibitive to shareholders, which may discourage such lawsuits against us and our directors, officers and other employees. However, there is uncertainty regarding whether a court would enforce the exclusive forum provision. If a court were to find the exclusive forum provision to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could adversely affect our financial condition and operating results.

**Limitation on Liability and Indemnification of Directors and Officers**

Florida law generally provides that a director of a Florida corporation is not personally liable for monetary damages to the corporation or any other person for any statement, vote, decision or failure to act regarding corporate management or policy, unless the director breached or failed to perform his or her duties as a director and the director's breach of or failure to perform those duties constitutes (i) a violation of criminal law, unless the director had reasonable cause to believe his conduct was lawful or had no reasonable cause to believe his conduct was unlawful, (ii) a transaction from which the director derived an improper personal benefit, either directly or indirectly, (iii) an unlawful distribution, (iv) in a proceeding by or in the right of the corporation or in the right of a shareholder, conscious disregard for the best interest of the corporation or willful misconduct, or (v) in a proceeding by or in the right of someone other than the corporation or a shareholder, recklessness or an act or omission which was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety or property.

In addition, Florida law provides that a Florida corporation has the power to (i) indemnify any person who was or is a party to any proceeding (other than an action by, or in the right of, the corporation), because he or she was a director, officer, employee or agent of the corporation or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against liability incurred in connection with such proceeding, including any appeal thereof, if he or she acted in good faith and in a manner he or she reasonably believed to be in, or not opposed to, the best interests of the corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful, and (ii) indemnify any person who was or is a party to any proceeding by or in the right of the corporation to procure a judgment in its favor because that person is or was a director, officer, employee or agent of the corporation or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses and amounts paid in settlement not exceeding, in the judgment of the board of directors of the corporation, the estimated expense of litigating the proceeding to conclusion, actually and reasonably incurred in connection with the defense or settlement of such proceeding, including any appeal thereof. Indemnification under clause (ii) of the preceding sentence is authorized if such person acted in good faith and in a manner he or she reasonably believed to be in, or not opposed to, the best interests of the corporation, except that no indemnification with regard to a proceeding by or in the right of the corporation is to be made in respect of any claim, issue or matter as to which such person has been found liable unless, and only to the extent that, the court in which the proceeding was brought, or any other court of competent jurisdiction, determines upon application that, despite the adjudication of liability but in view of all circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

Further, under Florida law, to the extent that a director, officer, employee or agent of a Florida corporation has been successful on the merits or otherwise in defense of any proceeding referred to in the preceding paragraph, or in defense of any claim, issue or matter therein, he or she shall be indemnified against expenses actually and reasonably incurred by him or her in connection therewith.

Our Amended and Restated Articles of Incorporation and Bylaws contain indemnification provisions substantially similar to the above-described provisions of Florida law. In addition, we carry insurance permitted by Florida for our directors, officers, employees and agents which covers alleged or actual error or omission, misstatement, misleading misstatement, neglect or breach of fiduciary duty while acting in such capacities on our behalf, which acts may include liabilities under the Securities Act.

Exhibit 10.105

## NINTH COMMITMENT AMENDMENT TO
## LOAN SALE AND SERVICING AGREEMENT

**THIS NINTH COMMITMENT AMENDMENT TO LOAN SALE AND SERVICING AGREEMENT** (this "**Ninth Amendment**"), dated as of March 16, 2020, is entered into by and among BRFC-Q 2010 LLC, a Delaware limited liability company, as seller (the "**Seller**"), Quorum Federal Credit Union, a federally chartered credit union, as buyer (the "**Buyer**"), Vacation Trust, Inc., a Florida Corporation, as Club Trustee (the "**Club Trustee**"), U.S. Bank National Association, a national banking association, as custodian and paying agent (the "**Custodian**"), Bluegreen Vacations Corporation, a Florida corporation, as servicer (the "**Servicer**"), and Concord Servicing Corporation, an Arizona corporation, as backup servicer (the "**Backup Servicer**").

## RECITALS

**WHEREAS**, the Buyer, the Seller, the Servicer and the Backup Servicer have previously entered into that certain Loan Sale and Servicing Agreement, dated as of December 22, 2010, as amended by that certain Omnibus Amendment, dated as of May 3, 2011, that certain Omnibus Amendment No. 2, dated as of June 30, 2015, and that certain Omnibus Amendment No. 3, dated as of June 30, 2016, and as further amended by that certain First Commitment Amendment, dated as of March 1, 2012, that Second Commitment Amendment, dated as of January 31, 2013 that Third Commitment Amendment dated as of April 1, 2014, that Fourth Commitment Amendment, dated as of November 1, 2014, that Fifth Commitment Amendment, dated as of December 23, 2014, that Sixth Commitment Amendment, dated as of July 1, 2015, that Seventh Commitment Amendment, dated as of September 1, 2016, that First General Amendment, dated as of April 1, 2014, and that and that certain Eighth Commitment Amendment dated as of April 6, 2018 (as may be amended, supplemented or restated from time to time, the "Loan Sale and Servicing Agreement").

**WHEREAS**, Standard Definitions are attached to the Loan Sale and Servicing Agreement at Annex A (the "Standard Definitions").

**WHEREAS**, the parties hereto desire to modify the Loan Sale and Servicing Agreement as set forth in this Eighth Amendment.

**WHEREAS**, capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Sale and Servicing Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      Amendment of Standard Definitions.

(a)      The following definitions shall replace the corresponding definition in the Standard Definitions:

"Commitment Period" shall mean the period commencing on January 1, 2020 and continuing until December 31, 2020.

"Commitment Purchase Period" shall mean the period referenced in the Commitment Purchase Period Terms Letter.

2.      Choice of Law and Venue.  This Ninth Amendment shall be construed in accordance with the internal laws of the State of New York.

3.      Binding Effect.  This Ninth Amendment shall inure to the benefit of and be binding upon the parties to this Eighth Amendment and their successors and assigns.

4.      Counterpart Execution. This Ninth Amendment may be executed in counterpart, and any number of copies of this Ninth Amendment which in the aggregate have been executed by all parties to this Eighth Amendment shall constitute one original.

5.      Time is of the Essence. Time is of the essence in the performance of the obligations in this Ninth Amendment.

6.      No Third-Party Beneficiary. No third party shall be a beneficiary hereof.

[Signatures on Following Page]

---

BRFC 9th Commitment Amendment                                                                                    2

IN WITNESS WHEREOF, the parties hereto have executed this Ninth Amendment as of the date set forth above.

THE BUYER:                 QUORUM FEDERAL CREDIT UNION

By: /s/ Bruno Sementilli
Bruno Sementilli,
President and CEO

THE SELLER:              BRFC-Q 2010 LLC

By: /s/ Paul Humphrey
Paul Humphrey
President

THE SERVICER:          BLUEGREEN VACATIONS CORPORATION

By: /s/ Paul Humphrey
Paul Humphrey
Senior Vice President Finance, Capital
Markets, and Mortgage Operations

THE BACKUP SERVICER:     CONCORD SERVICING CORPORATION

By: /s/ Sonja M. Yurkiw
Sonja M. Yurkiw, Esq.
COO & General Counsel

THE CUSTODIAN:        U.S. BANK NATIONAL ASSOCIATION, not
in its individual capacity but solely as
Custodian and Paying Agent hereunder

By: /s/ Eric M. Ott
Eric M. Ott
Vice President

THE CLUB TRUSTEE:      VACATION TRUST, INC.,
as Club Trustee

By: /s/ Douglas S. Carr
Douglas S. Carr
Vice President

D - 0055-0166

Exhibit 10.106

## The NINTH COMMITMENT AMENDMENT TO
## LOAN SALE AND SERVICING AGREEMENT

**T H I S  NINTH  COMMITMENT AMENDMENT TO  LOAN  SALE AND SERVICING AGREEMENT** (this "**Ninth Amendment**"), dated as of March 17, 2020, is entered into by and among BBCV Receivables-Q 2010 LLC, a Delaware limited liability company, as seller (the "**Seller**"), Quorum Federal Credit Union, a federally chartered credit union, as buyer (the "**Buyer**"), Vacation Trust, Inc., a Florida Corporation, as Club Trustee (the "**Club Trustee**"), U.S. Bank National Association, a national banking association, as custodian and paying agent (the "**Custodian**"), Bluegreen Vacations Corporation, a Florida corporation, as servicer (the "**Servicer**"), and Concord Servicing Corporation, an Arizona corporation, as backup servicer (the "**Backup Servicer**").

### RECITALS

**WHEREAS**, the Buyer, the Seller, the Servicer, and the Backup Servicer have previously entered into that certain Loan Sale and Servicing Agreement, dated as of December 22, 2010, as amended by that certain Omnibus Amendment, dated as of May 3, 2011, that certain Omnibus Amendment No. 2, dated as of February 7, 2012, that certain First Commitment Amendment, dated as of March 1, 2012, that certain Second Commitment Amendment, dated as of January 31, 2013, that certain Third Commitment Amendment dated as of April 1, 2014, that certain First General Amendment, dated as of April 1, 2014, that certain Fourth Commitment Amendment, dated as of November 1, 2014, that certain Fifth Commitment Amendment, dated as of December 23, 2014, that certain Omnibus Amendment No. 3, dated as of June 30, 2015, that certain Sixth Commitment Amendment, dated as of July 1, 2015, that certain Seventh Commitment Amendment, dated September 1, 2016, that certain Omnibus Amendment No. 4, dated as of June 30, 2016, that certain Omnibus Amendment No. 5, dated as of January 24, 2018, and that certain Eighth Commitment Amendment dated as of April 6, 2018 (as may be amended, supplemented or restated from time to time, the "**Loan Sale and Servicing Agreement**").

**WHEREAS**, Standard Definitions are attached to the Loan Sale and Servicing Agreement at Annex A (the "**Standard Definitions**").

**WHEREAS**, the parties hereto desire to modify the Loan Sale and Servicing Agreement as set forth in this Ninth Amendment.

**WHEREAS**, capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Sale and Servicing Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1

1. **Amendment of Standard Definitions**.

(a)    The following definitions shall replace the corresponding definition in the Standard Definitions:

"Commitment Period" shall mean the period commencing on January 1, 2020 and continuing until December 31, 2020.

"Commitment Purchase Period" shall mean the period referenced in the Commitment Purchase Period Terms Letter.

"Distribution Date" shall mean, commencing in the month of February 2020, the second to last Business Day of each calendar month following the end of the preceding Due Period.

"Fifth Aggregate Sale Date Loan Pool" shall mean, on any date of determination, all Timeshare Loans sold to the Buyer on each Sale Date occurring between January 1, 2018 and December 31, 2018.

"Reacquisition Date" shall mean, with respect to the reacquisition of the Second Aggregate Sale Date Loan Pool, the Third Aggregate Sale Date Loan Pool, the Fourth Aggregate Sale Date Loan Pool, the Fifth Aggregate Sale Date Loan Pool, or the Sixth Aggregate Sale Date Loan Pool on or after the Second Optional Reacquisition Date, the Third Optional Reacquisition Date, the Fourth Optional Reacquisition Date, the Fifth Optional Reacquisition Date, or the Sixth Optional Reacquisition Date, respectively, the date fixed pursuant to Section 11.3 of this Agreement.

"Reacquisition Price" shall mean, with respect to the Second Aggregate Sale Date Loan Pool, the Third Aggregate Sale Date Loan Pool, the Fourth Aggregate Sale Date Loan Pool, the Fifth Aggregate Sale Date Loan Pool, or the Sixth Aggregate Sale Date Loan Pool, the sum of the Net Investment Amounts of all Sale Date Loan Pools comprising the Second Aggregate Sale Date Loan Pool, the Third Aggregate Sale Date Loan Pool, the Fourth Aggregate Sale Date Loan Pool, the Fifth Aggregate Sale Date Loan Pool or the Sixth Aggregate Sale Date Loan Pool respectively, together with the Program Fee accrued and unpaid thereon at the applicable Program Fee Rate up to and including the Reacquisition Date.

(b)    The following definitions shall be added to the Standard Definitions:

"Sixth Aggregate Sale Date Loan Pool" shall mean, on any date of determination, all Timeshare Loans sold to the Buyer on each Sale Date occurring between June 1, 2019 and December 31, 2019.

"Sixth Optional Reacquisition Date" shall mean the first date on which the then current aggregate Net Investment Amounts in respect of all Timeshare Loans in the Sixth Aggregate Sale Date Loan Pool is less than or equal to fifteen percent (15%) of all of the original aggregate Net Investment Amounts in respect of all of the Timeshare Loans sold in each Sale Date Loan Pool corresponding to the Sixth Aggregate Sale Date Loan Pool on the related Sale Date.

---

2. Section 7.5(a) of the Loan Sale and Servicing Agreement is hereby deleted in its entirety and replaced with the following:

(a) <u>Monthly Servicer Report</u>. Not later than two (2) Business Days prior to the Distribution Date, the Servicer shall deliver to the Seller, the Buyer, and the Backup Servicer, a report (the **"Monthly Servicer Report"**) substantially in the form of <u>Exhibit G</u> hereto, detailing certain activity relating to the Timeshare' Loans. The Monthly Servicer Report shall be completed with the information specified therein for the related Due Period and shall contain such other information as may be reasonably requested by the Seller, the Buyer or the Backup Servicer in writing at least five (5) Business Days prior to such Determination Date. Each such Monthly Servicer Report shall be accompanied by an Officer's Certificate of the Servicer in the form of <u>Exhibit H</u> hereto, certifying the accuracy of the computations reflected in such Monthly Servicer Report.

3. Section 11.1 of the Loan Sale and Servicing Agreement is hereby deleted in its entirety and replaced with the following:

SECTION 11.1. <u>Clean-up Call; Optional Reacquisition; Election to Reacquire</u>.

The initial Servicer shall have the option to reacquire not less than all of the Timeshare Loans in the Second Aggregate Sale Date Loan Pool, the Third Aggregate Sale Date Loan Pool, the Fourth Aggregate Sale Date Loan Pool,  the Fifth Aggregate Sale Date Loan Pool or the Sixth Aggregate Sale Date Loan Pool any date after the Second Optional Reacquisition Date, the Third Optional Reacquisition Date, the Fourth Optional Reacquisition Date, the Fifth Optional Reacquisition Date or the Sixth Optional Reacquisition Date respectively, by payment of an amount equal to the Reacquisition Price (unless amounts in the Trust Accounts are sufficient to make such payments).

4. Section 11.2 of the Loan Sale and Servicing Agreement is hereby deleted in its entirety and replaced with the following:

SECTION 11.2. <u>Notice to Buyer</u>.

The Servicer shall give written notice of its intention to reacquire the Second Aggregate Sale Date Loan Pool, the Third Aggregate Sale Date Loan Pool, the Fourth Aggregate Sale Date Loan Pool, the Fifth Aggregate Sale Date Loan Pool, or the Sixth Aggregate Sale Date Loan Pool, as applicable, to the Buyer at least fifteen (15) days prior to the Reacquisition Date (unless a shorter period shall be satisfactory to the Buyer).

5. Section 11.3 of the Loan Sale and Servicing Agreement is hereby deleted in its entirety and replaced with the following:

SECTION 11.3. <u>Notice of Reacquisition by the Servicer</u>.

Notices of reacquisition shall be given by electronic transmission and by first class mail, postage prepaid, mailed not less than fifteen (15) days prior to the Reacquisition Date, to the Buyer. All notices of reacquisition shall state (a) the Reacquisition Date, (b) the Reacquisition Price, (c) that the Timeshare Loans comprising the Second Aggregate Sale Date Loan Pool, the Third Aggregate Sale Date Loan Pool, the Fourth Aggregate Sale Date Loan Pool, the Fifth Aggregate Sale Date Loan Pool, or the Sixth Aggregate Sale Date Loan Pool is being reacquired, and (d) that on the Reacquisition Date, the Reacquisition Price shall become due and payable in respect of the reacquisition of the Second Aggregate Sale Date Loan Pool,  the Third Aggregate Sale Date Loan Pool, the Fourth Aggregate Sale Date Loan Pool, the Fifth Aggregate Sale Date Loan Pool, or the Sixth Aggregate Sale Date Loan Pool, as applicable, and that the Program Fee shall cease to accrue if payment is made on the Reacquisition Date.

6. Section 11.5 of the Loan Sale and Servicing Agreement is hereby deleted in its entirety and replaced with the following:

SECTION 11.5. <u>Timeshare Loans on Reacquisition Date</u>.

Notice of reacquisition having been given as provided in Section 11.2 hereof and deposit of the Reacquisition Price with the Buyer having been made as provided in Section 11.4 hereof, the Second Aggregate Sale Date Loan Pool, the Third Aggregate Sale Date Loan Pool, the Fourth Aggregate Sale Date Loan Pool, the Fifth Aggregate Sale Date Loan Pool or the Sixth Aggregate Sale Date Loan Pool being reacquired shall on the Reacquisition Date, become due and payable at the Reacquisition Price, and, on such Reacquisition Date, the Second Aggregate Sale Date Loan Pool, the Third Aggregate Sale Date Loan Pool, the Fourth Aggregate Sale Date Loan Pool,  the Fifth Aggregate Sale Date Loan Pool, or the Sixth Aggregate Sale Date Loan Pool, as applicable, shall cease to accrue the Program Fee. The Buyer shall apply all available funds in the Trust Accounts and the Buyer shall be paid any remaining portion of the Reacquisition Price by the Servicer upon transfer of the Second Aggregate Sale Date Loan Pool, the Third Aggregate Sale Date Loan Pool, the Fourth Aggregate Sale Date Loan Pool, the Fifth Aggregate Sale Date Loan Pool, or the Sixth Aggregate Sale Date Loan Pool being purchased by the Servicer or its designee. If the Servicer shall have failed to deposit the Reacquisition Price with the Buyer, the principal and the Program Fee with respect to the Second Aggregate Sale Date Loan Pool, the Third Aggregate Sale Date Loan Pool, the Fourth Aggregate Sale Date Loan Pool, the Fifth Aggregate Sale Date Loan Pool, or the Sixth Aggregate Sale Date Loan Pool, as applicable, shall, until paid, continue to accrue at the applicable Program Fee Rate. The Servicer's failure to deposit the Reacquisition Price shall not constitute a Purchase Termination Event hereunder.

7. **<u>Choice of Law and Venue</u>**. This Ninth Amendment shall be construed in accordance with the internal laws of the State of New York.

8. **<u>Binding Effect</u>**. This Ninth Amendment shall inure to the benefit of and be binding upon the parties to this Ninth Amendment and their successors and assigns.

D - 0055-0170

9. **<u>Counterpart Execution</u>**. This Ninth Amendment may be executed in counterpart, and any number of copies of this Ninth Amendment which in the aggregate have been executed by all parties to this Ninth Amendment shall constitute one original.

10. **<u>Time is of the Essence</u>**. Time is of the essence in the performance of the obligations in this Ninth Amendment.

11. **<u>No Third-Party Beneficiary</u>**. No third party shall be a beneficiary hereof.

[Signatures Appear on Next Page]

---

BBCV 9th Commitment
Amendment                                                                                    5

**IN WITNESS WHEREOF,** the parties hereto have executed this Ninth Amendment as of the date set forth above.

THE BUYER:                          QUORUM FEDERAL CREDIT UNION

                                    By:        /s/ Bruno Sementilli
                                        Bruno Sementilli,
                                        President and CEO


THE SELLER:                         BBCV Receivables-Q 2010 LLC

                                    By:        /s/ Paul Humphrey
                                        Paul Humphrey
                                        President


THE SERVICER:                       BLUEGREEN VACATIONS
                                    CORPORATION

                                    By:        /s/ Paul Haumphrey
                                        Paul Humphrey
                                        Senior Vice President Finance, Capital
                                        Markets, and Mortgage Operations


THE BACKUP SERVICER:                CONCORD SERVICING CORPORATION
                                    By:        /s/ Sonja M. Yurkiw
                                        Sonja M. Yurkiw, Esq.
                                        COO & General Counsel


THE CUSTODIAN:                      U.S. BANK NATIONAL ASSOCIATION,
                                    not in its individual capacity but solely as
                                    Custodian and Paying Agent hereunder

                                    By:        /s/ Eric M. Ott
                                        Eric M. Ott
                                        Vice President


THE CLUB TRUSTEE:                   VACATION TRUST, INC.,
                                    as Club Trustee

                                    By:        /s/ Douglas S. Carr
                                        Douglas S. Carr
                                        Vice President

---

Exhibit 10.107

## TENTH COMMITMENT AMENDMENT TO
## LOAN SALE AND SERVICING AGREEMENT

**T H I S TENTH COMMITMENT AMENDMENT TO LOAN SALE AND SERVICING AGREEMENT** (this "**Tenth Amendment**"), dated as of December 18, 2020, is entered into by and among BBCV Receivables-Q 2010 LLC, a Delaware limited liability company, as seller (the "**Seller**"), Quorum Federal Credit Union, a federally chartered credit union, as buyer (the "**Buyer**"), Vacation Trust, Inc., a Florida Corporation, as Club Trustee (the "**Club Trustee**"), U.S. Bank National Association, a national banking association, as custodian and paying agent (the "**Custodian**"), Bluegreen Vacations Corporation, a Florida corporation, as servicer (the "**Servicer**"), and Concord Servicing Corporation, an Arizona corporation, as backup servicer (the "**Backup Servicer**").

## RECITALS

**WHEREAS**, the Buyer, the Seller, the Servicer, and the Backup Servicer have previously entered into that certain Loan Sale and Servicing Agreement, dated as of December 22, 2010, as amended by that certain Omnibus Amendment, dated as of May 3, 2011, that certain Omnibus Amendment No. 2, dated as of February 7, 2012, that certain First Commitment Amendment, dated as of March 1, 2012, that certain Second Commitment Amendment, dated as of January 31, 2013, that certain Third Commitment Amendment dated as of April 1, 2014, that certain First General Amendment, dated as of April 1, 2014, that certain Fourth Commitment Amendment, dated as of November 1, 2014, that certain Fifth Commitment Amendment, dated as of December 23, 2014, that certain Omnibus Amendment No. 3, dated as of June 30, 2015, that certain Sixth Commitment Amendment, dated as of July 1, 2015, that certain Seventh Commitment Amendment, dated September 1, 2016, that certain Omnibus Amendment No. 4, dated as of June 30, 2016, that certain Omnibus Amendment No. 5, dated as of January 24, 2018, that certain Eighth Commitment Amendment dated as of April 6, 2018, and that certain Ninth Commitment Amendment dated as of March 17, 2018 (as may be amended, supplemented or restated from time to time, the "**Loan Sale and Servicing Agreement**").

**WHEREAS**, Standard Definitions are attached to the Loan Sale and Servicing Agreement at Annex A (the "**Standard Definitions**").

**WHEREAS**, the parties hereto desire to modify the Loan Sale and Servicing Agreement as set forth in this Tenth Amendment.

**WHEREAS**, capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Sale and Servicing Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1. **Amendment of Standard Definitions**. The following definitions shall replace the corresponding definition in the Standard Definitions:

1

D - 0055-0173

[Type here]

"Commitment Period" shall mean the period commencing on January 1, 2021 and continuing until December 31, 2022.

2. **Choice of Law and Venue**. This Tenth Amendment shall be construed in accordance with the internal laws of the State of New York.

3. **Binding Effect**. This Tenth Amendment shall inure to the benefit of and be binding upon the parties to this Tenth Amendment and their successors and assigns.

4. **Counterpart Execution**. This Tenth Amendment may be executed in counterpart, and any number of copies of this Tenth Amendment which in the aggregate have been executed by all parties to this Tenth Amendment shall constitute one original.

5. **Time is of the Essence**. Time is of the essence in the performance of the obligations in this Tenth Amendment.

6. **No Third-Party Beneficiary**. No third party shall be a beneficiary hereof.

[Signatures Appear on Next Page]

**IN WITNESS WHEREOF,** the parties hereto have executed this Tenth Amendment as of the date set forth above.

THE BUYER:                          QUORUM FEDERAL CREDIT UNION

                                    By:        /s/ Bruno Sementilli
                                     Bruno Sementilli,
                                     Chief Executive Officer


THE SELLER:                         BBCV Receivables-Q 2010 LLC

                                    By:        /s/ Paul Humphrey
                                     Paul Humphrey
                                     President


THE SERVICER:                       BLUEGREEN VACATIONS
                                    CORPORATION

                                    By:        /s/ Paul Humphrey
                                     Paul Humphrey
                                     Senior Vice President Finance, Capital
                                     Markets, and Mortgage Operations


THE BACKUP SERVICER:                CONCORD SERVICING CORPORATION

                                    By:        /s/ Sonja M. Yurkiw
                                     Sonja M. Yurkiw, Esq.
                                     Vice President & General Counsel


THE CUSTODIAN:                      U.S. BANK NATIONAL ASSOCIATION,
                                    not in its individual capacity but solely as
                                    Custodian and Paying Agent hereunder

                                    By:        /s/ Timothy Matyi
                                     Timothy Matyi
                                     Vice President


THE CLUB TRUSTEE:                   VACATION TRUST, INC.,
                                    as Club Trustee

                                    By:        /s/ Constance G. Dodd
                                     Constance G. Dodd
                                     President, Treasurer and Secretary

D - 0055-0175

Exhibit 10.108

**FOURTH AMENDMENT TO AMENDED AND RESTATED
LOAN AND SECURITY AGREEMENT**

This **FOURTH AMENDMENT TO AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT** (this "**Amendment**"), dated as of October 19, 2017 ("**Amendment Date**"), by and among **BLUEGREEN VACATIONS CORPORATION**, a Florida corporation f/k/a Bluegreen Corporation ("**Borrower**"), each of the financial institutions from time to time party hereto (individually, each a "**Lender**", and collectively, the "**Lenders**") and **PACIFIC WESTERN BANK**, a California state-chartered bank, as successor-by-merger to CapitalSource Bank, as administrative, payment and collateral agent for itself, as a Lender and the other Lenders (in such capacities, "**Agent**").

<u>RECITALS</u>

WHEREAS, Borrower, Lenders and Agent are parties to, among other Loan Documents, that certain Amended and Restated Loan and Security Agreement, dated as of July 10, 2013, as amended by that certain First Amendment to Amended and Restated Loan and Security Agreement, dated as of December 6, 2013, as further amended by that certain Second Amendment to Amended and Restated Loan and Security Agreement, dated as of June 25, 2015, as further amended by that certain Third Amendment to Amended and Restated Loan and Security Agreement, dated as of October 24, 2016 (as amended, restated, supplemented or otherwise modified in writing from time to time, the "<u>Loan Agreement</u>"); and

WHEREAS, Borrower, Lenders and Agent desire to amend the Loan Agreement as set forth herein.

<u>AGREEMENT</u>

NOW, THEREFORE, in consideration of the premises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

**ARTICLE I.**
**Definitions**

Capitalized terms used in this Amendment are defined in the Loan Agreement unless otherwise stated.

**ARTICLE II.**
**Amendments to Loan Agreement and Side Letter**

**2.1 <u>Amendment to Section 1.1 of the Loan Agreement</u>**. Effective as of the date hereof, <u>Section 1.1</u> of the Loan Agreement is hereby amended by amending the chart set forth in the definition of "Calculated Rate" in its entirety as follows:

<u>Bluegreen – Fourth Amendment</u>

| 2 | Applicable Portion of the Outstanding Unpaid Principal Balance of the Loan | Calculated Rate |
|---|---|---|

| Applicable Time Period | | |
|---|---|---|
| From October 19, 2017 and thereafter | Equal to or less than the sum of $10,000,000 <u>less</u> the then outstanding principal balance of the Inventory Loan | 4.50% |
| From October 19, 2017 and thereafter | Greater than the sum of $10,000,000 <u>less</u> the then outstanding principal balance of the Inventory Loan, but less than or equal to the sum of $19,000,000 <u>less</u> the then outstanding principal balance of the Inventory Loan | 4.00% |
| From October 19, 2017 and thereafter | Greater than the sum of $19,000,000 <u>less</u> the then outstanding principal balance of the Inventory Loan | 3.50% |

3

Notwithstanding the foregoing, in the event Lenders agree to extend the Revolving Credit Period Expiration Date as set forth in the definition of "Revolving Credit Period Expiration Date" hereunder, the "Calculated Rate" shall be equal to (i) for that portion of the outstanding unpaid principal balance of the Loan that is less than the sum of $19,000,000 <u>less</u> the then outstanding principal balance of the Inventory Loan, four percent (4.0%) per annum from September 20, 2018 and thereafter or (ii) for that portion of the outstanding unpaid principal balance of the Loan that is greater than the sum of $19,000,000 <u>less</u> the then outstanding principal balance of the Inventory Loan, three and one-half percent (3.5%) per annum from September 20, 2018 and thereafter."

**2.2  Amendment to Section 1.1 of the Loan Agreement**.  Effective as of the date hereof, <u>Section 1.1</u> of the Loan Agreement is hereby amended by adding the definition of "Force Majeure Receivable" in the correct alphabetical order as follows:

"'<u>Force Majeure Receivable</u>' shall mean a Receivable for which a natural disaster or act of terror has had a direct impact on the ability of the related Obligor to make payments due to disruption of employment or to place of residence,  as reasonably determined by the Servicer in accordance with the servicing standard,  and for which the Servicer has determined, in accordance with the servicing standard, to defer loan payments for a specified grace period of not more than two (2) months. A Receivable shall no longer be deemed a Force Majeure Receivable if the Obligor has made two consecutive timely payments following the implementation of the loan payment deferral described above."

**2.3  Amendment to Section 6.25 of the Loan Agreement**.  Effective as of the date hereof, clause (a) of <u>Section 6.25</u> of the Loan Agreement is hereby amended to (i) remove the word "and" from clause (viii) thereto, (ii) replace the period with "; and" in clause (ix) thereto and (iii) add a new clause (x) to the end thereto as follows:

"(x) no more than five percent (5%) (as determined on the basis of the aggregate Receivable Balances of such Receivables) of the Financed Pool of Eligible Receivables shall be Force Majeure Receivables."

**2.4  Amendment to Section 7.13 of the Loan Agreement**.  Effective as of the date hereof, <u>Section 7.13</u> of the Loan Agreement is hereby amended and restated in its entirety as follows:

"**7.13     Tangible Net Worth**

Borrower shall not permit its Tangible Net Worth (as measured on the last day of each fiscal year end of Borrower) to be less than Two Hundred Five Million and No/100 Dollars ($205,000,000) for any fiscal year ending during the term of the Loan."

**2.5  Amendment to Section 7.14 of the Loan Agreement**.  Effective as of the date hereof, <u>Section 7.14</u> of the Loan Agreement is hereby amended and restated in its entirety as follows:

4

"7.14       Maximum Leverage Ratio

Borrower shall not permit its Leverage Ratio to be more than 3.50 to 1.00 as measured on the last day of each fiscal year end of Borrower."

**2.6  Amendment to Exhibit D of the Loan Agreement**. Effective as of the date hereof, Exhibit D of the Loan Agreement is hereby amended and restated in the form of Exhibit D attached to this amendment.

**2.7  Amendment to Schedule 1.1 of the Loan Agreement**. Effective as of the date hereof, Schedule 1.1 of the Loan Agreement is hereby amended and restated in the form of Schedule 1.1 attached to this amendment.

**2.8  Amendment to Schedule 1.2 of the Loan Agreement**. Effective as of the date hereof, Schedule 1.2 of the Loan Agreement is hereby amended and restated in the form of Schedule 1.2 attached to this amendment.

**2.9  Amendment to Schedule 5.15 of the Loan Agreement**. Effective as of the date hereof, Schedule 5.15 of the Loan Agreement is hereby amended and restated in the form of Schedule 5.15 attached to this amendment.

**2.10  Amendment to Schedule 5.30 of the Loan Agreement**. Effective as of the date hereof, Schedule 5.30 of the Loan Agreement is hereby amended and restated in the form of Schedule 5.30 attached to this amendment.

**2.11  Amendment to Specified Receivables Side Letter**.  Effective as of the date hereof, the first sentence of the second paragraph of that certain letter agreement, dated as of December 1, 2016, by and between Agent and Borrower (the "**Specified Receivables Side Letter**") is hereby amended to add the phrase "(which such schedule may be updated from time to time in the sole and absolute discretion of Agent)" immediately after the word "hereto" therein.

**2.12  Amendment to Specified Receivables Side Letter**. Effective as of the date hereof, clauses (c), (d) and (e) of the Specified Receivables Side Letter are hereby amended and restated in their entirety as follows:

"(c)     For the period beginning October 19, 2017 and ending June 30, 2018,  Borrower shall at all such times ensure that no more than twenty-five percent (25%) of the unpaid principal balance of the Loan and the Inventory Loan, as measured in the aggregate, shall be composed of Advances secured by Specified Receivables;

(d)     For the period beginning July 1, 2018 and ending September 30, 2018,  Borrower shall at all such times ensure that no more than twenty percent (20%) of the unpaid principal balance of the Loan and the Inventory Loan, as measured in the aggregate, shall be composed of Advances secured by Specified Receivables;

5

(e)      For the period beginning October 1, 2018 and thereafter, Borrower shall at all such times ensure that no more than fifteen percent (15%) of the unpaid principal balance of the Loan and the Inventory Loan, as measured in the aggregate, shall be composed of Advances secured by Specified Receivables; and"

## ARTICLE III.
### Conditions Precedent

The effectiveness of this Amendment is subject to the satisfaction of the following conditions precedent in a manner satisfactory to Agent, unless specifically waived in writing by Agent:

**3.1** Agent shall have received each of the following, each in form and substance satisfactory to Agent, in its sole discretion, and, where applicable, each duly executed by each party thereto:

(a) This Amendment duly executed by Borrower;

(b) The Third Amended and Restated Secured Promissory Note in the original principal amount of $2,722,750.00, duly executed by Borrower (the "**Third A&R Note**");

(c) Each of the other documents required to be delivered in connection with the Third A&R Note, together with any endorsements to existing title insurance policies required by Agent, duly executed by each of the parties thereto; and

(d) All other documents Agent may reasonably request prior to or as of the date of this Amendment with respect to any matter relevant to this Amendment or the transactions contemplated hereby.

**3.2 Representations and Warranties.** The representations and warranties contained herein, in the Loan Agreement and in the other Loan Documents, as each is amended hereby, and in the Inventory Loan Documentation, shall be true and correct as of the date hereof, as if made on the date hereof, except for such representations and warranties as are by their express terms limited to a specific date.

**3.3 Defaults.** No Potential Default or Event of Default shall have occurred and be continuing, unless such Potential Default or Event of Default has been otherwise specifically waived in writing by Agent. No Default or Event of Default (as such terms are defined in the Inventory Loan Promissory Note) shall have occurred and be continuing, unless such Default or Event of Default has been otherwise specifically waived in writing by Inventory Loan Lender.

**3.4 Corporate Proceedings and other Matters.** All corporate proceedings taken in connection with the transactions contemplated by this Amendment and all documents, instruments and other legal matters incident thereto shall be satisfactory to Agent.

## ARTICLE IV.

6

**No Consent or Waiver**

Nothing contained herein shall be construed as a consent or waiver by Agent or any Lender of any covenant or provision of the Loan Agreement, the other Loan Documents, this Amendment or any other contract or instrument among Borrower, Agent or any Lender, and the failure of Agent or any Lender at any time or times hereafter to require strict performance by Borrower of any provision thereof shall not waive, affect or diminish any right of Agent or any Lender to thereafter demand strict compliance therewith.

**ARTICLE V.**
**Ratifications, Representations and Warranties**

**5.1** **Ratifications.** The terms and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions set forth in the Loan Agreement and the other Loan Documents, and, except as expressly modified and superseded by this Amendment, the terms and provisions of the Loan Agreement and the other Loan Documents are ratified and confirmed and shall continue in full force and effect. Borrower, Agent and Lenders agree that the Loan Agreement and the other Loan Documents, all as amended hereby, shall continue to be legal, valid, binding and enforceable in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, liquidation, dissolution, moratorium and other similar applicable laws affecting the enforceability of creditors' rights generally applicable in the event of bankruptcy, insolvency, reorganization, liquidation, or dissolution, and to general principles of equity, regardless of whether such enforceability shall be considered in a proceeding in equity or at law. Borrower agrees that this Amendment is not intended to and shall not cause a novation with respect to any or all of the obligations under the Loan Agreement. Borrower agrees that the Payment Guaranty (the "**Guaranty**"), dated as of November 19, 2012, executed by Borrower in favor of Agent (as successor-by-merger to CapitalSource Bank) is hereby ratified and confirmed and shall continue in full force and effect. Borrower agrees that the Guaranty shall continue to be legal, valid, binding and enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, liquidation, dissolution, moratorium and other similar applicable laws affecting the enforceability of creditors' rights generally applicable in the event of bankruptcy, insolvency, reorganization, liquidation, or dissolution, and to general principles of equity, regardless of whether such enforceability shall be considered in a proceeding in equity or at law.

**5.2** **Representations and Warranties.** Borrower hereby represents and warrants to Agent and each Lender that (a) the execution, delivery and performance of this Amendment and any and all other Loan Documents executed and/or delivered in connection herewith have been authorized by all requisite action (as applicable) on the part of Borrower and will not violate the articles (or certificate) of incorporation or bylaws of Borrower; (b) Borrower's board of directors has authorized the execution, delivery and performance of this Amendment and any and all other Loan Documents executed and/or delivered in connection herewith; (c) the representations and warranties contained in the Loan Agreement and any other Loan Document, all as amended hereby, are true and correct on and as of the date hereof and on and as of the date of execution hereof as though made on and as of each such date, except for such representations and warranties as are by their express terms limited to a specific date; (d) no Potential Default or Event of Default under the Loan Agreement, as amended hereby, has occurred and is continuing,

7

unless such Potential Default or Event of Default has been specifically waived in writing by Agent; (e) Borrower is in full compliance with all covenants and agreements contained in the Loan Agreement and the other Loan Documents, all as amended hereby; and (f) except as disclosed to Agent, Borrower has not amended its articles (or certificate) of incorporation or bylaws or similar organizational documents since the date of the Loan Agreement.

## ARTICLE VI.
## Miscellaneous Provisions

**6.1 Survival of Representations and Warranties.** All representations and warranties of the Borrower made in the Loan Agreement or any other Loan Document, including, without limitation, any document furnished in connection with this Amendment, shall survive the execution and delivery of this Amendment and the other Loan Documents to the same extent provided in any applicable Loan Documents, and no investigation by Agent or any Lender or any closing shall affect the representations and warranties or the right of Agent or any Lender to rely upon them.

**6.2 Reference to Loan Agreement.** Each of the Loan Agreement and the other Loan Documents, and any and all other Loan Documents, documents or instruments now or hereafter executed and delivered pursuant to the terms hereof or pursuant to the terms of the Loan Agreement, all as amended hereby, are hereby amended so that any reference in the Loan Agreement and such other Loan Documents to the Loan Agreement shall mean a reference to the Loan Agreement and the other Loan Documents, all as amended hereby.

**6.3 Expenses of Agent.** As provided in Section 12.7 of the Loan Agreement, Borrower agrees to pay on demand all costs and expenses incurred by Agent, any Lender or their respective Affiliates, in connection with the preparation, negotiation, and execution of this Amendment and the other Loan Documents executed pursuant hereto and any and all amendments, modifications, and supplements thereto, including, without limitation, the costs and fees of legal counsel, and all reasonable costs and expenses incurred by Agent or any Lender in connection with the enforcement or preservation of any rights under the Loan Agreement or any other Loan Documents, all as amended hereby, including, without, limitation, the reasonable costs and fees of legal counsel. Notwithstanding anything to the contrary in this Amendment or otherwise, nothing in this Section 6.3 is intended to be inconsistent with, or interpreted in a manner inconsistent with, Section 12.7 of the Loan Agreement.

**6.4 Severability.** Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

**6.5 Successors and Assigns.** This Amendment is binding upon and shall inure to the benefit of Lenders, Agent and Borrower and their respective permitted successors and assigns, except that Borrower may not assign or transfer any of its rights or obligations hereunder without the prior written consent of Agent.

8

**6.6** __Counterparts.__  This Amendment may be executed in one or more counterparts, each of which when so executed shall be deemed to be an original, but all of which when taken together shall constitute one and the same instrument.  This Amendment may be executed by facsimile transmission, which facsimile signatures shall be considered original executed counterparts for purposes of this __Section 6.6__, and each party to this Amendment agrees that it will be bound by its own facsimile signature and that it accepts the facsimile signature of each other party to this Amendment.

**6.7** __Effect of Waiver__.  No consent or waiver, express or implied, by Agent or any Lender to or for any breach of or deviation from any covenant or condition by Borrower shall be deemed a consent to or waiver of any other breach of the same or any other covenant, condition or duty.

**6.8** __Headings.__  The headings, captions, and arrangements used in this Amendment are for convenience only and shall not affect the interpretation of this Amendment.

**6.9** __Applicable Law.__  THIS AMENDMENT AND ALL OTHER LOAN DOCUMENTS EXECUTED PURSUANT HERETO SHALL BE DEEMED TO HAVE BEEN MADE AND TO BE PERFORMABLE IN AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, AS SET FORTH IN THE LOAN AGREEMENT.

**6.10** __Final Agreement.__  THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS, EACH AS AMENDED HEREBY, AND THE INVENTORY LOAN DOCUMENTATION REPRESENT THE ENTIRE EXPRESSION OF THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF ON THE DATE THIS AMENDMENT IS EXECUTED.  THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS, EACH AS AMENDED HEREBY, AND THE INVENTORY LOAN DOCUMENTATION MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.  NO MODIFICATION, RESCISSION, WAIVER, RELEASE OR AMENDMENT OF ANY PROVISION OF THIS AMENDMENT SHALL BE MADE, EXCEPT BY A WRITTEN AGREEMENT SIGNED BY BORROWER AND AGENT AND LENDERS.

**6.11** __Release by Borrower.__   FOR AND IN CONSIDERATION OF AGENT AND LENDERS' AGREEMENTS CONTAINED HEREIN, BORROWER ("__RELEASOR__") HEREBY VOLUNTARILY AND KNOWINGLY RELEASES AND FOREVER WAIVES AND DISCHARGES  AGENT  AND LENDERS WHO ARE PARTIES TO THE LOAN AGREEMENT AS OF THE DATE HEREOF (INDIVIDUALLY AND COLLECTIVELY, THE "__RELEASED PARTIES__") FROM ALL POSSIBLE CLAIMS, COUNTERCLAIMS, DEMANDS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, ANTICIPATED OR UNANTICIPATED, SUSPECTED OR UNSUSPECTED, FIXED, CONTINGENT OR CONDITIONAL OR AT LAW OR IN EQUITY, IN WHOLE OR IN PART, ARISING ON OR BEFORE THE DATE OF THIS AMENDMENT THAT RELEASOR MAY NOW OR HEREAFTER HAVE AGAINST THE RELEASED PARTIES, IF ANY, IRRESPECTIVE OF

9

WHETHER ANY SUCH CLAIMS ARISE OUT OF CONTRACT, TORT, VIOLATION OF LAW OR REGULATIONS OR OTHERWISE, INCLUDING WITHOUT LIMITATION ARISING  DIRECTLY OR INDIRECTLY FROM ANY OF THE LOAN DOCUMENTS, THE INVENTORY LOAN DOCUMENTATION, THE EXERCISE OF ANY RIGHTS AND REMEDIES UNDER ANY OF THE LOAN DOCUMENTS OR INVENTORY LOAN DOCUMENTATION AND/OR NEGOTIATION FOR AND EXECUTION OF THIS  AMENDMENT, INCLUDING, WITHOUT LIMITATION, ANY CONTRACTING FOR, CHARGING, TAKING, RESERVING, COLLECTING OR RECEIVING INTEREST IN EXCESS OF THE HIGHEST LAWFUL RATE APPLICABLE.  RELEASOR  WAIVES THE BENEFITS OF ANY LAW, WHICH MAY PROVIDE IN SUBSTANCE: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MUST HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE DEBTOR." RELEASOR UNDERSTANDS THE FACTS IT BELIEVES TO BE TRUE AT THE TIME OF MAKING THE RELEASE PROVIDED FOR HEREIN MAY LATER TURN OUT TO BE DIFFERENT THAN IT NOW BELIEVES, AND INFORMATION NOT NOW KNOWN OR SUSPECTED MAY LATER BE DISCOVERED.  RELEASOR ACCEPTS THIS POSSIBILITY AND ASSUMES THE RISK OF THE FACTS TURNING OUT TO BE DIFFERENT AND NEW INFORMATION BEING DISCOVERED AND FURTHER AGREES THE RELEASE PROVIDED FOR HEREIN SHALL IN ALL RESPECTS CONTINUE TO BE EFFECTIVE AND NOT SUBJECT TO TERMINATION OR RESCISSION BECAUSE OF ANY DIFFERENCE IN SUCH FACTS OR ANY NEW INFORMATION.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

10

IN WITNESS WHEREOF, this Amendment has been executed as of the date first written above.

**BORROWER:**

**BLUEGREEN VACATIONS CORPORATION**,
a  Florida corporation


By: <u>/s/ Paul Humphrey</u>
Name:  Paul Humphrey
Title:    Senior Vice President, Finance and Capital Markets

---

**AGENT AND LENDER:**

**PACIFIC WESTERN BANK**,
a California state-chartered bank, as successor-by-merger to CapitalSource Bank

By:  /s/ Jason Schwartz
Name: Jason Schwartz
Title:  Senior Vice President, Portfolio Manager

---

**EXHIBIT D**

**UNDERWRITING GUIDELINES**

Customer financing on sales of timeshare interests requires (a) that the obligor (which may include one or more persons) has made total payments (comprised of a down payment and/or principal payments) by cash, check, credit card or otherwise of at least 10% (or 20% in limited circumstances) of the actual purchase price of the timeshare property (which down payment may, (i) in the case of upgrade club loans or conversion in connection with an introductory loan be represented in whole or in part by the principal payments and down payment made on, as applicable, such related original club loan or the related introductory loan since its date of origination, (ii) in the case of an upgrade or a conversion in connection with an introductory product, be represented in whole or in part by the amount paid where the obligor has paid in full, whether at the point of sale or otherwise for the original timeshare property or introductory product, as applicable, or (iii) in the case of no equity loans, may be represented by equity from a previous purchase), (b) an executed mortgage note and mortgage or, in the case of sales in the La Cabana Resort, an owner beneficiary agreement, and (c) other closing documents between the originator and the purchaser.  Bluegreen Vacations Corporation and its affiliates, as applicable, (together the "Company") encourages purchasers to make increased down payments by offering a lower interest rate.  Purchasers who participate in the Company's pre-authorized checking payment plan receive a 1% discount in the interest rate, where allowed by applicable laws and regulations.

Prior to December 15, 2008, the Company's customer financing was not subject to any significant loan underwriting criteria and no FICO® score was obtained prior to extending credit. The Company implemented a formal FICO® score-based credit underwriting program effective December 15, 2008. Following implementation, the Company no longer provided financing to customers with FICO® scores below 500 and new customers with FICO® scores between 500 and 599 were required to make a minimum cash down payment of 20%. Effective January 1, 2010, the Company increased its credit underwriting standards and no longer provided financing to new customers with FICO® scores below 575 and new customers with FICO® scores between 575 and 599 were required to make a minimum cash down payment of 20%.  Effective March 29, 2017, the Company has temporarily further increased its credit underwriting standards to no longer provide financing to new customers with FICO® scores below 600. Interest rates may vary due to transaction sizes, FICO® scores and/or other factors. The Company may, from time to time, offer certain introductory products with FICO® scores and finance terms that are intended to be held in the Company's portfolio. Additionally, the Company may provide financing to customers with no FICO® scores who make a minimum down payment.

**Schedule 1.1**

Occupancy Issues Regarding Resorts as of Amendment Date

The Lake Eve Resort was affected by Hurricane Irma.  A portion of the resort experienced water intrusion (100 out of 160 units) and is expected to be open over time and completely by year end.

D - 0055-0189

Schedule 1.2

Resorts

Primary Resorts

| | | | |
|---|---|---|---|
| 1. | BG Fountains Condominium | Orlando | Florida |
| 2. | BG Club 36 | Las Vegas | Nevada |
| 3. | Bluegreen Odyssey Dells | Lake Delton | Wisconsin |
| 4. | Lake Eve Resort | Orlando | Florida |

Secondary Resorts

| | | | |
|---|---|---|---|
| 1. | Wilderness Traveler at Shenandoah | Gordonsville | Virginia |
| 2. | BG Pirate's Lodge Condominium | Lake Delton | Wisconsin |
| 3. | The Villas at Christmas Mountain | Wisconsin Dells | Wisconsin |
| 4. | Christmas Mountain — Timbers | Wisconsin Dells | Wisconsin |
| 5. | Christmas Mountain — Campground | Wisconsin Dells | Wisconsin |
| 6. | BG Patrick Henry Square | Williamsburg | Virginia |
| 7. | Grande Villas at World Golf Village Condominium | St. Augustine | Florida |
| 8. | Mountain Run at Boyne | Boyne Falls | Michigan |
| 9. | Falls Village | Branson | Missouri |
| 10. | MountainLoft | Gatlinburg | Tennessee |
| 11. | MountainLoft II | Gatlinburg | Tennessee |
| 12. | Harbour Lights Resort Horizontal Property Regime | Myrtle Beach | South Carolina |
| 13. | Shore Crest | Myrtle Beach | South Carolina |
| 14. | Shore Crest II | Myrtle Beach | South Carolina |
| 15. | Laurel Crest | Pigeon Forge | Tennessee |

Other Approved Resorts

Club Resorts

| | | | |
|---|---|---|---|
| 1. | Daytona SeaBreeze | Daytona Beach Shores | Florida |
| 2. | The Hammocks at Marathon | Marathon | Florida |
| 3. | Orlando's Sunshine Resort I & II | Orlando | Florida |
| 4. | Casa Del Mar Beach Resort | Ormond Beach | Florida |
| 5. | Solara Surfside | Surfside | Florida |
| 6. | Bluegreen Club La Pension | New Orleans | Louisiana |
| 7. | The Suites at Hershey | Hershey | Pennsylvania |
| 8. | The Lodge Alley Inn | Charleston | South Carolina |
| 9. | Carolina Grande | Myrtle Beach | South Carolina |
| 10. | SeaGlass Tower | Myrtle Beach | South Carolina |
| 11. | Shenandoah Crossing Farm & Country Club | Gordonsville | Virginia |
| 12. | La Cabana Beach And Racquet Club | Oranjestad | Aruba |
| 13. | Resort at World Golf Village | St. Augustine | Florida |
| 14. | The Innsbruck, A Condominium | Aspen | Colorado |

D - 0055-0190

| 15. | The Hotel Blake | Chicago | Illinois |
| 16. | Club at Big Bear | Big Bear Lake | California |
| 17. | The Atlantic Palace | Atlantic City | New Jersey |
| 18. | King 583 | Charleston | South Carolina |
| 19. | Club Lodges at Trillium | Cashiers | North Carolina |

| | The Soundings Seaside Resort | Dennisport | Massachusetts |

| | | | |
|---|---|---|---|
| 20. | | | |
| 21. | The Breakers Resort | Dennisport | Massachusetts |
| 22. | Bluegreen at Tradewinds | St. Pete Beach | Florida |
| 23. | Horizons at 77th | N. Myrtle Beach | South Carolina |
| 24. | Cibola Vista Resort & Spa | Peoria | Arizona |
| 25. | Blue Ridge Village | Banner Elk | North Carolina |

## Club Associate Resorts (other than FBS Resorts)

| | | | |
|---|---|---|---|
| 1. | Paradise Isle Resort | Gulf Shores | Alabama |
| 2. | Shoreline Towers Resort | Gulf Shores | Alabama |
| 3. | Via Roma Beach Resort | Bradenton Beach | Florida |
| 4. | Dolphin Beach Club | Daytona Beach Shores | Florida |
| 5. | Fantasy Island Resort II | Daytona Beach Shores | Florida |
| 6. | Mariner's Boathouse and Beach Resort | Fort Myers Beach | Florida |
| 7. | Tropical Sands Resort | Fort Myers Beach | Florida |
| 8. | Windward Passage Resort | Fort Myers Beach | Florida |
| 9. | Gulfstream Manor | Gulfstream | Florida |
| 10. | Resort Sixty-Six | Holmes Beach | Florida |
| 11. | Outrigger Beach Club | Ormond Beach | Florida |
| 12. | Landmark Holiday Beach Resort | Panama City Beach | Florida |
| 13. | Ocean Towers Beach Club | Panama City Beach | Florida |
| 14. | Panama City Resort & Club | Panama City Beach | Florida |
| 15. | Surfrider Beach Club | Sanibel Island | Florida |
| 16. | Petit Crest Villas at Big Canoe | Marble Hill | Georgia |
| 17. | Pono Kai Resort | Kapaa (Kauai) | Hawaii |
| 18. | Lake Condominiums at Big Sky | Big Sky | Montana |
| 19. | Foxrun Townhouses | Lake Lure | North Carolina |
| 20. | Sandcastle Village | New Bern | North Carolina |
| 21. | Waterwood Townhouses | New Bern | North Carolina |
| 22. | Players Club | Hilton Head Island | South Carolina |
| 23. | Hemlock | Boyne Falls | Michigan |

## FBS Resorts

| | | | |
|---|---|---|---|
| 1. | Parkside a Vacation Ownership Resort | Williamsburg | Virginia |
| 2. | InnSeason Resorts South Mountain Condominium | Lincoln | New Hampshire |
| 3. | The Breakers Resort Condominium | Dennisport | Massachusetts |
| 4. | The Soundings Seaside Resort Condominium | Dennisport | Massachusetts |
| 5. | Cibola Vista Resort & Spa | Peoria | Arizona |

| 6. | Studio Homes at Ellis Square | Savannah | Georgia |
| 7. | The Hotel Blake | Chicago | Illinois |

D - 0055-0194

**Schedule 5.15**

Names, Addresses and States of Formation

**Name:**        Bluegreen Vacations Corporation (a Florida corporation), fka Bluegreen Corporation

**Address:**     4960 Conference Way North, Suite 100
                 Boca Raton, Florida 33431

Additional names used during past five (5) years:

(1)  **North Carolina**:        Bluegreen Corporation d/b/a Bluegreen Patten Corporation

(2)  **Louisiana**:  Bluegreen Corporation of Massachusetts

(3)  **California**:            BXG California, Inc.

**And such other names and/or addresses as may be provided to the Agent from time to time.**

**Schedule 3.30**

Resort Documents

**BG FOUNTAINS CONDOMINIUM**

    a.  Master Declaration of Covenants, Conditions and Restrictions, recorded July 28, 1998, in Book 5535, Page 3243 of the Public Records of Orange County, Florida.

    b.  Declaration of Condominium for BG Fountains Condominium, recorded October 26, 2004, in Book 07674, Page 4336 of the Public Records of Orange County, Florida, with amendments of record in Book 07785, Page 2252; Book 08559, Page 1321; Book 08559, Page 1360; Book 08775, Page 4485; Book 09443, Page 2378; Book 9881, Page 2943.

    c.  Articles of Incorporation of BG Fountains Condominium Association, Inc.

    d.  Bylaws of BG Fountains Condominium Association, Inc.

    e.  That certain Timeshare Management Agreement dated as of October 3, 2012, by and between BG Fountains Condominium Association, Inc. and Bluegreen Resorts Management, Inc.

    f.  BG Fountains Condominium A Bluegreen Vacation Club Resort Public Offering Statement (Florida).

    g.  Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to BG Fountains Condominium.

    h.  The applicable Consumer Documents for BG Fountains Condominium.

    i.  Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to BG Fountains Condominium.

**BG CLUB 36**

    a.  Master Declaration of Covenants, Conditions, Easements and Restrictions for Bluegreen Club 36, recorded July 29, 2008, Book 080729, at Document No. 0004566, in the office of the County Recorder of Clark County, Nevada.

    b.  Articles of Incorporation of BG Club 36 Master Association, Inc.

    c.  Bylaws of BG Club 36 Master Association, Inc.

    d.  Declaration of Covenants, Conditions, Easements, Restrictions and Timeshare Ownership Instrument for BG Club 36, recorded July 29, 2008, in Book 080729 at Document No. 0004568, in the office of the County Recorder of Clark County, Nevada.

    e.  Articles of Incorporation of BG Club 36 Owners Association, Inc.

    f.  Bylaws of BG Club 36 Owners Association, Inc.

    g.  That certain Timeshare Management Agreement, dated as of September 18, 2012, by and between BG Club 36 Owners Association, Inc., and Bluegreen Resorts Management, Inc.

    h.  Nevada Public Offering Statement for Bluegreen Vacation Club.

    i.  Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to BG Club 36.

    j.  The applicable Consumer Documents for BG Club 36.

    k.  Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to BG Club 36.

**BLUEGREEN WILDERNESS TRAVELER AT SHENANDOAH**

a. Declaration of Covenants, Conditions and Restrictions for Bluegreen Wilderness Traveler at Shenandoah Vacation Ownership Program, dated November 28, 2007, recorded at Deed Book 1117, Page 861 of the Public Records of Louisa County, Virginia, with amendments of record at Book 1126, Page 372, and Book 1216, Page 818, and Book 1526, Page 111.

b. Articles of Incorporation of Bluegreen Wilderness Traveler at Shenandoah Owners Association, Inc.

c. By-Laws of Bluegreen Wilderness Traveler at Shenandoah Owners Association, Inc.

d. That certain Timeshare Management Agreement dated as of the July 14, 2014 by and between Bluegreen Wilderness Traveler at Shenandoah Owners Association Inc. and Bluegreen Resorts Management, Inc.

e. Bluegreen Wilderness Traveler at Shenandoah Vacation Ownership Program Public Offering Statement (Virginia).

f. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Bluegreen Wilderness Traveler at Shenandoah.

g. The applicable Consumer Documents for Bluegreen Wilderness Traveler at Shenandoah.

h. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Bluegreen Wilderness Traveler at Shenandoah.

**BG PIRATE'S LODGE**

a. Master Declaration by and between Treasure Island, LLC, Bluegreen Vacations Unlimited, Inc., Dells Vacation Condominium Unit Owners Association, Inc., and Club Optima Dells Owners' Association, Inc., recorded September 28, 2006 as Document No. 918419 in the Public Records of Sauk County, Wisconsin, with an amendment recorded on May 28, 2008 as Document No. 962000.

b. First Amendment to Declaration of Condominium of Dells Vacation Condominium and Declaration of Covenants, Conditions, Easements and Restrictions and Time-Share Instrument for Club Optima Amending, Restating, and Merging them into Declaration of Condominium for BG Pirate's Lodge Condominium recorded November 3, 2006, as Document No. 921739 in the Public Records of Sauk County, Wisconsin.

c. Declaration of Condominium for Bluegreen Odyssey Dells, A Condominium recorded June 30, 2008, as Document No. 963977 in the Public Records of Sauk County, Wisconsin.

d. Amended and Restated Articles of Incorporation of BG Pirate's Lodge Owners Association, Inc.

e. Amended and Restated By-Laws of BG Pirate's Lodge Owners Association, Inc., adopted September 12, 2006.

f. That certain Timeshare Management Agreement dated December 5, 2012, by and between BG Pirate's Lodge Owners Association, Inc. and Bluegreen Resorts Management, Inc.

g. Time-Share Disclosure Statement BG Pirate's Lodge Condominium (Wisconsin).

h. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to BG Pirate's Lodge Condominium.

    i.  The applicable Consumer Documents for BG Pirate's Lodge Condominium.

    j.  Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to BG Pirate's Lodge Condominium.

**CHRISTMAS MOUNTAIN TIMBERS**

    a.  Declaration of Covenants, Conditions and Restrictions for Christmas Mountain Village recorded in the Office of the Register of Deeds of Sauk County, Wisconsin on August 26, 1991, in Book 002, Page 762, with amendment of record at Book 002, Page 791.

    b.  Amended and Restated Declaration of Covenants, Conditions and Restrictions for the Timbers at Christmas Mountain recorded December 4, 2003, in the Office of the Register of Deeds of Sauk County, Wisconsin, as Document No. 827468.

    c.  Articles of Association of The Timbers at Christmas Mountain Association.

    d.  By-Laws of The Timbers at Christmas Mountain Association, as amended.

    e.  That certain Timeshare Management Agreement dated June 1, 2014, by and between The Timbers at Christmas Mountain Association U.A., and Bluegreen Resorts Management, Inc., as amended by First Amendment dated June 1, 2015.

    f.  Time-Share Disclosure Statement The Timbers at Christmas Mountain (Wisconsin).

    g.  Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to The Timbers at Christmas Mountain.

    h.  The applicable Consumer Documents for The Timbers at Christmas Mountain.

    i.  Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to The Timbers at Christmas Mountain.

**CHRISTMAS MOUNTAIN VILLAS**

    a.  Declaration of Covenants, Conditions and Restrictions for Christmas Mountain Village recorded in the Office of the Register of Deeds of Sauk County, Wisconsin on August 26, 1991, in Book 002, Page 762, with amendment of record at Book 002, Page 791.

    b.  Restated Declaration of Time-Share Condominium of The Villas at Christmas Mountain recorded in the Office of the Register of Deeds of Sauk County, Wisconsin, in Book 002, Page 271, with amendments of record in Book 002, Page 560; Book 002, Page 677; Book 003, Page 576; and Document 842609.

    c.  Articles of The Villas at Christmas Mountain Association, as amended.

    d.  By-Laws of The Villas at Christmas Mountain Association, as amended.

    e.  That certain Timeshare Management Agreement dated June 1, 2014, by and between The Villas at Christmas Mountain Association, U.A., and Bluegreen Resorts Management, Inc., as amended by First Amendment dated June 1, 2015.

    f.  Time-Share Disclosure Statement The Villas at Christmas Mountain (Wisconsin).

    g.  Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to The Villas at Christmas Mountain.

    h.  The applicable Consumer Documents for The Villas at Christmas Mountain.

    i.  Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to The Villas at Christmas Mountain.

**CHRISTMAS MOUNTAIN CAMPGROUND**

    a.  Declaration of Covenants, Conditions and Restrictions for Christmas Mountain Village recorded in the Office of the Register of Deeds of Sauk County, Wisconsin on August 26, 1991, in Book 002, Page 762, with amendment of record at Book 002, Page 791.

    b.  Declaration of Covenants, Conditions and Restrictions for Christmas Mountain Campground recorded in the Office of the Register of Deeds of Sauk County, Wisconsin, at Book 206, Page 898, with amendments of record at Book 405, Page 688; Book 461, Page 716; and Book 002, Page 519; Book 002, Page 556; Book 002, Page 797; Book 003, Page 267; Book 003, Page 568; and Document No. 842924.

    c.  Articles of Association of The Christmas Mountain Campground Association.

    d.  By-Laws of The Christmas Mountain Campground Association, as amended.

    j.  That certain Timeshare Management Agreement dated June 1, 2014, by and between The Christmas Mountain Campground Association and Bluegreen Resorts Management, Inc., as amended by First Amendment dated June 1, 2015.

    e.  Time-Share Disclosure Statement Christmas Mountain Campground (Wisconsin).

    f.  Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Christmas Mountain Campground.

    g.  The applicable Consumer Documents for Christmas Mountain Campground.

    h.  Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Christmas Mountain Campground.

**PATRICK HENRY**

    a.  Amended and Restated Master Declaration of Covenants, Conditions and Restrictions for BG Patrick Henry Square recorded in the Clerk's Office, Circuit Court of Williamsburg/James City County, Virginia, at Instrument Number 142739, as amended by Instrument Number 166377.

    b.  Amended and Restated Declaration of Covenants, Conditions and Restrictions for BG Patrick Henry Square Vacation Ownership Program recorded in t h e Clerk's Office, Circuit Court of Williamsburg/James City County, Virginia, at Instrument Number 152793, as amended by Instrument Number 171441.

    c.  Articles of Incorporation of BG Patrick Henry Square Timeshare Owners Association, Inc.

    d.  By-laws of BG Patrick Henry Square Timeshare Owners Association, Inc.

    e.  That certain Timeshare Management Agreement dated July 14, 2014, by and between BG Patrick Henry Square Timeshare Owners Association, Inc. and Bluegreen Resorts Management, Inc.

    i.  BG Patrick Henry Square Vacation Ownership Program Public Offering Statement (Virginia).

    f.  Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Patrick Henry Square.

    g.  The applicable Consumer Documents for Patrick Henry Square.

    h.  Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Patrick Henry Square.

**GRANDE VILLAS AT WORLD GOLF VILLAGE CONDOMINIUM**

    a.  Master Declaration of Covenants, Conditions and Restrictions recorded September 3, 1998 in the Official Records of St. John's County, Florida, in Book 1345, Page 1586.

    b.  Declaration of Condominium for Grande Villas at World Golf Village Condominium a Bluegreen Vacation Club Resort recorded January 22, 2004, in the Official Records of St. John's County, Florida, in Book 2126, Page 1051, with an amendment of record in Book 2964, Page 1900.

    c.  Articles of Incorporation of Grand Villas at World Golf Village Condominium Association, Inc.

    d.  Bylaws of Grande Villas at World Golf Village Condominium Association, Inc.

    e.  That certain Timeshare Management Agreement dated October 16, 2012, by and between Grande Villas at World Golf Village Condominium Association, Inc. and Bluegreen Resorts Management, Inc.

    f.  Grande Villas at World Golf Village Condominium A Bluegreen Vacation Club Resort Public Offering Statement (Florida).

    g.  Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Grande Villas at World Golf Village Condominium.

    h.  The applicable Consumer Documents for Grande Villas at World Golf Village Condominium.

    i.  Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Grande Villas at World Golf Village Condominium.

**MOUNTAIN RUN AT BOYNE**

    a.  Master Deed of Mountain Run at Boyne recorded August 14, 2003 in the Register of Deeds of Charlevoix County, Michigan in Liber 563, Page 576, with amendments of record in Liber 690, Page 762; Liber 690, Page 772; and Liber 714, Page 118.

    b.  Restated Articles of Incorporation of Mountain Run at Boyne Owners Association, Inc.

    c.  Bylaws of the Mountain Run at Boyne Owners Association, Inc.

    d.  That certain Timeshare Management Agreement dated September 27, 2012, by and between Mountain Run at Boyne Owners Association, Inc. and Bluegreen Resorts Management, Inc.

    e.  Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Mountain Run at Boyne.

    f.  The applicable Consumer Documents for Mountain Run at Boyne.

    g.  Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Mountain Run at Boyne.

**FALLS VILLAGE**

    a.  Declaration of Restrictions of The Falls recorded in Taney County, Missouri at Book 0318, Page 8772.

    b.  Declaration of Condominium and By-Laws for The Falls Village Resort, a Condominium, as recorded in Taney County, Missouri, in Book 340, Page 1764, and amended in Book 344, Page 4886; Book 346, Page 7596; Book 349, Page 7131; Book 354, Page 8986; Book 362, Page 5723; Book 362, Page 5731; Book 365, Page 7217; Book 368, Page 3323; Book 370, Page 5496; Book 424, Page 5329; Book 450, Page 735;

Book 450, Page 743; Book 456, Page 2709; Book 463, Page 828; Book 485, Page 965; Book 485, Page 989; and Book 2007L, Page 16245.

c. Articles of Incorporation of The Falls Village Resort Condominium Association, Inc.

d. That certain Timeshare Management Agreement dated the January 1, 2013, by and between The Falls Village Resort Condominium Association, Inc., and Bluegreen Resorts Management, Inc.

e. Original Sales Certificate for The Falls Village Resort (Missouri).

f. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to The Falls Village Resort.

g. The applicable Consumer Documents for The Falls Village Resort.

h. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to The Falls Village Resort.

**MOUNTAINLOFT**

a. Declaration of Condominium for MountainLoft Resort recorded in the Official Records of Sevier County, Tennessee, at Book D516, Page 324, with amendments of record in Book D525, Page 356; Book D543, Page 21; Book D551, Page 256; Book D568, Page 573; Book D569, Page 561; Book D587, Page 292; Book D607, Page 526; Book D620, Page 81; Book D627, Page 161; Book D636, Page 783; Book D667, Page 242; Book 1006, Page 443; Book 1450, Page 526; and Book 3350, Page 362.

b. Charter of The MountainLoft Resort Condominium Association, Inc.

c. By-Laws of The MountainLoft Resort Condominium Association, Inc., as amended

d. That certain Timeshare Management Agreement dated May 7, 2014, by and between The MountainLoft Resort Condominium Association, Inc. and Bluegreen Resorts Management, Inc.

e. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to The MountainLoft Resort Condominium.

f. The applicable Consumer Documents for The MountainLoft Resort Condominium.

g. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to The MountainLoft Resort Condominium.

**MOUNTAINLOFT II**

a. Declaration of Condominium for MountainLoft Resort II recorded in the Official Records of Sevier County, Tennessee, at Book 2714, Page 171.

b. Articles of Incorporation of MountainLoft Resort II Condominium Association, Inc.

c. Bylaws of MountainLoft Resort II Condominium Association, Inc.

d. That certain Timeshare Management Agreement dated February 1, 2013, by and between MountainLoft Resort II Condominium Association, Inc. and Bluegreen Resorts Management, Inc.

e. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to MountainLoft Resort II Condominium.

f. The applicable Consumer Documents for MountainLoft Resort II Condominium.

g. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to MountainLoft Resort II Condominium.

**HARBOUR LIGHTS RESORT HORIZONTAL PROPERTY REGIME**

    a.   Master Deed for Harbour Lights Resort Horizontal Property Regime recorded June 29, 1998, in Book 2049, Page 437, in the office of the Registrar of Deeds in Horry County, South Carolina, with amendments of record in Book 2087, Page 875; Book 2374, Page 372; Book 2221, Page 951; Book 2681, Page 538; Book 2758, Page 699; Book 3078, Page 743; Book 3078, Page 750; Book 3162, Page 359; Book 3860, Page 2176; and Book 3870, Page 3394.

    b.   Articles of Incorporation of Harbour Lights Resorts Owners Association, Inc.

    c.   Bylaws of Harbour Lights Resorts Owners Association, Inc.

    d.   That certain Timeshare Management Agreement dated as of September 12, 2017, between Harbour Lights Resorts Owners Association, Inc. and Bluegreen Resorts Management, Inc.

    e.   Public Offering Statement for Harbour Lights, a Condominium (South Carolina).

    f.   Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Harbour Lights Resort Horizontal Property Regime.

    g.   The applicable Consumer Documents for Harbour Lights Resort Horizontal Property Regime.

    h.   Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Harbour Lights Resort Horizontal Property Regime.

**SHORE CREST**

    a.   Master Deed for Shore Crest Vacation Villas Horizontal Property Regime, rec orded April 29, 1997, in Book 1937, Page 530 of the Public Records of Horry County, South Carolina, with amendments of record in Book 2221, Page 947; Book 3860, Page 2170; and Book 3871, Page 1826.

    b.   Articles of Incorporation of The Shore Crest Vacation Villas Owners Association, Inc.

    c.   By-Laws of The Shore Crest Vacation Villas Owners Association, Inc., as amended.

    d.   That certain Timeshare Management Agreement dated as of October 23, 2012, by and between Shore Crest Vacation Villas Owners Association, Inc., and Bluegreen Resorts Management, Inc.

    e.   Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Shore Crest Vacation Villas Horizontal Property Regime.

    f.   The applicable Consumer Documents for Shore Crest Vacation Villas Horizontal Property Regime.

    g.   Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Shore Crest Vacation Villas Horizontal Property Regime.

**SHORE CREST II**

   a. Master Deed for Shore Crest Vacation Villas II Horizontal Property Regime, recorded December 17, 1999, in Book 2217, Page 48 of the Public Records of Horry County, South Carolina.

   b. Articles of Incorporation of the Shore Crest Vacation Villas II Owners Association, Inc.

   c. By-Laws of the Shore Crest Vacation Villas II Owners Association, Inc.

   d. That certain Timeshare Management Agreement dated as of October 23, 2012, by and between Shore Crest Vacation Villas II Owners Association, Inc., and Bluegreen Resorts Management, Inc.

   i. Public Offering Statement for Shore Crest Vacation Villas II Horizontal Property Regime (South Carolina).

   e. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Shore Crest Vacation Villas II Horizontal Property Regime.

   f. The applicable Consumer Documents for Shore Crest Vacation Villas II Horizontal Property Regime.

   g. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Shore Crest Vacation Villas II Horizontal Property Regime.

**LAUREL CREST**

   a. Declaration of Condominium for Laurel Crest Resort, recorded in the Public Records of Sevier County, Tennessee, June 23, 1995, in Book D548, Page 228, and amendments recorded in Book D554, Page 9; Book D567, Page 549; Book D590, Page 60; Book D608, Page 205; Book D637, Page 1; Book D666, Page 251; Book 1006, Page 438; Book 1763, Page 327; Book 3350, Page 325; and Book 3350, Page 331, of the Public Records of Sevier County, Tennessee.

   b. Charter of The Laurel Crest Resort Condominium Association, Inc.

   c. By-Laws of The Laurel Crest Resort Condominium Association, Inc., as amended.

   d. That certain Timeshare Management Agreement dated as of August 23, 2012, by and between The Laurel Crest Resort Condominium Association, Inc., and Bluegreen Resorts Management, Inc.

   e. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to The Laurel Crest Resort Condominium.

   f. The applicable Consumer Documents for The Laurel Crest Resort Condominium.

   g. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to The Laurel Crest Resort Condominium.

**LAKE EVE RESORT**

a.  Master Declaration of Covenants, Conditions and Restrictions for Lake Eve Resort, recorded November 13, 2013, in Book 10663, Page 6429 of the Public Records of Orange County, Florida, with amendments of record in Book 10686, Page 3217, Book 10871, Page 4936, Book 10916, Page 5930, Document No. 20160233549, Document No. 20160342959, Document No. 20160584368, Document No. 20170253808.

b.  Amended and Restated Declaration of Condominium for Lake Eve Resort Condominium, recorded July 5, 2016, as Document No. 20160342961 of the Public Records of Orange County, Florida, with amendments of recorded as Document No. 20160342962, Document No. 20160584370, Document No. 20170253810.

c.  Articles of Incorporation of Lake Eve Resort Condominium Owners Association, Inc.

d.  Bylaws of Lake Eve Resort Condominium Owners Association, Inc.

e.  That certain Management Agreement dated as of November 6, 2013, by and between Lake Eve Resort Condominium Owners Association, Inc. and Bluegreen Resorts Management, Inc.

f.  Lake Eve Resort Condominium A Bluegreen Vacation Club Resort Public Offering Statement (Florida).

g.  Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Lake Eve Resort Condominium.

h.  The applicable Consumer Documents for BG Fountains Condominium.

i.  Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to BG Fountains Condominium.

Exhibit 10.109

## FOURTH AMENDMENT TO AMENDED AND RESTATED
## LOAN AND SECURITY AGREEMENT

This **FOURTH AMENDMENT TO AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT** (this "**Amendment**"), dated as of October 19, 2017 ("**Amendment Date**"), by and among **BLUEGREEN VACATIONS CORPORATION**, a Florida corporation f/k/a Bluegreen Corporation ("**Borrower**"), each of the financial institutions from time to time party hereto (individually, each a "**Lender**", and collectively, the "**Lenders**") and **PACIFIC WESTERN BANK**, a California state-chartered bank, as successor-by-merger to CapitalSource Bank, as administrative, payment and collateral agent for itself, as a Lender and the other Lenders (in such capacities, "**Agent**").

### RECITALS

WHEREAS, Borrower, Lenders and Agent are parties to, among other Loan Documents, that certain Amended and Restated Loan and Security Agreement, dated as of July 10, 2013, as amended by that certain First Amendment to Amended and Restated Loan and Security Agreement, dated as of December 6, 2013, as further amended by that certain Second Amendment to Amended and Restated Loan and Security Agreement, dated as of June 25, 2015, as further amended by that certain Third Amendment to Amended and Restated Loan and Security Agreement, dated as of October 24, 2016 (as amended, restated, supplemented or otherwise modified in writing from time to time, the "**Loan Agreement**"); and

WHEREAS, Borrower, Lenders and Agent desire to amend the Loan Agreement as set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

### ARTICLE I.
### Definitions

Capitalized terms used in this Amendment are defined in the Loan Agreement unless otherwise stated.

### ARTICLE II.
### Amendments to Loan Agreement and Side Letter

**2.1 Amendment to Section 1.1 of the Loan Agreement**. Effective as of the date hereof, Section 1.1 of the Loan Agreement is hereby amended by amending the chart set forth in the definition of "Calculated Rate" in its entirety as follows:

| 2 | Applicable Portion of the Outstanding Unpaid Principal Balance of the Loan | Calculated Rate |
|---|---|---|
|   |   |   |

| Applicable Time Period | | |
|---|---|---|
| From October 19, 2017 and thereafter | Equal to or less than the sum of $10,000,000 less the then outstanding principal balance of the Inventory Loan | 4.50% |
| From October 19, 2017 and thereafter | Greater than the sum of $10,000,000 less the then outstanding principal balance of the Inventory Loan, but less than or equal to the sum of $19,000,000 less the then outstanding principal balance of the Inventory Loan | 4.00% |
| From October 19, 2017 and thereafter | Greater than the sum of $19,000,000 less the then outstanding principal balance of the Inventory Loan | 3.50% |

3

Notwithstanding the foregoing, in the event Lenders agree to extend the Revolving Credit Period Expiration Date as set forth in the definition of "Revolving Credit Period Expiration Date" hereunder, the "Calculated Rate" shall be equal to (i) for that portion of the outstanding unpaid principal balance of the Loan that is less than the sum of $19,000,000 less the then outstanding principal balance of the Inventory Loan, four percent (4.0%) per annum from September 20, 2018 and thereafter or (ii) for that portion of the outstanding unpaid principal balance of the Loan that is greater than the sum of $19,000,000 less the then outstanding principal balance of the Inventory Loan, three and one-half percent (3.5%) per annum from September 20, 2018 and thereafter."

**2.2  Amendment to Section 1.1 of the Loan Agreement**.  Effective as of the date hereof, Section 1.1 of the Loan Agreement is hereby amended by adding the definition of "Force Majeure Receivable" in the correct alphabetical order as follows:

"'Force Majeure Receivable' shall mean a Receivable for which a natural disaster or act of terror has had a direct impact on the ability of the related Obligor to make payments due to disruption of employment or to place of residence,  as reasonably determined by the Servicer in accordance with the servicing standard,  and for which the Servicer has determined, in accordance with the servicing standard, to defer loan payments for a specified grace period of not more than two (2) months. A Receivable shall no longer be deemed a Force Majeure Receivable if the Obligor has made two consecutive timely payments following the implementation of the loan payment deferral described above."

**2.3  Amendment to Section 6.25 of the Loan Agreement**.  Effective as of the date hereof, clause (a) of Section 6.25 of the Loan Agreement is hereby amended to (i) remove the word "and" from clause (viii) thereto, (ii) replace the period with "; and" in clause (ix) thereto and (iii) add a new clause (x) to the end thereto as follows:

"(x) no more than five percent (5%) (as determined on the basis of the aggregate Receivable Balances of such Receivables) of the Financed Pool of Eligible Receivables shall be Force Majeure Receivables."

**2.4  Amendment to Section 7.13 of the Loan Agreement**.  Effective as of the date hereof, Section 7.13 of the Loan Agreement is hereby amended and restated in its entirety as follows:

"**7.13      Tangible Net Worth**

Borrower shall not permit its Tangible Net Worth (as measured on the last day of each fiscal year end of Borrower) to be less than Two Hundred Five Million and No/100 Dollars ($205,000,000) for any fiscal year ending during the term of the Loan."

**2.5  Amendment to Section 7.14 of the Loan Agreement**.  Effective as of the date hereof, Section 7.14 of the Loan Agreement is hereby amended and restated in its entirety as follows:

4

"**7.14**      **Maximum Leverage Ratio**

Borrower shall not permit its Leverage Ratio to be more than 3.50 to 1.00 as measured on the last day of each fiscal year end of Borrower."

**2.6** **Amendment to Exhibit D of the Loan Agreement**. Effective as of the date hereof, <u>Exhibit D</u> of the Loan Agreement is hereby amended and restated in the form of <u>Exhibit D</u> attached to this amendment.

**2.7** **Amendment to Schedule 1.1 of the Loan Agreement**. Effective as of the date hereof, <u>Schedule 1.1</u> of the Loan Agreement is hereby amended and restated in the form of <u>Schedule 1.1</u> attached to this amendment.

**2.8** **Amendment to Schedule 1.2 of the Loan Agreement**. Effective as of the date hereof, <u>Schedule 1.2</u> of the Loan Agreement is hereby amended and restated in the form of <u>Schedule 1.2</u> attached to this amendment.

**2.9** **Amendment to Schedule 5.15 of the Loan Agreement**. Effective as of the date hereof, <u>Schedule 5.15</u> of the Loan Agreement is hereby amended and restated in the form of <u>Schedule 5.15</u> attached to this amendment.

**2.10** **Amendment to Schedule 5.30 of the Loan Agreement**. Effective as of the date hereof, <u>Schedule 5.30</u> of the Loan Agreement is hereby amended and restated in the form of <u>Schedule 5.30</u> attached to this amendment.

**2.11** **Amendment to Specified Receivables Side Letter**.   Effective as of the date hereof, the first sentence of the second paragraph of that certain letter agreement, dated as of December 1, 2016, by and between Agent and Borrower (the "**Specified Receivables Side Letter**") is hereby amended to add the phrase "(which such schedule may be updated from time to time in the sole and absolute discretion of Agent)" immediately after the word "hereto" therein.

**2.12** **Amendment to Specified Receivables Side Letter**. Effective as of the date hereof, clauses (c), (d) and (e) of the Specified Receivables Side Letter are hereby amended and restated in their entirety as follows:

"(c)      For the period beginning October 19, 2017 and ending June 30, 2018,  Borrower shall at all such times ensure that no more than twenty-five percent (25%) of the unpaid principal balance of the Loan and the Inventory Loan, as measured in the aggregate, shall be composed of Advances secured by Specified Receivables;

(d)      For the period beginning July 1, 2018 and ending September 30, 2018,  Borrower shall at all such times ensure that no more than twenty percent (20%) of the unpaid principal balance of the Loan and the Inventory Loan, as measured in the aggregate, shall be composed of Advances secured by Specified Receivables;

5

(e)      For the period beginning October 1, 2018 and thereafter, Borrower shall at all such times ensure that no more than fifteen percent (15%) of the unpaid principal balance of the Loan and the Inventory Loan, as measured in the aggregate, shall be composed of Advances secured by Specified Receivables; and"

## ARTICLE III.
### Conditions Precedent

The effectiveness of this Amendment is subject to the satisfaction of the following conditions precedent in a manner satisfactory to Agent, unless specifically waived in writing by Agent:

**3.1** Agent shall have received each of the following, each in form and substance satisfactory to Agent, in its sole discretion, and, where applicable, each duly executed by each party thereto:

(a) This Amendment duly executed by Borrower;

(b) The Third Amended and Restated Secured Promissory Note in the original principal amount of $2,722,750.00, duly executed by Borrower (the "**Third A&R Note**");

(c) Each of the other documents required to be delivered in connection with the Third A&R Note, together with any endorsements to existing title insurance policies required by Agent, duly executed by each of the parties thereto; and

(d) All other documents Agent may reasonably request prior to or as of the date of this Amendment with respect to any matter relevant to this Amendment or the transactions contemplated hereby.

**3.2** **Representations and Warranties**.  The representations and warranties contained herein, in the Loan Agreement and in the other Loan Documents, as each is amended hereby, and in the Inventory Loan Documentation, shall be true and correct as of the date hereof, as if made on the date hereof, except for such representations and warranties as are by their express terms limited to a specific date.

**3.3** **Defaults**.  No Potential Default or Event of Default shall have occurred and be continuing, unless such Potential Default or Event of Default has been otherwise specifically waived in writing by Agent.  No Default or Event of Default (as such terms are defined in the Inventory Loan Promissory Note) shall have occurred and be continuing, unless such Default or Event of Default has been otherwise specifically waived in writing by Inventory Loan Lender.

**3.4** **Corporate Proceedings and other Matters**.  All corporate proceedings taken in connection with the transactions contemplated by this Amendment and all documents, instruments and other legal matters incident thereto shall be satisfactory to Agent.

## ARTICLE IV.

6

**No Consent or Waiver**

Nothing contained herein shall be construed as a consent or waiver by Agent or any Lender of any covenant or provision of the Loan Agreement, the other Loan Documents, this Amendment or any other contract or instrument among Borrower, Agent or any Lender, and the failure of Agent or any Lender at any time or times hereafter to require strict performance by Borrower of any provision thereof shall not waive, affect or diminish any right of Agent or any Lender to thereafter demand strict compliance therewith.

### ARTICLE V.
### Ratifications, Representations and Warranties

**5.1 Ratifications.** The terms and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions set forth in the Loan Agreement and the other Loan Documents, and, except as expressly modified and superseded by this Amendment, the terms and provisions of the Loan Agreement and the other Loan Documents are ratified and confirmed and shall continue in full force and effect. Borrower, Agent and Lenders agree that the Loan Agreement and the other Loan Documents, all as amended hereby, shall continue to be legal, valid, binding and enforceable in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, liquidation, dissolution, moratorium and other similar applicable laws affecting the enforceability of creditors' rights generally applicable in the event of bankruptcy, insolvency, reorganization, liquidation, or dissolution, and to general principles of equity, regardless of whether such enforceability shall be considered in a proceeding in equity or at law. Borrower agrees that this Amendment is not intended to and shall not cause a novation with respect to any or all of the obligations under the Loan Agreement. Borrower agrees that the Payment Guaranty (the "**Guaranty**"), dated as of November 19, 2012, executed by Borrower in favor of Agent (as successor-by-merger to CapitalSource Bank) is hereby ratified and confirmed and shall continue in full force and effect. Borrower agrees that the Guaranty shall continue to be legal, valid, binding and enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, liquidation, dissolution, moratorium and other similar applicable laws affecting the enforceability of creditors' rights generally applicable in the event of bankruptcy, insolvency, reorganization, liquidation, or dissolution, and to general principles of equity, regardless of whether such enforceability shall be considered in a proceeding in equity or at law.

**5.2 Representations and Warranties.** Borrower hereby represents and warrants to Agent and each Lender that (a) the execution, delivery and performance of this Amendment and any and all other Loan Documents executed and/or delivered in connection herewith have been authorized by all requisite action (as applicable) on the part of Borrower and will not violate the articles (or certificate) of incorporation or bylaws of Borrower; (b) Borrower's board of directors has authorized the execution, delivery and performance of this Amendment and any and all other Loan Documents executed and/or delivered in connection herewith; (c) the representations and warranties contained in the Loan Agreement and any other Loan Document, all as amended hereby, are true and correct on and as of the date hereof and on and as of the date of execution hereof as though made on and as of each such date, except for such representations and warranties as are by their express terms limited to a specific date; (d) no Potential Default or Event of Default under the Loan Agreement, as amended hereby, has occurred and is continuing, unless such Potential Default or Event of Default has been specifically waived in writing by Agent; (e) Borrower is in

7

full compliance with all covenants and agreements contained in the Loan Agreement and the other Loan Documents, all as amended hereby; and (f) except as disclosed to Agent, Borrower has not amended its articles (or certificate) of incorporation or bylaws or similar organizational documents since the date of the Loan Agreement.

## ARTICLE VI.
### Miscellaneous Provisions

**6.1 Survival of Representations and Warranties.**  All representations and warranties of the Borrower made in the Loan Agreement or any other Loan Document, including, without limitation, any document furnished in connection with this Amendment, shall survive the execution and delivery of this Amendment and the other Loan Documents to the same extent provided in any applicable Loan Documents, and no investigation by Agent or any Lender or any closing shall affect the representations and warranties or the right of Agent or any Lender to rely upon them.

**6.2 Reference to Loan Agreement.**  Each of the Loan Agreement and the other Loan Documents, and any and all other Loan Documents, documents or instruments now or hereafter executed and delivered pursuant to the terms hereof or pursuant to the terms of the Loan Agreement, all as amended hereby, are hereby amended so that any reference in the Loan Agreement and such other Loan Documents to the Loan Agreement shall mean a reference to the Loan Agreement and the other Loan Documents, all as amended hereby.

**6.3 Expenses of Agent.**  As provided in Section 12.7 of the Loan Agreement, Borrower agrees to pay on demand all costs and expenses incurred by Agent, any Lender or their respective Affiliates, in connection with the preparation, negotiation, and execution of this Amendment and the other Loan Documents executed pursuant hereto and any and all amendments, modifications, and supplements thereto, including, without limitation, the costs and fees of legal counsel, and all reasonable costs and expenses incurred by Agent or any Lender in connection with the enforcement or preservation of any rights under the Loan Agreement or any other Loan Documents, all as amended hereby, including, without, limitation, the reasonable costs and fees of legal counsel.  Notwithstanding anything to the contrary in this Amendment or otherwise, nothing in this Section 6.3 is intended to be inconsistent with, or interpreted in a manner inconsistent with, Section 12.7 of the Loan Agreement.

**6.4 Severability.**  Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

**6.5 Successors and Assigns.**  This Amendment is binding upon and shall inure to the benefit of Lenders, Agent and Borrower and their respective permitted successors and assigns, except that Borrower may not assign or transfer any of its rights or obligations hereunder without the prior written consent of Agent.

**6.6 Counterparts.**  This Amendment may be executed in one or more counterparts, each of which when so executed shall be deemed to be an original, but all of which when taken

8

together shall constitute one and the same instrument. This Amendment may be executed by facsimile transmission, which facsimile signatures shall be considered original executed counterparts for purposes of this <u>Section 6.6</u>, and each party to this Amendment agrees that it will be bound by its own facsimile signature and that it accepts the facsimile signature of each other party to this Amendment.

**6.7** <u>**Effect of Waiver**</u>.  No consent or waiver, express or implied, by Agent or any Lender to or for any breach of or deviation from any covenant or condition by Borrower shall be deemed a consent to or waiver of any other breach of the same or any other covenant, condition or duty.

**6.8** <u>**Headings**</u>.  The headings, captions, and arrangements used in this Amendment are for convenience only and shall not affect the interpretation of this Amendment.

**6.9** <u>**Applicable Law**</u>.  THIS AMENDMENT AND ALL OTHER LOAN DOCUMENTS EXECUTED PURSUANT HERETO SHALL BE DEEMED TO HAVE BEEN MADE AND TO BE PERFORMABLE IN AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, AS SET FORTH IN THE LOAN AGREEMENT.

**6.10** <u>**Final Agreement**</u>.  THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS, EACH AS AMENDED HEREBY, AND THE INVENTORY LOAN DOCUMENTATION REPRESENT THE ENTIRE EXPRESSION OF THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF ON THE DATE THIS AMENDMENT IS EXECUTED.  THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS, EACH AS AMENDED HEREBY, AND THE INVENTORY LOAN DOCUMENTATION MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.  NO MODIFICATION, RESCISSION, WAIVER, RELEASE OR AMENDMENT OF ANY PROVISION OF THIS AMENDMENT SHALL BE MADE, EXCEPT BY A WRITTEN AGREEMENT SIGNED BY BORROWER AND AGENT AND LENDERS.

**6.11** <u>**Release by Borrower**</u>.  FOR AND IN CONSIDERATION OF AGENT AND LENDERS' AGREEMENTS CONTAINED HEREIN, BORROWER ("**<u>RELEASOR</u>**") HEREBY VOLUNTARILY AND KNOWINGLY RELEASES AND FOREVER WAIVES AND DISCHARGES  AGENT  AND LENDERS WHO ARE PARTIES TO THE LOAN AGREEMENT AS OF THE DATE HEREOF (INDIVIDUALLY AND COLLECTIVELY, THE " **<u>RELEASED PARTIES</u>**") FROM ALL POSSIBLE CLAIMS, COUNTERCLAIMS, DEMANDS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, ANTICIPATED OR UNANTICIPATED, SUSPECTED OR UNSUSPECTED, FIXED, CONTINGENT OR CONDITIONAL OR AT LAW OR IN EQUITY, IN WHOLE OR IN PART, ARISING ON OR BEFORE THE DATE OF THIS AMENDMENT THAT RELEASOR MAY NOW OR HEREAFTER HAVE AGAINST THE RELEASED PARTIES, IF ANY, IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS ARISE OUT OF CONTRACT, TORT, VIOLATION OF LAW OR REGULATIONS OR OTHERWISE, INCLUDING WITHOUT LIMITATION

9

ARISING DIRECTLY OR INDIRECTLY FROM ANY OF THE LOAN DOCUMENTS, THE INVENTORY LOAN DOCUMENTATION, THE EXERCISE OF ANY RIGHTS AND REMEDIES UNDER ANY OF THE LOAN DOCUMENTS OR INVENTORY LOAN DOCUMENTATION AND/OR NEGOTIATION FOR AND EXECUTION OF THIS AMENDMENT, INCLUDING, WITHOUT LIMITATION, ANY CONTRACTING FOR, CHARGING, TAKING, RESERVING, COLLECTING OR RECEIVING INTEREST IN EXCESS OF THE HIGHEST LAWFUL RATE APPLICABLE. RELEASOR WAIVES THE BENEFITS OF ANY LAW, WHICH MAY PROVIDE IN SUBSTANCE: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MUST HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE DEBTOR." RELEASOR UNDERSTANDS THE FACTS IT BELIEVES TO BE TRUE AT THE TIME OF MAKING THE RELEASE PROVIDED FOR HEREIN MAY LATER TURN OUT TO BE DIFFERENT THAN IT NOW BELIEVES, AND INFORMATION NOT NOW KNOWN OR SUSPECTED MAY LATER BE DISCOVERED. RELEASOR ACCEPTS THIS POSSIBILITY AND ASSUMES THE RISK OF THE FACTS TURNING OUT TO BE DIFFERENT AND NEW INFORMATION BEING DISCOVERED AND FURTHER AGREES THE RELEASE PROVIDED FOR HEREIN SHALL IN ALL RESPECTS CONTINUE TO BE EFFECTIVE AND NOT SUBJECT TO TERMINATION OR RESCISSION BECAUSE OF ANY DIFFERENCE IN SUCH FACTS OR ANY NEW INFORMATION.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

10

IN WITNESS WHEREOF, this Amendment has been executed as of the date first written above.

**BORROWER:**

**BLUEGREEN VACATIONS CORPORATION**,
a  Florida corporation


By: /s/ Paul Humphrey
Name:  Paul Humphrey
Title:    Senior Vice President, Finance and Capital Markets

---

**AGENT AND LENDER:**

**PACIFIC WESTERN BANK**,
a California state-chartered bank, as successor-by-merger to CapitalSource Bank

By:  /s/ Jason Schwartz
Name: Jason Schwartz
Title:  Senior Vice President, Portfolio Manager

---

EXHIBIT D

**UNDERWRITING GUIDELINES**

Customer financing on sales of timeshare interests requires (a) that the obligor (which may include one or more persons) has made total payments (comprised of a down payment and/or principal payments) by cash, check, credit card or otherwise of at least 10% (or 20% in limited circumstances) of the actual purchase price of the timeshare property (which down payment may, (i) in the case of upgrade club loans or conversion in connection with an introductory loan be represented in whole or in part by the principal payments and down payment made on, as applicable, such related original club loan or the related introductory loan since its date of origination, (ii) in the case of an upgrade or a conversion in connection with an introductory product, be represented in whole or in part by the amount paid where the obligor has paid in full, whether at the point of sale or otherwise for the original timeshare property or introductory product, as applicable, or (iii) in the case of no equity loans, may be represented by equity from a previous purchase), (b) an executed mortgage note and mortgage or, in the case of sales in the La Cabana Resort, an owner beneficiary agreement, and (c) other closing documents between the originator and the purchaser.  Bluegreen Vacations Corporation and its affiliates, as applicable, (together the "Company") encourages purchasers to make increased down payments by offering a lower interest rate.  Purchasers who participate in the Company's pre-authorized checking payment plan receive a 1% discount in the interest rate, where allowed by applicable laws and regulations.

Prior to December 15, 2008, the Company's customer financing was not subject to any significant loan underwriting criteria and no FICO® score was obtained prior to extending credit. The Company implemented a formal FICO® score-based credit underwriting program effective December 15, 2008. Following implementation, the Company no longer provided financing to customers with FICO® scores below 500 and new customers with FICO® scores between 500 and 599 were required to make a minimum cash down payment of 20%. Effective January 1, 2010, the Company increased its credit underwriting standards and no longer provided financing to new customers with FICO® scores below 575 and new customers with FICO® scores between 575 and 599 were required to make a minimum cash down payment of 20%.  Effective March 29, 2017, the Company has temporarily further increased its credit underwriting standards to no longer provide financing to new customers with FICO® scores below 600. Interest rates may vary due to transaction sizes, FICO® scores and/or other factors. The Company may, from time to time, offer certain introductory products with FICO® scores and finance terms that are intended to be held in the Company's portfolio. Additionally, the Company may provide financing to customers with no FICO® scores who make a minimum down payment.

**Schedule 1.1**

Occupancy Issues Regarding Resorts as of Amendment Date

The Lake Eve Resort was affected by Hurricane Irma.  A portion of the resort experienced water intrusion (100 out of 160 units) and is expected to be open over time and completely by year end.

---

Schedule 1.2

Resorts

Primary Resorts

| | | | |
|---|---|---|---|
| 1. | BG Fountains Condominium | Orlando | Florida |
| 2. | BG Club 36 | Las Vegas | Nevada |
| 3. | Bluegreen Odyssey Dells | Lake Delton | Wisconsin |
| 4. | Lake Eve Resort | Orlando | Florida |

Secondary Resorts

| | | | |
|---|---|---|---|
| 1. | Wilderness Traveler at Shenandoah | Gordonsville | Virginia |
| 2. | BG Pirate's Lodge Condominium | Lake Delton | Wisconsin |
| 3. | The Villas at Christmas Mountain | Wisconsin Dells | Wisconsin |
| 4. | Christmas Mountain — Timbers | Wisconsin Dells | Wisconsin |
| 5. | Christmas Mountain — Campground | Wisconsin Dells | Wisconsin |
| 6. | BG Patrick Henry Square | Williamsburg | Virginia |
| 7. | Grande Villas at World Golf Village Condominium | St. Augustine | Florida |
| 8. | Mountain Run at Boyne | Boyne Falls | Michigan |
| 9. | Falls Village | Branson | Missouri |
| 10. | MountainLoft | Gatlinburg | Tennessee |
| 11. | MountainLoft II | Gatlinburg | Tennessee |
| 12. | Harbour Lights Resort Horizontal Property Regime | Myrtle Beach | South Carolina |
| 13. | Shore Crest | Myrtle Beach | South Carolina |
| 14. | Shore Crest II | Myrtle Beach | South Carolina |
| 15. | Laurel Crest | Pigeon Forge | Tennessee |

Other Approved Resorts

Club Resorts

| | | | |
|---|---|---|---|
| 1. | Daytona SeaBreeze | Daytona Beach Shores | Florida |
| 2. | The Hammocks at Marathon | Marathon | Florida |
| 3. | Orlando's Sunshine Resort I & II | Orlando | Florida |
| 4. | Casa Del Mar Beach Resort | Ormond Beach | Florida |
| 5. | Solara Surfside | Surfside | Florida |
| 6. | Bluegreen Club La Pension | New Orleans | Louisiana |
| 7. | The Suites at Hershey | Hershey | Pennsylvania |
| 8. | The Lodge Alley Inn | Charleston | South Carolina |
| 9. | Carolina Grande | Myrtle Beach | South Carolina |
| 10. | SeaGlass Tower | Myrtle Beach | South Carolina |
| 11. | Shenandoah Crossing Farm & Country Club | Gordonsville | Virginia |
| 12. | La Cabana Beach And Racquet Club | Oranjestad | Aruba |
| 13. | Resort at World Golf Village | St. Augustine | Florida |
| 14. | The Innsbruck, A Condominium | Aspen | Colorado |

| | | | |
|---|---|---|---|
| 15. | The Hotel Blake | Chicago | Illinois |
| 16. | Club at Big Bear | Big Bear Lake | California |
| 17. | The Atlantic Palace | Atlantic City | New Jersey |
| 18. | King 583 | Charleston | South Carolina |
| 19. | Club Lodges at Trillium | Cashiers | North Carolina |

| | The Soundings Seaside Resort | Dennisport | Massachusetts |

| 20. | | | |
|-----|---------------------|------------------|-----------------|
| 21. | The Breakers Resort | Dennisport | Massachusetts |
| 22. | Bluegreen at Tradewinds | St. Pete Beach | Florida |
| 23. | Horizons at 77th | N. Myrtle Beach | South Carolina |
| 24. | Cibola Vista Resort & Spa | Peoria | Arizona |
| 25. | Blue Ridge Village | Banner Elk | North Carolina |

Club Associate Resorts (other than FBS Resorts)

| 1. | Paradise Isle Resort | Gulf Shores | Alabama |
|-----|---------------------|------------------|-----------------|
| 2. | Shoreline Towers Resort | Gulf Shores | Alabama |
| 3. | Via Roma Beach Resort | Bradenton Beach | Florida |
| 4. | Dolphin Beach Club | Daytona Beach Shores | Florida |
| 5. | Fantasy Island Resort II | Daytona Beach Shores | Florida |
| 6. | Mariner's Boathouse and Beach Resort | Fort Myers Beach | Florida |
| 7. | Tropical Sands Resort | Fort Myers Beach | Florida |
| 8. | Windward Passage Resort | Fort Myers Beach | Florida |
| 9. | Gulfstream Manor | Gulfstream | Florida |
| 10. | Resort Sixty-Six | Holmes Beach | Florida |
| 11. | Outrigger Beach Club | Ormond Beach | Florida |
| 12. | Landmark Holiday Beach Resort | Panama City Beach | Florida |
| 13. | Ocean Towers Beach Club | Panama City Beach | Florida |
| 14. | Panama City Resort & Club | Panama City Beach | Florida |
| 15. | Surfrider Beach Club | Sanibel Island | Florida |
| 16. | Petit Crest Villas at Big Canoe | Marble Hill | Georgia |
| 17. | Pono Kai Resort | Kapaa (Kauai) | Hawaii |
| 18. | Lake Condominiums at Big Sky | Big Sky | Montana |
| 19. | Foxrun Townhouses | Lake Lure | North Carolina |
| 20. | Sandcastle Village | New Bern | North Carolina |
| 21. | Waterwood Townhouses | New Bern | North Carolina |
| 22. | Players Club | Hilton Head Island | South Carolina |
| 23. | Hemlock | Boyne Falls | Michigan |

FBS Resorts

| 1. | Parkside a Vacation Ownership Resort | Williamsburg | Virginia |
|-----|---------------------|------------------|-----------------|
| 2. | InnSeason Resorts South Mountain Condominium | Lincoln | New Hampshire |
| 3. | The Breakers Resort Condominium | Dennisport | Massachusetts |
| 4. | The Soundings Seaside Resort Condominium | Dennisport | Massachusetts |
| 5. | Cibola Vista Resort & Spa | Peoria | Arizona |

| 6. | Studio Homes at Ellis Square | Savannah | Georgia |
| 7. | The Hotel Blake | Chicago | Illinois |

D - 0055-0223

**Schedule 5.15**

Names, Addresses and States of Formation

**Name:**          Bluegreen Vacations Corporation (a Florida corporation), fka Bluegreen Corporation

**Address:**       4960 Conference Way North, Suite 100
                   Boca Raton, Florida 33431

Additional names used during past five (5) years:

(1)  **North Carolina**:          Bluegreen Corporation d/b/a Bluegreen Patten Corporation

(2)  **Louisiana**:  Bluegreen Corporation of Massachusetts

(3)  **California**:               BXG California, Inc.

**And such other names and/or addresses as may be provided to the Agent from time to time.**

**Schedule 3.30**

Resort Documents

**BG FOUNTAINS CONDOMINIUM**

   a.   Master Declaration of Covenants, Conditions and Restrictions, recorded July 28, 1998, in Book 5535, Page 3243 of the Public Records of Orange County, Florida.

   b.   Declaration of Condominium for BG Fountains Condominium, recorded October 26, 2004, in Book 07674, Page 4336 of the Public Records of Orange County, Florida, with amendments of record in Book 07785, Page 2252; Book 08559, Page 1321; Book 08559, Page 1360; Book 08775, Page 4485; Book 09443, Page 2378; Book 9881, Page 2943.

   c.   Articles of Incorporation of BG Fountains Condominium Association, Inc.

   d.   Bylaws of BG Fountains Condominium Association, Inc.

   e.   That  certain Timeshare Management Agreement dated as of October 3, 2012, by and between BG Fountains Condominium Association, Inc. and Bluegreen Resorts Management, Inc.

   f.   BG Fountains Condominium A Bluegreen Vacation Club Resort Public Offering Statement (Florida).

   g.   Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to BG Fountains Condominium.

   h.   The applicable Consumer Documents for BG Fountains Condominium.

   i.   Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to BG Fountains Condominium.

**BG CLUB 36**

   a.   Master Declaration of Covenants, Conditions, Easements and Restrictions for Bluegreen Club 36, recorded July 29, 2008, Book 080729, at Document No. 0004566, in the office of the County Recorder of Clark County, Nevada.

   b.   Articles of Incorporation of BG Club 36 Master Association, Inc.

   c.   Bylaws of BG Club 36 Master Association, Inc.

   d.   Declaration of Covenants, Conditions, Easements, Restrictions and Timeshare Ownership Instrument for BG Club 36, recorded July 29, 2008, in Book 080729 at Document No. 0004568, in the office of the County Recorder of Clark County, Nevada.

   e.   Articles of Incorporation of BG Club 36 Owners Association, Inc.

   f.   Bylaws of BG Club 36 Owners Association, Inc.

   g.   That certain Timeshare Management Agreement, dated as of September 18, 2012, by and between BG Club 36 Owners Association, Inc., and Bluegreen Resorts Management, Inc.

   h.   Nevada Public Offering Statement for Bluegreen Vacation Club.

   i.   Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to BG Club 36.

   j.   The applicable Consumer Documents for BG Club 36.

   k.   Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to BG Club 36.

**BLUEGREEN WILDERNESS TRAVELER AT SHENANDOAH**

a. Declaration of Covenants, Conditions and Restrictions for Bluegreen Wilderness Traveler at Shenandoah Vacation Ownership Program, dated November 28, 2007, recorded at Deed Book 1117, Page 861 of the Public Records of Louisa County, Virginia, with amendments of record at Book 1126, Page 372, and Book 1216, Page 818, and Book 1526, Page 111.

b. Articles of Incorporation of Bluegreen Wilderness Traveler at Shenandoah Owners Association, Inc.

c. By-Laws of Bluegreen Wilderness Traveler at Shenandoah Owners Association, Inc.

d. That certain Timeshare Management Agreement dated as of the July 14, 2014 by and between Bluegreen Wilderness Traveler at Shenandoah Owners Association Inc. and Bluegreen Resorts Management, Inc.

e. Bluegreen Wilderness Traveler at Shenandoah Vacation Ownership Program Public Offering Statement (Virginia).

f. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Bluegreen Wilderness Traveler at Shenandoah.

g. The applicable Consumer Documents for Bluegreen Wilderness Traveler at Shenandoah.

h. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Bluegreen Wilderness Traveler at Shenandoah.

**BG PIRATE'S LODGE**

a. Master Declaration by and between Treasure Island, LLC, Bluegreen Vacations Unlimited, Inc., Dells Vacation Condominium Unit Owners Association, Inc., and Club Optima Dells Owners' Association, Inc., recorded September 28, 2006 as Document No. 918419 in the Public Records of Sauk County, Wisconsin, with an amendment recorded on May 28, 2008 as Document No. 962000.

b. First Amendment to Declaration of Condominium of Dells Vacation Condominium and Declaration of Covenants, Conditions, Easements and Restrictions and Time-Share Instrument for Club Optima Amending, Restating, and Merging them into Declaration of Condominium for BG Pirate's Lodge Condominium recorded November 3, 2006, as Document No. 921739 in the Public Records of Sauk County, Wisconsin.

c. Declaration of Condominium for Bluegreen Odyssey Dells, A Condominium recorded June 30, 2008, as Document No. 963977 in the Public Records of Sauk County, Wisconsin.

d. Amended and Restated Articles of Incorporation of BG Pirate's Lodge Owners Association, Inc.

e. Amended and Restated By-Laws of BG Pirate's Lodge Owners Association, Inc., adopted September 12, 2006.

f. That certain Timeshare Management Agreement dated December 5, 2012, by and between BG Pirate's Lodge Owners Association, Inc. and Bluegreen Resorts Management, Inc.

g. Time-Share Disclosure Statement BG Pirate's Lodge Condominium (Wisconsin).

h. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to BG Pirate's Lodge Condominium.

i. The applicable Consumer Documents for BG Pirate's Lodge Condominium.

j. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to BG Pirate's Lodge Condominium.

**CHRISTMAS MOUNTAIN TIMBERS**

   a. Declaration of Covenants, Conditions and Restrictions for Christmas Mountain Village recorded in the Office of the Register of Deeds of Sauk County, Wisconsin on August 26, 1991, in Book 002, Page 762, with amendment of record at Book 002, Page 791.

   b. Amended and Restated Declaration of Covenants, Conditions and Restrictions for the Timbers at Christmas Mountain recorded December 4, 2003, in the Office of the Register of Deeds of Sauk County, Wisconsin, as Document No. 827468.

   c. Articles of Association of The Timbers at Christmas Mountain Association.

   d. By-Laws of The Timbers at Christmas Mountain Association, as amended.

   e. That certain Timeshare Management Agreement dated June 1, by and between The Timbers at Christmas Mountain Association U.A., and Bluegreen Resorts Management, Inc., as amended by First Amendment dated June 1, 2015.

   f. Time-Share Disclosure Statement The Timbers at Christmas Mountain (Wisconsin).

   g. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to The Timbers at Christmas Mountain.

   h. The applicable Consumer Documents for The Timbers at Christmas Mountain.

   i. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to The Timbers at Christmas Mountain.

**CHRISTMAS MOUNTAIN VILLAS**

   a. Declaration of Covenants, Conditions and Restrictions for Christmas Mountain Village recorded in the Office of the Register of Deeds of Sauk County, Wisconsin on August 26, 1991, in Book 002, Page 762, with amendment of record at Book 002, Page 791.

   b. Restated Declaration of Time-Share Condominium of The Villas at Christmas Mountain recorded in the Office of the Register of Deeds of Sauk County, Wisconsin, in Book 002, Page 271, with amendments of record in Book 002, Page 560; Book 002, Page 677; Book 003, Page 576; and Document 842609.

   c. Articles of The Villas at Christmas Mountain Association, as amended.

   d. By-Laws of The Villas at Christmas Mountain Association, as amended.

   e. That certain Timeshare Management Agreement dated June 1, 2014, by and between The Villas at Christmas Mountain Association, U.A., and Bluegreen Resorts Management, Inc., as amended by First Amendment dated June 1, 2015.

   f. Time-Share Disclosure Statement The Villas at Christmas Mountain (Wisconsin).

   g. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to The Villas at Christmas Mountain.

   h. The applicable Consumer Documents for The Villas at Christmas Mountain.

   i. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to The Villas at Christmas Mountain.

**CHRISTMAS MOUNTAIN CAMPGROUND**

   a. Declaration of Covenants, Conditions and Restrictions for Christmas Mountain Village recorded in the Office of the Register of Deeds of Sauk County, Wisconsin on August 26, 1991, in Book 002, Page 762, with amendment of record at Book 002, Page 791.

    b.   Declaration of Covenants, Conditions and Restrictions for Christmas Mountain Campground recorded in the Office of the Register of Deeds of Sauk County, Wisconsin, at Book 206, Page 898, with amendments of record at Book 405, Page 688; Book 461, Page 716; and Book 002, Page 519; Book 002, Page 556; Book 002, Page 797; Book 003, Page 267; Book 003, Page 568; and Document No. 842924.

    c.   Articles of Association of The Christmas Mountain Campground Association.

    d.   By-Laws of The Christmas Mountain Campground Association, as amended.

    j.   That certain Timeshare Management Agreement dated June 1, 2014, by and between The Christmas Mountain Campground Association and Bluegreen Resorts Management, Inc., as amended by First Amendment dated June 1, 2015.

    e.   Time-Share Disclosure Statement Christmas Mountain Campground (Wisconsin).

    f.   Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Christmas Mountain Campground.

    g.   The applicable Consumer Documents for Christmas Mountain Campground.

    h.   Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Christmas Mountain Campground.

**PATRICK HENRY**

    a.   Amended and Restated Master Declaration of Covenants, Conditions and Restrictions for BG Patrick Henry Square recorded in the Clerk's Office, Circuit Court of Williamsburg/James City County, Virginia, at Instrument Number 142739, as amended by Instrument Number 166377.

    b.   Amended and Restated Declaration of Covenants, Conditions and Restrictions for BG Patrick Henry Square Vacation Ownership Program recorded in t h e Clerk's Office, Circuit Court of Williamsburg/James City County, Virginia, at Instrument Number 152793, as amended by Instrument Number 171441.

    c.   Articles of Incorporation of BG Patrick Henry Square Timeshare Owners Association, Inc.

    d.   By-laws of BG Patrick Henry Square Timeshare Owners Association, Inc.

    e.   That certain Timeshare Management Agreement dated July 14, 2014, by and between BG Patrick Henry Square Timeshare Owners Association, Inc. and Bluegreen Resorts Management, Inc.

    i.   BG Patrick Henry Square Vacation Ownership Program Public Offering Statement (Virginia).

    f.   Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Patrick Henry Square.

    g.   The applicable Consumer Documents for Patrick Henry Square.

    h.   Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Patrick Henry Square.

**GRANDE VILLAS AT WORLD GOLF VILLAGE CONDOMINIUM**

    a.   Master Declaration of Covenants, Conditions and Restrictions recorded September 3, 1998 in the Official Records of St. John's County, Florida, in Book 1345, Page 1586.

    b.   Declaration of Condominium for Grande Villas at World Golf Village Condominium a Bluegreen Vacation Club Resort recorded January 22, 2004, in the Official Records of St.

John's County, Florida, in Book 2126, Page 1051, with an amendment of record in Book 2964, Page 1900.

c. Articles of Incorporation of Grand Villas at World Golf Village Condominium Association, Inc.
d. Bylaws of Grande Villas at World Golf Village Condominium Association, Inc.
e. That certain Timeshare Management Agreement dated October 16, 2012, by and between Grande Villas at World Golf Village Condominium Association, Inc. and Bluegreen Resorts Management, Inc.
f. Grande Villas at World Golf Village Condominium A Bluegreen Vacation Club Resort Public Offering Statement (Florida).
g. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Grande Villas at World Golf Village Condominium.
h. The applicable Consumer Documents for Grande Villas at World Golf Village Condominium.
i. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Grande Villas at World Golf Village Condominium.

**MOUNTAIN RUN AT BOYNE**

a. Master Deed of Mountain Run at Boyne recorded August 14, 2003 in the Register of Deeds of Charlevoix County, Michigan in Liber 563, Page 576, with amendments of record in Liber 690, Page 762; Liber 690, Page 772; and Liber 714, Page 118.
b. Restated Articles of Incorporation of Mountain Run at Boyne Owners Association, Inc.
c. Bylaws of the Mountain Run at Boyne Owners Association, Inc.
d. That certain Timeshare Management Agreement dated September 27, 2012, by and between Mountain Run at Boyne Owners Association, Inc. and Bluegreen Resorts Management, Inc.
e. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Mountain Run at Boyne.
f. The applicable Consumer Documents for Mountain Run at Boyne.
g. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Mountain Run at Boyne.

**FALLS VILLAGE**

a. Declaration of Restrictions of The Falls recorded in Taney County, Missouri at Book 0318, Page 8772.
b. Declaration of Condominium and By-Laws for The Falls Village Resort, a Condominium, as recorded in Taney County, Missouri, in Book 340, Page 1764, and amended in Book 344, Page 4886; Book 346, Page 7596; Book 349, Page 7131; Book 354, Page 8986; Book 362, Page 5723; Book 362, Page 5731; Book 365, Page 7217; Book 368, Page 3323; Book 370, Page 5496; Book 424, Page 5329; Book 450, Page 735; Book 450, Page 743; Book 456, Page 2709; Book 463, Page 828; Book 485, Page 965; Book 485, Page 989; and Book 2007L, Page 16245.
c. Articles of Incorporation of The Falls Village Resort Condominium Association, Inc.
d. That certain Timeshare Management Agreement dated the January 1, 2013, by and between The Falls Village Resort Condominium Association, Inc., and Bluegreen Resorts Management, Inc.

e.  Original Sales Certificate for The Falls Village Resort (Missouri).

f.  Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to The Falls Village Resort.

g.  The applicable Consumer Documents for The Falls Village Resort.

h.  Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to The Falls Village Resort.

**MOUNTAINLOFT**

a.  Declaration of Condominium for MountainLoft Resort recorded in the Official Records of Sevier County, Tennessee, at Book D516, Page 324, with amendments of record in Book D525, Page 356; Book D543, Page 21; Book D551, Page 256; Book D568, Page 573; Book D569, Page 561; Book D587, Page 292; Book D607, Page 526; Book D620, Page 81; Book D627, Page 161; Book D636, Page 783; Book D667, Page 242; Book 1006, Page 443; Book 1450, Page 526; and Book 3350, Page 362.

b.  Charter of The MountainLoft Resort Condominium Association, Inc.

c.  By-Laws of The MountainLoft Resort Condominium Association, Inc., as amended

d.  That certain Timeshare Management Agreement dated May 7, 2014, by and between The MountainLoft Resort Condominium Association, Inc. and Bluegreen Resorts Management, Inc.

e.  Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to The MountainLoft Resort Condominium.

f.  The applicable Consumer Documents for The MountainLoft Resort Condominium.

g.  Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to The MountainLoft Resort Condominium.

**MOUNTAINLOFT II**

a.  Declaration of Condominium for MountainLoft Resort II recorded in the Official Records of Sevier County, Tennessee, at Book 2714, Page 171.

b.  Articles of Incorporation of MountainLoft Resort II Condominium Association, Inc.

c.  Bylaws of MountainLoft Resort II Condominium Association, Inc.

d.  That certain Timeshare Management Agreement dated February 1, 2013, by and between MountainLoft Resort II Condominium Association, Inc. and Bluegreen Resorts Management, Inc.

e.  Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to MountainLoft Resort II Condominium.

f.  The applicable Consumer Documents for MountainLoft Resort II Condominium.

g.  Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to MountainLoft Resort II Condominium.

**HARBOUR LIGHTS RESORT HORIZONTAL PROPERTY REGIME**

a.  Master Deed for Harbour Lights Resort Horizontal Property Regime recorded June 29, 1998, in Book 2049, Page 437, in the office of the Registrar of Deeds in Horry County, South Carolina, with amendments of record in Book 2087, Page 875; Book 2374, Page 372; Book 2221, Page 951; Book 2681, Page 538; Book 2758, Page 699; Book 3078, Page

743; Book 3078, Page 750; Book 3162, Page 359; Book 3860, Page 2176; and Book 3870, Page 3394.

    b.  Articles of Incorporation of Harbour Lights Resorts Owners Association, Inc.

    c.  Bylaws of Harbour Lights Resorts Owners Association, Inc.

    d.  That certain Timeshare Management Agreement dated as of September 12, 2017, between Harbour Lights Resorts Owners Association, Inc. and Bluegreen Resorts Management, Inc.

    e.  Public Offering Statement for Harbour Lights, a Condominium (South Carolina).

    f.  Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Harbour Lights Resort Horizontal Property Regime.

    g.  The applicable Consumer Documents for Harbour Lights Resort Horizontal Property Regime.

    h.  Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Harbour Lights Resort Horizontal Property Regime.

### SHORE CREST

    a.  Master Deed for Shore Crest Vacation Villas Horizontal Property Regime, rec orded April 29, 1997, in Book 1937, Page 530 of the Public Records of Horry County, South Carolina, with amendments of record in Book 2221, Page 947; Book 3860, Page 2170; and Book 3871, Page 1826.

    b.  Articles of Incorporation of The Shore Crest Vacation Villas Owners Association, Inc.

    c.  By-Laws of The Shore Crest Vacation Villas Owners Association, Inc., as amended.

    d.  That certain Timeshare Management Agreement dated as of October 23, 2012, by and between Shore Crest Vacation Villas Owners Association, Inc., and Bluegreen Resorts Management, Inc.

    e.  Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Shore Crest Vacation Villas Horizontal Property Regime.

    f.  The applicable Consumer Documents for Shore Crest Vacation Villas Horizontal Property Regime.

    g.  Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Shore Crest Vacation Villas Horizontal Property Regime.

### SHORE CREST II

    a.  Master Deed for Shore Crest Vacation Villas II Horizontal Property Regime, recorded December 17, 1999, in Book 2217, Page 48 of the Public Records of Horry County, South Carolina.

    b.  Articles of Incorporation of the Shore Crest Vacation Villas II Owners Association, Inc.

    c.  By-Laws of the Shore Crest Vacation Villas II Owners Association, Inc.

    d.  That certain Timeshare Management Agreement dated as of October 23, 2012, by and between Shore Crest Vacation Villas II Owners Association, Inc., and Bluegreen Resorts Management, Inc.

    i.  Public Offering Statement for Shore Crest Vacation Villas II Horizontal Property Regime (South Carolina).

    e.  Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Shore Crest Vacation Villas II Horizontal Property Regime.

    f.  The applicable Consumer Documents for Shore Crest Vacation Villas II Horizontal Property Regime.

    g.  Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Shore Crest Vacation Villas II Horizontal Property Regime.

**LAUREL CREST**

    a.  Declaration of Condominium for Laurel Crest Resort, recorded in the Public Records of Sevier County, Tennessee, June 23, 1995, in Book D548, Page 228, and amendments recorded in Book D554, Page 9; Book D567, Page 549; Book D590, Page 60; Book D608, Page 205; Book D637, Page 1; Book D666, Page 251; Book 1006, Page 438; Book 1763, Page 327; Book 3350, Page 325; and Book 3350, Page 331, of the Public Records of Sevier County, Tennessee.

    b.  Charter of The Laurel Crest Resort Condominium Association, Inc.

    c.  By-Laws of The Laurel Crest Resort Condominium Association, Inc., as amended.

    d.  That certain Timeshare Management Agreement dated as of August 23, 2012, by and between The Laurel Crest Resort Condominium Association, Inc., and Bluegreen Resorts Management, Inc.

    e.  Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to The Laurel Crest Resort Condominium.

    f.  The applicable Consumer Documents for The Laurel Crest Resort Condominium.

    g.  Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to The Laurel Crest Resort Condominium.

**LAKE EVE RESORT**

    a.  Master Declaration of Covenants, Conditions and Restrictions for Lake Eve Resort, recorded November 13, 2013, in Book 10663, Page 6429 of the Public Records of Orange County, Florida, with amendments of record in Book 10686, Page 3217, Book 10871, Page 4936, Book 10916, Page 5930, Document No. 20160233549, Document No. 20160342959, Document No. 20160584368, Document No. 20170253808.

b. Amended and Restated Declaration of Condominium for Lake Eve Resort Condominium, recorded July 5, 2016, as Document No. 20160342961 of the Public Records of Orange County, Florida, with amendments of recorded as Document No. 20160342962, Document No. 20160584370, Document No. 20170253810.

c. Articles of Incorporation of Lake Eve Resort Condominium Owners Association, Inc.

d. Bylaws of Lake Eve Resort Condominium Owners Association, Inc.

e. That certain Management Agreement dated as of November 6, 2013, by and between Lake Eve Resort Condominium Owners Association, Inc. and Bluegreen Resorts Management, Inc.

f. Lake Eve Resort Condominium A Bluegreen Vacation Club Resort Public Offering Statement (Florida).

g. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Lake Eve Resort Condominium.

h. The applicable Consumer Documents for BG Fountains Condominium.

i. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to BG Fountains Condominium.

Exhibit 10.110

### Fifth AMENDMENT TO AMENDED AND RESTATED
### LOAN AND SECURITY AGREEMENT

This **FIFTH AMENDMENT TO AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT** (this "**Amendment**"), dated as of August 15, 2018 ("**Amendment Date**"), by and among **BLUEGREEN VACATIONS CORPORATION**, a Florida corporation f/k/a Bluegreen Corporation ("**Borrower**"), each of the financial institutions from time to time party hereto (individually, each a "**Lender**", and collectively, the "**Lenders**") and **PACIFIC WESTERN BANK**, a California state-chartered bank, as successor-by-merger to CapitalSource Bank, as administrative, payment and collateral agent for itself, as a Lender and the other Lenders (in such capacities, "**Agent**").

### RECITALS

WHEREAS, Borrower, Lenders and Agent are parties to, among other Loan Documents, that certain Amended and Restated Loan and Security Agreement, dated as of July 10, 2013, as amended by that certain First Amendment to Amended and Restated Loan and Security Agreement, dated as of December 6, 2013, as further amended by that certain Second Amendment to Amended and Restated Loan and Security Agreement, dated as of June 25, 2015, as further amended by that certain Third Amendment to Amended and Restated Loan and Security Agreement, dated as of October 24, 2016, as further amended by that certain Fourth Amendment to Amended and Restated Loan and Security Agreement, dated as of October 19, 2017 (as amended, restated, supplemented or otherwise modified in writing from time to time, the "**Loan Agreement**"); and

WHEREAS, Borrower, Lenders and Agent desire to amend the Loan Agreement as set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

### ARTICLE I.
### Definitions

Capitalized terms used in this Amendment are defined in the Loan Agreement unless otherwise stated.

### ARTICLE II.
### Amendments to Loan Agreement and Side Letter

**2.1 Amendment to Section 1.1 of the Loan Agreement**. Effective as of the date hereof, Section 1.1 of the Loan Agreement is hereby amended by deleting the reference to "BFC Financial Corporation" in the definition of "Affiliate" and replacing such reference with "BBX Capital Corporation".

**2.2 <u>Amendment to Section 1.1 of the Loan Agreement</u>**.  Effective as of the date hereof, <u>Section 1.1</u> of the Loan Agreement is hereby amended by amending and restating the definition of "Calculated Rate" in its entirety as follows:

""<u>Calculated Rate</u>" shall mean, as of any date of determination, the applicable percentage referenced in the table below during the time period opposite each such percentage with respect to the portion of the outstanding unpaid principal balance of the Loan opposite each such percentage:

| Applicable Time Period | Applicable Portion of the Outstanding Unpaid Principal Balance of the Loan | Calculated Rate |
|---|---|---|
| From Fifth Amendment Effective Date to September 20, 2018 | Equal to or less than the sum of $10,000,000 <u>less</u> the then outstanding principal balance of the Inventory Loan | 4.50% |
| From Fifth Amendment Effective Date to September 20, 2018 | Greater than the sum of $10,000,000 <u>less</u> the then outstanding principal balance of the Inventory Loan, but less than or equal to the sum of $19,000,000 <u>less</u> the then outstanding principal balance of the Inventory Loan | 4.00% |
| From Fifth Amendment Effective Date to September 20, 2018 | Greater than the sum of $19,000,000 <u>less</u> the then outstanding principal balance of the Inventory Loan | 3.50% |
| From September 21, 2018 and thereafter | Equal to or less than the sum of $15,000,000 <u>less</u> the then outstanding principal balance of the Inventory Loan | 3.00% |
| From September 21, 2018 and thereafter | Greater than the sum of $15,000,000 <u>less</u> the then outstanding principal balance of the Inventory Loan | 2.75% |

**2.3 <u>Amendment to Section 1.1 of the Loan Agreement</u>**.  Effective as of the date hereof, <u>Section 1.1</u> of the Loan Agreement is hereby amended by deleting all references to "BFC Financial Corporation" in the definition of "Change of Control."

2

**2.4 <u>Amendment to Section 1.1 of the Loan Agreement</u>**.  Effective as of the date hereof, <u>Section 1.1</u> of the Loan Agreement is hereby amended by amending and restating clause (v) of the definition of "Custodian Deliverables" as follows:

"(v)       for all Receivables, a Collateral Assignment (which may be part of a blanket assignment of more than one Receivable, in which case the original or copy of the blanket Collateral Assignment is held by the Custodian in the related master pool header file and which, in the case of Receivables other than Aruba Receivables, shall be deemed a representation and warranty by Borrower that such Collateral Assignment has not been returned from recording and an agreement by Borrower to promptly deliver the original recorded document or copy thereof to Custodian upon its receipt thereof);"

**2.5 <u>Amendment to Section 1.1 of the Loan Agreement</u>**.  Effective as of the date hereof, <u>Section 1.1</u> of the Loan Agreement is hereby amended by adding the definition of "Customer Service Cancellation" in correct alphabetical order as follows:

""<u>Customer Service Cancellation</u>" shall mean the cancellation by Borrower of a Receivable as a result of dissatisfaction by the Obligor thereunder with some aspect of such Obligor's Vacation Ownership Interest."

**2.6 <u>Amendment to Section 1.1 of the Loan Agreement</u>**.  Effective as of the date hereof, <u>Section 1.1</u> of the Loan Agreement is hereby amended by amending and restating clause (xix) of the definition of "Eligible A Receivables" in its entirety as follows:

"(xix) the Unit in which the applicable Vacation Ownership Interest financed by such Receivable is situated and to which the Obligor has access: (A) as of the applicable Transfer Date, (w) has been completed in compliance with all Applicable Law, (x) is currently served by all required utilities, (y) is fully furnished and (z) is ready for use, except with respect to this clause (z) (1) for renovations for improvements from time to time in the ordinary course of maintaining the Unit, (2) for temporary closure or partial closure of Resorts for which Receivables included in the Borrowing Base are not in excess of $100,000 in the aggregate per such Resort, and (3) as set forth on <u>Schedule 1.1</u> hereto; (B) is covered by a valid permanent and unconditional certificate of occupancy (or its equivalent) duly issued; (C) is subject to the terms of the Declaration for the applicable Resort; and (D) has been developed to the specifications provided for in the applicable Timeshare Agreement; all furnishings (including appliances) within the Unit(s) to which the Obligor has access have been or will timely be fully paid for and are free and clear of any lien or other interest by any third party, except for any furniture leases which contain non-disturbance provisions acceptable to Agent;"

**2.7 <u>Amendment to Section 1.1 of the Loan Agreement</u>**.  Effective as of the date hereof, <u>Section 1.1</u> of the Loan Agreement is hereby amended by adding the definition of "Fifth Amendment Effective Date" in correct alphabetical order as follows:

""<u>Fifth Amendment Effective Date</u>" means August 15, 2018."

3

**2.8** <u>**Amendment to Section 1.1 of the Loan Agreement**</u>.  Effective as of the date hereof, <u>Section 1.1</u> of the Loan Agreement is hereby amended by amending and restating the definition of "LIBOR Rate" as follows:

""<u>LIBOR Rate</u>" shall mean a rate per annum rounded upwards, if necessary, to the nearest 1/1000 of 1% (3 decimal places). The LIBOR Rate is equal to the rate of interest which is identified and normally published by Bloomberg Professional Service page USD-LIBOR-BBA (BBAM) as the offered rate for loans in United States dollars for a one (1) month period. The rate is set by the British Bankers Association as of 11:00 a.m. (London time) as adjusted on a daily basis and effective on the second full Business Day after each such day (unless such date is not a Business Day, in which event the next succeeding Business Day will be used).  If Bloomberg Professional Service (or another nationally-recognized rate reporting source acceptable to Lender) no longer reports the LIBOR or Lender determines in good faith that the rate so reported no longer accurately reflects the rate available to Lender in the London Interbank Market or if such index no longer exists or if page USD-LIBOR-BBA (BBAM) no longer exists or accurately reflects the rate available to Lender in the London Interbank Market, Lender may select a substitute index or page, as the case may be, that results in a Calculated Rate that is materially comparable to the Calculated Rate that was determined immediately prior to the date that the LIBOR Rate becomes unavailable, after notifying Borrower."

**2.9** <u>**Amendment to Section 1.1 of the Loan Agreement**</u>.  Effective as of the date hereof, <u>Section 1.1</u> of the Loan Agreement is hereby amended by amending and restating the definition of "Lockbox Agreement" as follows:

""<u>Lockbox Agreement</u>" shall mean that certain Deposit Account Control Agreement by and among Agent, Borrower and Lockbox Bank dated on or about the Original Closing Date, which evidences a security interest in the Lockbox Account and provides for Lockbox Bank to collect through a lockbox, payments under Pledged Receivables and remit them to Agent, for the benefit of Lenders, as the same may be amended, supplemented or restated, from time to time.  Borrower and Agent shall cooperate in good faith in the event Borrower or Lockbox Bank desire to enter into a master lockbox agreement satisfactory to Agent in its Permitted Discretion (it being understood that any such master lockbox agreement shall, at a minimum, provide to Agent a perfected first lien and security interest and control commensurate with the existing Lockbox Agreement).  Bank of America, N.A. shall be deemed by Agent to be an approved lockbox bank."

**2.10** <u>**Amendment to Section 1.1 of the Loan Agreement**</u>.  Effective as of the date hereof, <u>Section 1.1</u> of the Loan Agreement is hereby amended by amending and restating the definition of "Maturity Date" as follows:

""<u>Maturity Date</u>" shall mean September 20, 2024; provided, the Maturity Date shall be extended to September 20, 2025, in the event Agent agrees to extend

4

the Revolving Credit Period Expiration Date by a one (1) year period as set forth in the definition of "Revolving Credit Period Expiration Date" hereunder."

**2.11** <u>Amendment to Section 1.1 of the Loan Agreement</u>.  Effective as of the date hereof, <u>Section 1.1</u> of the Loan Agreement is hereby amended by amending and restating the definition of "Revolving Credit Period Expiration Date" as follows:

> ""<u>Revolving Credit Period Expiration Date</u>" shall mean the expiry date of the Revolving Credit Period, which shall be September 20, 2021; provided, however, Lenders may, in their sole and absolute discretion, agree to extend the expiry date of the Revolving Credit Period (and the Maturity Date) by a one (1) year period by delivering written notice thereof to Borrower on or before March 20, 2021, the parties hereby agreeing that no other documentation need be executed and no other action need be taken for the occurrence of such extension of the Revolving Credit Period Expiration Date (and the Maturity Date), though Borrower hereby agrees to execute such documentation and to take such actions in connection with such extension as shall be required by Lenders, in Lenders' Permitted Discretion. Borrower shall not be responsible for and shall not be required to pay any costs related to Lenders' extension of the Revolving Credit Period Expiration Date."

**2.12** <u>Amendment to Section 2.15 of the Loan Agreement</u>.  Effective as of the date hereof, clause (b) of <u>Section 2.15</u> of the Loan Agreement is hereby amended and restated in its entirety as follows:

> "(b)      Borrower shall give written notification to Agent and Custodian, in the form annexed hereto as <u>Exhibit G</u>, in the event the obligation of an Obligor under a Pledged Receivable has been (i) satisfied in full by such Obligor and all amounts paid thereunder are actually deposited into the Lockbox Account or (ii) cancelled due to an upgrade of the related Vacation Ownership Interest or Customer Service Cancellation, then within thirty-one (31) days after the date of the occurrence of such upgrade or Customer Service Cancellation, Borrower will at its sole option either (x) make to Agent a principal payment in an amount necessary so that Borrower remains in compliance with <u>Section 2.5</u> hereof following such release of such Pledged Receivable(s), (y) deliver to Custodian on behalf of Agent, one or more Receivables having an aggregate unpaid principal balance not less that the unpaid principal balance of the Pledged Receivable that was upgraded or cancelled or (z) a combination of (x) and (y).  Upon receipt of such notice and confirmation by Agent that it has received in good funds all such amounts owing on such Pledged Receivable or replacement Receivables, as the case may be, Agent shall promptly execute any documents reasonably necessary or required by law to release the Lien of Agent and Lenders with respect to the related Collateral under this Agreement. Agent shall return or cause to be returned all Collateral, including, without limitation, all Custodian Deliverables (original or otherwise) related thereto, to Borrower."

5

**2.13** <u>**Amendment to Section 3.5 of the Loan Agreement**</u>.  Effective as of the date hereof, <u>Section 3.5</u> of the Loan Agreement is hereby amended and restated in its entirety as follows:

"**3.5**      **Unused Line Fee**

On the first Business Day of each calendar month following the Fifth Amendment Effective Date during (and immediately following the termination of, as provided herein) the Revolving Credit Period, Borrower agrees to pay to Agent, for the benefit of Lenders, with respect to the preceding calendar month (or the portion thereof, if the expiration of the Revolving Credit Period does not occur on the first day of a calendar month), a fee payable in an amount (calculated as of the last day of the preceding calendar month) equal to one-twelfth (1/12th) of 0.375% multiplied by the positive difference between (A) the Facility Cap and (B) the greater of (x) the Average Daily Balance of the Loan during such prior calendar month <u>plus</u> the outstanding principal balance of the Inventory Loan and (y) $15,000,000. The Unused Line Fee shall be waived upon the termination of the Revolving Credit Period."

**2.14** <u>**Amendment to Section 3.6 of the Loan Agreement**</u>.  Effective as of the date hereof, <u>Section 3.6</u> of the Loan Agreement is hereby amended and restated in its entirety as follows:

"**3.6**      **Minimum Yield Maintenance Fee**

Beginning on September 20, 2019, Borrower agrees to pay to Agent, for the benefit of Lenders, with respect to the preceding twelve (12) calendar month period (or the portion thereof, if the expiration of the Revolving Credit Period occurs within a time period less than twelve (12) calendar months since the most recent annual payment), an annual fee (the "<u>**Minimum Yield Maintenance Fee**</u>") payable in an amount equal to the product of (a) a percentage equal to the sum of (x) the LIBOR Rate plus (y) the Calculated Rate multiplied by (b) the positive difference, if any, between (i)(A) as it relates to any date of determination on or after September 20, 2019, $15,000,000; or (B) as it relates to any date of determination on or after September 21, 2021, in the event Lenders agree to extend the Revolving Credit Period Expiration Date by a one (1) year period as set forth in the definition of "Revolving Credit Period Expiration Date" hereunder, $10,000,000 and (ii) an amount equal to the sum of (x) the Average Daily Balance of the Loan during such prior twelve (12) calendar month period plus (y) the outstanding principal balance of the Inventory Loan as of the last day of such prior twelve (12) calendar month period. The Minimum Yield Maintenance Fee shall be waived upon the termination of the Revolving Credit Period."

**2.15** <u>**Amendment to Section 5.5 of the Loan Agreement**</u>.  Effective as of the date hereof, <u>Section 5.5</u> of the Loan Agreement is hereby amended and restated in its entirety as follows:

6

"**5.5      Litigation**

Except as set forth on Borrower's most recent SEC filings or Schedule 5.5, there are no suits, actions or proceedings pending or to the best of Borrower's knowledge, threatened, against or affecting any Resort, the Collateral, Borrower, or its properties, at law or in equity before any court or before any governmental or regulatory authority or agency, arbitration board or other tribunal, which would reasonably be expected to result in a Material Adverse Change.  Neither Borrower nor any Affiliate of Borrower has received any written notice from any court, governmental authority or agency or other tribunal alleging that Borrower, any Affiliate of Borrower or any Resort has violated in any material respect any Applicable Law, the Declarations or other agreements or arrangements, in a manner which would reasonably be expected to result in a Material Adverse Change."

**2.16 <u>Amendment to Section 6.1 of the Loan Agreement</u>**. Effective as of the date hereof, <u>Sections 6.1(a)(i)</u> and <u>6.1(a)(iv)</u> are hereby amended and restated as follows:

"(i)             as soon as available and in any event within ninety-one (91) calendar days after the end of each fiscal year of Borrower, audited annual financial statements of Borrower on a consolidated basis,  including the notes thereto, consisting of a balance sheet at the end of such completed fiscal year and the related statements of income, cash flows and owners' equity (including retained earnings, such statement may be included in a note to the financial statements as allowed by GAAP), for such completed fiscal year, which financial statements shall be prepared by an independent certified public accounting firm of recognized standing; <u>provided</u>, that the financial statements of Borrower shall be deemed delivered and the foregoing requirements satisfied when such financial statements are filed with the SEC and publicly available;"

"(iv)            as soon as available and in any event within forty-five (45) calendar days after the end of each fiscal quarter (other than the final fiscal quarter of each fiscal year; provided that, upon the request of Agent, Borrower shall deliver draft, annual financial statements of Borrower, excluding notes, supplemental schedules and management discussion, within sixty (60) calendar days of the end of each fiscal year) of Borrower, unaudited, quarterly financial statements of Borrower on a consolidated and consolidating basis, including the notes thereto, consisting of a balance sheet at the end of such completed fiscal quarter and the related statements of income, cash flows and owners' equity (including retained earnings, such statement may be included in a note to the financial statements as allowed by GAAP) for such completed fiscal quarter; <u>provided</u>, that the financial statements of Borrower shall be deemed delivered and the foregoing requirements satisfied when such financial statements are filed with the SEC and publicly available."

**2.17 <u>Amendment to Section 6.28 of the Loan Agreement</u>**. .  Effective as of the date hereof, <u>Section 6.28</u> is hereby amended and restated, as follows:

7

"**6.28**     **Deposit Accounts**.

Unless otherwise consented to by Agent in writing, the Borrower will establish and maintain average deposits, measured on a quarterly basis, in Borrower's demand deposit accounts with Pacific Western Bank of a minimum  of (a) $5,000,000 for the period beginning on the Fifth Amendment Effective Date and ending on September 19, 2018 and (b) $2,000,000 for the period beginning September 20, 2018 and thereafter, and Borrower shall not enter into any agreement to move any such relationship to another financial institution during the term of the Loan without Agent's prior written consent. Borrower will receive earnings credits or monthly interest and can use such earnings credits or monthly interest to offset expenses of the Loan."

**2.18  Amendment to Section 7.2 of the Loan Agreement**.  Effective as of the date hereof, Section 7.2 of the Loan Agreement is hereby amended and restated in its entirety as follows:

"Notwithstanding any provision of any Loan Document, following the occurrence and continuance of an Event of Default or if an Event of Default would result therefrom, Borrower will not (a) declare, pay or make any dividend or distribution on any Equity Interests or other securities or ownership interests or (b) apply any of its funds, property or assets to the acquisition, redemption or other retirement of any Equity Interests or other securities or interests or of any options to purchase or acquire any of the foregoing;  provided that, to the extent an Event of Default has occurred and is continuing and Agent has accelerated the Obligations and is exercising remedies in accordance with the Loan Documents, and Borrower is required to pay $10,000,000 of outstanding Obligations pursuant to Section 13.13 in connection therewith and Borrower does pay such amount in full, then upon the making of such payment Borrower shall be permitted to declare, pay or make any dividend or distribution on any Equity Interest or other Securities or ownership interests."

**2.19  Amendment to Section 7.13 of the Loan Agreement**.  Effective as of the date hereof, Section 7.13 of the Loan Agreement is hereby amended and restated in its entirety as follows:

"**7.13**     **Tangible Net Worth**

Borrower shall not permit its Tangible Net Worth (as measured on the last day of each fiscal year end of Borrower) to be less than One Hundred Eighty-Four Million Five Hundred Thousand and No/100 Dollars ($184,500,000) for any fiscal year ending during the term of the Loan."

**2.20  Amendment to Section 8.1(h) of the Loan Agreement**.  Effective as of the date hereof, Section 8.1(h) of the Loan Agreement is hereby amended and restated in its entirety as follows:

"(h)     [Reserved.]"

8

**2.21 <u>Amendment to Article XIII of the Loan Agreement</u>.**  Effective as of the date hereof, <u>Section 13.13</u> is hereby added to the Loan Agreement, immediately following <u>Section 13.12</u>, as follows:

"**13.13      Exculpation**.

Subject to the qualifications below, Agent shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Loan Documents by any action or proceeding wherein a money judgment of more than $10,000,000 of outstanding Obligations shall be sought against Borrower, except that Lender may bring an action for specific performance or any other appropriate action or proceeding to enable Agent to enforce and realize upon its interest and rights to the Collateral securing the Loan; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding in excess of $10,000,000 shall be enforceable against Borrower only to the extent of Borrower's interest in the Collateral given to Agent, and Agent shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with any Loan Document.  The provisions of this Section 13.13 shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by any Loan Document; (b) affect the validity or enforceability of any of the Loan Documents or any of the rights and remedies of Agent thereunder; (c) constitute a prohibition against Lender to commence any other appropriate action or proceeding in order for Lender to fully realize the security granted by the Collateral; or (d) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any actual, out-of-pocket loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following:

(i)                                any willful or intentional misrepresentation or gross negligence by Borrower in connection with the Loan;

(ii)                               any acts of fraud, misappropriation of funds or theft by Borrower;

(iii)                              any unauthorized, consensual and intentional transfer, assignment, sale or encumbrance of any Collateral under the Loan caused by the acts or omissions of Borrower, other than as permitted under the Loan Documents;

(iv)                              any material damage, destruction or waste to any Collateral or the Resort caused by the acts or omissions of Borrower, its agents or employees;

9

(v)          the removal or disposal by, or at the direction of Borrower, of any portion of the Collateral, other than as permitted under the Loan Documents;

(vi)          any failure by Borrower to pay taxes, assessments, or other charges affecting the Resort or any Collateral as may be required by Borrower pursuant to the Loan Agreement;

(vii)          any failure by Borrower to maintain insurance as required by Borrower pursuant to the Loan Agreement; and/or

(viii)          the misapplication or conversion by Borrower of (A) any insurance proceeds received by Borrower which are paid by reason of any loss, damage or destruction to the Collateral, or (B) any awards or other amounts received by Borrower in connection with the condemnation of all or a portion of the Resort in violation of the Loan Documents, in each of the foregoing clauses (A) and (B) only to the extent of proceeds received or misapplied by Borrower;

Notwithstanding anything to the contrary in this Amendment or any of the Loan Documents, (A) Agent shall not be deemed to have waived any right which Agent may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Obligations or to require that all collateral shall continue to secure all of the Obligations in accordance with the Loan Documents, and (B) Agent's agreement not to pursue personal liability of Borrower as set forth above SHALL BECOME NULL AND VOID and shall be of no further force and effect, and the Obligations shall be fully recourse to Borrower in the event that one or more of the following occurs:

(i)          Borrower files a voluntary petition under any Debtor Relief Law or consents to any such filing, or commences a proceeding for the appointment of a receiver, trustee, liquidator or conservator of Borrower or of the whole or any substantial part of the Collateral or the Resort or the whole or any substantial part of Borrower's assets;

(ii)          an officer, director, representative or Person which controls, directly or indirectly, Borrower, files, or joins in the filing of, an involuntary petition against Borrower under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower from any Person;

(iii)          Borrower files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against Borrower, by any other Person under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law, or solicits or causes to be

10

solicited petitioning creditors for any involuntary petition from any Person;

      (iv)                         in any case or proceeding under the Bankruptcy Code or in any other judicial proceeding, Borrower makes application to a court to (A) declare that all or any portion of the lien of Agent or the Obligations of Borrower to pay principal and interest as specified in the Loan Documents be rescinded, set aside, or determined to be void or unenforceable, or (B) modify any of the terms of any of the Loan Documents without Agent's consent;

      (v)                          the voluntary dissolution or liquidation of the Borrower;

      (vi)                         Borrower or any of its Affiliates asserts any claim, defense or offset against Agent that Borrower has waived or agreed not to assert.

**2.22** <u>**Amendment to Schedules to Loan Agreement**</u>.  Effective as of the date hereof, <u>Schedules 1.2</u> and <u>5.30</u> to the Loan Agreement are hereby amended and restated in their entirety in the form of Exhibit A attached hereto.

**2.23** <u>**Amendment to Specified Receivables Side Letter**</u>.  Effective as of the date hereof, clauses (e) and (f) of the Specified Receivables Side Letter are hereby deleted in their entirety and clauses (a) through (d) of the Specified Receivables Side Letter are hereby amended and restated in their entirety as follows:

"(a)     The Obligor on each Specified Receivable shall have a FICO Score equal to or greater than six hundred twenty-five (625);

(b)     The weighted average FICO® Score of the Obligors on the Specified Receivables shall be equal to or greater than seven hundred twenty (720);

(c)     Borrower shall at all such times ensure that no more than twenty-five percent (25%) of the unpaid principal balance of the Loan and the Inventory Loan, as measured in the aggregate, shall be composed of Advances secured by Specified Receivables,  <u>provided</u> <u>that</u> for a period of six (6) calendar months following a Securitization Event, no more than fifty percent (50%) of the unpaid principal balance of the Loan, as measured in the aggregate, shall be composed of Advances secured by Specified Receivables; and

(d)     The Obligor on each Specified Receivable must at the closing of the Specified Receivable be the owner of a Vacation Ownership Interest other than the Vacation Ownership Interest securing such Specified Receivable."

<div align="center">

**ARTICLE III.**

</div>

11

**Conditions Precedent**

The effectiveness of this Amendment is subject to the satisfaction of the following conditions precedent in a manner satisfactory to Agent, unless specifically waived in writing by Agent:

**3.1**   Agent shall have received each of the following, each in form and substance satisfactory to Agent, in its sole discretion, and, where applicable, each duly executed by each party thereto:

(a) This Amendment duly executed by Borrower;

(b) Agent shall have received an amendment fee due and payable by Borrowers in the amount of $100,000, which fee shall be deemed fully earned and non-refundable upon the execution of this Amendment by Borrowers; and

(c) All other documents Agent may reasonably request prior to or as of the date of this Amendment with respect to any matter relevant to this Amendment or the transactions contemplated hereby.

**3.2   Representations and Warranties**.   The representations and warranties contained herein, in the Loan Agreement and in the other Loan Documents, as each is amended hereby, and in the Inventory Loan Documentation, shall be true and correct as of the date hereof, as if made on the date hereof, except for such representations and warranties as are by their express terms limited to a specific date.

**3.3   Defaults**.   No Potential Default or Event of Default shall have occurred and be continuing, unless such Potential Default or Event of Default has been otherwise specifically waived in writing by Agent.   No Default or Event of Default (as such terms are defined in the Inventory Loan Promissory Note) shall have occurred and be continuing, unless such Default or Event of Default has been otherwise specifically waived in writing by Inventory Loan Lender.

**3.4   Corporate Proceedings and other Matters**.   All corporate proceedings taken in connection with the transactions contemplated by this Amendment and all documents, instruments and other legal matters incident thereto shall be satisfactory to Agent.

**ARTICLE IV.**
**No Consent or Waiver**

Nothing contained herein shall be construed as a consent or waiver by Agent or any Lender of any covenant or provision of the Loan Agreement, the other Loan Documents, this Amendment or any other contract or instrument among Borrower, Agent or any Lender, and the failure of Agent or any Lender at any time or times hereafter to require strict performance by Borrower of any provision thereof shall not waive, affect or diminish any right of Agent or any Lender to thereafter demand strict compliance therewith.

**ARTICLE V.**

12

Ratifications, Representations and Warranties

**5.1 Ratifications.**  The terms and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions set forth in the Loan Agreement and the other Loan Documents, and, except as expressly modified and superseded by this Amendment, the terms and provisions of the Loan Agreement and the other Loan Documents are ratified and confirmed and shall continue in full force and effect.  Borrower, Agent and Lenders agree that the Loan Agreement and the other Loan Documents, all as amended hereby, shall continue to be legal, valid, binding and enforceable in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, liquidation, dissolution, moratorium and other similar applicable laws affecting the enforceability of creditors' rights generally applicable in the event of bankruptcy, insolvency, reorganization, liquidation, or dissolution, and to general principles of equity, regardless of whether such enforceability shall be considered in a proceeding in equity or at law.  Borrower agrees that this Amendment is not intended to and shall not cause a novation with respect to any or all of the obligations under the Loan Agreement.  Borrower agrees that the Payment Guaranty (the "**Guaranty**"), dated as of November 19, 2012, executed by Borrower in favor of Agent (as successor-by-merger to CapitalSource Bank) is hereby ratified and confirmed and shall continue in full force and effect.  Borrower agrees that the Guaranty shall continue to be legal, valid, binding and enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, liquidation, dissolution, moratorium and other similar applicable laws affecting the enforceability of creditors' rights generally applicable in the event of bankruptcy, insolvency, reorganization, liquidation, or dissolution, and to general principles of equity, regardless of whether such enforceability shall be considered in a proceeding in equity or at law.

**5.2 Representations and Warranties.**  Borrower hereby represents and warrants to Agent and each Lender that (a) the execution, delivery and performance of this Amendment and any and all other Loan Documents executed and/or delivered in connection herewith have been authorized by all requisite action (as applicable) on the part of Borrower and will not violate the articles (or certificate) of incorporation or bylaws of Borrower; (b) Borrower's board of directors has authorized the execution, delivery and performance of this Amendment and any and all other Loan Documents executed and/or delivered in connection herewith; (c) the representations and warranties contained in the Loan Agreement and any other Loan Document, all as amended hereby, are true and correct on and as of the date hereof and on and as of the date of execution hereof as though made on and as of each such date, except for such representations and warranties as are by their express terms limited to a specific date; (d) no Potential Default or Event of Default under the Loan Agreement, as amended hereby, has occurred and is continuing, unless such Potential Default or Event of Default has been specifically waived in writing by Agent; (e) Borrower is in full compliance with all covenants and agreements contained in the Loan Agreement and the other Loan Documents, all as amended hereby; and (f) except as disclosed to Agent, Borrower has not amended its articles (or certificate) of incorporation or bylaws or similar organizational documents since the date of the Loan Agreement.

**ARTICLE VI.**

13

**Miscellaneous Provisions**

**6.1 <u>Survival of Representations and Warranties</u>.**  All representations and warranties of the Borrower made in the Loan Agreement or any other Loan Document, including, without limitation, any document furnished in connection with this Amendment, shall survive the execution and delivery of this Amendment and the other Loan Documents to the same extent provided in any applicable Loan Documents, and no investigation by Agent or any Lender or any closing shall affect the representations and warranties or the right of Agent or any Lender to rely upon them.

**6.2 <u>Reference to Loan Agreement</u>.**  Each of the Loan Agreement and the other Loan Documents, and any and all other Loan Documents, documents or instruments now or hereafter executed and delivered pursuant to the terms hereof or pursuant to the terms of the Loan Agreement, all as amended hereby, are hereby amended so that any reference in the Loan Agreement and such other Loan Documents to the Loan Agreement shall mean a reference to the Loan Agreement and the other Loan Documents, all as amended hereby.

**6.3 <u>Expenses of Agent</u>.**  As provided in <u>Section 12.7</u> of the Loan Agreement, Borrower agrees to pay on demand all costs and expenses incurred by Agent, any Lender or their respective Affiliates, in connection with the preparation, negotiation, and execution of this Amendment and the other Loan Documents executed pursuant hereto and any and all amendments, modifications, and supplements thereto, including, without limitation, the costs and fees of legal counsel, and all reasonable costs and expenses incurred by Agent or any Lender in connection with the enforcement or preservation of any rights under the Loan Agreement or any other Loan Documents, all as amended hereby, including, without, limitation, the reasonable costs and fees of legal counsel.  Notwithstanding anything to the contrary in this Amendment or otherwise, nothing in this <u>Section 6.3</u> is intended to be inconsistent with, or interpreted in a manner inconsistent with, <u>Section 12.7</u> of the Loan Agreement.

**6.4 <u>Severability</u>.**  Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

**6.5 <u>Successors and Assigns</u>.**  This Amendment is binding upon and shall inure to the benefit of Lenders, Agent and Borrower and their respective permitted successors and assigns, except that Borrower may not assign or transfer any of its rights or obligations hereunder without the prior written consent of Agent.

**6.6 <u>Counterparts</u>.**  This Amendment may be executed in one or more counterparts, each of which when so executed shall be deemed to be an original, but all of which when taken together shall constitute one and the same instrument.  This Amendment may be executed by facsimile or other electronic transmission, which facsimile or other electronic signatures shall be considered original executed counterparts for purposes of this <u>Section 6.6</u>, and each party to this Amendment agrees that it will be bound by its own facsimile or other electronic signature and that it accepts such facsimile or other electronic signature of each other party to this Amendment.

14

**6.7** **Effect of Waiver.**  No consent or waiver, express or implied, by Agent or any Lender to or for any breach of or deviation from any covenant or condition by Borrower shall be deemed a consent to or waiver of any other breach of the same or any other covenant, condition or duty.

**6.8** **Headings.**  The headings, captions, and arrangements used in this Amendment are for convenience only and shall not affect the interpretation of this Amendment.

**6.9** **Applicable Law.**  THIS AMENDMENT AND ALL OTHER LOAN DOCUMENTS EXECUTED PURSUANT HERETO SHALL BE DEEMED TO HAVE BEEN MADE AND TO BE PERFORMABLE IN AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, AS SET FORTH IN THE LOAN AGREEMENT.

**6.10** **Final Agreement.**  THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS, EACH AS AMENDED HEREBY, AND THE INVENTORY LOAN DOCUMENTATION REPRESENT THE ENTIRE EXPRESSION OF THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF ON THE DATE THIS AMENDMENT IS EXECUTED.  THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS, EACH AS AMENDED HEREBY, AND THE INVENTORY LOAN DOCUMENTATION MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.  NO MODIFICATION, RESCISSION, WAIVER, RELEASE OR AMENDMENT OF ANY PROVISION OF THIS AMENDMENT SHALL BE MADE, EXCEPT BY A WRITTEN AGREEMENT SIGNED BY BORROWER AND AGENT AND LENDERS.

**6.11** **Release by Borrower.**  FOR AND IN CONSIDERATION OF AGENT AND LENDERS' AGREEMENTS CONTAINED HEREIN, BORROWER ("**RELEASOR**") HEREBY VOLUNTARILY AND KNOWINGLY RELEASES AND FOREVER WAIVES AND DISCHARGES  AGENT  AND LENDERS WHO ARE PARTIES TO THE LOAN AGREEMENT AS OF THE DATE HEREOF (INDIVIDUALLY AND COLLECTIVELY, THE " **RELEASED PARTIES**") FROM ALL POSSIBLE CLAIMS, COUNTERCLAIMS, DEMANDS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, ANTICIPATED OR UNANTICIPATED, SUSPECTED OR UNSUSPECTED, FIXED, CONTINGENT OR CONDITIONAL OR AT LAW OR IN EQUITY, IN WHOLE OR IN PART, ARISING ON OR BEFORE THE DATE OF THIS AMENDMENT THAT RELEASOR MAY NOW OR HEREAFTER HAVE AGAINST THE RELEASED PARTIES, IF ANY, IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS ARISE OUT OF CONTRACT, TORT, VIOLATION OF LAW OR REGULATIONS OR OTHERWISE, INCLUDING WITHOUT LIMITATION ARISING DIRECTLY OR INDIRECTLY FROM ANY OF THE LOAN DOCUMENTS, THE INVENTORY LOAN DOCUMENTATION, THE EXERCISE OF ANY RIGHTS AND REMEDIES UNDER ANY OF THE LOAN DOCUMENTS OR INVENTORY LOAN DOCUMENTATION AND/OR NEGOTIATION FOR AND EXECUTION OF THIS  AMENDMENT, INCLUDING, WITHOUT LIMITATION, ANY CONTRACTING FOR, CHARGING, TAKING, RESERVING, COLLECTING OR RECEIVING INTEREST IN

15

EXCESS OF THE HIGHEST LAWFUL RATE APPLICABLE.  RELEASOR  WAIVES THE BENEFITS OF ANY LAW, WHICH MAY PROVIDE IN SUBSTANCE: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MUST HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE DEBTOR." RELEASOR UNDERSTANDS THE FACTS IT BELIEVES TO BE TRUE AT THE TIME OF MAKING THE RELEASE PROVIDED FOR HEREIN MAY LATER TURN OUT TO BE DIFFERENT THAN IT NOW BELIEVES, AND INFORMATION NOT NOW KNOWN OR SUSPECTED MAY LATER BE DISCOVERED.  RELEASOR ACCEPTS THIS POSSIBILITY AND ASSUMES THE RISK OF THE FACTS TURNING OUT TO BE DIFFERENT AND NEW INFORMATION BEING DISCOVERED AND FURTHER AGREES THE RELEASE PROVIDED FOR HEREIN SHALL IN ALL RESPECTS CONTINUE TO BE EFFECTIVE AND NOT SUBJECT TO TERMINATION OR RESCISSION BECAUSE OF ANY DIFFERENCE IN SUCH FACTS OR ANY NEW INFORMATION.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

16

IN WITNESS WHEREOF, this Amendment has been executed as of the date first written above.

**BORROWER:**

**BLUEGREEN VACATIONS CORPORATION**,
a Florida corporation


By: /s/ Paul Humphrey
Name: Paul Humphrey
Title:  Senior Vice President,  Finance, Capital Markets and Mortgage Operations

---

**AGENT AND LENDER:**

**PACIFIC WESTERN BANK**,
a California state-chartered bank, as successor-by-merger to CapitalSource Bank

By:  /s/ Robert Dailey
Name:  Robert Dailey
Title:   SVP, Managing Director

Exhibit A

**Schedule 1.2**

Resorts

<u>Primary Resorts</u>

| | | | |
|---|---|---|---|
| 1. | BG Fountains Condominium | Orlando | Florida |
| 2. | BG Club 36 | Las Vegas | Nevada |
| 3. | Bluegreen Odyssey Dells | Lake Delton | Wisconsin |
| 4. | The Manhattan Club | New York | New York |
| 5. | Éilan Hotel & Spa | San Antonio | Texas |

<u>Secondary Resorts</u>

| | | | |
|---|---|---|---|
| 1. | Wilderness Traveler at Shenandoah | Gordonsville | Virginia |
| 2. | BG Pirate's Lodge Condominium | Lake Delton | Wisconsin |
| 3. | Mountain Run at Boyne | Boyne Falls | Michigan |
| 4. | Harbour Lights Resort Horizontal Property Regime | Myrtle Beach | South Carolina |
| 5. | Laurel Crest | Pigeon Forge | Tennessee |

<u>Other Approved Resorts</u>

Club Resorts

| | | | |
|---|---|---|---|
| 1. | Lake Eve Resort | Orlando | Florida |
| 2. | The Villas at Christmas Mountain | Wisconsin Dells | Wisconsin |
| 3. | Christmas Mountain — Timbers | Wisconsin Dells | Wisconsin |
| 4. | Christmas Mountain — Campground | Wisconsin Dells | Wisconsin |
| 5. | BG Patrick Henry Square | Williamsburg | Virginia |
| 6. | Grande Villas at World Golf Village Condominium | St. Augustine | Florida |
| 7. | Falls Village | Branson | Missouri |
| 8. | MountainLoft | Gatlinburg | Tennessee |
| 9. | MountainLoft II | Gatlinburg | Tennessee |
| 10. | Shore Crest | Myrtle Beach | South Carolina |
| 11. | Shore Crest II | Myrtle Beach | South Carolina |
| 12. | Daytona SeaBreeze | Daytona Beach Shores | Florida |
| 13. | The Hammocks at Marathon | Marathon | Florida |
| 14. | Orlando's Sunshine Resort I & II | Orlando | Florida |
| 15. | Casa Del Mar Beach Resort | Ormond Beach | Florida |
| 16. | Solara Surfside | Surfside | Florida |
| 17. | Bluegreen Club La Pension | New Orleans | Louisiana |
| 18. | The Suites at Hershey | Hershey | Pennsylvania |
| 19. | The Lodge Alley Inn | Charleston | South Carolina |
| 20. | Carolina Grande | Myrtle Beach | South Carolina |

| SeaGlass Tower | | Myrtle Beach | South Carolina |
|---|---|---|---|

D - 0055-0254

| 21. | | | |
|-----|---|---|---|
| 22. | Shenandoah Crossing Farm & Country Club | Gordonsville | Virginia |
| 23. | La Cabana Beach And Racquet Club | Oranjestad | Aruba |
| 24. | Resort at World Golf Village | St. Augustine | Florida |
| 25. | The Innsbruck, A Condominium | Aspen | Colorado |
| 26. | The Hotel Blake | Chicago | Illinois |
| 27. | Club at Big Bear | Big Bear Lake | California |
| 28. | The Atlantic Palace | Atlantic City | New Jersey |
| 29. | King 583 | Charleston | South Carolina |
| 30. | Club Lodges at Trillium | Cashiers | North Carolina |
| 31. | The Soundings Seaside Resort | Dennisport | Massachusetts |
| 32. | The Breakers Resort | Dennisport | Massachusetts |
| 33. | Bluegreen at Tradewinds | St. Pete Beach | Florida |
| 34. | Horizons at 77th | N. Myrtle Beach | South Carolina |
| 35. | Cibola Vista Resort & Spa | Peoria | Arizona |
| 36. | Blue Ridge Village | Banner Elk | North Carolina |

Club Associate Resorts (other than FBS Resorts)

| 1. | Paradise Isle Resort | Gulf Shores | Alabama |
|----|---------------------|-------------|---------|
| 2. | Shoreline Towers Resort | Gulf Shores | Alabama |
| 3. | Via Roma Beach Resort | Bradenton Beach | Florida |
| 4. | Dolphin Beach Club | Daytona Beach Shores | Florida |
| 5. | Fantasy Island Resort II | Daytona Beach Shores | Florida |
| 6. | Mariner's Boathouse and Beach Resort | Fort Myers Beach | Florida |
| 7. | Tropical Sands Resort | Fort Myers Beach | Florida |
| 8. | Windward Passage Resort | Fort Myers Beach | Florida |
| 9. | Gulfstream Manor | Gulfstream | Florida |
| 10. | Resort Sixty-Six | Holmes Beach | Florida |
| 11. | Outrigger Beach Club | Ormond Beach | Florida |
| 12. | Landmark Holiday Beach Resort | Panama City Beach | Florida |
| 13. | Ocean Towers Beach Club | Panama City Beach | Florida |
| 14. | Panama City Resort & Club | Panama City Beach | Florida |
| 15. | Surfrider Beach Club | Sanibel Island | Florida |
| 16. | Petit Crest Villas at Big Canoe | Marble Hill | Georgia |
| 17. | Pono Kai Resort | Kapaa (Kauai) | Hawaii |
| 18. | Lake Condominiums at Big Sky | Big Sky | Montana |
| 19. | Foxrun Townhouses | Lake Lure | North Carolina |
| 20. | Sandcastle Village | New Bern | North Carolina |

| 21. | Waterwood Townhouses | New Bern | North Carolina |
| 22. | Players Club | Hilton Head Island | South Carolina |
| 23. | Hemlock | Boyne Falls | Michigan |

FBS Resorts

| 1. | Parkside a Vacation Ownership Resort | Williamsburg | Virginia |
| 2. | InnSeason Resorts South Mountain Condominium | Lincoln | New Hampshire |

| | The Breakers Resort Condominium | Dennisport | Massachusetts |
| | | | |

| 3. |  |  |  |
|----|----|----|----|
| 4. | The Soundings Seaside Resort Condominium | Dennisport | Massachusetts |
| 5. | Cibola Vista Resort & Spa | Peoria | Arizona |
| 6. | Studio Homes at Ellis Square | Savannah | Georgia |
| 7. | The Hotel Blake | Chicago | Illinois |

**Schedule 3.30**

Resort Documents

**BG FOUNTAINS CONDOMINIUM**

a. Master Declaration of Covenants, Conditions and Restrictions, recorded July 28, 1998, in Book 5535, Page 3243 of the Public Records of Orange County, Florida.

b. Declaration of Condominium for BG Fountains Condominium, recorded October 26, 2004, in Book 07674, Page 4336 of the Public Records of Orange County, Florida, with amendments of record in Book 07785, Page 2252; Book 08559, Page 1321; Book 08559, Page 1360; Book 08775, Page 4485; Book 09443, Page 2378; Book 9881, Page 2943.

c. Articles of Incorporation of BG Fountains Condominium Association, Inc.

d. Bylaws of BG Fountains Condominium Association, Inc.

e. That certain Timeshare Management Agreement dated as of December 18, 2017, by and between BG Fountains Condominium Association, Inc. and Bluegreen Resorts Management, Inc.

f. BG Fountains Condominium A Bluegreen Vacation Club Resort Public Offering Statement (Florida).

g. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to BG Fountains Condominium.

h. The applicable Consumer Documents for BG Fountains Condominium.

i. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to BG Fountains Condominium.

**BG CLUB 36**

a. Master Declaration of Covenants, Conditions, Easements and Restrictions for Bluegreen Club 36, recorded July 29, 2008, Book 080729, at Document No. 0004566, in the office of the County Recorder of Clark County, Nevada.

b. Articles of Incorporation of BG Club 36 Master Association, Inc.

c. Bylaws of BG Club 36 Master Association, Inc.

d. Declaration of Covenants, Conditions, Easements, Restrictions and Timeshare Ownership Instrument for BG Club 36, recorded July 29, 2008, in Book 080729 at Document No. 0004568, in the office of the County Recorder of Clark County, Nevada.

e. Articles of Incorporation of BG Club 36 Owners Association, Inc.

f. Bylaws of BG Club 36 Owners Association, Inc.

g. That certain Timeshare Management Agreement, dated as of September 18, 2012, by and between BG Club 36 Owners Association, Inc., and Bluegreen Resorts Management, Inc.

h. Nevada Public Offering Statement for Bluegreen Vacation Club.

i. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to BG Club 36.

j. The applicable Consumer Documents for BG Club 36.

k. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to BG Club 36.

**BG PIRATE'S LODGE**

   a.  Master Declaration by and between Treasure Island, LLC, Bluegreen Vacations Unlimited, Inc., Dells Vacation Condominium Unit Owners Association, Inc., and Club Optima Dells Owners' Association, Inc., recorded September 28, 2006 as Document No. 918419 in the Public Records of Sauk County, Wisconsin, with an amendment recorded on May 28, 2008 as Document No. 962000.

   b.  First Amendment to Declaration of Condominium of Dells Vacation Condominium and Declaration of Covenants, Conditions, Easements and Restrictions and Time-Share Instrument for Club Optima Amending, Restating, and Merging them into Declaration of Condominium for BG Pirate's Lodge Condominium recorded November 3, 2006, as Document No. 921739 in the Public Records of Sauk County, Wisconsin.

   c.  Declaration of Condominium for Bluegreen Odyssey Dells, A Condominium recorded June 30, 2008, as Document No. 963977 in the Public Records of Sauk County, Wisconsin.

   d.  Amended and Restated Articles of Incorporation of BG Pirate's Lodge Owners Association, Inc.

   e.  Amended and Restated By-Laws of BG Pirate's Lodge Owners Association, Inc., adopted September 12, 2006.

   f.  That certain Timeshare Management Agreement dated December 5, 2012, by and between BG Pirate's Lodge Owners Association, Inc. and Bluegreen Resorts Management, Inc.

   g.  Time-Share Disclosure Statement BG Pirate's Lodge Condominium (Wisconsin).

   h.  Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to BG Pirate's Lodge Condominium.

   i.  The applicable Consumer Documents for BG Pirate's Lodge Condominium.

   j.  Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to BG Pirate's Lodge Condominium.

**THE MANHATTAN CLUB**

   a.  Thirteenth Amendment To Declaration of Timeshare Plan Amended, Restated and Consolidated Timeshare Declaration, recorded June 1, 2012, as Document ID 2012053100053001 in The Public Records of NYC Department of Finance Office of the City Register.

   b.  Fourteenth Amendment To Declaration of Timeshare Plan, The Manhattan Club, recorded June 19th, 2018, as Document ID 2018061900368001 in The Public Records of NYC Department of Finance Office of the City Register.

   c.  Seventh Amendment to Declaration, Amended, Restated and Consolidated Declaration, The Park Central Condominium, recorded November 20, 2003, as Document ID 2003102102291001 in The Public Records of NYC Department of Finance Office of the City Register.

   d.  Eighth Amendment to Declaration, The Park Central Condominium, recorded July 28, 2005, as Document ID 2005072200142002 in The Public Records of NYC Department of Finance Office of the City Register.

e. Ninth Amendment to Declaration and Eighth Amendment to Tax Lot Plans, The Park Central Condominium, recorded March 1, 2007, as Document ID 2007022701835001 in The Public Records of NYC Department of Finance Office of the City Register.

f. Assignment of Declarant Rights (Condominium Declaration and Timeshare Declaration) The Manhattan Club, recorded July 5, 2018, as Document ID 2018062501395004001 in The Public Records of NYC Department of Finance Office of the City Register.

g. Certificate of Amendment of the Certificate of Incorporation of The Manhattan Club Urban Ownership Inc., filed June 5, 1996.

h. Timeshare By-Laws of The Manhattan Club.

i. Timeshare Reservation Rules, The Manhattan Club, dated as of May 1, 2012.

j. That certain Fourth Amendment to Management Agreement (Restated Management Agreement) The Manhattan Club, dated as of January 18, 2012, by and between The Manhattan Club Timeshare Association, Inc., and New York Urban Ownership Management LLC.

k. Amendment Number Eighteen to Second Restated, New York Supplement to the Bluegreen Vacation Club MULTI-SITE Timeshare Offering Plan, dated May 18, 2018.

l. Letter of State of New York Office of Attorney General, Division of Economic Justice, Real Estate Finance Bureau, dated May 31, 2018, File Number T050009.

m. The applicable Consumer Documents for The Manhattan Club.

n. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to The Manhattan Club.

**ÉILAN HOTEL & SPA**

[TO BE ADDED UPON APPROVAL OF THE RESORT]

**BLUEGREEN WILDERNESS TRAVELER AT SHENANDOAH**

a. Declaration of Covenants, Conditions and Restrictions for Bluegreen Wilderness Traveler at Shenandoah Vacation Ownership Program, dated November 28, 2007, recorded at Deed Book 1117, Page 861 of the Public Records of Louisa County, Virginia, with amendments of record at Book 1126, Page 372, and Book 1216, Page 818, and Book 1526, Page 111.

b. Articles of Incorporation of Bluegreen Wilderness Traveler at Shenandoah Owners Association, Inc.

c. By-Laws of Bluegreen Wilderness Traveler at Shenandoah Owners Association, Inc.

d. That certain Timeshare Management Agreement dated as of the December 13, 2017 by and between Bluegreen Wilderness Traveler at Shenandoah Owners Association Inc. and Bluegreen Resorts Management, Inc.

e. Bluegreen Wilderness Traveler at Shenandoah Vacation Ownership Program Public Offering Statement (Virginia).

f. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Bluegreen Wilderness Traveler at Shenandoah.

g. The applicable Consumer Documents for Bluegreen Wilderness Traveler at Shenandoah.

h. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Bluegreen Wilderness Traveler at Shenandoah.

**MOUNTAIN RUN AT BOYNE**

a. Master Deed of Mountain Run at Boyne recorded August 14, 2003 in the Register of Deeds of Charlevoix County, Michigan in Liber 563, Page 576, with amendments of record in Liber 690, Page 762; Liber 690, Page 772; and Liber 714, Page 118.

b. Restated Articles of Incorporation of Mountain Run at Boyne Owners Association, Inc.

c. Bylaws of the Mountain Run at Boyne Owners Association, Inc.

d. That certain Timeshare Management Agreement dated December 18, 2017, by and between Mountain Run at Boyne Owners Association, Inc. and Bluegreen Resorts Management, Inc.

e. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Mountain Run at Boyne.

f. The applicable Consumer Documents for Mountain Run at Boyne.

g. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Mountain Run at Boyne.

**HARBOUR LIGHTS RESORT HORIZONTAL PROPERTY REGIME**

a. Master Deed for Harbour Lights Resort Horizontal Property Regime recorded June 29, 1998, in Book 2049, Page 437, in the office of the Registrar of Deeds in Horry County, South Carolina, with amendments of record in Book 2087, Page 875; Book 2374, Page 372; Book 2221, Page 951; Book 2681, Page 538; Book 2758, Page 699; Book 3078, Page 743; Book 3078, Page 750; Book 3162, Page 359; Book 3860, Page 2176; and Book 3870, Page 3394.

b. Articles of Incorporation of Harbour Lights Resorts Owners Association, Inc.

c. Bylaws of Harbour Lights Resorts Owners Association, Inc.

d. That certain Timeshare Management Agreement dated as of September 12, 2017, between Harbour Lights Resorts Owners Association, Inc. and Bluegreen Resorts Management, Inc.

e. Public Offering Statement for Harbour Lights, a Condominium (South Carolina).

f. Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to Harbour Lights Resort Horizontal Property Regime.

g. The applicable Consumer Documents for Harbour Lights Resort Horizontal Property Regime.

h. Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to Harbour Lights Resort Horizontal Property Regime.

**LAUREL CREST**

    a.   Declaration of Condominium for Laurel Crest Resort, recorded in the Public Records of Sevier County, Tennessee, June 23, 1995, in Book D548, Page 228, and amendments recorded in Book D554, Page 9; Book D567, Page 549; Book D590, Page 60; Book D608, Page 205; Book D637, Page 1; Book D666, Page 251; Book 1006, Page 438; Book 1763, Page 327; Book 3350, Page 325; and Book 3350, Page 331, of the Public Records of Sevier County, Tennessee.

    b.   Charter of The Laurel Crest Resort Condominium Association, Inc.

    c.   By-Laws of The Laurel Crest Resort Condominium Association, Inc., as amended.

    d.   That certain Timeshare Management Agreement dated as of August 23, 2012, by and between The Laurel Crest Resort Condominium Association, Inc., and Bluegreen Resorts Management, Inc.

    e.   Bluegreen Vacation Club MULTI-SITE Public Offering Statement and any and all additional documents referenced therein with respect to The Laurel Crest Resort Condominium.

    f.   The applicable Consumer Documents for The Laurel Crest Resort Condominium.

    g.   Any and all such other documents and records as may be existing in any recording office of an applicable jurisdiction relating to The Laurel Crest Resort Condominium.

Exhibit 21.1

### SUBSIDIARIES OF BLUEGREEN VACATIONS HOLDING CORPORATION

| | Jurisdiction of Incorporation or Organization |
|---|---|
| Woodbridge Holdings Corporation | Florida |
| Share Happiness Captive Insurance Company, LLC | Tennessee |

### SUBSIDIARIES OF WOODBRIDGE HOLDINGS CORPORATION

| | Jurisdiction of Incorporation or or Organization |
|---|---|
| Bluegreen Vacations Corporation | Florida |
| Core Communities of South Carolina, LLC | So. Carolina |
| Carolina Oak Homes, LLC | So. Carolina |
| PF Program Partnership, LP | Delaware |
| PF Program GP LLC | Delaware |

D - 0055-0264

**SUBSIDIARIES OF BLUEGREEN VACATIONS CORPORATION**

| Name of Subsidiary | Jurisdiction of Incorporation or Organization |
|---|---|
| BBCV Receivables-Q 2010, LLC | Delaware |
| Bluegreen Asset Management Corporation | Delaware |
| Bluegreen Beverage, LLC | Delaware |
| Bluegreen Communities of Texas, LP | Delaware |
| Bluegreen Corporation of Tennessee | Delaware |
| Bluegreen Golf Clubs, Inc. | Delaware |
| Bluegreen HoldCo, LLC | Nevada |
| Bluegreen Holding Corporation (Texas) | Delaware |
| Bluegreen Louisiana, LLC | Delaware |
| Bluegreen Nevada, LLC | Delaware |
| Bluegreen New Jersey, LLC | Delaware |
| Bluegreen Properties N.V. | Aruba |
| Bluegreen Properties of Virginia, Inc. | Delaware |
| Bluegreen Purchasing & Design, Inc. | Florida |
| Bluegreen Receivables Finance Corporation III | Delaware |
| Bluegreen Resorts International, Inc. | Delaware |
| Bluegreen Resorts Management, Inc. | Delaware |
| Bluegreen Servicing LLC | Delaware |
| Bluegreen Southwest Land, Inc. | Delaware |
| Bluegreen Southwest One, L.P. | Delaware |
| Bluegreen Specialty Finance, LLC | Delaware |
| Bluegreen Timeshare Finance Corporation I | Delaware |
| Bluegreen Vacations Unlimited, Inc. | Florida |
| Bluegreen/Big Cedar Vacations, LLC | Delaware |
| BRFC 2013-A LLC | Delaware |
| BRFC 2015-A LLC | Delaware |
| BRFC 2016-A LLC | Delaware |
| BRFC 2017-A LLC | Delaware |
| BRFC 2018-A LLC | Delaware |
| BRFC 2020-A LLC | Delaware |
| BRFC III Deed Corporation | Delaware |
| BRFC-Q 2010, LLC | Delaware |
| BRM Bahamas Limited | Bahamas |
| BXG Construction, LLC | Delaware |
| Encore Rewards, Inc. | Delaware |
| Great Vacation Destinations, Inc. | Florida |
| Jordan Lake Preserve Corporation | North Carolina |
| Leisure Capital Corporation | Vermont |
| Managed Assets Corporation | Delaware |
| New England Advertising Corporation | Vermont |
| Pinnacle Vacations, Inc. | Delaware |
| Prizzma, LLC | Delaware |
| Resort Title Agency, Inc. | Florida |
| SC Holdco, LLC | Delaware |
| Select Connections, LLC | Delaware |
| TFRI 2013-1 LLC | Delaware |

Exhibit 23.1

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We have issued our reports dated March 1, 2021, with respect to the consolidated financial statements and internal control over financial reporting included in the Annual Report of Bluegreen Vacations Holding Corporation on Form 10-K for the year ended December 31, 2020.   We consent to the incorporation by reference of said reports in the Registration Statements of Bluegreen Vacations Holding Corporation on Forms S-3 (File No. 333-216751 and File No. 333-219178) and on Forms S-8 (File No. 333-197195, File No. 333-206371, File No. 333-218265, File No. 333-225211 and File No. 333-231857).

/s/ GRANT THORNTON LLP

Fort Lauderdale, Florida
March 1, 2021

**Exhibit 31.1**

I, Alan B. Levan, certify that:

1)  I have reviewed this annual report on Form 10-K of Bluegreen Vacations Holding Corporation;

2)  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3)  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4)  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5)  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:   March 1, 2021

By: /s/ Alan B. Levan
   Alan B. Levan,
   Chairman of the Board,
   Chief Executive Officer and President

**Exhibit 31.2**

I, Raymond S. Lopez, certify that:

1) I have reviewed this annual report on Form 10-K of Bluegreen Vacations Holding Corporation;

2) Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3) Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4) The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5) The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:   March 1, 2021

By:  /s/ Raymond S. Lopez
     Raymond S. Lopez,
     Chief Financial Officer

Exhibit 32.1

**Certification Pursuant to 18 U.S.C. Section 1350,**
**as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report on Form 10-K of Bluegreen Vacations Holding Corporation (the "Company") for the year ended December 31, 2020, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Alan B. Levan, Chairman of the Board, Chief Executive Officer and President of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Alan B. Levan
Name:   Alan B. Levan
Title:   Chairman of the Board, Chief Executive Officer and President
Date:   March 1, 2021

Exhibit 32.2

**Certification Pursuant to 18 U.S.C. Section 1350,
as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report on Form 10-K of Bluegreen Vacations Holding Corporation (the "Company") for the year ended December 31, 2020, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Raymond S. Lopez, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Raymond S. Lopez
Name: Raymond S. Lopez
Title:  Chief Financial Officer
Date:  March 1, 2021

D-231

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

BLUEGREEN VACATIONS UNLIMITED, INC., *et al.*,

      Plaintiffs,

v.

TIMESHARE LAWYERS P.A., *et al.*,

      Defendants.

Case No.: 1:20-cv-24681-RNS

## **PLAINTIFFS' SECOND RULE 26 DISCLOSURES**

Plaintiffs BLUEGREEN VACATIONS UNLIMITED, INC., and BLUEGREEN VACATIONS CORPORATION (collectively "Bluegreen"), pursuant to Federal Rule of Civil Procedure 26(a)(1), provide the following initial disclosures to CARLSBAD LAW GROUP, LLP, GALLAGHER-CLIFTON, LLC, YUGE INTERNET MARKETING, LLC, BIGLY INTERNET MARKETING, LLC, PANDORA MARKETING, LLC, RICH FOLK, WILLIAM WILSON, JL 'SEAN' SLATTERY, PADDY DEIGHAN, PAUL STEWART and DAVID J. CRADER (collectively "Defendants").

These disclosures are made to the best of Bluegreen's abilities and are based on information reasonably available to Bluegreen, or in its possession as of the date of service of these disclosures, following a good-faith inquiry in accordance with Rule 26. Bluegreen's investigation of possible witnesses and documents is ongoing, however, and Bluegreen reserves the right to supplement and amend this disclosure to produce additional information acquired during the course of discovery and to rely on such information as evidence in this civil action. These disclosures are made without waiver of, or prejudice to, any objection that Bluegreen may

have to use at trial of any of the information disclosed in this document, this document itself, or

any document or thing produced pursuant to Rule 26.

**I.** **Individuals Likely to Have Discoverable Information that Bluegreen May Use to Support its Claims or Defenses**

Pursuant to Rule 26(a)(1)(A)(i), Bluegreen hereby identifies the following individuals

likely to have discoverable information that Bluegreen may use to support its claims and

defenses and the subject(s) of the information:

| Name / Contact Information | Subject Areas of Knowledge |
|---|---|
| Corporate Representative(s) of Bluegreen Vacations Unlimited, Inc. 4960 Conference Way North, Suite 100 Boca Raton, FL 33431<br><br>c/o Shutts & Bowen LLP Alfred J. Bennington, Jr., Esq. Glennys Ortega Rubin, Esq. Michael J. Quinn, Esq. 300 South Orange Avenue, Suite 1600 Orlando, Florida 32801 Telephone: (407) 835-6755 Facsimile: (407) 849-7255<br><br>and<br><br>c/o Shutts & Bowen LLP Eric C. Christu, Esq. 525 Okeechobee Boulevard, Suite 1100 West Palm Beach, Florida 33401 Telephone: (561) 835-8500 Facsimile: (561) 650-8530 | Allegations of the Complaint; Existence of Timeshare Contracts; Breach of the Timeshare Contracts; Defendants' online false advertising; Defendants' inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen and/or promissory notes held by Bluegreen; Defendant Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL "Sean" Slattery, Paul Stewart, Paddy Deighan, and Patrick Thompson's legal threats and actions on behalf of Bluegreen Owners; Bluegreen's damages. |

2

| Corporate Representative(s) of Bluegreen Vacations Corporation 4960 Conference Way North, Suite 100 Boca Raton, FL 33431<br><br>c/o Shutts & Bowen LLP Alfred J. Bennington, Jr., Esq. Glennys Ortega Rubin, Esq. Michael J. Quinn, Esq. 300 South Orange Avenue, Suite 1600 Orlando, Florida 32801 Telephone: (407) 835-6755 Facsimile: (407) 849-7255<br><br>and<br><br>c/o Shutts & Bowen LLP Eric C. Christu, Esq. 525 Okeechobee Boulevard, Suite 1100 West Palm Beach, Florida 33401 Telephone: (561) 835-8500 Facsimile: (561) 650-8530 | Allegations of the Complaint; Existence of Timeshare Contracts; Breach of the Timeshare Contracts; Defendants' online false advertising; Defendants' inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen and/or promissory notes held by Bluegreen; Defendant Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL "Sean" Slattery, Paul Stewart, Paddy Deighan, and Patrick Thompson's legal threats and actions on behalf of Bluegreen Owners; Bluegreen's damages. |
|---|---|
| Corporate Representative(s) of TIMESHARE LAWYERS, P.A.<br><br>c/o Patrick J. Thompson, Registered Agent 15192 Harrington Cove Dr. Orlando, FL 32819<br><br>Or at any location otherwise designated or disclosed by Defendants. | Allegations of the Complaint; Defendants' false advertising; Defendants' internet practices; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' revenue and profits from Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Referral of clients from Yuge Internet Marketing, LLC, Bigly Internet Marketing, LLC, Pandora Marketing, LLC, VCF Enterprises, LLC, Rich Folk, William Wilson, and/or David J. Crader to Timeshare Lawyers, P.A. and/or Co-Defendants Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson. |

3

D - 0231-0003

| | |
|---|---|
| Corporate Representative(s) of FEDERAL FINANCIAL LAW GROUP, LLC<br><br>201 Hilda Street, Suite 23<br>Kissimmee, FL 34741 | Allegations of the Complaint; Defendants' false advertising; Defendants' internet practices; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' revenue and profits from Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Referral of clients from Yuge Internet Marketing, LLC, Bigly Internet Marketing, LLC, Pandora Marketing, LLC, VCF Enterprises, LLC, Rich Folk, William Wilson, and/or David J. Crader to Federal Financial Law Group and/or Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson. |
| Corporate Representative(s) of CARLSBAD LAW GROUP, LLP<br><br>c/o Mateer & Harbert, P.A.<br>Brian L. Wagner, Esq.<br>W. Scott Gabrielson, Esq.<br>225 East Robinson St., Ste. 600<br>Orlando, FL 32801-2854<br>Telephone: (407) 425-9044<br>Facsimile: (407) 423-2016<br><br>Or at any location otherwise designated or disclosed by Defendants. | Allegations of the Complaint; Defendants' false advertising; Defendants' internet practices; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' revenue and profits from Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Referral of clients from Yuge Internet Marketing, LLC, Bigly Internet Marketing, LLC, Pandora Marketing, LLC, VCF Enterprises, LLC, Rich Folk, William Wilson, and/or David J. Crader to Carlsbad Law Group, LLP and/or Co-Defendants Timeshare Lawyers, P.A., Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson. |

4

| | |
|---|---|
| Corporate Representative(s) of GALLAGHER-CLIFTON, LLC<br><br>c/o William P. Stewart, Jr., Registered Agent<br>122 Seascape Dr., Unit 1607<br>Miramar Beach, FL 32550<br><br>Or at any location otherwise designated or disclosed by Defendants. | Allegations of the Complaint; Defendants' false advertising; Defendants' internet practices; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' revenue and profits from Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Referral of clients from Yuge Internet Marketing, LLC, Bigly Internet Marketing, LLC, Pandora Marketing, LLC, VCF Enterprises, LLC, Rich Folk, William Wilson, and/or David J. Crader to Gallagher-Clifton, LLC and/or Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson. |
| Corporate Representative(s) of MG&N Group, LLP<br><br>c/o Michael Consalvo, Registered Agent<br>9502 Sun Pointe Drive<br>Boynton Beach, FL 33437<br><br>Or at any location otherwise designated or disclosed by Defendants. | Allegations of the Complaint; Defendants' false advertising; Defendants' internet practices; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' revenue and profits from Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Agreements between MG&N Group, LLP and Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson for legal services; Defendants' referral of clients to Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson. |

5

D - 0231-0005

| Corporate Representative(s) of YUGE INTERNET MARKETING, LLC<br><br>c/o Waugh Law, P.A.<br>Christian W. Waugh, Esq.<br>Morgan Fayocavitz, Esq.<br>321 N. Crystal Lake Dr., Ste. 207<br>Orlando, FL 32803<br>Telephone: (321) 800-6008<br>Facsimile: (844) 206-0245<br><br><br>Or at any location otherwise designated or disclosed by Defendants. | Allegations of the Complaint; Defendants' false advertising; Defendants' internet practices; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' revenue and profits from Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Agreements between Yuge Internet Marketing, LLC and Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson for legal services; Defendants' referral of clients to Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson. |
|---|---|
| Corporate Representative(s) of BIGLY INTERNET MARKETING, LLC<br><br>c/o Waugh Law, P.A.<br>Christian W. Waugh, Esq.<br>Morgan Fayocavitz, Esq.<br>321 N. Crystal Lake Dr., Ste. 207<br>Orlando, FL 32803<br>Telephone: (321) 800-6008<br>Facsimile: (844) 206-0245<br><br>Or at any location otherwise designated or disclosed by Defendants. | Allegations of the Complaint; Defendants' false advertising; Defendants' internet practices; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' revenue and profits from Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Agreements between Bigly Internet Marketing, LLC and Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson for legal services; Defendants' referral of clients to Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson. |

6

| Corporate Representative(s) of PANDORA MARKETING, LLC<br><br>c/o Klein Park & Lowe, P.L.<br>Houston S. Park, III, Esq.<br>Robert M. Klein, Esq.<br>Andrew M. Feldman, Esq.<br>9130 S. Dadeland Blvd., Suite 2000<br>Miami, FL 33156<br>Telephone: (305) 670-3700<br>Facsimile: (305) 670-8592<br><br><br>Or at any location otherwise designated or disclosed by Defendants. | Allegations of the Complaint; Defendants' false advertising; Defendants' internet practices; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' revenue and profits from Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Agreements between Pandora Marketing, LLC and Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson for legal services; Defendants' referral of clients to Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson. |
| Corporate Representative(s) of VCF ENTERPRISES, LLC<br><br>c/o Klein Park & Lowe, P.L.<br>Houston S. Park, III, Esq.<br>Robert M. Klein, Esq.<br>Andrew M. Feldman, Esq.<br>9130 S. Dadeland Blvd., Suite 2000<br>Miami, FL 33156<br>Telephone: (305) 670-3700<br>Facsimile: (305) 670-8592<br><br><br>Or at any location otherwise designated or disclosed by Defendants. | Allegations of the Complaint; Defendants' false advertising; Defendants' internet practices; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' revenue and profits from Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Agreements between VCF Enterprises, LLC, and Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson for legal services; Defendants' referral of clients to Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson. |

D - 0231-0007

| | |
|---|---|
| RICH FOLK<br><br>c/o Klein Park & Lowe, P.L.<br>Houston S. Park, III, Esq.<br>Robert M. Klein, Esq.<br>Andrew M. Feldman, Esq.<br>9130 S. Dadeland Blvd., Suite 2000<br>Miami, FL 33156<br>Telephone: (305) 670-3700<br>Facsimile: (305) 670-8592<br><br><br>Or at any location otherwise designated or disclosed by Defendants. | Allegations of the Complaint; Defendants' false advertising; Defendants' internet practices; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' revenue and profits from Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Agreements between Rich Folk and Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson for legal services; Defendants' referral of clients to Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson. |
| WILLIAM WILSON<br><br>c/o Klein Park & Lowe, P.L.<br>Houston S. Park, III, Esq.<br>Robert M. Klein, Esq.<br>Andrew M. Feldman, Esq.<br>9130 S. Dadeland Blvd., Suite 2000<br>Miami, FL 33156<br>Telephone: (305) 670-3700<br>Facsimile: (305) 670-8592<br><br><br>Or at any location otherwise designated or disclosed by Defendants. | Allegations of the Complaint; Defendants' false advertising; Defendants' internet practices; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' revenue and profits from Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Agreements between William Wilson and Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson for legal services; Defendants' referral of clients to Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson. |

8

| JL 'SEAN' SLATTERY<br><br>c/o Mateer & Harbert, P.A.<br>Brian L. Wagner, Esq.<br>W. Scott Gabrielson, Esq.<br>225 East Robinson St., Ste. 600<br>Orlando, FL 32801-2854<br>Telephone: (407) 425-9044<br>Facsimile: (407) 423-2016<br><br>Or at any location otherwise designated or disclosed by Defendants. | Allegations of the Complaint; Defendants' false advertising; Defendants' internet practices; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' revenue and profits from Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Referral of clients from Yuge Internet Marketing, LLC, Bigly Internet Marketing, LLC, Pandora Marketing, LLC, VCF Enterprises, LLC, Rich Folk, William Wilson, and/or David J. Crader to JL 'Sean' Slattery and/or Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, Paul Stewart, Paddy Deighan, and/or Patrick Thompson. |
| PAUL STEWART<br><br>508 Harbor Boulevard, No. 401<br>Destin, FL 32541<br><br>Or at any location otherwise designated or disclosed by Defendants. | Allegations of the Complaint; Defendants' false advertising; Defendants' internet practices; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' revenue and profits from Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Referral of clients from Yuge Internet Marketing, LLC, Bigly Internet Marketing, LLC, Pandora Marketing, LLC, VCF Enterprises, LLC, Rich Folk, William Wilson, and/or David J. Crader to Paul Stewart and/or Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paddy Deighan, and/or Patrick Thompson. |

9

| ANGELA CONSALVO<br><br>9588 Cobblestone Creek Drive<br>Boynton Beach, FL 33742<br><br>Or at any location otherwise designated or disclosed by Defendants. | Allegations of the Complaint; Defendants' false advertising; Defendants' internet practices; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' revenue and profits from Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Agreements between Angela Consalvo and Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson for legal services; Defendants' referral of clients to Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson. |
|---|---|
| PADDY DEIGHAN<br><br>2000 N. Fashion Dr., Ste. 2222<br>Las Vegas, NV 89109<br><br>Or at any location otherwise designated or disclosed by Defendants. | Allegations of the Complaint; Defendants' false advertising; Defendants' internet practices; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' revenue and profits from Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Referral of clients from Yuge Internet Marketing, LLC, Bigly Internet Marketing, LLC, Pandora Marketing, LLC, VCF Enterprises, LLC, Rich Folk, William Wilson, and/or David J. Crader to Paddy Deighan and/or Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, and/or Patrick Thompson. |

10

| PATRICK THOMPSON<br><br>Location Unknown | Allegations of the Complaint; Defendants' false advertising; Defendants' internet practices; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' revenue and profits from Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Referral of clients from Yuge Internet Marketing, LLC, Bigly Internet Marketing, LLC, Pandora Marketing, LLC, VCF Enterprises, LLC, Rich Folk, William Wilson, and/or David J. Crader to Patrick Thompson and/or Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, and/or Paddy Deighan. |
|---|---|
| DAVID J. CRADER<br><br>c/o Waugh Law, P.A.<br>Christian W. Waugh, Esq.<br>Morgan Fayocavitz, Esq.<br>321 N. Crystal Lake Dr., Ste. 207<br>Orlando, FL 32803<br>Telephone: (321) 800-6008<br>Facsimile: (844) 206-0245<br><br>Or at any location otherwise designated or disclosed by Defendants. | Allegations of the Complaint; Defendants' false advertising; Defendants' internet practices; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' revenue and profits from Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Agreements between David J. Crader and Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson for legal services; Defendants' referral of clients to Co-Defendants Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Paddy Deighan, and/or Patrick Thompson. |

D - 0231-0011

| | |
|---|---|
| Relevant Bluegreen timeshare owners identified to date.<br><br>To the extent that Bluegreen is able to identify such timeshare owners, such owners are referenced at the attached Exhibit A hereto.<br><br>The identities of these individuals are largely within the possession, custody, or control of Defendants. To the extent further discovery reveals additional relevant timeshare owners, Plaintiffs will supplement this disclosure with reference to such individuals. | Allegations of the Complaint; Defendants' false advertising; Defendants' internet practices; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' revenue and profits from Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Defendants' referral of clients to Co-Defendants Harold O. Miller, Michael A. Molfetta, and Molfetta Law, LLC. |
| John Donboli, Esq.<br>13223 Black Mountain Road, No. 222<br>San Diego, California 92129 | John Donboli is the former law partner of Defendant JL 'Sean' Slattery. Mr. Donboli has alleged in a lawsuit filed in San Diego County, California, against Mr. Slattery, that Mr. Slattery used the assets and funds of Del Mar Law Group, LLP to orchestrate a timeshare scheme, over Mr. Donboli's objections, which consisted of sending demand letters on firm letterhead.<br><br>Accordingly, Mr. Donboli likely has discoverable information regarding the allegations of the Complaint; the business relationship between the Lawyer Defendants (Timeshare Lawyers, P.A., Carlsbad Law Group, LLP, Gallagher-Clifton, LLC, JL 'Sean' Slattery, Paul Stewart, Patrick Thompson, and Paddy Deighan) and the Marketing Defendants (MG&N Group, LLC, Yuge Internet Marketing, LLC, Bigly Internet Marketing, LLC, Pandora Marketing, LLC, VCF Enterprises, LLC, Rich Folk, William 'Bo' Wilson, Angela Consalvo, and David J. Crader); JL 'Sean' Slattery's participation in the timeshare exit scheme at issue in this case; Lawyer Defendants' performance of the services advertised by the Marketing Defendants; Defendants' violations of Florida's Deceptive and Unfair Trade Practices Act; Defendants' false advertising and tortious interference with timeshare contracts. |

12

| Marketing Defendants' (MG&N Group, LLC, Yuge Internet Marketing, LLC, Bigly Internet Marketing, LLC, Pandora Marketing, LLC, Rich Folk, William 'Bo' Wilson, Angela Consalvo, and David J. Crader) sales personnel, including:<br><br>LLAUGER, COURTLAND<br>ALLISON, ERIKA RENEE<br>BRIDGES, JONATHAN<br>LEATH, LESLIE<br>KING, LUKE<br>ROPELA, MATT<br>RECANIA, JR., RICHARD<br>GAINES, CHANELLE<br>OTTO, TAYLOR<br>CARNEY, THOMAS<br>JARAMILLO, VICTORIA<br>GARD, WALTER<br>MARQUEZ, ROBERT<br>DENTON, BRISHAUN<br>ZAMBROTTA, DAVID<br>MCCARTY, THOMAS H<br>MASTER, TRAVEL<br>GUNTER, LARRY<br>BICKEL, TUCKER GRADY<br>BASKETT, JIMMY<br>ABBOTT, DARYL I<br>GAINES JR., MORELL<br><br>As these are the Marketing Defendants' current or former employees, the Marketing Defendants are believed to have knowledge as to the last known address and location of said individuals. | These individuals are believed to have knowledge based on their employment with the Marketing Defendants of the Marketing Defendants' sales pitch; Defendants' false advertising; Defendants' pattern and practice of inducing timeshare owners to stop payments on their timeshare contracts; Defendants' exorbitant fees; Defendants' unauthorized practice of law and/or violation of attorney ethics rules; Defendants' tortious interference with timeshare contracts; and Defendants violations of Florida's Deceptive and Unfair Trade Practices Act. |

13

| | |
|---|---|
| MIRANDA MCCROSKEY<br>137 S. Prospect Avenue<br>Tustin, CA 92780 | Allegations of the Complaint; Existence of the Timeshare Contracts; Marketing Defendants' false advertising; Marketing Defendants' referral relationships with lawyers; breach of the Timeshare Contracts; Defendants' inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; legal threats and actions against Bluegreen on behalf of Bluegreen Owners by Defendants; Defendants violation of Florida's Deceptive and Unfair Trade Practices Act. |
| MICHAEL CONSALVO<br>9502 Sun Pointe<br>Boynton Beach, FL 33437 | Allegations of the Complaint; Defendants' business practices; Defendants' promises to Bluegreen Owners; Defendants' actions and inactions with respect to Bluegreen Owners; Defendants' inducement of Bluegreen Owners to breach their Timeshare Contracts with Bluegreen; Defendants' violations of the Florida Deceptive and Unfair Trade Practices Act; Defendants violations of the Credit Repair Organizations Act, 15 U.S.C. § 1679a-b. |

Bluegreen also relies upon the disclosures made or to be made in each of the Defendants' Rule 26 Disclosure(s). Bluegreen reserves the right to supplement its identification of individuals pursuant to Rule 26(e) as discovery in this matter continues. Bluegreen reserves the right to rely on any individuals whom Defendants identify in their Rule 26(a)(1) Disclosure(s).

## II. Documents in Bluegreen's Possession, Custody, or Control that Bluegreen May Use to Support its Claims or Defenses

Pursuant to Rule 26(a)(1)(A)(ii), Bluegreen hereby discloses the following description, by category and location, of documents, data compilations, and tangible things in Bluegreen's possession, custody, or control that Bluegreen may use to support its claims or defenses:

| Category | Location |
|---|---|
| Timeshare Contracts that have been breached as a result of Defendants' conduct. | Bluegreen. |

14

| | |
|---|---|
| Correspondence from Bluegreen to the Bluegreen Owners reflecting any delinquency or breach of the Timeshare Contracts. | Bluegreen. |
| Documents reflecting the Bluegreen Owners' payment history. | Bluegreen. |
| Documents reflecting the location and manner in which Defendant solicited and provided services to timeshare owners, including Bluegreen Owners. | Bluegreen, Defendants, and Third-Parties |
| Defendants' advertisements, including, without limitation, online advertisements, websites, and search engine optimization materials. | Bluegreen is in possession of a few of these; there are many more in the possession of Defendants and online. |
| Correspondence from Defendants to Bluegreen allegedly sent on behalf of individual Bluegreen Owners. | Bluegreen and Defendants. |
| Defendants' telephone sales call scripts and audio recordings of actual calls with Bluegreen Owners containing false and deceptive advertising inducing Bluegreen Owners to stop payments. | Defendants. |
| Correspondence sent on behalf of Defendants' Bluegreen Owner customers by non-party entities or law firms, such as Miranda McCroskey, Del Mar Law Group, LLP, and Slattery, Sobel, and DeCamp, LLP. | Bluegreen and Defendants. |
| Correspondence between the Defendants and Bluegreen Owners. | Defendants and Bluegreen Owners |
| Correspondence between the Defendants. | Defendants |
| Defendants' financial records | Defendants and third-party financial |

15

| | institutions |
|---|---|

Bluegreen reserves the right to supplement its identification of categories of documents pursuant to Rule 26(e) as discovery in this matter continues. Bluegreen reserves the right to rely on any documents that Defendants identify in their Rule 26(a)(1) Disclosures.

### III.    Computation of Damages

Bluegreen is seeking damages resulting from: (1) false advertising and contributory false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1); (2) tortious interference with contractual relations; (3) civil conspiracy; and (4) deceptive or unfair trade practices in violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*, as set forth in the Complaint for Damages and Injunctive Relief. Additionally, with regard to Bluegreen's claims arising under the Lanham Act, Bluegreen seeks not only its own actual damages, but also disgorgement of Defendants' profits associated with falsely advertising to Bluegreen's timeshare owners, as well as corrective advertising. For each of Bluegreen's state law claims, Bluegreen seeks the recovery of punitive damages against the Defendants. Finally, for all such claims where permitted by law, Bluegreen further seeks the recovery of its attorneys' fees.

For each category of damages, Bluegreen presently computes and quantifies the various categories of its damages as follows:

| Category | Amount | Computation Method |
|---|---|---|
| Actual Damages | To be Determined | Aggregation of unpaid loan balances outstanding on mortgage loans owed to Bluegreen by Bluegreen timeshare owners. After the discovery in this case, Bluegreen will provide a total sum for this amount after it is |

16

| | | able to fully identify all relevant owners upon receipt of necessary discovery from each of the Defendants. |
|---|---|---|
| Disgorgement Damages | To be Determined | After discovery, disgorgement will be computed by aggregating Defendants' total revenues received from Bluegreen timeshare owners. Disgorgement calculations may also require the aid of expert testimony, if deemed appropriate, after a review of Defendants' records. |
| Corrective Advertising Damages | To be Determined | After discovery, corrective advertising will be computed based on Defendants' total expenditures for the relevant time period and the total scope of harm. To the extent prospective corrective advertising may be appropriate, corrective advertising calculations may require the aid of expert testimony, if deemed appropriate, after a review of Defendants' records. |
| Punitive Damages | ~ $10,000,000 | Punitive damages are not susceptible to a precise calculation. After Defendants comply with their discovery obligations, punitive damages will be based on the Defendants' financial records and the egregiousness of Defendants' behavior. The amount stated is an estimate of what Bluegreen presently anticipates will be necessary to deter future conduct by Defendant. |

17

| Attorneys' Fees | To be Determined | Attorneys' fees are fluid as Bluegreen continues to expend fees prosecuting this matter, and cannot be liquidated until the resolution of this case. |
|---|---|---|

Final determinations and calculations cannot be made until Bluegreen receives Defendants' discovery, including without limitation, a list of Bluegreen Owners serviced by the Defendants and financial documents.

**IV.    Insurance Agreements**

As there are no claims asserted against Bluegreen at this time, Bluegreen is not aware of any insurance policy available which could provide coverage or satisfy all of part of a possible judgment in this civil action or to indemnify or reimburse for payments made to satisfy any judgment against Bluegreen.

Dated: June 21, 2022

*/s/ Glennys Ortega Rubin*
**ERIC C. CHRISTU, ESQ.**
Florida Bar No. 434647
echristu@shutts.com
**SHUTTS & BOWEN, LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, FL 33131
Telephone: (305) 358-6300
Facsimile: (305) 381-9982

and

**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**MICHAEL QUINN, ESQ.**
Florida Bar No. 84587

18

D - 0231-0018

mquinn@shutts.com
**CHRISTIAN M. LEGER, ESQ.**
Florida Bar No. 0100562
cleger@shutts.com
**BENJAMIN F. ELLIOTT, ESQ.**
Florida Bar No. 1010706
belliott@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile: (407) 849-7255

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of June, 2022, , a true and correct copy of the

foregoing has been served via electronic mail to the following CM/ECF Participants and via U.S.

Mail, postage prepaid, to the following non-CM/ECF Participants:

| | |
|---|---|
| Brian L. Wagner, Esq. | Christian W. Waugh, Esq. |
| Email: bwagner@mateerharbert.com | Email: cwaugh@waughgrant.com |
| Email: semerson@mateerharbert.com | Morgan Fayocavitz, Esq. |
| W. Scott Gabrielson, Esq. | Email: mfayocavitz@waughgrant.com |
| Email: sgabrielson@mateerharbert.com | Mary Norberg, Esq. |
| Email: Mstoutamire@mateerharbert.com | Email: mnorberg@waughgrant.com |
| Mateer & Harbert, P.A. | Email: rwood@waughgrant.com |
| 225 East Robinson Street, Suite 600 | WAUGH Grant PLLC |
| Orlando, FL 32801-2854 | 201 E. Pine Street, Suite 315 |
| Telephone: 407-425-9044 | Orlando, FL 32801 |
| Facsimile: 407-423-2016 | Telephone: (321) 800-6008 |
| *Attorneys for Carlsbad Law Group, LLP and* | Facsimile: (844) 206-0245 |
| *JL "Sean" Slattery* | *Attorneys for Yuge Internet Marketing, LLC,* |
| | *Bigly Internet Marketing, LLC and David J.* |
| | *Crader* |

D - 0231-0019

| | |
|---|---|
| John J. Bennett, Esq.<br>Email: jbennett@nardellalaw.com<br>John M. Sykes, Esq.<br>Email: jsykes@nardellalaw.com<br>Email: nmacdougall@nardellalaw.com<br>Email: service@nardellalaw.com<br>Nardella & Nardella, PLLC<br>135 W. Central Blvd., Suite 300<br>Orlando, FL 32801<br>Telephone: (407) 966-2680<br><br>and<br><br>Patrick A. Bradford, Esq. (Pro Hac Vice)<br>Email: pbradford@bradfordedwards.com<br>Bradford Edwards and Varlack LLP<br>112 East 49th Street, 11th Floor<br>New York, NY 10017<br>Telephone: (917) 671-9406<br>*Attorneys for Pandora Marketing, LLC d/b/a Timeshare Compliance, William Wilson a/k/a Bo Wilson, Rich Folk* | Patrick James Thompson, Esq.<br>Email: law@patrickjthompson.com<br>Patrick Thompson Law P.A.<br>7025 County Road 46A PMB 432<br>Lake Mary, FL 32746-4721<br>Telephone: (407) 750-9000<br>Facsimile: (386) 675-1445<br>*Patrick Thompson, Pro Se*<br><br>Patrick J. Thompson, Esq.<br>Email: law@patrickjthompson.com<br>Patrick Thompson Law P.A.<br>201 Hilda Street, Ste. 23<br>Kissimmee, FL 34741<br>Telephone: 407-750-9000<br>*Attorney for Timeshare Lawyers P.A.* |

**NON-ECF PARTICIPANTS**

| | |
|---|---|
| Angela Consalvo<br>588 Cobblestone Creek Drive<br>Boynton Beach, Florida 33472 | Paul Stewart<br>508 Harbor Blvd., #401<br>Destin, FL 32541 |
| MG&N Group LLC d/b/a National Credit Rehab<br>c/o Registered Agent Michael Consalvo<br>502 Sun Pointe Drive<br>Boynton Beach, Florida 33437 | Paddy Deighan<br>2000 Fashion Show Drive, Unit 2222<br>Las Vegas, Nevada 89109<br>Email: paddy@federalfinanciallawgroup.com<br><br>923 Haddonfield Road, Suite 300<br>Cherry Hill, NJ 08002 |
| Gallagher-Clifton, LLC<br>c/o Registered Agent William O. Stewart, Jr.<br>508 Harbor Blvd., #401<br>Destin, FL 32541 | |

/s/ Glennys Ortega Rubin
**GLENNYS ORTEGA RUBIN, ESQ.**

D - 0231-0020

| # | Owner Name(s) | Contract Number | Loan Balance | Delinquency Date |
|---|---|---|---|---|
| 1 | Adan & Channell Blevins | 1075133 | $ 17,979.55 | 9/6/2019 |
| 2 | Albert & Nicole Renshaw | 931278 | $ 14,732.56 | 10/16/2019 |
| 3 | AlfonsoLascano Jr & Loretta Ann Wilson Lascano | 855975 | $ 9,542.49 | 6/29/2017 |
| 4 | Amanda & Eric Olsen | 2659855 | $ 7,326.64 | 1/13/2020 |
| 5 | Angela T. & Angela J. Buchanan | 1072508 | $ 21,492.14 | 7/5/2019 |
| 6 | Anthony & Ashley Tilahun | 1024294 | $ 12,111.91 | 9/13/2019 |
| 7 | Anthony Fisher & Senora Harris | 828889 | $ 5,402.44 | 11/6/2020 |
| 8 | Anthony L. & Melissa J. Church | 986215 | $ 8,852.04 | 9/8/2020 |
| 9 | Anthony R. Murphy & Nancy L. Satterlee | 989949 | $ 9,652.06 | 7/21/2018 |
| 10 | April Joy Worthington, Chad Alan Vincent | 970708 | $ 11,287.57 | 8/6/2020 |
| 11 | Arnold A. Gittens & Greta Stuart-Gittens | 763446 | $ 10,342.19 | 9/29/2019 |
| 12 | Autumn Romain | 1047205 | $ 3,185.14 | 5/27/2018 |
| 13 | Beatriz Astencio & Roberto Cedeno | 665537 | $ 3,185.20 | 6/8/2020 |
| 14 | Betty J. Adams | 1097944 | $ 41,300.24 | 9/7/2020 |
| 15 | Billy & Mary H. Hays | 1131368 | $ 30,501.53 | 5/18/2019 |
| 16 | Billy W. Garner | 887944 | $ 3,481.52 | 2/9/2019 |
| 17 | Bobbie E. & Alice L. McNeil | 2583331 | $ 14,953.34 | 3/8/2020 |
| 18 | Bobbie E. & Alice L. McNeil | 2155848 | $ 14,781.40 | 2/25/2020 |
| 19 | Bobby & Leanna Harmon | 1029442 | $ 12,823.70 | 1/12/2021 |
| 20 | Bobby & Leanna Harmon | 2613697 | $ 11,506.23 | 1/10/2021 |
| 21 | Bobby & Leanna Harmon | 2697102 | $ 6,728.63 | 1/11/2021 |
| 22 | Bradley & Amy Selvey | 1121875 | $ 35,592.20 | 11/1/2019 |
| 23 | Brandy & Kyle Griffin | 2596865 | $ 31,669.13 | 8/19/2020 |
| 24 | Brenda K. Kern, Cameron Elizabeth Kern, Lyle D. Kern & Lyndon Weslie Kern | 2612531 | $ 84,498.10 | 11/3/2019 |
| 25 | Brent & Lynette King | 2683191 | $ 7,798.71 | 3/1/2021 |
| 26 | Bryan & Elizabeth Catherine Espinosa | 1077728 | $ 11,939.51 | 12/18/2019 |
| 27 | Candace Hollins-Brokaw & Jeffrey Brokaw | 2594593 | $ 72,539.08 | 1/6/2021 |
| 28 | Celestine G Carter & Haru Carter Jr. | 2650947 | $ 10,080.00 | 9/28/2019 |
| 29 | Chao Xiong | 2726620 | $ 25,048.85 | 7/24/2021 |
| 30 | Chao Xiong | 943748 | $ 8,591.25 | 8/15/2021 |
| 31 | Chao Xiong | 1027037 | $ 7,635.03 | 7/27/2021 |
| 32 | Chao Xiong & Aimee Lee | 928916 | $ 6,661.97 | 7/7/2021 |
| 33 | Charlene & Charly Brown | 1042750 | $ 45,149.78 | 8/6/2019 |
| 34 | Charles & Sherry Terry | 2660018 | $ 13,347.04 | 12/14/2020 |
| 35 | Charles Govan | 1104638 | $ 24,398.14 | 1/22/2020 |
| 36 | Cheresa & Jose Ramon | 868721 | $ 6,313.96 | 4/2/2018 |
| 37 | Cheryll Craigie | 990314 | $ 8,727.09 | 8/22/2018 |
| 38 | Christopher Dwayne Shivers & Katie Rochelle Shivers | 992828 | $ 8,303.85 | 11/1/2017 |
| 39 | Claribell Soiza | 1134323 | $ 7,532.57 | 12/31/2020 |
| 40 | Colleen & David Bolanowski | 927037 | $ 12,050.77 | 5/28/2019 |
| 41 | Cyril & Debra Guild | 1075994 | $ 7,578.40 | 7/10/2018 |
| 42 | Dale Greenley | 2588180 | $ 12,296.28 | 12/2/2018 |

Exhibit A

| # | Owner Name(s) | Contract Number | Loan Balance | Delinquency Date |
|---|---|---|---|---|
| 43 | Damon L. & Sherita Perry | 1029230 | $ 6,636.77 | 9/10/2020 |
| 44 | Daniel & Cheryl Burns | 2698743 | $ 66,000.00 | 10/23/2020 |
| 45 | Danny & Christina Cormier | 997956 | $ 24,067.63 | 12/20/2018 |
| 46 | Darrin Hartman | 2613390 | $ 35,593.45 | 11/8/2020 |
| 47 | David & Barbara Mitchell Sr. | 761672 | $ 7,332.38 | 10/19/2016 |
| 48 | David & Karen Sprague | 974355 | $ 11,186.73 | 9/21/2020 |
| 49 | Dean & Margaretta Garlinghouse | 940556 | $ 19,549.81 | 11/27/2017 |
| 50 | Deborah Leanne Truelove & Terry Efurd | 970810 | $ 4,906.29 | 8/6/2020 |
| 51 | Demetrius Baytop & Carla Kitchel | 2626207 | $ 26,120.35 | 4/11/2020 |
| 52 | Denise Nelson-Smith & Willie E. Smith | 1140951 | $ 28,216.80 | 10/30/2020 |
| 53 | Dennis D. & Vicki Mitchell | 764763 | $ 4,357.45 | 9/6/2018 |
| 54 | Derrick & Debra J. Braswell | 1144375 | $ 4,971.48 | 9/15/2020 |
| 55 | Derrick Marshall | 1146483 | $ 14,025.15 | 8/25/2020 |
| 56 | Donald & Lisa Craig | 999717 | $ 12,989.19 | 5/26/2019 |
| 57 | Donald J. Thomas | 1037808 | $ 16,196.31 | 5/9/2019 |
| 58 | Donnie & Christine Brown | 1113084 | $ 23,938.44 | 9/17/2019 |
| 59 | Donnie & Christine Brown | 1066140 | $ 17,431.35 | 9/24/2019 |
| 60 | Dorothy Fizer Lucas & Clifton D. Lucas | 1094223 | $ 35,647.71 | 11/14/2020 |
| 61 | Dorothy Hale | 1123691 | $ 6,109.91 | 9/11/2019 |
| 62 | Earl S. & Caitlin A. Abercrombie | 954529 | $ 13,517.11 | 7/16/2017 |
| 63 | Eduardo A. & Stacy L. Rodriguez | 928442 | $ 7,459.16 | 8/5/2019 |
| 64 | Eduardo A. & Stacy L. Rodriguez | 997463 | $ 6,776.61 | 7/18/2019 |
| 65 | Edward & Maria Streckfus | 963159 | $ 22,663.73 | 7/5/2017 |
| 66 | Elijah T. & Tiffany K. Ireland | 1074792 | $ 10,368.94 | 2/4/2021 |
| 67 | Elizabeth & Gerardo Sepulveda | 1004178 | $ 9,265.16 | 7/12/2019 |
| 68 | Emma Stubblefield | 1104162 | $ 1,412.58 | 2/18/2020 |
| 69 | Erickson Thomas | 1035270 | $ 8,823.09 | 8/18/2019 |
| 70 | Erin Marconi & Jeremy McCoy | 2586285 | $ 17,107.55 | 1/23/2021 |
| 71 | Ernesto & Yolanda S. Pacheco | 1005414 | $ 7,034.78 | 10/16/2021 |
| 72 | Eugene & Brenda K. Combs | 1133049 | $ 10,783.20 | 11/25/2019 |
| 73 | Eva Steskal Thoms & Richard Gordan Thoms | 1137197 | $ 30,947.78 | 6/13/2020 |
| 74 | Fetu & William Bruhnke | 1094394 | $ 23,205.44 | 12/15/2020 |
| 75 | Fidencio Martinez & C. Victoria Llanos | 868156 | $ 6,989.52 | 12/28/2019 |
| 76 | Frank J & Ingrid H Bernard | 1112531 | $ 32,319.70 | 2/14/2019 |
| 77 | Garry & Deborah Barrett | 890595 | $ 2,837.88 | 5/21/2019 |
| 78 | Gayle Turner, Stanley Singleton, Equalla Agee, & Anthony Sykes | 751289 | $ 11,672.39 | 11/19/2019 |
| 79 | Gene & Sharon Ballantyne | 2587013 | $ 25,567.27 | 10/27/2019 |
| 80 | George William & Roxane Brown | 2589802 | $ 55,158.79 | 3/10/2019 |
| 81 | Gerald & Sheila Barnett | 1110130 | $ 31,289.72 | 3/22/2020 |
| 82 | Glenda Petersen & Michael Bohley | 1114115 | $ 20,991.45 | 11/23/2019 |
| 83 | Glenwood C. Simmons & Vicki G. Fisher | 1134042 | $ 27,399.47 | 4/30/2020 |

Exhibit A

D - 0231-0022

| # | Owner Name(s) | Contract Number | Loan Balance | Delinquency Date |
|---|---|---|---|---|
| 84 | Gloria Jean McCutcheon & Cynthia A. Timberlake & William Kenneth McCutcheon | 959546 | $ 9,245.83 | 7/17/2017 |
| 85 | Gregory Cyrus & Christy Cyrus | 998213 | $ 8,927.49 | 6/3/2019 |
| 86 | Heather & Justin Wiezorek | 1003009 | $ 4,702.33 | 9/7/2020 |
| 87 | Heather & Justin Wiezorek | 938691 | $ 4,495.50 | 8/19/2020 |
| 88 | Herman Shannon & Kelly Schmitt | 997846 | $ 13,276.87 | 5/19/2018 |
| 89 | Herschel Lee Shawver & Paula Lisle Shawver | 724532 | $ 2,310.55 | 7/16/2019 |
| 90 | Ismael Valdespino Ortega & Yesenia Moran Mendoza | 2622407 | $ 23,486.65 | 5/22/2020 |
| 91 | Jack A & Pamela J Rickett | 741387 | $ 7,023.92 | 12/1/2016 |
| 92 | Jackie Glenn & Brenda Carol Furnace | 593807 | $ 574.88 | 7/20/2019 |
| 93 | James & Debora Davidson | 1131730 | $ 19,950.35 | 2/20/2021 |
| 94 | James & Debra Loveless | 801816 | $ 9,883.32 | 4/13/2020 |
| 95 | James & Kristin Schupp | 2600623 | $ 23,186.47 | 8/13/2019 |
| 96 | James F. Cullison & Amanda L. Reatherford | 967811 | $ 13,805.00 | 11/25/2019 |
| 97 | James L. & Debra J. Neideffer | 1121948 | $ 9,826.89 | 10/1/2020 |
| 98 | James R. & Sheila Waltrip | 941508 | $ 17,635.28 | 10/2/2016 |
| 99 | James Taylor Brooks & Jacqueline Smith-Brooks | 992079 | $ 5,019.58 | 8/29/2019 |
| 100 | Jamie Mayle & Sahara Alonzo | 1055446 | $ 8,551.10 | 2/4/2019 |
| 101 | Jeffrey & Anna Westby | 1037243 | $ 7,834.34 | 1/5/2021 |
| 102 | Jeffrey & Jennifer Clark | 864926 | $ 15,608.97 | 11/13/2020 |
| 103 | Jennifer McCullough | 762161 | $ 2,222.27 | 9/22/2020 |
| 104 | Jeremy & Darla Lathrem | 2674038 | $ 55,347.17 | 6/23/2020 |
| 105 | Jerene L. Nutter | 1072081 | $ 9,611.96 | 10/22/2019 |
| 106 | Jerry & Tammy Johnson | 1127507 | $ 10,065.84 | 8/13/2019 |
| 107 | Jerry Ray Rosewell & Hollye Elaine Rosewell | 875223 | $ 8,652.52 | 1/13/2019 |
| 108 | Jesse & Jordan Harding | 942475 | $ 7,228.35 | 1/8/2020 |
| 109 | Jimmy & Mary Phillips | 2608281 | $ 23,263.47 | 8/7/2020 |
| 110 | Jody & Diana Jones | 981097 | $ 5,388.84 | 10/18/2020 |
| 111 | John Beth & Cristal Advincula | 1114668 | $ 13,994.02 | 10/25/2020 |
| 112 | John T Carey, Jr & Samantha M Carey | 748520 | $ 4,284.20 | 1/27/2018 |
| 113 | John Woods & Harriet Woods | 935110 | $ 26,432.56 | 5/4/2021 |
| 114 | John Woods & Harriet Woods | 1098920 | $ 10,397.80 | 4/14/2021 |
| 115 | Jonathan & Samantha Castelblanco | 1098801 | $ 10,098.92 | 9/13/2020 |
| 116 | Jose Antonio Baez & Beronica Ibarra | 1130020 | $ 6,472.88 | 5/11/2020 |
| 117 | Joseph & Rosalie Laskos | 1117664 | $ 34,362.94 | 5/10/2020 |
| 118 | Joseph & Rosalie Laskos | 2591210 | $ 17,166.96 | 3/18/2020 |
| 119 | Joseph Bernard & Marilou Gamara Tejchman | 1081797 | $ 10,189.99 | 8/10/2020 |
| 120 | Joshua & Megan Freed | 1137862 | $ 53,991.32 | 4/16/2019 |
| 121 | Judith Abbott & Brenda Fox | 1138359 | $ 29,395.84 | 11/18/2019 |

Exhibit A

D - 0231-0023

| # | Owner Name(s) | Contract Number | Loan Balance | Delinquency Date |
|---|---|---|---|---|
| 122 | JudyAnn Jones & Harvey Dennis Robinson | 918390 | $ 7,262.73 | 3/22/2018 |
| 123 | JudyAnn Jones & Harvey Dennis Robinson | 935073 | $ 5,554.04 | 4/3/2018 |
| 124 | Julian Laureano Rosales & Guadalupe Coyt | 2623236 | $ 21,198.30 | 7/26/2020 |
| 125 | Justin Mason & Kaitlyn Pieratt | 2672277 | $ 7,380.67 | 6/23/2020 |
| 126 | Karen Tibwell Wallace & Aubry Gary Wallace | 992734 | $ 23,688.33 | 8/1/2019 |
| 127 | Keegan Giles & Lakisha Giles | 1121142 | $ 14,804.76 | 6/28/2019 |
| 128 | Kenneth B, Cardwell & Michelle L. Mock | 1049352 | $ 18,398.93 | 6/7/2019 |
| 129 | Kimberly L. Howard | 853121 | $ 8,447.50 | 8/16/2020 |
| 130 | Kimberly McClain | 1056337 | $ 3,226.35 | 7/8/2020 |
| 131 | Kinda Grant | 832349 | $ 11,679.81 | 10/16/2016 |
| 132 | Kinda Grant | 502906 | $ 4,745.56 | 10/29/2016 |
| 133 | Kristy & Greg DeMarcus | 762147 | $ 4,461.14 | 12/22/2020 |
| 134 | Kyle Allen | 919006 | $ 8,831.33 | 7/25/2016 |
| 135 | Lauren & Jeffery McCullough | 907175 | $ 5,467.82 | 6/8/2018 |
| 136 | Linda & Manuel Aguinaga | 1064055 | $ 28,247.20 | 11/14/2020 |
| 137 | Linda Danis & William Danis | 2595888 | $ 24,727.16 | 5/13/2020 |
| 138 | Linda M. & Robert L. Mclaughlin | 952818 | $ 30,755.84 | 6/5/2020 |
| 139 | Lisa Billie | 2582503 | $ 20,312.16 | 12/3/2019 |
| 140 | Lisa Oxton | 1083165 | $ 12,312.95 | 2/19/2020 |
| 141 | Londa Byrd | 531076 | $ 4,732.80 | 9/15/2016 |
| 142 | Maria & Edward Streckfus | 948590 | $ 20,103.50 | 7/12/2017 |
| 143 | Mark & Laura Campbell | 1056313 | $ 9,692.31 | 10/8/2018 |
| 144 | Mark & Sue Brewer | 652482 | $ 4,784.97 | 12/26/2017 |
| 145 | Mark A. Loken & Amelia M. Loken | 1136753 | $ 11,103.60 | 9/26/2019 |
| 146 | Marvin S. Cook | 853583 | $ 5,593.40 | 1/17/2018 |
| 147 | Marvin S. Cook | 578234 | $ 2,106.78 | 1/2/2018 |
| 148 | Mathew L. Spencer & Christie N. Fasick | 1101103 | $ 8,343.13 | 10/28/2020 |
| 149 | Matthew & Nathalia Timmins | 767260 | $ 3,880.59 | 6/24/2019 |
| 150 | Matthew Cody LaDeaux & Stephanie Michelle LaDeaux | 771787 | $ 3,272.20 | 1/12/2017 |
| 151 | Megan & Anthony Bunch | 1045300 | $ 41,043.69 | 9/19/2019 |
| 152 | Melissa & Erik Pond | 1082094 | $ 8,537.76 | 10/12/2018 |
| 153 | Melissa Stenberg | 2719925 | $ 481.63 | 9/14/2021 |
| 154 | Michael & Ruth Eldridge | 877002 | $ 5,864.63 | 1/27/2021 |
| 155 | Michael B. & Regilyn P. Johnson | 808414 | $ 3,140.64 | 8/29/2020 |
| 156 | Michael B. & Regilyn P. Johnson | 742902 | $ 2,682.74 | 8/20/2020 |
| 157 | Michael Denis & Claudia Leon | 503885 | $ 2,122.12 | 7/3/2017 |
| 158 | MIguel A Astudillo & Gloria Elena Astudillo | 821260 | $ 3,113.04 | 8/22/2019 |
| 159 | Mitchell Leigh Marston & Megan R. Marston | 863613 | $ 5,342.62 | 10/7/2019 |
| 160 | Nakisha & Sandra Lockhart | 916953 | $ 7,865.33 | 6/17/2017 |
| 161 | Nancy Lynn Braun & Bobby Earl Braun | 2676055 | $ 18,802.06 | 12/16/2020 |
| 162 | Nancy Lynn Braun & Bobby Earl Braun | 1071352 | $ 6,505.33 | 12/18/2020 |
| 163 | Norman K. Athy Jr. & Terri L. Leamy | 1108638 | $ 5,051.29 | 11/22/2020 |

Exhibit A

| # | Owner Name(s) | Contract Number | Loan Balance | Delinquency Date |
|---|---|---|---|---|
| 164 | Norris & Faye Horton | 1064999 | $ 10,529.33 | 8/19/2020 |
| 165 | Pamela Franklin | 2690248 | $ 24,148.55 | 11/17/2020 |
| 166 | Patricia O'Neal-Mellen | 2657728 | $ 26,635.67 | 9/3/2020 |
| 167 | Paul & Melinda Jacobs | 1019337 | $ 10,396.78 | 11/19/2017 |
| 168 | Paul & Shirley Prosek | 939932 | $ 5,015.67 | 1/25/2020 |
| 169 | Randall E. Owens & Tanya R. Owens | 969961 | $ 5,950.22 | 7/3/2019 |
| 170 | Randy C. & Jonnie S. Driver | 978144 | $ 8,348.25 | 1/6/2021 |
| 171 | Ray Yorker Jr. | 704014 | $ 4,317.89 | 5/21/2019 |
| 172 | Raymond & Viola Nault, PO BOX 809 | 974551 | $ 7,356.39 | 2/22/2019 |
| 173 | Rebecca & Ricky Jones | 1118187 | $ 35,646.13 | 5/13/2019 |
| 174 | Rhonda & George Dixon | 1088722 | $ 6,852.80 | 3/16/2020 |
| 175 | Ricky & Lynn Oberlender | 2631501 | $ 19,606.99 | 8/7/2020 |
| 176 | Rita Patient & Charles Butler | 938087 | $ 15,261.86 | 3/17/2021 |
| 177 | Robert N. & Patricia B. Watson | 848475 | $ 8,266.95 | 10/26/2017 |
| 178 | Robert Scott Yaikow & Amy Medders Yaikow | 761475 | $ 4,284.76 | 5/18/2019 |
| 179 | Robert Whitaker & Karen Scott | 985044 | $ 9,857.50 | 11/3/2018 |
| 180 | Roger P. & Angela B. Hays | 1007579 | $ 3,928.67 | 11/26/2020 |
| 181 | Ronald & Loretta Hardeman | 2584761 | $ 18,963.71 | 11/14/2020 |
| 182 | Ronald & Loretta Hardeman | 2610646 | $ 11,167.17 | 11/22/2020 |
| 183 | Ronda & Samuel Herrington | 1101279 | $ 9,472.87 | 10/29/2020 |
| 184 | Rosana E. Narvaez-Colon | 1095608 | $ 18,019.15 | 5/22/2020 |
| 185 | Roy & Deborah Ashby | 2592947 | $ 44,155.32 | 8/27/2019 |
| 186 | Ruben Ortega & Adriana Cota | 888760 | $ 7,235.29 | 3/13/2020 |
| 187 | Ryan & Suzanne Mailhiot | 697833 | $ 4,117.29 | 3/12/2019 |
| 188 | Samuel J. & Dana M. Bollinger | 1128307 | $ 10,621.78 | 12/3/2020 |
| 189 | Sandra & Thomas J. Lawson | 660399 | $ 7,321.86 | 1/31/2017 |
| 190 | Sarah & Eric Chambers | 2598094 | $ 7,029.34 | 5/26/2019 |
| 191 | Scott & Tammy Bomkamp | 742194 | $ 4,180.58 | 5/8/2019 |
| 192 | Shannon & William Meredith | 2624595 | $ 12,513.24 | 8/2/2019 |
| 193 | Sherry Helton | 1065107 | $ 5,115.84 | 6/11/2020 |
| 194 | Sierra Tebeau Sherry | 1122472 | $ 9,016.48 | 3/5/2021 |
| 195 | Sierra Tebeau-Sherri & Nikolas Beardsworth | 1089362 | $ 5,382.57 | 2/19/2021 |
| 196 | Simbarashe Murengami | 2678525 | $ 20,911.94 | 6/4/2020 |
| 197 | Simbarashe Murengami | 2594355 | $ 10,383.70 | 6/4/2020 |
| 198 | Steve & Rosalyn Moorehead | 1013032 | $ 34,210.95 | 7/20/2017 |
| 199 | Stuart & Bethany Roberts | 1058522 | $ 8,061.40 | 1/19/2021 |
| 200 | Tamikka Lashaun Portee & Vanessa Shavan Porter | 754503 | $ 4,348.65 | 4/9/2020 |
| 201 | Tammy Kay & Phillip Lee Salmans | 1038370 | $ 8,212.53 | 10/24/2020 |
| 202 | Taury Person & Shannon Person | 815966 | $ 6,248.78 | 4/24/2017 |
| 203 | Terry & Dalila Kennedy | 989467 | $ 9,600.00 | 8/19/2016 |
| 204 | Theresa & David Barnewall | 886604 | $ 3,737.80 | 11/1/2020 |
| 205 | Theresa & Gregory Dunn | 916821 | $ 8,140.30 | 7/17/2020 |

Exhibit A

| # | Owner Name(s) | Contract Number | Loan Balance | Delinquency Date |
|---|---|---|---|---|
| 206 | Thomas Hollingsworth | 987891 | $ 45,240.40 | 7/14/2019 |
| 207 | Thomas Hollingsworth | 1134867 | $ 47,870.65 | 7/3/2019 |
| 208 | Tim & Tina Bullock | 911214 | $ 13,429.63 | 8/24/2017 |
| 209 | Timothy C. & Julie A. Creekmur | 1094235 | $ 9,169.62 | 11/15/2019 |
| 210 | Urban & Cheryl Lanser | 728588 | $ 4,671.99 | 3/10/2019 |
| 211 | Victor Schexnayder | 1099771 | $ 9,352.51 | 4/20/2019 |
| 212 | Victor Schexnayder | 875825 | $ 7,594.67 | 4/19/2019 |
| 213 | Victoria & Donald McKenney | 1128611 | $ 33,693.67 | 12/5/2020 |
| 214 | Victoria & Donald McKenney | 1059972 | $ 8,905.15 | 12/26/2020 |
| 215 | Wayne & Shirley Norland | 791993 | $ 8,239.60 | 3/22/2020 |
| 216 | Wendell B. Taylor | 1054045 | $ 10,647.29 | 12/28/2020 |
| 217 | Weylen & Emily Gibson | 857493 | $ 12,179.66 | 2/7/2019 |
| 218 | Willie & Velma Waters | 801606 | $ 5,322.56 | 5/12/2018 |

Exhibit A

D - 0231-0026

D-235

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

BLUEGREEN VACATIONS UNLIMITED,
INC., *et al.*,

       Plaintiffs,

v.

TIMESHARE LAWYERS P.A., *et al.*,

       Defendants.

Case No.: 1:20-cv-24681-RNS

## <u>NOTICE OF SERVICE OF PLAINTIFF'S UNVERIFIED ANSWERS</u>
## <u>TO DEFENDANT CARLSBAD LAW GROUP FIRST SET OF INTERROGATORIES</u>

Plaintiff, BLUEGREEN VACATIONS CORPORATION, by and through undersigned counsel, and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, hereby gives notice of serving its unverified Answers to Defendant, CARLSBAD LAW GROUP, LLP, First Set of Interrogatories.

Dated: September 27, 2022

*/s/ Christian M. Leger*
**ERIC C. CHRISTU, ESQ.**
Florida Bar No. 434647
echristu@shutts.com
**SHUTTS & BOWEN, LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, FL 33131
Telephone: (305) 358-6300
Facsimile: (305) 381-9982

and

**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com

**MICHAEL J. QUINN, ESQ.**
Florida Bar NO. 084587
mquinn@shutts.com
**CHRISTIAN M. LEGER, ESQ.**
Florida Bar No. 0100562
cleger@shutts.com
**BENJAMIN F. ELLIOTT, ESQ.**
Florida Bar No. 1010706
belliott@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile: (407) 849-7255
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of September, 2022, a true and correct copy of

the foregoing has been served via electronic mail to the following CM/ECF Participants and via

U.S. Mail, postage prepaid, to the following non-CM/ECF Participants:

| | |
|---|---|
| Brian L. Wagner, Esq.<br>Email: bwagner@mateerharbert.com<br>Email: semerson@mateerharbert.com<br>W. Scott Gabrielson, Esq.<br>Email: sgabrielson@mateerharbert.com<br>Email: Mstoutamire@mateerharbert.com<br>Mateer & Harbert, P.A.<br>225 East Robinson Street, Suite 600<br>Orlando, FL 32801-2854<br>Telephone: (407) 425-9044<br>Facsimile: (407) 423-2016<br><br>*Attorneys for Carlsbad Law Group, LLP and JL "Sean" Slattery* | Patrick James Thompson, Esq.<br>Email: law@patrickjthompson.com<br>Patrick Thompson Law P.A.<br>7025 County Road 46A PMB 432<br>Lake Mary, FL 32746-4721<br>Telephone: (407) 750-9000<br>Facsimile: (386) 675-1445<br><br>*Patrick Thompson, Pro Se*<br><br>Patrick J. Thompson, Esq.<br>Email: law@patrickjthompson.com<br>Patrick Thompson Law P.A.<br>201 Hilda Street, Ste. 23<br>Kissimmee, FL 34741<br>Telephone: 407-750-9000<br><br>*Attorney for Timeshare Lawyers P.A.* |

2

D - 0235-0002

John J. Bennett, Esq.
Email: jbennett@nardellalaw.com
John M. Sykes, Esq.
Email: jsykes@nardellalaw.com
Paul N. Mascia, Esq.
Email: pmascia@nardellalaw.com
Email: nmacdougall@nardellalaw.com
Email: service@nardellalaw.com
Nardella & Nardella, PLLC
135 W. Central Blvd., Suite 300
Orlando, FL 32801
Telephone: (407) 966-2680

and

Patrick A. Bradford, Esq. (Pro Hac Vice)
Email: pbradford@bradfordedwards.com
Bradford Edwards and Varlack LLP
112 East 49th Street, 11th Floor
New York, NY 10017
Telephone: (917) 671-9406

*Attorneys for Pandora Marketing, LLC d/b/a Timeshare Compliance, William Wilson a/k/a Bo Wilson, Rich Folk*

## NON-CM/ECF PARTICIPANTS

| | |
|---|---|
| Angela Consalvo<br>588 Cobblestone Creek Drive<br>Boynton Beach, Florida 33472 | Paul Stewart<br>508 Harbor Blvd., #401<br>Destin, FL 32541 |
| MG&N Group LLC d/b/a National Credit Rehab<br>c/o Registered Agent Michael Consalvo<br>9502 Sun Pointe Drive<br>Boynton Beach, Florida 33437 | Paddy Deighan<br>2000 Fashion Show Drive, Unit 2222<br>Las Vegas, Nevada 89109<br>Email: paddy@federalfinanciallawgroup.com<br><br>923 Haddonfield Road, Suite 300<br>Cherry Hill, NJ 08002 |
| Gallagher-Clifton, LLC<br>c/o Registered Agent William O. Stewart, Jr.<br>508 Harbor Blvd., #401<br>Destin, FL 32541 | |

*/s/ Christian M. Leger*
**CHRISTIAN M. LEGER, ESQ.**

3

## ANSWERS TO INTERROGATORIES

1.      As to each owner set forth on the attached Exhibit A who you have identified as having been provided false information by representatives of Defendant Pandora Marketing, LLC, to induce that owner to stop making payments on that owner's timeshare loan reflected on Exhibit A, please set forth below the name of the owner, the date on which the false statement was made, and what information was conveyed in the false statement.

**ANSWER: In response to Interrogatory No. 1, Bluegreen objects to this Request on the grounds that such request is overbroad and disproportionate to this matter and broader than the Court's August 5, 2022 order [DE 202] as it seeks an exhaustive list of all such communication. Pursuant to the Court's Order, Bluegreen has previously produced documents responsive to this Request in its response to Sean Slattery's Amended Third Set of Interrogatories (and exhibits incorporated therein) served on August 31, 2022, as well as Exhibit A served with Plaintiffs' Amended Answer to Pandora's Interrogatory No. 8 on August 12, 2022.**

**Additionally, the "date on which the false statement was made" would be whatever date Pandora's business records reflect the Bluegreen Owner spoke with an Analyst, and "what information was conveyed" is reflected in either (1) the recording of the Analyst call produced by Pandora or (2) if no recording exists, other Analyst recordings by the same Analyst or scripts produced by Pandora. Because all such information would be completed from a manual review of Pandora's business records, the burden of reviewing and ascertaining such information is the same for all parties, and thus Bluegreen directs Carlsbad Law Group to Pandora's production under Rule 33(d).**

2.      As to each owner set forth on the attached Exhibit A who you have identified as having been provided false information by representatives of Defendant Carlsbad Law Group, LLP, to induce that owner to stop making payments on that owner's timeshare loan reflected on Exhibit A, please set forth below the name of the owner, the date on which the false statement was made, and what information was conveyed in the false statement.

**ANSWER: In response to Interrogatory No. 2, Bluegreen objects to this Request on the grounds that this request is a mischaracterization of the Plaintiffs' claims in this case. Plaintiffs claim that Carlsbad Law Group, LLP has contributed to the scheme in which its co-defendant, Pandora Marketing, LLC, has made stop payment statements. Further, to the extent this Request seeks an exhaustive list of all false statements by Carlsbad Law Group, LLP, and/or identification of all conduct contributing to the scheme, Bluegreen objects to this Request on the grounds that such request is overbroad and disproportionate to this matter and broader than the Court's August 5, 2022 order [DE 202].**

3.      As to each timeshare interest set forth on Exhibit A which Plaintiff Bluegreen Vacations Corporation considers to be exited, cancelled, terminated, or resolved such that the owner identified on Exhibit A no longer owes the loan balance shown on Exhibit A, please set forth below the contract number of loan, the name of the owner of the timeshare interest associated

4

with the loan, and the date on which the exit, cancellation, termination, or other resolution was completed.

**ANSWER: In response to Interrogatory No. 3, Bluegreen notes that pursuant to Fed. R. Civ. P. 33(d), the requested information can be found in the Notice of Termination of Owner Beneficiary Rights sent to Bluegreen Owners already produced at the Bates Nos. identified within "Exhibit A" attached hereto.**

4.    As to each timeshare interest set forth on Exhibit A, if the owner of that interest as shown on Exhibit A has been sent a Notice of Termination of Owner Beneficiary Rights, or a similar notice terminating that owner's rights acquired in the purchase of the timeshare interest, please set forth below the name of that owner, the contract number involved, and the date of that notice.

**ANSWER: In response to Interrogatory No. 4, Bluegreen incorporates as if stated herein the response and objections to Interrogatory No. 3 above.**

5.    During the calendar year 2019, how many 1099-A forms were issued to owners by Plaintiffs where those owners' accounts were more than 90 days past due?

**ANSWER: In response to Interrogatory No. 5, Bluegreen objects on the grounds that this Interrogatory is overly broad, irrelevant and disproportionate to the claims or defenses of this case because it seeks materials not connected to the contracts that form the basis of Bluegreen's claims in this matter, which Bluegreen has identified in its Second Rule 26 Disclosure. Bluegreen further notes that it has already produced 1099-As related to the at-issue contracts that form the basis of Bluegreen's claims.**

6.    During the calendar year 2019, how many 1099-A forms were issued to owners by Plaintiffs where those owners' accounts were current or less than 30 days past due?

**ANSWER: In response to Interrogatory No. 6, Bluegreen incorporates as if stated herein the response and objections to Interrogatory No. 5 above.**

7.    During the calendar year 2020, how many 1099-A forms were issued to owners by Plaintiffs where those owners' accounts were more than 90 days past due?

**ANSWER: In response to Interrogatory No. 7, Bluegreen incorporates as if stated herein the response and objections to Interrogatory No. 5 above.**

8.    During the calendar year 2020, how many 1099-A forms were issued to owners by Plaintiffs where those owners accounts were current or less than 30 days past due?

**ANSWER: In response to Interrogatory No. 8, Bluegreen incorporates as if stated herein the response and objections to Interrogatory No. 5 above.**

5

9.      If you contend that any party has assigned or transferred to any Plaintiff a cause of action for damages incurred by that third party as a result of actions taken by one or more of the Defendants in the above styled lawsuit, which actions involved any of the loans set forth on Exhibit A, as to each such cause of action, please set forth below:

      1.      The contract number of the loan involved and the name of the owner of the timeshare interest associated with that loan as shown on Exhibit A.

      2.      The date on which the cause of action was assigned.

      3.      The identity of the party who assigned the cause of action.

      4.      The identity of the party to whom the cause of action was assigned.

      5.      A description of the cause of action which was assigned.

      6.      Whether the agreement to assign the cause of action was oral or written and, if oral, the identity and job title of the individuals who agreed to the reassignment.

      7.      A description of each document which reflects the assignment of that cause of action (in lieu of providing a description, Plaintiff may instead produce a copy of said documents).

**ANSWER: In response to Interrogatory No. 9.1-9.4 and 9.6, Bluegreen has attached as "Exhibit B" hereto, a chart in which references assignments of relevant loans wherein all rights, including a cause of action, is transferred to Plaintiffs. The requested information as to each assignment is included in the referenced exhibit. To the extent that No. 9.6 seeks identity and job title of the individuals who agreed to the reassignment, Bluegreen objects on the grounds that such request is overbroad and disproportionate in that it seeks information that has no connection to the matters before the Court.**

**In response to Interrogatory No. 9.5, Bluegreen notes that the assignments referenced in the attached Exhibit B conveyed to Bluegreen all rights, including those causes of action asserted in this case. Bluegreen otherwise objects that the Interrogatory seeks any further information pursuant to the request for "a description" of the referenced causes of action as such language is vague and/or ambiguous in that the Interrogatory does not provide any guidance as to what information is sought in such "description."**

**To the extent Interrogatory No. 9.7 seeks documents in addition to those already produced or those identified as forthcoming, Bluegreen objects to this Interrogatory as overly broad and disproportionate to the needs of this case as such documents sufficiently identify the information requested. Bluegreen further objects to Interrogatory 9.7 as vague and ambiguous in that it seeks information regarding documents that "reflect" assignments.**

6

10.     In regards to the loans identified on Plaintiffs' 218 Loan Damage Model attached as Exhibit A, please set forth below which of those loans were owned by Bluegreen Vacations Unlimited on the date on which the delinquency reflected on Exhibit A arose.

**ANSWER: None.**

11.     In regards to the loans identified on Plaintiffs' 218 Loan Damage Model attached as Exhibit A, please set forth below which of those loans were owned by Bluegreen Vacations Corporation on the date on which the delinquency reflected on Exhibit A arose.

**ANSWER: In response to Interrogatory No. 11, Bluegreen has attached "Exhibit C" – a chart in which provides the requested information.**

12.     In regards to the loans identified on Plaintiffs' 218 Loan Damage Model attached as Exhibit A, please set forth below which of those loans were owned by Bluegreen Vacations Unlimited on the date on which the Complaint in the above styled litigation was filed.

**ANSWER: None.**

13.     In regards to the loans identified on Plaintiffs' 218 Loan Damage Model attached as Exhibit A, please set forth below which of those loans were owned by Bluegreen Vacations Corporation on the date on which the Complaint in the above-styled litigation was filed.

**ANSWER: In response to Interrogatory No. 13, Bluegreen incorporates as if stated herein the response and objections to Interrogatory No. 11 above.**

14.     As to each owner set forth on the attached Exhibit A, did either Plaintiff investigate the facts surrounding any claims of false representations made by that owner or that owner's representative or attorneys and, if so, please describe that investigation and include in that description:

- The name of the owner;
- The date on which the claim of false representations was received;
- The identity of the individual or individuals who conducted the investigation;
- The names of any individuals interviewed in conjunction with the investigation;
- What conclusions, if any, were reached as to the validity of the claims made as to false representations;
- Whether any of Plaintiffs' employees or agents were disciplined as a result of the investigation.

**ANSWER: Bluegreen objects to Interrogatory No. 14 to the extent that it seeks information other than that ordered by Magistrate Judge Goodman in the September 26, 2022 post-hearing order on topic No. 3 to the Defendants' corporate representative deposition notice. Bluegreen incorporates its anticipated response to the interrogatory crafted by the Court's Order herein.**

7

| NOT Bates Beg | NOT Bates End |
|---|---|
| BG-CARLSBAD 000778 | BG-CARLSBAD 000779 |
| BG-CARLSBAD 000780 | BG-CARLSBAD 000781 |
| BG-CARLSBAD 000908 | BG-CARLSBAD 000909 |
| BG-CARLSBAD 000910 | BG-CARLSBAD 000911 |
| BG-CARLSBAD 000924 | BG-CARLSBAD 000925 |
| BG-CARLSBAD 000926 | BG-CARLSBAD 000927 |
| BG-CARLSBAD 000968 | BG-CARLSBAD 000969 |
| BG-CARLSBAD 000970 | BG-CARLSBAD 000971 |
| BG-CARLSBAD 000980 | BG-CARLSBAD 000981 |
| BG-CARLSBAD 000982 | BG-CARLSBAD 000983 |
| BG-CARLSBAD 001020 | BG-CARLSBAD 001021 |
| BG-CARLSBAD 001022 | BG-CARLSBAD 001023 |
| BG-CARLSBAD 001040 | BG-CARLSBAD 001041 |
| BG-CARLSBAD 001042 | BG-CARLSBAD 001043 |
| BG-CARLSBAD 001054 | BG-CARLSBAD 001055 |
| BG-CARLSBAD 001056 | BG-CARLSBAD 001056 |
| BG-CARLSBAD 001057 | BG-CARLSBAD 001057 |
| BG-CARLSBAD 001058 | BG-CARLSBAD 001058 |
| BG-CARLSBAD 001059 | BG-CARLSBAD 001059 |
| BG-CARLSBAD 001084 | BG-CARLSBAD 001085 |
| BG-CARLSBAD 001086 | BG-CARLSBAD 001087 |
| BG-CARLSBAD 001120 | BG-CARLSBAD 001121 |
| BG-CARLSBAD 001122 | BG-CARLSBAD 001123 |
| BG-CARLSBAD 001196 | BG-CARLSBAD 001197 |
| BG-CARLSBAD 001244 | BG-CARLSBAD 001244 |
| BG-CARLSBAD 001245 | BG-CARLSBAD 001245 |
| BG-CARLSBAD 001262 | BG-CARLSBAD 001263 |
| BG-CARLSBAD 001264 | BG-CARLSBAD 001265 |
| BG-CARLSBAD 001294 | BG-CARLSBAD 001295 |
| BG-CARLSBAD 001296 | BG-CARLSBAD 001297 |
| BG-CARLSBAD 001364 | BG-CARLSBAD 001365 |
| BG-CARLSBAD 001382 | BG-CARLSBAD 001383 |
| BG-CARLSBAD 001384 | BG-CARLSBAD 001385 |
| BG-CARLSBAD 001398 | BG-CARLSBAD 001399 |
| BG-CARLSBAD 001400 | BG-CARLSBAD 001401 |
| BG-CARLSBAD 001430 | BG-CARLSBAD 001431 |
| BG-CARLSBAD 001432 | BG-CARLSBAD 001433 |
| BG-CARLSBAD 001466 | BG-CARLSBAD 001467 |
| BG-CARLSBAD 001492 | BG-CARLSBAD 001493 |
| BG-CARLSBAD 001494 | BG-CARLSBAD 001495 |
| BG-CARLSBAD 001508 | BG-CARLSBAD 001509 |
| BG-CARLSBAD 001510 | BG-CARLSBAD 001511 |
| BG-CARLSBAD 001524 | BG-CARLSBAD 001525 |

Exhibit A

| | |
|---|---|
| BG-CARLSBAD 001526 | BG-CARLSBAD 001527 |
| BG-CARLSBAD 001552 | BG-CARLSBAD 001553 |
| BG-CARLSBAD 001566 | BG-CARLSBAD 001567 |
| BG-CARLSBAD 001568 | BG-CARLSBAD 001569 |
| BG-CARLSBAD 001582 | BG-CARLSBAD 001583 |
| BG-CARLSBAD 001584 | BG-CARLSBAD 001585 |
| BG-CARLSBAD 001598 | BG-CARLSBAD 001599 |
| BG-CARLSBAD 001600 | BG-CARLSBAD 001601 |
| BG-CARLSBAD 048619 | BG-CARLSBAD 048619 |
| BG-CARLSBAD 048620 | BG-CARLSBAD 048620 |
| BG-CARLSBAD 048853 | BG-CARLSBAD 048853 |
| BG-CARLSBAD 048854 | BG-CARLSBAD 048854 |
| BG-CARLSBAD 048951 | BG-CARLSBAD 048951 |
| BG-CARLSBAD 048952 | BG-CARLSBAD 048952 |
| BG-CARLSBAD 049002 | BG-CARLSBAD 049003 |
| BG-CARLSBAD 049004 | BG-CARLSBAD 049005 |
| BG-CARLSBAD 049106 | BG-CARLSBAD 049106 |
| BG-CARLSBAD 049107 | BG-CARLSBAD 049107 |
| BG-CARLSBAD 049108 | BG-CARLSBAD 049108 |
| BG-CARLSBAD 049109 | BG-CARLSBAD 049109 |
| BG-CARLSBAD 049116 | BG-CARLSBAD 049117 |
| BG-CARLSBAD 049143 | BG-CARLSBAD 049144 |
| BG-CARLSBAD 049149 | BG-CARLSBAD 049150 |
| BG-CARLSBAD 049151 | BG-CARLSBAD 049152 |
| BG-CARLSBAD 049332 | BG-CARLSBAD 049333 |
| BG-CARLSBAD 049334 | BG-CARLSBAD 049334 |
| BG-CARLSBAD 049335 | BG-CARLSBAD 049336 |
| BG-CARLSBAD 049337 | BG-CARLSBAD 049338 |
| BG-CARLSBAD 049339 | BG-CARLSBAD 049340 |
| BG-CARLSBAD 049341 | BG-CARLSBAD 049342 |
| BG-CARLSBAD 049345 | BG-CARLSBAD 049346 |
| BG-CARLSBAD 049347 | BG-CARLSBAD 049348 |
| BG-CARLSBAD 049373 | BG-CARLSBAD 049373 |
| BG-CARLSBAD 049374 | BG-CARLSBAD 049374 |
| BG-CARLSBAD 049375 | BG-CARLSBAD 049376 |
| BG-CARLSBAD 049377 | BG-CARLSBAD 049378 |
| BG-CARLSBAD 049385 | BG-CARLSBAD 049386 |
| BG-CARLSBAD 049387 | BG-CARLSBAD 049388 |
| BG-CARLSBAD 049392 | BG-CARLSBAD 049393 |
| BG-CARLSBAD 049394 | BG-CARLSBAD 049395 |
| BG-CARLSBAD 049396 | BG-CARLSBAD 049397 |
| BG-CARLSBAD 049398 | BG-CARLSBAD 049399 |
| BG-CARLSBAD 049400 | BG-CARLSBAD 049403 |
| BG-CARLSBAD 049417 | BG-CARLSBAD 049418 |

| | |
|---|---|
| BG-CARLSBAD 049442 | BG-CARLSBAD 049443 |
| BG-CARLSBAD 049444 | BG-CARLSBAD 049447 |
| BG-CARLSBAD 049448 | BG-CARLSBAD 049448 |
| BG-CARLSBAD 049457 | BG-CARLSBAD 049458 |
| BG-CARLSBAD 049466 | BG-CARLSBAD 049467 |
| BG-CARLSBAD 049468 | BG-CARLSBAD 049469 |
| BG-CARLSBAD 049476 | BG-CARLSBAD 049477 |
| BG-CARLSBAD 049478 | BG-CARLSBAD 049479 |
| BG-CARLSBAD 049491 | BG-CARLSBAD 049492 |
| BG-CARLSBAD 049493 | BG-CARLSBAD 049496 |
| BG-CARLSBAD 049497 | BG-CARLSBAD 049501 |
| BG-CARLSBAD 049531 | BG-CARLSBAD 049532 |
| BG-CARLSBAD 049533 | BG-CARLSBAD 049534 |
| BG-CARLSBAD 049153 | BG-CARLSBAD 049154 |
| BG-CARLSBAD 049155 | BG-CARLSBAD 049156 |
| BG-CARLSBAD 049175 | BG-CARLSBAD 049176 |
| BG-CARLSBAD 049181 | BG-CARLSBAD 049182 |
| BG-CARLSBAD 049183 | BG-CARLSBAD 049184 |
| BG-CARLSBAD 049185 | BG-CARLSBAD 049186 |
| BG-CARLSBAD 049187 | BG-CARLSBAD 049188 |
| BG-CARLSBAD 049194 | BG-CARLSBAD 049195 |
| BG-CARLSBAD 049199 | BG-CARLSBAD 049200 |
| BG-CARLSBAD 049201 | BG-CARLSBAD 049202 |
| BG-CARLSBAD 049230 | BG-CARLSBAD 049231 |
| BG-CARLSBAD 049232 | BG-CARLSBAD 049233 |
| BG-CARLSBAD 049236 | BG-CARLSBAD 049237 |
| BG-CARLSBAD 049239 | BG-CARLSBAD 049239 |
| BG-CARLSBAD 049240 | BG-CARLSBAD 049240 |
| BG-CARLSBAD 049248 | BG-CARLSBAD 049249 |
| BG-CARLSBAD 049260 | BG-CARLSBAD 049261 |
| BG-CARLSBAD 049262 | BG-CARLSBAD 049263 |
| BG-CARLSBAD 049271 | BG-CARLSBAD 049272 |
| BG-CARLSBAD 049273 | BG-CARLSBAD 049274 |
| BG-CARLSBAD 049281 | BG-CARLSBAD 049282 |
| BG-CARLSBAD 049287 | BG-CARLSBAD 049288 |
| BG-CARLSBAD 049289 | BG-CARLSBAD 049290 |
| BG-CARLSBAD 049300 | BG-CARLSBAD 049301 |
| BG-CARLSBAD 049302 | BG-CARLSBAD 049303 |
| BG-CARLSBAD 049317 | BG-CARLSBAD 049320 |
| BG-CARLSBAD 049551 | BG-CARLSBAD 049553 |
| BG-CARLSBAD 049554 | BG-CARLSBAD 049557 |
| BG-CARLSBAD 049565 | BG-CARLSBAD 049566 |
| BG-CARLSBAD 049567 | BG-CARLSBAD 049568 |
| BG-CARLSBAD 049569 | BG-CARLSBAD 049572 |

| | |
|---|---|
| BG-CARLSBAD 049575 | BG-CARLSBAD 049576 |
| BG-CARLSBAD 049592 | BG-CARLSBAD 049593 |
| BG-CARLSBAD 049598 | BG-CARLSBAD 049603 |
| BG-CARLSBAD 049615 | BG-CARLSBAD 049616 |
| BG-CARLSBAD 049617 | BG-CARLSBAD 049618 |
| BG-CARLSBAD 049619 | BG-CARLSBAD 049620 |
| BG-CARLSBAD 049621 | BG-CARLSBAD 049622 |
| BG-CARLSBAD 049625 | BG-CARLSBAD 049630 |
| BG-CARLSBAD 049631 | BG-CARLSBAD 049634 |
| BG-CARLSBAD 049644 | BG-CARLSBAD 049645 |
| BG-CARLSBAD 049646 | BG-CARLSBAD 049647 |
| BG-CARLSBAD 049648 | BG-CARLSBAD 049649 |
| BG-CARLSBAD 049650 | BG-CARLSBAD 049651 |
| BG-CARLSBAD 049659 | BG-CARLSBAD 049660 |
| BG-CARLSBAD 049661 | BG-CARLSBAD 049662 |
| BG-CARLSBAD 049663 | BG-CARLSBAD 049664 |
| BG-CARLSBAD 049665 | BG-CARLSBAD 049666 |
| BG-CARLSBAD 049687 | BG-CARLSBAD 049688 |
| BG-CARLSBAD 049693 | BG-CARLSBAD 049694 |
| BG-CARLSBAD 049695 | BG-CARLSBAD 049696 |
| BG-CARLSBAD 049703 | BG-CARLSBAD 049704 |
| BG-CARLSBAD 049705 | BG-CARLSBAD 049706 |
| BG-CARLSBAD 049711 | BG-CARLSBAD 049712 |
| BG-CARLSBAD 049713 | BG-CARLSBAD 049714 |
| BG-CARLSBAD 049717 | BG-CARLSBAD 049718 |
| BG-CARLSBAD 049739 | BG-CARLSBAD 049740 |
| BG-CARLSBAD 049741 | BG-CARLSBAD 049742 |
| BG-CARLSBAD 049767 | BG-CARLSBAD 049768 |
| BG-CARLSBAD 049769 | BG-CARLSBAD 049770 |
| BG-CARLSBAD 049775 | BG-CARLSBAD 049776 |
| BG-CARLSBAD 049777 | BG-CARLSBAD 049778 |
| BG-CARLSBAD 049781 | BG-CARLSBAD 049782 |
| BG-CARLSBAD 049783 | BG-CARLSBAD 049783 |
| BG-CARLSBAD 049784 | BG-CARLSBAD 049784 |
| BG-CARLSBAD 049787 | BG-CARLSBAD 049788 |
| BG-CARLSBAD 049547 | BG-CARLSBAD 049548 |
| BG-CARLSBAD 049861 | BG-CARLSBAD 049862 |
| BG-CARLSBAD 049863 | BG-CARLSBAD 049864 |
| BG-CARLSBAD 049909 | BG-CARLSBAD 049910 |
| BG-CARLSBAD 049911 | BG-CARLSBAD 049912 |
| BG-CARLSBAD 049913 | BG-CARLSBAD 049914 |
| BG-CARLSBAD 049915 | BG-CARLSBAD 049916 |
| BG-CARLSBAD 049917 | BG-CARLSBAD 049918 |
| BG-CARLSBAD 049932 | BG-CARLSBAD 049933 |

| | |
|---|---|
| BG-CARLSBAD 049934 | BG-CARLSBAD 049935 |
| BG-CARLSBAD 049953 | BG-CARLSBAD 049954 |
| BG-CARLSBAD 049955 | BG-CARLSBAD 049956 |
| BG-CARLSBAD 049960 | BG-CARLSBAD 049960 |
| BG-CARLSBAD 049961 | BG-CARLSBAD 049961 |
| BG-CARLSBAD 049966 | BG-CARLSBAD 049967 |
| BG-CARLSBAD 049968 | BG-CARLSBAD 049969 |
| BG-CARLSBAD 049991 | BG-CARLSBAD 049991 |
| BG-CARLSBAD 049992 | BG-CARLSBAD 049992 |
| BG-CARLSBAD 049996 | BG-CARLSBAD 049997 |
| BG-CARLSBAD 050004 | BG-CARLSBAD 050009 |
| BG-CARLSBAD 050010 | BG-CARLSBAD 050011 |
| BG-CARLSBAD 050015 | BG-CARLSBAD 050016 |
| BG-CARLSBAD 050017 | BG-CARLSBAD 050018 |
| BG-CARLSBAD 050019 | BG-CARLSBAD 050020 |
| BG-CARLSBAD 050021 | BG-CARLSBAD 050022 |
| BG-CARLSBAD 050023 | BG-CARLSBAD 050023 |
| BG-CARLSBAD 050024 | BG-CARLSBAD 050025 |
| BG-CARLSBAD 050026 | BG-CARLSBAD 050027 |
| BG-CARLSBAD 050028 | BG-CARLSBAD 050029 |
| BG-CARLSBAD 050040 | BG-CARLSBAD 050049 |
| BG-CARLSBAD 050057 | BG-CARLSBAD 050058 |
| BG-CARLSBAD 050074 | BG-CARLSBAD 050075 |
| BG-CARLSBAD 050078 | BG-CARLSBAD 050079 |
| BG-CARLSBAD 050080 | BG-CARLSBAD 050081 |
| BG-CARLSBAD 050089 | BG-CARLSBAD 050090 |
| BG-CARLSBAD 050091 | BG-CARLSBAD 050092 |
| BG-CARLSBAD 050093 | BG-CARLSBAD 050094 |
| BG-CARLSBAD 050095 | BG-CARLSBAD 050096 |
| BG-CARLSBAD 050135 | BG-CARLSBAD 050136 |
| BG-CARLSBAD 050137 | BG-CARLSBAD 050138 |
| BG-CARLSBAD 049792 | BG-CARLSBAD 049793 |
| BG-CARLSBAD 049794 | BG-CARLSBAD 049795 |
| BG-CARLSBAD 049798 | BG-CARLSBAD 049798 |
| BG-CARLSBAD 049799 | BG-CARLSBAD 049799 |
| BG-CARLSBAD 049804 | BG-CARLSBAD 049804 |
| BG-CARLSBAD 049815 | BG-CARLSBAD 049815 |
| BG-CARLSBAD 049816 | BG-CARLSBAD 049816 |
| BG-CARLSBAD 049823 | BG-CARLSBAD 049824 |
| BG-CARLSBAD 049825 | BG-CARLSBAD 049826 |
| BG-CARLSBAD 049831 | BG-CARLSBAD 049832 |
| BG-CARLSBAD 049833 | BG-CARLSBAD 049834 |
| BG-CARLSBAD 049835 | BG-CARLSBAD 049836 |
| BG-CARLSBAD 049849 | BG-CARLSBAD 049850 |

| | |
|---|---|
| BG-CARLSBAD 049851 | BG-CARLSBAD 049852 |
| BG-CARLSBAD 049853 | BG-CARLSBAD 049854 |
| BG-CARLSBAD 049855 | BG-CARLSBAD 049856 |
| BG-CARLSBAD 049857 | BG-CARLSBAD 049858 |
| BG-CARLSBAD 049859 | BG-CARLSBAD 049860 |
| BG-CARLSBAD 050149 | BG-CARLSBAD 050150 |
| BG-CARLSBAD 050151 | BG-CARLSBAD 050152 |
| BG-CARLSBAD 050153 | BG-CARLSBAD 050154 |
| BG-CARLSBAD 050155 | BG-CARLSBAD 050156 |
| BG-CARLSBAD 050159 | BG-CARLSBAD 050160 |
| BG-CARLSBAD 050236 | BG-CARLSBAD 050237 |
| BG-CARLSBAD 050238 | BG-CARLSBAD 050239 |
| BG-CARLSBAD 050168 | BG-CARLSBAD 050169 |
| BG-CARLSBAD 050170 | BG-CARLSBAD 050171 |
| BG-CARLSBAD 050184 | BG-CARLSBAD 050185 |
| BG-CARLSBAD 050186 | BG-CARLSBAD 050187 |
| BG-CARLSBAD 050215 | BG-CARLSBAD 050216 |
| BG-CARLSBAD 050217 | BG-CARLSBAD 050218 |
| BG-CARLSBAD 050219 | BG-CARLSBAD 050220 |
| BG-CARLSBAD 050221 | BG-CARLSBAD 050222 |
| BG-CARLSBAD 050228 | BG-CARLSBAD 050229 |
| BG-CARLSBAD 019948 | BG-CARLSBAD 019949 |
| BG-CARLSBAD 019950 | BG-CARLSBAD 019951 |
| BG-CARLSBAD 020011 | BG-CARLSBAD 020012 |
| BG-CARLSBAD 020013 | BG-CARLSBAD 020014 |
| BG-CARLSBAD 020049 | BG-CARLSBAD 020050 |
| BG-CARLSBAD 020051 | BG-CARLSBAD 020052 |
| BG-CARLSBAD 035087 | BG-CARLSBAD 035088 |
| BG-CARLSBAD 035445 | BG-CARLSBAD 035446 |
| BG-CARLSBAD 035447 | BG-CARLSBAD 035448 |
| BG-CARLSBAD 035467 | BG-CARLSBAD 035468 |
| BG-CARLSBAD 035469 | BG-CARLSBAD 035470 |
| BG-CARLSBAD 035793 | BG-CARLSBAD 035794 |
| BG-CARLSBAD 035808 | BG-CARLSBAD 035808 |
| BG-CARLSBAD 035809 | BG-CARLSBAD 035809 |
| BG-CARLSBAD 035810 | BG-CARLSBAD 035810 |
| BG-CARLSBAD 035811 | BG-CARLSBAD 035811 |
| BG-CARLSBAD 036185 | BG-CARLSBAD 036186 |
| BG-CARLSBAD 036187 | BG-CARLSBAD 036188 |
| BG-CARLSBAD 036416 | BG-CARLSBAD 036417 |
| BG-CARLSBAD 036418 | BG-CARLSBAD 036419 |
| BG-CARLSBAD 036432 | BG-CARLSBAD 036433 |
| BG-CARLSBAD 036434 | BG-CARLSBAD 036435 |

| Owner Name(s) | VC # | Contract Number | Mortgage Number | Assignor | Assignee | Bates | Assignment Date |
|---|---|---|---|---|---|---|---|
| Adan & Channell Blevins | 869219 | 1075133 | 695665 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 1/14/2020 |
| Albert & Nicole Renshaw | 758406 | 931278 | 616639 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | Non-Written | 2/19/2020 |
| Amanda & Eric Olsen | 942791 | 2659855 | 2159655 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 5/20/2020 |
| Anthony & Ashley Tilahun | 835181 | 1024294 | 667808 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 1/15/2020 |
| | | | | Bluegreen Corp-Vacation Club | Bluegreen Corp-Vacation Club | Non-Written | 1/17/2020 |
| Arnold A. Gittens & Greta Stuart-Gittens | 718390 | 763446 | 534519 | BXG Receivables Note Trust 2013-A | Bluegreen Corp-Vacation Club | Non-Written | 2/3/2020 |
| Beatriz Astencio & Roberto Cedeno | 668648 | 665537 | 487607 | BXG Receivables Note Trust 2012-A | Bluegreen Corp-Vacation Club | Non-Written | 10/2/2020 |
| | | | | Bluegreen Corp-Vacation Club | Bluegreen Corp-Vacation Club | Non-Written | 10/12/2020 |
| Betty J. Adams | 456408 | 1097944 | 710184 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 1/15/2021 |
| Billy & Mary H. Hays | 813768 | 1131368 | 727368 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 9/23/2019 |
| Bobbie E. & Alice L. McNeil | 906350 | 2155848 | 2155848 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 6/30/2020 |
| Bobby & Leanna Harmon | 468572 | 1029442 | 670983 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 5/18/2021 |
| Bobby & Leanna Harmon | 468572 | 2613697 | 2113672 | Bluegreen/Liberty Bank 2010 | Bluegreen Corp-Vacation Club | Non-Written | 6/11/2021 |
| | | | | Bluegreen Corp-Vacation Club | Bluegreen Corp-Vacation Club | Non-Written | 7/15/2021 |
| Bobby & Leanna Harmon | 468572 | 2697102 | 2196872 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp-Vacation Club | Non-Written | 6/30/2022 |
| Brent & Lynette King | 940492 | 2683191 | 2182970 | BXG Receivables Note Trust 2020-A | Bluegreen Corp-Vacation Club | Non-Written | 7/6/2021 |
| Candace Hollins-Brokaw & Jeffrey Brokaw | 837200 | 2594593 | 2094575 | BXG Receivables Note Trust 2020-A | Bluegreen Corp-Vacation Club | Non-Written | 10/15/2021 |
| Celestine G Carter & Haru Carter Jr. | 938862 | 2650947 | 2150749 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 10/8/2020 |
| Chao Xiong & Aimee Lee | 797304 | 928916 | 615873 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | Non-Written | 11/10/2021 |
| Chao Xiong & Aimee Lee | 797304 | 2726620 | 2226371 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp-Vacation Club | Non-Written | 6/30/2022 |
| Claribell Soiza | 465764 | 1134323 | 728866 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 5/14/2021 |
| Colleen & David Bolanowski | 796112 | 927037 | 614443 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | Non-Written | 10/2/2019 |
| Cyril & Debra Guild | 104127 | 1075994 | 696939 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 10/25/2018 |
| Dale Greenley | 842325 | 2588180 | 2088175 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 4/15/2019 |

CONFIDENTIAL

Exhibit B

D - 0235-0014

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Daniel & Cheryl Burns | 941068 | 2698743 | 2198512 | Bluegreen Corp-Vacation Club | Bluegreen Corp-Vacation Club | Non-Written | 2/26/2021 |
| Danny & Christina Cormier | 744902 | 997956 | 652400 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 4/30/2019 |
| Darrin Hartman | 472056 | 2613390 | 2113365 | BXG Receivables Note Trust 2020-A | Bluegreen Corp-Vacation Club | Non-Written | 3/15/2021 |
| David & Karen Sprague | 552595 | 974355 | 638775 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 1/25/2021 |
| Deborah Leanne Truelove & Terry Efurd | 779404 | 970810 | 637502 | Pacific Western Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 016460 | 4/12/2021 |
| Demetrius Baytop & Carla Kitchel | 695206 | 2626207 | 2126024 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp-Vacation Club | Non-Written | 6/30/2022 |
| Denise Nelson-Smith & Willie E. Smith | 322754 | 1140951 | 733562 | Liberty Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 021990 | 4/30/2021 |
| Dennis D. & Vicki Mitchell | 707398 | 764763 | 534729 | BXG Receivables Note Trust 2013-A | Bluegreen Corp-Vacation Club | Non-Written | 4/5/2022 |
| Derrick & Debra J. Braswell | 904463 | 1144375 | 735414 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 1/19/2021 |
| Donald & Lisa Craig | 821441 | 999717 | 653896 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 9/30/2019 |
| Donald J. Thomas | 850669 | 1037808 | 675212 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 9/12/2019 |
| Donnie & Christine Brown | 827051 | 1066140 | 690231 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 1/28/2020 |
| Donnie & Christine Brown | 827051 | 1113084 | 717277 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp-Vacation Club | Non-Written | 6/30/2022 |
| Dorothy Hale | 836441 | 1123691 | 723004 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 1/16/2020 |
| Earl S. & Caitlin A. Abercrombie | 802511 | 954529 | 628958 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | Non-Written | 11/15/2017 |
| Erickson Thomas | 846301 | 1035270 | 674330 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 12/24/2019 |
| Eugene & Brenda K. Combs | 898593 | 1133049 | 728652 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 3/30/2020 |
| Fidencio Martinez & C. Victoria Llanos | 768351 | 868156 | 583842 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 5/4/2020 |
| Garry & Deborah Barrett | 777916 | 890595 | 594344 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | Non-Written | 9/29/2020 |
| Gayle Turner, Stanley Singleton, Equalla Agee, & Anthony Sykes | 712115 | 751289 | 528111 | BXG Receivables Note Trust 2013-A | Bluegreen Corp-Vacation Club | Non-Written | 4/14/2017 |
| Gene & Sharon Ballantyne | 579572 | 2587013 | 2087009 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 3/2/2020 |
| Gerald & Sheila Barnett | 755946 | 1110130 | 715778 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 8/5/2020 |
| Glenda Petersen & Michael Bohley | 846752 | 1114115 | 718062 | Liberty Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 021977 | 5/19/2020 |
| Glenwood C. Simmons & Vicki G. Fisher | 618327 | 1134042 | 729116 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 9/3/2020 |
| Herman Shannon & Kelly Schmitt | 830495 | 997846 | 652227 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 10/15/2018 |

CONFIDENTIAL

D - 0235-0015

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Ismael Valdespino Ortega & Yesenia Moran Mendoza | 747434 | 2622407 | 2122227 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 10/12/2020 |
| | | | | Bluegreen Corp-Vacation Club | Bluegreen Corp-Vacation Club | Non-Written | 7/15/2021 |
| Jackie Glenn & Brenda Carol Furnace | 624347 | 593807 | 449419 | BXG Receivables Note Trust 2007-A | Bluegreen Corp-Vacation Club | BG-CARLSBAD 015518 | 3/17/2016 |
| James & Debora Davidson | 545052 | 1131730 | 727685 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 6/28/2021 |
| James & Debra Loveless | 733678 | 801816 | 552812 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 9/15/2020 |
| James F. Cullison & Amanda L. Reatherford | 814913 | 967811 | 635601 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 3/30/2020 |
| James R. & Sheila Waltrip | 485267 | 941508 | 622329 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | Non-Written | 2/15/2017 |
| James Taylor Brooks & Jacqueline Smith-Brooks | 794975 | 992079 | 650102 | Liberty Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 021651 | 3/10/2020 |
| Jamie Mayle & Sahara Alonzo | 826525 | 1055446 | 685353 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 6/14/2019 |
| Jeremy & Darla Lathrem | 890477 | 2674038 | 2173824 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 10/8/2020 |
| | | | | Bluegreen Corp-Vacation Club | Bluegreen Corp-Vacation Club | Non-Written | 10/28/2020 |
| Jerry & Tammy Johnson | 861230 | 1127507 | 730172 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 12/17/2019 |
| Jody & Diana Jones | 786901 | 981097 | 643104 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 3/15/2021 |
| John Beth & Cristal Advincula | 615667 | 1114668 | 717779 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 3/15/2021 |
| Jonathan & Samantha Castelblanco | 882037 | 1098801 | 709245 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 1/18/2021 |
| Joseph & Rosalie Laskos | 65918 | 1117664 | 719614 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 9/14/2020 |
| Joseph & Rosalie Laskos | 65918 | 2591210 | 2091201 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 7/23/2020 |
| Joseph Bernard & Marilou Gamara Tejchman | 838835 | 1081797 | 699900 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | Non-Written | 12/15/2020 |
| Joshua & Megan Freed | 825536 | 1137862 | 731174 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 8/21/2019 |
| Judith Abbott & Brenda Fox | 652794 | 1138359 | 732165 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 10/8/2020 |
| Julian Laureano Rosales & Guadalupe Coyt | 825100 | 2623236 | 2123056 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 10/8/2020 |
| Justin Mason & Kaitlyn Pieratt | 910628 | 2672277 | 2172068 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 10/8/2020 |
| Keegan Giles & Lakisha Giles | 861824 | 1121142 | 721977 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 11/15/2019 |
| Kimberly L. Howard | 760734 | 853121 | 577633 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 1/4/2021 |

CONFIDENTIAL

D - 0235-0016

| Kinda Grant | 522774 | 502906 | 386716 | BXG Receivables Note Trust 2010-A | Bluegreen Corp-Vacation Club | Non-Written | 4/20/2017 |
|---|---|---|---|---|---|---|---|
| Kinda Grant | 522774 | 832349 | 566949 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 3/5/2020 |
| Linda & Manuel Aguinaga | 379355 | 1064055 | 689151 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 3/22/2021 |
| Linda M. & Robert L. Mclaughlin | 449742 | 952818 | 627623 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | Non-Written | 10/15/2020 |
| Lisa Billie | 457051 | 2582503 | 1508583 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 4/15/2020 |
| Lisa Oxton | 551103 | 1083165 | 701064 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 6/25/2020 |
| Londa Byrd | 470519 | 531076 | 406083 | BXG Receivables Note Trust 2008-A | Bluegreen Corp-Vacation Club | Non-Written | 4/5/2016 |
| Mark & Laura Campbell | 817974 | 1056313 | 685542 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 2/15/2019 |
| Marvin S. Cook | 400785 | 578234 | 443338 | Liberty Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 021218 | 9/27/2012 |
| Mathew L. Spencer & Christie N. Fasick | 883369 | 1101103 | 710807 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 3/15/2021 |
| Megan & Anthony Bunch | 523432 | 1045300 | 681051 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 1/23/2020 |
| Melissa & Erik Pond | 822029 | 1082094 | 700516 | Liberty Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 021955 | 3/18/2019 |
| Melissa Stenberg | 526738 | 2719925 | 2219684 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | Non-Written | 4/29/2022 |
| Michael & Ruth Eldridge | 772433 | 877002 | 588014 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 6/2/2021 |
| Michael B. & Regilyn P. Johnson | 709022 | 742902 | 524977 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 5/14/2021 |
| Michael B. & Regilyn P. Johnson | 709022 | 808414 | 555588 | Pacific Western Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 015854 | 4/27/2021 |
| Michael Denis & Claudia Leon | 452747 | 503885 | 387452 | Pacific Western Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 021206 | 1/11/2018 |
| Nancy Lynn Braun & Bobby Earl Braun | 744873 | 1071352 | 694279 | Pacific Western Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 017508 | 6/30/2021 |
| Norman K. Athy Jr. & Terri L. Leamy | 812353 | 1108638 | 715482 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 4/15/2021 |
| Norris & Faye Horton | 408974 | 1064999 | 690248 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 12/23/2020 |
| Pamela Franklin | 731952 | 2690248 | 2190022 | BXG Receivables Note Trust 2020-A | Bluegreen Corp-Vacation Club | Non-Written | 3/23/2021 |
| Patricia O'Neal-Mellen | 721702 | 2657728 | 2157528 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 1/7/2021 |
| Paul & Shirley Prosek | 382446 | 939932 | 621922 | Bluegreen Big Cedar Quorum 2012 (4.75% Program) | Bluegreen Corp-Vacation Club | Non-Written | 6/2/2020 |
| Randall E. Owens & Tanya R. Owens | 449924 | 969961 | 637035 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 11/15/2019 |
| Randy C. & Jonnie S. Driver | 238501 | 978144 | 641388 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 5/13/2021 |

CONFIDENTIAL

D - 0235-0017

| Raymond & Viola Nault, PO BOX 809 | 818578 | 974551 | 639731 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 7/15/2019 |
|---|---|---|---|---|---|---|---|
| Rebecca & Ricky Jones | 807079 | 1118187 | 720350 | Liberty Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 021985 | 11/24/2020 |
| Rhonda & George Dixon | 103275 | 1088722 | 704639 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 8/14/2020 |
| Robert Whitaker & Karen Scott | 823205 | 985044 | 644853 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 3/15/2019 |
| Ronald & Loretta Hardeman | 896433 | 2584761 | 2084758 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 3/22/2021 |
| Ronald & Loretta Hardeman | 896433 | 2610646 | 2110623 | Bluegreen/Liberty Bank 2010 | Bluegreen Corp-Vacation Club | Non-Written | 6/11/2021 |
| | | | | Bluegreen Corp-Vacation Club | Bluegreen Corp-Vacation Club | Non-Written | 7/15/2021 |
| Roy & Deborah Ashby | 614303 | 2592947 | 2092937 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 1/6/2020 |
| Ruben Ortega & Adriana Cota | 759873 | 888760 | 593280 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 8/14/2020 |
| Ryan & Suzanne Mailhiot | 685417 | 697833 | 502779 | BXG Receivables Note Trust 2012-A | Bluegreen Corp-Vacation Club | Non-Written | 7/15/2019 |
| Samuel J. & Dana M. Bollinger | 754117 | 1128307 | 725824 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 4/9/2021 |
| Sandra & Thomas J. Lawson | 665960 | 660399 | 484854 | Pacific Western Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 015549 | 7/19/2017 |
| Scott & Tammy Bomkamp | 684594 | 742194 | 523685 | BXG Receivables Note Trust 2013-A | Bluegreen Corp-Vacation Club | Non-Written | 9/12/2019 |
| Sierra Tebeau Sherry | 877835 | 1089362 | 704153 | Pacific Western Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 017579 | 1/21/2021 |
| Sierra Tebeau Sherry | 877835 | 1122472 | 722595 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | Non-Written | 7/9/2021 |
| Tammy Kay & Phillip Lee Salmans | 855702 | 1038370 | 680444 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 3/15/2021 |
| Taury Person & Shannon Person | 742258 | 815966 | 559060 | Pacific Western Bank | Bluegreen Corp-Vacation Club | BG-CARLSBAD 021240 | 10/5/2017 |
| Thomas Hollingsworth | 497258 | 987891 | 647209 | BXG Receivables Note Trust 2013-A | Bluegreen Corp-Vacation Club | Non-Written | 11/19/2019 |
| Thomas Hollingsworth | 497258 | 1134867 | 729830 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | BG-CARLSBAD 017991 | 11/25/2019 |
| Timothy C. & Julie A. Creekmur | 808256 | 1094235 | 707214 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 10/8/2020 |
| Victor Schexnayder | 772009 | 875825 | 587628 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | Non-Written | 8/26/2019 |
| Victoria & Donald McKenney | 644142 | 1059972 | 687126 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | Non-Written | 10/15/2021 |
| Wayne & Shirley Norland | 732121 | 791993 | 548243 | BXG Receivables Note Trust 2013-A | Bluegreen Corp-Vacation Club | Non-Written | 7/27/2020 |

CONFIDENTIAL

D - 0235-0018

| Name(s) | Contract Number | Mortgage/Loan Number | BVC Owned - Delinquency Date (Y/N) | BVC Owned - Complaint Filing (Y/N) |
|---|---|---|---|---|
| Adan & Channell Blevins | 1075133 | 695665 | N | Y |
| Albert & Nicole Renshaw | 931278 | 616639 | N | Y |
| AlfonsoLascano Jr & Loretta Ann Wilson Lascano | 855975 | 578246 | N | N |
| Amanda & Eric Olsen | 2659855 | 2159655 | Y | Y |
| Andrew & Angela Buchanan | 1072508 | 698856 | N | N |
| Anthony & Ashley Tilahun | 1024294 | 667808 | N | Y |
| Anthony Fisher & Senora Harris | 828889 | 566190 | N | N |
| Anthony L. & Melissa J. Church | 986215 | 646293 | N | N |
| Anthony R. Murphy & Nancy L. Satterlee | 989949 | 648248 | N | N |
| April Joy Worthington, Chad Alan Vincent | 970708 | 637726 | N | N |
| Arnold A. Gittens & Greta Stuart-Gittens | 763446 | 534519 | N | Y |
| Autumn Romain | 1047205 | 680851 | N | N |
| Beatriz Astencio & Roberto Cedeno | 665537 | 487607 | N | Y |
| Betty J. Adams | 1097944 | 710184 | N | N |
| Billy & Mary H. Hays | 1131368 | 727368 | N | Y |
| Billy W. Garner | 887944 | 592975 | N | N |
| Bobbie E. & Alice L. McNeil | 2583331 | 2083327 | N | N |
| Bobbie E. & Alice L. McNeil | 2155848 | 2155848 | N | Y |
| Bobby & Leanna Harmon | 1029442 | 670983 | N | N |
| Bobby & Leanna Harmon | 2613697 | 2113672 | N | N |
| Bobby & Leanna Harmon | 2697102 | 2196872 | Y | Y |
| Bradley & Amy Selvey | 1121875 | 722485 | N | N |
| Brandy & Kyle Griffin | 2596865 | 2096845 | N | N |
| Brenda K. Kern, Cameron Elizabeth Kern, Lyle D. Kern & Lyndon Weslie Kern | 2612531 | 2112506 | N | N |
| Brent & Lynette King | 2683191 | 2182970 | N | N |
| Bryan & Elizabeth Catherine Espinosa | 1077728 | 697878 | N | N |
| Candace Hollins-Brokaw & Jeffrey Brokaw | 2594593 | 2094575 | N | N |
| Celestine G Carter & Haru Carter Jr. | 2650947 | 2150749 | Y | Y |
| Chao Xiong & Aimee Lee | 928916 | 615873 | N | N |
| Chao Xiong & Aimee Lee | 943748 | 624193 | N | N |
| Chao Xiong & Aimee Lee | 1027037 | 669505 | N | N |
| Chao Xiong & Aimee Lee | 2726620 | 2226371 | Y | Y |
| Charlene & Charly Brown | 1042750 | 677954 | N | N |
| Charles & Sherry Terry | 2660018 | 2159818 | N | N |
| Charles Govan | 1104638 | 712749 | N | N |
| Cheresa & Jose Ramon | 868721 | 584006 | N | N |
| Cheryll Craigie | 990314 | 648842 | N | N |
| Christopher Dwayne Shivers & Katie Rochelle Shivers | 992828 | 649089 | N | N |
| Claribell Soiza | 1134323 | 728866 | N | N |
| Colleen & David Bolanowski | 927037 | 614443 | N | Y |
| Cyril & Debra Guild | 1075994 | 696939 | N | Y |
| Dale Greenley | 2588180 | 2088175 | N | Y |
| Damon L. & Sherita Perry | 1029230 | 670686 | N | N |
| Daniel & Cheryl Burns | 2698743 | 2198512 | Y | Y |
| Danny & Christina Cormier | 997956 | 652400 | N | Y |
| Darrin Hartman | 2613390 | 2113365 | N | N |
| David & Barbara Mitchell Sr. | 761672 | 532740 | N | N |
| David & Karen Sprague | 974355 | 638775 | N | N |
| Dean & Margaretta Garlinghouse | 940556 | 622181 | N | N |
| Deborah Leanne Truelove & Terry Efurd | 970810 | 637502 | N | N |
| Demetrius Baytop & Carla Kitchel | 2626207 | 2126024 | N | N |
| Denise Nelson-Smith & Willie E. Smith | 1140951 | 733562 | N | N |
| Dennis D. & Vicki Mitchell | 764763 | 534729 | N | N |
| Derrick & Debra J. Braswell | 1144375 | 735414 | N | N |
| Derrick Marshall | 1146439 | 735884 | N | N |

CONFIDENTIAL

Exhibit C

| Donald & Lisa Craig | 999717 | 653896 | N | Y |
|---|---|---|---|---|
| Donald J. Thomas | 1037808 | 675212 | N | Y |
| Donnie & Christine Brown | 1066140 | 690231 | N | Y |
| Donnie & Christine Brown | 1113084 | 717277 | N | N |
| Dorothy Fizer Lucas & Clifton D. Lucas | 1094223 | 707705 | N | N |
| Dorothy Hale | 1123691 | 723004 | N | Y |
| Earl S. & Caitlin A. Abercrombie | 954529 | 628958 | N | Y |
| Eduardo A. & Stacy L. Rodriguez | 928442 | 615120 | N | N |
| Eduardo A. & Stacy L. Rodriguez | 997463 | 651741 | N | N |
| Elijah T. & Tiffany K. Ireland | 1074792 | 695909 | N | N |
| Elizabeth & Gerardo Sepulveda | 1004178 | 656783 | N | N |
| Emma Stubblefield | 1104162 | 712880 | N | N |
| Erickson Thomas | 1035270 | 674330 | N | Y |
| Erin Marconi & Jeremy McCoy | 2586285 | 2086282 | N | N |
| Ernesto  & Yolanda S. Pacheco | 1005414 | 657865 | N | N |
| Eugene & Brenda K. Combs | 1133049 | 728652 | N | Y |
| Eva Steskal Thoms & Richard Gordan Thoms | 1137197 | 733019 | N | N |
| Fetu & William Bruhnke | 1094394 | 707703 | N | N |
| Fidencio Martinez & C. Victoria Llanos | 868156 | 583842 | N | Y |
| Frank J & Ingrid H Bernard | 1112531 | 717819 | N | N |
| Garry & Deborah Barrett | 890595 | 594344 | N | Y |
| Gayle Turner, Stanley Singleton, Equalla Agee, & Anthony Sykes | 751289 | 528111 | Y | Y |
| Gene & Sharon Ballantyne | 2587013 | 2087009 | N | Y |
| George William & Roxane Brown | 2589802 | 2089795 | N | N |
| Gerald & Sheila Barnett | 1110130 | 715778 | N | Y |
| Glenda Petersen & Michael Bohley | 1114115 | 718062 | N | Y |
| Glenwood C. Simmons & Vicki G. Fisher | 1134042 | 729116 | N | Y |
| Gloria Jean McCutcheon & Cynthia A. Timberlake & William Kenneth McCutcheon | 959546 | 631201 | N | N |
| Gregory Cyrus & Christy Cyrus | 998213 | 659294 | N | N |
| Heather & Justin Wiezorek | 938691 | 620750 | N | N |
| Heather & Justin Wiezorek | 1003009 | 655678 | N | N |
| Herman Shannon & Kelly Schmitt | 997846 | 652227 | N | Y |
| Herschel Lee Shawver & Paula Lisle Shawver | 724532 | 516180 | N | N |
| Ismael Valdespino Ortega & Yesenia Moran Mendoza | 2622407 | 2122227 | N | Y |
| Jack A & Pamela J Rickett | 741387 | 523413 | N | N |
| Jackie Glenn & Brenda Carol Furnace | 593807 | 449419 | Y | Y |
| James & Debora Davidson | 1131730 | 727685 | N | N |
| James & Debra Loveless | 801816 | 552812 | N | Y |
| James & Kristin Schupp | 2600623 | 2100601 | N/A | Y |
| James F. Cullison & Amanda L. Reatherford | 967811 | 635601 | N | Y |
| James L. & Debra J. Neideffer | 1121948 | 722393 | N | N |
| James R. & Sheila Waltrip | 941508 | 622329 | N | Y |
| James Taylor Brooks & Jacqueline Smith-Brooks | 992079 | 650102 | N | Y |
| Jamie Mayle & Sahara Alonzo | 1055446 | 685353 | N | Y |
| Jeffrey & Anna Westby | 1037243 | 675323 | N | N |
| Jeffrey & Jennifer Clark | 864926 | 582614 | N | N |
| Jennifer McCullough | 762161 | 532887 | N | N |
| Jeremy & Darla Lathrem | 2674038 | 2173824 | N | Y |
| Jerene L. Nutter | 1072081 | 694707 | N/A | Y |
| Jerry & Tammy Johnson | 1127507 | 730172 | N | Y |
| Jerry Ray Rosewell & Hollye Elaine Rosewell | 875223 | 587123 | N | N |
| Jesse & Jordan Harding | 942475 | 623124 | N | N |
| Jimmy & Mary Phillips | 2608281 | 2108258 | N | N |
| Jody & Diana Jones | 981097 | 643104 | N | N |
| John Beth & Cristal Advincula | 1114668 | 717779 | N | N |
| John T Carey, Jr & Samantha M Carey | 748520 | 526755 | N | N |
| John Woods & Harriet Woods | 935110 | 619806 | N | N |

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| John Woods & Harriet Woods | 1098920 | 709918 | N | N |
| Jonathan & Samantha Castelblanco | 1098801 | 709245 | N | N |
| Jose Antonio Baez & Beronica Ibarra | 1130020 | 726258 | N | N |
| Joseph & Rosalie Laskos | 1117664 | 719614 | N | Y |
| Joseph & Rosalie Laskos | 2591210 | 2091201 | N | Y |
| Joseph Bernard & Marilou Gamara Tejchman | 1081797 | 699900 | N | N |
| Joshua & Megan Freed | 1137862 | 731174 | N | Y |
| Judith Abbott & Brenda Fox | 1138359 | 732165 | N | Y |
| JudyAnn Jones & Harvey Dennis Robinson | 918390 | 608850 | N | N |
| JudyAnn Jones & Harvey Dennis Robinson | 935073 | 621281 | N | N |
| Julian Laureano Rosales & Guadalupe Coyt | 2623236 | 2123056 | N | Y |
| Justin Mason & Kaitlyn Pieratt | 2672277 | 2172068 | N | Y |
| Karen Tibwell Wallace & Aubry Gary Wallace | 992734 | 650617 | N | N |
| Keegan Giles & Lakisha Giles | 1121142 | 721977 | N | Y |
| Kenneth B, Cardwell & Michelle L. Mock | 1049352 | 681900 | N | N |
| Kimberly L. Howard | 853121 | 577633 | N | N |
| Kimberly McClain | 1056337 | 684991 | N | N |
| Kinda Grant | 502906 | 386716 | N | Y |
| Kinda Grant | 832349 | 566949 | N | Y |
| Kristy & Greg DeMarcus | 762147 | 533228 | N | N |
| Kyle Allen | 919006 | 610254 | N | N |
| Lauren & Jeffery McCullough | 907175 | 603422 | N | N |
| Linda & Manuel Aguinaga | 1064055 | 689151 | N | N |
| Linda Danis & William Danis | 2595888 | 2095867 | N/A | Y |
| Linda M. & Robert L. Mclaughlin | 952818 | 627623 | N | Y |
| Lisa Billie | 2582503 | 1508583 | N | Y |
| Lisa Oxton | 1083165 | 701064 | N | Y |
| Londa Byrd | 531076 | 406083 | Y | Y |
| Maria & Edward Streckfus | 948590 | 626231 | N | N |
| Maria & Edward Streckfus | 963159 | 633528 | N | N |
| Mark & Laura Campbell | 1056313 | 685542 | N | Y |
| Mark & Sue Brewer | 652482 | 481302 | N | N |
| Mark A. Loken & Amelia M. Loken | 1136753 | 732375 | N | N |
| Marvin S. Cook | 578234 | 443338 | Y | Y |
| Marvin S. Cook | 853583 | 577176 | N | N |
| Mathew L. Spencer & Christie N. Fasick | 1101103 | 710807 | N | N |
| Matthew & Nathalia Timmins | 767260 | 536178 | N | N |
| Matthew Cody LaDeaux & Stephanie Michelle LaDeaux | 771787 | 537333 | N | N |
| Megan & Anthony Bunch | 1045300 | 681051 | N | Y |
| Melissa & Erik Pond | 1082094 | 700516 | N | Y |
| Melissa Stenberg | 2719925 | 2219684 | N | Y |
| Michael & Ruth Eldridge | 877002 | 588014 | N | N |
| Michael B. & Regilyn P. Johnson | 742902 | 524977 | N | N |
| Michael B. & Regilyn P. Johnson | 808414 | 555588 | N | N |
| Michael Denis & Claudia Leon | 503885 | 387452 | N | Y |
| Miguel A Astudillo & Gloria Elena Astudillo | 821260 | 561844 | N | N |
| Mitchell Leigh Marston & Megan R. Marston | 863613 | 582017 | N | N |
| Nakisha & Sandra Lockhart | 916953 | 613100 | N | N |
| Nancy Lynn Braun & Bobby Earl Braun | 1071352 | 694279 | N | N |
| Nancy Lynn Braun & Bobby Earl Braun | 2676055 | 2175841 | N | N |
| Norman K. Athy Jr. & Terri L. Leamy | 1108638 | 715482 | N | N |
| Norris & Faye Horton | 1064999 | 690248 | N | N |
| Pamela Franklin | 2690248 | 2190022 | N | N |
| Patricia O'Neal-Mellen | 2657728 | 2157528 | N | N |
| Paul & Melinda Jacobs | 1019337 | 665061 | N | N |
| Paul & Shirley Prosek | 939932 | 621922 | N | Y |
| Randall E. Owens & Tanya R. Owens | 969961 | 637035 | N | Y |
| Randy C. & Jonnie S. Driver | 978144 | 641388 | N | N |
| Ray Yorker Jr. | 704014 | 506081 | N | N |

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| Raymond & Viola Nault | 974551 | 639731 | N | Y |
| Rebecca & Ricky Jones | 1118187 | 720350 | Y | N |
| Rhonda & George Dixon | 1088722 | 704639 | N | Y |
| Ricky & Lynn Oberlender | 2631501 | 2131317 | N | N |
| Rita Patient & Charles Butler | 938087 | 621189 | N | N |
| Robert N. & Patricia B. Watson | 848475 | 574454 | N | N |
| Robert Scott Yaikow & Amy Medders Yaikow | 761535 | 532910 | N | N |
| Robert Whitaker & Karen Scott | 985044 | 644853 | N | Y |
| Roger P. & Angela B. Hays | 1007579 | 658850 | N | N |
| Ronald & Loretta Hardeman | 2584761 | 2084758 | N | N |
| Ronald & Loretta Hardeman | 2610646 | 2110623 | N | N |
| Ronda & Samuel Herrington | 1101279 | 711043 | N | N |
| Rosana E. Narvaez-Colon | 1095608 | 707758 | N | N |
| Roy & Deborah Ashby | 2592947 | 2092937 | N | Y |
| Ruben Ortega & Adriana Cota | 888760 | 593280 | N | Y |
| Ryan & Suzanne Mailhiot | 697833 | 502779 | N | Y |
| Samuel J. & Dana M. Bollinger | 1128307 | 725824 | N | N |
| Sandra & Thomas J. Lawson | 660399 | 484854 | N | N |
| Sarah & Eric Chambers | 2598094 | 2098073 | N/A | Y |
| Scott & Tammy Bomkamp | 742194 | 523685 | N | Y |
| Shannon & William Meredith | 2624595 | 2124412 | N | N |
| Sherry Helton | 1065107 | 690216 | N | N |
| Sierra Tebeau Sherry | 1089362 | 704153 | Y | N |
| Sierra Tebeau Sherry | 1122472 | 722595 | N | N |
| Simbarashe Murengami | 2594355 | 2094337 | N/A | Y |
| Simbarashe Murengami | 2678525 | 2178310 | N | N |
| Steve & Rosalyn Moorehead | 1013032 | 661683 | N/A | Y |
| Stuart & Bethany Roberts | 1058522 | 686536 | N | N |
| Tamikka Lashaun Portee & Vanessa Shavan Porter | 754503 | 529448 | N | N |
| Tammy Kay & Phillip Lee Salmans | 1038370 | 680444 | N | N |
| Taury Person & Shannon Person | 815966 | 559060 | N | Y |
| Terry & Dalila Kennedy | 989467 | 647866 | N/A | Y |
| Theresa & David Barnewall | 886604 | 592233 | N | N |
| Theresa & Gregory Dunn | 916821 | 608930 | N | N |
| Thomas Hollingsworth | 987891 | 647209 | N | Y |
| Thomas Hollingsworth | 1134867 | 729830 | N | Y |
| Tim & Tina Bullock | 911214 | 605909 | N | N |
| Timothy C. & Julie A. Creekmur | 1094235 | 707214 | N | Y |
| Urban & Cheryl Lanser | 728588 | 517336 | N | N |
| Victor Schexnayder | 875825 | 587628 | N | Y |
| Victor Schexnayder | 1099771 | 710349 | N | N |
| Victoria & Donald McKenney | 1059972 | 687126 | N | N |
| Victoria & Donald McKenney | 1128611 | 725369 | N | N |
| Wayne & Shirley Norland | 791993 | 548243 | N | Y |
| Wendell B. Taylor | 1054045 | 683828 | N | N |
| Weylen & Emily Gibson | 857493 | 579652 | N | N |
| Willie & Velma Waters | 801606 | 552805 | N | N |

CONFIDENTIAL

D - 0235-0022

D-239

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

BLUEGREEN VACATIONS UNLIMITED, INC., *et al.*,

      Plaintiffs,

v.

TIMESHARE LAWYERS P.A., *et al.*,

      Defendants.

Case No.: 1:20-cv-24681-RNS

## NOTICE OF SERVICE OF PLAINTIFF BLUEGREEN VACATIONS CORPORATION'S UNVERIFIED RESPONSES TO PANDORA MARKETING' LLC'S THIRD SET OF INTERROGATORIES

Plaintiff, BLUEGREEN VACATIONS CORPORATION., by and through its undersigned counsel and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, hereby answers PANDORA MARKETING, LLC's ("Pandora") Third Set of Interrogatories.

Dated: August 15, 2022

*/s/ Christian M. Leger, Esq.*
**ERIC C. CHRISTU, ESQ.**
Florida Bar No. 434647
echristu@shutts.com
**SHUTTS & BOWEN, LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, FL 33131
Telephone: (305) 358-6300
Facsimile: (305) 381-9982

and

**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com

**MICHAEL J. QUINN, ESQ.**
Florida Bar NO. 084587
mquinn@shutts.com
**CHRISTIAN M. LEGER, ESQ.**
Florida Bar No. 0100562
cleger@shutts.com
**BENJAMIN F. ELLIOTT, ESQ.**
Florida Bar No. 1010706
belliott@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile: (407) 849-7255
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of August, 2022, a true and correct copy of the

foregoing has been served via electronic mail to the following CM/ECF Participants and via U.S.

Mail, postage prepaid, to the following non-CM/ECF Participants:

| | |
|---|---|
| Brian L. Wagner, Esq. | Christian W. Waugh, Esq. |
| Email: bwagner@mateerharbert.com | Email: cwaugh@waughgrant.com |
| Email: semerson@mateerharbert.com | Morgan Fayocavitz, Esq. |
| W. Scott Gabrielson, Esq. | Email: mfayocavitz@waughgrant.com |
| Email: sgabrielson@mateerharbert.com | Mary Norberg, Esq. |
| Email: Mstoutamire@mateerharbert.com | Email: mnorberg@waughgrant.com |
| Mateer & Harbert, P.A. | Email: rwood@waughgrant.com |
| 225 East Robinson Street, Suite 600 | WAUGH Grant PLLC |
| Orlando, FL 32801-2854 | 201 E. Pine Street, Suite 315 |
| Telephone: (407) 425-9044 | Orlando, FL 32801 |
| Facsimile: (407) 423-2016 | Telephone: (321) 800-6008 |
| | Facsimile: (844) 206-0245 |
| *Attorneys for Carlsbad Law Group, LLP and* | |
| *JL "Sean" Slattery* | *Attorneys for Yuge Internet Marketing, LLC,* |
| | *Bigly Internet Marketing, LLC and David J.* |
| | *Crader* |

2

John J. Bennett, Esq.
Email: jbennett@nardellalaw.com
John M. Sykes, Esq.
Email: jsykes@nardellalaw.com
Paul N. Mascia, Esq.
Email: pmascia@nardellalaw.com
Email: nmacdougall@nardellalaw.com
Nardella & Nardella, PLLC
135 W. Central Blvd., Suite 300
Orlando, FL 32801
Telephone: (407) 966-2680

and

Patrick A. Bradford, Esq. (Pro Hac Vice)
Email: pbradford@bradfordedwards.com
Bradford Edwards and Varlack LLP
112 East 49th Street, 11th Floor
New York, NY 10017
Telephone: (917) 671-9406

*Attorneys for Pandora Marketing, LLC d/b/a*
*Timeshare Compliance, William Wilson a/k/a*
*Bo Wilson, Rich Folk*

Patrick James Thompson, Esq.
Email: law@patrickjthompson.com
Patrick Thompson Law P.A.
7025 County Road 46A PMB 432
Lake Mary, FL 32746-4721
Telephone: (407) 750-9000
Facsimile: (386) 675-1445

*Patrick Thompson, Pro Se*

Patrick J. Thompson, Esq.
Email: law@patrickjthompson.com
Patrick Thompson Law P.A.
201 Hilda Street, Ste. 23
Kissimmee, FL 34741
Telephone: 407-750-9000

*Attorney for Timeshare Lawyers P.A.*

## NON-CM/ECF PARTICIPANTS

Angela Consalvo
588 Cobblestone Creek Drive
Boynton Beach, Florida 33472

MG&N Group LLC d/b/a National Credit
Rehab
c/o Registered Agent Michael Consalvo
9502 Sun Pointe Drive
Boynton Beach, Florida 33437

Gallagher-Clifton, LLC
c/o Registered Agent William O. Stewart, Jr.
508 Harbor Blvd., #401
Destin, FL 32541

Paul Stewart
508 Harbor Blvd., #401
Destin, FL 32541

Paddy Deighan
2000 Fashion Show Drive, Unit 2222
Las Vegas, Nevada 89109
Email: paddy@federalfinanciallawgroup.com

923 Haddonfield Road, Suite 300
Cherry Hill, NJ 08002

/s/ Christian M. Leger, Esq.
**CHRISTIAN M. LEGER, ESQ.**

3

## ANSWERS TO INTERROGATORIES

**INTERROGATORY 17.**     If any entity, other than one of plaintiffs, owned any of the Bluegreen Owner loan contracts at any time of alleged harm, identify the timeshare owner and non-plaintiff entity owner. This integratory is limited to the Bluegreen Owner whose loan contracts are part of your damages request, including those timeshare owners identified in any of your Rule 26 disclosures.

>**ANSWER:**     **In response to Interrogatory No. 17, Bluegreen states that to the extent that this Interrogatory seeks the disclosure of the assignment history of debt associated with Owner Beneficiary Agreements that form the basis of Bluegreen's claims in this matter (which Bluegreen has identified in its *Second Rule 26 Disclosures* dated June 21, 2022), to the extent any such debt was assigned, such information is provided as to such debt that was assigned in the table attached hereto at Exhibit A. Bluegreen objects to the extent that this request seeks any other information as overboard and disproportionate to the needs of this case as the stated information permits all parties to equally determine the ownership status of the referenced debt at all points in time relevant to this matter.**

**INTERROGATORY 18.**     For each Bluegreen Owner identified in your answer to Interrogatory No. 17, if any, identify any servicing or agency agreement by which You purport to have been granted the right to bring this case on behalf of the non-plaintiff entity owner of respective loan contracts.

>**ANSWER:**     **In response to Interrogatory No. 18, Bluegreen states that pursuant to Fed. R. Civ. P. 33(d) the answer to such interrogatory can be found in documents already produced by Bluegreen in this matter and the burden of deriving or ascertaining the answer to the specific matter posed by this Interrogatory will be substantially the same for either party. Such records are found at BG-Carlsbad015211–018096; BG-Carlsbad021176–021990; BG-Carlsbad022604–024595; BG-Carlsbad034417–034422.**

**INTERROGATORY 19.**     For each Bluegreen Owner whose loan contracts are part of your damages requests, including those Bluegreen Owner identified in any of your rule 26 disclosures, for each such Bluegreen Owner who's timeshare interest you reacquired from said Bluegreen Owner, identify the date of Your acquisition of such Bluegreen Owner's timeshare interest, the total number of the Bluegreen Owner's timeshare points existing upon Your acquisition of the Bluegreen Owner's timeshare interest (the "Returned Points"), the total number of points existing in Your pool of points available to sell immediately prior to your acquisition of the Returned Points (the "Then Existing Points") and the total number of points existing in Your pool of available points immediately after your acquisition of the Returned Points.

>**ANSWER:**     **In response to Interrogatory No. 19, Bluegreen states that it recovers a timeshare interest into its inventory upon termination of the Bluegreen Owner's rights under an Owner Beneficiary Agreement, which is reflected in a "Notice of Termination of Owner Beneficiary Rights" delivered to the timeshare owner. To the extent this Interrogatory calls for the identification of the number of returned points**

4

for such interests, Bluegreen states that it would have recovered the amount sold which is referenced in the Owner Beneficiary Agreements already produced in this matter, and, pursuant to Fed. R. Civ. P. 33(d), the answer to such interrogatory can be found in documents already produced by Bluegreen in this matter and the burden of deriving or ascertaining the answer to the specific matter posed by this Interrogatory will be substantially the same for either party. Such records may be found at the bates numbers referenced in the attached Exhibit B. A list of the Bluegreen Owners disclosed on the *Second Rule 26 Disclosures* whose contracts have been terminated is attached as Exhibit C.

Bluegreen otherwise objects to this Interrogatory as overly broad and disproportionate as it imposes on Bluegreen a burden to conduct a historical analysis of available points at numerous different points in time yet Bluegreen lacks the capacity to engage in such analysis. Finally, Bluegreen objects on the grounds that this Interrogatory is vague and/or ambiguous as it is unclear what is meant by subjective terms "immediately prior" or "immediately after".

**INTERROGATORY 20.** For each Bluegreen Owner identified in your answer to Interrogatory No. 19, identify any and all transfers of any of the Then Existing Points to any person following Your acquisition of the Returned Points (a "TEP Transfer") that You contend were made prior to your subsequent transfer of the owner's Returned Points (the "RP Transfer"), and if any, identify the date, amount and recipient of each TEP Transfer, and the date of the related RP Transfer.

**ANSWER:** In response to Interrogatory No. 20, Bluegreen objects on the grounds that this Interrogatory is vague and or ambiguous as it is unclear what information the Interrogatory is actually seeking. Nevertheless, Bluegreen objects on the grounds that the Interrogatory is overbroad and disproportionate in that it *appears* (but Bluegreen cannot be certain) that this Interrogatory seeks the identification of all company-wide timeshare sales over given periods of time regardless of connection to the matters before the Court in this litigation. Bluegreen notes that it lacks the ability to track the resale of individual timeshare points after their acquisition, and thus, also believes that it is unable to respond to this Interrogatory. Finally, Bluegreen objects on the grounds that this Interrogatory is vague and/or ambiguous as it is unclear what is meant by "Then Existing Points" as the previously offered definition of such term includes the use of subjective terms without definition. Bluegreen reserves the right to assert additional objections upon clarification of the instant Interrogatory.

**INTERROGATORY 21.** For each Bluegreen Owner identified in your answer to Interrogatory No. 19, identify any and all newly created points that were issued after Your acquisition of the Returned Points and prior to the RP Transfer (the "Newly Issued Points"), and if any, identify the date, amount and recipient of each Newly Issued Point, and the date of the related RP Transfer.

**ANSWER:** In response to Interrogatory No. 21, Bluegreen objects on the grounds that this Interrogatory is vague and or ambiguous as it is unclear what information the Interrogatory is actually seeking. Nevertheless, Bluegreen objects on the grounds

5

that the Interrogatory is overbroad and disproportionate in that it *appears* (but Bluegreen cannot be certain) that this Interrogatory seeks the identification of all company-wide timeshare sales over given periods of time regardless of connection to the matters before the Court in this litigation. Bluegreen notes that it lacks the ability to track the movement of individual timeshare points and thus also believes that it is unable to respond to this Interrogatory. Finally, Bluegreen objects on the grounds that this Interrogatory is vague and/or ambiguous as it is unclear what is sought in regard to the date, amount, and recipient of the "Newly Issued Points" and how such "Newly Issued Points" relate any "RP Transfer".

INTERROGATORY 22.    Identify the Person employed by You with the most knowledge concerning the creation, issuance, acquisition, ownership, maintenance, sale, transfer and/or distribution of Your timeshare ownership interest points, including without limitation, Your processes, systems, software and records for determining how many and which timeshare points are owned by any timeshare owner at any point in time, which and how many timeshare points are owned by You in Your internal pool of timeshare points at any point in time, and recording any transfer of any timeshare points by and between You and any person.

**ANSWER:**    **In response to Interrogatory No. 22, Bluegreen objects that the interrogatory effectively asks Bluegreen to identify a singular witness with the most knowledge of Bluegreen's entire business, which does not exist. Bluegreen states that it will designate (as limited to Bluegreen's objections) Angela Blevins as its corporate representative on matters related to owner relations, Tina Miller on matters related to Bluegreen's sales, and Paul Humphrey on matters related to securitization.**

6

| Contract Number | Mortgage Number | Vacation Club Number | First Name (1) | Last Name (1) | First Name (2) | Last Name (2) | Assignor (1) | Assignee (1) | Assignment Date (1) | Assignor (2) | Assignee (2) | Assignment Date (2) | Assignor (3) | Assignee (3) | Assignment Date (3) | Assignor (4) | Assignee (4) | Assignment Date (4) | Assignor (5) | Assignee (5) | Assignment Date (5) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1138359 | 732165 | 652794 | Judith | Abbott | Brenda | Fox | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 9/27/2018 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/24/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 10/8/2020 | | | | | | |
| 1097944 | 710184 | 456408 | Betty | Adams | | | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 3/22/2018 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 1/15/2021 | | | | | | |
| 1064055 | 689151 | 379355 | Linda | Aguinaga | Manuel | Aguinaga | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 8/30/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 3/22/2021 | | | | | | | | | |
| 919006 | 610254 | 792593 | Kyle | Allen | | | Bluegreen - BC WC Marketing | BXG Receivable Note Trust 2016-A | 3/17/2016 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | 12/20/2016 | | | | | | | | | |
| 2592947 | 2092937 | 614303 | Roy | Ashby | Deborah | Ashby | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | 1/15/2019 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 1/6/2020 | | | | | | | | | |
| 665537 | 487607 | 668648 | Beatriz | Astencio | Roberto | Cedeno | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 8/26/2011 | BXG Timeshare Trust I | BXG Receivables Note Trust 2012-A | 9/13/2012 | BXG Receivables Note Trust 2012-A | Bluegreen Corp-Vacation Club | 10/2/2020 | Bluegreen Corp-Vacation Club | Bluegreen Corp-Vacation Club | 10/12/2020 | | | |
| 821260 | 561844 | 745086 | MIguel | Astudillo | Gloria | Astudillo | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 5/27/2014 | BXG Timeshare Trust I | BXG Receivables Note Trust 2015-A | 1/29/2015 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | 1/21/2020 | | | | | | |
| 1108638 | 715482 | 812353 | Norman | Athy | Terri | Leamy | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 4/27/2018 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 4/15/2021 | | | | | | |
| 1130020 | 726258 | 863071 | Jose | Baez | Beronica | Ibarra | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 8/15/2018 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 10/19/2020 | | | | | | | | | |
| 1110130 | 715778 | 755946 | Gerald | Barnett | Sheila | Barnett | Bluegreen Corp-Vacation Club | Bluegreen Corp/CapitalSource Bank | 5/25/2018 | Bluegreen Corp/CapitalSource Bank | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 8/5/2020 | | | | | | |
| 886604 | 592233 | 746789 | Theresa | Barnewall | David | Barnewall | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 7/23/2015 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | 3/17/2016 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | 3/16/2021 | | | | | | |
| 2626207 | 2126024 | 695206 | Demetrius | Baytop | Carla | Kitchel | Bluegreen Corp-Vacation Club | Bluegreen Corp/CapitalSource Bank | 7/30/2019 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp/CapitalSource Bank | 8/17/2020 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp-Vacation Club | 6/30/2022 | | | | | | |
| 1112531 | 717819 | 818446 | Frank | Bernard | Ingrid | Bernard | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 5/15/2018 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 7/16/2019 | | | | | | | | | |
| 1114668 | 717779 | 615667 | John | Beth | Cristal | Advincula | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 5/31/2018 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 3/15/2021 | | | | | | |
| 2582503 | 1508583 | 457051 | Lisa | Billie | | | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | 10/30/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 4/15/2020 | | | | | | | | | |
| 1075133 | 695665 | 869219 | Adan | Blevins | Channell | Blevins | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 9/15/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 1/14/2020 | | | | | | | | | |
| 927037 | 614443 | 796112 | Colleen | Bolanowski | David | Bolanowski | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 10/27/2015 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | 3/17/2016 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | 10/2/2019 | | | | | | |
| 1128307 | 725824 | 754117 | Samuel | Bollinger | Dana | Bollinger | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 8/28/2018 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 4/9/2021 | | | | | | |
| 742194 | 523685 | 684594 | Scott | Bomkamp | Tammy | Bomkamp | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 2/27/2013 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | 9/26/2013 | BXG Receivables Note Trust 2013-A | Bluegreen Corp-Vacation Club | 9/12/2019 | | | | | | |
| 1144375 | 735414 | 904463 | Derrick | Braswell | Debra | Braswell | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | 10/30/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 1/19/2021 | | | | | | | | | |
| 2676055 | 2175841 | 744873 | Nancy | Braun | Bobby | Braun | Bluegreen Louisianna | Bluegreen Corp-Vacation Club | 2/17/2020 | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 3/27/2020 | BXG Timeshare Trust I | BXG Receivables Note Trust 2020-A | 10/8/2020 | BXG Receivables Note Trust 2020-A | BXG Receivables Note Trust 2020-A | 4/28/2021 | | | |
| 1071352 | 694279 | 744873 | Nancy | Braun | Bobby | Braun | Bluegreen Corp-Vacation Club | Pacific Western Bank | 2/13/2018 | Pacific Western Bank | Bluegreen Corp-Vacation Club | 6/30/2021 | | | | | | | | | |
| 652482 | 481302 | 662433 | Mark | Brewer | Sue | Brewer | Bluegreen - BC WC Marketing | BXG Timeshare Trust I | 5/25/2011 | BXG Timeshare Trust I | BXG Receivables Note Trust 2012-A | 9/13/2012 | BXG Receivables Note Trust 2012-A | BXG Receivables Note Trust 2012-A | 5/21/2018 | | | | | | |
| 992079 | 650102 | 794975 | James | Brooks | Jacqueline | Smith-Brooks | Bluegreen Corp-Vacation Club | Liberty Bank | 6/23/2017 | Liberty Bank | Bluegreen Corp-Vacation Club | 3/10/2020 | | | | | | | | | |
| 1042750 | 677954 | 739316 | Charlene | Brown | | | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 12/17/2019 | | | | | | | | | |
| 1113084 | 717277 | 827051 | Donnie | Brown | Christine | Brown | Bluegreen Corp-Vacation Club | Bluegreen Corp/CapitalSource Bank | 5/25/2018 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp/CapitalSource Bank | 1/21/2020 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp-Vacation Club | 6/30/2022 | | | | | | |
| 1066140 | 690231 | 827051 | Donnie | Brown | Christine | Brown | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 8/15/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 1/28/2020 | | | | | | | | | |
| 1094394 | 707703 | 796498 | Fetu | Bruhnke | William | Bruhnke | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 4/27/2018 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | 4/28/2021 | | | | | | |
| 911214 | 605909 | 788622 | Tim | Bullock | Tina | Bullock | Bluegreen - BC WC Marketing | BXG Receivable Note Trust 2016-A | 3/17/2016 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | 1/18/2018 | | | | | | | | | |
| 1045300 | 681051 | 523432 | Megan | Bunch | Anthony | Bunch | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 1/23/2020 | | | | | | | | | |
| 531076 | 406083 | 470519 | Londa | Byrd | | | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2008-A | 9/12/2008 | BXG Receivables Note Trust 2008-A | Bluegreen Corp-Vacation Club | 4/5/2016 | | | | | | | | | |
| 1056313 | 685542 | 817974 | Mark | Campbell | Laura | Campbell | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 7/28/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 2/15/2019 | | | | | | | | | |
| 1049352 | 681900 | 828223 | Kenneth | Cardwell | Michelle | Mock | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 10/16/2019 | | | | | | | | | |
| 748520 | 526755 | 666267 | John | Carey | Samantha | Carey | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 3/25/2013 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | 9/26/2013 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | 6/20/2018 | | | | | | |
| 1098801 | 709245 | 882037 | Jonathan | Castelblanco | Samantha | Castelblanco | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | 2/15/2018 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | 1/18/2021 | | | | | | | | | |
| 864926 | 582614 | 766704 | Jeffrey | Clark | Jennifer | Clark | Big Cedar Vacations,LLC | Bluegreen Big Cedar Quorum 2012 | 11/21/2014 | Bluegreen Big Cedar Quorum 2012 | Big Cedar Vacations,LLC | 12/11/2020 | Big Cedar Vacations,LLC | Bluegreen/Big Cedar NBA | 12/14/2020 | Bluegreen/Big Cedar NBA | Bluegreen Corp-Vacation Club | 6/30/2022 | Bluegreen Corp-Vacation Club | Big Cedar Vacations, LLC | 7/6/2022 |
| 1133049 | 728652 | 898593 | Eugene | Combs | Brenda | Combs | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 8/28/2018 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 3/30/2020 | | | | | | |
| 578234 | 443338 | 400785 | Marvin | Cook | Linda | Thurman | Bluegreen Corp-Vacation Club | Liberty Bank | 8/9/2011 | Liberty Bank | Bluegreen Corp-Vacation Club | 9/13/2012 | Bluegreen Corp-Vacation Club | Liberty Bank | 9/26/2012 | Liberty Bank | Bluegreen Corp-Vacation Club | 9/27/2012 | | | |
| 853583 | 577176 | 400785 | Marvin | Cook | Linda | Thurman | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 10/28/2014 | Bluegreen/Liberty Bank 2010 | Bluegreen/Liberty Bank 2010 | 1/12/2015 | Bluegreen/Liberty Bank 2010 | BXG Receivable Note Trust 2016-A | 3/17/2016 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | 6/20/2018 | | | |
| 997956 | 652400 | 744902 | Danny | Cormier | Christina | Cormier | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 9/29/2016 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 4/30/2019 | | | | | | |
| 999717 | 653896 | 821441 | Donald | Craig | Lisa | Craig | Bluegreen Corp-Vacation Club | Bluegreen Corp/CapitalSource Bank | 12/21/2016 | Bluegreen Corp/CapitalSource Bank | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 9/30/2019 | | | | | | |
| 990314 | 648842 | 827071 | Cheryll | Craigie | | | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 8/24/2016 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 1/17/2019 | | | | | | |
| 1094235 | 707214 | 808256 | Timothy | Creekmur | Julie | Creekmur | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 12/15/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 10/8/2020 | | | | | | | | | |
| 967811 | 635601 | 814913 | James | Cullison | Amanda | Reatherford | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 5/26/2016 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 3/30/2020 | | | | | | |
| 998213 | 659294 | 822521 | Gregory | Cyrus | Christy | Cyrus | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 11/18/2016 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 10/16/2019 | | | | | | |
| 1131730 | 727685 | 545052 | James | Davidson | Debora | Davidson | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 8/28/2018 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 6/28/2021 | | | | | | |
| 762147 | 533228 | 549438 | Kristy | DeMarcus | Greg | DeMarcus | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 6/26/2013 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | 9/26/2013 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | 5/5/2021 | | | | | | |
| 503885 | 387452 | 452747 | Michael | Denis | Claudia | Leon | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2007-A | 7/2/2008 | BXG Receivables Note Trust 2007-A | Bluegreen Corp-Vacation Club | 4/6/2016 | Bluegreen Corp-Vacation Club | Pacific Western Bank | 5/10/2016 | Pacific Western Bank | Bluegreen Corp-Vacation Club | 1/11/2018 | | | |
| 1088722 | 704639 | 103275 | Rhonda | Dixon | George | Dixon | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 12/15/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 8/14/2020 | | | | | | | | | |
| 978144 | 641388 | 238501 | Randy | Driver | Jonnie | Driver | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 6/22/2016 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 5/13/2021 | | | | | | |
| 916821 | 608930 | 267400 | Theresa | Dunn | Gregory | Dunn | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 9/25/2015 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | 3/17/2016 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | 12/21/2020 | | | | | | |
| 877002 | 588014 | 772433 | Michael | Eldridge | Ruth | Eldridge | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | 2/12/2015 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | 2/13/2015 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | 2/24/2015 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | 6/2/2021 | | | |
| 1077728 | 697878 | 872825 | Bryan | Espinosa | Elizabeth | Espinosa | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 10/31/2017 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | 5/20/2020 | | | | | | |
| 828889 | 566190 | 507950 | Anthony | Fisher | Senora | Harris | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 6/27/2014 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2015-A | 1/29/2015 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | 3/16/2021 | | | | | | |
| 2690248 | 2190022 | 731952 | Pamela | Franklin | | | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2020-A | 10/8/2020 | BXG Receivables Note Trust 2020-A | Bluegreen Corp-Vacation Club | 3/23/2021 | | | | | | | | | |
| 1137862 | 731174 | 825536 | Joshua | Freed | Megan | Freed | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | 10/24/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 8/21/2019 | | | | | | | | | |
| 593807 | 449419 | 624347 | Jackie | Furnace | Brenda | Furnace | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2007-A | 12/2/2010 | BXG Receivables Note Trust 2007-A | Bluegreen Corp-Vacation Club | 3/17/2016 | | | | | | | | | |
| 940556 | 622181 | 803065 | Dean | Garlinghouse | Margaretta | Garlinghouse | Bluegreen - BC WC Marketing | BXG Receivable Note Trust 2016-A | 3/17/2016 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | 4/16/2018 | | | | | | | | | |
| 887944 | 592975 | 707188 | Billy | Garner | Leslee | Garner | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | 4/23/2015 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | 7/16/2019 | | | | | | | | | |
| 857493 | 579652 | 763159 | Weylen | Gibson | Emily | Gibson | Big Cedar Vacations,LLC | Bluegreen Big Cedar Quorum 2012 | 10/23/2014 | Bluegreen Big Cedar Quorum 2012 | Big Cedar Vacations,LLC | 6/14/2019 | Big Cedar Vacations,LLC | Big Cedar Vacations, LLC | 6/24/2019 | | | | | | |
| 1121142 | 721977 | 861824 | Keegan | Giles | Lakisha | Giles | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 6/26/2018 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 11/15/2019 | | | | | | |
| 1104638 | 712749 | 555869 | Charles | Govan | | | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 4/26/2018 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | 6/18/2020 | | | | | | |
| 502906 | 386716 | 522774 | Kinda | Grant | | | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 5/23/2008 | BXG Timeshare Trust I | BXG Receivables Note Trust 2010-A | 12/15/2010 | BXG Receivables Note Trust 2010-A | BXG Receivables Note Trust 2010-A | 3/16/2017 | BXG Receivables Note Trust 2010-A | Bluegreen Corp-Vacation Club | 4/20/2017 | | | |
| 832349 | 566949 | 522774 | Kinda | Grant | | | Bluegreen Properties NV | BXG Timeshare Trust I | 7/30/2014 | BXG Timeshare Trust I | BXG Receivables Note Trust 2015-A | 1/29/2015 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | 3/16/2017 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | 3/5/2020 | | | |
| 2588180 | 2088175 | 842325 | Dale | Greenley | | | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | 11/30/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 4/15/2019 | | | | | | | | | |
| 1123691 | 723004 | 836441 | Dorothy | Hale | | | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | 7/13/2018 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | 1/16/2020 | | | | | | | | | |
| 2584761 | 2084758 | 896433 | Ronald | Hardeman | Loretta | Hardeman | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | 12/27/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 3/22/2021 | | | | | | | | | |
| 942475 | 623124 | 803988 | Jesse | Harding | Jordan | Harding | BVC (BG/Big Cedar Vacations, LLC | Quorum Federal Credit Union | 2/16/2016 | Quorum Federal Credit Union | Big Cedar Vacations, LLC | 7/22/2020 | | | | | | | | | |
| 2697102 | 2196872 | 468572 | Bobby | Harmon | Leanna | Harmon | Bluegreen Corp-Vacation Club | Bluegreen Corp/CapitalSource Bank | 1/29/2021 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp/CapitalSource Bank | 5/17/2021 | Bluegreen Corp/CapitalSource Bank | Bluegreen Corp-Vacation Club | 6/30/2022 | | | | | | |
| 1029442 | 670983 | 468572 | Bobby | Harmon | Leanna | Harmon | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 3/27/2017 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 5/18/2021 | | | | | | |
| 2613390 | 2113365 | 472056 | Darrin | Hartman | | | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 5/21/2019 | BXG Timeshare Trust I | BXG Receivables Note Trust 2020-A | 10/8/2020 | BXG Receivables Note Trust 2020-A | Bluegreen Corp-Vacation Club | 3/15/2021 | | | | | | |
| 1131368 | 727368 | 813768 | Billy | Hays | Mary | Hays | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 8/28/2018 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 9/23/2019 | | | | | | |
| 1007579 | 658850 | 477348 | Roger | Hays | Angela | Hays | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 7/28/2017 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 4/16/2021 | | | | | | | | | |
| 1065107 | 690216 | 208648 | Sherry | Helton | | | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 9/28/2017 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | 11/17/2020 | | | | | | |
| 1101279 | 711043 | 840467 | Ronda | Herrington | Samuel | Herrington | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 3/22/2018 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | 3/16/2021 | | | | | | |
| 1134867 | 729830 | 497258 | Thomas | Hollingsworth | | | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | 12/7/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 11/25/2019 | | | | | | | | | |
| 2594593 | 2094575 | 837200 | Candace | Hollins-Brokaw | Jeffrey | Brokaw | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 6/24/2019 | BXG Timeshare Trust I | BXG Receivables Note Trust 2020-A | 10/8/2020 | BXG Receivables Note Trust 2020-A | BXG Receivables Note Trust 2020-A | 5/17/2021 | BXG Receivables Note Trust 2020-A | Bluegreen Corp-Vacation Club | 10/15/2021 | | | |
| 1064999 | 690248 | 408974 | Norris | Horton | Faye | Horton | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 9/28/2017 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 12/23/2020 | | | | | | |
| 853121 | 577633 | 760734 | Kimberly | Howard | | | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 10/28/2014 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2015-A | 1/29/2015 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | 1/4/2021 | | | | | | |
| 1074792 | 695909 | 869435 | Elijah | Ireland | Tiffany | Ireland | Big Cedar Vacations,LLC | Nat. B of AZ (NKA ZB) | 8/13/2018 | ZB Nat. B of AZ | Bluegreen/Big Cedar | 7/29/2021 | | | | | | | | | |
| 1019337 | 665061 | 801184 | Paul | Jacobs | Melinda | Jacobs | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | 1/13/2017 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | 4/16/2018 | | | | | | | | | |
| 1127507 | 730172 | 861230 | Jerry | Johnson | Tammy | Johnson | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 9/27/2018 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 12/17/2019 | | | | | | |
| 742902 | 524977 | 709022 | Michael | Johnson | Regilyn | Johnson | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 2/27/2013 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | 10/1/2013 | Bluegreen Corp-Vacation Club | Bluegreen Corp/CapitalSource Bank | 10/18/2013 | Bluegreen Corp/CapitalSource Bank | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 5/14/2021 |
| 808414 | 555588 | 709022 | Michael | Johnson | Regilyn | Johnson | Bluegreen Corp-Vacation Club | Pacific Western Bank | 10/13/2014 | Pacific Western Bank | Bluegreen Corp-Vacation Club | 4/27/2021 | | | | | | | | | |
| 935073 | 621281 | 791143 | JudyAnn | Jones | Harvey | Robinson | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 12/23/2015 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | 3/17/2016 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | 8/20/2018 | | | | | | |
| 918390 | 608850 | 791143 | JudyAnn | Jones | Harvey | Robinson | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 9/25/2015 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 8/20/2018 | | | | | | |
| 1118187 | 720350 | 807079 | Rebecca | Jones | Ricky | Jones | Bluegreen Corp-Vacation Club | Liberty Bank | 6/3/2019 | Bluegreen Corp-Vacation Club | Liberty Bank | 4/9/2020 | Liberty Bank | Bluegreen Corp-Vacation Club | 11/24/2020 | | | | | | |
| 771787 | 537333 | 721044 | Matthew | LaDeaux | Stephanie | LaDeaux | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 8/27/2013 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | 9/26/2013 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | 6/16/2017 | | | | | | |
| 728588 | 517336 | 650089 | Urban | Lanser | Cheryl | Lanser | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 12/21/2012 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2013-A | 9/26/2013 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | 7/16/2019 | | | | | | |

Exhibit A

| Contract Number | Mortgage Number | Vacation Club Number | First Name (1) | Last Name (1) | First Name (2) | Last Name (2) | Assignor (1) | Assignee (1) | Assignment Date (1) | Assignor (2) | Assignee (2) | Assignment Date (2) | Assignor (3) | Assignee (3) | Assignment Date (3) | Assignor (4) | Assignee (4) | Assignment Date (4) | Assignor (5) | Assignee (5) | Assignment Date (5) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 855975 | 578246 | 761519 | Alfonso | Lascano Jr. | Loretta | Lascano | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 10/28/2014 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2015-A | 1/29/2015 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | 11/17/2017 | | | | | | |
| 1117664 | 719614 | 65918 | Joseph | Laskos | Rosalie | Laskos | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 6/26/2018 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 9/14/2020 | | | | | | |
| 2591210 | 2091201 | 65918 | Joseph | Laskos | Rosalie | Laskos | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | 12/27/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 7/23/2020 | | | | | | | | | |
| 660399 | 484854 | 665960 | Sandra | Lawson | Thomas | Lawson | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 7/26/2011 | BXG Timeshare Trust I | Bluegreen Corp-Vacation Club | 9/13/2012 | Bluegreen Corp-Vacation Club | Bluegreen Corp/CapitalSource Bank | 10/2/2012 | | | | | | |
| 916953 | 613100 | 794938 | Nakisha | Lockhart | Sandra | Lockhart | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 10/26/2015 | Bluegreen/Liberty Bank 2010 | BXG Receivable Note Trust 2016-A | 3/17/2016 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | 11/17/2017 | | | | | | |
| 1136753 | 732375 | 901872 | Mark | Loken | Amelia | Loken | Big Cedar Vacations,LLC | Bluegreen Big Cedar Quorum 2018 (4.95% Program) | 9/25/2018 | Bluegreen Big Cedar Quorum 2018 (4.95% Pro | Big Cedar Vacations,LLC | 1/30/2020 | | | | | | | | | |
| 801816 | 552812 | 733678 | James | Loveless | Debra | Loveless | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 1/30/2014 | BXG Timeshare Trust I | BXG Receivables Note Trust 2015-A | 1/29/2015 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | 9/15/2020 | | | | | | |
| 1094223 | 707705 | 801083 | Dorothy | Lucas | Clifton | Lucas | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 4/26/2018 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2020-A | 10/8/2020 | BXG Receivables Note Trust 2020-A | BXG Receivables Note Trust 2020-A | 4/16/2021 | | | | | | |
| 697833 | 502779 | 685417 | Ryan | Mailhiot | Suzanne | Mailhiot | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 5/25/2012 | BXG Timeshare Trust I | BXG Receivables Note Trust 2012-A | 9/13/2012 | BXG Receivables Note Trust 2012-A | Bluegreen Corp-Vacation Club | 7/15/2019 | | | | | | |
| 2586285 | 2086282 | 907998 | Erin | Marconi | Jeremy | McCoy | Big Cedar Vacations,LLC | Nat. B of AZ (NKA ZB) | ?? | ZB Nat. B of AZ | Bluegreen/Big Cedar | 7/29/2021 | | | | | | | | | |
| 1146439 | 735884 | 554724 | Derrick | Marshall | | | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | 11/15/2018 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | 1/19/2021 | | | | | | | | | |
| 863613 | 582017 | 746197 | Mitchell | Marston | Megan | Marston | BVC (BG/Big Cedar Vacations, LLC | Quorum Federal Credit Union | 1/14/2015 | Quorum Federal Credit Union | Big Cedar Vacations, LLC | 4/9/2020 | | | | | | | | | |
| 868156 | 583842 | 768351 | Fidencio | Martinez | C. | Llanos | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | 1/29/2015 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | 5/4/2020 | | | | | | | | | |
| 1055446 | 685353 | 826525 | Jamie | Mayle | Sahara | Alonzo | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 9/28/2017 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 6/14/2019 | | | | | | |
| 1056337 | 684991 | 690994 | Kimberly | McClain | | | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 7/28/2017 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 11/17/2020 | | | | | | | | | |
| 762161 | 532887 | 683145 | Jennifer | McCullough | | | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2013-A | 9/26/2013 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | 2/18/2021 | | | | | | | | | |
| 907175 | 603422 | 559885 | Lauren | McCullough | Jeffery | McCullough | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 7/23/2015 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | 3/17/2016 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | 11/19/2018 | | | | | | |
| 1059972 | 687126 | 644142 | Victoria | McKenney | Donald | McKenney | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 8/30/2017 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 5/12/2021 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 10/15/2021 | | | | | | |
| 1128611 | 725369 | 644142 | Victoria | McKenney | Donald | McKenney | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2018-A | 10/24/2018 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | 5/12/2021 | | | | | | | | | |
| 952818 | 627623 | 449742 | Linda | Mclaughlin | Robert | Mclaughlin | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 2/22/2016 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | 3/17/2016 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | 10/15/2020 | | | | | | |
| 2624595 | 2124412 | 925301 | Shannon | Meredith | William | Meredith | Big Cedar Vacations,LLC | Bluegreen Big Cedar Quorum 2019 (5.1% Program) | 6/28/2019 | Bluegreen Big Cedar Quorum 2019 (5.1% Prog | Big Cedar Vacations,LLC | 12/9/2019 | | | | | | | | | |
| 764763 | 534729 | 707398 | Dennis | Mitchell | Vicki | Mitchell | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 7/29/2013 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | 9/26/2013 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | 1/17/2019 | BXG Receivables Note Trust 2013-A | Bluegreen Corp-Vacation Club | 4/5/2022 | | | |
| 761672 | 532740 | 716618 | David | Mitchell Sr. | Barbara | Mitchell | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 6/26/2013 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | 9/26/2013 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | 3/16/2017 | | | | | | |
| 989949 | 648248 | 826333 | Anthony | Murphy | Nancy | Satterlee | Big Cedar Vacations,LLC | Nat. B of AZ (NKA ZB) | 12/12/2016 | ZB Nat. B of AZ | Bluegreen/Big Cedar | 1/4/2019 | | | | | | | | | |
| 1095608 | 707758 | 841181 | Rosana | Narvaez-Colon | | | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 3/22/2018 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | 10/19/2020 | | | | | | |
| 974551 | 639731 | 818578 | Raymond | Nault | Viola | Nault | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 6/22/2016 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 7/15/2019 | | | | | | |
| 1121948 | 722393 | 860590 | James | Neideffer | Debra | Neideffer | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 7/30/2018 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | 2/18/2021 | | | | | | |
| 1140951 | 733562 | 322754 | Denise | Nelson-Smith | Willie | Smith | Bluegreen Corp-Vacation Club | Liberty Bank | 4/9/2020 | Liberty Bank | Bluegreen Corp-Vacation Club | 4/30/2021 | | | | | | | | | |
| 791993 | 548243 | 732121 | Wayne | Norland | Shirley | Norland | Bluegreen - BC WC Marketing | BXG Receivables Note Trust 2013-A | 12/19/2013 | BXG Receivables Note Trust 2013-A | Bluegreen Corp-Vacation Club | 7/27/2020 | | | | | | | | | |
| 2631501 | 2131317 | 670614 | Ricky | Oberlender | Lynn | Oberlender | Big Cedar Vacations,LLC | Bluegreen Big Cedar Quorum 2019 (5.1% Prog | 7/29/2019 | Bluegreen Big Cedar Quorum 2019 (5.1% Prog | Big Cedar Vacations,LLC | 12/14/2020 | | | | | | | | | |
| 969961 | 637035 | 449924 | Randall | Owens | Tanya | Owens | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 5/26/2016 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 11/15/2019 | | | | | | |
| 1083165 | 701064 | 551103 | Lisa | Oxton | | | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 11/21/2017 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 6/25/2020 | | | | | | |
| 1005414 | 657865 | 835514 | Ernesto | Pacheco | Yolanda | Pacheco | Big Cedar Vacations,LLC | Nat. B of AZ (NKA ZB) | 12/12/2016 | ZB Nat. B of AZ | Bluegreen/Big Cedar | 4/21/2020 | | | | | | | | | |
| 938087 | 621189 | 802300 | Rita | Patient | Charles | Butler | Bluegreen - BC WC Marketing | BXG Receivable Note Trust 2016-A | 3/17/2016 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | 7/28/2021 | | | | | | | | | |
| 1029230 | 670686 | 806361 | Damon | Perry | Sherita | Perry | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 3/2/2017 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 1/25/2021 | | | | | | |
| 815966 | 559060 | 742258 | Taury | Person | Shannon | Person | Bluegreen Corp-Vacation Club | Pacific Western Bank | 7/2/2014 | Pacific Western Bank | Bluegreen Corp-Vacation Club | 10/5/2017 | | | | | | | | | |
| 1114115 | 718062 | 846752 | Glenda | Petersen | Michael | Bohley | Bluegreen Corp-Vacation Club | Liberty Bank | 6/3/2019 | Liberty Bank | Bluegreen Corp-Vacation Club | 5/19/2020 | | | | | | | | | |
| 1082094 | 700516 | 822029 | Melissa | Pond | Erik | Pond | Bluegreen Corp-Vacation Club | Liberty Bank | 12/11/2017 | Liberty Bank | Bluegreen Corp-Vacation Club | 3/18/2019 | | | | | | | | | |
| 754503 | 529448 | 465990 | Tamikka | Portee | Vanessa | Porter | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 6/26/2013 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | 9/26/2013 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | 8/19/2020 | | | | | | |
| 939932 | 621922 | 382446 | Paul | Prosek | Shirley | Prosek | Big Cedar Vacations,LLC | Bluegreen Big Cedar Quorum 2012 (4.75% Pro | 12/22/2015 | Bluegreen Big Cedar Quorum 2012 (4.75% Pro | Bluegreen Corp-Vacation Club | 6/2/2020 | | | | | | | | | |
| 868721 | 584006 | 768468 | Cheresa | Ramon | Jose | Ramon | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 12/22/2014 | BXG Timeshare Trust I | BXG Receivables Note Trust 2015-A | 1/29/2015 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | 8/20/2018 | | | | | | |
| 931278 | 616639 | 758406 | Albert | Renshaw | Nicole | Renshaw | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 11/24/2015 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | 3/17/2016 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | 2/19/2020 | | | | | | |
| 741387 | 523413 | 707538 | Jack | Rickett | Pamela | Rickett | Big Cedar Vacations,LLC | Bluegreen Big Cedar Quorum 2012 (6% Progra | 3/27/2013 | Bluegreen Big Cedar Quorum 2012 (6% Progra | Big Cedar Vacations,LLC | 3/31/2017 | | | | | | | | | |
| 1058522 | 686536 | 785123 | Stuart | Roberts | Bethany | Roberts | Big Cedar Vacations,LLC | Bluegreen/Big Cedar NBA | 9/29/2017 | Bluegreen/Big Cedar NBA | Bluegreen/Big Cedar NBA | 5/25/2021 | Bluegreen/Big Cedar NBA | Bluegreen Corp-Vacation Club | 6/30/2022 | Bluegreen Corp-Vacation Club | Big Cedar Vacations, LLC | 7/6/2022 | | | |
| 928442 | 615120 | 796712 | Eduardo | Rodriguez | Stacy | Rodriguez | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 10/27/2015 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | 3/17/2016 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | 12/17/2019 | | | | | | |
| 997463 | 651741 | 796712 | Eduardo | Rodriguez | Stacy | Rodriguez | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 9/29/2016 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 12/17/2019 | | | | | | |
| 1047205 | 680851 | 855912 | Autumn | Romain | | | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 10/17/2018 | | | | | | | | | |
| 875223 | 587123 | 730107 | Jerry | Rosewell | Hollye | Rosewell | Big Cedar Vacations,LLC | Nat. B of AZ (NKA ZB) | 12/7/2015 | ZB Nat. B of AZ | Bluegreen/Big Cedar | 6/18/2019 | | | | | | | | | |
| 1038370 | 680444 | 855702 | Tammy | Salmans | Phillip | Salmans | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 3/15/2021 | | | | | | | | | |
| 875825 | 587628 | 772009 | Victor | Schexnayder | | | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | 2/12/2015 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | 2/13/2015 | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | 2/24/2015 | BXG Receivables Note Trust 2015-A | Bluegreen Corp-Vacation Club | 8/26/2019 | | | |
| 1121875 | 722485 | 860092 | Bradley | Selvey | Amy | Selvey | BVC (BG/Big Cedar Vacations, LLC | Quorum Federal Credit Union | 12/18/2019 | Quorum Federal Credit Union | Big Cedar Vacations, LLC | 6/1/2020 | | | | | | | | | |
| 1004178 | 656783 | 834466 | Elizabeth | Sepulveda | Gerardo | Sepulveda | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 12/17/2019 | | | | | | | | | |
| 997846 | 652227 | 830495 | Herman | Shannon | Kelly | Schmitt | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 9/29/2016 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 10/15/2018 | | | | | | |
| 724532 | 516180 | 699418 | Herschel | Shawver | Paula | Shawver | Big Cedar Vacations,LLC | Nat. B of AZ (NKA ZB) | 1/22/2013 | ZB Nat. B of AZ | Bluegreen/Big Cedar | 12/27/2019 | | | | | | | | | |
| 992828 | 649089 | 725740 | Christopher | Shivers | Katie | Shivers | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 8/24/2016 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 3/16/2018 | | | | | | |
| 1134042 | 729116 | 618327 | Glenwood | Simmons | Vicki | Fisher | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 8/28/2018 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 9/3/2020 | | | | | | |
| 1134323 | 728866 | 465764 | Claribell | Soiza | | | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 8/28/2018 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | 5/12/2021 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 5/14/2021 | | | |
| 974355 | 638775 | 552595 | David | Sprague | Karen | Sprague | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 6/22/2016 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 1/25/2021 | | | | | | |
| 963159 | 633528 | 806866 | Edward | Streckfus | Maria | Streckfus | Big Cedar Vacations,LLC | Nat. B of AZ (NKA ZB) | 12/12/2016 | ZB Nat. B of AZ | Bluegreen/Big Cedar | 11/11/2018 | | | | | | | | | |
| 948590 | 626231 | 806866 | Maria | Streckfus | Edward | Streckfus | Big Cedar Vacations,LLC | Nat. B of AZ (NKA ZB) | 12/12/2016 | ZB Nat. B of AZ | Bluegreen/Big Cedar | 11/11/2018 | | | | | | | | | |
| 1104162 | 712880 | 819623 | Emma | Stubblefield | | | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | 3/15/2018 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | 7/22/2020 | | | | | | | | | |
| 751289 | 528111 | 712115 | Anthony | Sykes | | | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 4/24/2013 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | 9/26/2013 | BXG Receivables Note Trust 2013-A | Bluegreen Corp-Vacation Club | 4/14/2017 | | | | | | |
| 1054045 | 683828 | 664512 | Wendell | Taylor | | | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 8/30/2017 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 5/12/2021 | | | | | | | | | |
| 1122472 | 722595 | 877835 | Sierra | Tebeau Sherry | | | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 7/30/2018 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | Bluegreen Corp-Vacation Club | 7/9/2021 | | | | | | |
| 1089362 | 704153 | 877835 | Sierra | Tebeau-Sherri | Nikolas | Beardsworth | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2012-A | 12/26/2017 | BXG Receivables Note Trust 2012-A | Bluegreen Corp-Vacation Club | 1/8/2019 | Bluegreen Corp-Vacation Club | Pacific Western Bank | 1/29/2019 | Pacific Western Bank | Bluegreen Corp-Vacation Club | 1/21/2021 | | | |
| 1081797 | 699900 | 838835 | Joseph | Tejchman | Marilou | Tejchman | Bluegreen Corp-Vacation Club | BXG Receivable Note Trust 2016-A | 10/13/2017 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | 12/15/2020 | | | | | | | | | |
| 2660018 | 2159818 | 840860 | Charles | Terry | Sherry | Terry | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 1/27/2020 | BXG Timeshare Trust I | BXG Receivables Note Trust 2020-A | 10/8/2020 | BXG Receivables Note Trust 2020-A | BXG Receivables Note Trust 2020-A | 4/28/2021 | | | | | | |
| 1037808 | 675212 | 850669 | Donald | Thomas | | | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 9/12/2019 | | | | | | | | | |
| 1035270 | 674330 | 846301 | Erickson | Thomas | | | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 12/24/2019 | | | | | | | | | |
| 1137197 | 733019 | 254371 | Eva | Thoms | Richard | Thoms | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 9/27/2018 | BXG Timeshare Trust I | BXG Receivables Note Trust 2018-A | 10/23/2018 | BXG Receivables Note Trust 2018-A | BXG Receivables Note Trust 2018-A | 11/17/2020 | | | | | | |
| 1024294 | 667808 | 835181 | Anthony | Tilahun | Ashley | Tilahun | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 1/15/2020 | Bluegreen Corp-Vacation Club | Bluegreen Corp-Vacation Club | 1/17/2020 | | | | | | |
| 970810 | 637502 | 779404 | Deborah | Truelove | Terry | Efurd | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2012-A | 7/12/2016 | BXG Receivables Note Trust 2012-A | Bluegreen Corp-Vacation Club | 1/8/2019 | Bluegreen Corp-Vacation Club | Pacific Western Bank | 2/5/2019 | Pacific Western Bank | Bluegreen Corp-Vacation Club | 4/12/2021 | | | |
| 970708 | 637726 | 715770 | Chad Alan | Vincent | | | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 5/26/2016 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 12/21/2020 | | | | | | |
| 992734 | 650617 | 783695 | Karen | Wallace | Aubry | Wallace | Big Cedar Vacations,LLC | Nat. B of AZ (NKA ZB) | 12/12/2016 | ZB Nat. B of AZ | Bluegreen/Big Cedar | 1/24/2020 | | | | | | | | | |
| 941508 | 622329 | 485267 | James | Waltrip | Sheila | Waltrip | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 12/23/2015 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | 3/17/2016 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | 2/15/2017 | | | | | | |
| 801606 | 552805 | 736647 | Willie | Waters | Velma | Waters | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 1/30/2014 | BXG Timeshare Trust I | BXG Receivables Note Trust 2015-A | 1/29/2015 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | 9/18/2018 | | | | | | |
| 848475 | 574454 | 757420 | Robert | Watson | Patricia | Watson | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 9/25/2014 | BXG Timeshare Trust I | BXG Receivables Note Trust 2015-A | 1/29/2015 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | 3/16/2017 | | | | | | |
| 1037243 | 675323 | 850800 | Jeffrey | Westby | Anna | Westby | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 5/17/2021 | | | | | | | | | |
| 985044 | 644853 | 823205 | Robert | Whitaker | Karen | Scott | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 7/25/2016 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | Bluegreen Corp-Vacation Club | 3/15/2019 | | | | | | |
| 1003009 | 655678 | 801629 | Heather | Wiezorek | Justin | Wiezorek | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 12/14/2016 | BXG Timeshare Trust I | BXG Receivables Note Trust 2017-A | 6/6/2017 | BXG Receivables Note Trust 2017-A | BXG Receivables Note Trust 2017-A | 1/19/2021 | | | | | | |
| 938691 | 620750 | 801629 | Heather | Wiezorek | Justin | Wiezorek | Bluegreen Corp-Vacation Club | BXG Receivables Note Trust 2015-A | 12/15/2015 | BXG Receivables Note Trust 2015-A | BXG Receivables Note Trust 2015-A | 1/19/2021 | | | | | | | | | |
| 935110 | 619806 | 714559 | John | Woods | Harriet | Wooods | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 11/24/2015 | BXG Timeshare Trust I | BXG Receivable Note Trust 2016-A | 3/17/2016 | BXG Receivable Note Trust 2016-A | BXG Receivable Note Trust 2016-A | 9/14/2021 | | | | | | |
| 1098920 | 709918 | 714559 | John | Woods | Harriet | Wooods | Bluegreen Corp-Vacation Club | Bluegreen/Liberty Bank 2010 | 4/13/2018 | Bluegreen/Liberty Bank 2010 | BXG Receivables Note Trust 2020-A | 10/8/2020 | BXG Receivables Note Trust 2020-A | BXG Receivables Note Trust 2020-A | 8/23/2021 | | | | | | |
| 943748 | 624193 | 797304 | Chao | Xiong | | | Big Cedar Vacations,LLC | Bluegreen Big Cedar Quorum 2012 (4.75% Program) | 1/21/2016 | Bluegreen Big Cedar Quorum 2012 (4.75% Pro | Big Cedar Vacations,LLC | 11/30/2021 | Big Cedar Vacations,LLC | Big Cedar Vacations, LLC | 12/21/2021 | | | | | | |
| 928916 | 615873 | 797304 | Chao | Xiong | Aimee | Lee | Bluegreen - BC WC Marketing | BXG Receivable Note Trust 2016-A | 3/17/2016 | BXG Receivable Note Trust 2016-A | Bluegreen Corp-Vacation Club | 11/10/2021 | | | | | | | | | |
| 761475 | 532910 | 716828 | Robert | Yaikow | Amy | Yaikow | Bluegreen Corp-Vacation Club | BXG Timeshare Trust I | 6/26/2013 | BXG Timeshare Trust I | BXG Receivables Note Trust 2013-A | 9/26/2013 | BXG Receivables Note Trust 2013-A | BXG Receivables Note Trust 2013-A | 10/16/2019 | | | | | | |

EXHIBIT B

| Bates No. |
|---|
| BG-CARLSBAD 002498 |
| BG-CARLSBAD 002544 |
| BG-CARLSBAD 002620 |
| BG-CARLSBAD 002642 |
| BG-CARLSBAD 002712 |
| BG-CARLSBAD 002749 |
| BG-CARLSBAD 002999 |
| BG-CARLSBAD 003035 |
| BG-CARLSBAD 003160 |
| BG-CARLSBAD 003171 |
| BG-CARLSBAD 003198 |
| BG-CARLSBAD 003246 |
| BG-CARLSBAD 003279 |
| BG-CARLSBAD 003292 |
| BG-CARLSBAD 003313 |
| BG-CARLSBAD 003375 |
| BG-CARLSBAD 003388 |
| BG-CARLSBAD 003411 |
| BG-CARLSBAD 003585 |
| BG-CARLSBAD 003609 |
| BG-CARLSBAD 003721 |
| BG-CARLSBAD 003732 |
| BG-CARLSBAD 003755 |
| BG-CARLSBAD 006268 |
| BG-CARLSBAD 006360 |
| BG-CARLSBAD 006458 |
| BG-CARLSBAD 006530 |
| BG-CARLSBAD 006597 |
| BG-CARLSBAD 006625 |
| BG-CARLSBAD 006681 |
| BG-CARLSBAD 006713 |
| BG-CARLSBAD 006745 |
| BG-CARLSBAD 006786 |
| BG-CARLSBAD 006867 |
| BG-CARLSBAD 006920 |
| BG-CARLSBAD 006941 |
| BG-CARLSBAD 007259 |
| BG-CARLSBAD 007321 |
| BG-CARLSBAD 007359 |
| BG-CARLSBAD 007421 |
| BG-CARLSBAD 007464 |
| BG-CARLSBAD 007501 |
| BG-CARLSBAD 007532 |

Exhibit B

| |
|---|
| BG-CARLSBAD 007572 |
| BG-CARLSBAD 007653 |
| BG-CARLSBAD 007762 |
| BG-CARLSBAD 007833 |
| BG-CARLSBAD 007867 |
| BG-CARLSBAD 007986 |
| BG-CARLSBAD 008031 |
| BG-CARLSBAD 008063 |
| BG-CARLSBAD 008100 |
| BG-CARLSBAD 008141 |
| BG-CARLSBAD 008259 |
| BG-CARLSBAD 008272 |
| BG-CARLSBAD 008290 |
| BG-CARLSBAD 008434 |
| BG-CARLSBAD 008469 |
| BG-CARLSBAD 008658 |
| BG-CARLSBAD 008689 |
| BG-CARLSBAD 008772 |
| BG-CARLSBAD 008844 |
| BG-CARLSBAD 008871 |
| BG-CARLSBAD 009013 |
| BG-CARLSBAD 009024 |
| BG-CARLSBAD 009045 |
| BG-CARLSBAD 009086 |
| BG-CARLSBAD 009112 |
| BG-CARLSBAD 009136 |
| BG-CARLSBAD 009190 |
| BG-CARLSBAD 009211 |
| BG-CARLSBAD 009259 |
| BG-CARLSBAD 009328 |
| BG-CARLSBAD 009406 |
| BG-CARLSBAD 009476 |
| BG-CARLSBAD 009511 |
| BG-CARLSBAD 009628 |
| BG-CARLSBAD 009683 |
| BG-CARLSBAD 009705 |
| BG-CARLSBAD 009813 |
| BG-CARLSBAD 009857 |
| BG-CARLSBAD 009894 |
| BG-CARLSBAD 009910 |
| BG-CARLSBAD 009948 |
| BG-CARLSBAD 009976 |
| BG-CARLSBAD 010013 |
| BG-CARLSBAD 010033 |
| BG-CARLSBAD 010089 |
| BG-CARLSBAD 010122 |
| BG-CARLSBAD 010153 |

| |
|---|
| BG-CARLSBAD 010237 |
| BG-CARLSBAD 010285 |
| BG-CARLSBAD 010351 |
| BG-CARLSBAD 010377 |
| BG-CARLSBAD 010433 |
| BG-CARLSBAD 010459 |
| BG-CARLSBAD 010511 |
| BG-CARLSBAD 010529 |
| BG-CARLSBAD 010558 |
| BG-CARLSBAD 010649 |
| BG-CARLSBAD 010685 |
| BG-CARLSBAD 010705 |
| BG-CARLSBAD 010743 |
| BG-CARLSBAD 010793 |
| BG-CARLSBAD 010819 |
| BG-CARLSBAD 010858 |
| BG-CARLSBAD 010904 |
| BG-CARLSBAD 010935 |
| BG-CARLSBAD 011108 |
| BG-CARLSBAD 011130 |
| BG-CARLSBAD 011157 |
| BG-CARLSBAD 011177 |
| BG-CARLSBAD 011223 |
| BG-CARLSBAD 011241 |
| BG-CARLSBAD 011282 |
| BG-CARLSBAD 011299 |
| BG-CARLSBAD 011324 |
| BG-CARLSBAD 011379 |
| BG-CARLSBAD 011398 |
| BG-CARLSBAD 011456 |
| BG-CARLSBAD 011497 |
| BG-CARLSBAD 011519 |
| BG-CARLSBAD 011540 |
| BG-CARLSBAD 011572 |
| BG-CARLSBAD 011614 |
| BG-CARLSBAD 011632 |
| BG-CARLSBAD 011654 |
| BG-CARLSBAD 011687 |
| BG-CARLSBAD 011707 |
| BG-CARLSBAD 011744 |
| BG-CARLSBAD 011825 |
| BG-CARLSBAD 011883 |
| BG-CARLSBAD 011903 |
| BG-CARLSBAD 011948 |
| BG-CARLSBAD 011979 |
| BG-CARLSBAD 012008 |
| BG-CARLSBAD 012100 |

| |
|---|
| BG-CARLSBAD 012129 |
| BG-CARLSBAD 012150 |
| BG-CARLSBAD 012171 |
| BG-CARLSBAD 012201 |
| BG-CARLSBAD 012268 |
| BG-CARLSBAD 012314 |
| BG-CARLSBAD 012336 |
| BG-CARLSBAD 012357 |
| BG-CARLSBAD 012385 |
| BG-CARLSBAD 012398 |
| BG-CARLSBAD 012424 |
| BG-CARLSBAD 012516 |
| BG-CARLSBAD 012537 |
| BG-CARLSBAD 012566 |
| BG-CARLSBAD 012584 |
| BG-CARLSBAD 012621 |
| BG-CARLSBAD 012641 |
| BG-CARLSBAD 012660 |
| BG-CARLSBAD 012700 |
| BG-CARLSBAD 012726 |
| BG-CARLSBAD 012741 |
| BG-CARLSBAD 012763 |
| BG-CARLSBAD 012797 |
| BG-CARLSBAD 012816 |
| BG-CARLSBAD 012841 |
| BG-CARLSBAD 012866 |
| BG-CARLSBAD 012882 |
| BG-CARLSBAD 012900 |
| BG-CARLSBAD 012964 |
| BG-CARLSBAD 013000 |
| BG-CARLSBAD 013061 |
| BG-CARLSBAD 013099 |
| BG-CARLSBAD 013123 |
| BG-CARLSBAD 013160 |
| BG-CARLSBAD 013193 |
| BG-CARLSBAD 013212 |
| BG-CARLSBAD 013239 |
| BG-CARLSBAD 013266 |
| BG-CARLSBAD 013377 |
| BG-CARLSBAD 013402 |
| BG-CARLSBAD 013435 |
| BG-CARLSBAD 013481 |
| BG-CARLSBAD 013509 |
| BG-CARLSBAD 013543 |
| BG-CARLSBAD 013572 |
| BG-CARLSBAD 013598 |
| BG-CARLSBAD 013627 |

| |
|---|
| BG-CARLSBAD 013649 |
| BG-CARLSBAD 013701 |
| BG-CARLSBAD 013726 |
| BG-CARLSBAD 013769 |
| BG-CARLSBAD 013799 |
| BG-CARLSBAD 013816 |
| BG-CARLSBAD 013831 |
| BG-CARLSBAD 013856 |
| BG-CARLSBAD 013880 |
| BG-CARLSBAD 013918 |
| BG-CARLSBAD 013959 |
| BG-CARLSBAD 013981 |
| BG-CARLSBAD 014032 |
| BG-CARLSBAD 014082 |
| BG-CARLSBAD 014260 |
| BG-CARLSBAD 014292 |
| BG-CARLSBAD 014320 |
| BG-CARLSBAD 014348 |
| BG-CARLSBAD 014386 |
| BG-CARLSBAD 014427 |
| BG-CARLSBAD 014456 |
| BG-CARLSBAD 014766 |
| BG-CARLSBAD 014787 |
| BG-CARLSBAD 014835 |
| BG-CARLSBAD 014880 |
| BG-CARLSBAD 014904 |
| BG-CARLSBAD 014924 |
| BG-CARLSBAD 014945 |
| BG-CARLSBAD 014985 |
| BG-CARLSBAD 015019 |
| BG-CARLSBAD 015171 |

| Owner Name(s) | BG Vacation Club Number | BG Contract Number |
|---|---|---|
| AlfonsoLascano Jr & Loretta Ann Wilson Lascano | 761519 | 855975 |
| Angela T. & Angela J. Buchanan | 873583 | 1072508 |
| Anthony Fisher & Senora Harris | 507950 | 828889 |
| Anthony L. & Melissa J. Church | 341545 | 986215 |
| Anthony R. Murphy & Nancy L. Satterlee | 826333 | 989949 |
| April Joy Worthington, Chad Alan Vincent | 715770 | 970708 |
| Autumn Romain | 855912 | 1047205 |
| Betty J. Adams | 456408 | 1097944 |
| Billy W. Garner | 707188 | 887944 |
| Bobbie E. & Alice L. McNeil | 906350 | 2583331 |
| Bradley & Amy Selvey | 860092 | 1121875 |
| Brandy & Kyle Griffin | 886112 | 2596865 |
| Bryan & Elizabeth Catherine Espinosa | 872825 | 1077728 |
| Candace Hollins-Brokaw & Jeffrey Brokaw | 837200 | 2594593 |
| Celestine G Carter & Haru Carter Jr. | 938862 | 2650947 |
| Charlene & Charly Brown | 739316 | 1042750 |
| Charles & Sherry Terry | 840860 | 2660018 |
| Charles Govan | 555869 | 1104638 |
| Cheresa & Jose Ramon | 768468 | 868721 |
| Cheryll Craigie | 827071 | 990314 |
| Christopher Dwayne Shivers & Katie Rochelle Shivers | 725740 | 992828 |
| Claribell Soiza | 465764 | 1134323 |
| Cyril & Debra Guild | 104127 | 1075994 |
| Dale Greenley | 842325 | 2588180 |
| Damon L. & Sherita Perry | 806361 | 1029230 |
| David & Barbara Mitchell Sr. | 716618 | 761672 |
| Dean & Margaretta Garlinghouse | 803065 | 940556 |
| Deborah Leanne Truelove & Terry Efurd | 779404 | 970810 |
| Denise Nelson-Smith & Willie E. Smith | 322754 | 1140951 |
| Dennis D. & Vicki Mitchell | 707398 | 764763 |
| Derrick Marshall | 554724 | 1146439 |
| Dorothy Fizer Lucas & Clifton D. Lucas | 801083 | 1094223 |
| Earl S. & Caitlin A. Abercrombie | 802511 | 954529 |
| Eduardo A. & Stacy L. Rodriguez | 796712 | 928442 |
| Eduardo A. & Stacy L. Rodriguez | 796712 | 997463 |
| Edward & Maria Streckfus | 806866 | 963159 |
| Elijah T. & Tiffany K. Ireland | 869435 | 1074792 |
| Elizabeth & Gerardo Sepulveda | 834466 | 1004178 |
| Emma Stubblefield | 819623 | 1104162 |
| Erin Marconi & Jeremy McCoy | 907998 | 2586285 |
| Eva Steskal Thoms & Richard Gordan Thoms | 254371 | 1137197 |
| Fetu & William Bruhnke | 796498 | 1094394 |
| Frank J & Ingrid H Bernard | 818446 | 1112531 |
| Gayle Turner, Stanley Singleton, Equalla Agee, & Anthony Sykes | 712115 | 751289 |

Exhibit C

| Owner Name(s) | BG Vacation Club Number | BG Contract Number |
|---|---|---|
| George William & Roxane Brown | 901178 | 2589802 |
| Glenda Petersen & Michael Bohley | 846752 | 1114115 |
| Gloria Jean McCutcheon & Cynthia A. Timberlake & William Kennet | 810958 | 959546 |
| Gregory Cyrus & Christy Cyrus | 822521 | 998213 |
| Heather & Justin Wiezorek | 801629 | 938691 |
| Heather & Justin Wiezorek | 801629 | 1003009 |
| Herman Shannon & Kelly Schmitt | 830495 | 997846 |
| Herschel Lee Shawver & Paula Lisle Shawver | 699418 | 724532 |
| Jack A & Pamela J Rickett | 707538 | 741387 |
| Jackie Glenn & Brenda Carol Furnace | 624347 | 593807 |
| James & Debra Loveless | 733678 | 801816 |
| James & Kristin Schupp | 891180 | 2600623 |
| James L. & Debra J. Neideffer | 860590 | 1121948 |
| James R. & Sheila Waltrip | 485267 | 941508 |
| James Taylor Brooks & Jacqueline Smith-Brooks | 794975 | 992079 |
| Jamie Mayle & Sahara Alonzo | 826525 | 1055446 |
| Jeffrey & Anna Westby | 850800 | 1037243 |
| Jennifer McCullough | 683145 | 762161 |
| Jerene L. Nutter | 868481 | 1072081 |
| Jerry Ray Rosewell & Hollye Elaine Rosewell | 730107 | 875223 |
| Jesse & Jordan Harding | 803988 | 942475 |
| Jimmy & Mary Phillips | 647636 | 2608281 |
| Jody & Diana Jones | 786901 | 981097 |
| John Beth & Cristal Advincula | 615667 | 1114668 |
| John T Carey, Jr & Samantha M Carey | 666267 | 748520 |
| John Woods & Harriet Woods | 714559 | 935110 |
| John Woods & Harriet Woods | 714559 | 1098920 |
| Jose Antonio Baez & Beronica Ibarra | 863071 | 1130020 |
| JudyAnn Jones & Harvey Dennis Robinson | 791143 | 918390 |
| JudyAnn Jones & Harvey Dennis Robinson | 791143 | 935073 |
| Julian Laureano Rosales & Guadalupe Coyt | 825100 | 2623236 |
| Justin Mason & Kaitlyn Pieratt | 910628 | 2672277 |
| Karen Tibwell Wallace & Aubry Gary Wallace | 783695 | 992734 |
| Keegan Giles & Lakisha Giles | 861824 | 1121142 |
| Kenneth B, Cardwell & Michelle L. Mock | 828223 | 1049352 |
| Kimberly McClain | 690994 | 1056337 |
| Kinda Grant | 522774 | 502906 |
| Kinda Grant | 522774 | 832349 |
| Kristy & Greg DeMarcus | 549438 | 762147 |
| Kyle Allen | 792593 | 919006 |
| Lauren & Jeffery McCullough | 559885 | 907175 |
| Linda M. & Robert L. Mclaughlin | 449742 | 952818 |
| Lisa Billie | 457051 | 2582503 |
| Londa Byrd | 470519 | 531076 |

| Owner Name(s) | BG Vacation Club Number | BG Contract Number |
|---|---|---|
| Maria & Edward Streckfus | 806866 | 948590 |
| Mark & Laura Campbell | 817974 | 1056313 |
| Mark & Sue Brewer | 662433 | 652482 |
| Marvin S. Cook | 400785 | 578234 |
| Marvin S. Cook | 400785 | 853583 |
| Mathew L. Spencer & Christie N. Fasick | 883369 | 1101103 |
| Matthew & Nathalia Timmins | 699300 | 767260 |
| Matthew Cody LaDeaux & Stephanie Michelle LaDeaux | 721044 | 771787 |
| Melissa & Erik Pond | 822029 | 1082094 |
| Melissa Stenberg | 526738 | 2719925 |
| Michael B. & Regilyn P. Johnson | 709022 | 742902 |
| Michael B. & Regilyn P. Johnson | 709022 | 808414 |
| Michael Denis & Claudia Leon | 452747 | 503885 |
| MIguel A Astudillo & Gloria Elena Astudillo | 745086 | 821260 |
| Mitchell Leigh Marston & Megan R. Marston | 746197 | 863613 |
| Nakisha & Sandra Lockhart | 794938 | 916953 |
| Nancy Lynn Braun & Bobby Earl Braun | 744873 | 1071352 |
| Nancy Lynn Braun & Bobby Earl Braun | 744873 | 2676055 |
| Norman K. Athy Jr. & Terri L. Leamy | 812353 | 1108638 |
| Paul & Melinda Jacobs | 801184 | 1019337 |
| Randall E. Owens & Tanya R. Owens | 449924 | 969961 |
| Ray Yorker Jr. | 688745 | 704014 |
| Raymond & Viola Nault, PO BOX 809 | 818578 | 974551 |
| Rhonda & George Dixon | 103275 | 1088722 |
| Rita Patient & Charles Butler | 802300 | 938087 |
| Robert N. & Patricia B. Watson | 757420 | 848475 |
| Robert Scott Yaikow & Amy Medders Yaikow | 716828 | 761475 |
| Robert Whitaker & Karen Scott | 823205 | 985044 |
| Roger P. & Angela B. Hays | 477348 | 1007579 |
| Ronda & Samuel Herrington | 840467 | 1101279 |
| Rosana E. Narvaez-Colon | 841181 | 1095608 |
| Ruben Ortega & Adriana Cota | 759873 | 888760 |
| Sandra & Thomas J. Lawson | 665960 | 660399 |
| Sarah & Eric Chambers | 877140 | 2598094 |
| Sherry Helton | 208648 | 1065107 |
| Simbarashe Murengami | 911478 | 2594355 |
| Simbarashe Murengami | 911478 | 2678525 |
| Steve & Rosalyn Moorehead | 753082 | 1013032 |
| Tamikka Lashaun Portee & Vanessa Shavan Porter | 465990 | 754503 |
| Tammy Kay & Phillip Lee Salmans | 855702 | 1038370 |
| Taury Person & Shannon Person | 742258 | 815966 |
| Terry & Dalila Kennedy | 826002 | 989467 |
| Theresa & David Barnewall | 746789 | 886604 |
| Theresa & Gregory Dunn | 267400 | 916821 |

| Owner Name(s) | BG Vacation Club Number | BG Contract Number |
|---|---|---|
| Tim & Tina Bullock | 788622 | 911214 |
| Urban  & Cheryl Lanser | 650089 | 728588 |
| Victoria & Donald McKenney | 644142 | 1059972 |
| Victoria & Donald McKenney | 644142 | 1128611 |
| Wendell B. Taylor | 664512 | 1054045 |
| Willie & Velma Waters | 736647 | 801606 |

D-412

**Timeshare Compliance: Frequently Asked Questions and Answers**

The following FAQs and Answers represent TSC's official polices and guidelines as of July 2023.

Any outdated marketing materials or statements by TSC, including from our staff, that are inconsistent with the following policy guidelines are incorrect and should be reported to Marketing Director Tara McMullin (tara@tscompliance.com) so that appropriate action can be taken. Please contact Tara by email with any questions about the TSC policies below.

# HOW DO I START THE PROCESS OF EXITING MY TIMESHARE?

We recommend that you first contact your developer and ask about available exit programs that they may offer. We recommend that you both call your developer and follow up with written correspondence, always keeping a copy of any correspondence for yourself. Explain to your developer why you want to exit your timeshare, and provide as much detail as possible, including any misrepresentations or high-pressure sales tactics that you may have experienced.

In writing your letter, you may want to consult an attorney. Although there are few attorneys out there with extensive timeshare exit experience, we can provide recommendations.

# HOW LONG CAN IT TAKE TO EXIT MY TIMESHARE?

Every case has specific characteristics and circumstances. As a general rule, and based on our experience, our team requires between 6 and 36 months to resolve a timeshare contract.

# WHY SHOULD I USE TSC'S SERVICES?

TSC has maintained a very high rating from the Better Business Bureau for several years. Our BBB rating is A+ and accredited. We pride ourselves on our customer service. There are no perfect companies, but what separates us is that we do our very best to resolve any issues.

1

DP-902292

**D - 0412-0001**

Every company has some bad reviews, including us. And every company has challenges, including us. For example, there are now a few lawsuits pending against us where developers are trying to use court cases to put us out of business. In addressing these cases, we are defending our right to provide important services to the public, and at the same time trying to address criticisms by giving our clients more information about how we do our work. We hope that this will enhance our offerings. And while these challenges are real, so too is our outstanding BBB rating, in which we take great pride. We care greatly what our clients say about working with us.

Another reason to consider working with us is that TSC has the expertise of those who have worked in the timeshare industry, collectively, for over 75 years. We know the timeshare industry from "both sides of the fence" and we follow developments in the industry so as to benefit our customers.

We have helped thousands of owners exit their timeshares.

https://www.bbb.org/us/ca/aliso-viejo/profile/timeshare-advocates/timeshare-compliance-1126-172015159

## CAN TSC COMPLETELY REMOVE MY LIABILITY FROM THE CONTRACT?

If we are successful in helping you resolve your timeshare contract, the answer is "Yes!" Our team at TSC has a proven track record of helping thousands of timeshare owners get out of their timeshare contracts. If we are successful, you will no longer be responsible for maintenance fees, assessment fees, or payments on debt loan notes. Your heirs will no longer have to deal with the possibility of inheriting your timeshare debt obligations.

## HOW WILL I WORK WITH TSC?

We pride ourselves on customer service. So, once you begin working with us, a dedicated member of our client services team will be assigned to you. You will be able to reach out to your client services representative whenever you wish.

## WHY DOES TSC SAY IT IS A CONSUMER ADVOCACY FIRM?

Because TSC only works with timeshare owners who believe that their developers have failed to deliver promised services. This includes owners who feel that they

2

DP-902293

have been lied to or deceived by their developer or who feel that their developer made misrepresentations to them during the sales process, perhaps tricking them into buying a timeshare. Many of our clients report experiencing high-pressure sales meetings where they are kept in developer sales presentations for up to 6 hours, sometimes with no breaks, and ultimately agreeing to sign a developer contract simply to escape the sales presentation. Because TSC works with these types of clients, we consider ourselves consumer advocates.

## HOW MUCH DOES TSC CHARGE FOR ITS EXIT SERVICES?

It depends on the specifics of your timeshare contract (or contracts, as many people have more than one timeshare contract). Our average fee range is always a fraction of what you will spend for your timeshare. In making your decision, you should calculate the total savings from exiting, including not having to pay maintenance fees, special assessment fees, facility fees, or high interest rate monthly payments if you are paying monthly on a note.

## WHAT SERVICES DOES TSC PROVIDE?

TSC provides many services for the fees that it charges. We use our decades of experience and knowledge of the timeshare industry and our best efforts to help you try to exit your timeshare. TSC will recommend an experienced attorney for you to consult with, one who has experience working with clients in your situation. TSC will also recommend an experienced credit management firm for you to consult with, one with experience in enforcing your rights under the federal Fair Credit Reporting Act, the federal Consumer Financial Protection Bureau rules, and certain state credit reporting laws, depending on where you live.

TSC also works with you to develop a complete list of the factual reasons as to why you want to exit your timeshare, including any misrepresentations by the developer, and then gives those facts to your attorney for their use. TSC also helps you identify the necessary documents and information to assist your attorney. If your attorney needs more information from you, we will let you know, and coordinate between you and the attorney. Of course you can always reach out to your attorney directly. We may also recommend various government agencies to help protect your rights as a consumer.

3

DP-902294

In addition, TSC tracks key developments and changes within the timeshare industry, including trends within individual timeshare developers. We make this information available to the credit management firms and attorneys to whom we recommend clients, so that they can use that information to better help you or others. By way of example, if TSC sees a trend whereby a certain developer's salespeople have a pattern of telling clients that their timeshares will increase in value just like owning a home (which is simply not true), we will make sure to ask our clients if they were told this lie and relay this information to the attorneys to whom we recommend clients. Because TSC works with hundreds of owners each year, we are often able to recognize such trends, including at the developer level.

TSC has also served as a resource for clients whose credit is harmed by a developer reporting negative items. We have communicated with financial institutions, educational institutions, and businesses on behalf of our clients, to describe the facts of their situation, including that timeshare ownership is not the same as home ownership. We have also paid for the legal defense of owners when a developer sued our client, though this service is discretionary and provided on a case-by-case basis. Based on our experience, developers do not typically sue owners, but when that has happened, TSC has paid for the defense of certain of these actions in the past.

TSC also counsels clients by talking to them about their bad experiences with developers. In fact, we spend many hours doing so. Many of our clients believe that their timeshare experience is unique. Many feel ashamed or angry that they purchased a timeshare because they feel that they were tricked into doing so. Because we have spoken with thousands of dissatisfied timeshare owners, we have heard many such stories. We may be able to help put your situation into a broader context, all as a part of our service offerings.

## WHAT ARE MY OPTIONS OTHER THAN PAYING FOR TSC'S SERVICES?

If you choose not to engage TSC, you have other options to try and help you exit your timeshare:

- You can contact your developer directly and seek an exit. Some developers have their own internal exit programs and policies.  Others have policies or practices whereby they will cancel or terminate a timeshare if the owner

4

DP-902295

does not pay for a certain period.  You can contact your developer and ask them about this option as well.

- You can consult an attorney.
- You can file a complaint with several places, including but not limited to the Better Business Bureau, your state's Attorney General, or the Federal Trade Commission.

## CAN I STOP PAYING ON MY TIMESHARE?

TSC can never advise you to stop paying on your contract. That is a decision that you must make on your own, or in consultation with a lawyer. We note that several national publications such as the AARP magazine (Dec. 2020/Jan. 2021) have run articles that describe this as an option. Also, certain developers have policies or practices whereby they will cancel an owner's timeshare if the owner does not pay for a period of time. You may also want to consult your developer to see if this is an option.

## WHAT IF I HAVE ALREADY STOPPED PAYING ON MY TIMESHARE?

Please let us know if you have already stopped paying on your timeshare and for how long. Regardless of your payments status we will do our best to assist you.

## CAN THE EXIT PROCESS AFFECT MY CREDIT?

Yes it can, but it may depend on the manner in which you try to exit. If you stop paying on your timeshare, your credit can be negatively affected. If you decide to work with us, we can recommend a credit repair agency that uses the rules of the federal Fair Credit Reporting Act, the Consumer Financial Protection Bureau, and where applicable certain state credit laws, to try to remove negative items from your credit reports. In some cases, this is a long process; in other cases, the credit agency may have to repeat the process; and in some cases, you may get results right away. It is a case-by-case, developer-by-developer process. While the process is not always completely effective, the service we recommend to our clients has had great success. And we have negotiated a deep discount, a flat fee, if you wish to use our recommended credit agency.

5

DP-902296

## IS TSC A LAW FIRM?

We are NOT a law firm and we do not give legal advice. We gather data from our clients about the reasons they want to exit their timeshare, including all misrepresentations and unethical sales practices they believe they were subjected to by the developers. Then we work with our team of professionals to understand your story. We gather the facts of your situation, and recommend a lawyer to review them on your behalf.

## DOES TSC OFFER A GUARANTEE?

No, we do not offer a guarantee. However, we do offer escrow, which, depending on your situation, may be better than a guarantee. In fact, we are one of very few companies in the timeshare exit industry that offer an escrow option.  And we believe that our A+ rating from the Better Business Bureau also explains our success, and we are accredited by the BBB, unlike some other timeshare exit companies.

https://www.bbb.org/us/ca/aliso-viejo/profile/timeshare-advocates/timeshare-compliance-1126-172015159

## WHAT IS THE DIFFERENCE BETWEEN TIMESHARE CANCELLATION AND TIMESHARE EXIT?

In general, "timeshare cancellation" refers to a window of time after your initial purchase during which you are allowed to terminate or rescind your timeshare contract. On the other hand, "timeshare exit" refers to our process of trying to help you resolve your unwanted timeshare once the cancellation period of your contract has passed.  If you qualify for our program, our team will use our best efforts to try to help you exit your timeshare.

For the record, we may use the term "timeshare cancellation" from time to time, but this is only referring to the basic term or phrase that many people use on a regular basis in their search for timeshare exit services such as ours. That term may include, but is not limited to, Re-Acceptance, Supply of Inventory, In Rem, Deed in Lieu, Foreclosure, Termination, Surrender and Release, Timeshare Release, Settlement and Release of Claims, Settlement Offer, Recapturing Inventory, Loss of Privilege, Quit Claim Deed, and Voluntary Surrender and Mutual Release.

6

DP-902297

## WHAT IS A TIMESHARE EXIT COMPANY?

A timeshare exit company is an intermediary between you and your timeshare developer that does its best to help you exit your current timeshare agreement. Timeshare exit companies can be one of the most efficient ways for timeshare owners to exit their current membership agreements. Additionally, this option tends to save owners precious time, energy, and money instead of dealing with difficult timeshare developers, who generally try to get you to keep paying their fees or to buy more points. Each situation and timeshare exit company will be different, so it's important to ensure you're selecting a reliable company with verified testimonials from reputable websites such as the Better Business Bureau and Trustpilot.com.

## WHAT FACTORS ARE MOST IMPORTANT WHEN SELECTING A TIMESHARE EXIT COMPANY LIKE TIMESHARE COMPLIANCE?

There are many factors that contribute to what makes a great timeshare exit company, and you should certainly do your own research. Finding a company with a proven track record, sound strategy, expertise, and a long tenure in this field can be very important. Also, a company that is ranked by third parties for being one of the best in the industry can be crucial. The best information for knowing which timeshare exit company will work well for you often comes from past client testimonials. Past customers of a company may well be the most informed on the experience and service that will be provided to you. We recognize that each experience will be different according to the individual's situation, but positive testimonials are a great indication of a good company. Reputable review sites like Google, Trustpilot and Facebook will often provide you with a broad picture of a company's service and reputation. The more positive and recent reviews there are, the more reliable one can expect the timeshare exit company to be. In addition, the Better Business Bureau is a good way to ensure that the company you're talking to is reputable and is an accredited business.

## HOW CAN I BE SURE THAT I'M CHOOSING A REPUTABLE TIMESHARE EXIT COMPANY?

Identifying a timeshare exit company that is potentially problematic can be difficult! Here are some factors to consider:

7

DP-902298

In the following circumstances you may want to ask more questions:

1) Are they telling you your exit must be done today?
2) Are they are asking you for your personal banking information before a signed contract?
3) Are they offering you a guarantee?
4) Are their customer reviews old and out of date?
5) Are their business licenses out of date?
6) Are they not registered for the National "Do Not Call" Registry?

Favorable considerations may include the following:

1) Do they have multiple positive reviews from reliable sites such as The Better Business Bureau (BBB) and Trustpilot?
   - BBB identifies companies in operation. More professional and reliable companies will usually be accredited by the BBB and have numerous positive reviews to back them up.
   - Businesses can register with Trustpilot to give past clients a platform to express their experiences with the respective company. Legitimate businesses often take advantage of this opportunity to attract more potential clients.
2) Do they provide an escrow option?

A general rule of thumb is to choose an exit company where the public reviews suggest that there will not be any fraudulent activity. Buyer beware of any company that offers guarantees or tells you they can get you out of your timeshare in less than 60 days. Also, beware of timeshare exit companies who transfer client contracts because such a transfer may prevent you from being permanently exited from your timeshare.

TSC offers financing, escrow, deferred payment, and in some hardship cases we offer pro bono (no cost) assistance.

## WHY DO I HAVE TO ATTEND A ONE-HOUR CONSULTATION TO FIND OUT THE COST OF YOUR SERVICES?  WHY CAN'T YOU PROVIDE ME WITH AN ESTIMATE?  DO YOU AT LEAST HAVE A BALLPARK RANGE?

We do not have an average or minimum price point. It is difficult to determine a ballpark, average or minimum price without first gathering more detailed

8

DP-902299

information. The reason for that is because everyone's situation is different. Some may have multiple contracts, while others may have just one. Someone may have a high loan balance, while someone else may have paid off their loan. Some timeshare owners are behind on fees, in collections, or getting ready for foreclosure and others are current on their payments. In order for us to determine your quote, we collect all necessary information about your timeshare experience. The last thing we want to do is misrepresent our company by giving you an incorrect cost estimate based on incomplete facts. Please add this to a list of questions to ask our senior analyst.

## WHY IS THERE URGENCY BEHIND EXITING YOUR TIMESHARE - BESIDES GROWING MONTHLY FEES?

Any urgency behind exiting your timeshare is determined only by you, the client. Since every set of circumstances is different, some timeshare owners may have factors like upcoming special assessments, escalating maintenance fees, high interest rate balances, and more. Some timeshare contracts contain a perpetuity clause. The definition of perpetuity is "ongoing" and may affect your heirs.

Most perpetuity clauses terminate upon your death and are dissolved along with any financial burden or attached fees as well.

However, timeshare perpetuity clauses usually do not end with the death of the original contract owner. Instead, these clauses often state that you are the owner of the timeshare for the remainder of your life, and when you pass away, the ownership would become part of your estate and then may be passed on to your children and then their children. This means generations may be responsible for the yearly maintenance fees associated with your timeshare. Even when a mortgage is paid off, the maintenance fees can be lifetime.

## DO YOU HAVE LEGAL GROUNDS TO TERMINATE YOUR TIMESHARE?

This depends on your circumstances. Please consult a lawyer of your choice for legal advice as to your rights. Based on our work over many years, we know that some courts and arbitrators have voided timeshare contracts due to the following:

9

DP-902300

Developer Misrepresentation - If your developer made misrepresentations to you during the sales process, or they used high pressure sales tactics to sell you a timeshare contract, you may have legal grounds to terminate your contract.

Failure to Obtain Required State Licenses – Selling timeshares can be subject to various state-specific laws, so depending on where you live, state laws in your favor may apply.

Rising Maintenance Fees - Unsubstantiated rising monthly maintenance fees could also serve as a legal means to terminate your contract, especially if your developer did not disclose those details before you signed.

For legal issues you can always consult a lawyer or your choice, or if you decide to go with us, we will recommend a lawyer.

## DO WE HAVE TO COME INTO THE OFFICE FOR APPOINTMENTS?

No, we offer in-person appointments mostly for locals who wish to attend our presentation at the office. We also offer Zoom video chat (you do not need to show yourself, but you can see who you're talking to), or we can schedule the appointment as a regular phone call where you have us on speaker and you're at home taking notes. We always do our best to accommodate our clients in any way we can!

## WHAT IF I HAVE QUESTIONS ABOUT ANY OF THE ABOVE?

Please contact TSC's Marketing Director Tara McMullin (tara@tscompliance.com) or via our contact page at https://timesharecompliance.com/contact-us/. We will happily answer your questions or direct you to someone who can.

10

DP-902301