United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| Bluegreen Vacations Unlimited, Inc. and Bluegreen Vacations Corporation, Plaintiffs, | ) ) ) ) | |
| v. | ) ) | Civil Action No. 20-24681-Civ-Scola |
| Timeshare Lawyers P.A., and others, Defendants. | ) ) ) | |

## Verdict and Order Following Non-Jury Trial

In this trial, the Court has learned that tens of thousands of timeshare owners have been victimized twice: first by the timeshare industry, which used false and misleading tactics to induce the owners to purchase their timeshares—often financed with high-interest mortgages; and second by the timeshare exit industry, which charged the owners thousands of dollars and used false and misleading tactics to tortiously induce them to breach their contracts with the timeshare companies, thus exposing them to damaged credit.

### 1. Procedural Background

Bluegreen Vacations Unlimited and Bluegreen Vacations Corporation (collectively "Bluegreen") filed this action seeking relief from a multi-party scheme to induce Bluegreen timeshare owners to breach their timeshare contracts.

While Bluegreen initially instituted the action against all those purportedly involved in the scheme, as a result of various settlement agreements and the Court's decisions on dispositive motions, only the Defendants Pandora Marketing, LLC, and its owners, Rich Folk, and William Wilson (collectively, the "Marketing Defendants") remain. As suggested by their name, the Marketing Defendants' role in the scheme is to advertise timeshare exit services by promoting a legitimate process to exit timeshare contracts while protecting the customers' credit. In reality, theirs was not a legitimate process and instead merely induced Bluegreen owners to breach their timeshare contracts through nonpayment, thus injuring many of their credits.

Bluegreen brought claims against the Marketing Defendants for false advertising in violation of the Lanham Act (Count One), tortious interference with contractual relations (Count Five), civil conspiracy to commit tortious interference (Count Seven), and violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count Six).

Previously, the parties filed cross-motions for summary judgment, and on May 2, 2023, the Court issued an omnibus order addressing the motions.

(Summ. J. Order, ECF No. 437.) The Court denied the Marketing Defendants' motion for summary judgment in its entirety and granted in part and denied in part Bluegreen's motion for partial summary judgment. Specifically, the Court granted summary judgment in Bluegreen's favor only with respect to its claim for tortious interference as to fifteen timeshare owners (except as to the issue of damages); its claim for injunctive relief pursuant to FDUTPA; and on the Marketing Defendants' affirmative defenses.

On May 5, 2023, shortly after this Court entered its omnibus order on the parties' cross-motions for summary judgment, Bluegreen filed a notice indicating its withdrawal of all requests for legal relief, and specifically monetary damages. (ECF No. 438.) In the notice, Bluegreen stated that it had chosen to proceed only with its requests for equitable relief, namely a permanent injunction and disgorgement of the Defendants' profits, as well as an award of attorney's fees and costs. Together with the notice, Bluegreen filed a motion to proceed exclusively via bench trial, which the Court granted. (ECF Nos. 439, 458.)

As a result of the Court's order on summary judgment and Bluegreen's decision to forego all forms of legal relief, the only issues pending before the Court are whether Bluegreen is also entitled to injunctive relief pursuant to its claims for false advertising (Count One), tortious interference (Count Five), and civil conspiracy (Count Seven), and whether it is entitled to disgorgement damages pursuant to its claim for false advertising (Count One).

The Court held a four-day, non-jury trial, beginning on August 21, 2023. Prior to the trial, the parties submitted a joint pretrial stipulation (ECF No. 515), as well as their proposed findings of fact and conclusions of law (ECF Nos. 501, 509). Following the trial, the parties also submitted post-trial proposed findings of fact and conclusions of law. (ECF Nos. 551, 552.)

The Court has carefully reviewed these submissions as well as the transcript of the trial proceedings. After considering the credible testimony and evidence, and the applicable law, the Court finds that Bluegreen has prevailed on its claims for false advertising (Count One), tortious interference (Count Five), and civil conspiracy (Count Seven), and is entitled to injunctive relief. The Court further finds that Bluegreen is entitled to $100,000 in disgorgement damages pursuant to its claim for false advertising (Count One).

## 2. Findings of Fact

### A. The Parties

Bluegreen is a timeshare developer based in Boca Raton, Florida. Bluegreen maintains a portfolio of approximately seventy vacation resorts, each of which are comprised of various units within. *Tr. of Bench Trial Proceedings*, Vol. I ("Trial Tr. Vol. I"), 28:11-12, 45:16-18. Bluegreen sells portions of such units to consumers. *Id.* at 28:12-13. Through purchase of the Bluegreen

vacation interests, also known as timeshares, owners are allotted an associated number of "points." *Id.* at 108:9-10.

The points that a Bluegreen timeshare owner acquires give the owner access to Bluegreen's entire portfolio of resorts, which permits owners to book vacations at multiple resorts. *Id.* at 28:13-16, 46:13–15. When booking a stay at a Bluegreen resort, owners are able to book stays that match the number of points they hold. *Id. at* 45:4-7.

Consumers may choose to finance their purchase of Bluegreen timeshare interests, which Bluegreen will provide itself. *Id.* at 29:15-22. Thereafter, Bluegreen will collect payments on the debt and may act as the servicer of the loan. *Id.* at 29:22-23, 93:2-4.

Bluegreen maintains adequate inventory to make additional sales at all times. *Id.* at 61:3-5. There is no need for Bluegreen to recover inventory for it to continue its sales operations. *Id.* at 6-11.

Many of the timeshare owners testified that Bluegreen lied to them, made misrepresentations to them during the sales process, pressured them into purchasing and/or upgrading, and otherwise defrauded them. *See* Trial Tr. Vol. IV, 9:16-21. These lies, misrepresentations, and high-pressure sales tactics include the following:

- False statements that an owner could rent out their timeshares to earn extra money. *Id.* at 10:8-10.
- False statements that an owner was being offered an exclusive deal that was only available for that day. *Id.* at 17-19.
- Statements that the timeshare ownership interest would increase in value and have great resale value. *Id.* at 10:25-11:1.
- Misrepresentations regarding the financial significance of the maintenance fees. *Id.* at 11:10-12.
- Misrepresentations from the Bluegreen sales representatives regarding the points increment and its significance. *Id.* at 11:17-19.
- Misrepresentations regarding the outside exchange program. *Id.* at 11:24-25.
- Sales representatives coerced owners into applying for Bluegreen-branded credit cards. *Id.* at 12:4-5.
- False statements that if an owner upgraded their timeshare, they would get greater priority when booking, when in fact they did not. *Id.* at 12:7-9.
- False statements that the Bluegreen sales representative would act as the owner's personal assistant and be available to them after the sale. *Id.* at 12:18-21.
- Failure on the part of the Bluegreen sales representative to disclose the correct interest rate on the loan. *Id.* at 12:25-13:1.

- Failure on the part of the Bluegreen sales representative to disclose the owner's right to rescind the timeshare contract. *Id.* at 13:6-7.

Bluegreen asked the Court to accept as credible the testimony of the timeshare owners relating to misrepresentations made to them by Pandora, but to reject the same owners' testimony concerning misrepresentations made to them by Bluegreen. This is simply not plausible. *See Tr. of Bench Trial Proceedings*, Vol. IV ("Trial Tr. Vol. IV"), 13:11-23.  As the Court put it during the trial, it cannot be true that "these tens of thousands or hundreds of thousands of people that are going to these timeshare exit companies"—people who are "so dissatisfied with [their timeshares] that they're willing to pay thousands of dollars to get out"—are "just all wrong."  *Id.* at 13:24-14:7.

Pandora is a timeshare exit company based in California.  *See* P-1001 through 1191 (Pandora customer services agreements referencing California office).  Pandora is owned and operated by Folk and Wilson.  *Deposition of Rich Folk, Aug. 28, 2020* ("Folk Dep."), 30:12-13, 17-18, 31:19-21.  Folk and Wilson are Pandora's managing partners and the final decision-makers for Pandora's business decisions.  Folk Dep. at 30:12-13, 17-18, 31:1-7, 15-18.

As a timeshare exit company, Pandora advertises to timeshare owners the ability to terminate the owner's obligations under his or her timeshare contract.  P-1390,[1] RFA No. 70 (admitting that Pandora advertises the ability to terminate a timeshare owner's obligations under a timeshare contract). Pandora advertises that its process is "legal," even though Pandora is not itself a law firm or registered with the California Bar as a lawyer referral service.  *See* P-1390 at RFA Nos. 84 (admitting that Pandora is not a law firm), 163 (admitting that Pandora claims its exit "process is legal"), 168 (admitting that Pandora makes the claim that it can "legally and permanently exit your timeshare"); Trial Tr. Vol. I, 249:17-22; *Tr. of Bench Trial Proceedings*, Vol. III ("Trial Tr. Vol. III"), 102:15-17.

Pandora takes the position that it only accepts as customers those timeshare owners that were subjected to some form of misrepresentations during the sale of the timeshare. However, Pandora has also taken the position that every timeshare owner is the subject of misrepresentation.  *See* P-1496 at 9 ("There is always misrepresentation, anyone who has ever attended a timeshare presentation has been misrepresented.").

Pandora executes a written agreement with each of its customers.  *See, e.g.*, P-1001 through P-1191 (service agreements with relevant owners).  The *Timeshare Compliance Services Agreement* states that Pandora "will work diligently and aggressively to cancel Client's Timeshare," and identifies in Section 2 the "Timeshare Contracts to Terminate."  *Id.*  Pandora then refers its customers to attorneys for the purpose of delivering the promised cancellation

---

[1] Pursuant to Fed. R. Civ. P. 36(b) "[a] matter admitted under this rule is conclusively established . . . ."

or termination, while Pandora merely acts as the liaison between the owner and the attorney. Trial Tr. Vol. I, 229:23–230:4.

Pandora refers all of its customers to attorneys, including co-Defendants Carlsbad Law Group ("Carlsbad") and Sean Slattery ("Slattery") (together, the "Lawyer Defendants").  P-1390, RFA Nos. 56 (admitting that Pandora referred Bluegreen Owners to Carlsbad or Slattery), 138 (admitting that Pandora uses Slattery to perform services advertised to Bluegreen Owners); Trial Tr. Vol. I, 229:23-25, 243:13–15 (testimony that Pandora refers every Bluegreen owner to an attorney); *Tr. of Bench Trial Proceedings*, Vol. II ("Trial Tr. Vol. II"), 227:19-22 (testimony from Carlsbad equity partner David Hall that Pandora refers timeshare owners to Carlsbad).  Like Pandora, Carlsbad is located in California, and Slattery is an attorney licensed by the California bar.  Trial Tr. Vol. II, 187:22-23; Trial Tr. Vol. III, 10:1-2.

Although the Services Agreement states that cancellation or termination may take many forms, at its base, Pandora's goal is to relieve Bluegreen timeshare owners of their payment obligations to Bluegreen.  Trial Tr. Vol. I, 228:7-10.

Unbeknownst to the Bluegreen owners who purchase Marketing Defendants' services, Marketing Defendants rely entirely on the owner defaulting on his or her Bluegreen loan to effectuate the promised "exit."  P-1438, No. 20 (admitting that "Pandora is unaware of any Bluegreen Owner that hired Pandora that was released from his or her Bluegreen timeshare contract who was also continuing to pay Bluegreen while Pandora and such Bluegreen Owner maintained their service relationship").

**B. The Timeshare Owners' Testimony**

The parties entered the deposition testimony of fifteen of the Bluegreen timeshare owners into evidence: Ashley Tilahun, Derrick Braswell, Gerald Barnett, James Schupp, Jeremy Lathrem, Jonnie Driver, Lynette King, Megan Ivy, Mitchell Marston, Nancy Braun, Rhonda Dixon, Ryan Mailhiot, Shirley Prosek, Jordan Harding, and Wayne Norland (collectively, the "Testifying Owners"). The Testifying Owners testified as to the impact of the Marketing Defendants' advertising and business practices.

At least 177 Bluegreen owners that were current on the financial obligations associated with their Bluegreen timeshare retained Marketing Defendants' services (the "Relevant Owners").  P-1001 through P-1191 (Marketing Defendant service agreements).

The Relevant Owners were parties to 198 separate Owner Beneficiary Agreements ("OBA") and Promissory Notes ("Notes") (OBAs and Notes together, the "Relevant Contracts") (P-0004 through P-0570) associated with the financing of their purchase of a Bluegreen timeshare interest.

The Notes obligate the Relevant Owners to repay Bluegreen the amount financed for purchase of their Bluegreen interests until the outstanding balance reaches zero.  P-363 through P-570.

The Relevant Owners are located in numerous different states across the United States and in Canada.  *See* P-1001 through P-1191.

Marketing Defendants attract timeshare owner customers through a nationwide advertising campaign that solicits consumers through a variety of channels.  P-1390 at RFA Nos. 1 (admitting that Pandora engages in a nationwide advertising for its services), 2 (admitting that Pandora advertises its services to timeshare owners), 6 (admitting that Pandora advertises to timeshare owners via radio), 7 (admitting that Pandora advertises to timeshare owners via television), 8 (admitting that Pandora solicits customers through cold-calling), 10 (admitting that Pandora solicits customers through in-person sales presentations), 153 (admitting that third-parties solicit timeshare owners on Pandora's behalf), 154 (same), 155 (same), 185 (admitting that Pandora's past or current customers include Florida residents), 187 (admitting that Pandora's past or current customers include California residents), 190 (admitting that Pandora's past or current customers include residents of states other than California or Florida), 192 (admitting that Pandora has solicited customers while they reside in Florida), 193 (admitting that Pandora has solicited customers while they reside in states other than California or Florida); Trial Tr. Vol. I, 218:19- 219:17 (describing the various means of advertising).

The various forms of advertising give timeshare owners a means to contact Pandora for further consultation and result in inbound telephone calls to Pandora from prospective customers.  Trial Tr. Vol. I, 220:1-5 (radio), 220:17-19 (television), 220:20-221:1 (internet); P-1392, RFA Nos. 235 (admitting that "sales leads generated from Pandora's television advertising are in the form of inbound telephone calls from potential customers"), 238 (admitting that "sales leads generated from Pandora's radio advertising are in the form of inbound telephone calls from potential customers"), 241 (admitting that "sales leads generated from Pandora's website are in the form of inbound telephone calls from potential customers").

Inbound telephone calls to Pandora from prospective customers are answered by "specialists."  P-1392, RFA No. 243 (admitting that "inbound telephone calls from potential customers are received by Pandora's 'specialists'").

Owners may also fill out an online form giving Pandora permission to contact them in which case Pandora's specialists call the owners.  Trial Tr. Vol. I, 220:23-221:3.

Pandora's specialists or "booking agents" then schedule prospective customers to speak with an "analyst," who delivers an oral sales presentation to the timeshare owner.  P-1392 at RFA No. 245 (admitting that "Pandora's 'specialists' schedule potential customers to speak with Pandora's 'analysts'"),

248 (admitting that "Pandora's 'analyst' presentations describe the services that Pandora wishes to sell to potential customers"); Trial Tr. Vol. I, 221:6-14 (testimony that booking agents schedule calls with analysts).

Most of Marketing Defendants' potential customers, regardless of how they found out about Marketing Defendants, will go through the analyst sales presentation.  P-1393 at RFA No. 261 ("[M]ost potential customers who hire Pandora, regardless of how such potential customers comes to learn about Pandora's services, communicate with an analyst who delivers a sales presentation to such potential customers.").

Prospective customers typically sign up for Pandora's services with the analysts.  Trial Tr. Vol. I, 223:9-15, 226:4-7.

Both the specialists and the analysts receive sales commissions for those timeshare owners that retain Pandora's services.  P-1392, RFA Nos. 251 (admitting that "Pandora's 'analysts' receive a sales commission associated with every timeshare owner they speak with that executes an agreement with Pandora"), 252 (admitting that "Pandora's 'specialists' receive a sales commission associated with every timeshare owner they speak with that executes an agreement with Pandora"); Trial Tr. Vol. I, 221:15-23 (specialist receive sales commissions), 223:16-224:10 (sixty percent of the analysts' compensation is a sales commission).

Folk and Wilson have had personal involvement in Pandora's marketing, including the creation of advertisements and sales scripts.  P-1390 at RFA Nos. 22 (admitting that Folk has personal involvement in creation of Pandora's radio advertisements), 23 (admitting that Folk has personal involvement in the creation of Pandora's television advertisements), 24 (admitting that Folk has personal involvement in the creation of Pandora's scripts used to solicit timeshare owners), 27 (admitting that Wilson approves all advertising statement made by Pandora prior to publication), 28 (admitting that Wilson has personal involvement in creation of Pandora's radio advertisements), 29 (admitting that Wilson has personal involvement in the creation of Pandora's television advertisements), 30 (admitting that Wilson has personal involvement in the creation of Pandora's scripts used to solicit timeshare owners); *Non-Confidential Deposition of Jim Baskett*, Jun. 28, 2022 ("Baskett Dep."), 34:11-17, 36:3-10; Trial Tr. Vol. I, 217:5-6 (Folk and Wilson are "very active in sales, managing sales"), 226:21-227:1 (Folk and Wilson review and approve sales scripts).

Pandora's Chief Financial Officer, Scott Grey ("Grey"), testified that Marketing Defendants typically employ no more than ten to fifteen analysts. Trial Tr. Vol. II, 7:21-23.

The sales presentations describe the services that Marketing Defendants wish to sell to potential customers, and the presentation's purpose is to obtain new customers.  P-1392 at RFA Nos. 247 (admitting that "the purpose of Pandora's 'analyst' sales presentation is to obtain new customers"), 248

(admitting that "Pandora's 'analyst' presentations describe the services that Pandora wishes to sell to potential customers"), 254 (admitting that "a purpose of the 'analyst' sales presentation is to influence timeshare owners to buy Pandora's services"); Trial Tr. Vol. I, 226:8-11.

The analysts use scripts to deliver the sales presentations, such that the sales presentations are generally the same for each potential customer.  P-1390 at RFA No. 19 (admitting that employees utilize a written script in connection with the solicitation of timeshare owners); P-1392 at RFA Nos. 255 ("Analysts are expected to hue closely to a script that changes over time."), 260 (admitting that portions of the analyst sales presentations are the same for each customer).

Analysts are expected to follow the script.  Trial Tr. Vol. I, 226:12-17 (analyst communications are "governed by a script" which the analysts are "expected to follow"); P-1393 at RFA No. 257 (admitting "analysts are provided and expected to hue closely to a script that changes over time" and "from time to time analysts are given advice and suggestions regarding how they should communicate with potential customers including how to deliver the scripted language").

Marketing Defendants assert that only one script from September 2020 (P-1488) was a script approved by company management. Trial Tr. Vol. II, 92:17–25. But Pandora has admitted that it has always used scripts for its analysts, produced numerous other scripts pre-dating September 2020, and acknowledged that Folk and Wilson were personally involved in their creation. P-1390, RFA Nos. 24 (admitting that Folk had personal involvement in the creation of Pandora's scripts), 30 (admitting that Wilson has had personal involvement in the creation of Pandora's scripts); P-1393, RFA No. 257 (admitting that "analysts are provided and expected to hue closely to a script"), P-1480 (script), P-1482 (script), P-1484 (script), P-1485 (script), P-1486 (script), P-1488 (script).  Thus, the idea that no company-sanctioned script existed until September 2020 lacks any credibility.

The analyst sales presentations are an essential part of the marketing and sales process.  P-1498, p. 7 (Pandora handbook stating that analysts are "an integral part of [the] marketing process").

In addition to being guided by scripts, the analysts also receive frequent training. The training includes regular analyst meetings wherein the sales presentations and their content are discussed, modified, and points of emphasis are conveyed.  *See* P-1392 at RFA No. 256 (admitting that Pandora hold meetings with analysts wherein there is discussion on the content of the analyst presentations); P-1574 (discussing an analyst meeting for purposes of "sharpening the analyst's pitch" to include "pitch[ing] contract resolution and the credit program as a contract resolution"); Trial Tr. Vol. I, 227:2-9; P-1528 (audio recording of training session); *Confidential Deposition of Jim Baskett, Jun. 28, 2022* ("Baskett Confidential Dep."), 235:12-19.  Training also comes in

the form of written training materials/manuals.  *See, e.g.*, P-1498 (a "Senior Analyst Playbook").

Folk and Wilson have run these analyst meetings and have had personal involvement in the training and supervision of analysts.  Baskett Non-Confidential Dep. at 58:18-59:2; P-1390 at RFA Nos. 25 (admitting that Folk has had personal involvement in the training of Pandora's sales employees and/or independent contractors), 26 (admitting that Folk has had personal involvement in the supervision of Pandora's sales employees and/or independent contractors), 31 (admitting that Wilson has had personal involvement in the training of Pandora's sales employees and/or independent contractors), 32 (admitting that Wilson has had personal involvement in the supervision of Pandora's sales employees and/or independent contractors).

### C. Pandora's Sales Presentations Contained False Statements That Were Widely Disseminated

#### (1) *Statements Regarding Credit Protection*

Marketing Defendants' sales presentations have falsely communicated to Bluegreen timeshare owners that the owners' credit will be protected throughout the duration of the exit process.

Specifically, Marketing Defendants admit that they tell owners that their credit will be protected during the exit process.  P-1390 at RFA No. 75 (admitting that Pandora communicates the availability of credit repair services to Bluegreen Owners before they retain Pandora's services), 159 (admitting that Marketing Defendants "tell [Bluegreen] Owners that their credit will be protected during the timeshare 'exit' process").  Marketing Defendants trained the analysts that credit repair services should be "mentioned in detail and highly encouraged" to owners.  P-1574, p. 1 (Pandora email dated July 15, 2020).

Indeed, Marketing Defendants have drafted analyst scripts relating to their offered credit services.  P-1392 at RFA No. 273 (admitting "that Pandora drafted scripts related to credit management or credit restoration").  The following types of statements were expressly set forth in analyst scripts, dating between 2019 and mid-2020:

   a. "And along with that if you have a mortgage, ***we're going to protect your credit***. So in a short period of time you are done with the developer, you're not making any more payments and your ***credit is protected***."  P-1485, p. 3 (July, 7, 2019) (emphasis added).

   b. "So in a short period of time you are done with the developer, you're not making any more payments and ***your credit is preserved***."  P-1480, p. 2 (Apr. 1, 2020) (emphasis added); P-1486, p. 2 (Aug. 2020).

Recordings from this time show numerous different analysts representing to Bluegreen timeshare owners that Pandora would protect their credit.  Specifically, these statements were made by analysts Taylor Otto (D-0506, p. 45), Courtland Llauger (D-0487, pp. 34-35), Luke King (D-0519, p. 30), Rick Recania (D-0517, pp. 24-25), James Leonard (D-0476, p. 19), Richard Otto (D-0491, p. 23), Kimmer Franz (D-0516, p. 37), and Grady Bickel, (D-0504, p. 75), each of which communicated this same message to timeshare owners.

These representations were also made to the Testifying Owners.  For example:

    c.  Analyst Courtland Llauger told Jordan Harding: "And for the credit protection, you do know that we are going to protect your credit. I don't know if that's important to you."  P-1516 at 8:15-8:25.[2] (emphasis added).  Upon hearing this, Ms. Harding believed "that our credit wouldn't be affected by stopping our payments. They would make sure that we were taken care of in that aspect." *Deposition of Jordan Harding, Aug. 15, 2022* ("Harding Dep."), 24:20-25:5. Ms. Harding signed up with Marketing Defendants on March 11, 2019.  P-1073, p. 1.

    d.  After explaining the credit service, analyst Grady Bickel told Megan Ivy: "And we've never had anything added to your credit in a negative form that we couldn't get taken off."  P-1512 at 46:40-46:50.[3]  Ms. Ivy understood the credit pitch to mean "[t]hat if we stopped paying it wouldn't affect our credit," which was material to her. *Deposition of Megan Ivy, Aug. 15, 2022* ("Ivy Dep."), 34:20-35:5.  Ms. Ivy signed up with Marketing Defendants on March 15, 2019. P-1060, p. 1.

    e.  Analyst Taylor Otto told James Schupp: "So the first thing that we're going to do is immediately once we take on the case, we protect your credit and the way we do that is I'll be sending you over a form which is called a trade line block and it makes it so when you are not making your payment to Bluegreen, they are not able to hurt the credit negatively. We use it on every one of our clients. Every client's credits are protected. It's the same thing for every client." P-1527 at 1:05:48-1:06:17.[4]  Mr. Schupp signed up with Marketing Defendants on July 2, 2019. P-1155, p. 1.

    f.  Analyst Otto told Shirly Prosek: "So that is part of the service that we offer. We are able to maintain the integrity of your credit. So what that means is, we find it easier and we get you out faster when you're not making payments to your timeshare developer."

---

[2] D-0457 at 9:2-4.
[3] D-0454 at 46:17-19.
[4] D-0461 at 59:20-60:3.

P-1537 at 14:12-14:34.[5]  The promise of credit protection was one of the reasons Ms. Prosek hired Marketing Defendants, because her credit was "absolutely" important and material to her decisions. *Deposition of Shirley Prosek, Sept. 8, 2022* ("Prosek Dep."), 25:5-18. Ms. Prosek signed up with Marketing Defendants on Jan. 3, 2020. *See* P-1144, p. 1.

Other Testifying Owners also recalled being told their credit would be protected during the sales presentations.  *Deposition of Mitchell Marston, Aug. 19, 2022* ("Marston Dep."), 23:1-24:13, 49:22-50:6; *Deposition of Gerald Barnett, Aug. 11, 2022* ("Barnett Dep."), 21:21-22:7; *Deposition of Derrick Braswell, Sept. 10, 2022* ("Braswell Dep."), 30:16-31:5; *Deposition of Ashley Tilahun, Aug. 18, 2022* ("Tilahun Dep."), 25:6-26:6.

At some point after Marketing Defendants were sued in 2020, Folk and Wilson instructed analysts to use the term "credit management" instead of "credit protection."  Baskett Confidential Dep. at 187:10-188:02.  Such change is reflected in the analyst scripts dated in the mid to latter-half of 2020:

g.  "Credit Management Pitch (FOR CLIENTS WITH MORTGAGE BALANCES) If you have a mortgage balance with your developer and decide that you do not want to move forward with the obligation of making monthly payments (we cannot legally tell you to stop paying) we do have a credit management option to assist you in removing the timeshare developer from your report in the event that they mark your credit." P-1482, p. 2 (dated June 2, 2020).

h.  "So in a short period of time you are done with the developer, you're not making any more payments and your credit is preserved." P-1486, p. 2 (August 2020).

However, recordings show several analysts continuing to tell Bluegreen owners that their credit will be protected:

i.  Analyst Llauger told Nancy Braun: "I'm going to share with you, to answer your question, nothing will happen to your credit if you take my advice. Now, so we have never had a client's credit compromised ever if they follow our advice." P-1507 at 1:02:23-1:03:01.[6]  The Brauns signed up for the offered credit protection service, and the existence of such a service was material in the decision to hire Marketing Defendants. *Deposition of Nancy Braun, Sept. 9, 2022* ("Braun Dep."), 34:19-35:1.  The Brauns signed up with Marketing Defendants on November 19, 2020. P-1021, p. 1.

j.  Analyst Luke King told Jonnie Driver: "You will be done with Bluegreen. You won't owe them another dollar. Your credit will

---

[5] D-0465 at 16:21-25.
[6] D-0449 at 49:20-23.

remain intact." P-1510 at 18:23-18:29.[7]   And: "This will never appear on your credit in any type of negative way whatsoever." *Id.* at 28:47 - 28:52.[8] The promised credit protection was a material reason why the Drivers hired Marketing Defendants on December 14, 2020. *Deposition of Jonnie Driver, Aug. 12, 2022* ("Driver Dep."), 30:1-8.

Pandora's training materials for analysts included language for employees to use in conversation with consumers related to Pandora's ability to protect consumer credit. *See* P-1498, p. 37 (Pandora's "Senior Analyst Playbook" which includes a "Credit Management Presentation").

Wilson recruited third-party Angela Consalvo ("Consalvo") to open her own credit repair entity (National Credit Rehab) to purportedly provide the credit-related services that Pandora advertised to customers. Trial Tr. Vol. II, 128:2-14. Ms. Consalvo had previously provided these same services to Marketing Defendants' customers through her former employer, Credit Guard, which was subsequently renamed to Tradebloc. *Id.* at 116:13-19.

The only need for credit protection related to an owner's timeshare interest is if the owner ceases payment to the developer. Trial Tr. Vol. I, 254:23–255:8 (admitting that "if a timeshare owner is current when they hire [Marketing Defendants] with regard to their timeshare developer" they would not "have any need for credit protection" as to the developer); Trial Tr. Vol. III, 110:15-19.

The use of the credit-pitch is central to the Marketing Defendants' strategy as it creates a false sense of resolution. In fact, Marketing Defendants instructed their salespeople to pitch the credit service as its own form of "contract resolution." *See* P-1574. Specifically, Pandora's training materials take the position that "[i]f the developer is not affecting your lifestyle, you're basically out!" *Id.* The Marketing Defendants' training materials provides employees with responses to potential customer complaints which includes the statement that "[i]f the developer is not leaving negative marks on your credit or harassing you via phone or mail, it's a win." P-1501, p. 7 (same).

In a training to fellow salespeople, Marketing Defendant's senior employee, Jimmy Baskett, coached analysts on how to pitch the credit repair service to prospective customers and ties such credit service to an owner's decision to cease payment and characterizes such non-payment as a feature of Pandora's services. P-1528 (01:25:14 through 01:27:00). Grey, a member of Pandora's senior leadership team, also testified that he has heard discussion of using credit service as a method to resolve timeshare contracts. Trial Tr. Vol. I, 255:9-13.

Slattery also testified regarding the similar concept of a "constructive exit," by which an owner would be considered exited so long has he or she was

---

[7] D-0452 at 16:24-17:1.
[8] D-0452 at 26:4-5.

not receiving debt collection calls or negative marks on his or her credit.  Trial Tr. Vol. III, 74:19-75:18.  Slattery testified that the reason for Marketing Defendants' use the credit repair pitches is because it removes "leverage" that timeshare developers like Bluegreen have to persuade owners to continue making regular loan payments.  *Id.* at 108:16-18 (testimony that "those can be effective in eliminating your client's leverage, the only leverage your clients have to force timeshare clients that don't pay to pay").

Similarly, in communication with Carlsbad, a Marketing Defendant employee stated that timeshare owners "already feel like we're a scam because of their history with the developer so we try to lieu them away from that feeling by letting them know all is good as long as they aren't hearing from the developer and if the trade block is in place (for debt clients)."  P-1990.  Slattery also noted in an email to Pandora that he spoke with an owner and explained that "the trade block makes the foreclosure an 'exit'."  P-1985.

Numerous examples of analyst sales calls, across a range of Pandora employees, include reference to the statement that Pandora will protect a consumer's credit.

Marketing Defendants' claims that they can protect consumer credit scores are literally false:

    k. Grey testified that Marketing Defendants "ha[ve] overstepped" by telling owners they could protect their credit."  *See* Trial Tr. Vol. I, 252:19–253:1.

    l. Grey admitted that Marketing Defendants cannot guarantee that a customer's credit score will not be harmed.  *Id.* at 253:11-21.

    m. Evidence from Bluegreen timeshare owners demonstrates that their credit was not in fact protected. Testifying Owners who signed up for the credit protection services confirmed that they experienced negative credit effects after ceasing payment to Bluegreen.  *See* Braswell Dep. at 33:4-6, 10-12; 37:1-13; Barnett Dep. at 26:24-27:2; 27:16-28:1; Driver Dep. at 36:21-24; 71:11-72:1; Marston Dep. at 29:2-4; Braun Dep. at 34:19-22; 49:4-8; Prosek Dep. at 30:2-31:24; Tilahun Dep. 24:04-26:06; *Deposition of Ryan Mailhiot, August 18, 2022*, ("Mailhiot Dep.") at 28:6-29:11.

    n. Bluegreen's Senior Vice President of Finance, Capital Markets, and Mortgage Operations Paul Humphrey ("Humphrey") testified that the Marketing Defendants' credit "protection" does not interfere with Bluegreen's credit reporting.  Trial Tr. Vol. I, 210:14-21.

    o. Similarly, testimony by Consalvo, who provided the credit-related services, reveals that Pandora's promises to consumers did not match reality. On behalf of the Pandora-referred consumers, Consalvo would input the owners' information into computer software that would generate generic dispute letters which Consalvo would mail to credit bureaus.  Trial Tr. Vol. II, 116:21-

117:4; 150:24-152:12.  If an initial dispute failed, Consalvo would make up to two additional attempts.  *Id.* at 125:14-126:24. Nevertheless, if a credit bureau confirmed with the creditor that the information related to the debt was accurate, nothing would happen to the consumer's credit report.  *Id.* at 119:1-7.  To this end, Consalvo emphasized in an email to Pandora that the credit service could only be sold as an "attempt."  *See* P-1978.  In response, a Pandora employee indicated that she had communicated this to the sales analysts that the credit services should not be presented as a guarantee and that she "hoped" they would stop doing so soon.  *Id.*

p.  Consalvo further testified that she is unaware of any method in the credit industry that proactively blocks a creditor from reporting on a timeshare owner's credit.  Trial Tr. Vol. II, 12919-22.  Consalvo also received regular complaints from Pandora's customers regarding negative and derogatory marks appearing on their credit reports.  *Id.* at 130:9-131:11.

q.  David Hall ("Hall"), Slattery's partner at Carlsbad, testified that the Marketing Defendants' credit protection does not make it safer for the owners to stop making payments to Bluegreen.  Trial Tr. Vol. II, 242:24-243:2.

Notably, Marketing Defendants failed to introduce any evidence that they protected or repaired even a single Bluegreen timeshare owner's credit.

Many Testifying Owners testified that that the promise of credit protection was material to their decision to hire the Marketing Defendants. Prosek Dep. at 25:9-18; Lathrem Dep. at 26:6-11; King Dep. at 25:7-16.

Many Testifying Owners testified that the promise of credit protection gave them more confidence to stop making their payments to Bluegreen.  *See* Braswell Dep. at 31:6-9; Driver Dep. at 30:5-15; *Deposition of James Schupp, Aug. 12, 2022* ("Schupp Dep."), 28:18-20; Marston Dep. at 23:15-24; Braun Dep. at 35:8-13, 22-23; 36:3; Prosek Dep. at 54:22-55:1; Harding Dep. at 25:1-10; Ivy Dep. at 34:22-35:10.

(2)  ***Statements Regarding Attorneys' Services***

Marketing Defendants inform potential Bluegreen timeshare owner customers during the sales presentation that an attorney that Bluegreen owners separately retain will provide them with an exit from their timeshare obligations.  P-1392, RFA No. 258 (admitting that Pandora's "analyst" sales presentations describe the services to be rendered by an attorney).

For instance, multiple analyst scripts from 2019 through 2020 contain statements that the timeshare owners' "case" will be submitted to a law firm and/or that an attorney will be working with the timeshare developer to seek an exit:

a. "Just know this, if I decide to take your case and submit it to one of our law firms, we will get you out of your timeshare agreement legally and permanently forever." P-1485, p. 2; P-1480, p. 2; P-1482, p. 2; P-1486, p. 2; P-1484, p. 2.

b. "But here's the most important part. It allows your attorney to have direct contact with the developer on your behalf, relieving you of the burden to communicate with them. From that point, your attorney will be on your side fighting for you." P-1488, p. 2.

The scripts also inform timeshare owners of the attorney's fee, and that they will need to sign a retainer with the attorney to whom they are referred, in substantially the same form as follows:

c. "Also, by law, we must have a direct relationship between you and the attorney, so within 30 days when the attorney reaches you, you must write them a separate check for $600/$750 dollars. That completes the loop of the attorney/client relationship." P-1485, p. 3; P-1480, p. 2.

d. "By law, we must have a direct relationship between you and the attorney, so in about 30 days when the attorney reaches you, you must write the attorney a separate check for $750 dollars, this is the retainer fee. That completes the loop of the attorney/client relationship." P-1482, p. 2; P-1486, p. 2; P-1488, p. 2; P-1484, p. 2.

Call recordings show analysts highlighting attorneys as key to the exit process:

e. "There are other companies that are cheaper, absolutely, but they don't use attorneys, so how the heck do they get you out?" P-1518 at 45:46-46:22[9] (analyst Otto sales presentation to owner King).

f. "[W]e want to settle the case and the attorney will negotiate a settlement and ultimately you will both walk away from this legally and permanently." P-1514 at 18:17-19:08 (analyst Llauger sales presentation to owner Harding).

g. "We have a clear understanding with the developer and their attorneys that we only show them the bad contracts where clients were misrepresented and that's why we are one hundred percent successful in getting our clients resolution." P-1510 at 30:17 - 30:31 (analyst King sales presentation to owner Driver).

Testifying Owners were told during sales presentations that the services would be through an attorney and/or they understood that an attorney would be the one providing the services. *See* Prosek Dep. at 55:2-16; *Deposition of Rhonda Dixon, Sept. 7, 2022* ("Dixon Dep."), 19:21-20:25; Braun Dep. at 14:22-15:10; Marston Dep. at 24:14-24; Harding Dep. at 22:6-23:5; Driver Dep. at 23:19-25:8; *Deposition of Jeremy Lathrem, Sept. 9, 2022* ("Lathrem Dep."),

---

[9] D-0458 at 44:4-7.

35:19-36:12; Schupp Dep. at 24:8-25:6; Barnett Dep. at 21:3-6, 10-13; Braswell Dep. at 13:9-23; Tilahun Dep. at 30:16-31:6; *Deposition of Lynette King, Sept. 8, 2022* ("King Dep."), 26:15-27:11; Ivy (Freed) Dep. at 81:11-14.

    Moreover, in an analyst training session, the trainer instructed analysts on how to explain the use of attorneys to timeshare owners.  P-1528 at 20:31-21:30, 22:09-23:49; Baskett Confidential Dep. at 235:12-19.

    Numerous examples of analyst sales calls, across a range of Pandora employees, include reference to the statement that an attorney will provide the desired timeshare contract cancellation. This is not surprising because Marketing Defendants' process it to refer every Bluegreen timeshare owner to an attorney.  P-1390 at RFA Nos. 56-58, 130, 134, 138; Trial Tr. Vol. I, 229:23-25, 243:13–15 (testimony that Pandora refers every Bluegreen owner to an attorney).

    Marketing Defendant's statements to Bluegreen Owners during sales presentations that the attorneys will get those owners out of their obligations with Bluegreen are literally false because the evidence demonstrates that the attorneys' actions are not what accomplishes an exit.  The Court found this to be true as a matter of undisputed fact on summary judgment,[10] and the evidence at trial continues to support that conclusion.

    The only steps that Lawyer Defendants take are insufficient to relieve timeshare owners of any of their obligations. Specifically:

      h. The Lawyer Defendants' actions on behalf of timeshare owners only involve (1) the sending of a cease and desist letter and (2) the sending of a demand letter.  *See* P-1192 through P-1267. Expressly excluded from the Lawyer Defendants' work are any litigation or arbitration services, *id.*, and such attorneys have never represented a timeshare owner in litigation or arbitration against Bluegreen.  Trial Tr. Vol. II, 232:4-9.

      i. Slattery admitted that release of an owner's obligations to the developer "requires [Bluegreen's] participation" and that he, as an attorney, "can't force them to get out."  Trial Tr. Vol. II, 112:19-113:8.

      j. Hall testified that Lawyer Defendants never include any legal *analysis* specific to the individual timeshare owners in their letters to Bluegreen as such letters do not account for customer-specific information such as where a timeshare owner lives, where the timeshare developer is located, or where any timeshare interests are located, but instead reference only California law even where

---

[10] *See* Summ. J. Order at 34, ECF No. 437 (finding "that the Lawyer Defendants' entire relationship with the timeshare owners was a sham, as the latter thought they were paying to be legally released from their timeshare contracts, when in reality it was their defaults that did all the work").

such customers have no connection to California.  *Id.* at 238:2-22.
Carlsbad itself is located in California.  Trial Tr. Vol. II, 187:22-23.

k. Humphrey testified that Bluegreen maintains a "zero-tolerance
policy" which means that it does not respond to attorneys affiliated
with the Marketing Defendants.  Trial Tr. Vol. I, 56:10-22
(testimony that Bluegreen does not negotiate with timeshare exit
companies or attorneys that work with such companies).

l. Grey conceded that Bluegreen does not respond to the attorney
letters.  Trial Tr. Vol. I, 243:24-244:2.  Slattery testified in
agreement during his deposition in this matter.  Trial Tr. Vol. III,
74:4-18.

m. Marketing Defendants have not offered evidence of any response
from Bluegreen in years.

As noted, any "exit" is achieved by way of default—not the actions of the
Lawyer Defendants. P-1438, No. 20 (admitting that "Pandora is unaware of any
Bluegreen Owner that hired Pandora that was released from his or her
Bluegreen timeshare contract who was also continuing to pay Bluegreen while
Pandora and such Bluegreen Owner maintained their service relationship").
Slattery—as the attorney tasked with delivering the supposed exit—conceded at
trial that an attorney is incapable of delivering the desired exit, stating "[i]f you
continue to make payments to your timeshare, the likelihood of you being
released based on any complaint that…***any lawyer does…is almost zero***."
Trial Tr. Vol. III, 86:11-13 (emphasis added).

Grey also conceded that that Pandora made false statements when it
communicated that their process cancelled timeshare contracts "permanently
and legally . . . ."  Trial Tr. Vol. I, 276:8-23.  Marketing Defendants have
virtually never delivered an "exit" to a Bluegreen Owner except through default.
P-1438, No. 20 (admitting that "Pandora is unaware of any Bluegreen Owner
that hired Pandora that was released from his or her Bluegreen timeshare
contract who was also continuing to pay Bluegreen while Pandora and such
Bluegreen Owner maintained their service relationship").

At trial, Marketing Defendants introduced (or attempted to introduce)
into evidence a small number of settlements with Bluegreen.  But the problems
with these settlements are numerous.  First, many of these settlements
involved a loan with a party other than Bluegreen. *See id.* at 101:14-102:5,
105:20-106:14, 106:20-107:23. Second, there was no evidence that these
owners were current on their obligations with Bluegreen. And third, even if the
Court were to credit those settlements as Marketing Defendants urge, their
number is so few in comparison to the total number of Bluegreen owners that
retained Marketing Defendants that the factual findings herein would be
unaffected.  *See* Trial Tr. Vol. III, 38:20 (Slattery testifying that he presently has
825 Bluegreen clients).

Indeed, Marketing Defendants actively seek to hide the true scope of the Lawyer Defendants' work from the timeshare owners. Specifically, Marketing Defendants instruct the Lawyer Defendants not to share with timeshare owners that they only send two letters to developers.  P-1990.  In email correspondence with the Lawyer Defendants, a Marketing Defendant employee stated "[p]lease know that we do not want this information mentioned to clients. Whenever we ask the firm to contact a client, we are doing so in hopes that the firm reassures a client that they're doing all that they can to help cancel, not that they aren't doing anything else on the file besides sending out two letters." *Id.* at p. 2.  The same employee continued to say that "less is more when it comes to clients . . . ."  *Id.* at p. 1.  Slattery testified that it is his understanding that Pandora *does not* communicate to timeshare owners that the only thing that will get them released from their obligations is stopping payment.  Trial Tr. Vol. III, 86:23-25.

Although Grey testified that Marketing Defendants did not become aware of Bluegreen's practice of not responding to Slattery, such knowledge would have made no difference. The evidence demonstrated that, even once Marketing Defendants learned that the Lawyer Defendants' services would not affect a Bluegreen owner's timeshare obligation, Marketing Defendants nonetheless continued to refer owners to the Lawyers Defendants anyway.  Trial Tr. Vol. I, 247:11-15 ("Q. So with full knowledge that Bluegreen wasn't going to respond to Carlsbad Law Group letters, Pandora Marketing continued to refer those timeshare owners or more timeshare owners to Carlsbad Law Group, did it not?  A. I guess they did, yes.").

Certain of the Testifying Owners confirmed that the potential of attorney representation or services encouraged them to purchase the Marketing Defendants' services. Marston Dep. at 61:2-5; Dixon Dep. at 32:7-25; Braun Dep. at 47:15-48:2.

Certain of the Testifying Owners also stated that the potential of attorney representation gave them confidence to cease payments to Bluegreen.  King Dep. at 35:3-6; Marston Dep. at 24:25-25:5; Barnett Dep. at 37:20-24; Braswell Dep. at 30:7-11; Ivy Dep. at 82:16-23; Prosek Dep. at 53:15-18.

### (3) *Statements Regarding the Marketing Defendants' Success Rate*

During sales presentations, analysts have also made statements to owners that Marketing Defendants have a perfect success rate.

These statements are found in multiple analyst scripts as follows:

     a. "I want to tell you the reasons as to why we are taking your case, here at timeshare compliance, we don't take every case, we are consumer advocates, we've never lost a single case, we have won every case we've taken." P-1480, p. 2; P-1482, p. 2; 1484, p. 2.

     b. "I want to tell you the reasons as to why we are taking your case. Timeshare Compliance doesn't take every case, we are consumer

advocates, we've never lost a single case, we have successful resolution for every case we've taken." P-1486, p. 2.

    c. "I want to tell you the reasons as to why we are taking your case, here at timeshare compliance, we don't accept every contract, we are consumer advocates, and we resolve all contracts we take on." P-1488, p. 2.

Marketing Defendant training materials state that they "have never lost a case" (P-1497), and, in order to close a sale, encourage employees to state that timeshare owners are "always" subject to misrepresentations from developers like Bluegreen (stating "anyone who has ever attended a timeshare presentation has been misrepresented"), thus ensuring that "the likelihood of full cancellation is 100% . . . ." P-1496, p. 9.

Consistent with the scripts and the training materials, audio recordings of sales presentations to Bluegreen owners show that analysts routinely deliver these types of statements:

    d. "[W]e have won every case we've taken and you can quote me on that." P-1519 at 56:35-49[11] (analyst Otto presentation to owner Lathrem).

    e. "100% successful, you will be out of your timeshare." P-1510 at 30:31-30:44[12] (analyst King presentation to owner Driver).

    f. "And not to brag on us again, but it's not just the research that you guys can do on us that we've been doing this for seven years with a hundred percent success rate, they know us really well by now." P-1512 at 34:27-34:38[13] (analyst Bickel presentation to owner Ivy). This 100% success rate was material to Ms. Ivy. Ivy Dep. at 28:17-21.

    g. "It's very difficult to get out of a timeshare contract. And we've never lost a case." P-1514 at 16:50-17:06[14] (analyst Llauger presentation to owner Harding). Llauger further told the Hardings: "But know that you will – we will -- there's a 100 percent probability we will get you out of this contract." P-1516 at 26:22-26:32.[15]

    h. "Now I will tell you that we don't take every case, but of the cases that we do take, we've never lost a single case and you can quote me on that. These calls are recorded." P-1527 at 51:43-51:54[16] (analyst Otto presentation to owner Schupp). These statements gave Schupp confidence that Marketing Defendants could get him out of his timeshare. Schupp Dep. at 23:18-24:7.

---

[11] D-0459 at 18-20.
[12] D-0452 at 27:19-20.
[13] D-0454 at 34:4-7.
[14] D-0456 at 15:7-8.
[15] D-0457 at 26:2-5.
[16] D-0461 at 48:17-21.

i.  "Number two, we don't accept every case. We only take the cases, without a doubt, we know we're going to win, and, because of that, we are 100 percent successful at full resolution." P-1505 at 23:27-24:02[17] (analyst King presentation to owner Braswell).

j.  "So as long as that's true, which I know they are, we will legally and permanently get you out of this timeshare. If you happen to be the first person that we don't win, then of course you're not going to keep paying our service agree on something we can't get you out of, but that has never happened." P-1518 at 50:05-51:35[18] (analyst Otto presentation to owner King). After hearing this, Ms. King felt that it was virtually certain that Marketing Defendants could exit her from her timeshare. King Dep. at 33:25-34:12.

Numerous timeshare owners acknowledged that Pandora salespersons communicated that Pandora has always been successful. Braun Dep. at 28:6-12, 29:6-23; Ivy Dep. at 27:21-28:8, 28:17-21; Schupp Dep. at 23:16-24:7; King Dep. at 32:14-17, 33:17-34:12; Braswell Dep. at 20:13-16, 21:1-4, 23:7-13.

Moreover, the presenter during an analyst training session, Pandora's senior analyst Jim Baskett, discussed statements about Marketing Defendants' success rate. Baskett Confidential Dep. at 70:2-13; 71:22-72:15. He also said he routinely tells clients about the success rate, and that having no "unresolved cases" is the same thing as having never lost a case. *Id.* at 18:4-19:7. Further, Baskett's belief in the truth of the success rate was based on Folk and Wilson communicating to him that they had no unresolved cases. *Id.* at 16:22-18:3.

Numerous examples of analyst sales calls, across a range of Pandora employees, include reference to the statement that Pandora has a one hundred percent success rate or has never lost a case. However, these statements are false because:

k.  Grey conceded that Marketing Defendants have had to refund timeshare owners for failure to achieve the advertised exit. Trial Tr. Vol. I, 240:4-10.

l.  There are Bluegreen owners who are clients of Marketing Defendants and who still have active Bluegreen contracts, meaning they have not been successfully "exited" from their Bluegreen contracts as guaranteed by Marketing Defendants. *See* Trial Tr. Vol. III, 38:20 (Slattery testifying that he presently has 825 Bluegreen clients).

Indeed, Grey admitted that these statements are false. Trial Tr. Vol. I, 240:19-22 ("Q. Okay. So the statement that "Timeshare Compliance is a

---

[17] D-0447 at 19:16-20.
[18] D-0458 at 49:13-20.

hundred percent successful," that's a false statement, is it not, Mr. Grey?  A. Yes . . . .").

Owners testified that the representations of complete success were material to their decision to hire Marketing Defendants.  Braun Dep. at 29:09-23; Ivy Dep. at 28:17-2; Schupp Dep. at 23:16-24:7.

Marketing Defendants' statements about their success rate gave owners more confidence in stopping their payments to Bluegreen.  King Dep. at 35:11-22; Ivy Dep. at 36:1-11; Harding Dep. at 22:6-10.

### (4) *Statements Regarding Timeshare Owner Payment Obligations*

Analysts also make statements regarding the attorney's effect on an owner's financial timeshare obligations once that owner is referred to the attorney.

The evidence demonstrates that analysts frequently communicate to prospective customers that, once the attorney contacts the developer, the owner is out or done with the timeshare, and can stop making payments.

a. These statements are found in multiple analyst scripts, as follows:

   i. "But here's the most important part ... Once that attorney sends out a cease and desist letter to your develop[er], you are out of your timeshare, because nobody should contact you whatsoever. . . . So in a short period of time you are done with the developer, you're not making any more payments and your credit is protected."  P-1485, p. 3; P-1480, p. 2.

   ii. "But here's the most important part ... Once that attorney contacts your developer, you are out of your timeshare, because nobody should contact you whatsoever. . . . So in a short period of time you are done with the developer, you're not making any more payments."  P-1482, p. 2; P-1486, p. 2; P-1484, p. 2.

b. This practice is confirmed by emails sent between Marketing Defendants' employees:

   i. In 2021, employee David Kong sent two emails confirming this practice. Kong stated: "I know we tell them to stop making payments, but wouldn't stopping their payment just cause the developer to charge whatever card they already have saved to their file to collect their payment? Do we have a way to prevent clients from being charged without their permission if they choose to stop paying?"  P-1884.  He also stated: "Do you think it's possible when speaking to clients *in the engagement process* and when we tell them to stop their payments to the developer to also

mention if they are on autopay to call the developer to get off of autopay?" P-1885 (Emphasis added).

c. Multiple owners confirmed that the Marketing Defendants told them to cease payments immediately upon hiring the defendants.

    i. "'Once you get on board with us, it doesn't make sense for you to make another payment. Does that make sense. Okay."' ... And what did you understand Mr. Llauger to be communicating to you during that portion of the recording? A. That he thought it was okay for us to stop making payments." Harding Dep. at 27:3-14.

    ii. "So I was informed that when you start working to get out of the contract just stop making payments. Q. Who told you to stop making payments? A. The representative from Timeshare." Tilahun Dep. at 27:5-8.

    iii. "'In a short period of time you'll be done with your timeshare companies. You're not making any more payments if you decide to do so, and you're legally and permanently out of this for you and your family.' ... Q. And what did you understand Mr. Otto to be communicating during that portion of the recording? A. We would be done paying the Bluegreen and Westgate. Q. And did you have a sense of when you would be done making those payments? A. As soon as he said we could stop." King Dep. at 31:3-17.

d. A recording of an analyst training presentation included instruction on how to communicate to prospective customers the claim that once an affiliated attorney sends a cease and desist letter to developers, the owner is out of their timeshare and further tied the ability to cease payment with the aforementioned credit services. P-1977, 3:00 through 4:42.

Numerous examples of analyst sales calls, across a range of Pandora employees, include reference to the statements that an owner can cease payments to developers once an attorney contacts the developers.

Representations that owners are out or done with the timeshare and can stop making payments once the attorney contacts the developer are false because the attorneys to which Pandora refers Bluegreen owners have no process that entitles an owner to cease payments. *See supra* Section 2.C.(2) at h.–m.; P-1438, No. 20; Trial Tr. Vol. III, 86:11-13.

Many Testifying Owners stated that the Marketing Defendants encouraged them to stop payment right away and that the ability to stop making payments and/or the promise of credit protection was material to their decision to hire Marketing Defendants. *See* Braswell Dep. at 40:25-41:3; Lathrem Dep. at 26:6-8, 11; Driver Dep. at 30:5-8, 30:17-22; King Dep. at

25:13-16, 35:17-19, 22; Braun Dep. at 34:19-35:1, 36:15-19; Dixon Dep. at 25:24-26:1, 26:4; Prosek Dep. at 25:13-18, 56:19-22, 25.

Numerous owners testified that they stopped paying Bluegreen because of the Marketing Defendants' instructions. Tilahun Dep. at 28:16-19; Braswell Dep. at 29:5-6, 29:25-30:2, 30:4-6; Barnett Dep. at 40:21-41:9; Schupp Dep. at 21:5-9, 27:3-7; Lathrem Dep. at 29:12-18; Driver Dep. at 17:21-18:5; King Dep. at 29:10-15; Freed Dep. at 35:16-21, 24; Marston Dep. at 22:20-25; Braun Dep. at 35:8-13, 35:22-23, 36:3; Dixon Dep. at 25:11-23; Prosek Dep. at 25:23-26:1; Harding Dep. at 19:3-5, 9.

### (5) *Statements Regarding Cessation of Payments*

Finally, the trial evidence also demonstrates that analysts often make statements to Bluegreen owners that stopping payments on their timeshares will make the attorneys' process "faster," "quicker," or "easier."

Again, these statements were made in analyst scripts:

a. "I cannot tell you to stop making payment that would be unprofessional and unethical. However, we have found that we are able to get you out quicker if you do not make payments." P-1488, p. 2.

In addition, these statements were made in audio recordings:

b. "[W]e find it easier and we get you out faster when you're not making your mortgage payments and your maintenance fees . . . ." P-1519 at 1:01:48 - 1:02:07[19] (analyst Otto presentation to owner Lathrem).

c. "First of all, uh, as strange as this may sound, our legal team, our attorneys have found, we get clients out faster when they don't -- we -- they do not make payments. Let me clarify this. We have found we get clients out faster, the attorneys have found, we get you out faster when you don't make payments." D-0449 at 49:9-15 (analyst Llauger presentation to owner Braun).

d. "We find it easier and we get you out faster when you're not making payments on these, okay?" D-0450 at 31:13-15 (analyst Otto presentation to owner Dixon).

e. "Number one, our -- our clients, when they come on board, they stop making payments, 'cause that allows us to get you out of the timeshare contract much quicker." D-0476 at 55:7-10 (analyst James Leonard presentation to owner Jeff Clark).

f. "I can't give you . . . legal advice like that. That would be highly unprofessional and unethical of me. However, we found that we get you out quicker when you're not makin' those payments." D-0480

---

[19] D-0459 at 51:3-5.

at 8:25-9:5 (analyst King presentation to owners Christie Fasick and Matthew Spencer).

The Testifying Owners heard these statements. *See* Barnett Dep. at 20:8-10 ("They said it would be – it makes it easier for the attorney to get us out of the contract if we were delinquent."); King Dep. at 28:23-29:6; Braun Dep. at 72:11-13, 18, 20-23; 73:2-4 ("I understood if we quit making payments, that it would expedite the process."); Dixon Dep. at 22:24-23:1; 23:4-8, 11-12; Schupp Dep. at 61:14-23.

These statements were referenced in internal training meetings wherein it was discussed that "Regarding developer payments, analysts should state the same as we do in the back. 'Legally, we cannot advise you to stop your payments to your developer. However, we have found that our attorneys have had more success with contract resolution when clients stop their payments. This pertains to both mortgage and maintenance fees.'" P-1574; *see also* P-1497, p. 7 (training manual providing template language to consumers stating "our attorneys have much more success in a shorter period of time when a client does fall into default").

These statements were mentioned in internal training materials which include template email language stating "Regarding existing mortgage payments owed to your timeshare developer, please know that we cannot legally advise you to stop your payments. However, what we can tell you is that our attorneys have much more success in a shorter period of time when a client does fall into default." P-1497, p. 7.

Numerous examples of analyst sales calls, across a range of Pandora employees, include reference to the statements that the attorney's process will be faster is they stop making payments.

Representations that stopping payments on their timeshares will make the attorneys' process "faster," "quicker," or "easier" are false because the attorneys to which Pandora refers Bluegreen owners have no process that entitles an owner to cease payments. Instead, the Lawyer Defendants rely on owner non-payment to reach the desired exit. *See supra* Section 2.C.(2) at h.–m.; P-1438, No. 20; Trial Tr. Vol. III, 86:11-13. It is for this reason that the Court has already found that "the Lawyer Defendants' entire relationship with the timeshare owners was a sham, as the latter thought they were paying to be legally released from their timeshare contracts, when in reality it was their defaults that did all the work." (Summ. J. Order at 34, ECF No. 437.)

As noted, many Testifying Owners stated that the Marketing Defendants encouraged them to stop payment right away and that the ability to stop making payments and/or the promise of credit protection was material to their decision to hire Marketing Defendants. *See* Prosek Dep. at 25:9-18; Lathrem Dep. at 26:6-11, 29:12-18; King Dep. at 25:7-16, 29:10-15, 35:17-22; Braswell Dep. at 29:5-6, 29:25-30:2, 30:4-6, 31:6-9, 40:25-41:3; Driver Dep. at 17:21-18:5, 30:5-15, 30:17-22; Schupp Dep. at 21:5-9, 27:3-7, 28:18-20; Marston

Dep. at 22:20-25, 23:15-24; Braun Dep. at 34:19-35:1, 35:8-13, 35:22-23; 36:3, 36:15-19; Prosek Dep. at 25:13-18, 25:23-26:1, 54:22-55:1, 56:19-25; Harding Dep. at 19:3-9, 25:1-10; Ivy Dep. at 34:22-35:10; Dixon Dep. at 25:11-23, 25:24-26:1, 26:4; Tilahun Dep. at 28:16-19; Barnett Dep. at 40:21-41:9; Freed Dep. at 35:16-24.

Numerous owners testified that they stopped paying Bluegreen because of the Marketing Defendants' instructions. *See* Tilahun Dep. at 28:16-19; Braswell Dep. at 29:5-6, 29:25-30:2, 30:4-6; Barnett Dep. at 40:21-41:9; Schupp Dep. at 21:5-9, 27:3-7; Lathrem Dep. at 29:12-18; Driver Dep. at 17:21-18:5; King Dep. at 29:10-15; Freed Dep. at 35:16-21, 24; Marston Dep. at 22:20-25; Braun Dep. at 35:8-13, 35:22-23, 36:3; Dixon Dep. at 25:11-23; Prosek Dep. at 25:23-26:1; Harding Dep. at 19:3-5, 9.

### D. Pandora's Exit Services

When owners sign up for Marketing Defendants' services, they agree to pay a fee for such services. *See* P-1001 through P-1191 (Pandora customer services agreements charging each owner a fee for services). Pandora's fee to identified Bluegreen owners ranges from $2,785 (P-1145) to $29,453.52 (P-1092).

The fee that Pandora charges owners for its services is typically one third of an owner's outstanding loan balance owed to Bluegreen. Trial Tr. Vol. I, 231:6-10. In certain cases, the fee may be greater than a third of the loan balance. *Id.* at 233:15-234:3. Pandora does not disclose to its customers that they are charged more depending on the amount of debt owed to timeshare developers. *Id.* at 233:9-14.

After retaining Pandora for the advertised services, Pandora refers timeshare owners to an attorney for the purpose of retaining the attorney in regard to their timeshare interest. P-1390 at RFA No. 17 (admitting that Pandora intended owners referred to Slattery or his associated law firms to retain Slattery or such law firms in regard to their timeshare interest); Trial Tr. Vol. II, 227:19-22.

Marketing Defendants' referral of the timeshare owner to the attorney is the sole means by which Marketing Defendants attempt to make good on the promise to cancel a customer's timeshare contract. P-1392 at RFA No. 83 (admitting that for Bluegreen Owners with a remaining loan balance, Pandora presently uses only an attorney to obtain an exit of the owners' timeshare interest).

Marketing Defendants themselves do not perform any function to obtain cancellation or termination of the Bluegreen owner's timeshare contract. P-1392 at RFA No. 83 (admitting that for Bluegreen Owners with a remaining loan balance, Pandora presently uses only an attorney to obtain an exit of the owners' timeshare interest). Instead, after getting paid by the timeshare owners, Marketing Defendants act as a paralegal for the affiliated attorneys

tasked with assembly and transmittal of paperwork.  Trial Tr. Vol. I, 250:10-18;
P-1390 at RFA Nos. 137 (admitting that Pandora used Carlsbad to perform
services advertised to Bluegreen Owners), 139 (admitting that Pandora referred
Bluegreen Owners to Carlsbad).

   In reality, the way timeshare owners are "exited" from their timeshare
obligations is through default; in other words, the owner stops paying their
timeshare loan. Indeed, whether a Bluegreen owner stops paying the loan
associated with his or her timeshare contract is integral to Defendants' ability
to deliver the advertised termination or cancellation of the financial obligations.
Defendants are not aware of any Bluegreen customer that has been released
from their financial contractual obligations while continuing to make loan
payments.  P-1438, No. 20; *see also* Trial Tr. Vol. III, 86:11-13 ("If you continue
to make payments to your timeshare, the likelihood of you being released
based on any complaint that…***any lawyer does…is almost zero***.") (emphasis
added).

   In anticipation of the harm owners might suffer should they stop making
their payments, Marketing Defendants also refer owners to third-party credit
protection, repair, and/or restoration services which purport to provide
monitoring and protection services for an owner that stops payments.  P-1393
at No. 276 (admitting that Pandora referred customers to a third-party credit
protection service which used a timer similar or comparable to "tradeline
blocking").  The only need for credit protection related to an owner's timeshare
interest is if the owner ceases payment to the developer.  Trial Tr. Vol. III,
110:14-19.

### E. The Lawyer Defendants' Role

   One of the law firms that Marketing Defendants refer customers to is
Carlsbad.  Trial Tr. Vol. II, 227:19-22. Slattery and Hall are equity partners of
Carlsbad.  Trial Tr. Vol. II, 187:18-21; Trial Tr. Vol. III, 9:18-23.

   Before Carlsbad began accepting clients from Marketing Defendants in
March 2019, Slattery previously accepted representation of timeshare owners
through Del Mar Law Group, LLP ("DMLG") which is a separate Slattery law
firm.  Trial Tr. Vol. III, 12:13-15; P-1491(written referral agreement between
Pandora and DMLG).

   Slattery visited Pandora's headquarters and observed employees engaged
in telephone solicitation efforts.  Trial Tr. Vol. III, 82:15-83:10.

   Once an owner signs up with Marketing Defendants, the Marketing
Defendants collect documents from owners, such as a copy of the owner's
timeshare contract, and upload those materials into a shared Google Drive to
update Lawyer Defendants with information regarding owners.  Trial Tr. Vol. II,
229:11-16; Trial Tr. Vol. III, 18:3-22.

   At some point, Lawyer Defendants specifically requested that Marketing
Defendants only refer them customers who had retained a credit-protection

service, colloquially referred to as a "tradeblock."  P-1393 at RFA No. 277 (admitting that Slattery requested that he be referred customers who had been offered credit protection services or referred to third parties who offer credit protection services).  This request was made in part because Lawyer Defendants did not want to deal with owners' calls and questions regarding credit issues.  P-1570 (recording between Slattery and Marketing Defendants wherein Slattery reiterates his request that Pandora refer him only those owners who have credit repair).

Marketing Defendants communicate to their customers on behalf of their attorneys. P-1390 at RFA No. 86 (admitting that Pandora communicates to its customers on behalf of its law firm vendors); P 1497, p. 4 (internal training guide stating that Lawyer Defendants "[p]refer[] Clients Send Correspondence directly to reps at TSC then we send it to them").

Lawyer Defendants rely upon the Marketing Defendants to instruct timeshare owners to cease payment to the timeshare developer.  P-1979 (email from Carlsbad to Pandora stating that Carlsbad "rel[ies] on RAG[to advise the clients to stop payment"). Grey testified that Intermarketing Media, LLC d/b/a Resort Advisory Group was another timeshare exit entity that relied on Pandora to operate its business.  Trial Tr. Vol. II, 37:17-38:16.  Specifically, that Pandora analysts also gave presentations under the name Resort Advisory Group. *Id.* Grey testified that there was no separate training for selling Resort Advisory Group's product compared to Pandora's product.  *Id.* at 38:17-20.

After referral to the Lawyer Defendants, Bluegreen owners execute a retainer agreement with the Lawyer Defendants (the "Lawyer Defendant Retainer Agreements") that limit the scope of services that Lawyer Defendants will provide to the owners.  P-1192 through P-1267.

The Lawyer Defendant Retainer Agreements obligate Lawyer Defendants to draft two letters to Bluegreen and "use their best efforts to negotiate a resolution with the developer to the extent possible."  *See id.*  These two letters are: (1) a letter of representation, and later (2) a cease and desist letter.  P-1268 through P-1388 (boilerplate correspondence sent by Carlsbad to Bluegreen).

The Lawyer Defendant Retainer Agreements expressly exclude any services not enumerated therein, including representation of the timeshare owners in foreclosure, judicial, tribunal, or arbitrational actions.  P-1192 through P-1267. The Lawyer Defendant's Retainer Agreements expressly provide that Carlsbad will not represent the timeshare owners in any judicial or arbitration actions.  *Id.*

However, Bluegreen does not respond to these letters, or otherwise engage in negotiations.  Trial Tr. Vol. I, 56:10-22 (testimony that Bluegreen does not negotiate with timeshare exit companies or attorneys that work with such companies).

Lawyer Defendants do not provide any other legal services for Bluegreen owners, for instance, Lawyer Defendants have never initiated litigation or arbitration against Bluegreen.  Trial Tr. Vol. II, 232:4-6.

Slattery testified that the purpose of the credit service offered to owners is to attempt to create some form of "leverage" through non-payment.  Trial Tr. Vol. III, 108:16-1.

For their part, the Lawyer Defendants charge an additional fee to the owners.  P-1192 through P-1267.  Such fee is charged with knowledge that Pandora had already charged the owners a fee.  Trial Tr. Vol. III, 100:7-9.  Historically, the lawyer's fee has been either $600 or $750.  P-1192 through P-1267.  Hall testified that such fee has recently increased to $950.  Trial Tr. Vol. II, 228:23-229:3.

The correspondence drafted by Lawyer Defendants on behalf of timeshare owners that Pandora refers to them uniformly rely on California law without consideration of the owners' place of residence, where the timeshare contract was purchased, where the timeshare property is located, where Bluegreen is headquartered, or any choice of law provisions in the relevant timeshare contracts.  *Id.* at 238:2-22.

Such boilerplate correspondence account for less than ten percent of Carlsbad's work but comprise forty percent of their revenue.  Trial Tr. Vol. III, 14:14-22.

Regardless of how much owners pay Marketing Defendants and Lawyer Defendants combined, they will receive the same services. By example:

  a. Marketing Defendants charged owner Barrett $3,998 [P-1012] and Lawyer Defendants charged this owner $750 [P-1198].[20] In return, Lawyer Defendants drafted a cease-and-desist letter [P-1312] along with a demand letter [P-1279]. This owner ceased payment to Bluegreen eighteen days after retaining the Marketing Defendants. *Compare* P-1012 *with* P-0583.

  b. Marketing Defendants charged owner Kern $29,453.52 [P-1092] and Lawyer Defendants charged this owner $750 [P-1234]. In return, Lawyer Defendants similarly drafted a cease-and-desist letter [P-1291] along with a demand letter [P-1333]. This owner ceased payment to Bluegreen twenty-three days after retaining the Marketing Defendants. *Compare* P-1092 *with* P-0672.

  c. The "substantive" demand letters for each of the above-referenced owners are nearly identical. *Compare* P-1279 *with* P-1333. Neither letter references legal arguments related to the states where such owners reside. *Id.* Instead, the letters rely nearly exclusively on California law. *Id.*

---

[20] Notably, the combined $4,748 paid to the Marketing Defendants and Lawyer Defendants together exceeds this owner's $ 2,837.38 loan balance to Bluegreen. *See* P-1012, P-1198, P-0583.

     d.  No evidence was presented at trial that Kern received anything materially different from Barrett despite paying significantly more to the Marketing Defendants.

After Carlsbad sends out the boilerplate correspondence to Bluegreen, it makes a notation in the shared Google drive to advise Pandora that such letters were sent.  Trial Tr. Vol. III, 120:5-16.

## F. The Marketing Defendants' Revenues and Profit

At trial, Bluegreen presented evidence that the Relevant Owners paid $1,558,958.62 to the Marketing Defendants in consideration of the Marketing Defendants' advertised services.  This number is the total aggregate of the sums reflected on the Bluegreen timeshare owners' Service Agreements with Pandora.  *See* P-1001 through 1191 (Marketing Defendant services agreements stating the fee charged by Marketing Defendants to the Relevant Owners).

In response, Marketing Defendants offered into evidence the testimony of Grey regarding a series of profit and loss statements (the "P&L") spanning from 2016 through the time of trial, which Marketing Defendants assert establishes a 5.27% profit margin over the life of the company.  D-427, p. 28.

However, Marketing Defendants did not present any testimony that tied the specific expenses listed on the P&L to the Marketing Defendants' sales operation as it pertained to Bluegreen timeshare owners. On cross-examination, Grey conceded that many of the expenses listed on such exhibit had no connection to such advertising.  *See, e.g.*, Trial Tr. Vol. III, 175:15-17 (attorney expenses), 180:17-181:4 (Christmas party); 198:7-17 (income deduction based on refund costs).  Indeed, Grey noted that some expenses were for other, non-timeshare related business ventures.  *Id.* at 191:15-192:6 (CBD business), 192:7-10 (line items titled as "corporate business development" are potentially related to "exploring other business opportunities outside of Pandora Marketing"), 192:23-193:8 (real estate flipping venture).  As to other categories of expenses listed, Grey further conceded that he was unable to determine the specific expenses actually incurred referenced within such categories without resort to review of additional information outside the record.  *Id.* at 173:14-25, 185:7-22, 185:25-186:18.

No evidence other than Grey's testimony and the P&L were offered at trial with regard to Marketing Defendants' proposed deduction of costs from their revenues.

Grey testified that Bluegreen timeshare owners constitute "less than eight percent" of Marketing Defendants' total sales.  Trial Tr. Vol. I, 252:8-9.

Moreover, Marketing Defendants did not contend that some portion of their revenues were attributable to advertising campaigns or sales presentations other than those placed at issue by Bluegreen in this case.

### G. Harm to Bluegreen

As a result of the Marketing Defendants' actions with regard to Bluegreen timeshare owners, those Bluegreen timeshare owners ceased paying obligations associated with their Bluegreen timeshares, which predictably harmed Bluegreen.

As Mr. Humphrey testified, BVC securitizes most of the loans that are originated with Bluegreen timeshare owners who finance the purchase of their Bluegreen timeshares. As part of the securitization process, the loans are assigned to a special purpose entity ("SPE"). Trial Tr. Vol. I, 32:24-5. BVC then borrows against some portion of the future payment stream associated with loan receivables for the loans in the SPE. *Id.* BVC also continues to act as the servicer for the loans assigned to the SPE. *Id.* at 93:2-4.

As loan payments are received, the majority of the principal and interest associated with those payments is paid out to bondholders. The residual principal and interest, however, is kept by BVC each month (the "Residual Payment"). When a Bluegreen timeshare owner defaults on one of these loans, BVC does not receive the Residual Payment associated with that loan. Additionally, even though the portion due to the bondholders was not received from the Bluegreen timeshare owner, BVC still makes the payment due to the bondholder out of its own funds using its Residual Payments from other performing loans. Trial Tr. Vol. I, 200:19-23. Therefore, when a securitized loan defaults, BVC immediately begins suffering losses in the form of missed Residual Payments and additional payments due to the bondholders that BVC would not otherwise make. *Id.* at 82:23-83:15, 183:13-16, 199:1-200:18.

For some of these defaulted loans, BVC either repurchases the delinquent loans in the amount of the unpaid principal balance, or substitutes the defaulted loan with another similar loan. *Id.* at 38:1-17. One reason for such repurchase is to avoid reputational injury that jeopardizes Bluegreen's overall ability to complete other securitization transactions. *Id.* at 96:6-16.

Plaintiff BVC was injured when Relevant Owners ceased payment on the debt associated with the Relevant Contracts as it did not receive the outstanding principal balances of such loans. P-0571 through P-0779 (LSAM records showing non-payment). Indeed, as outlined in detail above, the owners' testimony evidences that they stopped paying Bluegreen because of the Marketing Defendants' representations. *See supra* Section 2.C.(1)–(5). BVC also loses revenue from servicing loans after they default. Trial Tr. Vol I, 35:16-24.

The evidence at trial demonstrated that each of the Relevant Owners that hired Pandora ceased payment on the Relevant Contracts thereafter. P-0571 through P-0779 (LSAM records showing non-payment). Each of the Relevant Owners have an outstanding unpaid principal loan balance on the notes associated with the Relevant Contracts. *Id.*

Indeed, fifty percent of the Relevant Contracts became delinquent within one month of when the related owner hired the Marketing Defendants while

eighty-two percent of the Relevant Contracts became delinquent within three months of when the related owner hired the Marketing Defendants. *Compare* Pandora Services Agreements (P-1001 through 1191) (referencing date Relevant Owners retained Pandora) *with* Bluegreen LSAM (P-0571 through P-0779) (referencing delinquency date of Relevant Contracts).

Second, plaintiff BVU is harmed by reacquiring the Bluegreen timeshare interests after they become delinquent, and then incurs carrying costs during the period after BVU takes title to the interest.  BVU also incurs remarketing costs associated with selling the re-acquired interest yet again.  Trial Tr. Vol. I, 42:1-7; 42:19-43:1; 118:19-20.

Finally, following delinquency and recovery of related inventory, such inventory must be re-sold but such re-sale deprives Bluegreen of the benefit from selling other inventory.  *Id.* at 43:2-4.

### 3.  Conclusions of Law

### A.  Count One: False Advertising in Violation of the Lanham Act

### (1) *Violation of the Lanham Act*

"The Lanham Act prescribes liability for false advertising to 'commercial advertising or promotion.'" *Tobinick v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017) (quoting 15 U.S.C. § 1125(a)(1)(B)). Bluegreen seeks a verdict in its favor on its false advertising claim based on the purportedly false statements made by Pandora's analysts to customers during the telephonic sales presentations at the last stage of Pandora's multi-stage advertising campaign. Thus, the Court must first determine whether those sales presentations constitute the kind of commercial advertising or promotion addressed by the Lanham Act.

> Commercial advertising or promotion includes "(1) commercial speech; . . . [(2)] for the purpose of influencing consumers to buy defendant's goods or services[;]" and [(3)] "the representations . . . must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry."

*Id.* (cleaned up) (quoting *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012)).

The parties' arguments during trial focused on the third element—*i.e.*, whether the sales presentations and the false statements allegedly contained therein were sufficiently disseminated to the relevant public to qualify as 'advertising' or 'promotion' within the timeshare industry. On summary judgment, the Court concluded that genuine issues of material fact remained as to whether the sales presentations at issue were sufficiently disseminated to constitute an actionable advertisement or promotion under the Lanham Act. The Court now concludes that the statements at issue constitute actionable advertising under the Lanham Act.

Marketing Defendants advertise their services through a nationwide, multi-stage campaign involving various dissemination methods, including Pandora's website, in-person presentations, and social media. The result of this comprehensive advertising is the scheduling of timeshare owners to speak with an analyst who delivers the sales presentation, an integral part of the multi-stage campaign. The sales presentations were thus "part of an organized campaign to penetrate the relevant market," *i.e.*, the market of timeshare owners seeking a release from their timeshare obligations. *See Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 461–62 (D.N.J. 2009). In addition, as detailed in the Court's findings of fact and conclusions of law, the statements at-issue in the sales presentations were widely disseminated. *See supra* Section 2.C.(1)–(5). In short, even if in varying degrees, the evidence has established that the statements at issue appear in multiple analyst scripts and other training materials, were made to the Testifying Owners with regularity, and appear in the audio recordings provided with regularity. *See Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1385-86 (5th Cir. 1996) ("[F]or purposes of the Lanham Act's definition of 'commercial advertising or promotion,' both the required level of circulation and the relevant 'consuming' or 'purchasing' public addressed by the dissemination of false information will vary according to the specifics of the industry.").

Having found that the statements at issue were disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within the timeshare exit industry, the Court also finds that the statements constituted commercial speech for the purpose of influencing consumers to buy the Marketing Defendants' services. "The core notion of commercial speech extends to speech that proposes a commercial transaction" and "[t]he Supreme Court has identified three factors in looking beyond the core notion of commercial speech: (1) that the material was conceded to be advertisements, (2) it contained a reference to a specific product, and (3) the speaker has an economic motivation for distributing the material." *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017) (cleaned up). This Court has already found as undisputed that the analysts "help potential customers decide whether the Marketing Defendants' services are right for them by delivering oral sales presentations." (Summ. J. Order at 2, ECF No. 437.) And, Marketing Defendants admit the purpose of the sales presentations is to influence timeshare owners to buy their services. Because the sales presentations clearly propose a commercial transaction, *i.e*, timeshare owners paying money in exchange for Marketing Defendants' exit services, and Marketing Defendants have an economic motivation in delivering the sales presentations, namely, getting timeshare owners to sign up for their services, the Court finds that the sales presentations constitute commercial advertising or promotion under the Lanham Act.

Because the Court has determined that the statements at issue constitute actionable advertisements under the Lanham Act, it moves on to analyze whether such advertisements meet the other requirements for a successful Lanham Act claim. To succeed on a claim for false advertising in violation of the Lanham Act, a plaintiff must meet five elements:

> (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been—or is likely to be—injured as a result of the false advertising."

*Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). The Court finds that the statements at issue satisfy all these elements.

The first element is satisfied "if the challenged advertisement is literally false, or if the challenged advertisement is literally true, but misleading." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). As detailed in the Court's findings of fact, this element is established in this case. *See supra* Section 2.C.(1)–(5). By way of example, the statements to owners that Marketing Defendants will protect their credit with certainty are literally false because many owners who signed up for the advertised credit services did in fact experience negative or derogatory impacts to their credit as a result of them ceasing payment to Bluegreen. In addition, the statements to owners that an attorney will provide an exit for them are false or misleading because Lawyer Defendants merely send two letters to Bluegreen that they know will not effectuate an exit. They then sit back and wait for an owner to default on his or her loan in order for the owner to be "exited" from their Bluegreen contract. (*See* Summ. J. Order at 27, ECF No. 437 ("In short, the record shows that the Defendants sell a service that depends entirely on the timeshare owners defaulting on their contractual obligations to Bluegreen.").) Because the attorneys do not provide an exit for owners, rather, owners' defaults provide the exit, these types of statements are deceptive. Moreover, the statements regarding Marketing Defendants' success rate are false, as there are Bluegreen owners who are clients of Marketing Defendants and who still have active Bluegreen contracts, meaning they have not been successfully "exited" from their Bluegreen contracts as guaranteed by Marketing Defendants. Similarly, the statements regarding the effect of the attorney's services on owners' payment obligations are false or misleading since, as explained, an owner stopping payment does not help the attorney's process or make it "faster." This is because the attorneys have no process for getting owners out of their timeshare obligations but rather wait for the owners to stop paying and go into default. Moreover, the attorneys to which Marketing Defendants refer Bluegreen owners have no process that entitles an owner to

cease payments, instead, Marketing Defendants' service is merely a referral to an attorney.

The statements were also material. "Even if an advertisement is literally false, the plaintiff must still establish materiality." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1319 (11th Cir. 2010). "A plaintiff may establish this materiality requirement by proving that the defendants misrepresented an inherent quality or characteristic of the product." *Diamond Resorts Int'l, Inc. v. Aaronson*, 371 F. Supp. 3d 1088, 1108 (M.D. Fla. 2019) (cleaned up).  The false statements regarding attorneys providing the owner's exit from his or her timeshare contract, Pandora's success rate, and the effect of the attorney's services on the owner's payment obligations, are all material because they each go to the inherent qualities of the Marketing Defendants' services: releasing owners from their timeshare obligations through the use of attorneys. Specifically, false statements regarding attorneys providing the exit and the false statements regarding the effect of the attorney's services on payment obligations go directly to the Marketing Defendants' offering of a timeshare exit exclusively through attorneys, and what those attorneys can do for owners' timeshare obligations. The false statement regarding Pandora's success rate promises that these services will be successful. Moreover, the Testifying Owners testified as to the importance these statements had on their hiring decision. As to the statement regarding credit protection, many Testifying Owners testified that the ability to stop making payments to Bluegreen and/or the ability to have credit protection services were material to their decision to choose the Marketing Defendants' services.  The statements were thus material under the Lanham Act.

The false statements also affect interstate commerce. Since the Marketing Defendants engage in nationwide advertising and solicit customers, via the false statements in the oral presentations, across many states, the false statements clearly affect interstate commerce.

Finally, Bluegreen is injured as a result of the false statements. Bluegreen seeks equitable relief—an injunction and disgorgement—as a result of its harm suffered by the false statements. The burden for demonstrating causation under the Lanham Act is lower for equitable relief and actual damages need not be proven. *See Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1353 (11th Cir. 2019) (explaining disgorgement under the Lanham Act "shifts the burden of proving economic injury off the innocent party, and places the hardship of disproving economic gain onto the infringer"); *Ameritox, Ltd. v. Millennium Lab'ys, Inc.*, No. 8:11-CV-775-T-24-TBM, 2014 U.S. Dist. LEXIS 51237, at *26, 2014 WL 1456347, at *9 (M.D. Fla. Apr. 14, 2014); *Newborn Bros. Co. v. Albion Eng'g Co.*, 481 F. Supp. 3d 312, 344 (D.N.J. 2020). Bluegreen is injured by the false statements because the false statements convince owners that hiring Marketing Defendants will result in a successful exit and advertise to owners the ability to stop their

payments, without harm to their credit, and with legal assistance. The cumulative effect of the false statements is that Bluegreen owners sign up with the Marketing Defendants and, pursuant to these statements, stop making their payments.

In addition to the testimony of the Testifying Owners who explained that the false statements were material to their decision to hire Marketing Defendants and stop paying Bluegreen, Bluegreen presented temporal evidence demonstrating that an overwhelming majority of the relevant owners at-issue in this matter ceased payment to Bluegreen shortly after exposure to the Marketing Defendant presentations. This is sufficient to establish that Bluegreen has been harmed by the false statements and is entitled to equitable relief.

Thus, the Court finds that Bluegreen has proven all of the elements of its claim for false advertising under the Lanham Act.

**(2) *Disgorgement Damages***

Once a violation is established, the Lanham Act provides that a plaintiff is entitled, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Disgorgement of profits "is appropriate where: (1) the defendant's conduct was willful and deliberate, (2) the defendant was unjustly enriched, or (3) it is necessary to deter future conduct." *Optimum Techs., Inc. v. Home Depot U.S.A., Inc.*, 217 F. App'x 899, 902 (11th Cir. 2007) (citing *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1521 (11th Cir. 1990)).

The remedies provided for in 15 U.S.C. § 1117(a) are "subject to the principles of equity," and "[i]f the court shall find that the amount of the recovery based on profits is . . . excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." Thus, § 1117(a) specifies that the disgorgement awarded "shall constitute compensation and not a penalty." *Id.*

In other words, disgorgement "should not produce . . . a gross disconnect between harm and recovery." *KEG Techs., Inc. v. Laimer*, 436 F. Supp. 2d 1364, 1373 (N.D. Ga. 2006) (reducing disgorgement of lost profits which constituted a "windfall . . . in contravention of the Lanham Act's mandate that any monetary award 'constitute compensation and not a penalty'"). While "an award of wrongful profits may be appropriate to deter the liable party from continuing its wrongful conduct[,] . . . the Lanham Act forbids the court from allowing a recovery that is so excessive as to constitute a penalty." *Alexander Binzel Corp. v. Nu-Tecsys Corp.*, No. 91 C 2092, 2000 U.S. Dist. LEXIS 5238, at *42-43, 2000 WL 310304, at *14 (N.D. Ill. March 23, 2000) (reducing disgorgement award). Awarding all of a defendant's profits during the relevant time period may be inappropriate if the award is "so excessive as to constitute a penalty." *Id.* Moreover, disgorgement may, at a minimum, be reduced by the

deductible costs and expenses to arrive at a defendant's net profits. 15 U.S.C. § 1117(a).

Equity also requires that the Court consider a plaintiff's unclean hands. *See, e.g.*, *4 Pillar Dynasty LLC v. N.Y. & Co.*, 933 F.3d 202, 214 (2d Cir. 2019) ("[A] district court must still balance equitable factors in assessing the propriety of a profits award. These include, but are not limited to: (1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) the availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) any delay by plaintiff; and (5) plaintiff's clean (or unclean) hands."); *Victorinox AG v. B&F Sys.*, 709 F. App'x 44, 50 n.5 (2d Cir. 2017) ("[T]he Lanham Act . . . subject[s] every award of monetary damages to 'principles of equity,' 15 U.S.C. § 1117, *e.g.*, unclean hands."). *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540-41 (2d Cir. 1992) (same); *see also Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, No. SACV 17-01613-CJC (DFMx), 2023 U.S. Dist. LEXIS 43066, at *10, 2023 WL 2652855, at *3 (C.D. Cal. Mar. 13, 2023) (denying disgorgement, among other reasons, because "the equitable considerations, in the Court's discretion, do not weigh in favor of disgorgement"); *Cesari S.R.L. v. Peju Province Winery L.P.*, No. 17 CIV. 873 (NRB), 2023 U.S. Dist. LEXIS 169434, at *20, 2023 WL 6173464, at *8 (S.D.N.Y. Sep. 22, 2023) ("[E]ven where the infringer failed to produce evidence of either apportionment or cost deductions, to avoid a windfall to the mark owner, the court may award its own estimate of what is a fair recovery.").

Section 1117(a) "gives the district court broad discretion to award damages that are appropriate to the facts of the particular case." *Slep-Tone Entm't Corp. v. Johnson*, 518 F. App'x 815, 819 (11th Cir. 2013). "Because of th[is] broad discretion . . ., 'the district court's damage assessment is entitled to deference[,]'" and "will not [be] disturb[ed] . . . on appeal unless it is 'clearly inadequate.'" *See id.* (quoting *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1564 (11th Cir. 1986)). "Moreover, Lanham Act damages may be awarded even when they are not susceptible to precise calculations." *Ramada Inns, Inc.*, 804 F.2d at 1565 (citing *Bangor Punta Operations v. Universal Marine Company*, 543 F.2d 1107, 1110-11 (5th Cir. 1976); *Borg-Warner Corporation v. York-Shipley, Inc.*, 293 F.2d 88, 95 (7th Cir. 1961)).

The Court itself already recognized Bluegreen's reproachable conduct in this matter during the trial, noting that the deposed owners testified that Bluegreen lied to them, made misrepresentations to them during the sales process, pressured them into purchasing and/or upgrading, and otherwise defrauded them. *See* Trial Tr. Vol. IV, 9:16-21. As previously noted, these lies, misrepresentations, and high-pressure sales tactics include the following:

      a.  False statements that an owner could rent out their timeshares to earn extra money. *Id.* at 10:8-10.

b. False statements that an owner was being offered an exclusive deal that was only available for that day. *Id.* at 17-19.

c. Statements that the timeshare ownership interest would increase in value and have great resale value. *Id.* at 10:25-11:1.

d. Misrepresentations regarding the financial significance of the maintenance fees. *Id.* at 11:10-12.

e. Misrepresentations from the Bluegreen sales representatives regarding the points increment and its significance. *Id.* at 11:17-19.

f. Misrepresentations regarding the outside exchange program. *Id.* at 11:24-25.

g. Sales representatives coerced owners into applying for Bluegreen-branded credit cards. *Id.* at 12:4-5.

h. False statements that if an owner upgraded their timeshare they would get greater priority when booking, when in fact they did not. *Id.* at 12:7-9.

i. False statements that the Bluegreen sales representative would act as the owner's personal assistant and be available to them after the sale. *Id.* at 12:18-21.

j. Failure on the part of the Bluegreen sales representative to disclose the correct interest rate on the loan. *Id.* at 12:25-13:1.

k. Failure on the part of the Bluegreen sales representative to disclose the owner's right to rescind the timeshare contract. *Id.* at 13:6-7.

*See also* Marketing Defendants' First and Second Offers of Proof, ECF Nos. 494, 521 (detailing owners' complaints about Bluegreen in this case).

Bluegreen's position that *every single one* of these owners' statements regarding their unconscionable treatment at the hands of Bluegreen is false and should not be accepted by the Court, but that the *same owners' testimony* regarding misrepresentations allegedly made by Marketing Defendants is entirely true and must be accepted by the Court, is not plausible. *See* Trial Tr. Vol. IV, 13:11-23. As the Court put it, it cannot be true that "these tens of thousands or hundreds of thousands of people that are going to these timeshare exit companies"—people who are "so dissatisfied with [their timeshares] that they're willing to pay thousands of dollars to get out"—are "just all wrong." *Id.* at 13:24-14:7.

But for Bluegreen's wrongful conduct, owners would not have sought out Pandora in an attempt to unburden themselves from a lifetime of limitless and ever-increasing maintenance fees and years of high-interest loan payments, totaling tens of thousands of dollars, in exchange for illusory timeshare accommodations.

Although Bluegreen is not blameless, this should not totally absolve the Marketing Defendants of their disgorgement obligations. After all, the principals of Pandora learned of the timeshare companies' reproachable

conduct within the timeshare industry during the time they worked there and committed the same misrepresentations. They helped create the victim/owners of timeshares, and then used their inside knowledge to victimize the owners a second time.

As noted earlier in this order, Bluegreen presented evidence that the Relevant Owners paid $1,558,958.62 to the Marketing Defendants in consideration of the Marketing Defendants' advertised services. This number is the total aggregate of the sums reflected on the Bluegreen timeshare owners' Service Agreements with Pandora. *See* P-1001 through 1191 (Marketing Defendant services agreements stating the fee charged by Marketing Defendants to the Relevant Owners).

In response, Marketing Defendants offered into evidence the testimony of Grey regarding a series of profit and loss statements (the "P&L") spanning from 2016 through the time of trial, which Marketing Defendants assert establish a 5.27% profit margin over the life of the company. But the Defendants' numbers are not reliable.

Thus, the Court finds that an appropriate amount of disgorgement taking into account the harm to Bluegreen as well as Bluegreen's own conduct is **$100,000.00**.

### B. Count Five: Tortious Interference with Contractual Relations

"A claim for tortious interference with a contractual or business relationship consists of four elements: 1) the existence of a business relationship between the plaintiff and a third person, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights, 2) the defendant's knowledge of the relationship, 3) an intentional and unjustified interference with the relationship by the defendant which induces or otherwise causes the third person not to perform, and 4) damage to the plaintiff resulting from the third person's failure to perform." *DNA Sports Performance Lab, Inc. v. Club Atlantis Condo. Ass'n*, 219 So. 3d 107, 110 (Fla. 3d DCA 2017) (citing *Seminole Tribe of Florida v. Times Pub. Co., Inc.*, 780 So. 2d 310, 315 (Fla. 4th DCA 2001)); *see also Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1215 (11th Cir. 2018) (same); *Zimmerman v. D.C.A. at Welleby, Inc.*, 505 So. 2d 1371, 1373 (Fla. 4th DCA 1987) ("It is not essential, however, that the business relationship be founded upon an enforceable contract.").

Previously, Bluegreen moved for summary judgment on its tortious interference claim only with respect to the fifteen timeshare owners for whom it had provided deposition testimony (again, the "Testifying Owners"). The Court granted Bluegreen's motion, except as to the element of damages. In so doing, the Court concluded that the Marketing Defendants knew of the Testifying Owners' contracts with Bluegreen, that the Marketing Defendants, through their analysts, intentionally induced the Testifying Owners to stop payments on

their contracts with Bluegreen, and that without the Marketing Defendants' intervention, the Testifying Owners would not have simply breached their agreements with Bluegreen as the way to get out of their timeshare obligations. The Court now reaches the same conclusions with respect to Bluegreen's contractual relationships with its other timeshare owners.

Importantly, Florida courts have held that an independent ground for equitable relief may be found in a claim for tortious interference with contractual relationships. *See Zimmerman v. D.C.A. at Welleby, Inc.*, 505 So. 2d 1371, 1376 (Fla. 4th DCA 1987) ("We approve the trial court's finding that some of the activities enjoined constitute or are incident to conduct which constitutes intentional interference with potentially advantageous business relationships, and that the rights thus tortuously violated are entitled to be protected by equitable intervention in the form of a temporary injunction."); *Murtagh v. Hurley*, 40 So.3d 62, 67 (Fla. Dist. Ct. App. 2010) (denying injunctive relief where plaintiff failed to present evidence that demonstrated or allowed an inference that defendant's conduct "had a deleterious effect on" plaintiff's business); *Chevaldina v. R.K./FL Mgmt.*, 133 So. 3d 1086, 1090 (Fla. 3d DCA 2014) (recognizing availability of injunctive relief where plaintiffs alleged intentional interference with advantageous business relationships); *see also Heavener, Ogier Services, Inc. v. R. W. Florida Region, Inc.*, 418 So. 2d 1074, 1075-76 (Fla. 5th DCA 1982) (finding plaintiff entitled to temporary injunction against tortious interference with contractual relationship).

Bluegreen has shown that when a loan defaults, including the Testifying Owners' loans, it is harmed in various ways such as failure to receive the outstanding principal loan balance, maintenance fees, carrying costs, costs related to the sale and marketing of the reacquired timeshare interests, loss of residuals, and more. Bluegreen has thus shown injury resulting from Marketing Defendants' tortious interference with the relationship between Bluegreen and its timeshare owners. Because Bluegreen seeks only injunctive relief on this claim, it need not show actual damages.

## C. Count Seven: Civil Conspiracy to Commit Tortious Interference

Under Florida law, success on a clam of civil conspiracy requires proof of "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009) (quoting *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159-60 (Fla. 3d DCA 2008)). "Each coconspirator need not act to further a conspiracy; each 'need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators.'" *Cordell Consultant, Inc. v. Abbott*, 561 F. App'x 882, 886 (11th Cir. 2014) (quoting *Charles*, 988 So. 2d at 1160).

A civil conspiracy claim also requires an underlying tort. *Tejera v. Lincoln Lending Servs., LLC*, 271 So. 3d 97, 103 (Fla. 3d DCA 2019). "Tortious interference with a business relationship can constitute an unlawful act for the purposes of pleading a claim for civil conspiracy." *Id.*; *see also Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1148 (M.D. Fla. 2007) (same). The Court has already found that Bluegreen has proven tortious interference by Marketing Defendants (*see* Summ. J. Order at 34, ECF No. 437; *supra* Section 2.B.), thus, this requirement is satisfied.

An agreement for civil conspiracy need not be express, but rather, "may be inferred from" the nature of the acts done, the relation between the conspirators, their mutual interests in the matter, and other circumstances. *See Donofrio v. Matassini*, 503 So. 2d 1278, 1281 (Fla. 2d DCA 1987). "It is only in rare cases that a plaintiff can establish a conspiracy by showing an express agreement. Most conspiracies are inferred from the behavior of the alleged conspirators." *JES Properties, Inc. v. USA Equestrian, Inc.*, 253 F. Supp. 2d 1273, 1279 (M.D. Fla. 2003) (cleaned up). Notably, "[p]roof that the [defendant] committed an act which furthered the purpose of the conspiracy is an example of the type of circumstantial evidence [that can] prove the existence of an agreement." *Koch v. Royal Wine Merchants*, Ltd., 907 F. Supp. 2d 1332, 1347 (S.D. Fla. 2012) (quoting *United States v. Arias–Izquierdo*, 449 F.3d 1168, 1182 (11th Cir. 2006)).

The evidence here demonstrates that the Marketing Defendants and Lawyer Defendants had an agreement to do an unlawful act by unlawful means, namely to tortiously interfere with Bluegreen's contractual relationships by convincing Bluegreen owners to stop paying on their loans.

First, explicit actions demonstrate the Defendants' agreement. Defendant Slattery has had a relationship with the Marketing Defendants for years, and previously negotiated business terms with them on behalf of Del Mar Group, CLG's successor entity. Lawyer Defendants rely upon Marketing Defendants to manage communication with the timeshare owners and provide specific instructions to such owners. Defendants share a "Google Drive" to pass information between them, and Marketing Defendants gather owner information and documents for Lawyer Defendants' use.

Second, the agreement can be implicitly inferred from the Defendants' relationship and mutual interests. *See Donofrio*, 503 So. 2d at 1281. Each Defendant group relies on the other to keep the scheme going—Lawyer Defendants rely on Marketing Defendants to advertise their legal services, send referrals, and induce owners' nonpayment, and Marketing Defendants rely, exclusively, on Lawyer Defendants' services to advertise and purport to accomplish their proffered "legal" exits. (*See* Summ. J. Order at 19, ECF No. 437.) Moreover, Defendants rely on owners' defaults to achieve the exits, such that the defaults are also necessary to the success of the scheme.

An agreement to do an unlawful act by unlawful means has thus been established.

An overt act is an act "done in pursuance of the conspiracy." *Francois v. Hatami*, 565 F. Supp. 3d 1259, 1269 (S.D. Fla. 2021) (cleaned up). "Each coconspirator need not act to further a conspiracy; each 'need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators.'" *Cordell Consultant, Inc. v. Abbott*, 561 F. App'x 882, 886 (11th Cir. 2014) (quoting *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159-60 (Fla. 3d DCA 2008)).

First, Marketing Defendants solicit timeshare owners—including Bluegreen Owners—with promises of the ability to legally cancel the owners' financial obligations. Marketing Defendants make many overt representations to timeshare owners during the sales presentations to convince such owners to retain Marketing Defendants.

Second, Marketing Defendants send referrals of timeshare owners to attorneys like the Lawyer Defendants. These referrals are overt acts "in furtherance of the conspiracy" as they validate the Marketing Defendants' sales presentations. The Court has already determined that absent such referral, the scheme would fail. (*See* Summ. J. Order at 19, ECF No. 437 ("[T]here is sufficient evidence in the record to establish that the Marketing Defendants' entire scheme would fall short without the services of the Lawyer Defendants and others like them.").) Thus, these referrals, and acceptance of the referrals, further the larger conspiracy.

The purpose of the conspiracy between Defendants is to operate a "business model . . . based on offering a service—*i.e.*, legal cancellation of timeshare contracts—they do not actually provide." (Summ. J. Order at 24, ECF No. 437.) This is done through the procurement of owners' defaults on their timeshare obligations. As discussed, Bluegreen has shown that it is harmed when a loan defaults. Bluegreen has thus shown injury resulting from Defendants' conspiracy. Because Bluegreen seeks only injunctive relief on this claim as well, it need not show actual damages**.**

### D. Count Six: Violation of Florida's Deceptive and Unfair Trade Practices Act

The Court previously granted summary judgment in favor of Bluegreen on its request for injunctive relief pursuant to FDUTPA. And, since then, the Court has entered a preliminary injunction in favor of Bluegreen in line with that ruling. (ECF Nos. 487, 502.) For some unexplained reason, however, Bluegreen now suggests that it seeks additional injunctive relief under this Count for the Marketing Defendants' violation of the California Business and Professions Code § 6155. On summary judgment, Bluegreen raised various arguments for why the Marketing Defendants' conduct qualified as a deceptive act or unfair trade practice under FDUTPA, including because it violated

California Business and Professions Code § 6155. However, in its order, the Court specifically explained that, because it had concluded that the Defendant's business practices are deceptive, it declined to address that additional point. Because Bluegreen has provided no justification for its request that the Court address its § 6155 argument, and, for that matter, no reason for how such a ruling would impact its anticipated relief, the Court once again declines to address this issue.

**E. Entitlement to and Scope of Injunctive Relief**

Because the conduct giving rise to Bluegreen's request for injunctive relief is essentially the same for all its claims, the Court will address Bluegreen's entitlement to injunctive relief with respect to all the claims simultaneously. To obtain a permanent injunction, under the principles of equity, Bluegreen is required to establish: (1) irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest will not be disserved by a permanent injunction. *See eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006); *see also Liberty Counsel v. Florida Bar Bd of Governors*, 12 So.3d 183, 186 n.7 (Fla. 2009) ("To obtain a permanent injunction, the petitioner must establish a clear legal right, an inadequate remedy at law and that irreparable harm will arise absent injunctive relief." (cleaned up)). Accordingly, the standard for a permanent injunction is almost the same as for a preliminary injunction, except that the movant must show actual success on the merits instead of a likelihood of success. *See Siegel v. LePore*, 234 F.3d 1163, 1213 (11th Cir. 2000). The decision to grant permanent injunctive relief is an act of equitable discretion by the district court. *See eBay*, 547 U.S. at 391.

As established by the foregoing discussion, Bluegreen has demonstrated actual success on the merits on its claims for relief under the Lanham Act, for tortious interference, and for conspiracy to commit tortious interference.

Moreover, and critically, the Court previously entered an order granting Bluegreen's motion for a preliminary injunction to prohibit the Marketing Defendants from engaging in certain conduct relating to their offer of services to Bluegreen timeshare owners during the remainder of this action and until such time as a final judgment and permanent injunction were issued. (*See* ECF No. 487.) The Court's order was based on its conclusions at summary judgment on the merits of Bluegreen's request for injunctive relief under FDUTPA. In granting Bluegreen's request for a preliminary injunction, however, the Court necessarily found that Bluegreen has demonstrated that it will suffer irreparable injury if the injunction did not issue because the Marketing Defendants continue to engage in the deceptive business practices, with no intention of stopping. Specifically, the Court found that unless enjoined, the

Marketing Defendants will continue providing a service that depends entirely on their interference with the contractual and business relationship between Bluegreen and its customers, and that the ongoing impacts of the Marketing Defendants' conduct, which include not only a loss of customers for Bluegreen, but also consumer confusion generally, suffice to satisfy the irreparable harm prong of the analysis. (*Id.* at 3–4.) In addition, the Court concluded that the harm suffered by Bluegreen without an injunction outweighs the Marketing Defendants' potential harm if an injunction is entered and that the entry of the relief requested would serve the public's interest.

Since then, the Court has denied the Marketing Defendants' request for modification or clarification of the preliminary injunction. (*See* ECF No. 502.) After conducting a thorough review of the Marketing Defendants' submission, including the hundreds of pages of supporting exhibits, the Court found that the Marketing Defendants had not demonstrated the ability to offer the legal cancellation of Bluegreen timeshare owners' contractual interests.

The Court now finds that all the foregoing conclusions remain valid, and accordingly that Bluegreen is entitled to the entry of a permanent injunction. As to the scope of that injunction, the Court finds that the terms of the preliminary injunction remain adequate to address the Marketing Defendants' unlawful conduct. Thus, a permanent injunction is entered under those terms, as set forth below.

### 4. Conclusion

Based on the foregoing findings of fact and conclusions of law, the Court concludes that Bluegreen is **entitled to judgment against the Marketing Defendants in the amount of $100,000**, jointly and severally, which represents a disgorgement of Defendants' profits pursuant to 15 U.S.C. § 1117(a), related to the false advertising to Bluegreen timeshare owners.

Bluegreen is also entitled to permanent injunctive relief against the Marketing Defendants as follows:

### PERMANENT INJUNCTION

This cause having come to be heard upon the request for a permanent injunction by the Plaintiffs Bluegreen Vacations Unlimited, Inc. and Bluegreen Vacations Corporation (together, "Bluegreen"), this Court hereby enters the following Permanent Injunction:

### DEFINITIONS

1.      As used herein, the "Marketing Defendants" means the Defendants Pandora Marketing, LLC; William "Bo" Wilson; and Rich Folk.

2.      As used herein, "Bluegreen Interest" shall be interpreted broadly to include any Bluegreen timeshare interest, Bluegreen points-based program, or other Bluegreen vacation ownership interest of any kind, including but not

limited to all current Bluegreen timeshare products and all legacy products affiliated with Bluegreen.

3. As used herein, "Bluegreen Owner" means:

    a.   a person who owns a Bluegreen Interest; or

    b.   a person who has an existing payment obligation in favor of Bluegreen; or

    c.   any owner of a points-based timeshare ownership program denominated as a Bluegreen points-based program.

## ENJOINED CONDUCT

It is hereby **ORDERED AND ADJUDGED** that the Marketing Defendants, their officers, employees, agents, affiliated entities, and all persons acting in active concert or participation shall be RESTRAINED AND ENJOINED from:

(1)    making any misrepresentation to a Bluegreen Owner regarding the services that the Marketing Defendants, or any lawyer to which the Marketing Defendants refer, will provide in connection with a Bluegreen Interest;

(2)    communicating to a Bluegreen Client, that the Marketing Defendants have a 100% success rate, that the Marketing Defendants are 100% successful, the Marketing Defendants have always gotten Bluegreen Owners out of their timeshare, or the Marketing Defendants have never lost a case;

(3)    inducing a Bluegreen Owner to cease payment on an obligation associated with a Bluegreen Interest; or

(4)    offering for sale to any Bluegreen Owner the legal cancellation of a Bluegreen Interest unless the Marketing Defendants first demonstrate to the Court that the Marketing Defendants have the ability to deliver such service.

The Court will separately enter a final judgment contemporaneously herewith, reserving jurisdiction to consider applications for prevailing party attorney's fees under the claims asserted as may be appropriate.

**Done and ordered** at Miami, Florida on October 27, 2023.

Robert N. Scola, Jr.
United States District Judge